**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

KINGMAN HOSPITAL, INC.; ARIZONA SPINE AND JOINT HOSPITAL LLC; BULLHEAD CITY HOSPITAL CORPORATION; CARONDELET ST. JOSEPH'S HOSPITAL; HOLY CROSS HOSPITAL, INC.; HOSPITAL DEVELOPMENT OF WEST PHOENIX, INC.; NORTHWEST HOSPITAL, LLC; OASIS HOSPITAL; ORO VALLEY HOSPITAL, LLC; ORTHOPEDIC AND SURGICAL SPECIALTY COMPANY, LLC; ST. MARY'S HOSPITAL OF TUCSON; VHS ACQUISITION SUBSIDIARY NUMBER 1, INC.; VHS OF ARROWHEAD, INC.; and YUMA REGIONAL MEDICAL CENTER,

Plaintiffs

v.

TEVA PHARMACEUTICALS USA, INC.; CEPHALON, INC.; JOHNSON & JOHNSON; JANSSEN PHARMACEUTICALS, INC. (f/k/a ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC. f/k/a JANSSEN PHARMACEUTICA, INC.); ENDO HEALTH SOLUTIONS, INC.; ENDO PHARMACEUTICALS INC.; PAR PHARMACEUTICALS COMPANIES, INC. (f/k/a PAR PHARMACEUTICAL HOLDINGS, INC.); PAR PHARMACEUTICAL, INC.; ALLERGAN FINANCE, LLC (f/k/a ACTAVIS, INC. f/k/a WATSON PHARMACEUTICALS, INC.); ALLERGAN SALES, LLC; ALLERGAN USA, INC.; WATSON LABORATORIES, INC.; ACTAVIS PHARMA, INC. (F/K/A WATSON PHARMA INC.); ACTAVIS LLC (F/K/A ACTAVIS INC.); ABBOTT LABORATORIES; ABBOTT LABORATORIES, INC.; ABBVIE, INC.; AMERISOURCEBERGEN DRUG CORPORATION; XCENDA L.L.C.; CARDINAL HEALTH, INC.; ANDA, INC.; H.D. SMITH, LLC (f/k/a H.D. SMITH WHOLESALE DRUG CO.); MCKESSON CORPORATION; WALGREEN

**COMPLAINT**

**JURY TRIAL DEMANDED**

This Action Relates to:

Case No. 1:17-md-2804

Hon. Dan A. Polster

**Under:**

**Nuisance**

**Unjust Enrichment**

**Fraud and Deceit**

**Fraudulent Concealment**

**Civil Conspiracy**

**Arizona Consumer Fraud Act (A.R.S.§ 44-1522)**

**Arizona Racketeering and Illegal Control of an Enterprise Statute (A.R.S. § 13-2314.04)**

**Racketeering Influenced Corrupt Organizations Act (18. U.S.C. §§ 1961–1968)**

CO.; WALGREEN EASTERN CO., INC.; CVS PHARMACY, INC.; CVS INDIANA, L.L.C.; WALMART INC. (f/k/a/ WAL-MART STORES, INC.); and WAL-MART STORES EAST, LP,

Defendants

# TABLE OF CONTENTS

I. INTRODUCTION ....3
II. JURISDICTION AND VENUE....12
III. PARTIES....13
A. Plaintiffs ....13
B. Defendants ....15
1. Marketing Defendants and Associates....15
a. Teva and Associated Companies ....15
b. Janssen and Associated Companies....18
c. Endo and Associated Companies ....20
d. Allergan and Associated Companies ....21
e. AbbVie and Associated Companies ....24
f. Mallinckrodt (unnamed associate) ....25
g. Purdue (unnamed associate) ....25
2. Distributor Defendants....26
a. AmerisourceBergen....28
b. Anda ....28
c. Cardinal....28
d. H.D. Smith ....29
e. McKesson....29
f. Walgreens ....29
g. CVS....30
h. Walmart....30
3. Defendants' Agents and Affiliated Persons ....31
IV. DEFENDANTS CREATED ILLEGITIMATE DEMAND FOR DANGEROUS OPIOIDS. ....31
A. Opioids are dangerous and highly addictive narcotics. ....32
B. Defendants set out to change the best practices for the use of opioids....34
C. Defendants used various tactics to spread misinformation about opioids. ....41
1. Falsehood #1: The risk of addiction to opioids is low....42
2. Falsehood #2: It is easy to identify people at high risk for addiction....45

3. Falsehood #3: Signs of addictive behavior are "pseudoaddiction" requiring more opioids. ....46

4. Falsehood #4: Addicted patients are "untrustworthy" "abusers". ....48

5. Falsehood #5: Opioid withdrawal can be avoided by tapering. ....49

6. Falsehood #6: Opioid doses can be increased without limit or increased risk. ....49

7. Falsehood #7: Long-term opioid use improves functioning. ....51

8. Falsehood #8: Opioids are safer than other pain medications. ....53

9. Falsehood #9: Ostensibly "abuse-deterrent" formulations are safer. ....54

10. Falsehood #10: Short-acting opioids should be used to treat chronic, noncancer "breakthrough" pain. ....56

11. Falsehood #11: Despite heightened risk factors, the elderly and veterans can safely use opioids. ....57

D. Defendants used a campaign of misinformation to increase opioid prescriptions for common chronic ailments. ....59

1. Defendants used "detailers" to disseminate their misrepresentations directly to prescribers. ....60

2. Defendants used Front Groups to promote greater opioid use. ....62

a. American Pain Foundation ....65

b. American Academy of Pain Medicine and the American Pain Society ....71

c. Federation of State Medical Boards ....74

d. The Joint Commission and the Pain & Policy Study Group of the University of Wisconsin ....76

e. Alliance for Patient Access ....80

f. U.S. Pain Foundation ....85

g. American Geriatrics Society ....85

h. American Chronic Pain Association ....88

i. National Pharmaceutical Council ....88

j. C.A.R.E.S. Alliance ....88

k. Collaborative for Opioids REMS Education ....89

l. Other Front Groups ....90

3. The Marketing Defendants paid Key Opinion Leaders to deceptively promote opioid use. ....91

a. Dr. Russell Portenoy ....93

b. Dr. Lynn Webster ....96

c. Dr. Perry Fine ....97

d. Dr. Scott Fishman .... 100

4. Defendants disseminated their misrepresentations through Continuing Medical Education programs. .... 101

5. Defendants promoted specific opioid products to doctors and consumers. .... 103

6. Defendants used general (unbranded) advertising to promote opioid use for pain without FDA review. .... 104

7. Defendants funded, edited, and distributed publications that supported their misrepresentations. .... 105

8. Defendants used speakers' bureaus and programs to spread their deceptive messages. .... 106

E. Defendants directly targeted hospitals. .... 107

F. Defendants succeeded in getting more patients to take more opioids at higher doses for longer periods of time. .... 108

G. Deceptive marketing caused the epidemic of licit and illicit opioid use. .... 109

H. The Marketing Defendants have been investigated, convicted, and fined, but have failed to alter their behavior. .... 114

V. DEFENDANTS CAUSED THE OPIOID EPIDEMIC IN ARIZONA BY ILLEGITIMATELY INFLATING THE SUPPLY OF OPIOIDS. .... 114

A. Defendants manufactured, sold, shipped, and dispensed massive quantities of opioids into and in Arizona. .... 117

B. The Marketing Defendants who produced generic opioids produced the vast majority of opioids sold in Arizona. .... 123

C. Defendants ignored red flags of opioid diversion and failed to implement reasonable safeguards to prevent diversion. .... 124

D. The Distributor Defendants have been investigated and fined repeatedly for failing to secure their supply chains, but refuse to change their ways. .... 137

E. The Distributor Defendants misrepresented that they were complying with their duties to prevent diversion of opioids. .... 138

F. The Distributor Defendants marketed the Marketing Defendants' opioid products. .... 140

G. Defendants coordinated their flawed approach to preventing diversion through trade associations. .... 143

1. Pain Care Forum .... 144

2. Healthcare Distribution Alliance .... 145

3. National Association of Chain Drug Stores .... 149

VI. THE OPIOID EPIDEMIC CREATED BY DEFENDANTS' DRIVING OF OPIOID DEMAND AND SUPPLY HAS HARMED PLAINTIFF HOSPITALS. ........ 151
A. Impact of Opioids on Arizona Hospitals .......... 151
B. Impact of Defendants' Activities on Plaintiffs .......... 154
VII. SPECIFIC ACTIONS TAKEN BY EACH DEFENDANT TO UNLAWFULLY OVER-INFLATE THE DEMAND FOR AND SUPPLY OF PRESCRIPTION OPIOIDS .......... 157
A. Teva and Associated Companies .......... 157
1. Promotion of Specific Opioid Products .......... 162
2. General (Unbranded) Promotion of Opioids .......... 165
a. KOLs .......... 165
b. Front Groups .......... 166
c. Publications .......... 167
d. Speakers' Bureaus .......... 170
e. CMEs .......... 172
3. Suspicious Order Monitoring .......... 173
4. Enforcement Actions .......... 178
B. Janssen and Associated Companies .......... 181
1. Promotion of Specific Opioid Products .......... 186
2. General (Unbranded) Promotion of Opioids .......... 188
a. KOLs .......... 190
b. Front Groups .......... 190
c. Publications .......... 192
d. Speakers' Bureaus .......... 194
3. Activities of Noramco .......... 195
4. Cooperation with Purdue .......... 198
5. Suspicious Order Monitoring .......... 199
6. Enforcement Actions .......... 202
7. Findings by Trial Courts .......... 203
C. Endo and Associated Companies .......... 205
1. Promotion of Specific Opioid Products .......... 206
2. General (Unbranded) Promotion of Opioids .......... 209
a. KOLs .......... 209
b. Front Groups .......... 209

c. Publications ... 211

d. CMEs ... 214

3. Claims About ADFs ... 215

4. Suspicious Order Monitoring ... 219

5. Enforcement Actions ... 223

D. Allergan and Associated Companies ... 223

1. Promotion of Specific Opioid Products ... 224

2. General (Unbranded) Promotion of Opioids ... 227

3. Suspicious Order Monitoring ... 228

4. Enforcement Actions ... 234

E. AbbVie ... 234

1. Abbott's Collaboration with Purdue ... 234

2. Abbott's Other Promotion of Opioids ... 245

3. Abbott's Sales of Vicodin and Other Opioids ... 246

4. AbbVie's Continued Sale of Opioids and Support of Front Groups ... 248

F. Mallinckrodt (unnamed associate) ... 249

1. Promotion of Specific Opioid Products ... 250

2. General (Unbranded) Promotion of Opioids ... 252

3. Suspicious Order Monitoring ... 254

4. Enforcement Actions ... 254

G. Purdue (unnamed associate) ... 258

1. Promotion of Specific Opioid Products ... 263

2. General (Unbranded) Promotion of Opioids ... 269

3. Claims about ADFs ... 273

4. Claims about OxyContin's Duration of Effect ... 276

5. Plans for Addiction Treatment ... 281

6. Failure to Report Suspicious Activity ... 283

7. Enforcement Actions ... 287

H. AmerisourceBergen ... 289

1. Enforcement Actions ... 291

2. Marketing Activities ... 292

3. Distribution Actions ... 296

4. Public Statements of Compliance ... 307

I. Cardinal ..... 308
1. Enforcement Actions ..... 309
2. Marketing Activities ..... 313
3. Distribution Activities ..... 315
4. Public Statements of Compliance ..... 324
J. McKesson ..... 325
1. Enforcement Actions ..... 326
2. Marketing Activities ..... 330
3. Distribution Activities ..... 331
4. Public Statements of Compliance ..... 345
K. Anda ..... 345
1. Enforcement Actions ..... 346
2. Distribution Activities ..... 347
3. Public Statements of Compliance ..... 350
L. H.D. Smith ..... 350
1. Enforcement Actions ..... 351
2. Marketing Activities ..... 352
3. Distribution Activities ..... 353
4. Public Statements of Compliance ..... 356
M. Walgreens ..... 356
1. Enforcement Actions ..... 358
2. Marketing Activities ..... 361
3. Dispensing Activities ..... 364
4. Distribution Activities ..... 371
5. Public Statements of Compliance ..... 388
N. CVS ..... 388
1. Enforcement Actions ..... 390
2. Marketing Activities ..... 392
a. CVS's Work with Purdue ..... 396
b. CVS's Work with Endo ..... 398
c. CVS's Work with Cardinal and Actavis ..... 399
3. Dispensing Activities. ..... 399
4. Distribution Activities ..... 402

5. Public Statements of Compliance ..... 407

O. Walmart ..... 408

1. Enforcement Actions ..... 409

a. 2018 DOJ Investigation into Walmart Pharmacies in Texas ..... 412

b. December 2020 DOJ Civil Action against Walmart in Delaware ..... 414

2. Marketing Activities ..... 415

3. Dispensing Activities ..... 415

4. Distribution Activities ..... 421

5. Public Statements of Compliance ..... 428

VIII. DEFENDANTS ENGAGED IN CONCERTED ACTION TO DRIVE UP DEMAND FOR AND SUPPLY OF PRESCRIPTION OPIOIDS. ..... 429

IX. ADDITIONAL ALLEGATIONS PERTAINING TO PUNITIVE DAMAGES ..... 432

X. TOLLING AND FRAUDULENT CONCEALMENT ..... 433

XI. CAUSES OF ACTION ..... 437

A. First Claim for Relief: Nuisance ..... 437

1. Defendants interfered with a public right. ..... 437

a. Defendants' interference with the public right was unreasonable. ..... 437

b. The nuisance created by Defendants has caused Plaintiffs special injury. ..... 439

B. Second Claim for Relief: Unjust Enrichment ..... 440

C. Third Claim for Relief: Fraud and Deceit ..... 442

1. Defendants made false representations of material fact. ..... 442

2. Defendants knew that these representations were false. ..... 446

3. Defendants intended that their statements would be relied upon. ..... 447

4. Plaintiffs and others justifiably relied on Defendants' misrepresentations and omissions. ..... 447

5. Plaintiffs suffered injury as a result. ..... 448

D. Fourth Claim for Relief: Fraudulent Concealment ..... 448

E. Fifth Claim for Relief: Civil Conspiracy ..... 449

F. Sixth Claim for Relief: Arizona Consumer Fraud Act (A.R.S. § 44-1522) ..... 452

1. Marketing Violations ..... 453

2. Regulatory and Statutory Violations ..... 454

G. Seventh Claim for Relief: Arizona Racketeering and Illegal Control of an Enterprise (A.R.S. § 13-2314.04) ..... 456

1. Structure of the False Narrative Enterprise ..... 456
2. The Common Purpose and Scheme of the False Narrative Enterprise ..... 457
3. Predicate Acts ..... 458
4. Pattern of Unlawful Activity ..... 473
5. Consequences ..... 477

H. Eighth Claim for Relief: Racketeering Influenced and Corrupt Organizations Act (18 U.S.C. §§ 1961–1968) ..... 477
1. Structure of the False Narrative Enterprise ..... 478
2. The Common Purpose and Scheme of the False Narrative Enterprise ..... 479
3. Predicate Acts ..... 480
4. Pattern of Unlawful Activity ..... 494
5. Consequences ..... 498

XII. PRAYER FOR RELIEF ..... 498
XIII. JURY DEMAND ..... 498
APPENDIX ..... 501

> The decade of the 1990s was the era of the blockbuster drug, the billion-dollar pill, and a pharmaceutical sales force arms race was part of the excess of the time . . . . A pharmaceutical Wild West emerged. Salespeople stampeded into offices. They made claims that helped sell the drugs to besieged doctors. Those claims also lead years later to blockbuster lawsuits and criminal cases against their companies.[1]

## COMPLAINT

Plaintiffs Kingman Hospital, Inc.; Arizona Spine and Joint Hospital LLC; Bullhead City Hospital Corporation; Carondelet St. Joseph's Hospital; Holy Cross Hospital, Inc.; Hospital Development of West Phoenix, Inc.; Northwest Hospital, LLC; OASIS Hospital; Oro Valley Hospital, LLC; Orthopedic and Surgical Specialty Company, LLC; St. Mary's Hospital of Tucson; VHS Acquisition Subsidiary Number 1, Inc.; VHS of Arrowhead, Inc.; and Yuma Regional Medical Center (collectively, "Plaintiffs") bring this Complaint against Defendants Teva Pharmaceuticals USA, Inc.; Cephalon, Inc.; Johnson & Johnson; Janssen Pharmaceuticals, Inc. (f/k/a Ortho-McNeil-Janssen Pharmaceuticals, Inc. f/k/a Janssen Pharmaceutica, Inc.); Endo Health Solutions, Inc.; Endo Pharmaceuticals Inc.; Par Pharmaceuticals Companies, Inc. (f/k/a Par Pharmaceutical Holdings, Inc.); Par Pharmaceutical, Inc.; Allergan Finance, LLC (f/k/a Actavis, Inc. f/k/a Watson Pharmaceuticals, Inc.); Allergan Sales, LLC; Allergan USA, Inc.; Watson Laboratories, Inc.; Actavis Pharma, Inc. (f/k/a Watson Pharma Inc.); Actavis LLC (f/k/a Actavis Inc.); Abbott Laboratories; Abbott Laboratories, Inc.; AbbVie, Inc.; AmerisourceBergen Drug Corporation; Xcenda L.L.C.; Anda, Inc.; Cardinal Health, Inc.; H.D. Smith, LLC (f/k/a H.D. Smith Wholesale Drug Co.); McKesson Corporation; CVS Pharmacy, Inc.; CVS Indiana, L.L.C.; Walgreen Co.; Walgreen Eastern Co., Inc.; Walmart Inc. (f/k/a/ Wal-Mart Stores, Inc.); and Wal-Mart Stores East, LP (collectively "Defendants"), asserting claims of nuisance, fraud and deceit, fraudulent concealment, unjust enrichment, civil conspiracy, violation of the Arizona Consumer Fraud Act (A.R.S. § 44-1522), the Arizona Racketeering and Illegal Control of

[1] Sam Quinones, *Dreamland: The True Tale of America's Opiate Epidemic* 133 (2015) (hereinafter *Dreamland*).

an Enterprise Statute (A.R.S. § 13-2314.04), and the Racketeering Influenced Corrupt Organizations ("RICO") Act (18 U.S.C. §§ 1961–1968) seeking judgment against Defendants and in favor of Plaintiffs; compensatory damages; treble damages; punitive damages; pre-judgment and post-judgment interest; cost of suit; and equitable relief, including injunctive relief, and allege as follows:

## I. INTRODUCTION

1. Plaintiffs operate hospitals that provide acute care throughout Arizona, including treatment of opioid-dependent patients and patients suffering from opioid-related conditions.[2] These patients routinely seek services at Plaintiffs' emergency rooms and occupy beds in Plaintiffs' hospitals. Hospitals are legally and morally compelled to act and treat all of these patients, regardless of the cost of treatment.

2. This crisis has a cause. Defendants cooperated to sell, ship, and dispense ever-increasing quantities of opioids into and within Arizona. To create newfound demand for opioids, Defendants used unfair and misleading marketing—including the use of front groups, paid "opinion leaders," and Continuing Medical Education courses ("CMEs")[3]—to convince both doctors and patients that opioids could safely be prescribed for common ailments that cause chronic pain. To meet the artificially inflated demand, Defendants sold, shipped, and dispensed opioids in quantities that could not possibly have been medically justified and in the face of clear evidence that opioids were being diverted for illegitimate uses. Defendants' plan succeeded, and they recorded multibillion-dollar profits as a result.

---

[2] "Opioid-related conditions" include but are not limited to opioid addiction and overdose; psychiatric and mental health treatment; neonatal abstinence syndrome ("NAS") or other opioid-related conditions of newborns; illnesses associated with opioid use, such as endocarditis, hepatitis C, and HIV; surgical procedures that are more complex and expensive due to opioid addiction; illnesses or other conditions claimed by a person with opioid addiction in order to obtain an opioid prescription; and any other condition identified in Plaintiffs' records as related to opioid use and abuse.

[3] For the Court's convenience, abbreviations are defined in the text on their first use and a glossary of abbreviations is appended to this Complaint.

3. The origins of the opioid epidemic stretch back to the 1990s when Purdue released its blockbuster opioid, OxyContin. To ensure uptake of this new drug by the medical establishment, Purdue engaged in an extensive marketing campaign in which it was soon joined by Defendants with a single coordinated message: opioids are safe and should be prescribed liberally for chronic pain.

4. Purdue's marketing brought about a "paradigm shift" in attitudes towards prescribing opioids for chronic pain.[4] After witnessing OxyContin's blockbuster success, "other pharmaceutical firms rushed to develop and promote their *own* long-acting painkillers."[5] They did so with "rank indifference to the dangers they posed."[6]

5. To further their scheme, Defendants conspired with Purdue and others to cause changes in the standard of care used by the medical profession (especially hospitals) for treating pain. This new (and ultimately unattainable) goal of eradicating all pain drove a rapid and sustained increase in prescriptions for opioids, facilitated by Defendants' marketing encouraging consumers to seek out opioids and medical professionals to write ever more prescriptions for ever stronger opioids.

6. Defendants' organized campaign to increase the demand for opioids worked as planned. Opioid sales—less than $1 billion in 1992—ballooned to $8 billion in 2015.

7. As demand rose, supply rose with it. The Drug Enforcement Administration ("DEA") sets quotas for the amount of controlled substances that can be manufactured (and hence distributed and dispensed) in a given year. Defendants engaged in a concerted campaign to convince regulators to raise these quotas to unprecedented heights, enabling Defendants to sell more and more opioids. At the same time, each Defendant was a distributor of opioids. Distributors have an obligation to detect and refuse to ship suspicious orders in order to prevent the possibility that controlled substances will be diverted out of legitimate channels. Defendants failed to develop sufficiently robust

---

[4] Patrick Radden Keefe, *Empire of Pain* 367 (2021) (hereinafter *Empire of Pain*).
[5] *Id.* at 245.
[6] *Id.* at 419.

systems to detect suspicious orders, collaborated with their customers on ways to avoid triggering review of orders as suspicious, and failed to halt shipment of potentially suspicious orders until the suspicion was dispelled.

8. The result was a flood of opioids into the state of Arizona far in excess of what could possibly have been serving a legitimate need. In 2018, there were 50.7 opioid prescriptions written for every 100 persons.[7]

9. It is inconceivable that so many pills were medically justified. Simply put, Defendants had to know that some of these opioids were being diverted—there were just too many being distributed into Arizona. In total, Defendants have sold and shipped hundreds of millions of opioid pills in Arizona. The Automation of Reports and Consolidated Orders System ("ARCOS") database maintained by the DEA shows the number of pills of hydrocodone and oxycodone delivered to Arizona that each participant in the conspiracy alleged in this Complaint manufactured, distributed, or dispensed between 2006 and 2014:

Mallinckrodt – 842 million pills manufactured

Actavis – 826 million pills manufactured

Par Pharmaceutical – 251 million pills manufactured

Purdue – 95 million pills manufactured

Teva – 19 million pills manufactured

AbbVie – 8 million pills manufactured

Endo – 6 million pills manufactured

Allergan – 129 thousand pills manufactured

McKesson – 511 million pills distributed

---

[7] U.S. State Opioid Dispensing Rates, 2018, Ctrs. for Disease Control & Prevention, https://www.cdc.gov/drugoverdose/maps/rxstate2018.html (last visited Aug. 2, 2021).

Cardinal – 358 million pills distributed

AmerisourceBergen – 262 million pills distributed

Anda – 10 million pills distributed

H.D. Smith – 588 thousand pills distributed

Walgreens – 667 million pills distributed; 811 million pills dispensed

Walmart – 171 million pills distributed; 164 million pills dispensed

CVS – 133 million pills distributed; 332 million pills dispensed

10. With such quantities of pills flowing into Arizona, diversion of those pills was inevitable. Joseph Rannazzisi, the retired head of the DEA's Office of Diversion Control, has testified that diversion leads to addiction, overdose, and death.

11. Opioids are powerful narcotics that include non-synthetic, partially synthetic, and fully synthetic derivatives of the opium poppy. Opioids are highly addictive, and their use can result in serious medical complications, including opioid use disorder and fatal overdoses. From 1999 to 2019, nearly 247,000 people died in the United States from overdoses related to prescription opioids,[8] and 2017 estimates indicated that opioids could kill as many as 500,000 people in the United States by 2027.[9]

12. Obtaining opioids pursuant to a valid prescription and taking them as directed is no shield against abuse, addiction, or overdose. A systematic review found that the prevalence of opioid misuse following prescription of opioids for chronic pain is between 21 and 29% and that the prevalence of addiction is between 8 and 12%.[10] An investigation by the Massachusetts Attorney General determined that between 2009 and 2018, 671 people in that state had filled a prescription for

[8] *Drug Overdose Overview*, Ctrs. for Disease Control & Prevention, https://www.cdc.gov/drugoverdose/deaths/prescription/overview.html (last visited July 21, 2021).

[9] Max Balu, *STAT Forecast: Opioids Could Kill Nearly 500,000 Americans in the Next Decade* (June 27, 2017), https://www.statnews.com/2017/06/27/opioid-deaths-forecast/.

[10] Kevin E. Vowles, *Rates of Opioid Misuse, Abuse, and Addiction in Chronic Pain: A Systematic Review and Data Synthesis*, 156 Pain 569 (2015), https://pubmed.ncbi.nlm.nih.gov/25785523/.

a Purdue opioid and later died of an opioid-related overdose.[11] Similarly, a study by United Health showed that hundreds of thousands of its policyholders had been prescribed Purdue opioids and then subsequently diagnosed with opioid use disorder ("OUD").[12]

13. The opioid epidemic poses an ongoing crisis in Arizona. In 2018, there were 1,106 opioid-related overdose deaths in Arizona – a rate of 15.9 deaths per 100,000 individuals compared to the national rate of 14.6 deaths per 100,000.[13]

14. Opioid abuse has reached epidemic levels in Arizona. According to the Arizona Department of Health Services, between June 15, 2017 and September 3, 2021, there were 10.349 suspect opioid deaths, 77,096 suspect opioid overdoses, 2,913 cases of neonatal abstinence syndrome, and 41,260 doses of the overdose-reversal drug, naloxone, dispensed.[14]

15. The progression from prescription opioids to the use of illicit drugs, particularly injectable heroin, is well documented; approximately 75% of heroin users reporting that their initial drug use was through prescription opioids.[15] As Arizona citizens who become addicted to prescription opioids have predictably migrated to less expensive illicit opioids, namely heroin and fentanyl, overdoses have dramatically increased. Between 2008 and 2019, opioid overdose deaths increased from 586 per year to 1,359 per year while deaths from heroin overdose increased from 69 to 289 annually in the same period.[16] Of individuals who died from an opioid overdoses for whom toxicology

---

[11] *Empire of Pain*, *supra*, at 381.

[12] *Id.* at 419.

[13] *Arizona: Opioid-Involved Deaths and Related Harms*, Nat'l Inst. on Drug Abuse, https://www.drugabuse.gov/drug-topics/opioids/opioid-summaries-by-state/arizona-opioid-involved-deaths-related-harms (last visited Sept. 9, 2021).

[14] *Opioid Epidemic*, Ariz. Dep't Health Servs., https://www.azdhs.gov/prevention/womens-childrens-health/injury-prevention/opioid-prevention/index.php (last visited Sept. 8, 2021).

[15] Theodore J. Cicero, et al., *The Changing Face of Heroin Use in The United States: A Retrospective Analysis of The Past 50 Years*, 71 JAMA Psychiatry (2014), https://www.seattle.gov/documents/departments/cityAttorney/opioidLitigation/FN9-JAMAPsychiatry-ChangingFaceHeroinUse.%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.pdf.

[16] Ariz. Dep't of Health Servs., *2019 Opioid Deaths & Hospitalizations* (n.d.), https://www.azdhs.gov/documents/prevention/health-systems-development/epidamic/2019-opioid-death-hospitalizations.pdf.

results are available, 57.7% tested positive for fentanyl.[17] Janssen manufacturers Duragesic, a transdermal fentanyl patch.

16. Opioids have endangered public health in Arizona even beyond addiction and overdose. Addicts who are not killed by drug addiction experience a variety of health consequences (including non-fatal overdoses) and engage in a variety of risky drug-seeking behaviors. Widespread drug addiction imposes costs on the community including health care costs (a substantial portion of which were paid by Plaintiffs), increased costs and burdens imposed on the criminal justice system, and costs associated with the lost productivity of addicts.[18] Recognizing these costs, Arizona's Attorney General has brought lawsuits to hold members of the Sackler family and their advisors McKinsey & Company to account for flooding Arizona communities with dangerous prescription drugs.

17. Children have been especially vulnerable to the opioid epidemic. Along with being psychologically injured when removed from their homes due to opioid abuse and addiction, children born to mothers addicted to opioids also suffer from neonatal abstinence syndrome ("NAS"). Infants with an NAS-related diagnosis are more likely to have respiratory disorders, low birth weight, and seizures.[19] These infants will spend days or weeks in neonatal intensive care units while they painfully withdraw from the drugs. When untreated, NAS can be life-threatening.

18. On average, a child suffering from NAS will stay in the hospital nearly 3.5 times as long as a child without NAS.[20] The average treatment cost for a child suffering from NAS is over three times that of a child who does not have NAS.[21]

---

[17] *Id.*

[18] Alex Brill & Scott Ganz, Am. Enter. Inst., *The Geographic Variation in the Cost of the Opioid Crisis* 1–4, (2018), https://www.aei.org/wp-content/uploads/2018/03/Geographic_Variation_in_Cost_of_Opioid_Crisis.pdf.

[19] S.W. Patrick, et al., *Risk of Hospital Readmission Among Infants With Neonatal Abstinence Syndrome*, 5 Hosp. Pediatrics 513 (2015), https://doi.org/10.1542/hpeds.2015-0024.

[20] Tammy E. Corr & Christopher S. Hollenbeak, *The Economic Burden of Neonatal Abstinence Syndrome in the United States*, 112 Addiction 1590 (2017), https://pubmed.ncbi.nlm.nih.gov/28612362/.

[21] *Id.*

19. Plaintiffs have directly paid the cost of the epidemic of opioid use and misuse caused by Defendants. The average cost of providing care for patients diagnosed with an opioid use disorder is eight times higher than for those without an opioid use disorder.[22] Plaintiffs must still provide patients with complete care, but private and government insurance does not fully cover these increased costs. This financial impact on Plaintiffs proceeds directly from Defendants' misconduct in driving inflated demand for and supply of prescription opioids in Arizona.

20. By providing care to patients who would not have had opioid-related conditions but for Defendants' misconduct, hospitals have absorbed the consequences of Defendants' illegal activities.

21. Defendants reaped billions of dollars in revenues while they knew, or should reasonably have known, that they were forcing hospitals to pick up the tab for the additional expenses that were a direct and foreseeable consequence of their actions.

22. Plaintiffs bring this civil action to recover for the financial impact of providing care to patients with opioid-use disorders and opioid-related conditions that were acquired as a direct and proximate result of Defendants' false, deceptive, and unfair marketing, distribution, and dispensing of opioids.

23. In recognition of Defendants' many and repeated violations of their legal obligations, numerous prosecutorial and enforcement authorities have brought actions, levied fines, and reached settlements with Defendants for misconduct involving the marketing, distribution, and dispensing of opioids.

24. Enforcement authorities that have investigated and/or brought successful actions against Defendants include (but are not limited to):

---

[22] Alan G. White, et al., *Direct Costs of Opioid Abuse in an Insured Population in the United States*, 11 J. Managed Care Pharmacy 469 (2005).

a. The Food and Drug Administration (Cephalon, Janssen, Endo, Actavis)

b. The Department of Justice (Cephalon, AmerisourceBergen, McKesson, Walmart)

c. The Department of Health and Human Services (Cephalon, Janssen)

d. The Drug Enforcement Administration (AmerisourceBergen, Cardinal, McKesson, Anda, Walgreens, CVS, Walmart)

e. The U.S. Attorney's Office for the Eastern District of New York (J&J, AmerisourceBergen, Cardinal)

f. The U.S. Attorney's Office for the Southern District of Florida (Walgreens)

g. The U.S. Attorney's Office for the District of New Jersey (AmerisourceBergen)

h. The U.S. Attorney's Office for the District of Maryland (Cardinal, CVS)

i. The U.S. Attorney's Office for the District of Rhode Island (CVS)

j. The U.S. Attorney's Office for the Eastern District of California (CVS)

k. The U.S. Attorney's Office for the Northern District of Alabama (CVS)

l. The U.S. Attorney's Office of the District of Massachusetts (CVS)

m. The House Energy and Commerce Committee (H.D. Smith)

n. The West Virginia Attorney General's Office (AmerisourceBergen, Cardinal, H.D. Smith, Anda, Walgreens)

o. The Florida Attorney General's Office (Endo, Janssen, J&J, Teva, Allergan, Actavis, AmerisourceBergen, Cardinal, Walgreens)

p. The Massachusetts Attorney General's Office (Walgreens)

q. The New York Attorney General's Office (Endo, Cardinal, Anda)

r. The New York State Department of Financial Services (J&J)

25. Arizona has expressed a clear public policy in favor of rigorous controls by pharmacies over the distribution and dispensing of opioids. In 2007, Arizona had implemented the Controlled Substances Prescription Monitoring Program and required pharmacists to input information about controlled substance prescriptions into a computer system daily; this information is vital to hospitals

who need to be able to use that system to determine whether a particular patient presenting at the hospital is already receiving opioids. Without this information, a hospital cannot make appropriate decisions regarding treatment.

26. In 2018, during a special legislative session, the legislature passed and the governor signed the Arizona Opioid Epidemic Act. This act strengthened the PMP by requiring pharmacists to check a patient's record for the previous twelve months before dispensing an opioid. This latter step recognized a duty to prevent patients from receiving excessive amounts of opioids, which would then be likely to be diverted.

27. The Arizona Opioid Epidemic Act also prohibited filling any controlled substance prescription more than ninety days after it was issued and required, after a short delay to allow the technology to be fully adopted, that all controlled substances prescriptions be electronic. By requiring pharmacies to invest in equipment to be able to receive electronic prescriptions, the legislature announced a public policy regarding pharmacies' role in preventing diversion when dispensing opioids.

28. This Court must now hold Defendants to account in order to make Plaintiffs whole and provide them with the resources to remediate the devastating consequences of the opioid crisis they caused in Arizona.

29. Plaintiffs acknowledge the unusual length of this Complaint. However, other courts accessing complaints regarding the marketing, distribution, and dispensing of opioids have suggested that a substantial level of factual detail about the full range of conduct of each separate defendant is necessary in order to state a claim for relief.[23] The length of the present Complaint is designed to preemptively address this concern by detailing the length and breadth of Defendants' misconduct.

---

[23] In a case brought by hospitals in Arkansas in a 335-page complaint, the court dismissed claims against an even larger group of opioid defendants for failure to plead sufficient facts about each defendant. Order of Dismissal of All Claims without Prejudice as to Distributor, Generic Manufacturer, and Pharmacy Defendants, *Fayetteville Ark. Hosp. Co. v.*

30. Certain of the allegations concerning Defendants' conduct in Arizona are made on information and belief because the conduct was the result of nationwide or multi-state policies of Defendants that operate integrated national and/or international businesses.

## II. JURISDICTION AND VENUE

31. This Court has subject matter jurisdiction based on the federal claims asserted under the Racketeering Influenced Corrupt Organizations Act, 18 U.S.C. § 1961–1968. This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.SC.. § 1367 because those are so related to Plaintiffs' federal claims that they form part of the same case or controversy.

32. This Court has personal jurisdiction over Defendants because at all relevant times Defendants engaged in substantial business activities in Arizona and Ohio and purposefully directed their actions toward these States, consensually submitted to the jurisdiction of these States when obtaining licenses or permits to manufacturer, distribute, and/or dispense prescription opioids, and have the requisite minimum contacts with these States necessary to constitutionally permit this Court to exercise jurisdiction.

33. Venue is proper in this District and in the District of Arizona under 28 U.S.C. § 1391 and 18 U.S.C. § 1965 because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in these Districts and each Defendant transacted affairs and conducted activity that gives rise to the claims for relief in these Districts.

---

*Amneal Pharm., LLC*, No. 72CV-20-156 (Cir. Ct. Wash. Cty., Ark. Mar. 24, 2021); *see also* Plaintiffs' Omnibus Response to Defendants' Motions to Dismiss Fourth Amended Complaint, *State of Arkansas ex rel. Chrestman v. Cephalon, Inc.*, 18CV-2018-268 (Cir. Ct. Crittenden Cty., Ark. Filed Feb. 26, 2021) (explaining that an amended complaint adding factual allegations regarding the conduct of dismissed defendants had been filed to address concerns about so-called "one-paragraph defendants" whose individual conduct had not been not explicated in the initial complaint); *North Broward Hosp. Dist. v. Sackler*, No. CACE19018882 (17th Jud. Cir. Broward Cty., Fla. Oct. 9, 2020) (dismissing claims in part because the complaint "fail[ed] to identify what, if any specific actions were allegedly performed by the respective Defendants").

34. Venue is also proper in this District pursuant to Case Management Order No. 1, which provides for direct filing in this Court for any Plaintiff whose case would be subject to transfer to this MDL.[24]

## III. PARTIES

### A. Plaintiffs

35. Abrazo Community Health Network is a trade name of a network of healthcare facilities in the Phoenix, Arizona metropolitan area. It includes five acute-care hospitals: Abrazo Arizona Heart Hospital, Abrazo Arrowhead Campus, Abrazo Central Campus, Abrazo Scottsdale Campus and Abrazo West Campus.

36. Plaintiff VHS of Arrowhead, Inc. ("VHS") is a Delaware corporation with its principal place of business in Dallas, Texas. VHS (1) operates a hospital under the trade name of Abrazo Arizona Heart Hospital at 1930 East Thomas Rd., Phoenix, AZ 85016; (2) operates a hospital under the trade name of Abrazo Central Campus at 2000 West Bethany Home Rd., Phoenix, AZ 85015; and (3) operates a hospital by the trade name of Abrazo Arrowhead Campus at 18701 North 67th Ave., Glendale, AZ 85308.

37. Plaintiff Hospital Development of West Phoenix, Inc. is a Delaware Corporation with its principal place of business at 13677 West McDowell Rd., Goodyear, AZ 85395, where it operates a hospital by the trade name Abrazo West Campus.

38. Plaintiff VHS Acquisition Subsidiary Number 1, Inc. is a Delaware Corporation with its principal place of business at 3929 E. Bell Rd., Phoenix, AZ 85032, where it operates a hospital by the trade name Abrazo Scottsdale Campus.

---

[24] Case Management Order One, Dkt. No. 232, *In re Nat'l Prescription Opiate Litig.*, No. 17-md-2804 (Apr. 11, 2018).

39. Arizona Spine and Joint Hospital LLC is a limited liability company organized under the laws of the State of Arizona with its principal place of business in Mesa, Arizona. Arizona Spine and Joint Hospital LLC operates Arizona Spine & Joint Hospital in Mesa, Arizona.

40. Orthopedic and Surgical Specialty Company, LLC is a limited liability company organized under the laws of the State of Arizona with its principal place of business in Chandler, Arizona. Orthopedic and Surgical Specialty Company, LLC operates a hospital under the trade name Arizona Specialty Hospital in Chandler, Arizona.

41. Holy Cross Hospital, Inc. is a non-profit corporation organized under the laws of the State of Arizona, with its principal place of business in Nogales, Arizona. It has been a part of the Carondelet Health Network since the Sisters of St. Joseph of Carondelet began managing the hospital in the early 1980s.

42. Plaintiff Kingman Hospital, Inc. is an Arizona nonprofit corporation located at 3269 Stockton Hill Road, Kingman, AZ 86409. Kingman Hospital operates a hospital doing business as Kingman Regional Medical Center in Kingman, Arizona.

43. Northwest Hospital, LLC is a limited liability company organized under the laws of the State of Delaware. It owns and operates a hospital under the trade name Northwest Medical Center located at 6080 N. LaCholla Blvd. Tucson, AZ 85741.

44. Oro Valley Hospital, LLC is a limited liability company organized under the laws of the State of Delaware. It owns and operates a hospital located at 1551 E. Tangerine Road, Tucson, AZ 85755.

45. The Orthopedic and Spine Inpatient Surgical (O.A.S.I.S) Hospital is a specialty orthopedic facility in Phoenix, Arizona providing orthopedic surgery and diagnostic services. It is a joint venture of United Surgical Partners International, Inc. (a Delaware corporation with its principal

place of business in Addison, Texas), and Dignity Health (a California nonprofit corporation with its principal place of business in Rancho Cordova, California).

46. Carondelet St. Joseph's Hospital is a corporation organized under the laws of the State of Arizona, with its principal place of business in Tucson, Arizona. It operates under the trade name St. Joseph's Hospital & Medical Center.

47. St. Mary's Hospital of Tucson is a non-profit corporation organized under the laws of the State of Arizona with its principal place of business in Tucson, Arizona. St. Mary's Hospital is Southern Arizona's longest continuously operating hospital (founded in 1880 by the Sisters of St. Joseph of Carondelet).

48. Bullhead City Hospital Corporation is a corporation organized under the laws of the State of Arizona, with its principal place of business in Bullhead City, Arizona. It operates a hospital under the name Western Arizona Regional Medical Center in Bullhead City, Arizona

49. Yuma Regional Medical Center is a non-profit corporation organized under the laws of the State of Arizona, with its principal place of business in Yuma, Arizona. It operates a hospital by the same name in Yuma, Arizona.

## B. Defendants

### 1. Marketing Defendants and Associates

#### a. Teva and Associated Companies

50. Teva Pharmaceutical Industries, Ltd. ("Teva Ltd.") is an Israeli corporation with its principal place of business in Petach Tikva, Israel.

51. Defendant Teva Pharmaceuticals USA, Inc. ("Teva USA") is a Delaware corporation with its principal place of business in Pennsylvania and is a wholly owned subsidiary of Teva Ltd.

52. Defendant Cephalon, Inc. ("Cephalon") is a Delaware corporation with its principal place of business in Frazer, Pennsylvania. In October 2011, Teva Ltd., acquired Cephalon, which became a wholly owned subsidiary of Teva Ltd.

53. Teva USA and Cephalon worked together to manufacture, promote, sell, and distribute the branded opioids Actiq (fentanyl citrate) and Fentora (fentanyl buccal) in the United States. Since Teva Ltd.'s acquisition of Cephalon in October 2011, Teva USA has conducted all sales and marketing activities for Cephalon in the United States through its "specialty medicines" division.[25] Teva USA holds out Actiq and Fentora as Teva products to the public. The FDA-approved prescribing information and medication guide, which is distributed with Cephalon opioids, discloses that the guide was submitted by Teva USA and directs physicians to contact Teva USA to report adverse events.[26] Until as recently as 2019, Cephalon's promotion websites for Actiq and Fentora displayed Teva Ltd.'s logo.[27] Teva USA's parent company, Teva Ltd., lists Cephalon and Teva USA's sales as its own on its financial reports, and its year-end report for 2012—the year immediately following the Cephalon acquisition—attributed a 22% increase in its specialty medicine sales to "the inclusion of a full year of Cephalon's specialty sales," including *inter alia* sales of Fentora.[28]

54. Teva Ltd. acquired Defendants Watson Laboratories, Inc.; Actavis LLC; and Actavis Pharma, Inc. from Allergan plc on August 2, 2016, as part of an acquisition of Allergan's global generic pharmaceutical business, which included manufacturing and selling generic opioids.

---

[25] *Teva Completes Acquisition of Cephalon*, Fierce Pharma (Oct. 14, 2011), https://www.fiercepharma.com/pharma/teva-completes-acquisition-of-cephalon; *Cephalon – Overview*, LinkedIn, https://www.linkedin.com/company/cephalon/about/ (last visited July 12, 2021).

[26] *Actiq Package Insert*, U.S. Food & Drug Admin. (Apr. 5, 2021), https://www.accessdata.fda.gov/drugsatfda_docs/label/2021/020747s053lbl.pdf; *Fentora Package Insert*, U.S. Food & Drug Admin. (Apr. 4, 2021), https://www.accessdata.fda.gov/drugsatfda_docs/label/2021/021947s034lbl.pdf.

[27] *See*, e.g., *Actiq*, Actiq.com, https://web.archive.org/web/20180313214430/http://www.actiq.com/ (last accessed July 13, 2021 as of Mar. 23, 2019) (displaying logo at bottom-left); *Fentora*, Fentora.com, https://web.archive.org/web/20190402193423/http://www.fentora.com/ (last accessed July 13, 2021 as of Apr. 2, 2019) (displayed logo at bottom-right).

[28] Teva Pharm. Indus. Ltd., *Form 20-F* (Feb. 12, 2013), https://www.annualreports.com/HostedData/AnnualReportArchive/t/NASDAQ_TEVA_2013.pdf.

55. Teva also sold generic opioids prior to the acquisition of Watson Laboratories, Inc.; Actavis LLC; and Actavis Pharma, Inc. Teva was the Abbreviated New Drug Application ("ANDA") holder for generic hydrocodone bitartrate and ibuprofen tablets (generic Vicoprofen and approved by the FDA in 2003) and the ANDA holder (through its subsidiary Barr Pharmaceuticals ("Barr"), which Teva acquired in 2008) for generic meperidine hydrochloride tablets (generic Demerol and approved by the FDA in 1984). An ANDA allows the sale of a generic version of a branded drug. On September 5, 2006 (prior to the acquisition of Barr), Teva granted Barr a license to manufacture and sell generic Actiq.

56. Teva Ltd., Teva USA, and Cephalon are referred to herein as "Teva."

57. On August 28, 2020, Teva was indicted for three separate conspiracies in the early- to mid-2010s to fix the prices of generic drugs:

a. Conspiracy with Glenmark and Apotex to fix the price of pravastatin and other generics. Apotex admitted its participation in this conspiracy as part of a deferred prosecution agreement and agreed to pay a $24.1 million fine.

b. Conspiracy with Taro Pharmaceuticals and its vice president, Ara Aprahamian to fix the price of carbamazepine, clotrimazole topical solution, etodolac, fluocinonide cream, and warfarin, among other generics. Taro admitted its participation in this conspiracy as part of a deferred prosecution agreement and agreed to pay a $205 million fine.

c. Conspiracy with Sandoz to fix the price of, among other generics, etodolac, nadolol, temozolomide, and tobramycin. Sandoz admitted its participation in this conspiracy as part of a deferred prosecution agreement and agreed to pay a $195 million fine.[29]

Teva's willingness to conspire with other drugmakers to artificially raise the price of valuable and, in some cases, lifesaving drugs demonstrates Teva's attitude toward its legal and regulatory responsibilities regarding the drugs it manufactures, markets, and sells.

[29] *Seventh Generic Drug Manufacturer is Charged in Ongoing Criminal Antitrust Investigation*, U.S. Dep't Just. (Aug. 25, 2020), https://www.justice.gov/opa/pr/seventh-generic-drug-manufacturer-charged-ongoing-criminal-antitrust-investigation.

58. Teva and/or its corporate affiliates have held Arizona prescription drug manufacturer permits since at least 2007 and Arizona prescription drug wholesaler permits since at least 2001.

### b. Janssen and Associated Companies

59. Defendant Johnson & Johnson is a New Jersey corporation with its principal place of business in New Brunswick, New Jersey.

60. Defendant Janssen Pharmaceuticals, Inc. is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey, and is a wholly owned subsidiary of J&J. Janssen Pharmaceuticals, Inc. was formerly known as Ortho-McNeil-Janssen Pharmaceuticals, Inc., which was formerly known as Janssen Pharmaceutica, Inc.

61. J&J is the only company that owns over 10% of Janssen Pharmaceuticals, Inc.'s stock. Janssen Pharmaceuticals, Inc.'s profits inure to J&J's benefit. J&J controls the development, sale, and marketing of Janssen Pharmaceuticals, Inc.'s drugs. For example, according to its website, J&J's policies "govern[]" the "sales and marketing practices" for the "Johnson & Johnson family of companies," which includes Janssen Pharmaceuticals, Inc. J&J also "provides sales representatives with ongoing scientific training and product knowledge," as well as training on J&J policies.[30] J&J employees monitor and enforce Janssen Pharmaceuticals, Inc.'s compliance with J&J's policies. Janssen Pharmaceuticals Inc.'s website provides links to J&J's policies.[31] J&J corresponded with the U.S. Food and Drug Administration (the "FDA") regarding Janssen's opioids and marketing practices.

62. Janssen, like many other companies, has a corporate code of conduct, which sets forth the organization's mission, values, and principles. Janssen's employees are required to read, understand, and follow its Code of Conduct for Health Care Compliance. J&J imposes this code of

---

[30] *Position on Ethical Sales and Marketing*, Johnson & Johnson, https://www.jnj.com/about-jnj/policies-and-positions/our-position-on-ethical-sales-and-marketing (last visited July 12, 2021).

[31] *See, e.g.*, *Transparency*, Janssen, https://www.janssen.com/transparency (last updated July 12, 2021) (linking to J&J's Ethical Code of Conduct).

conduct on Janssen as a pharmaceutical subsidiary of J&J. Documents posted on J&J's and Janssen's websites confirm J&J's control of the development and marketing of opioids by Janssen. Janssen's website, *Ethical Code of Conduct of Research and Development*, names only J&J and does not name Janssen anywhere within the document. The *Ethical Code of Conduct of Research and Development* posted on Janssen's website is J&J's company-wide ethical code, which J&J requires all subsidiaries to follow.[32]

63. The *Every Day Health Care Compliance Code of Conduct* is a J&J company-wide document that describes Janssen as one of the "Pharmaceutical Companies of Johnson & Johnson" and as one of the "Johnson & Johnson Pharmaceutical Affiliates." It governs how "[a]ll employees of Johnson & Johnson Pharmaceutical Affiliates," including those of Janssen, "market, sell, promote, research, develop, inform and advertise Johnson & Johnson Pharmaceutical Affiliates' products." All Janssen officers, directors, employees, and sales associates must certify that they have "read, understood and will abide by" the code. The code governs all of the forms of marketing at issue in this case.[33]

64. J&J, Janssen Pharmaceuticals, Inc., Ortho-McNeil-Janssen Pharmaceuticals, Inc., and Janssen Pharmaceutica, Inc. (collectively, "Janssen") are or have been in the business of manufacturing, selling, promoting, and/or distributing both brand name and generic opioids throughout the United States.

65. Janssen and/or its corporate affiliates have held prescription drug wholesaler permits under Arizona law since at least 2007.

---

[32] *See id.*; *Ethical Code for the Conduct of Research and Development*, Johnson & Johnson, https://www.jnj.com/about-jnj/policies-and-positions/ethical-code-for-the-conduct-of-research-and-development (last visited July 12, 2021).

[33] Janssen: Pharmaceutical Companies of Johnson & Johnson, *Every Day Health Care Compliance Code of Conduct* (n.d.).

### c. Endo and Associated Companies

66. Defendant Endo Pharmaceuticals Inc. is a wholly owned subsidiary of Defendant Endo Health Solutions, Inc. Both are Delaware corporations with their principal places of business in Malvern, Pennsylvania.

67. In 2010, Endo Pharmaceuticals Inc. acquired Qualitest, a large manufacturer of generic drugs, including generic opioids.[34]

68. Defendant Par Pharmaceutical, Inc. is a Delaware corporation with its principal place of business located in Chestnut Ridge, New York. Par Pharmaceutical, Inc. is a wholly owned subsidiary of Par Pharmaceuticals Companies, Inc. f/k/a Par Pharmaceutical Holdings, Inc.

69. Defendant Par Pharmaceuticals Companies, Inc. f/k/a Par Pharmaceutical Holdings, Inc. is a Delaware corporation with its principal place of business located in Chestnut Ridge, New York. It is the parent company of Par Pharmaceutical, Inc. Par Pharmaceutical, Inc. and Par Pharmaceuticals Companies, Inc. are referred to collectively as "Par Pharmaceutical."

70. Par Pharmaceutical was acquired by Endo International plc in September 2015 and is an operating company of Endo International plc. Before this merger, Par Pharmaceutical manufactured generic drugs, including generic opioids.

71. After the acquisition, Qualitest was folded into Par Pharmaceutical to consolidate Endo's generic product lines.

72. Endo Health Solutions, Inc.; Endo Pharmaceuticals Inc.; Par Pharmaceutical, Inc.; and Par Pharmaceuticals Companies, Inc. are collectively referred to herein as "Endo."

---

[34] *Endo Pharmaceuticals Announces Agreement to Acquire Qualitest Pharmaceuticals for $1.2 Billion*, Endo.com (Sept. 28, 2010), https://investor.endo.com/news-releases/news-release-details/endo-pharmaceuticals-announces-agreement-acquire-qualitest.

73. Endo manufactures the branded opioids Percocet (oxycodone and acetaminophen), Opana (oxymorphone hydrochloride), and Percodan (oxycodone and aspirin). Through Par Pharmaceutical, Endo also manufactures and sells generic opioids, including oxycodone, oxymorphone, hydromorphone, and hydrocodone.

74. Endo previously manufactured Opana ER (extended release oxymorphone hydrochloride). On June 8, 2017, the FDA requested that Endo remove Opana ER from the market because of a "serious outbreak" of HIV and hepatitis C among opioid users after its reformulation from a nasal spray to an injectable.[35] This was the first time the agency had ever moved to pull an opioid medication from sale. Endo removed Opana ER from the market in July 2017.[36]

75. Endo has promoted, marketed, advertised, and sold its opioid products in Arizona, including Percocet, Opana, and Opana ER.

76. Par Pharmaceutical and/or its corporate affiliates has held an Arizona prescription drug wholesaler permit since at least 2005 and an Arizona prescription drug manufacturers permit since at least 2019. Endo and/or its corporate affiliates have held an Arizona prescription drug manufacturer permit from 2009 to 2010 and an Arizona prescription drug wholesale permit since at least 2003.

**d. Allergan and Associated Companies**

77. Allergan plc is a public limited company incorporated in Ireland with its principal place of business in Dublin, Ireland. Allergan plc does business in the United States through its U.S.

---

[35] *FDA Requests Removal of Opana ER for Risks Related to Abuse*, U.S. Food & Drug Admin. (June 8, 2017), https://www.fda.gov/news-events/press-announcements/fda-requests-removal-opana-er-risks-related-abuse (hereinafter *FDA Requests Removal of Opana ER*).

[36] *Endo Provides Update on Opana ER*, Endo (July 6, 2017), https://investor.endo.com/news-releases/news-release-details/endo-provides-update-opanar-er (hereinafter *Endo Provides Update*).

Specialized Therapeutics and U.S. General Medicine segments, which together generated nearly 80% of the company's $15.8 billion in net revenue in 2018.

78. Defendant Allergan Finance, LLC is a Nevada limited liability company headquartered in Madison, New Jersey. Allergan Finance, LLC is a wholly owned subsidiary of Allergan plc.

79. Defendant Allergan Sales, LLC is incorporated in Delaware and headquartered in Irvine, California.

80. Defendant Allergan USA, Inc. is incorporated in Delaware and headquartered in Madison, New Jersey. Allergan USA, Inc. is a wholly owned subsidiary of Allergan plc.

81. Allergan plc; Allergan Finance, LLC; Allergan Sales, LLC; and Allergan USA, Inc. are collectively referred to as "Allergan."

82. Defendant Watson Laboratories, Inc. ("Watson") is a Nevada corporation with its principal place of business in Corona, California.

83. Defendant Actavis Pharma, Inc. (f/k/a Watson Pharma Inc.) ("Actavis Pharma") is a Delaware corporation with its principal place of business in New Jersey.

84. Defendant Actavis LLC (f/k/a Actavis Inc.) ("Actavis LLC") is a Delaware limited liability company with its principal place of business in Parsippany, New Jersey.

85. Watson, Actavis Pharma, and Actavis LLC are collectively referred to as "Actavis."

86. Allergan and Actavis have manufactured, promoted, marketed, advertised, and sold branded opioids nationwide and in Arizona, including Kadian (extended-release morphine sulfate) and Norco (hydrocodone bitartrate and acetaminophen). They have also marketed and sold generic opioids including oxymorphone, extended-release morphine sulfate, fentanyl, oxymorphone hydrochloride, and an extended-release version of the same.

87. Watson received approval of the New Drug Application ("NDA") for branded Norco in February 1997 and sold and marketed this opioid.

88. In 2008, Actavis, Inc. (n/k/a Allergan Finance, LLC) acquired the opioid Kadian through its subsidiary, Actavis Elizabeth LLC, which had been the contract manufacturer of Kadian since 2005. Since 2008, Kadian's label has identified the following entities as the manufacturer or distributor of Kadian: Actavis Elizabeth LLC; Actavis Kadian LLC; Actavis Pharma, Inc.; and Allergan USA, Inc. Allergan Sales, LLC is the current holder of the Kadian NDA. Currently, Allergan USA, Inc. is contracted with UPS SCS, Inc. to distribute Kadian on its behalf.

89. In 2012, Watson acquired Actavis, Inc., and the combined company took the Actavis name. Prior to its 2012 acquisition by Watson, Actavis produced twelve different generic opioids, including some of the most abused and diverted opioids such as generic OxyContin, generic Opana ER, and generic Duragesic.

90. In 2013, Actavis acquired Warner Chilcott plc, another pharmaceutical company; these two companies were combined and incorporated in Ireland as Actavis plc. In March 2015, Actavis plc purchased Allergan, Inc. and adopted the name Allergan plc.

91. In 2016, Allergan Sales, LLC held an ANDA for Norco. The Norco ANDA is currently held by Allergan Pharmaceuticals International Limited.

92. In 2016, Teva Ltd. acquired Actavis (i.e., Watson, Actavis LLC, and Actavis Pharma) from Allergan plc. Following the sale of Actavis to Teva, Allergan continued to sell branded Kadian and Norco, and Actavis continued to sell generic opioids as well as certain dosages of branded Kadian.

93. Allergan and/or its corporate affiliates have held an Arizona prescription drug manufacturer permit since at least 2018 and an Arizona prescription drug wholesaler permit since at least 2002.

94. Actavis and/or its corporate affiliates have held an Arizona prescription drug wholesaler permit since at least 2004 and held an Arizona prescription drug manufacturer permit from 2006 to 2011.

**e. AbbVie and Associated Companies**

95. Defendant Abbott Laboratories, Inc. is a corporation organized under the laws of the State of Delaware, with its principal place of business in Chicago, Illinois. Before splitting from Defendant AbbVie, Inc. in 2013, Abbott Laboratories, Inc. manufactured, promoted, sold, and distributed branded and generic opioids in the United States and Arizona.

96. Defendant Abbott Laboratories is an Illinois corporation with its principal place of business in Abbott Park, Illinois. Abbott Laboratories, Inc. is a subsidiary of Abbott Laboratories. Abbott Laboratories and Abbott Laboratories, Inc. are referred to collectively as "Abbott."

97. Defendant AbbVie, Inc. ("AbbVie"), is a corporation organized under the laws of Delaware, with its principal place of business in North Chicago, Illinois.

98. AbbVie was formed in 2012 for purposes of effecting a separation or "spinoff" (the "AbbVie Spinoff" or the "Spinoff") of Abbott's pharmaceutical business (including all operations related to the manufacture and distribution of opioids) from Abbott's other operations. Effective January 1, 2013, pursuant to a "Separation Agreement" entered between Abbott and AbbVie in late 2012, AbbVie expressly took title to all Abbott assets relating to its pharmaceutical business and expressly assumed all liabilities relating to Abbott's pharmaceutical business. Accordingly, AbbVie is liable as a matter of law for all pre-Spinoff liabilities of Abbott relating to its pharmaceutical business, including all opioid-related liabilities.[37]

99. On May 23, 2020, AbbVie acquired Allergan plc, including Allergan Finance, LLC; Allergan Sales, LLC; and Allergan USA, Inc.

100. Abbott and AbbVie are collectively known as "AbbVie."

---

[37] Separation and Distribution Agreement by and between Abbott Laboratories and AbbVie Inc. (Nov. 28, 2012).

101. AbbVie has held an Arizona prescription drug manufacturer permit since at least 2020 and an Arizona prescription drug wholesaler permit since at least 2012. Abbott and/or its corporate affiliates held an Arizona prescription drug wholesaler permit from at least 2003 to 2016.

**f. Mallinckrodt (unnamed associate)**

102. Mallinckrodt LLC, Mallinckrodt plc, and SpecGx LLC (collectively, "Mallinckrodt") manufactured, promoted, advertised, distributed, and sold branded and generic opioids in Arizona. Mallinckrodt is not named as a defendant in this action.

103. Mallinckrodt manufactures four branded opioids: Exalgo (extended-release hydromorphone), Roxicodone (oxycodone), Xartemis XR (extended-release oxycodone and acetaminophen), and Methadose (methadone hydrochloride). Mallinckrodt is also one of the largest manufacturers of generic opioids, manufacturing extended-release morphine sulfate, oralsolution of morphine sulfate, fentanyl transdermal system, oral transmucosal fentanyl citrate, oxycodone and acetaminophen, hydrocodone bitartrate and acetaminophen, hydromorphone hydrochloride and an extended-release version of the same, oxymorphone hydrochloride, methadone hydrochloride, oxycodone hydrochloride, buprenorphine, and naloxone.

104. Mallinckrodt and/or its corporate affiliates has held an Arizona prescription drug manufacturer license since at least 2006 and an Arizona prescription drug wholesaler license from at least 2004 to at least 2017. Mallinckrodt described itself as a "manufacturer *and distributor* of oxycodone and hydrocodone products" in a 2017 settlement with the DEA.[38]

**g. Purdue (unnamed associate)**

---

[38] Administrative Memorandum of Agreement (July 10, 2017), https://www.justice.gov/usao-edmi/press-release/file/986026/download (emphasis added) (hereinafter 2017 Mallinckrodt MOA).

105. Although not named as a defendant in this matter, Purdue Pharma, L.P.; Purdue Pharma, Inc.; and The Purdue Frederick Company (collectively, "Purdue") participated with Defendants in the misconduct alleged in this action.

106. Purdue manufactures the opioids OxyContin (extended-release oxycodone hydrochloride), MS Contin (extended-release morphine sulfate), Butrans (buprenorphine), Hysingla ER (hydrocodone bitartrate), Dilaudid (hydromorphone hydrochloride), Dilaudid-HP (same), and Targiniq ER (extended-release oxycodone hydrochloride and naloxone hydrochloride). Purdue has promoted and sold these opioids in Arizona.

107. Purdue and/or its affiliates have held an Arizona prescription drug wholesaler permit since at least 2018 and an Arizona prescription drug manufacturer permit since at least 2005.

108. Collectively, Actavis, Teva, Cephalon, Janssen, Endo, AbbVie, and Allergan are referred to as "Marketing Defendants." Throughout this Complaint, Purdue and Mallinckrodt, although not named as defendants in this action, are included as participants in any conduct alleged of the "Marketing Defendants" as a collective entity and in any conduct alleged of "Defendants" as a collective entity.

**2. Distributor Defendants**

109. Although the Marketing Defendants held licenses to distribute prescription drugs into Arizona, the Distributor Defendants also held such licenses. AmerisourceBergen, Cardinal, McKesson, H.D. Smith, and Anda distributed opioids to doctors, pharmacies, hospitals (including Plaintiffs), and other health care settings in Arizona. Walgreens, CVS, and Walmart distributed opioids to their own retail stores. All of these opioids were then purchased by Arizona consumers.

110. The Distributor Defendants are among the largest and most profitable companies in the United States. For instance, in 2021, Walmart ranked first on the list of Fortune 500 companies,

CVS ranked fourth, McKesson ranked seventh, AmerisourceBergen ranked eighth, Cardinal ranked fourteenth, and Walgreens ranked seventeenth.[39]

111. The Distributor Defendants also marketed opioids. The Distributor Defendants marketed and promoted both branded and generic opioids to pharmacies and, in some cases, hospitals, health care providers, and patients. The Distributor Defendants provided discount cards to induce consumers to purchase the Manufacturer Defendants' opioids. The Distributor Defendants also invested in overcoming resistance on the part of insurance and health plans to pay for opioids prescribed for chronic, noncancer conditions. Strategies to overcome insurers' refusal to cover opioids included call centers to help patients navigate the insurance and insurance appeals process, as well as working with doctors on the same issues.

112. These Distributor marketing activities were an integral part of the Marketing Defendants' deceptive scheme to spread misrepresentations about opioids and increase opioid prescribing. The Marketing Defendants worked with the Distributor Defendants to develop marketing activities and paid the Distributor Defendants for their efforts. As these marketing activities drove dramatic increases in opioid prescriptions, the Distributor Defendants continued to market opioids and continued to distribute unconscionable quantities of opioids, ignoring their obligations to monitor, report, and stop suspicious orders.

113. The Distributor Defendants engaged in marketing efforts designed to inflate demand for opioids despite knowing about high order histories and widespread diversion of these same opioids by their customers in Arizona and elsewhere. Additional details concerning each Distributor Defendant's marketing activities are described in the sections detailing particular actions by each Defendant.

---

[39] *Fortune 500*, Fortune, https://fortune.com/fortune500/2021/search/ (last visited July 12, 2021).

114. In addition to distributing opioids to their pharmacies in Arizona, Walgreens, Walmart, and CVS also dispensed and continue to dispense opioids to consumers in Arizona. These entities also marketed opioids and served as a conduit between the manufacturers of opioids and customers.

**a. AmerisourceBergen**

115. Defendant AmerisourceBergen Drug Corporation ("ABDC") is a Delaware corporation with its principal place of business in Chesterbrook, Pennsylvania.

116. ABDC has held Arizona prescription drug wholesaler permits since at least 1952 and has used one or more of these permits to distribute prescription opioids into Arizona.

117. In addition to distributing opioids, ABDC has marketed and promoted opioids, including through its subsidiary, Defendant Xcenda L.L.C. ("Xcenda"). Defendant Xcenda is a Florida limited liability company with its principal place of business in Palm Harbor, Florida.

**b. Anda**

118. Defendant Anda, Inc. ("Anda") is a Florida corporation with its principal place of business in Weston, Florida.

119. In October 2016, Defendant Teva Ltd. acquired Anda from Allergan plc.

120. Anda has held Arizona prescription drug wholesaler permits since at least 2000 and has used one or more of these permits to distribute prescription opioids into Arizona.

**c. Cardinal**

121. Defendant Cardinal Health, Inc. ("Cardinal") is an Ohio corporation with its principal place of business in Dublin, Ohio.

122. In addition to distributing opioids, Cardinal has marketed opioids during the relevant times.

123. Anda has held Arizona prescription drug wholesaler permits since at least 1993 and has used one or more of these permits to distribute prescription opioids into Arizona.

**d. H.D. Smith**

124. Defendant H.D. Smith, LLC f/k/a H.D. Smith Wholesale Drug Co. ("H.D. Smith") through its various DEA-registered subsidiaries and affiliated entities, is the largest independent drug wholesaler in the United States

125. H.D. Smith, LLC's sole member is H.D. Smith Holdings, LLC, whose sole member is H.D. Smith Holding Company, a Delaware corporation with its principal place of business in Illinois.

126. In January 2018, ABDC acquired H.D. Smith.

127. H.D. Smith held Arizona prescription drug wholesaler permits from at least 2005 until 2018 and has used one or more of these permits to distribute prescription opioids into Arizona.

**e. McKesson**

128. Defendant McKesson Corporation ("McKesson") is a Delaware corporation with its principal place of business in Irving, Texas.

129. In addition to distributing opioids, McKesson has marketed opioids during the relevant times.

130. McKesson has held Arizona prescription drug wholesaler permits since at least 1951 and has used one or more of these permits to distribute prescription opioids into Arizona.

**f. Walgreens**

131. Defendant Walgreen Co. is an Illinois corporation with its principal place of business in Deerfield, Illinois. Defendant Walgreen Eastern Co., Inc. ("WEC") is a New York corporation with its principal place of business in Deerfield, Illinois. Walgreen Co. and WEC are collectively referred to herein as "Walgreens."

132. At all times relevant to this Complaint, Walgreens distributed and dispensed prescription opioids throughout the United States, including in Arizona.

133. Walgreens has held Arizona pharmacy permits since at least 1971 and has used one or more of these permits to distribute and dispense prescription opioids in Arizona.

134. In addition to distributing and dispensing opioids, Walgreens also marketed opioids.

**g. CVS**

135. Defendant CVS Pharmacy, Inc. is a Rhode Island corporation with its principal place of business in Rhode Island.

136. Defendant, CVS Indiana, L.L.C. is an Indiana limited liability company with its principal place of business in Rhode Island.

137. CVS Pharmacy, Inc. and CVS Indiana, L.L.C. are collectively referred to as "CVS." CVS distributed and dispensed prescription opioids throughout the United States, including in Arizona.

138. CVS has held Arizona pharmacy permits since at least 2002 and has used one or more of these permits to distribute and dispense prescription opioids in Arizona.

139. In addition to distributing and dispensing opioids, CVS also marketed opioids.

**h. Walmart**

140. Defendant Walmart Inc. f/k/a Wal-Mart Stores, Inc. is a Delaware corporation with its principal place of business in Arkansas.

141. Defendant, Wal-Mart Stores East, LP is a Delaware limited partnership with its principal place of business in Arkansas. Walmart Inc. and Wal-Mart Stores East, LP are collectively referred to as "Walmart."

142. Walmart has dispensed prescription opioids from its pharmacies in Arizona.

143. Walmart has held Arizona pharmacy permits since at least 1991 and has used one or more of these permits to distribute and dispense prescription opioids in Arizona.

144. In addition to distributing and dispensing opioids, Walmart also marketed opioids.

145. Defendants ABDC, Cardinal, Anda, H.D. Smith, McKesson, Walgreens, CVS, and Walmart are collectively referred to herein as the "Distributor Defendants." Walgreens, CVS, and Walmart are collectively referred to herein as the "National Retail Pharmacies."

**3. Defendants' Agents and Affiliated Persons**

146. Defendants include the above-referenced entities as well as their predecessors, successors, affiliates, subsidiaries, partnerships, and divisions to the extent that they are engaged in the manufacture, promotion, distribution, sale, and/or dispensing of opioids.

147. All of the actions described in this Complaint are part of, and in furtherance of, the unlawful conduct alleged herein and were authorized, ordered, and/or done by Defendants' officers, agents, employees, or other representatives while actively engaged in the management of Defendants' affairs within the course and scope of their duties and employment, and/or with Defendants' actual, apparent, and/or ostensible authority.

## IV. DEFENDANTS CREATED ILLEGITIMATE DEMAND FOR DANGEROUS OPIOIDS.

148. Defendants worked together to create illegitimate demand for dangerous opioids and to unlawfully increase the supply to meet that demand. The use of these drugs had previously been confined to highly specialized hospital end-of-life- or cancer-care settings because opioids are highly addictive, and their use can and does result in fatal overdoses. Defendants launched a campaign of misleading advertising to inflate the market for these drugs, peddling them as safe and appropriate for use to treat a range of chronic conditions and severely downplaying how addictive and dangerous they are. Defendants also engaged in a range of successful strategies to overcome barriers to the widespread

use of opioid narcotics. Defendants then poured unreasonable, medically unjustifiable quantities of opioids into Arizona, deliberately turning a blind eye to abuse and diversion of the drugs.

**A. <u>Opioids are dangerous and highly addictive narcotics.</u>**

149. Prescription opioids are highly addictive narcotics. Their powerfully addictive properties come from two basic qualities inherent to opioids.

150. First, the use of opioids leads to physical dependency. If a physically dependent person stops taking opioids, the result is withdrawal, which involves agonizing symptoms such as anxiety, nausea, pain, headaches, vomiting, insomnia, and hallucinations.

151. Second, opioid use leads to tolerance in which the brain physiologically adapts to the presence of opioids and then demands greater and greater doses over time to achieve the same effects. Tolerance is extremely common in patients who take opioids for any length of time.

152. As a result of these physiological properties, millions of people who have been prescribed opioids have become dependent and suffered the effects of addiction. In 2015, approximately two million Americans "suffered from substance use disorders related to prescription opioid[s]."[40]

153. While tolerance and physical dependence can develop in as little as a few days, high-dose and long-term prescription of opioids for chronic pain present particular dangers. According to the National Institute on Drug Abuse, roughly a quarter of patients who are prescribed opioids will misuse them. According to the U.S. Centers for Disease Control and Prevention ("CDC"), as many as 1 in 4 people receiving prescription opioids long term in a primary-care setting struggles with addiction.[41] Similarly, "as many as 56 percent of patients receiving long-term prescription opioids for

[40] Nora D. Volkow, *What Sciences Tells Us About Opioid Abuse and Addiction*, Nat'l Inst. on Drug Abuse (Jan. 27, 2106), https://archives.drugabuse.gov/testimonies/2016/what-science-tells-us-about-opioid-abuse-addiction.

[41] *Prescription Opioids*, Ctrs. for Disease Control & Prevention, https://www.cdc.gov/opioids/basics/prescribed.html (last reviewed Aug. 29, 2017).

low back pain, for example, progress to addictive opioid use, including patients with no prior history of addiction."[42]

154. As their tolerance grows and addiction deepens, many opioid users seek prescriptions from multiple doctors, buy black-market prescription opioids on the street, or turn to street drugs like heroin and illicitly produced fentanyl. Nearly 80% of heroin users reported using a prescription opioid prior to using heroin.[43] Fentanyl and heroin carry extremely high risks of fatal overdose, and deaths caused by fentanyl and fentanyl analogs have skyrocketed in recent years, including in Arizona, where deaths involving fentanyl accounted for half of all opioid overdose deaths in 2018.[44]

155. Defendants' conduct drove up the demand for prescription opioids for both legitimate and illegitimate uses. The result was increased diversion of opioids from lawful, controlled medical uses into the illegal drug market.

156. Opioid use comes with a number of risks in addition to tolerance, dependency, and addiction, including respiratory depression, hyperalgesia (where the use of opioids actually leads patients to feel *more* pain), hormonal dysfunction, neonatal abstinence syndrome, declines in immune function, confusion, dizziness, and increased falls and fractures in the elderly. The risk of death is particularly high when opioids are used with other drugs, like alcohol or benzodiazepines.

157. Overdoses of opioids have become increasingly common as prescriptions and addiction have skyrocketed. The number of opioid overdose deaths quadrupled between 2004 and 2017. Patients may even die when taking opioids at a prescribed dose. Because a person's tolerance to the analgesic or euphoria-producing effects of opioids may develop more quickly than his or her

[42] Anna Lembke, *Drug Dealer, MD: How Doctors Were Duped, Patients Got Hooked and Why It's So Hard to Stop* 22 (2016) (hereinafter, *Drug Dealer, MD*).

[43] Nat'l Inst. on Drug Abuse, *Prescription Opioids and Heroin Research Report* 4 (Jan. 2018), https://www.drugabuse.gov/download/19774/prescription-opioids-heroin-research-report.pdf.

[44] *Governor Ducey Signs Legislation to Help Prevent Fentanyl Overdoses*, Ariz. Off. Gov. (May 19, 2021), https://azgovernor.gov/governor/news/2021/05/governor-ducey-signs-legislation-help-prevent-fentanyl-overdoses (hereinafter, *Governor Ducey Signs Legislation*).

body's tolerance to an opioids' other effects on critical functions, many patients who become addicted to opioids seek higher and higher doses, until they eventually take a dose that kills them. More than 40% of all drug overdose deaths in 2016 involved a prescription opioid, and more than 200,000 Americans died of an opioid overdose from 1999 to 2016.

## B. Defendants set out to change the best practices for the use of opioids.

158. Defendants were aware that opioids pose significant risks and that the long-term safety and efficacy of opioids for chronic pain has never been established in medical literature. Nevertheless, in a deliberate plot to counter doctors' and patients' legitimate fears of opioids, Defendants intentionally and unlawfully engaged in a deceptive, unfair, and unconscionable misinformation campaign about the risks and effects of opioid use. They did so to convince prescribers and the public that opioids are appropriate—and even necessary—to treat common conditions that can last months or years, such as back pain, headaches, and fibromyalgia.

159. Because of these well-known risks, the consensus in the medical community—prior to Defendants' concerted campaign of deception—was that opioids were not safe for long-term use or for the treatment of chronic pain. As a result, opioids were reserved for specialized uses, such as treatment of cancer pain or palliative care at the end of life. But Defendants realized that they could reap billions of dollars in profit if they could convince providers to prescribe, and patients to consume, opioids for common ailments.

160. The result of Defendants' push to normalize the treatment of chronic, noncancer pain with prescription opioids is clearly described by the Department of Veterans Affairs and the Department of Defense:

> Prior to the 1980s, O[pioid] T[herapy] was rarely used outside of severe acute injury or post-surgical pain, primarily due to concern for tolerance, physical dependence, and addiction. As the hospice and palliative care movement began defining end-of-life care in the U.S. during the 1980s and emphasizing the importance of pain relief, OT increasingly became a mainstay for cancer and end-of-life pain. Efforts

> to destigmatize the use of prescription opioids for chronic non-terminal pain encompassed primary care providers and the public. The efforts led to an unprecedented increase in opioid prescribing for chronic non-terminal pain. Chronic pain management became synonymous with L[ong-term] OT in the 1990s and the first decade of the 2000s with significant numbers of patients in pain clinics receiving LOT. Despite the absence of long-term safety or efficacy data, OT for chronic non-terminal pain became a mainstay of therapy.[45]

161. According to Dr. Anna Lembke, the Chief of Addiction Medicine at Stanford University School of Medicine:

> Prior to 1980, doctors used opioid pain relievers sparingly, and only for short term in cases of severe injury and illness, or during surgery. Their reluctance to use opioids for an extended length of time, despite short-term effectiveness for pain, sprang from fear of causing addiction.[46]

162. And doctors had good reason to fear the addictiveness of opioids. America's first opioid epidemic began in the 1870s. Driven by liberal prescribing of potent opioids such as morphine and the ready availability of over-the-counter and patent medicines containing opioids, opioid consumption tripled, and addiction rates rose to historic highs. This wave of abuse was instigated by the use of opioids in medical contexts in which the risks of such highly addictive drugs outweighed their benefits.

163. As a result of this epidemic, Congress banned the non-prescription sale of opioids in the Harrison Act of 1914. Although the act allowed physicians to use morphine when personally attending a patient, "the Treasury Department charged with the law's enforcement determined that maintaining chronic opioid use was not legitimate medical practice."[47]

---

[45] The Opioid Therapy for Chronic Pain Work Group, U.S. Dep't of Veterans Affairs & U.S. Dep't of Defense, *VA/DoD Clinical Practice Guideline for Opioid Therapy for Chronic Pain* (3d ed. 2017), https://www.va.gov/HOMELESS/nchav/resources/docs/mental-health/substance-abuse/VA_DoD-CLINICAL-PRACTICE-GUIDELINE-FOR-OPIOID-THERAPY-FOR-CHRONIC-PAIN-508.pdf (emphasis added) (hereinafter *VA/DoD 2017 Opioid Guidelines*).

[46] *Drug Dealer, MD*, *supra*, at 56-57.

[47] Marcia Meldrum, *Opioids' Long Shadow*, 22 AMA J. Ethics E729 (2020), https://journalofethics.ama-assn.org/sites/journalofethics.ama-assn.org/files/2020-07/mhst1-2008.pdf.

164. In the decades that followed, the medical community reached a consensus around best practices for the use of opioids. "These informal but well-understood guidelines" "reserved opioid prescriptions for the comfort of patients with terminal illnesses or for the short-term relief of patients experiencing postinjury or postoperative pain." While physicians were cognizant that severe chronic pain caused patients to suffer, they were also aware that drug addiction, even to a prescription medication, could be equally if not more harmful.[48]

165. In the 1960s and 1970s, a new wave of opioid abuse began among veterans returning from the Vietnam War. Many soldiers had become accustomed to using heroin, which was cheap and readily available in Vietnam, and some developed addictions. Upon return, a heroin-addicted veteran's fate was often determined by geography. If he lived in a city where heroin was available, his addiction likely continued. If he lived in a rural area where heroin was exceedingly difficult to locate, he was more likely to avoid continuing use.

166. Each of these waves demonstrates a fact recognized by the scientific community as early as 1973 when sociologist Philip Baridon produced a study comparing addiction rates in 33 countries. His statistical analysis using 12 independent variables showed that the availability of supply explained more variance in addiction rates than any other factor. Thus, he could conclude: "The most fundamental fact about drug abuse is frequently overlooked in the welter of complicated psychosocial explanations. <u>If the drug is not available, there will be no abuse of it</u>."[49]

167. The current epidemic illustrates the continuing truth of Baridon's observation. The oversupply of prescription opioids predictably generated a crisis of addiction and misuse—the same sort of crisis that by the mid-twentieth century had led the medical community to limit the use of

[48] *Id.*

[49] Philip Baridon, *A Comparative Analysis of Drug Addiction in 33 Countries*, 2 Drug Forum 335, 342 (1973) (emphasis added).

opioids for chronic pain. By foregoing the use of opioids for chronic, noncancer pain, the medical community had limited the risk of addiction and the ensuing social harms.

168. This stable state of affairs would not continue. According to Dr. Lembke:

> In the early 1980's, professional medical opinion on the use of opioid pain relievers began to change, in favor of using opioids more liberally. The number of patients living with pain was growing, due to an aging population, to more people undergoing and surviving complicated surgeries, and to more people being kept alive with life-threatening illnesses. A new movement, known as hospice care, was beginning to make inroads in the United States at this time as well, advocating for more aggressive comfort care at the end of life.[50]

169. This tentative expansion of opioid use provided an opportunity that Defendants exploited both directly and indirectly: directly through their characterization of the appropriate use and risk-benefit profile of their own products and indirectly through financing and influencing organizations that promoted increasing the use of opioids to treat an ever-wider variety of chronic conditions. Led by Purdue, Endo, Cephalon, and Janssen, Defendants advocated with little to no evidentiary support that opioids, particularly extended-release opioids like MS Contin and OxyContin, posed little, if any, risk of addiction when used by patients in pain.

170. America's first opioid epidemic was caused by patients with chronic pain taking drugs recommended by the medical community in order to treat their pain. And from that epidemic, the medical community had learned that opioids should be reserved for their limited appropriate uses. Causing the medical community to unlearn this lesson was Defendants' next objective.

171. Much of the early work in changing the approach to pain management was made possible through grants by the Robert Wood Johnson Foundation ("RWJF"), which funded initiatives to expand the use of prescription opioids to treat both life-ending cancer <u>and</u> chronic, nonmalignant pain. A primary grantee was the University of Wisconsin Pain & Policy Study Group ("UW-PPSG")

---

[50] *Drug Dealer, MD*, *Supra* at 56–57.

that initially promoted opioid use for end-of-life and cancer care before expanding its advocacy to the use of opioids for other chronic conditions.

172. One of the primary ways in which Defendants achieved their objective was by manipulating, funding, and, in some cases, founding various ostensibly independent organizations to advocate for the wider use of opioids to treat all forms of chronic, noncancer pain, particularly through treatment guidelines.

173. Such guidelines play a role in establishing best practices for clinicians. Guidelines make recommendations, but, as Dr. Lembke has testified in the recent California trial against the Marketing Defendants, in the "real world," guidelines get turned into rules that hospital and clinic managers require their doctors to follow.

174. Recognizing this fact of modern medical practice, Defendants set their sights on three targets to change prescribing practices and the culture surrounding pain treatment: (1) the Joint Commission of the Accreditation of Healthcare Organizations ("JCAHO"), which established standards that hospitals had to follow to remain accredited; (2) the Federation of State Medical Boards ("FSMB"), which established model standards for doctor discipline; and (3) the Veterans Administration ("VA"), which directly ran a great number of hospitals and clinics. The goal was to convince these organizations to issue treatment guidelines encouraging the regular evaluation of pain and its treatment with prescription opioids.

175. And in this Defendants were successful. The VA and FSMB guidelines supporting the assessment of pain and its treatment via prescription opioids were issued in 1998. JCAHO and the opioid industry (through another front group, the National Pharmaceutical Council) issued joint guidelines in 1999. The changes in these guidelines were so significant from the then-current best practices that hospitals were given two years—until 2001—to implement them.

176. The slogan, "pain is the fifth vital sign," illustrates just how radical this change was. For the entire twentieth century, despite numerous medical advances, the four vital signs had remained a stable lodestar for the medical profession: pulse, respiration rate, temperature, and blood pressure. These signs are so fundamental they are checked frequently in both inpatient and outpatient settings and are used to monitor the effectiveness of treatment. The addition of pain, a subjective and effectively unquantifiable metric, to the list of vital signs not only encouraged doctors to be more cognizant of patients' comfort, but also, because patients should receive treatment to bring their vital signs back into a normal range, it essentially required doctors to treat pain. In the context of an overburdened health care system, doctors of necessity turned to the fastest-acting tool at their disposal to reduce pain to an acceptable level: prescription opioids.

177. In the interval before the JCAHO guidelines went into effect, UW-PPSG (funded by the RWJF and the drug industry) led a media campaign directed at doctors, hospitals, and patients to persuade them to adopt these novel practices that had been rejected by the medical profession for decades. As Dr. Lembke described in her testimony:

> The funding is really what made it possible for the Pain & Policy Study Group to roll out this new paradigm around pain treatment . . . . Also, the Joint Commission was involved in that process, and they actually received content that was created by Purdue Pharma. That was disseminated to hospitals who were trying to make Joint Commission accreditation. They used videos produced by Purdue. They used documents created by Purdue in order to change the paradigm around opioid prescribing, including promoting opioid—including promoting pain as the fifth vital sign.

178. As a result of the paradigm shift in the approach to treating chronic pain orchestrated by Defendants through their Front Groups, according to Dr. Lembke, "Doctors were taught that prescribing opioids for chronic pain was evidence-based medicine even though there was no evidence

to support it." Simply put, "these different factions manipulated and misrepresented, deliberately or otherwise, medical science to serve their own agendas."[51]

179. The results of this paradigm shift in the best practices for the treatment of pain were widespread and affected nearly every aspect of medical practice:

a. Articles were published in the media describing pain as the fifth vital sign, the assessment of pain as a required practice in hospitals and clinics around the country, and the treatment of pain as a patient right.

b. In hospitals, particularly in the more than 95% of hospitals accredited by JCAHO, doctors assessed their patients' pain and often wrote prescriptions to treat pain with prescription opioids. Pain scores emphasized the absence of pain as a patient right and documented pain in patient records. Those records became the basis for enforcement activities resulting from JCAHO accreditation audits and effectively "forced" doctors to treat pain.

c. The 1998 FSMB guidelines spurred prescriptions by removing the threat of discipline for doctors who prescribed opioids in violation of what had been accepted best practices prior to Defendants' intervention. Reasonable physicians could even conclude that failing to treat pain using opioids would expose them to discipline.

d. Medical schools began teaching pain as the fifth vital sign and the assessment and treatment of pain as part of the core curriculum.

e. CMEs led by the opioid industry and their Front Groups and KOLs provided education regarding pain assessment and best treatment practices, which were regularly characterized as the use of prescription opioids even to the exclusion of other recognized treatment modalities.

f. Once a greater number of patients with chronic, noncancer pain were receiving opioid "therapy," best practices had to evolve to treat the resulting consequences: titration to higher doses for patients presenting with the industry-promoted concept of "pseudoaddiction," which cannot be reliably distinguished from addition and higher doses and longer use of opioids when patients presented with withdrawal-like symptoms.

g. The concept of blaming the patient for drug-seeking behavior took root. Patients moved to illicit heroin and other drugs to address their withdrawal cravings after states and regulatory authorities took steps to reduce opioid prescriptions and prosecute pill mills doctors in pill mills and pain clinics.

---

[51] *Drug Dealer, MD*, *supra*, at 57.

180. Belatedly, the medical profession is returning to a more appropriate set of practices to address chronic pain. According to the 2017 guidelines from the Department of Defense and the Veterans Administration: "[N]on-pharmacologic treatments and non-opioid medications are the preferred treatments for chronic non-terminal pain. O[pioid] T[herapy] has a limited role, primarily in the treatment of severe acute pain, post-operative pain, and end-of-life pain."[52]

181. Even Defendants' experts agree that opioids should not be a first-line treatment. For instance, Dr. Carol Warfield, an expert who testified at trial for Allergan in a case brought by California counties against opioid manufacturers, has previously testified that legitimate doctors should consider and exhaust alternative treatment methods before prescribing opioids for chronic pain.

**C. <u>Defendants used various tactics to spread misinformation about opioids.</u>**

182. Defendants were aware that opioids pose significant risks and that the long-term safety and efficacy of opioids for chronic pain has never been established in medical literature. Nevertheless, in a deliberate plot to counter doctors' and patients' legitimate fears of opioids, Defendants intentionally and unlawfully engaged in a deceptive, unfair, and unconscionable misinformation campaign about the risks and effects of opioid use. They did so to convince prescribers and the public that opioids are appropriate—and even necessary—to treat common conditions that can last months or years, such as back pain, headaches, and fibromyalgia.

183. The intended effect (which was, in fact, achieved) was to increase opioid prescriptions, thereby increasing Defendants' profit from manufacturing, distributing, and dispensing their opioids.

184. The following categories of misrepresentations were spread by Defendants to prescribers (including doctors in hospitals) and patients, nationwide and within Arizona:

a. The risk of addiction to opioids is low;

b. It is easy to identify people at high risk for addiction;

---

[52] *VA/DoD 2017 Opioid Guidelines*, *supra*.

c. Signs of addictive behavior are "pseudoaddiction," requiring more opioids;

d. Addicted patients are "untrustworthy" "abusers";

e. Opioid withdrawal can be avoided by tapering;

f. Opioid doses can be increased without limit or increased risk;

g. Long-term opioid use improves functioning;

h. Opioids are safer than "traditional" pain medicines;

i. Ostensibly "abuse-deterrent" formulations are safer;

j. Short-acting opioids should be used to treat chronic, noncancer "breakthrough" pain; and

k. Despite heightened risks, the elderly and veterans can safely use opioids.

185. Incidents of these and other misrepresentations are more particularly alleged in the following sections and in those detailing each Defendant's activities.

**1. Falsehood #1: The risk of addiction to opioids is low.**

186. Defendants were aware that opioids are highly addictive, that tolerance and physical dependency develop rapidly, and that prescription opioids confer an increased risk of addiction and overdose even in patients who take their medication as prescribed. By the mid-1990s, a number of studies already demonstrated a high incidence of opioid use disorder among chronic pain patients. In fact, addiction can result from the use of any opioid, "even at recommended dose"[53]; the risk substantially increases with more than three months of use.[54]

---

[53] *FDA Announces Safety Labeling Changes and Post Market Study Requirements for Extended-release and Long-acting Opioid Analgesics*, U.S. Food & Drug Admin. (Sept. 10, 2013), https://wayback.archive-it.org/7993/20170112130229/http://www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/ucm367726.htm; *see also FDA Announces Enhanced Warnings for Immediate-release Opioid Pain Medications Related to Risks of Misuse, Abuse, Addiction, Overdose and Death*, U.S. Food & Drug Admin. (Mar. 22, 2016), https://wayback.archive-it.org/7993/20170112130225/http://www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/ucm491739.htm.

[54] Deborah Dowell, et al., *CDC Guideline for Prescribing Opioids for Chronic Pain – United States, 2016* at 21 (Mar. 18, 2016), https://www.cdc.gov/mmwr/volumes/65/rr/pdfs/rr6501e1.pdf (hereinafter *2016 CDC Guideline*).

187. Each Defendant claimed that the potential for addiction from its opioids was relatively small or non-existent, even though there was no scientific evidence to support that claim. None of them have acknowledged, retracted, or corrected their false statements.

188. A common method, used by various Marketing Defendants, was to point to a one-paragraph letter to the editor published in the *New England Journal of Medicine* ("*NEJM*") in 1980.[55]

189. This letter, by Jane Porter and Dr. Hershel Jick ("the Porter & Jick Letter"), declared the incidence of addiction "rare" for patients treated with opioids.[56] They had analyzed a database of hospitalized patients who were given opioids in a controlled setting to ease suffering from acute pain. Porter and Jick considered a patient not addicted if there was no sign of addiction noted in patients' records.

190. The brevity of the Porter & Jick Letter is apparent at a glance.

**ADDICTION RARE IN PATIENTS TREATED WITH NARCOTICS**

*To the Editor:* Recently, we examined our current files to determine the incidence of narcotic addiction in 39,946 hospitalized medical patients[1] who were monitored consecutively. Although there were 11,882 patients who received at least one narcotic preparation, there were only four cases of reasonably well documented addiction in patients who had no history of addiction. The addiction was considered major in only one instance. The drugs implicated were meperidine in two patients,[2] Percodan in one, and hydromorphone in one. We conclude that despite widespread use of narcotic drugs in hospitals, the development of addiction is rare in medical patients with no history of addiction.

JANE PORTER
HERSHEL JICK, M.D.
Boston Collaborative Drug Surveillance Program
Boston University Medical Center
Waltham, MA 02154

1. Jick H, Miettinen OS, Shapiro S, Lewis GP, Siskind Y, Slone D. Comprehensive drug surveillance. JAMA. 1970; 213:1455-60.
2. Miller RR, Jick H. Clinical effects of meperidine in hospitalized medical patients. J Clin Pharmacol. 1978; 18:180-8.

[55] Jane Porter & Hershel Jick, *Addiction Rare in Patients Treated with Narcotics*, 302 New Eng. J. Med. 123 (1980), https://www.nejm.org/doi/pdf/10.1056/NEJM198001103020221.

[56] *Id.*

191. As Dr. Jick explained to a journalist years later, he submitted the statistics to *NEJM* as a letter because the data were not robust enough to be published as a study.[57]

192. Citations to the Porter & Jick Letter, which had been largely ignored for more than a decade, significantly increased after the introduction of OxyContin. While first Purdue and then other Marketing Defendants used it to assert that their opioids were not addictive, according to Dr. Jick, "that's not in any shape or form what we suggested in our letter."[58]

193. The enormous impact of Defendants' misleading amplification of the Porter & Jick Letter was well documented in another letter published in the *NEJM* on June 1, 2017, describing the way the Porter & Jick Letter had been irresponsibly cited and, in some cases, "grossly misrepresented." In particular, the authors explained:

> [W]e found that a five-sentence letter published in the *Journal* in 1980 was heavily and uncritically cited as evidence that addiction was rare with long-term opioid therapy. We believe that this citation pattern contributed to the North American opioid crisis by helping to shape a narrative that allayed prescribers' concerns about the risk of addiction associated with long-term opioid therapy.[59]

194. "It's difficult to overstate the role of this letter," said Dr. David Juurlink of the University of Toronto, who led the analysis. "It was the key bit of literature that helped the opiate manufacturers convince front-line doctors that addiction is not a concern."[60]

195. The picture painted by the Porter & Jick Letter regarding short-term therapy in a hospital setting is not consistent with the evidence about long-term opioid therapy for chronic pain. A 2015 systematic review found that the prevalence of misuse following opioid prescriptions for

---

[57] Barry Meier, *Pain Killer: A "Wonder" Drug's Trail of Addiction and Death* 47 (2003) (hereinafter *Pain Killer*).

[58] Taylor Haney & Andrea Hsu, *Doctor Who Wrote 1980 Letter on Painkillers Regrets that It Fed Opioid Crisis*, NPR (June 16, 2017), https://www.npr.org/sections/health-shots/2017/06/16/533060031/doctor-who-wrote-1980-letter-on-painkillers-regrets-that-it-fed-the-opioid-crisi.

[59] Pamela T.M. Leung, et al., *A 1980 Letter on the Risk of Opioid Addiction*, 376 N. Engl J. Med. 2194 (June 1, 2017), https://www.nejm.org/doi/full/10.1056/NEJMc1700150#t=article.

[60] Marilynn Marchione, *Painful Words: How a 1980 Letter Fueled the Opioid Epidemic*, Stat (May 31, 2017), https://www.statnews.com/2017/05/31/opioid-epidemic-nejm-letter/.

chronic pain was between 21 and 29%, with a prevalence of addiction between 8 and 12%.[61] Under the standards of the Council for International Organizations of Medical Sciences, an organization founded by the World Health Organization ("WHO"), an adverse outcome is common if it occurs more than 1 case out of 100 and very common if it occurs in more than 1 case of out 10.[62] Hence, rates of misuse and addiction are either common or very common.

**2. Falsehood #2: It is easy to identify people at high risk for addiction.**

196. While continuing to maintain that most patients can safely take opioids long-term for chronic pain without becoming addicted, Defendants asserted that even if some patients are at risk of opioid addiction, doctors (including doctors in hospitals) can effectively identify them using screening tools or questionnaires and then manage the risk of addiction by imposing heightened monitoring on patients deemed "at risk."

197. Defendants created and disseminated these tools to perpetuate the myth that only patients with easily identifiable traits (e.g., a personal or family history of substance abuse issues, mental illness, or trauma) are at risk for addiction and that, by implication, opioids are safe for everyone else.

198. There are three fundamental flaws in Defendants' representations that doctors can consistently identify and manage the risk of addiction. First, there is no reliable scientific evidence that doctors can depend on the screening tools currently available to materially limit the risk of addiction. Second, there is no reliable scientific evidence that high-risk patients identified through screening can take opioids over the long term without triggering addiction, even with enhanced monitoring. Third, there is no reliable scientific evidence that patients who are not identified through such screening can

---

[61] Vowles, et al., *supra*.

[62] Antje Neubert, et al., *E-pharmacovigiliance: Development and Implementation of a Computable Knowledge Base to Identify Adverse Drugs Reactions*, 76 Supp. 1 Brit. J. Clinical Pharmacology 69 (2013), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3781681/pdf/bcp0076-0069.pdf.

take opioids over the long term without significant danger of addiction; many such patients become addicted to prescription opioids.

199. At trial in the case brought by California counties against Teva, Endo, Janssen, and Allergan, Dr. Carol Warfield, a Harvard Medical School professor and the director of a pain management clinic at Beth Israel Deaconess Medical Center, testified on behalf of Allergan. She stated that it is impossible to predict who is going to become addicted to opioids prescribed by a doctor and that there is no foolproof way for a doctor to determine if a patient is actually abusing opioids because it is very difficult for a physician to determine whether a patient's request for opioids stems from pain or from addiction or opioid use disorder. Despite her nearly 40 years of practice in pain management, she admitted that even she has been fooled by patients who have lied in order to obtain opioids that were not medically necessary. She agreed that it is very difficult for clinicians who lack specialized training in substance abuse, such as general practitioners, to accurately determine whether a patient is addicted.

200. Another expert in that same trial testifying on behalf of Endo, Janssen, Teva, and Allergan was Dr. Douglas Tucker, an addiction psychiatrist. On the stand, he agreed that no screening tool is 100% accurate and that even a patient who is screened using these tools has the potential to develop OUD and addiction.

201. By ostensibly identifying patients likely to become addicted, the tool gave doctors false confidence in their ability to safely prescribe opioids long-term. For this reason, references to screening appear in various industry-supported guidelines.

#### 3. Falsehood #3: Signs of addictive behavior are "pseudoaddiction" requiring more opioids.

202. Defendants claimed that the signs of opioid addiction were merely symptoms of "pseudoaddiction," meaning "behaviors (that mimic addictive behaviors) exhibited by patients with inadequately treated pain." Moreover, Defendants claimed that pseudoaddiction should be treated by

giving patients higher doses of opioids. In other words, Defendants led doctors and patients to believe that the cure for signs of addiction was to prescribe ever-higher doses of opioids—despite the life-threatening risks of doing so.

203. Dr. J. David Haddox, who later became a Senior Medical Director for Purdue, published a study in 1989 coining the term "pseudoaddiction": "the iatrogenic syndrome of abnormal behavior developing as a direct consequence of inadequate pain management."[63] In other words, patients exhibiting classic signs of addiction—for example, asking for more and higher doses of opioids, self-escalating their doses, or claiming to have lost prescriptions in order to get more opioids—were not addicted, but rather simply suffering from under-treatment of their pain.

204. In reality, addictive behaviors and signs of addiction are frequently, if not usually, indications of addiction. Defendants knew there was no legitimate evidence to support their claim that doctors should treat signs of addiction as "pseudoaddiction." As late as 2015, an investigative review of medical studies concluded that empirical evidence supporting pseudoaddiction as a diagnosis distinct from addiction had still not emerged.[64]

205. Similarly, the CDC's opioid prescribing guidelines do not recommend treating addictive behaviors as "pseudoaddiction." Nor do they recommend providing more opioids to patients exhibiting symptoms of addiction. Even Dr. Lynn Webster, a key opinion leader ("KOL") discussed below, has admitted that pseudoaddiction "is already something we are debunking as a concept" and that it became "too much of an excuse to give patients more medication. It led us down a path that caused harm."[65]

---

[63] David E. Weissman & J. David Haddox, *Opioid Pseudoaddiction—An Iatrogenic Syndrome*, 36 Pain 363–66 (1989), https://www.ncbi.nlm.nih.gov/pubmed/2710565. "Iatrogenic" describes a condition induced by medical treatment.

[64] Marion S. Greene & R. Andrew Chambers, *Pseudoaddiction: Fact or Fiction? An Investigation of the Medical Literature* 2 Curr. Addiction Rep. 310 (2015), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4628053/pdf/40429_2015_Article_74.pdf.

[65] John Fauber, *Painkiller Boom Fueled by Networking*, Milwaukee J. Sentinel (Feb. 18, 2012), https://archive.jsonline.com/watchdog/watchdogreports/painkiller-boom-fueled-by-networking-dp3p2rn-139609053.html/ (hereinafter *Painkiller Boom*).

### 4. Falsehood #4: Addicted patients are "untrustworthy" "abusers".

206. As it became apparent that individuals were, in fact, misusing opioids that they were prescribed, Defendants began to deceptively blame addiction, overdose, and death on "abuse," in effect blaming patients for their addiction—rather than accurately identifying the culprit as the marketing and resulting excessive prescription of dangerous opioids.

207. As early as 2001, Richard Sackler, Purdue's president, wrote in a confidential email exculpating Purdue's marketing of OxyContin: "we have to hammer on the abusers in every way possible. They are the culprits and the problem. They are reckless criminals."[66] He chose to stigmatize people who were hurt by Purdue's opioids, calling them "junkies."[67] Similarly, in December 2011, John Stewart, Purdue's CEO from 2007 to 2013, gave a speech titled *Providing Relief, Preventing Abuse*, which deceptively blamed addiction, overdose, and death on "abuse."

208. Purdue and other Defendants knew that the tactic of blaming addiction on untrustworthy patients was a lie. The truth is that the real risk of addiction is not so limited. Purdue internally admitted: "This can happen to anyone—from a 50-year-old woman with chronic lower back pain to an 18-year-old boy with a sports injury, from the very wealthy to the very poor."

209. Defendants' suggestion that the opioid epidemic is the result of bad patients who manipulate doctors to obtain opioids illicitly helped further their marketing scheme, but it is incorrect. While there are patients who obtain opioids in order to abuse them, they are a small minority. For example, patients who "doctor-shop"—i.e., visit multiple prescribers to obtain opioid prescriptions—are responsible for roughly 2% of opioid prescriptions.[68] The epidemic of opioid addiction and abuse

---

[66] Joanna Walters, *House of Pain: Who are the Sacklers Under Fire in Lawsuits Over Opioids* (July 26, 2019), https://www.theguardian.com/us-news/2019/jul/26/sacklers-opioids-purdue-pharma-oxycontin-opioids.

[67] *Id.*

[68] *Although Relatively Few, "Doctor Shoppers" Skew Opioid Prescribing*, Nat'l Inst. on Drug Abuse (May 27, 2014), https://archives.drugabuse.gov/news-events/nida-notes/2014/05/although-relatively-few-doctor-shoppers-skew-opioid-prescribing.

is overwhelmingly a problem of false marketing and unconstrained distribution of the drugs—not problem patients.

**5. Falsehood #5: Opioid withdrawal can be avoided by tapering.**

210. Most patients who have been taking opioids regularly will, upon stopping treatment, experience physically and psychologically painful withdrawal. The intense pain of withdrawal leaves many patients unwilling or unable to give up opioids, heightening the risk of further addiction.

211. Defendants also knew or should have known of the facts of dependency and withdrawal, but nevertheless deceptively represented that withdrawal is easily managed by tapering a patient's dose of opioids. These claims minimized the length of withdrawal effects and trivialized how difficult it can be for people to wean themselves off a dependence on opioids.

212. Indeed, Dr. Timothy Deer, a pain-medicine doctor appearing on behalf of Cardinal in the opioid trial in West Virginia federal court, testified that it would sometimes take three or four years to wean a patient off of high doses of OxyContin.

213. Defendants not only failed to disclose the very real effects of withdrawal and the lack of evidence for the effectiveness of rapid tapering at reducing withdrawal symptoms, but they also failed to disclose that withdrawal would be more severe and tapering less effective in patients who had used opioids for a prolonged period (i.e., how Defendants wanted their opioids to be used).

**6. Falsehood #6: Opioid doses can be increased without limit or increased risk.**

214. Defendants claimed there was no ceiling on the amount of opioids that can be taken safely. This claim is highly misleading. With higher doses, and particularly with the addition of short-acting or immediate-release opioids, the risk of fatal overdose and other adverse effects grows.

215. In its 2010 Risk Evaluation and Mitigation Strategy for OxyContin, Purdue did not address the heightened risk of respiratory depression and death from increasing the dose. Instead, Purdue advised prescribers that "dose adjustments may be made every 1-2 days"; "it is most

appropriate to increase the q12h dose"; the "total daily dose can usually be increased by 25% to 50%"; and if "significant adverse reactions occur, treat them aggressively until they are under control, then resume upward titration."[69]

216. These misrepresentations were integral to the Marketing Defendants' promotion of prescription opioids, and they were directed, in key part, toward prescribers, including those working in hospitals. Because patients develop a tolerance to opioids' analgesic effects, achieving long-term pain relief requires constantly increasing the dose. Not only are stronger doses more expensive, but patients who take larger doses or who escalate to larger doses faster are much more likely to remain on opioids for a longer period of time. The increased revenue that results comes at the cost of increased adverse effects: opioid doses at or above 50 MME (morphine milligram equivalents)/day double the risk of overdose compared to 20 MME/day.[70]

217. The Marketing Defendants' sales representatives aggressively pushed doctors to prescribe stronger doses of opioids. One common technique was to visit doctors regularly, gradually and dangerously raising their comfort level with prescribing ever-higher doses of opioids. For example, one Purdue sales representative wrote about how his regional manager would drill the sales team on their upselling tactics:

> It went something like this. "Doctor, what is the highest dose of OxyContin you have ever prescribed?" "20mg Q12h." "Doctor, if the patient tells you their pain score is still high you can increase the dose 100% to 40mg Q12h, will you do that?" "Okay." "Doctor, what if that patient then came back and said their pain score was still high, did you know that you could increase the OxyContin dose to 80mg Q12h, would you do that?" "I don't know, maybe." "Doctor, but you do agree that you would at least Rx the 40mg dose, right?" "Yes."

[69] Purdue Pharma, L.P., *OxyContin Risk Evaluation and Mitigation Strategy*, (Nov. 2010), https://web.archive.org/web/2/https://www.fda.gov/downloads/Drugs/DrugSafety/PostmarketDrugSafetyInformationforPatientsandProviders/UCM220990.pdf (last accessed July 13, 2021 as of Feb. 15, 2017).

[70] Heidi N. Overton, et al., *Opioid-Prescribing Guidelines for Common Surgical Procedures: An Expert Panel Consensus*, 227 J. Am. Coll. Surgeons 411 (2018), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6353661/pdf/nihms-989596.pdf.

The next week the representative would see that same doctor and go through the same discussion with the goal of selling higher and higher doses of OxyContin.

218. Marketing Defendants were aware of the greater dangers high-dose opioids posed. In 2013, the FDA acknowledged "that the available data do suggest a relationship between increasing opioid dose and risk of certain adverse events" and that studies "appear to credibly suggest a positive association between high-dose opioid use and the risk of overdose and/or overdose mortality."[71] Similarly, a Veterans Health Administration study from 2004 to 2008 found the rate of overdose deaths to be directly related to the maximum daily dose.[72]

**7. Falsehood #7: Long-term opioid use improves functioning.**

219. Defendants represented to patients and prescribers, including physicians in hospitals, that long-term opioid use can improve the quality of life of patients suffering from chronic conditions, such as back pain.

220. Defendants knew that these claims were incorrect because they knew that there were no controlled long-term studies (i.e., more than 16 weeks) establishing that opioids improve the quality of life in chronic pain patients—or even that they are effective in improving patients' chronic pain over the long term, a fact that the CDC has noted.[73] For years, the FDA has made clear through warning letters to manufacturers the lack of evidence for claims that the use of opioids for chronic

---

[71] Letter from Janet Woodcock, Dir. of Ctr. for Drug Evaluation & Research, to Andrew Kolodny, President, Physicians for Responsible Opioid Prescribing (Sept. 10, 2013), https://paindr.com/wp-content/uploads/2013/09/FDA_CDER_Response_to_Physicians_for_Responsible_Opioid_Prescribing_Partial_Petition_Approval_and_Denial.pdf (responding to citizen petition regarding opioid prescribing) (hereinafter "Woodcock-Kolodny Letter").

[72] Amy S.B. Bohnert, et al., *Association Between Opioid Prescribing Patterns and Overdose-Related Deaths*, 305 J. AM. Med. Ass'n 1315 (2011).

[73] *Promoting Safer and More Effective Pain Management*, Ctrs. for Disease Control, https://www.cdc.gov/drugoverdose/pdf/guidelines_factsheet-patients-a.pdf (last visited July 16, 2021); *2016 CDC Guideline*, *supra*, at 20.

pain improves patients' function and quality of life.[74] These claims are based on what the CDC has characterized as "insufficient evidence."[75]

221. What evidence there is belies Defendants' claims and shows not only that opioids are ineffective for the treatment of chronic pain but also that they worsen patients' health. For example, a 2006 review found that opioids as a class did not demonstrate an improvement in functional outcomes over other non-addictive treatments.[76] The few longer-term studies of opioid use had "consistently poor results," and "several studies have showed that opioids for chronic pain may actually worsen pain and functioning . . . ."[77] Evidence also shows that an increased duration of opioid use is strongly associated with an increased prevalence of mental-health disorders and greater health care utilization.

222. In addition, Defendants knew that patients using opioids for chronic pain were at heightened risk of addiction and that long-term opioid use can cause debilitating deterioration in a patient's quality of life. The CDC has even recognized this, concluding that "[w]hile benefits for pain relief, function and quality of life with long-term opioid use for chronic pain are uncertain, risks associated with long-term opioid use are clearer and significant."[78] According to the CDC, "for the vast majority of patients, the known, serious, and too-often-fatal risks far outweigh the unproven and

---

[74] *See also* Warning Letter from Thomas Abrams, Dir., Div. of Mktg., Adver., & Commc'ns, U.S. Food & Drug Admin., to Doug Boothe, CEO, Actavis US (Feb. 18, 2010), https://www.fdanews.com/ext/resources/files/archives/a/ActavisElizabethLLC.pdf (rejecting claims that Actavis' opioid, Kadian, had an "overall positive impact on a patient's work, physical and mental functioning, daily activities, or enjoyment of life."); Warning Letter from Thomas Abrams, Dir., Div. of Mktg., Adver., & Commc'ns, U.S. Food & Drug Admin., to Brian A. Markison, Chairman, President and Chief Executive Officer, King Pharmaceuticals, Inc. (March 24, 2008) (finding the claim that "patients who are treated with [Avinza (morphine sulfate ER)] experience an improvement in their overall function, social function, and ability to perform daily activities . . . has not been demonstrated by substantial evidence or substantial clinical experience."). The FDA's warning letters were available to Defendants on the FDA website.

[75] *2016 CDC Guideline*, *supra*, at 20.

[76] Andrea D. Furlan, et al., *Opioids for Chronic Noncancer Pain: A Meta-Analysis of Effectiveness and Side Effects*, 174 Can. Med. Ass'n J. 1589 (2006), https://www.cmaj.ca/content/cmaj/174/11/1589.full.pdf.

[77] Thomas Frieden & Debra Houry, *Reducing the Risks of Relief – The CDC Opioid-Prescribing Guideline*, 374 New Eng. J. Med. 1503 (2016), https://www.nejm.org/doi/full/10.1056/NEJMp1515917 (hereinafter "*Reducing the Risks of Relief*").

[78] *2016 CDC Guideline*, *supra*, at 2, 18.

transient benefits [of opioids for chronic pain].”[79] As one pain specialist observed, “opioids may work acceptably well for a while, but over the long term, function generally declines, as does general health, mental health, and social functioning. Over time, even high doses of potent opioids often fail to control pain, and these patients are unable to function normally.”[80]

223. Defendants were aware of the value of misleading claims that opioid treatment would improve patients’ quality of life. For instance, Purdue noted:

> Janssen has been stressing decreased side effects, especially constipation, as well as patient quality of life, as supported by patient rating compared to sustained release morphine . . . We do not have such data to support OxyContin promotion. . . . In addition, Janssen has been using the “life uninterrupted” message in promotion of Duragesic for non-cancer pain, stressing that Duragesic “helps patients think less about their pain.” This is a competitive advantage based on our inability to make any quality-of-life claims.[81]

This statement highlights both the commercial value of quality-of-life claims and the lack of data supporting them.

### 8. Falsehood #8: Opioids are safer than other pain medications.

224. Defendants misleadingly claimed that opioids are safer than traditional painkillers like acetaminophen and nonsteroidal anti-inflammatory drugs (“NSAIDs”) like ibuprofen or acetaminophen by exaggerating the risks of NSAIDs and trivializing, or simply omitting, the risks of opioids.

225. These risks, which are not shared or are of much less concern with acetaminophen and NSAIDs, include hyperalgesia, a “known serious risk associated with chronic opioid analgesic therapy in which the patient becomes more sensitive to certain painful stimuli over time;”[82] hormonal

---

[79] *Reducing the Risks of Relief*, *supra*, at 1503.
[80] Andrea Rubinstein, *Are We Making Pain Patients Worse?*, 60 Sonoma Med. (Fall 2009).
[81] *Pain Killer*, *supra*, at 281.
[82] Woodcock-Kolodny Letter, *supra*.

dysfunction;[83] decline in immune function; mental clouding, confusion, and dizziness; increased falls and fractures in the elderly;[84] neonatal abstinence syndrome; and potentially fatal interactions with alcohol or with benzodiazepines.[85]

226. In fact, because of the risks of overdose and addiction, it is highly misleading to represent pain treatment with opioids as a safer alternative to traditional painkillers. In 2010, for example, the 1,109 fatal overdoses associated with acetaminophen and NSAIDs were a fraction of the 16,651 deaths associated with opioid medications.

227. As a result of the Marketing Defendants' deceptive promotion of opioids over safer and more effective drugs, opioid prescriptions increased even as the percentage of patients visiting a doctor for pain remained constant. A study of 7.8 million doctor visits between 2000 and 2010 found that opioid prescriptions increased from 11.3% to 19.6% of visits, while NSAID and acetaminophen prescriptions fell from 38% to 29%, driven primarily by a decline in NSAID prescribing.[86]

**9. Falsehood #9: Ostensibly "abuse-deterrent" formulations are safer.**

228. As the opioid crisis intensified in Arizona and elsewhere, Defendants capitalized on the problem they generated—the widespread diversion and misuse of opioids—by creating and marketing formulations purported to deter abuse and diversion. These purportedly "abuse-deterrent formulations" ("ADFs") make pills harder to crush, snort, or dissolve and inject. Defendants knew that these properties did not make their products resistant to the most common way that people abuse

---

[83] Harry W. Daniell, *Hypogonadism in Men Consuming Sustained-Action Oral Opioids*, 3 J. Pain 377 (2001), https://www.jpain.org/article/S1526-5900(02)00032-9/fulltext.

[84] *See* Bernhard M. Kuschel, et al., *The Risk of Fall Injury in Relation to Commonly Prescribed Medications Among Older People – A Swedish Case-control Study*, 25 Eur. J. Pub. Health 527 (2014), https://www.ncbi.nlm.nih.gov/pubmed/25085470.

[85] Karen H. Seal, et al., *Association of Mental Health Disorders with Prescription Opioids and High-Risk Opioids in US Veterans of Iraq and Afghanistan*, 307 J. Am. Med. Ass'n 940 (2012), https://jamanetwork.com/journals/jama/fullarticle/1105046.

[86] Matthew Daubresse, et al., *Ambulatory Diagnosis and Treatment of Nonmalignant Pain in the United States, 2000-2010*, 51 Med. Care, 870 (2013), https://insights.ovid.com/pubmed?pmid=24025657 ("For back pain alone, the percentage of patients prescribed opioids increased from 19% to 29% between 1999 and 2010, even as the use of NSAIDs or acetaminophen declined from 39.9% to 24.5% of these visits; and referrals to physical therapy remained steady."); *see also* John N. Mafi, et al., *Worsening Trends in the Management and Treatment of Back Pain*, 173 J. Am Med. Ass'n Internal Med. 1573, 1573 (2013), https://www.ncbi.nlm.nih.gov/pubmed/23896698.

opioids: by swallowing them, a fact that the FDA noted as early as 2009. Nevertheless, Defendants aggressively marked ADFs to the medical community, including prescribers in hospitals.

229. Moreover, websites and message boards, such as *bluelight.org* and *reddit.com*, reported a variety of ways to tamper with ADFs to release their opioids immediately, thereby defeating the effectiveness of ADFs, even against individuals who were clearly using the drugs nonmedically.

230. The CDC Guidelines confirm that "[n]o studies" support the notion that "abuse-deterrent technologies [are] a risk mitigation strategy for deterring or preventing abuse."[87] Tom Frieden, a former director of the CDC, reported that his staff could not find "any evidence showing the updated opioids [i.e., ADF opioids] actually reduce rates of addiction, overdoses, or death."[88]

231. Defendants also knew that these formulations did nothing to reduce the likelihood that a patient taking a pill orally for medical use would become addicted.

232. By falsely representing ADFs as safer, companies such as Purdue and Endo convinced prescribers that they could continue to "safely" prescribe opioids and thereby drove sales of Purdue's and Endo's expensive branded drugs.

233. In the case of Endo's Opana ER, the FDA found that those addicted responded to the reformulated version by switching from inhalation to injection, thereby magnifying, rather than reducing, risks.[89]

234. Because the new formulations did not prevent diversion nor misuse, the result of Defendants' marketing of ADFs as a solution only prolonged the opioid epidemic.

---

[87] *2016 CDC Guidelines*.

[88] Matthew Perrone, et al., *Drugmakers Push Profitable, but Unproven Opioid Solution*, Ctr. for Pub. Integrity (Dec. 15, 2016), https://publicintegrity.org/politics/state-politics/drugmakers-push-profitable-but-unproven-opioid-solution/.

[89] *FDA Requests Removal of Opana ER*, *supra*.

**10. Falsehood #10: Short-acting opioids should be used to treat chronic, noncancer "breakthrough" pain.**

235. Defendants disseminated the idea that short-acting or immediate-release opioids containing fentanyl should be taken in conjunction with long-acting or extended-release opioids to treat "breakthrough pain" for a variety of common chronic conditions. While breakthrough pain is recognized in cancer patients, Defendants broadened the definition to include a transitory flare of moderate-to-severe pain that occurs in any patient with otherwise persistent pain.

236. In the context of end-stage cancer treatment, patients taking long-acting opioids for their persistent pain may need a supplemental short-acting opioid to treat transient, intense pain—"breakthrough" cancer pain. Such patients are frequently in a carefully controlled setting like a hospital or treatment center.

237. Some short-acting opioids used to treat breakthrough cancer pain contain fentanyl. Fentanyl is a synthetic opioid 80 to 100 times stronger than morphine. More than 29,000 overdose deaths in the United States involved fentanyl and synthetic fentanyl analogs in 2017. In 2018, fentanyl "account[ed] for 522 of the 1,106 overdose deaths" in Arizona.[90]

238. Fentanyl treatments for breakthrough pain are deadly for people who are not already tolerant of opioids. They have never been accepted as a safe treatment for non-cancer chronic pain, partly because evidence shows that people who take these drugs for common chronic ailments are at a higher risk of abusing the drugs, which can lead to overdoses.

239. As part of their campaign to expand the market for their opioid products, Defendants marketed high-risk fentanyl-based opioids to fill that "need" in patients taking opioids for chronic conditions, even though Defendants knew that the safety of such use had never been established and that fentanyl-based opioids come with a high risk of addiction, overdose, and death. Defendants

---

[90] *Governor Ducey Signs Legislation*, *supra*.

created and disseminated the idea that short-acting, fentanyl-based opioids should be used, in addition to long-acting opioids, to treat "breakthrough pain" in patients using opioids for common ailments like back pain, with catastrophic results. These misrepresentations were directed at the medical community, including prescribers in hospitals.

**11. Falsehood #11: Despite heightened risk factors, the elderly and veterans can safely use opioids.**

240. Defendants aggressively marketed opioids to the medical community (including hospitals) as safe and effective for high-risk groups. For example, Defendants marketed opioids to veterans, even though opioids can cause fatal interactions with benzodiazepines, a common treatment for PTSD. Defendants did so without addressing these risks. For instance, in 2009 the American Pain Foundation, a Front Group discussed below, published *Exit Wounds: A Survival Guide to Pain Management for Veterans and their Families*; this publication was sponsored by Purdue, among others.[91]

241. *Exit Wounds* targeted veterans with misinformation about opioids. Presented as the personal narrative of a single veteran, *Exit Wounds* described opioids as the "gold standard" of pain medications, as "often underused," and as drugs that can "increase [your] level of functioning." The publication further stated, "[l]ong experience with opioids shows that people who are not predisposed to addiction are unlikely to become addicted to opioid pain medications." *Exit Wounds* did not address the significant dangers of taking benzodiazepines, commonly prescribed for PTSD, with opioids. The book encouraged veterans that they "may need to push" doctors "hard" to get their preferred pain treatment. The publication further suggested that patients should plan for a "recurrence of pain" by "having a supply of a pain medication on hand."[92]

242. Defendants also aggressively marketed opioids to elderly patients, even though the elderly suffer the same risk of dependence and tolerance that other opioid users experience. In fact,

---

[91] Derek McGinnis, *Exit Wounds: A Survival Guide to Pain Management for Veterans and Their Families* (2009).
[92] *Id.*

opioid use by older adults comes with additional risks, such as mental confusion and falls, which together with the weakening of bones associated with age can lead to more and more severe fractures. One study of more than 12,000 Medicare patients taking either opioids or other kinds of painkillers found that elderly patients using opioids were four times more likely to suffer a fracture; cardiovascular events were 77% higher in opioid users; and that such patients were 87% more likely to die (of any cause).[93] The elderly also face a significant risk of overdose. Older adults take multiple medications, which can lead to dangerous interactions between opioids and other drugs. And, as people age, medications affect them more strongly and are slower to leave their system.

243. For instance, elderly patients frequently suffer from osteoarthritis, but opioids are not approved to treat that condition. Purdue conducted a single study on osteoarthritis for its Butrans opioid, and it failed.[94] Purdue admitted in internal documents that its opioids "are not indicated for a specific disease" and that "it is very important that you never suggest to your HCP [health care professional] that OxyContin is indicated for the treatment of a specific disease state such as Rheumatoid Arthritis or Osteoarthritis." Nevertheless, to meet its business goals, Purdue trained its representatives to mislead doctors by promoting opioids for osteoarthritis without disclosing Purdue's failed trial.

244. Purdue also directed sales reps to use marketing materials that highlighted patients with osteoarthritis. An internal Purdue document questioned whether reps could sell more by remaining silent about the failed Butrans trial: "What can be said in response to a prescriber who asks directly or indirectly, 'can this product be prescribed for my patient with OA [osteoarthritis]?' In responding are we required to specifically mention the failed trials in OA?"

---

[93] John Fauber & Ellen Gabler, *Narcotics Use for Chronic Pain Soars Among Seniors*, Milwaukee J. Sentinel (May 29, 2012), http://archive.jsonline.com/watchdog/watchdogreports/narcotics-use-for-chronic-pain-soars-among-seniors-kg56kih-155555495.html.

[94] *Efficacy and Safety Evaluated in Opioid-Experienced Patients*, Butrans, https://butrans.com/clinical-data/trial-results.html (last visited July 12, 2021).

* * * * * * *

245. In sum, each of these misrepresentations regarding the use of opioids to treat chronic pain was either not supported by or was contrary to the scientific evidence. In addition, Defendants' misrepresentations and omissions were misleading and contrary to the labels of these products. Through these and other misrepresentations, Defendants misinformed and continue to misinform the medical community, including prescribers working in hospitals, and the public about the risks of opioid use.

### D. Defendants used a campaign of misinformation to increase opioid prescriptions for common chronic ailments.

246. Defendants utilized various channels to target the medical community and patients in Arizona with their deceptive, unfair, and unconscionable messages.

247. Defendants did not merely spread their misinformation through their own employees and publications. Defendants recognized that their messages would more strongly influence doctors, including hospital physicians, if those messages appeared to come from, or were reinforced by, purportedly independent sources. Defendants, therefore, used multiple, mutually reinforcing channels to spread their deceptive claims, including: (1) direct, targeted communications with prescribers by sales representatives or "detailers"; (2) "Front Groups" with the appearance of independence from the Marketing Defendants; (3) Key Opinion Leaders ("KOLs"), that is, doctors paid by the Marketing Defendants to promote their pro-opioid message; (4) mechanisms of disseminating their misleading messages through reputable organizations; (5) CME programs controlled and/or funded by the Marketing Defendants; (6) branded advertising; (7) unbranded advertising; (8) publications; and (9) speakers' bureaus and programs.

248. As a part of their deceptive marketing scheme, the Marketing Defendants identified and targeted susceptible prescribers, including those working in hospitals, and vulnerable patient populations in the United States and Arizona by, for example, focusing on primary care doctors, who

were more likely to prescribe drugs to chronic pain patients, but less likely to be educated about treating pain; such doctors were, therefore, more likely to accept the Marketing Defendants' misrepresentations about the risks and benefits of opioids.

249. To further facilitate this targeting, the Marketing Defendants purchased and closely analyzed prescription sales data from IMS Health (now IQVIA), a healthcare data collection, management, and analytics corporation. This data allowed them to precisely track the rates of initial and renewal prescribing by individual doctors, allowing more targeted and tailored appeals.

**1. Defendants used "detailers" to disseminate their misrepresentations directly to prescribers.**

250. The Marketing Defendants employed numerous sales representatives (also called "detailers") in Arizona to call and visit doctors' offices and hospitals and deliver deceptive messages about opioids to prescribers, including medical doctors, nurse practitioners, and physician assistants. These in-person sales calls are called "detailing." Sales representatives use meals and other perks to gain access to prescribers. Defendants gave their sales representatives funds, which sometimes totaled tens of thousands of dollars each year for a single representative, to buy "access" to prescribers' offices where they would promote and sell opioids.

251. Defendants' sales representatives knew or should have known that opioids were highly susceptible to misuse and diversion; that rates of opioid misuse and diversion were directly related to the amount and volume of opioids being prescribed; and that the escalating number of prescriptions for these highly addictive drugs and the sheer volume of pills flowing into Arizona indicated that opioids were being misused, abused, and diverted across the country and within Arizona. They knew or should have known that opioid addiction, abuse, and diversion and their related consequences would injure and damage communities across the country, including those in Arizona.

252. Defendants trained these representatives to deliver carefully tailored messages to prescribers across the nation, including in Arizona. Sales representatives were trained to evade

prescribers' questions regarding opioids' addictiveness and to misrepresent and conceal facts relating to opioid safety.

253. Defendants and their public-relations consultants prepared brochures, videos, and other marketing materials for sales representatives to distribute to providers during in-person visits. Defendants supported the sales representatives' detailing through other direct marketing activities such as e-mail blasts, letters, and advertisements in medical journals.

254. Defendants' sales representatives delivered misinformation about both branded and generic opioids. They knowingly or negligently provided false or misleading information to prescribers (including those in hospitals) within Arizona concerning the safety of opioids and the risk of addiction, abuse, and diversion.

255. Defendants' sales representatives had a financial incentive to provide false information to prescribers because their pay and continued employment depended on the volume of sales within their territories. Sales representatives received extremely lucrative bonuses, trips, and other items of value as a result of their success in pushing opioids into Arizona communities. Such incentives rewarded sales representatives who happened to have pill mills within their territories, enticing those sales representatives to look the other way even when their in-person visits to such clinics raised (or should have raised) numerous red flags.

256. By establishing close relationships with prescribers through detailing and small-group speaker programs, the Marketing Defendants were able to disseminate their misrepresentations in targeted, one-on-one settings that allowed them to promote their opioids and to allay individual prescribers' concerns about prescribing opioids for chronic pain.

257. The Marketing Defendants devoted and continue to devote massive resources to direct sales contacts with doctors. In 2014 alone, the Marketing Defendants spent $166 million to detail branded opioids to doctors. This amount is twice as much as the Marketing Defendants spent

on detailing in 2000. The amount included $108 million spent by Purdue, $34 million by Janssen, $13 million by Teva, and $10 million by Endo. These companies would not have spent so lavishly had detailing not been effective at increasing the prescribing rates.

258. Because it is known that in-person detailing affects prescribers' treatment decisions, the Marketing Defendants knew or should have known their detailing was a substantial factor in physicians, patients, and others prescribing, purchasing, or using opioids in Arizona.

259. Defendants identified barriers to the dissemination of their myths and used more misrepresentations to overcome those barriers. For example, when insurers refused to cover opioids for uses for which they had not been approved, the Marketing Defendants fought back, supplying health care providers with template letters containing misrepresentations that providers could use to challenge insurers' coverage determinations. The Distributor Defendants also worked with healthcare providers to get opioid prescriptions to be paid for by insurers, and they even operated toll-free hotlines to help patients negotiate with their health plans to cover their opioid prescriptions. By helping to ensure that insurance would cover prescriptions, Defendants undermined yet another check on over-prescription.

260. The Marketing Defendants used sales representatives in Arizona to deliver the misrepresentations about prescriptions opioids described above to health care providers within Arizona.

**2. Defendants used Front Groups to promote greater opioid use.**

261. Defendants, led by the Marketing Defendants, spread misinformation through front groups that were created to appear to be independent, neutral, third-party patient advocacy groups and professional associations (the "Front Groups"), but were in fact funded and influenced by Defendants. Defendants used these organizations as mouthpieces to promote the widespread use of

opioids for chronic pain by conveying the false and misleading messages described above. Defendants were thus able to promote their messages while concealing their involvement.

262. The importance of such groups cannot be discounted:

> Patient advocacy organizations and professional societies play a significant role in shaping health policy debates, setting national guidelines for patient treatment, raising disease awareness, and educating the public. Even small organizations—with 'their large numbers and credibility with policymakers and the public'—have 'extensive influence in specific disease areas.' Larger organizations with extensive funding and outreach capabilities 'likely have a substantial effect on policies relevant to their industry sponsors.'"[95]

263. These Front Groups released patient education materials, treatment guidelines, and CMEs that, despite the absence of evidence, overstated the benefits and understated the risks of using opioids to treat chronic pain.[96] Defendants then used, referenced, and distributed these ostensibly neutral materials to provide supposedly independent support for their marketing claims.

264. Treatment guidelines released by Front Groups are especially influential with primary care physicians and family doctors to whom Marketing Defendants promoted opioids and whose lack of specialized training in pain management made them more reliant on and less able to evaluate these guidelines. For that reason, the CDC has recognized that treatment guidelines can "change prescribing practices."[97] Such guidelines are an especially effective way to increase prescriptions of generic opioids because guidelines generally do not endorse specific brands.

265. The materials and misinformation disseminated by Front Groups rarely recommended specific brand name opioids. As a result, they were a form of unbranded marketing that drove sales of both branded and generic opioids.

---

[95] U.S. Senate Homeland Sec. & Governmental Affairs Comm., Ranking Members' Office, *Fueling an Epidemic, Report Two: Exposing the Financial Ties Between Opioid Manufacturers and Third Party Advocacy Groups* 2 (Feb. 12, 2018), https://www.hsdl.org/?abstract&did=808171 (hereinafter *Fueling an Epidemic Part Two*).

[96] *Id.* at 3.

[97] *2016 CDC Guideline*, *supra*.

266. Defendants funded these Front Groups in order to ensure supportive messages from seemingly neutral and credible third parties, and this funding did, in fact, ensure such supportive messaging—often at the expense of the Front Groups' own constituencies.

267. A 2017 U.S. Senate investigation "provide[d] the first comprehensive snapshot of the financial connections between opioid manufacturers and advocacy groups and professional societies operating in the area of opioids policy."[98] The report, *Fueling an Epidemic: Exposing the Financial Ties Between Opioid Manufacturers and Third Party Advocacy Groups*, found that the Marketing Defendants made millions of dollars' worth of contributions to various Front Groups.[99] The Marketing Defendants also "made substantial payments to individual group executives, staff members, board members, and advisory board members" affiliated with Front Groups.[100]

268. The Senate found that the Front Groups "amplified or issued messages that reinforce[d] industry efforts to promote opioid prescription and use, including guidelines and policies minimizing the risk of addiction and promoting opioids for chronic pain."[101] The report also found that these groups "lobbied to change laws directed at curbing opioid use, strongly criticized landmark CDC guidelines on opioid prescribing, and challenged legal efforts to hold physicians and industry executives responsible for over prescription and misbranding."[102]

269. The Marketing Defendants took an active role in funding, guiding, reviewing, and approving many of the false and misleading statements issued by the Front Groups, ensuring that Defendants were consistently in control of their content. Defendants acted in concert with and through the Front Groups, each working with the other to deceptively promote the use of opioids for the treatment of chronic pain.

---

[98] *Fueling an Epidemic Part Two*, *supra*, at 2.
[99] *Id.* at 3.
[100] *Id.* at 10.
[101] *Id.* at 12–15.
[102] *Id.* at 12.

270. While the Marketing Defendants dominated these organizations, as explained in more detail below, Cardinal, ABDC, McKesson, and Anda participated in at least the American Pain Foundation's Pain Care Forum through their own trade group.

271. The desired and achieved effect of Defendants' funding and control of the Front Groups and Defendants' resulting ability to use the favorable materials to promote opioid prescriptions and sales was to increase the sales of both generic and branded opioids.

272. The roles of various Front Groups are discussed below.

**a. American Pain Foundation**

273. The most prominent of the Front Groups was the American Pain Foundation ("APF").

274. The APF's 1998 business plan stated that "most pain sufferers are under-medicated" and that "many [physicians] are reluctant to prescribe opioids because they mistakenly think their patients will become addicted to the drug or because they fear investigation and sanctions by the regulatory bodies."[103] APF made it a three-year objective to reduce the "percentage of Americans who agree that it is easy to become addicted to pain medication."[104]

275. Although APF held itself out as an independent patient advocacy organization, it was actually funded almost entirely by the pharmaceutical industry. For instance, it received 88% of its funding in 2010 from drug manufacturers, including Purdue, Endo, Janssen, and Cephalon; Endo contributed over half of the APF's funding that year—more than $1 million. In all, APF received more than $10 million in funding from opioid manufacturers from 2007 until it closed its doors in May 2012, over half from Endo ($5.9 million) along with $633,300 from Janssen and $25,000 from Purdue

[103] Am. Pain Found., *1998 Business Plan* § 3-2 (June 1998), https://www.finance.senate.gov/download/apf-1998-business-plan.

[104] *Id.* § 7-2.

in 2012. By 2011, APF was entirely dependent on incoming grants from Purdue, Cephalon, Endo, and others to avoid using its line of credit.

276. This funding was not disinterested. As Purdue told APF in 2001, the basis of a grant to the organization was Purdue's desire to strategically align its investments in nonprofit organizations that shared its business interests. As a result, APF operated in close collaboration with Defendants, submitting grant proposals seeking to fund activities and publications suggested by Defendants and assisting in marketing projects for Defendants.

277. This alignment of interests was expressed most forcefully in the fact that Purdue hired APF to provide consulting services on its marketing initiatives. Purdue and APF entered into a "Master Consulting Services" Agreement on September 14, 2011. That agreement gave Purdue substantial rights to control APF's work related to a specific promotional project. Moreover, based on the assignment of particular Purdue "contacts" for each project and APF's periodic reporting on their progress, the agreement enabled Purdue to be regularly aware of the misrepresentations APF was disseminating regarding the use of opioids to treat chronic pain in connection with that project. The agreement gave Purdue—but not APF—the right to end the project (and, thus, APF's funding) for any reason.

278. In return for its funding, APF provided the Marketing Defendants with frequent and detailed updates, such as an accomplishments memo sent to Purdue's president, Richard Sackler, highlighting multiple initiatives, including lobbying and public relations efforts to fight "misconceptions about [o]pioids in the [press]," noting that it sent background materials to 1,200 health journalists.[105]

---

[105] Am. Pain Found., Letter from John D. Giglio, Executive Dir., Am. Pain Found., to Richard S. Sackler, President, Purdue Pharma, L.P. (Feb. 18, 2002), https://www.finance.senate.gov/download/apf-purdue-correpondence-2001-2005-apf65-111.

279. APF's Board of Directors was largely comprised of doctors who were on the Marketing Defendants' payrolls, either as consultants or as speakers for medical events.

280. APF also developed materials and initiatives intended to influence prescribers and patients through the media. For example, APF published *A Reporter's Guide: Covering Pain and Its Management*, which promotes the false concept of pseudoaddiction and claimed that "the potential for addiction is low for the vast majority of patients using opioids for the long-term management of chronic pain." The guide argues that under-treatment of pain is a greater concern than addiction and asserts that, "[u]nless a patient has a past or current history of substance abuse, the potential for addiction is low." It warned reporters that "misunderstandings" about physical dependence and tolerance "reinforce the stigma surrounding legitimate medical use of these medicines" and "fuel fears of addiction" that "may impinge on patient access to these medications." The guide also claims that dependence is "not related to addiction"—an absurd statement given that physical dependence is a major reason people become addicted.[106]

281. APF published a guide sponsored by Cephalon and Purdue, *Treatment Options: A Guide for People Living with Pain*, and distributed 17,200 copies of this guide in 2007 alone. This guide contains multiple misrepresentations regarding opioid use, including that opioids are an appropriate first-line therapy for chronic pain.[107]

282. *Treatment Options* also represented the risk of death as a reason to avoid NSAIDs and warned that risks of NSAIDs increase if "taken for more than a period of months," with no corresponding warning about opioids. Under a heading asking "[s]hould I take these pain medicines?", the publication claimed that "NSAIDs can cause life-threatening side effects in some persons" and

---

[106] Am. Pain Found., *A Reporter's Guide: Covering Pain and Its Management*, https://web.archive.org/web/20111011052403/http://www.painfoundation.org/learn/publications/files/reporters-guide.pdf (last accessed July 16, 2021 as of Oct. 11, 2011).

[107] Am. Pain Found., *Treatment Options: A Guide for People Living with Pain*, https://ce4less.com/Tests/Materials/E019Materials.pdf (last visited July 12, 2021) (hereinafter *Treatment Options*).

that "[t]here are 10,000 to 20,000 deaths each year because of the side effects of this class of medicines,"[108] when the actual figure is closer to 3,200.[109] In contrast, *Treatment Options* posed no such question about the appropriateness of opioids. Rather, the publication stated that opioids could be "increased over time" and that there was "no ceiling dose as there is with the NSAIDs."[110] This comparison is deceptive because opioids also pose severe and life-threatening effects, particularly at higher doses, and more people die each year from opioid use than from NSAID use.

283. *Treatment Options* also trivialized the risk of addiction. It stated that law enforcement officers' use of the phrase "'narcotics'" to describe opioids "reinforces myths and misunderstandings as it places emphasis on potential abuse rather than on the importance of their use as pain medicines." The publication dismissed the concern that an "average person" could become addicted to opioids and blamed this concern for doctors' hesitation to write opioid prescriptions and for the fact that opioids were, as a result, "under-used." It also claimed that withdrawal can be prevented by slowly reducing the dose, without addressing that many people have an extremely difficult time weaning themselves off opioids once they become physically dependent.[111]

284. The same publication claimed that opioid drugs could give patients "a quality of life [they] deserve." The publication further represented that despite the "great benefits of opioids, they are often under-used" because providers and patients may be fearful of them.[112]

285. APF spread other messages to promote Defendants' agenda as well, including media releases criticizing "unbalanced" media coverage of opioids.

---

[108] *Id.*

[109] Robert E. Tarone, et al., *Nonselective Nonaspirin Nonsteroidal Anti-Inflammatory Drugs and Gastrointestinal Bleeding: Relative and Absolute Risk Estimates from Recent Epidemiologic Studies*, 11 Am. J. Therapeutics 17 (2004), https://pubmed.ncbi.nlm.nih.gov/14704592/.

[110] *Treatment Options*, *supra*.

[111] *Id.*

[112] *Id.*

286. APF also developed the National Initiative on Pain Control (the "NIPC"), which ran a facially unaffiliated website, *painknowledge.org*. NIPC promoted itself as an education initiative led by its expert leadership team, including purported experts in the pain management field. NIPC published unaccredited[113] prescriber education programs, including a series of "dinner dialogues." But it was Endo that substantially controlled NIPC by funding NIPC projects; developing, specifying, and reviewing the programs' content; and distributing NIPC materials. Endo's control of NIPC was such that Endo listed it as one of its "professional education initiative[s]" in a plan submitted to the FDA. Yet, Endo's involvement in NIPC was nowhere disclosed on the website pages describing NIPC or on *painknowledge.org*. Endo estimated it would reach 60,000 prescribers through NIPC.[114]

287. This website proclaimed that "[p]eople who take opioids as prescribed usually do not become addicted" and that opioid dosages should be raised until "you are on the right dose of medication for your pain," without addressing the dangers that high doses of opioids present to patients. The website listed certain adverse effects from opioids but omitted the severe adverse effects of hyperalgesia, immune system and hormone dysfunction, cognitive impairment, tolerance, dependence, addiction, and death. *Painknowledge.org* represented that, with opioids,"your level of function should improve; you may find you are now able to participate in activities of daily living, such as work and hobbies, that you were not able to enjoy when your pain was worse." In addition to "improved function," the website touted an improved quality of life as a benefit of opioid therapy.[115] The grant request that Endo approved for this project specifically indicated NIPC's intent to make claims of functional improvement.

---

[113] Accredited programs are reviewed by a third party and must meet certain requirements of independence from pharmaceutical companies.

[114] Endo Pharmaceuticals, *Risk Minimization Action Plan for OPANA ER (Oxymorphone Hydrochloride) Extended-Release Tablets* (June 2007) (hereinafter, *Opana REMS*).

[115] *Pain: Opioid Therapy*, painknowledge.org, https://web.archive.org/web/20101007083722/http://painknowledge.org/patiented/pdf/B697_%20Patient%20Handout_FINAL.pdf (last accessed July 13, 2021 as of Jan. 19, 2012) (hereinafter *Pain: Opioid Therapy*).

288. *Pain: Opioid Facts*, a brochure available on *Painknowledge.org*, stated that "people who have no history of drug abuse, including tobacco, and use their opioid medication as directed will probably not become addicted."[116]

289. In addition, a 2009 patient education publication, *Pain: Opioid Therapy*, funded by Endo and posted on *Painknowledge.org*, omitted addiction from the "common risks" of opioids:[117]

> **As with any medication, there are some side effects that are associated with opioid therapy. The most common side effects that occur with opioid use include the following:**
>
> - Constipation
> - Drowsiness
> - Confusion
> - Nausea
> - Itching
> - Dizziness
> - Shortness of breath
>
> Your healthcare provider can help to address and, in some cases, prevent side effects that may occur as a result of opioid treatment. Less severe side effects, including nausea, itching, or drowsiness, typically go away within a few days without the need for further treatment. If you experience any side effects, you should let your healthcare provider know immediately.

290. APF was often called upon to provide "patient representatives" for the Marketing Defendants' promotional activities, including for Purdue's *Partners Against Pain* and Janssen's *Let's Talk Pain*.

291. APF's messages regarding pain treatment have reached millions of people, nationwide and in Arizona.

292. The close relationship between APF and the Marketing Defendants demonstrates APF's lack of independence. Its willingness to allow the Marketing Defendants to control its activities and messages supports an inference that each Defendant that worked with it was able to exercise

---

116 *Pain: Opioid Facts*, painknowledge.org, https://web.archive.org/web/20120112051109/http://www.painknowledge.org/patiented/pdf/Patient%20Education%20b380_b385%20%20pf%20opiod.pdf (last accessed July 14, 2021 as of Jan. 19, 2012).

117 *Pain: Opioid Therapy*, *supra*.

editorial control over its publications—even when Defendants' messages contradicted APF's internal conclusions.

293. In May 2012, the U.S. Senate Finance Committee began looking into APF to determine the links, financial and otherwise, between the organization and opioid manufacturers. Within days of being targeted by the Senate investigation, APF's board voted to dissolve the organization "due to irreparable economic circumstances." APF then "cease[d] to exist, effective immediately."[118] Without support from the Marketing Defendants, to whom APF could no longer be useful, APF was no longer financially viable.

**b. American Academy of Pain Medicine and the American Pain Society**

294. The American Academy of Pain Medicine ("AAPM") and the American Pain Society ("APS") are professional medical societies that received substantial and regular funding from Defendants who were thus able to wield influence over them.

295. Through 2019, AAPM received lavish funding totaling nearly $10 million from opioid manufacturers. Purdue paid $2,798,769; J&J paid $570,174; Janssen paid $562,674; Insys paid $52,725; and Teva and Cephalon contributed over $1 million. Endo contributed $1.3 million[119] and also funded AAPM CMEs.[120] In 2011 alone, AAPM received $1.3 million from pharmaceutical companies.

296. As to APS, Purdue paid $3,418,210; J&J paid $1,793,906; Endo paid $5,208,065; and Janssen paid $60,000. Altogether, opioid manufacturers contributed over $12 million to APS through 2019.[121]

---

[118] Charles Ornstein & Tracy Weber, *American Pain Foundation Shuts Down as Senators Launch Investigation of Prescription Narcotics* (May 8, 2012), https://www.propublica.org/article/senate-panel-investigates-drug-company-ties-to-pain-groups.

[119] Sen. Chuck Grassley & Sen. Ron Wyden, Senate Fin. Comm., *Findings from the Investigation of Opioid Manufacturers' Financial Relationships with Patient Advocacy Groups and Other Tax-Exempt Entities* 19–37 (Dec. 16, 2020) (hereinafter *December 2020 Senate Bipartisan Opioids Report*).

[120] *Id.*

[121] *Id.*

297. AAPM's corporate relations council, which required members to pay $25,000 in addition to any other funding, included Purdue, Endo, Cephalon, and Allergan. The benefits of membership included meetings with AAPM executive committee members in small settings and allowing members to present deceptive but purportedly educational programs at a dinner symposium in connection with AAPM's annual meeting held in Palm Springs or other resort locations.

298. AAPM's past presidents include Dr. J. David Haddox (1998), Dr. Scott Fishman (2005), Dr. Perry G. Fine (2011), and Dr. Lynn Webster (2013), all of whom have well-documented connections to opioid manufacturers. In this way, Defendants were able to influence AAPM.

299. Dr. Fishman, a KOL for the Marketing Defendants, stated that he would place AAPM "at the forefront" of teaching that "the risks of addiction are . . . small and can be managed."[122] Despite its mission to address pain management in general, the conferences sponsored by AAPM heavily emphasized CME sessions on opioids—37 out of roughly 40 at one conference alone.

300. In 1997, AAPM and APS jointly issued a consensus statement, *The Use of Opioids for the Treatment of Chronic Pain*, which endorsed opioids to treat chronic pain and claimed that the risk of addiction to opioids was low.[123] Dr. Haddox, who co-authored the statement, was a paid speaker for Purdue at the time. Dr. Portenoy was the sole consultant.[124] The consensus statement remained on AAPM's website until 2011.

301. The AAPM offered a CME on *The Truth About Pain Management* in conjunction with a 2007 annual meeting, and the chief lecturer promoting pseudoaddiction had financial ties to Cephalon and Purdue.[125]

---

[122] Interview by Paula Moyer with Scott M. Fishman., Prof. of Anesthesiology & Pain Med., Chief of the Div. of Pain Med., Univ. of Cal., Davis (2005), http://www.medscape.org/viewarticle/500829.

[123] Am. Acad. of Pain Med. & Am. Pain Soc'y, *The Use of Opioids for the Treatment of Chronic Pain* (1997).

[124] Am. Acad. of Pain Med. & Am. Pain Soc'y, *The Use of Opioids for the Treatment of Chronic Pain*, 13 J. Pharmaceutical Care in Pain & Symptom Control 6 (Mar. 1997).

[125] *The Truth About Pain Management: The Interface of Pain and Addiction*, Am. Acad. Pain Med., https://aapm.confex.com/aapm/2007am/techprogram/S1237.HTM (last visited July 14, 2021); *Addiction: Just What Is It?*, Am. Acad. Pain Med., https://aapm.confex.com/aapm/2007am/techprogram/P1664.HTM (last visited July 14, 2021).

302. AAPM and APS issued their own guidelines in 2009 (the "2009 Guidelines") by a "multidisciplinary expert panel" but with Defendants' assistance, prompting, involvement, and funding. The 2009 Guidelines recommended the use of opioids to treat chronic pain and the use of screening tools to identify patients at a purportedly high risk of addiction. The panel made these recommendations despite the fact that *none* of its recommendations were "supported by high quality evidence," and only four of its 25 recommendations were supported "by even moderate quality evidence."[126]

303. Attesting to Defendants' influence on these recommendations, 14 of the 21 panel members, including KOLs Drs. Fine and Portenoy, received support from the Marketing Defendants: six from Purdue, eight from Teva, nine from Janssen, and nine from Endo.[127]

304. Dr. Gilbert Fanciullo, who served on the AAPM/APS Guidelines panel, has since described the 2009 Guidelines as "skewed" by drug companies and "biased in many important respects," including the high presumptive maximum dose, lack of suggested mandatory urine toxicology testing, and claims of a low risk of addiction.

305. The 2009 Guidelines have been a particularly effective channel of deception. They have influenced not only treating physicians, particularly those without specialized training who rely on published guidelines more heavily, but also the scientific literature on opioids; they were reprinted in the *Journal of Pain*, have been cited hundreds of times in academic literature, were disseminated during the relevant time period, and were and are available online.

306. The Marketing Defendants widely cited and promoted the 2009 Guidelines without disclosing the lack of evidence to support the guidelines' conclusions, the Marketing Defendants'

[126] Roger Chou, et al., Am. Pain Soc'y & Am. Acad. of Pain Med. Opioids Guidelines Panel, *Clinical Guidelines for the Use of Chronic Opioid Therapy in Chronic Noncancer Pain*, 10 J. Pain 113 (2009), https://www.jpain.org/action/showPdf?pii=S1526-5900%2808%2900831-6 (hereinafter *APS & AAPM Guidelines*).
[127] *Id.*

involvement in the guidelines' development, or their financial backing of the guidelines' authors. For example, a 2009 speaker presentation prepared by Endo, *The Role of Opana ER in the Management of Moderate to Severe Chronic Pain*, used the 2009 Guidelines while omitting their disclaimer about the lack of evidence for recommending the use of opioids for chronic pain.

**c. Federation of State Medical Boards**

307. The Federation of State Medical Boards ("FSMB") is a trade organization representing the various state medical boards in the United States. These boards have the power to license doctors, investigate complaints, and discipline physicians.

308. The FSMB finances opioid- and pain-specific programs through grants from Defendants. For instance, the FSMB sponsored an online CME available for credit entitled *Extended Release and Long Acting Opioids: Assessing Risks, Safe Prescribing* that included some of the misrepresentations described above.[128]

309. Since 1998, the FSMB has been developing guidelines for the use of opioids for treating pain. The 1998 version, *Model Guidelines for the Use of Controlled Substances for the Treatment of Pain* (the "1998 Guidelines")[129] was produced "in collaboration with pharmaceutical companies." Purdue paid $100,000 for the printing and distribution of FSMB's Guidelines.[130]

310. The 1998 Guidelines did not teach that opioids are only appropriate in limited cases after other treatments have failed, but rather that opioids are "essential" for treating chronic pain, including as a first-line therapy.[131] A 2004 iteration of the 1998 Guidelines made the same claims.[132]

---

[128] Opioid CME, CME List, https://www.cmelist.com/opioid-cme/ (last visited July 30, 2021).

[129] *Model Guidelines for the Use of Controlled Substances for the Treatment of Pain*, Fed. St. Med. Bds. (May 1998), https://web.archive.org/web/19990202032433/http://www.fsmb.org/pain.htm (last accessed July 13, 2021 as of Feb. 2, 1999) (hereinafter *1998 FSMB Guidelines*).

[130] John Fauber, *Follow the Money: Pain, Policy, and Profit*, MedPage Today (Feb. 19, 2012), https://www.medpagetoday.com/neurology/painmanagement/31256.

[131] *1998 FSMB Guidelines.*

[132] *Model Guidelines for the Use of Controlled Substances for the Treatment of Pain*, Fed. St. Med. Bds. (May 2004), https://web.archive.org/web/20050103015118/http://www.fsmb.org/ (click "Pain Policy Research Center"; then click "Model Policy") (last accessed July 13, 2021 as of Jan. 3, 2005).

FSMB's Guidelines were posted online and were available and intended to reach physicians nationwide, including those in Arizona.

311. The Marketing Defendants used the 1998 Guidelines to convey the alarming message that "under-treatment of pain" would result in official discipline, but that no discipline would result if opioids were prescribed as part of an ongoing patient relationship in which prescription decisions were documented. FSMB thus turned doctors' fear of discipline on its head.

312. FSMB's 2007 publication, *Responsible Opioid Prescribing*, was backed largely by drug manufacturers, including Purdue, Endo, and Cephalon. This publication was also supported by APF and AAPM; Dr. Fishman wrote the text and Dr. Fine served on the Board of Advisors.[133] Belying its title, *Responsible Opioid Prescribing* made claims similar to those in the 1998 Guidelines, asserting that opioid therapy to relieve pain and improve function is a legitimate medical practice for chronic pain of non-cancer origins; that pain is under-treated; and that patients should not be denied opioid medications, except in light of clear evidence that such medications are harmful to the patient. The publication taught that behaviors such as "requesting drugs by name," "demanding or manipulative behavior," seeing more than one doctor to obtain opioids, and hoarding, all of which are signs of genuine addiction, are really signs of "pseudoaddiction," which is a false concept. This publication inaccurately claimed that "[m]ultiple clinical studies" showed that opioids improved daily function, psychological health, and overall quality of life for those suffering from chronic pain.[134]

313. The FSMB website described it as the "leading continuing medical education (CME) activity for prescribers of opioid medications."[135] Endo sales representatives distributed copies of

---

[133] *Project Sponsors*, Fed'n St. Med. Bds., https://web.archive.org/web/20071112193505/http://www.fsmb.org/RE/PAIN/projectsponsors.html (last accessed July 13, 2021 as of Nov. 12, 2007).

[134] Scott M. Fishman, *Responsible Opioid Prescribing: A Physician's Guide* (2007) (hereinafter, *Responsible Opioid Prescribing*).

[135] *Responsible Opioid Prescribing: A Clinician's Guide*, Fed'n St. Med. Bds., https://web.archive.org/web/20130115014329/http://www.fsmb.org/book/ (last accessed July 13, 2021 as of Jan. 15, 2013).

*Responsible Opioid Prescribing* with a special introductory letter from Dr. Fishman. Evidencing its influence, 163,131 copies of *Responsible Opioid Prescribing* were distributed by state medical boards.[136]

314. The Marketing Defendants made additional contributions to the FSMB to further their misleading advertising. For example, Purdue paid FSMB $822,400.06 over 8 years.[137] Cephalon paid FSMB a total of $180,000 in 2007, 2008, and 2011.[138] Endo paid FSMB $371,620 over a 5-year period.[139] Mallinckrodt paid FSMB $100,000 in 2011.[140]

#### d. The Joint Commission and the Pain & Policy Study Group of the University of Wisconsin

315. The Joint Commission f/k/a the Joint Commission on Accreditation of Healthcare Organizations ("JCAHO" prior to 2007 and "Joint Commission" thereafter) is the oldest and largest healthcare standards-setting and performance-improvement organization in the United States. It accredits and certifies approximately 21,000 public and private health care organizations and programs in the United States. One of its principal purposes is the accreditation of hospitals.

316. The Joint Commission accredits 99% of health care organizations in the United States. Hospitals view losing Joint Commission accreditation as a disaster because the loss of accreditation means losing an automatic right to participate in Medicare and Medicaid and can also cause private insurers to refuse to pay for hospital care.[141] Moreover, loss of accreditation by JCAHO can require a hospital to expend enormous resources to become reaccredited.

---

136 Email from Dr. Scott Fishman to Charles Ornstein (Dec. 15, 2011), https://assets.documentcloud.org/documents/279033/fishman-responses-to-propublica.pdf (hereinafter "Email from Dr. Scott Fishman to Charles Ornstein").

137 Letter from Humayun J. Chaudhry, President and CEO, FSMB, to the Hon. Max Baucus and Hon. Charles Grassley, U.S. Senate (June 8, 2012), https://s3.documentcloud.org/documents/3109089/FSMB-Response-Letter-to-US-Senate.pdf.

138 *Id.*

139 *Id.*

140 *Id.*

141 Terry Richards, *Consultant: Loss of Hospital Accreditation Can Be Catastrophic* (Sept. 27, 2018), https://www.valdostadailytimes.com/news/local_news/consultant-loss-of-hospital-accreditation-can-be-catastrophic/article_169da87d-3eb5-5aca-a4ee-f32409481b07.html.

317. Because compliance with Joint Commission standards is critical for hospitals, drug manufacturers and those in the supply chain who profit from drug sales understand that Joint Commission standards that effectively require the use of their drug product are an ideal path to lucrative sales. To take advantage of this situation, Defendants made it their paramount goal in the late 1990s to influence JCAHO to enact standards making pain the "fifth vital sign," thereby encouraging (and in some cases all but requiring) the use of opioids to treat hospital patients' pain.

318. The Marketing Defendants advanced their campaign of deception to influence JCAHO to enact favorable pain standards through Front Groups such as APF, APS, and UW-PPSG, whose efforts to advocate for the assessment and treatment of pain and to minimize the risks of addiction from opioids were financed primarily by the Robert Wood Johnson Foundation, an organization that still holds a significant amount of J&J stock.

319. Supported by these entities and the efforts of the Marketing Defendants, FSMB enacted its 1998 Pain Guidelines, and JCAHO enacted Pain Standards in 1999, co-authored by the National Pharmaceutical Council ("NPC"), another Front Group.[142] A JCAHO pain care guide written to explain the new standards claimed that "[s]ome clinicians have inaccurate and exaggerated concerns" regarding addiction and that "[t]his attitude prevails despite the fact that there is no evidence that addiction is a significant issue when persons are given opioids for pain control."[143]

320. Because the JCAHO Standards totally transformed the standard of care for treating pain in hospitals and other healthcare organizations, their effective date was delayed until 2001. In the interim, JCAHO, the Marketing Defendants, and Front Groups and KOLs supported by the Marketing Defendants engaged in a well-financed effort to persuade hospitals, prescribers, and even

[142] *1998 FSMB Guidelines*, *supra*.
[143] *December 2020 Senate Bipartisan Opioids Report*, *supra*, at 6–7.

consumers to adopt the messages embodied in the new standards: opioids should be used to treat pain and were not addictive when so used.

321. The Marketing Defendants provided additional financial support to JCAHO while it was developing a pain care guide and other materials to be distributed to hospitals and pain care providers that reflected the JCAHO Standards. Purdue reported paying over $2.1 million directly to JCAHO from 2000 to 2002, including $560,000 in 2000; $981,359 in 2001; and $582,649 in 2002. J&J contributed $14,919 in 2001, and Endo contributed a total of $75,000 in 2000 and 2001 and another $500,325 in 2011. Janssen also directly contributed.[144] J&J contributed $498,791 to JCAHO in 2011 to support JCAHO's continued efforts to enforce its standards on healthcare organizations that it certified, including hospitals.

322. In 2000, Purdue sponsored a JCAHO book that falsely claimed that "there is no evidence that addiction is a significant issue when persons are given opioids for pain control."[145] It also called doctors' concerns about addiction side effects "inaccurate and exaggerated," a claim that is contrary to scientific evidence and the cautious approach to opioid use historically taken by the medical profession.[146]

323. In October 2001, Purdue paid $58,272 to fund a JCAHO publication, *Pain Assessment and Management: An Organizational Approach*. In August 2000, Purdue also paid $85,000 to fund two JCAHO videos for "Pain Management in Special Populations: Geriatric and Disease Related Pain."[147]

324. In 2001, Ortho McNeil (now Janssen) provided $66,000 in funding to JCAHO for the "Pain Management: An Overview for Clinicians" audioconference.[148]

---

[144] *Id.* at 19–37.

[145] Sonia Moghe, *Opioid History: From 'Wonder Drug' to Abuse Epidemic*, CNN (Oct. 13, 2016), https://www.cnn.com/2016/05/12/health/opioid-addiction-history/ (hereinafter *Wonder Drug*).

[146] *Id.*

[147] *December 2020 Senate Bipartisan Opioids Report*, *supra*, at 6.

[148] *Id.*

325. NPC paid $155,104 between 2001 and 2002 for JCAHO to develop "a monograph designed as a reference for clinicians, quality professionals, researchers and others involved in performance assessment, improvement, education, and policy decisions related to pain management within healthcare organizations."[149] This monograph, *Pain: Current Understanding of Assessment, Management and Treatments*, was published in December 2001 and required assessment of pain in all patients.[150]

326. The Marketing Defendants further supported these activities with payments to UW-PPSG, FSMB, and other Front Groups intending to implement the change in the standard of care for treating pain forced by the 1998 FMSB and 1999 JCAHO pain standards. For example, Purdue's total contribution to UW-PPSG from 1997 to 2012 was $2,054,178, including $175,000 in 2001; $85,024 in 2002; $280,000 in 2003; $282,220 in 2004; $670,388 in 2005; and $142,500 in 2006. In addition, Purdue gave a total of $904,742 to FSMB to support their activities relative to their 1998 Pain Guidelines, including $199,895 in 2004; $339,000 in 2005; $50,000 in 2006; and $100,000 in 2007. Endo contributed to UW-PPSG a total of $666,965 through 2012, including a total of over $230,000 between 2001 and 2004.[151]

327. As a result of the Marketing Defendants' efforts to manipulate the standard of care, many hospitals, including Plaintiffs, risked losing their JCAHO accreditation if they did not incorporate the "fifth vital sign" standard and put pain at the forefront of their treatment. The result of the change that the JCAHO standards prompted by the activities of the Marketing Defendants and their Front Groups was to increase opioid prescribing and administration within hospitals, which were effectively forced to comply with these new standards.

---

[149] *Id.* (quoting letter from Mark Chassin, President, The Joint Commission, to Sen. Baucus & Sen. Grassley (June 2012)).

[150] Nat'l Pharm. Council & Joint Comm'n on Accreditation of Healthcare Orgs., *Pain: Current Understanding of Assessment, Management, and Treatments* (Dec. 1999), https://www.npcnow.org/sites/default/files/media/Pain-Current-Understanding-of-Assessment-Management-and-Treatments.pdf.

[151] *December 2020 Senate Bipartisan Opioids Report*, *supra*, at 7, 19–37.

328. For example, the emergency department at Oconomowoc Memorial Hospital in Wisconsin achieved 10 consecutive years of patient satisfaction in the 99th percentile, a feat no other emergency department in the United States had been able to accomplish.[152] However, during its routine survey, JCAHO found that the department was not documenting follow-up questions after prescribing pain medications to patients in accordance with the new standards.[153] JCAHO gave the emergency department only one quarter to bring its compliance with the new standards up to 90%.[154] The emergency department could not, placing the entire hospital's JCAHO accreditation at risk, despite the extremely high patient satisfaction rate.

329. Since 2001, JCAHO standards relating to pain assessment and management have been revised to lessen emphasis on pain. However, the damage caused by the Marketing Defendants' campaign could not be undone. Dr. David W. Baker, JCAHO's executive vice president for health care quality evaluation, explains that "the concept that iatrogenic addiction was rare and that long acting opioids were less addictive had been greatly reinforced and widely repeated, and studies refuting these claims were not published until several years later."[155]

**e. Alliance for Patient Access**

330. Founded in 2006, the Alliance for Patient Access ("AfPA") is a self-described patient advocacy and health professional organization that styles itself as "a national network of physicians dedicated to ensuring patient access to approved therapies and appropriate clinical care."[156] It is run

---

[152] Testimony of Tim Westlake, U.S. Senate Comm. on Homeland Sec. & Gov't Affairs (Apr. 15, 2016), https://www.hsgac.senate.gov/imo/media/doc/Testimony-Westlake-2016-04-15-REVISED.pdf.

[153] *Id.*

[154] *Id.*

[155] David W. Baker, In Reply, *The Joint Commission and the Opioid Epidemic*, 318 J. Am. Med. Ass'n 91 (2017), https://jamanetwork.com/journals/jama/article-abstract/2635622.

*The Joint Commission's Pain Standards: Origins and Evolution* (May 5, 2017) (hereinafter *Origins and Evolution*).

[156] Anne Marie Hummel, *New Treatments Provide Hope for Respiratory Patients*, Am. Ass'n for Respiratory Care (May 19, 2021), https://www.aarc.org/an21-new-treatments-provide-hope-for-respiratory-patients/; *see also About AfPA*, Alliance for Patient Access, https://allianceforpatientaccess.org/about (last visited July 27, 2021). References herein to AfPA include two affiliated groups: the Global Alliance for Patient Access and the Institute for Patient Access.

by Woodberry Associates LLC, a lobbying firm that was also established in 2006.[157] As of June 2017, the AfPA listed 30 "Associate Members and Financial Supporters." The list includes J&J, Endo, Mallinckrodt, Purdue, and Cephalon.

331. AfPA's board members have also directly received substantial funding from pharmaceutical companies.[158] For instance, board vice president Dr. Srinivas Nalamachu ("Nalamachu") received more than $800,000 from 2013 through 2015 from pharmaceutical companies—nearly all of it from manufacturers of opioids or drugs that treat opioids' side effects, including from Endo, Purdue, Cephalon, and nonparty Insys. Nalamachu's clinic was raided by FBI agents in connection with an investigation of Insys and its payment of kickbacks to physicians who prescribed an Insys opioid.[159] Other board members have included Dr. Robert A. Yapundich, who received $215,000 from 2013 through 2015 from pharmaceutical companies, including payments by Cephalon and Mallinckrodt; Dr. Jack D. Schim, who received more than $240,000 between 2013 and 2015 from pharmaceutical companies, including Endo, Mallinckrodt, and Cephalon; Dr. Howard Hoffberg, who received $153,000 between 2013 and 2015 from pharmaceutical companies, including Endo, Purdue, Mallinckrodt, and Cephalon; and Dr. Robin K. Dore, who received $700,000 between 2013 and 2015 from pharmaceutical companies.

332. Among its activities, AfPA issued a white paper, *Prescription Pain Medication: Preserving Patient Access While Curbing Abuse.*[160] The white paper criticizes prescription monitoring programs,

---

[157] Mary Chris Jaklevic, *Non-profit Alliance for Patient Access Uses Journalists and Politicians to Push Big Pharma's Agenda*, Health News Rev. (Oct. 2, 2017), https://www.healthnewsreview.org/2017/10/non-profit-alliance-patient-access-uses-journalists-politicians-push-big-pharmas-agenda/.

[158] All information concerning pharmaceutical company payments to doctors in this paragraph is from ProPublica's Dollars for Docs database, https://projects.propublica.org/docdollars/.

[159] Andy Marso, *FBI Seizes Records of Overland Park Pain Doctor Tied to Insys*, Kan. City Star (July 19, 2017), https://www.kansascity.com/news/business/health-care/article162569383.html.

[160] Inst. for Patient Access, *Prescription Pain Medication: Preserving Patient Access While Curbing Abuse*, (Oct. 2013), http://alliancebpm.wpengine.com/wp-content/uploads/2016/05/2014-11-13-pt-white-paper-final-1-1-pdf.pdf.

purporting to express concern that they are burdensome, not user friendly, and of questionable efficacy:

> Prescription monitoring programs that are difficult to use and cumbersome can place substantial burdens on physicians and their staff, ultimately leading many to stop prescribing pain medications altogether. This forces patients to seek pain relief medications elsewhere, which may be much less convenient and familiar and may even be dangerous or illegal.
>
> ***
>
> In some states, physicians who fail to consult prescription monitoring databases before prescribing pain medications for their patients are subject to fines; those who repeatedly fail to consult the databases face loss of their professional licensure. Such penalties seem excessive and may inadvertently target older physicians in rural areas who may not be facile with computers and may not have the requisite office staff. Moreover, threatening and fining physicians in an attempt to induce compliance with prescription monitoring programs represents a system based on punishment as opposed to incentives.
>
> ***
>
> We cannot merely assume that these programs will reduce prescription pain medication use and abuse.[161]

333. The white paper also purports to express concern about policies that have been enacted in response to the prevalence of pill mills:

> Although well intentioned, many of the policies designed to address this problem have made it difficult for legitimate pain management centers to operate. For instance, in some states, [pain management centers] must be owned by physicians or professional corporations, must have a Board certified medical director, may need to pay for annual inspections, and are subject to increased record[-]keeping and reporting requirements. . . . [I]t is not even certain that the regulations are helping prevent abuses.[162]

---

[161] *Id.* at 4–5 (footnote omitted).
[162] *Id.* at 5–6.

334. In addition, in an echo of earlier industry efforts to push back against what they termed "opiophobia," the white paper laments the stigma associated with prescribing and taking pain medication:

> Both pain patients and physicians can face negative perceptions and outright stigma. When patients with chronic pain can't get their prescriptions for pain medication filled at a pharmacy, they may feel like they are doing something wrong – or even criminal. . . . Physicians can face similar stigma from peers. Physicians in non-pain specialty areas often look down on those who specialize in pain management – a situation fueled by the numerous regulations and fines that surround prescription pain medications.[163]

The white paper concludes that "[p]rescription pain medications, and specifically opioids, can provide substantial relief for people who are recovering from surgery, afflicted by chronic painful diseases, or experiencing pain associated with other conditions that does not adequately respond to over-the-counter drugs."[164]

335. The AfPA also issues "Patient Access Champion" financial awards to members of Congress, including 50 such awards in 2015. The awards were funded by a $7.8 million donation from unnamed donors. While ostensibly given for protecting patients' access to Medicare and touted by their recipients as demonstrating a commitment to protecting the rights of senior citizens and the middle class, they were generally given to members of Congress who supported the AfPA's agenda.[165]

336. The AfPA also lobbies Congress directly. In 2015, the AfPA signed onto a letter supporting legislation proposed to limit the ability of the DEA to police pill mills by enforcing the "suspicious orders" provision of the Controlled Substances Act.[166] The AAPM was also a signatory to this letter. An internal DOJ memo stated that the proposed bill "'could actually result in increased

[163] *Id.* at 6.
[164] *Id.* at 7.
[165] Jaklevic*, supra.*
[166] Letter from Alliance for Patient Access, et al., to Reps. Tom Marino, Marsha Blackburn, Peter Welch, & Judy Chu (Jan. 26, 2015).

diversion, abuse, and public health and safety consequences,'"[167] and, according to DEA Chief Administrative Law Judge John J. Mulrooney, the law would make it "all but logically impossible" to prosecute manufacturers and distributors, like Defendants here, in the courts.[168] In part due to AfPA's lobbying efforts, the bill became law in 2016.

337. Although purporting to be a physician-advocacy organization, AfPA's funding stream tied it to the Marketing Defendants and other drug manufacturers. For instance, in 2017, all of AfPA's approximately $2 million in revenue was generated from contributions and grants, 90% of which were from pharmaceutical manufacturers. Three opioid makers led the way: Teva ($40,000), Mallinckrodt ($75,000), and Pfizer ($40,000).[169] In addition, between 2012 and 2018, Mallinckrodt contributed $615,000; Teva contributed $500,000; and Purdue contributed $165,000.[170]

338. AfPA manages a coalition called the Alliance for Balanced Pain Management, which it acquired from Mallinckrodt in 2016. As part of the acquisition, Mallinckrodt paid AfPA $200,000 to support the coalition and to pay for an annual summit that the coalition hosts. The Alliance for Balanced Pain Management describes its mission as advocating for "balanced pain management by supporting organizations and individuals who share a common goal to reduce pain, reduce medicine abuse and improve care."[171] Its members include patient groups such as the American Chronic Pain Foundation and U.S. Pain Foundation, which have strong financial ties to opioid manufacturers. It is led by a Steering Committee that includes several individuals who have received about $480,000 from opioids manufacturers.[172]

---

[167] Bill Whitaker, *Ex-DEA Agent: Opioid Crisis Fueled by Drug Industry and Congress*, CBS News (Oct. 17, 2017) https://www.cbsnews.com/news/ex-dea-agent-opioid-crisis-fueled-by-drug-industry-and-congress/.

[168] J John J. Mulrooney, II & Katherine E. Legel, *Current Navigation Points in Drug Diversion Law: Hidden Rocks in Shallow, Murky, Drug-Infested Waters*, 101 Marquette L. Rev. 333 (2017), https://scholarship.law.marquette.edu/cgi/viewcontent.cgi?article=5348&context=mulr.

[169] *December 2020 Senate Bipartisan Opioids Report*, *supra*, at 12.

[170] *Id.* at 26.

[171] *Id.* at 14–15.

[172] *Id.*

### f. U.S. Pain Foundation

339. The U.S. Pain Foundation ("USPF") was another Front Group with systematic connections to and interpersonal relationships with the Marketing Defendants. It describes itself as an educational and advocacy organization for people with chronic pain. USPF has engaged in advocacy efforts nationwide, including through its participation in 62 advocacy coalitions and active engagement on 80 legislative bills.[173] USPF was also a critical component of the Marketing Defendants' lobbying efforts to reduce limits on over-prescription.

340. USPF was one of the largest recipients of contributions from opioid manufacturers, collecting nearly $3 million from Purdue, Janssen, Depomed, and Insys between 2012 and 2015.[174] Drug and device manufacturers contributed a total of over $6.3 million to USPF between 2012 and 2018. Teva paid $789,000; Purdue gave $249,6000 from 2012 to 2018; J&J contributed $192,000; Endo contributed $130,000; and Janssen paid $7,500 in 2014.[175] J&J is still listed as a sponsor on USPF's website.[176]

341. USPF advertised its ties to the Marketing Defendants, listing opioid manufacturers like Pfizer, Teva, Depomed, Endo, Purdue, McNeil (i.e., Janssen), and Mallinckrodt as "Platinum," "Gold," and "Basic" corporate members.[177] Front Groups like AAPM, APS, and PhRMA are also USPF members.

### g. American Geriatrics Society

342. The American Geriatrics Society ("AGS"), a trade association of geriatrics professionals, was another Front Group with systematic connections to the Marketing Defendants.

---

[173] U.S. Pain Found., *2017 Annual Report* (n.d.), https://uspainfoundation.org/wp-content/uploads/2018/09/2017-annual-report.pdf.

[174] *Fueling an Epidemic Part Two*, *supra*, at 4.

[175] *December 2020 Senate Bipartisan Opioids Report*, *supra*, at 37.

[176] *Funding & Financials*, U.S. Pain Found., https://uspainfoundation.org/funding/ (last visited July 12, 2021).

[177] *Fueling an Epidemic Part Two*, *supra*, at 12; *Transparency*, U.S. Pain Found., https://web.archive.org/web/20170305004324/https://uspainfoundation.org/transparency/ (last accessed July 13, 2021 as of Mar. 5, 2017).

The Marketing Defendants used the AGS to target the elderly by making false representations to prescribers and consumers and advocating for increased treatment of the elderly with opioids.

343. AGS was a large recipient of contributions from the Marketing Defendants, including Endo, Purdue, and Janssen. Between 1997 and 2012, Purdue contributed a total of $443,548 to AGS; J&J contributed $565,626; and Endo paid $341,785.[178] Purdue paid an additional $11,785 from 2012 to 2017[179] and provided $40,000 in "corporate roundtable dues" to AGS's Health in Aging Foundation, an affiliated 501(c)(3) organization between 2012 and 2015.[180]

344. AGS contracted with Purdue, Endo, and Janssen to disseminate guidelines regarding the use of opioids for chronic pain in 2002 called *The Management of Persistent Pain in Older Persons* ("2002 AGS Guidelines"),[181] and again in 2009, this time called *Pharmacological Management of Persistent Pain in Older Persons* ("2009 AGS Guidelines").[182] Purdue, Janssen, and Endo also participated in the production of these guidelines, whose authors included a number of paid consultants to Endo, Janssen, Purdue, and Cephalon. Purdue sponsored CMEs based on these guidelines.

345. The 2009 AGS Guidelines recommended that "[a]ll patients with moderate to severe pain . . . should be considered for opioid therapy." The panel made "strong recommendations" in this regard despite "low quality of evidence" and concluded that the risk of addiction is manageable even in patients with a prior history of drug abuse.[183] These Guidelines further advised that "the risks [of addiction] are exceedingly low in older patients with no current or past history of substance abuse." These recommendations are not supported by any study or other reliable scientific evidence.

---

[178] *December 2020 Senate Bipartisan Opioids Report*, *supra*, at 22–23.

[179] *Fueling an Epidemic Part Two*, *supra*, at 4.

[180] Letter from Nancy E. Lundebjerg, CEO, Am. Geriatrics Soc'y, to Sen. Claire McCaskill (Oct. 11, 2017).

[181] AGS Panel on Persistent Pain in Older Persons, *The Management of Persistent Pain in Older Persons*, 50 J. Am. Geriatrics Soc'y S205 (2002), https://pubmed.ncbi.nlm.nih.gov/12067390/.

[182] AGS Panel on Pharmacological Management of Persistent Pain in Older Persons, *The Pharmacological Management of Persistent Pain in Older Persons*, 57 J. Am. Geriatrics Soc'y 1331 (2009), https://www.ncbi.nlm.nih.gov/pubmed/19573219 (hereinafter *2009 AGS Guidelines*).

[183] *Id.* at 1342.

Nevertheless, they have been cited over 500 times in Google Scholar since their 2009 publication, a testament to their significant influence and wide dissemination.

346. One panel member, Dr. Joel Saper, Clinical Professor of Neurology at Michigan State University and founder of the Michigan Headache & Neurological Institute, resigned from the panel because of his concerns that the Guidelines were influenced by contributions that drug companies made to the sponsoring organizations and committee members. For example, Dr. Bruce Ferrell was an AGS task force chairman for the 2009 Guidelines but was also a paid speaker for Endo and helped conduct a Purdue-funded CME for treating osteoarthritis pain with opioids.[184]

347. AGS's common purpose with the Marketing Defendants is evidenced by the fact that AGS's internal discussions in August 2009 reveal that it did not want to receive up-front funding from drug companies as that would suggest drug company influence. Instead, AGS opted to accept commercial support to disseminate pro-opioid publications.

348. AGS, along with AAPM, served as a "partner" in a 2009 Janssen-sponsored publication, *Finding Relief: Pain Management for Older Adults*, which contained misrepresentations about opioids.[185]

349. Representatives of the Marketing Defendants, often at informal meetings during conferences, suggested activities, lobbying efforts, and publications for AGS to pursue. AGS then submitted grant proposals, knowing that drug companies would support projects conceived as a result of these meetings.

350. Members of the AGS Board of Directors were doctors who were on the Marketing Defendants' payrolls, either as consultants or as speakers for medical events.

---

[184] *Painkiller Boom*, *supra*.

[185] Am. Acad. of Pain Med., *Finding Relief: Pain Management for Older Adults* (2009) (hereinafter *Finding Relief*).

**h. American Chronic Pain Association**

351. After the American Chronic Pain Association ("ACPA") was founded in 1980, it became influenced by the opioid industry. The organization received funding from opioid makers, medical device manufacturers, and companies that market opioid therapies for opioid-related conditions. These payments funded materials that "appear to help sell products sold by opioid manufacturers, discussed opioid therapy while sidestepping the addictive nature of drugs, and attributed responsibility for overdoses for people who misuse opioids."[186]

352. Between 2012 and 2018, contributions to ACPA totaled $3,193,795 and included the following amounts from the Marketing Defendants: Teva ($1,005,975); Endo ($399,250); Purdue ($386,470); J&J ($120,000); Mallinckrodt ($55,775); Janssen ($25,000); and Cephalon ($10,000).[187]

353. Between 2013 and 2016, 10 members of ACPA's Advisory Board received more than $140,000 from opioid manufacturers, including Endo.

**i. National Pharmaceutical Council**

354. The National Pharmaceutical Council ("NPC") is an organization of pharmaceutical companies styled as a "policy research organization." Its functions include "information dissemination" to benefit its members. Upon information and belief, most of the Marketing Defendants (including but not limited to Allergan, Mallinckrodt, J&J, and Teva) are or have been members of the NPC during the relevant time period. NPC is currently funded by, among others, J&J, Mallinckrodt, and Teva.[188]

**j. C.A.R.E.S. Alliance**

355. In 2010, Mallinckrodt created the C.A.R.E.S. (Collaborating and Acting Responsibly to Ensure Safety) Alliance, which it describes as "a coalition of national patient safety, provider and

---

[186] *December 2020 Senate Bipartisan Opioids Report*, *supra*, at 10–12 (and authorities cited therein).

[187] *Id.* at 31.

[188] *Meet Our Members*, Nat'l Pharm. Council, https://www.npcnow.org/about/members (last visited July 12, 2021).

drug diversion organizations that are focused on reducing opioid pain medication abuse and increasing responsible prescribing habits." It further described this Front Group as a "patient safety initiative which provides education and tools to healthcare professionals and patients to support responsible opioid prescribing and safe use."[189] Materials distributed by the C.A.R.E.S. Alliance include unbranded publications promoting the use of opioids to treat noncancer chronic pain that do not disclose the link to Mallinckrodt. For example, by 2012 the C.A.R.E.S. Alliance was promoting the book *Defeat Chronic Pain Now!* to doctors and patients.[190]

356. The C.A.R.E.S. Alliance worked closely with other front groups. For example, the Alliance offered to send doctors copies (for free) of *Clinical Guidelines for the Use of Opioid Therapy in Chronic Noncancerous Pain*, written by APS and the AAPM, and *Responsible Opioid Prescribing*, a work written by Dr. Fishman and sponsored by Purdue, Endo, and Teva.[191] In addition, a portion of the sales of *Defeat Chronic Pain Now!* were donated to APF.[192]

**k. Collaborative for Opioids REMS Education**

357. For certain medications with a high risk for serious side effects (including abuse), the FDA can require pharmaceutical manufacturers, drugmakers, and/or patients to participate in a Risk Evaluation and Mitigation Strategy ("REMS").

358. The Marketing Defendants participated in REMS-related Front Groups that disseminated false or misleading information about the safety of prescription opioids.

359. One of these organizations is CO*RE (Collaborative for Opioids REMS Education), which is essentially a front group of front groups—its "partners" include APS as well as standard

---

[189] C.A.R.E.S. All., *Fact Sheet* (Feb. 2011), https://www.justice.gov/sites/default/files/usao-ndga/legacy/2011/03/02/C.A.R.E.S.%20Alliance%20Fact%20Sheets.pdf.

[190] C.A.R.E.S. All., *C.A.R.E.S. Alliance Tools: Catalog and Order Form* 13 (n.d.) (hereinafter *C.A.R.E.S. Alliance Tools*)..

[191] C.A.R.E.S. All., *C.A.R.E.S. Alliance Tools: Catalog and Order Form* 6 (n.d.).

[192] *Defeat Chronic Pain Now*, http://www.defeatchronicpainnow.com/ (last visited July 12, 2021) (hereinafter *Defeat Chronic Pain Now Website*).

professional organizations such as the American Academy of Physician Assistants and the American Association of Nurse Practitioners, but the "Funder Information" indicates that the project is funded by the Marketing Defendants, including Allergan, Endo, Janssen, Purdue, and Teva.[193] CO*RE has an affiliated organization: the ER/LA Opioid Analgesics REMS Program Companies, a consortium that includes Purdue, Allergan, Endo, Janssen, Mallinckrodt, and Teva.[194] This entity funded the creation of the *Opioid REMS* CME with a grant.

360. *Opioid REMS* CMEs were created by Endo consultants, including Dr. Charles Argoff (who consulted for Teva and Janssen and co-authored the book *Defeat Chronic Pain Now!*, which was promoted by Mallinckrodt's C.A.R.E.S. Alliance), Dr. Steven Stanos (who also consulted for Janssen), and one non-Endo consultant, Dr. Paul Arnstein, who consulted for Janssen and Mallinckrodt. These CMEs continued to promote discredited and false ideas about the safety of prescription opioids.

**l. Other Front Groups**

361. Other Front Groups used and funded by the Marketing Defendants to promulgate their misleading pro-opioids messages included the Academy of Integrative Pain Management (Purdue—$1,091,024.86), the ACS Cancer Action Network (Purdue—$168,500.00[195]), the American Chronic Pain Association (Purdue—$312,470), the American Society of Pain Educators (Purdue—$30,000), the American Society of Pain Management Nursing (Purdue—$242,535), the Center for Practical Bioethics (Janssen—$8000; Purdue—$145,095), the Washington Legal Foundation (Purdue—$500,000), and the National Initiative on Pain Control (Endo—at least $31,000,000).

* * * * * * *

[193] *What Is CO*RE?*, CO*RE, http://core-rems.org/about-core/ (last visited July 12, 2021).

[194] *Project Partners*, CO*RE, http://core-rems.org/opioid-education/participants/ (last visited July 12, 2021).

[195] Payments from Purdue to the American Cancer Society Cancer Action Network include payments to the American Cancer Society that could potentially have applied to the Cancer Action Network. *See* Production from Purdue Pharma to the Senate Homeland Security and Governmental Affairs Committee (Nov. 13, 2017).

362. The Front Groups succeeded in spreading Defendants' misinformation about opioids, nationwide and in Arizona. Their publications and messages were widely available, caused inappropriate opioid prescribing, and many remain available today. The Marketing Defendants' false messages through the Front Groups have thus continued to this day.

**3. The Marketing Defendants paid Key Opinion Leaders to deceptively promote opioid use.**

363. The Marketing Defendants also spread misinformation through purported medical experts, known as Key Opinion Leaders ("KOLs"), whom the Marketing Defendants paid to deliver deceptive messages because of their ability to influence their peer prescribers. Although funded by the Marketing Defendants, the KOLs were used to present the appearance that unbiased and reliable medical research supporting the broad use of opioid therapy for chronic pain had been conducted and was being reported on by independent medical professionals. This use of KOLs was intentionally designed to lend legitimacy to their opinions, making doctors and their patients more likely to accept their claims.

364. The Marketing Defendants carefully vetted their KOLs to ensure that they were likely to remain on message and supportive of the Marketing Defendants' agenda. KOLs were employed and sponsored to tout the purported benefits of opioid treatment for chronic pain in books, medical literature, pamphlets, research studies, treatment guidelines, speeches, and CMEs.

365. Rather than being independent, KOLs were paid by the Marketing Defendants to present misrepresentations about opioids. Payments took the form of honoraria for speaking at conferences or delivering CMEs, consulting fees, payments for creating promotional videos for opioids, travel and lodging expenses, and food and beverage expenses. Each of the Marketing Defendants also hired KOLs as paid consultants, advisory board members, and members of the Marketing Defendants' speakers' bureaus. KOLs were also placed on boards of Front Groups. As a result of all of these activities, the KOLs acquired money, prestige, and recognition.

366. The Marketing Defendants also provided research funding and publication opportunities to KOLs for studies supporting Defendants' claims, thereby enabling KOLs to push the Marketing Defendants' deceptive messages out to the medical community. To ensure that the messaging was always favorable, the Marketing Defendants kept close tabs on the content published by KOLs; the Marketing Defendants did not support, acknowledge, or disseminate truly independent publications critical of chronic opioid therapy. Once the Marketing Defendants identified and funded KOLs and those KOLs began to publish "scientific" papers supporting the Marketing Defendants' false position that opioids were safe and effective for the treatment of chronic pain, the Marketing Defendants poured significant funds and resources into a marketing machine that widely cited and promoted their KOLs' studies or articles to drive prescriptions of opioids for chronic pain. The Marketing Defendants cited to, distributed, and marketed these studies and articles as if they were independent medical literature so that they would be well-received by the medical community. The Marketing Defendants trained their sales representatives to use the studies of KOLs (that had been funded by the Marketing Defendants) to persuade doctors to prescribe opioids liberally even where the safety of such uses had not been established.

367. The KOLs furthered Defendants' scheme to increase the number of opioid prescriptions and opioid use by consumers in Arizona and elsewhere.

368. In their promotion of the use of opioids to treat chronic pain, the Marketing Defendants' KOLs either knew that their statements were false and misleading or recklessly disregarded their truth or falsity. Nevertheless, these KOLs continued to publish their misstatements to benefit themselves and the Marketing Defendants.

369. In recent years, some of the Marketing Defendants' KOLs have conceded that many of their past claims in support of opioid use lacked evidence or support in the scientific literature.[196]

370. Some of the most prominent KOLs, paid by a number of the Marketing Defendants, included Drs. Lynn Webster, Russell Portenoy, Perry Fine, and Scott Fishman.

**a. Dr. Russell Portenoy**

371. In 1986, Dr. Russell Portenoy, who later became Chairman of the Department of Pain Medicine and Palliative Care at Beth Israel Medical Center, reported that "[f]ew substantial gains in employment or social function could be attributed to the institution of opioid therapy."[197]

372. Writing in 1994, Dr. Portenoy described the prevailing attitudes regarding the dangers of long-term opioid use:

> The traditional approach to chronic non-malignant pain does not accept the long-term administration of opioid drugs. This perspective has been justified by the perceived likelihood of tolerance, which would attenuate any beneficial effects over time, and the potential for side effects, worsening disability, and addiction. According to conventional thinking, the initial response to an opioid drug may appear favorable, with partial analgesia and salutary mood changes, but adverse effects inevitably occur thereafter. It is assumed that the motivation to improve function will cease as mental clouding occurs and the belief takes hold that the drug can, by itself, return the patient to a normal life. Serious management problems are anticipated, including difficulty in discontinuing a problematic therapy and the development of drug seeking behavior induced by the desire to maintain analgesic effects, avoid withdrawal, and perpetuate reinforcing psychic effects. There is an implicit assumption that little separates these outcomes from the highly aberrant behaviors associated with addiction.[198]

---

[196] *See*, *e.g.*, *Painkiller Boom*, *supra* (reporting that a key Endo KOL acknowledged that opioid marketing went too far).

[197] Russell Portenoy & Kathy Foley, *Chronic Use of Opioid Analgesics in Non-Malignant Pain: Report of 38 cases*, 25 Pain 171 (1986), https://www.ncbi.nlm.nih.gov/pubmed/2873550.

[198] Russell Portenoy, *Opioid Therapy for Chronic Nonmalignant Pain: Current Status*, 1 Progress in Pain Res. & Mgmt., 247 (H.L. Fields and J.C. Liebeskind eds., 1994) (emphasis added).

According to Dr. Portenoy, the foregoing problems could constitute "compelling reasons to reject long-term opioid administration as a therapeutic strategy in all but the most desperate cases of chronic nonmalignant pain."[199]

373. Despite having taken this position on long-term opioid treatment, Dr. Portenoy ended up promoting the use of prescription opioids and minimizing their risks as a spokesperson for Purdue and other Marketing Defendants. A respected leader in the field of pain treatment, Dr. Portenoy was highly influential. Dr. Andrew Kolodny, co-founder of Physicians for Responsible Opioid Prescribing, described him "lecturing around the country as a religious-like figure. The megaphone for Portenoy is Purdue, which flies in people to resorts to hear him speak. It was a compelling message: 'Docs have been letting patients suffer; nobody really gets addicted; it's been studied.'"[200]

374. As one organizer of CME seminars who worked with Portenoy and Purdue pointed out, "had Portenoy not had Purdue's money behind him, he would have published some papers, made some speeches, and his influence would have been minor. With Purdue's millions behind him, his message, which dovetailed with their marketing plans, was hugely magnified."[201]

375. Dr. Portenoy was also a critical component of the Marketing Defendants' control over their Front Groups. He sat as a director on the APF board and was the APS president.[202]

376. In 2009, Portenoy was the co-chair of a committee that authored *A Call to Revolutionize Chronic Pain Care in America: An Opportunity for Reform in Health Care*, which represented that "[i]ndividuals with chronic pain often need a combination of multiple daily medications, and sometimes opioids (strong pain medications), psychological, behavioral and social interventions, rehabilitation therapy, and complementary treatments." The report featured testimonials of patients

---

[199] *Id.*

[200] *Dreamland*, *supra*, at 314.

[201] *Id.* at 136.

[202] *See Treatment Options*, *supra*; Chris McGreal, *US Medical Group That Pushed Doctors to Prescribe Painkillers Forced to Close*, Guardian (May 25, 2019), https://www.theguardian.com/us-news/2019/may/25/american-pain-society-doctors-painkillers.

treated with opioids, which were the only class of analgesic identified by name in this report. The report specifically recommended:

> Federal, state and local agencies should publicly adopt a balanced approach to the regulation of controlled prescription drugs, particularly opioids. The clinical decisions of prescribers should not be inappropriately influenced by fear of regulatory scrutiny. Research has shown that state laws continue to harbor requirements that are outdated or reflect poor medical practice. A balance must be achieved between the legitimate need to protect public safety and public health through efforts to reduce drug abuse and diversion, and the imperative to address the public health problem of unrelieved pain.

The implication of this recommendation was that more, not fewer, opioids should be prescribed to chronic pain patients.[203]

377. This report had an influence in Arizona. One of the signatories to the report was Theodore Price, an assistant professor of pharmacology at the University of Arizona.[204]

378. Dr. Portenoy has now admitted that he minimized the risks of opioids[205] and that he "gave innumerable lectures in the late 1980s and '90s about addiction that weren't true."[206] He mused, "Did I teach about pain management, specifically about opioid therapy, in a way that reflects misinformation? Well, against the standards of 2012, I guess I did . . ."[207]

379. In a 2011 interview, Portenoy stated that his earlier work purposefully relied on evidence that was not "real" and left real evidence behind:

> I gave so many lectures to primary care audiences in which the Porter and Jick article was just one piece of data that I would then cite, and I would cite six, seven, maybe ten different avenues of thought or avenues of evidence, <u>none of which represented real evidence</u>, and yet what I was trying to do was to create a narrative so that the primary care audience would look at this information in [total] and feel more

---

[203] The Mayday Fund, *A Call to Revolutionize Chronic Pain Care in America: An Opportunity in Health Care Reform* (Nov. 4, 2009), https://maydayfund.org/wp-content/uploads/2019/08/FINAL-MAYDAY-REPORT-08.22.2019.pdf.

[204] *Id.*

[205] Celine Gounder, *Who Is Responsible for the Pain-Pill Epidemic?*, New Yorker (Nov. 8, 2013), https://www.newyorker.com/business/currency/who-is-responsible-for-the-pain-pill-epidemic.

[206] Thomas Catan & Evan Perez, *A Pain-Drug Champion Has Second Thoughts*, Wall Street J. (Dec. 17, 2012), https://www.wsj.com/articles/SB10001424127887324478304578173342657044604.

[207] *Id.*

> comfortable about opioids in a way they hadn't before. In essence this was education to destigmatize [opioids], and because the primary goal was to destigmatize, we often left evidence behind.[208]

As he told *The Wall Street Journal* in 2012, "data about the effectiveness of opioids does not exist."[209]

380. Several years earlier, when interviewed by journalist Barry Meier for his 2003 book, *Pain Killer*, Dr. Portenoy was more direct: "It was pseudoscience. I guess I'm going to have always to live with that one."[210]

**b. Dr. Lynn Webster**

381. Another KOL, Dr. Lynn Webster, was the co-founder and Chief Medical Director of the Lifetree Clinical Research & Pain Clinic in Salt Lake City, Utah. Dr. Webster was president of AAPM in 2013 and was a Senior Advising Editor of *Pain Medicine*, the AAPM's journal—the same journal that published Endo's special advertising supplements touting Opana ER.[211] Dr. Webster was the author of numerous CMEs sponsored by Cephalon, Endo, and Purdue. At the same time, Dr. Webster was receiving significant funding from Defendants (including nearly $2 million from Cephalon).

382. Dr. Webster created and promoted the *Opioid Risk Tool*, a five-question, one-minute screening tool relying on patient self-reports that purportedly allows doctors to manage the risk that their patients will become addicted to or abuse opioids.[212] Versions of this tool appear on, or are linked to, websites run by Endo, Janssen, and Purdue.

---

[208] Harrison Jacobs, *This one-paragraph letter may have launched the opioid epidemic*, Bus. Insider (May 26, 2016), http://www.businessinsider.com/porter-and-jick-letter-launched-the-opioid-epidemic-2016-5; Andrew Kolodny, *Opioids for Chronic Pain: Addiction is NOT Rare*, YouTube (Oct. 30, 2011), https://www.youtube.com/watch?v=DgyuBWN9D4w&feature=youtu.be.

[209] *Empire of Pain*, *supra*, at 343.

[210] *Pain Killer*, *supra*, at 277.

[211] *CRI Lifetree Chief Medical Directors Dr. Lynn Webster Named President of the American Academy of Pain Medicine (AAPM)*, Scorr Marketing (Apr. 23, 2013), https://www.scorrmarketing.com/news/cri-lifetree-chief-medical-director-dr-lynn-webster-named-president-of-the-american-academy-of-pain-medicine-aapm/; Elaine Silvestrini, *Profiting from Pain*, Drug Watch, https://www.drugwatch.com/featured/opioid-crisis-big-pharma/ (last modified June 29, 2021).

[212] Lynn Webster & Rebecca Webster, *Predicting Aberrant Behaviors in Opioid-Treated Patients: Preliminary Validation of the Opioid Risk Tool*, 6 Pain Med. 432 (2005).

383. In 2011, Dr. Webster presented a webinar sponsored by Purdue titled *Managing Patients' Opioid Use: Balancing the Need and the Risk*. This webinar misleadingly taught that risk screening tools, urine testing, and patient agreements to prevent "overuse of prescriptions" and "overdose deaths." This webinar was available to and was intended to reach doctors at hospitals such as Plaintiffs.

384. Dr. Webster is himself tied to numerous overdose deaths. He and the Lifetree Clinic were investigated by the DEA for overprescribing opioids after twenty patients died from overdoses. In keeping with the Marketing Defendants' promotional messages, Dr. Webster apparently believed the solution to patients' tolerance or addictive behaviors was more opioids; he prescribed staggering quantities of pills.

385. Like Dr. Portenoy, Dr. Webster has since admitted that his former representations about the safety of opioids were false: "It's obviously crazy to think that only 1% of the population is at risk of opioid addiction . . . . It's just not true."[213]

**c. Dr. Perry Fine**

386. Dr. Perry Fine's ties to the Marketing Defendants are well documented. He has authored articles, testified in court cases and before state and federal committees, and argued against legislation restricting the prescription of high doses of opioids to noncancer patients. He has served on Purdue's advisory board, consulted for Janssen, and participated in CME activities for Endo; he has served in similar capacities for several other drug companies. He co-chaired the APS-AAPM Opioid Guideline Panel, served as treasurer of AAPM from 2007 to 2010 and as president of that group from 2011 to 2013, and sat on the board of directors of APF.[214]

---

[213] *Empire of Pain*, *supra*, at 343.

[214] Scott M. Fishman, *Incomplete Financial Disclosures in a Letter on Reducing Opioid Abuse and Diversion*, 306 J. Am. Med. Ass'n 1445 (2011), https://jamanetwork.com/journals/jama/article-abstract/1104464 (hereinafter *Incomplete Financial Disclosures*).

387. Multiple videos feature Dr. Fine delivering educational talks about prescription opioids. He even testified at trial that the 1,500 pills a month prescribed to celebrity Anna Nicole Smith before her death did not make her an addict.[215]

388. Dr. Fine has also acknowledged failing to disclose numerous conflicts of interest, including to his own employer, the University of Utah. For example, he told the university that he had received under $5,000 in 2010 from J&J for providing "educational" services, but J&J's website states that the company paid him $32,017 that year for consulting, promotional talks, meals, and travel.[216]

389. Drs. Fine and Portenoy co-wrote the Endo-supported *A Clinical Guide to Opioid Analgesia*, which downplayed the risks of opioid treatment, such as respiratory depression and addiction:

> At clinically appropriate doses . . . respiratory rate typically does not decline. Tolerance to the respiratory effects usually develops quickly, and doses can be steadily increased without risk.
>
> Overall, the literature provides evidence that the outcomes of drug abuse and addiction are rare among patients who receive opioids for a short period (i.e., for acute pain) and among those with no history of abuse who receive long-term therapy for medical indications.

This publication also promoted the discredited idea of pseudoaddiction and the myth that "long-term opioid therapy of an older population with no history of substance abuse is rarely associated with de novo development of abuse or addiction."[217]

390. In November 2010, Dr. Fine and others presented the results of a Cephalon-sponsored study in the article, "Long-Term Safety and Tolerability of Fentanyl Buccal Tablet for the Treatment of Breakthrough Pain in Opioid-Tolerant Patients with Chronic Pain: An 18-Month

---

[215] Tracy Weber & Charles Ornstein, *Two Leaders in Pain Treatment Have Long Ties to Drug Industry*, ProPublica (Dec. 23, 2011), https://www.propublica.org/article/two-leaders-in-pain-treatment-have-long-ties-to-drug-industry (hereinafter *Two Leaders*).

[216] *Id.*

[217] Perry G. Fine & Russell K. Portenoy, *A Clinical Guide to Opioid Analgesia* 20, 34 (2004).

Study."[218] In this article, Dr. Fine explained that the 18-month open-label study "assessed the safety and tolerability of FBT [Fentora] for the [long-term] treatment of BTP [breakthrough pain] in a large cohort . . . of opioid-tolerant patients receiving around-the-clock . . . opioids for non-cancer pain."[219] The article acknowledged that (a) "[t]here has been a steady increase in the use of opioids for the management of chronic non-cancer pain over the past two decades," (b) the "widespread acceptance" had led to the publishing of practice guidelines "to provide evidence- and consensus-based recommendations for the optimal use of opioids in the management of chronic pain," and (c) those guidelines lacked "data assessing the long-term benefits and harms of opioid therapy for chronic pain."[220] The article concluded: "[T]he safety and tolerability profile of FBT in this study was generally typical of a potent opioid. The [adverse events] observed were, in most cases, predictable, manageable, and tolerable." It also concluded that the number of abuse-related events was "small."[221]

391. Multiple videos feature Dr. Fine delivering educational talks about opioids. In one video from 2011, *Optimizing Opioid Therapy*, he sets forth a "Guideline for Chronic Opioid Therapy" discussing "opioid rotation" (switching from one opioid to another) for both cancer and non-cancer patients and suggesting it may take four or five switches over a person's "lifetime" to manage pain.[222] He states the "goal is to improve effectiveness which is different from efficacy and safety." Rather, for chronic pain patients, effectiveness "is a balance of therapeutic good and adverse events over the course of years."[223] The entire program assumes that opioids are appropriate treatment over a "protracted period of time" and even over a patient's entire "lifetime." He even suggests that opioids

---

[218] Perry G. Fine, et al., *Long-Term Safety and Tolerability of Fentanyl Buccal Tablet for the Treatment of Breakthrough Pain in Opioid-Tolerant Patients with Chronic Pain: An 18-Month Study*, 40 J. Pain & Symptom Mgm't 747 (2010), https://www.jpsmjournal.com/article/S0885-3924(10)00390-8/fulltext.

[219] *Id.*

[220] *Id.*

[221] *Id.*

[222] Perry A. Fine, *Safe and Effective Opioid Rotation*, YouTube (Nov. 8, 2012), https://www.youtube.com/watch?v=_G3II9yqgXI (hereinafter *Opioid Rotation*).

[223] *Id.*

can be used to treat sleep apnea. He further states that the associated risks of addiction and abuse can be managed by doctors and evaluated with "tools," but leaves that for "a whole other lecture."[224]

**d. Dr. Scott Fishman**

392. Dr. Scott Fishman is a physician whose ties to the opioid drug industry are multitudinous. He has served as an APF board member and as AAPM president and has participated yearly in numerous CME activities for which he received "market rate honoraria." As discussed below, he has authored publications, including the seminal guides on opioid prescribing, which were funded by the Marketing Defendants. He has also worked to oppose legislation requiring doctors and others to consult pain specialists before prescribing high doses of opioids to noncancer patients. He has himself acknowledged his failure to disclose all potential conflicts of interest in a letter in *JAMA*.[225]

393. He received funding from Marketing Defendants including Janssen, Endo, Cephalon, and Purdue.

394. In 2007, Dr. Fishman authored *Responsible Opioid Prescribing*, a physician's guide that promoted long-term opioid treatment as a viable and safe option for treating chronic pain.[226]

395. In 2012, Dr. Fishman updated the guide and continued emphasizing the "catastrophic" "under-treatment" of pain and the "crisis" such under-treatment created:

> Given the magnitude of the problems related to opioid analgesics, it can be tempting to resort to draconian solutions: clinicians may simply stop prescribing opioids, or legislation intended to improve pharmacovigilance may inadvertently curtail patient access to care. As we work to reduce diversion and misuse of prescription opioids, it's critical to remember that the problem of unrelieved pain remains as urgent as ever.[227]

---

[224] *Id.*
[225] *Incomplete Financial Disclosures*, *supra*; *Two Leaders*, *supra*.
[226] *About the Project*, Fed'n St. Med. Boards, https://web.archive.org/web/20071112193443/http://www.fsmb.org/RE/PAIN/abouttheproject.html (last accessed July 13, 2021 as of Nov. 12, 2007).
[227] Scott M. Fishman, *Responsible Opioid Prescribing: A Clinician's Guide* (2d ed. 2012) (hereinafter, *Responsible Opioid Prescribing, Second Edition*).

396. The updated guide still assures physicians that "[o]pioid therapy to relieve pain and improve function is legitimate medical practice for acute and chronic pain of both cancer and non-cancer origins."[228]

397. In another guide, Dr. Fishman continues to downplay the risk of addiction: "I believe clinicians must be very careful with the label 'addict.' I draw a distinction between a 'chemical coper' and an addict."[229] The guide also continues to present symptoms of addiction as symptoms of "pseudoaddiction."

**4. Defendants disseminated their misrepresentations through Continuing Medical Education programs.**

398. One way the Marketing Defendants aggressively distributed their false message to the medical community, including to health care providers working in hospitals, was through countless continuing medical education ("CME") programs. In some cases, Defendants created educational organizations to develop the CMEs; in other cases, Defendants supported Front Groups and KOLs to develop and provide CMEs. Defendants controlled the content of these presentations. CMEs spread Defendants' false messages to doctors under the guise of neutral educational programs. Defendants deliberately maintained the illusion that these groups and programs were neutral, rather than heavily influenced by them.

399. Doctors are required to attend or view CME programs each year to remain licensed. Doctors also rely on CMEs to learn about new developments or to deepen their knowledge in specific areas of practice. Because CMEs are taught typically by KOLs who are highly respected in their fields, they can be especially influential with doctors who believe that the presentations reflect these physicians' expertise.

---

[228] *Id.*

[229] Scott M. Fishman, *Listening to Pain: A Physician's Guide to Improving Pain Management Through Better Communication* 45 (2012).

400. The Marketing Defendants particularly targeted general practitioners, whose broad area of practice and lack of expertise and specialized training in pain management made them particularly dependent upon CMEs and, as a result, especially susceptible to the Marketing Defendants' deceptions.

401. The Marketing Defendants sponsored CMEs that were delivered thousands of times; these CMEs promoted chronic opioid therapy by supporting and disseminating the deceptive and biased messages described in this Complaint. While often generically titled to relate to the treatment of chronic pain, these CMEs focused on opioids to the exclusion of alternative treatments, inflated the benefits of opioids, and frequently omitted or downplayed their risks and adverse effects. Dr. David W. Baker, JCAHO's executive vice president for health care quality evaluation, has since acknowledged that JCAHO "was one of the dozens of individual authors and organizations that developed educational materials for pain management that propagated this erroneous information."[230]

402. The American Medical Association has recognized the impropriety that pharmaceutical-company-funded CMEs create. It has stated that support from drug companies with a financial interest in the content being promoted "creates conditions in which external interests could influence the availability and/or content" of the programs and urged that, "[w]hen possible, CME[s] should be provided without such support or the participation of individuals who have financial interests in the education subject matter."[231]

403. Arizona prescribers attended or reviewed CMEs sponsored by the Marketing Defendants during the relevant time period and were misled by them.

[230] *Wonder Drug*, *supra*.

[231] Am. Med. Ass'n, Opinion 9.2.7, *Financial Relationships with Industry in Continuing Medical Education*, https://www.ama-assn.org/delivering-care/ethics/financial-relationships-industry-continuing-medical-education (last visited July 16, 2021).

404. By sponsoring CME programs put on by Front Groups including APF and AAPM, the Marketing Defendants expected and understood that instructors would deliver pro-opioid messages, as these organizations were dependent on the Marketing Defendants for other projects. The sponsoring organizations honored this principle by hiring pro-opioid KOLs to give talks that supported chronic opioid therapy. Producers of CMEs and the Marketing Defendants measured the effects of CMEs on prescribers' view of opioids and their absorption of specific messages. This measurement confirms the strategic rationale for the Marketing Defendants' support of CMEs.

**5. Defendants promoted specific opioid products to doctors and consumers.**

405. The Marketing Defendants engaged in widespread advertising campaigns touting the benefits of their branded drugs. The Marketing Defendants published print advertisements in a broad array of medical journals, ranging from those aimed at specialists, such as the *Journal of Pain* and *Clinical Journal of Pain*, to journals with wider medical audiences, such as the *JAMA*. The Marketing Defendants collectively spent more than $14 million on medical journal advertising of opioids in 2011, nearly triple what they had spent in 2001. The 2011 total includes $8.3 million by Purdue, $4.9 million by Janssen, and $1.1 million by Endo.

406. The Marketing Defendants' advertising also targeted consumers. The Marketing Defendants knew that physicians were more likely to prescribe a drug if a patient specifically requested it.[232] They also knew that this willingness to acquiesce to such patient requests holds true even for opioids and for conditions for which they are not approved.[233] Endo's research, for example, found that direct-to-consumer advertising resulted in greater patient "brand loyalty," with longer durations of Opana ER therapy and fewer discontinuations. The Marketing Defendants thus increasingly took

[232] In one study, for example, nearly 20% of sciatica patients requesting oxycodone received a prescription for it compared with 1% of those making no specific request. John B. McKinlay, et al., *Effects of Patient Medication Requests on Physician Prescribing Behavior*, 52 Med. Care 294 (2014), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4151257/.

[233] *Id.*

their opioid sales campaigns directly to consumers, including through patient-focused "education and support" materials in the form of pamphlets, videos, or other publications that patients could view in their physicians' offices.

### 6. Defendants used general (unbranded) advertising to promote opioid use for pain without FDA review.

407. The Marketing Defendants also aggressively promoted opioids through "unbranded advertising" that generally touted the benefits of opioids without specifically naming a particular brand-name drug.

408. Unbranded advertising is usually framed as "disease awareness"—encouraging consumers to "talk to your doctor" about a certain health condition without promoting a specific product. As a result, there is no requirement to provide balanced disclosures about the product's limits and risks. In contrast, a "branded" advertisement that identifies a specific medication must also include its indication (i.e., the condition which the drug is approved to treat) and possible side effects and contraindications—what FDA Guidance refers to as "fair balance." Branded advertising is also subject to FDA review for consistency with the drug's FDA-approved label.

409. By using unbranded materials to avoid these restrictions, the Marketing Defendants expanded the overall acceptance of and demand for chronic opioid therapy. By expanding the market for opioids generally, unbranded advertising benefited manufacturers of both generic and branded opioids.

410. Many of the Marketing Defendants utilized unbranded websites to promote opioid use without promoting a specific branded drug, such as Purdue's pain-management website, *inthefaceofpain.com*. The website contained testimonials from several dozen "advocates," including health care providers, urging more pain treatment. The website presented the advocates as neutral and

unbiased, but an investigation by the New York Attorney General later revealed that Purdue had paid them hundreds of thousands of dollars.[234]

### 7. Defendants funded, edited, and distributed publications that supported their misrepresentations.

411. The Marketing Defendants created a body of false, misleading, and unsupported medical and popular literature about opioids that (a) understated the risks and overstated the benefits of long-term use; (b) appeared to be the result of independent, objective research; and (c) was calculated to shape the perceptions of prescribers, patients, and payors. This literature served marketing goals, rather than scientific standards, and was intended to persuade doctors, including those at hospitals, and consumers that the benefits of long-term opioid use outweighed the risks.

412. To accomplish their goal, the Marketing Defendants—sometimes through third-party consultants and/or Front Groups—commissioned, edited, and arranged for the placement in academic journals of favorable but deceptive review articles, letters to the editor, commentaries, case-study reports, and newsletters aimed at discrediting or suppressing negative information that contradicted their claims or raised concerns about chronic opioid therapy. Defendants designed these studies to produce misleading results about opioids that they then quoted and cited in marketing materials and speaker presentations.

413. The Marketing Defendants' plans for these materials originated in their marketing departments, not in the departments responsible for research, development, or any other area that would have specialized knowledge about the drugs and their effects on patients.

414. The Marketing Defendants made sure that favorable articles were disseminated and cited widely in the medical literature, even when the Marketing Defendants knew that the articles distorted the significance or meaning of the underlying study, as with the Porter & Jick Letter. The

---

[234] Assurance of Discontinuance under Executive Law Section 63, Subdivision 15, No. 15-151, *Purdue Pharma, L.P.*. (N.Y. Att'y Gen. Aug. 19, 2015), https://ag.ny.gov/pdfs/Purdue-AOD-Executed.pdf.

Marketing Defendants also frequently relied on unpublished data or posters, neither of which are subject to peer review, but were presented as valid scientific evidence.

415. This conduct was particularly pernicious because "[t]he average clinician relies on his or her academic colleagues to publish unbiased research."[235]

416. Some studies promoting myths about opioids were published by Defendants' in-house scientists, including scientists working for ABDC's Xcenda consulting and marketing subsidiary, who co-authored such studies with scientists working for Teva.

**8. Defendants used speakers' bureaus and programs to spread their deceptive messages.**

417. In addition to making sales calls, the Marketing Defendants' detailers also identified doctors to serve, for payment, on speakers' bureaus and to attend programs with speakers and meals paid for by the Marketing Defendants.

418. These speaker programs and associated speaker trainings served three purposes: (1) as an incentive to doctors to prescribe, or increase their prescriptions of, a particular drug; (2) as an opportunity for doctors to be selected to attend forums at which the drug companies could further market to the speaker; and (3) as an opportunity for the doctors to market to their peers.

419. The Marketing Defendants graded their speakers, and future opportunities were based on speaking performance, post-program sales, and product usage.

* * * * * * *

420. The Marketing Defendants used the techniques described above in order to place the misleading messages (also described above) before doctors, patients, and health care payors. The intention and effect of this blitz of messaging was to increase opioid prescribing regardless of the consequences for public health and safety.

[235] *Drug Dealer, MD*, *supra*, at 59.

### E. Defendants directly targeted hospitals.

421. From the beginning, hospitals were directly targeted by the Marketing Defendants.

422. Internal documents from the 1995 "OxyContin Launch" orchestrated by Purdue and Abbott Laboratories ("Abbott") identified (1) hospital pharmacists as among their "audience," (2) hospitals among their "institutional targets," (3) an objective of "[f]ormulary acceptance in 75% of hospitals for first twelve months," and (4) an objective of developing a "successful distribution program" to hospitals. Purdue used Abbott's sales force to market OxyContin directly to doctors working in hospitals.

423. The importance of targeting hospitals was illustrated by a study that "demonstrated that patients who receive an opiate prescription within 7 days of surgery are 44% more likely to still be using the medication one year after surgery than patients who do not receive an opioid prescription."[236]

424. This marketing push was successful. Abbott, in a 1997 document, indicated that prescriptions written by "Abbott MD's" comprised 25% of all OxyContin prescriptions. Abbott's role in developing the market for OxyContin in collaboration with Purdue is discussed more fully *infra*.

425. Beyond direct marketing, in which other Defendants were also engaged, for to hospitals and the doctors who practice in them, the primary vehicle through which the Marketing Defendants collectively accomplished this result was through the creation and enforcement of guidelines for the treatment of pain by JCAHO. In 2001, due to the influence of the Marketing Defendants, JCAHO, along with NPC, "introduced standards for [hospitals] to improve their care for

[236] Cheryl Genord, et al., *Opioid Exit Plan: A Pharmacist's Role in Managing Acute Postoperative Pain*, 57 J. Am. Pharmacists Ass'n S92 (Jan. 2017), https://www.japha.org/article/S1544-3191(17)30016-X/fulltext (hereinafter *Opioid Exit Plan*).

patients with pain" as discussed in more detail *supra*.[237] Hospitals, including hospitals like Plaintiffs, were required to follow these standards.

**F. <u>Defendants succeeded in getting more patients to take more opioids at higher doses for longer periods of time.</u>**

426. The Marketing Defendants wanted more patients to take more opioids at higher doses and for longer periods of time. They sought to achieve this in two ways: (1) increasing the patient population and (2) increasing dosages quickly to keep patients on opioids longer.

427. In order to expand the market for their drugs, the Marketing Defendants worked to change the perception of opioids from a last resort for cancer patients and the terminally ill to a "first line" medication suitable for widespread use, thereby increasing the number of patients taking opioids

428. The Marketing Defendants also focused on increasing dosages and increasing the duration of opioid usage. This had devastating consequences for patients. Patients exposed to higher dosages and for longer periods of time are many times more likely to become addicted and to overdose.

429. Each of the Marketing Defendants actively tracked the impact of their marketing efforts on doctors' perceptions and prescribing habits. They purchased prescribing and survey data that allowed them to closely monitor these trends. For instance, they monitored doctors' prescribing before and after detailing visits and before and after speaker programs. Defendants' marketing changed prescribers' willingness to prescribe opioids, led them to prescribe more opioids, and persuaded them to not stop prescribing opioids.

430. This success would have come as no surprise. Drug company marketing materially impacts doctors' prescribing behavior.[238] In one recent survey published by the AMA, even though

---

[237] *Origins and Evolution*, *supra*.

[238] *See, e.g.*, Puneet Manchanda & Pradeep Chintagunta, *Responsiveness of Physician Prescription Behavior to Salesforce Effort: An Individual Level Analysis*, 15 (2-3) Mktg. Letters 129 (2004) (detailing has a positive impact on prescriptions written); Ian Larkin, et al., *Restrictions on Pharmaceutical Detailing Reduced Off-Label Prescribing of Antidepressants and Antipsychotics*

nine in ten general practitioners reported prescription drug abuse to be a moderate to large problem in their communities, 88% of the respondents said they were confident in their prescribing skills, and nearly half were comfortable using opioids for chronic noncancer pain.[239] This response is the direct result of the Marketing Defendants' fraudulent marketing campaign.

**G. Deceptive marketing caused the epidemic of licit and illicit opioid use.**

431. Because marketing opioids to doctors, including those in hospitals, was effective at making chronic opioid therapy a commonplace and often first-line treatment, the opioid prescription rates have increased.

432. According to the CDC, opioid prescriptions, as measured by the number of prescriptions and morphine milligram equivalents ("MMEs") per person, tripled from 1999 to 2015.[240] In 2015, on an average day, more than 650,000 opioid prescriptions were dispensed in the U.S.[241] While previously a small minority of opioid sales, today between 80 and 90% of opioids (measured by weight) are used for chronic pain. Approximately 20% of the population between the ages of 30 and 44, and nearly 30% of the population over 45, have used opioids.

433. The increasing number of opioid prescriptions has led to increased rates of opioid abuse because there is a "parallel relationship between the availability of prescription opioid analgesics through legitimate pharmacy channels and the diversion and abuse of these drugs and associated

---

*in Children*, 33 Health Affairs 1014 (2014), https://pubmed.ncbi.nlm.nih.gov/24889951/ (finding academic medical centers that restricted direct promotion by pharmaceutical sales representatives resulted in a 34% decline in on-label use of promoted drugs); *see also* Art Van Zee, *The Promotion and Marketing of OxyContin: Commercial Triumph, Public Health Tragedy*, 99 Am J. Pub. Health 221 (2009), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2622774/ (correlating an increase of OxyContin prescriptions from 670,000 annually in 1997 to 6.2 million in 2002 to a doubling of Purdue's sales force and trebling of annual sales calls) (hereinafter "*Commercial Triumph*").

239 Catherine S. Hwang, et al., *Prescription Drug Abuse: A National Survey of Primary Care Physicians*, 175 J. Am. Med. Ass'n Intern. Med. 302 (2014), https://www.ncbi.nlm.nih.gov/pubmed/25485657.

240 Gery P. Guy Jr., et al., *Vital Signs: Changes in Opioid Prescribing in the United States*, 66 Morbidity & Mortality Wkly. Rep. 697 (2017), https://www.cdc.gov/mmwr/volumes/66/wr/mm6626a4.htm.

241 Katherine Susan, Essential Hosps. Inst., *The Opioid Crisis: Hospital Prevention and Response* (June 2017), https://essentialhospitals.org/institute/the-opioid-crisis-hospital-prevention-and-response/.

adverse outcomes."[242] The opioid epidemic is thus "directly related to the increasingly widespread misuse of powerful opioid pain medications."[243]

434. This connection has been repeatedly demonstrated. For example, a 2007 study found a "very strong correlation between therapeutic exposure to opioid analgesics, as measured by prescriptions filled, and their abuse."[244] It has been estimated that 60% of the opioids that are abused come, directly or indirectly, through physicians' prescriptions.[245]

435. The increase in prescriptions (driven by aggressive marketing) leads to increased rates of overdose. In a 2016 report, the CDC explained, "Opioid pain reliever prescribing has quadrupled since 1999 and has increased in parallel with [opioid] overdoses." Patients receiving opioid prescriptions for chronic pain account for the majority of overdoses. For these reasons, the CDC concluded that efforts to rein in the prescribing of opioids for chronic pain are critical "to revers[ing] the epidemic of opioid drug overdose deaths and prevent[ing] opioid-related morbidity."[246]

436. The progression from prescription opioids to the use of illicit drugs, particularly injectable heroin (and, more recently, fentanyl), is well documented; approximately 75% of heroin users report that their initial drug use was through prescription opioids.[247]

437. In a November 2019 study by the National Bureau of Economic Research, researchers from the University of Pennsylvania, the University of Notre Dame, and the Rand Corporation

---

[242] Richard C. Dart, et al., *Trends in Opioid Analgesic Abuse and Mortality in the United States*, 372 New Eng. J. Med. 241 (2015), https://www.nejm.org/doi/pdf/10.1056/NEJMsa1406143.

[243] *See* Robert M. Califf, et al., *A Proactive Response to Prescription Opioid Abuse*, 374 N. Engl. J. Med. 1480 (2016), https://www.nejm.org/doi/full/10.1056/NEJMsr1601307.

[244] Theodore J. Cicero, et al., *Relationship Between Therapeutic Use and Abuse of Opioid Analgesics in Rural, Suburban, and Urban Locations in the United States*, 16 Pharmacoepidemiology & Drug Safety 827 (2007), https://pubmed.ncbi.nlm.nih.gov/17636553/.

[245] Anna Lembke, *Why Doctors Prescribe Opioids to Known Opioid Abusers*, 367 New Eng. J. Med. 1580 (2012), https://www.nejm.org/doi/full/10.1056/nejmp1208498.

[246] Rose A. Rudd, et al., *Increases in Drug and Opioid Overdose Deaths – United States, 2000-2014*, 643 Morbidity & Mortality Wkly. Rep. 1378 (2016), https://www.cdc.gov/mmwr/preview/mmwrhtml/mm6450a3.htm.

[247] Theodore J. Cicero, et al., *The Changing Face of Heroin Use in The United States: A Retrospective Analysis of The Past 50 Years*, 71 J. Am. Med. Ass'n Psychiatry 821 (2014), https://jamanetwork.com/journals/jamapsychiatry/fullarticle/1874575.

examined how the marketing of OxyContin at its introduction in 1996 affected the opioid crisis. At that time, certain states' regulations made the drug easier to prescribe, and Purdue concentrated its marketing efforts in those states.

438. The study found that in states where Purdue focused its initial misleading marketing messages, OxyContin distribution was nearly twice as high as in similarly situated states with more stringent prescription requirements in which Purdue did not market aggressively.[248]

439. The study used unsealed court documents from settled lawsuits and investigations involving Purdue in Florida, West Virginia, and Washington. Those documents showed that Purdue deliberately selected the states it would focus on in its initial marketing push. As discussed above, this marketing push involved disseminating misleading messages about the need to change the standard of care for treating pain, especially chronic pain.

440. The documents also showed that Purdue concluded that regulations requiring the use of state-based triplicate prescription forms had a chilling effect on opioid prescribing. Prescribers of Schedule II opioids like OxyContin in "triplicate states" such as California, Idaho, Illinois, New York, and Texas had to produce three copies of each prescription: one to be retained by the prescriber; one which went to the pharmacy; and one which was forwarded to a state agency. In "non-triplicate states," Schedule II opioids could be prescribed without the need to write and file multiple copies of each prescription.

441. The documents reveal that Purdue chose to avoid triplicate states and did not fully market its products there. The study then tracked the distribution of OxyContin in states where Purdue fully engaged in its fraudulent marketing and compared the distribution of OxyContin in those states to states where Purdue did not fully market the drug.

[248] Abby E. Albert, et al. "Origins of the Opioid Crisis and Its Enduring Impacts," NBER Working Papers 26500, Nat'l Bureau of Econ. Research (2019), https://www.nber.org/system/files/working_papers/w26500/w26500.pdf.

442. The authors found that by 2000 the false marketing campaign engaged in by Purdue and its surrogates had led to OxyContin sales 2.5 times higher in non-triplicate states than in triplicate states. Hence, the authors concluded that Purdue's false marketing had a direct effect on sales of OxyContin and that sales were about 50% lower in triplicate states in the years after the launch.[249]

443. The authors further found that the effects of the presence or absence of marketing continued for many years and continued in the triplicate states even after triplicate laws were repealed: "The differences in OxyContin distribution across triplicate and non-triplicate states was quantitatively large and statistically significant in all time periods and those differences persist through 2016."[250]

444. The authors also studied misuse and overdose death trends over time. When looking at overdose deaths, the authors found low overdose death rates across triplicate states and much higher rates in non-triplicate states where Purdue had concentrated its false marketing. They concluded:

> Taken together, these results are consistent with any differences in overdose rates being primarily attributable to OxyContin, since the primary differences between triplicate states and non-triplicate states are exposure to and misuse of OxyContin. The differences in OxyContin distribution and misuse continue even through the most recent years of data, consistent with long run differences in mortality rates.[251]

445. According to the authors, this difference was associated with Purdue's decisions about which states to target:

> States with more exposure to OxyContin's introduction experienced higher growth in overdose deaths in almost every year since 1996. . . . Our estimates . . . show that non-triplicate states would have experienced 4.49 fewer drug overdose deaths per 100,000 on average from 1996-2017 if they had been triplicate states and 3.04 fewer opioid overdose deaths per 100,000.[252]

---

249 *Id.* at 20.
250 *Id.*
251 *Id.* at 22.
252 *Id.* at 35.

446. The difference between the two sets of states persisted even as the opioid epidemic evolved and as states changed their policies:

> The timing of these differential drug-specific trends suggests that the introduction of OxyContin had long-term effects on drug overdose deaths through each wave of the opioid crisis. Initially, we observe growth in overdose deaths involving prescription opioids. After OxyContin became hard to abuse, and the opioid crisis transitioned first to heroin and then to fentanyl, states less exposed to OxyContin's introduction were also less affected by these transitions.[253]

447. Based on their careful analysis, the authors concluded that the differences were attributable to Purdue's marketing: "The evidence in this paper is consistent with Purdue Pharma's marketing practices playing an important role in explaining growth of drug overdose rates. . . . Overall, we find strong evidence that the marketing practices of OxyContin interacted with state-level policy conditions [and] led to dramatically reduced overdose rates in triplicate states."[254]

448. Although this study used the natural experiment created by Purdue's decision to avoid marketing OxyContin in triplicate states, its conclusion applies to opioid marketing more broadly because the study demonstrates a quantifiable effect of the intensity of opioid marketing on adverse outcomes (i.e., overdose rates).

449. This study and the others described above demonstrate that the actions of the Marketing Defendants had a direct and proximate causal effect on prescriptions of opioids; that the initial effects of the false marketing engaged in by the Marketing Defendants persist over time and through the various transitions in the epidemic—from prescription opioids, to heroin, to fentanyl; and that false marketing engaged in by the Marketing Defendants directly and proximately led to increased overdose deaths and the spread of the opioid epidemic.

---

[253] *Id.* at 26.
[254] *Id.* at 37 (emphasis added).

### H. The Marketing Defendants have been investigated, convicted, and fined, but have failed to alter their behavior.

450. The Marketing Defendants' failure to secure their opioid supply chain and prevent drug diversion, as well as their repeated insistence on including misleading statements in their marketing materials, have resulted in over a decade of governmental investigations and settlements. Notwithstanding these settlements and the egregious wrongdoing they uncovered, the Marketing Defendants continued to violate their duties under Arizona law. They did so even as they publicly touted their insufficient efforts to prevent abuse and diversion of their prescription opioids.

451. The details of these investigations are described below in the section for each Defendant.

## V. DEFENDANTS CAUSED THE OPIOID EPIDEMIC IN ARIZONA BY ILLEGITIMATELY INFLATING THE SUPPLY OF OPIOIDS.

452. All Defendants worked—with great success—toward their shared goal of creating a market for, and then selling, far more opioids in Arizona and nationwide than were medically appropriate or safe.

453. The Marketing and Distributor Defendants structured their contracts to give the Distributor Defendants strong financial incentives to sell as many opioids as possible. The Distributor Defendants benefitted from rebates or "chargebacks" that increased as the sales of pharmaceuticals increased. Joined by this powerful joint incentive to sell as many opioids as possible, the two groups of Defendants cooperated to increase opioid sales in Arizona.

454. This cooperation included the Distributor Defendants' active role in marketing and promoting the use of opioids to treat chronic pain. It also included creating the illusion that the Distributor Defendants had erected effective firewalls against the diversion of opioids. The Distributor Defendants created this illusion by repeatedly misleading the public and regulators into thinking that they had enacted safeguards, as they were required to do.

455. In order to ensure that the closed system for the distribution of controlled substances remains intact, distributors are required to identify, report, and refuse to ship suspicious orders. The only suspicious orders that may be shipped are those that the distributor can determine, after conducting due diligence, are unlikely to result in the diversion of scheduled drugs into illegal channels.[255] Any order whose suspicion cannot be dispelled after investigation must be reported, even if the distributor resolves the immediate problem by cutting the size of the order before shipping it.[256]

456. Individually and through their trade organizations, Defendants misrepresented their efforts to secure the opioids supply chain and control diversion. For example, the Distributor Defendants made public statements that they were cracking down on diversion, setting thresholds to limit the number of opioids that their pharmacy customers could purchase at a time, and purporting to enforce effective monitoring and "know your customer" procedures to identify pill mills and suspicious orders. In reality, the Distributor Defendants failed to take reasonable precautions or establish effective policies to prevent or reduce the risk of diversion and opioid abuse. The absence of effective safeguards foreseeably resulted in widespread diversion and abuse, imposing enormous costs on Plaintiffs and others while Defendants earned record profits.

457. This course of conduct was deliberate. In a *60 Minutes* interview, former DEA agent Joe Rannazzisi described Defendants' industry as "out of control," stating, "What they wanna do, is do what they wanna do, and not worry about what the law is. And if they don't follow the law in drug supply, people die. That's just it. People die." The interview continued:

> JOE RANNAZZISI: The three largest distributors are Cardinal Health, McKesson, and AmerisourceBergen. They control probably 85 or 90 percent of the drugs going downstream.

---

[255] *See* Southwood Pharm., 72 Fed. Reg. 36,487, 36,501 (Drug Enf't Admin. July 3, 2007); *Masters Pharm., Inc. v. Drug Enforcement Admin.*, 861 F.3d 206 (D.C. Cir. 2017).

[256] Southwood Pharm., 72 Fed. Reg. 36,487; *Masters Pharm.*, 861 F.3d 206.

> [INTERVIEWER]: You know the implication of what you're saying, that these big companies knew that they were pumping drugs into American communities that were killing people.
>
> JOE RANNAZZISI: That's not an implication, that's a fact. That's exactly what they did.

Another DEA veteran stated that these companies failed to make even a "good faith effort" to "do the right thing." He explained, "I can tell you with 100 percent accuracy that we were in there on multiple occasions trying to get them to change their behavior. And they just flat out ignored us."[257]

458. The National Retail Pharmacies also violated their duties under state law not only in their capacities as a distributors to their own retail pharmacies, but also in their capacities as dispensing pharmacies. Pharmacists are the last line of defense between dangerous opioids and the public. For this reason, they are subject to duties under the common law and duties under Arizona statutes and regulations to take special care when dispensing these addictive and dangerous drugs.

459. The National Retail Pharmacies violated these duties of care by dispensing extremely large amounts of opioids from their retail pharmacy stores in Arizona under circumstances in which diversion was highly likely, if not inevitable, all while misleading the public that they were fulfilling their duties as pharmacies.

460. Pharmacies' responsibilities are not limited to ensuring that a prescription is not, for instance, forged or issued by a practitioner without a valid DEA registration. Pharmacists are required to ensure that prescriptions for controlled substances are valid and issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his or her professional practice. Pharmacies are also required to track prescriptions for controlled substances and report suspected abuse and diversion of controlled substances. Because pharmacies themselves are registrants under

---

[257] Jennifer Zimpfer Vaughan, *Ex-DEA Agent: Opioid Crisis Fueled by Drug Industry and Congress – By Correspondent Bill Whitaker* (Oct. 17, 2017), https://www.linkedin.com/pulse/ex-dea-agent-opioid-crisis-fueled-drug-industry-jennifer/.

Arizona law, the duty to prevent diversion lies with the pharmacy entity as well as with individual pharmacists.

461. Performance metrics and prescription quotas adopted by the National Retail Pharmacies contributed to this failure. For instance, Walgreens made it clear to its pharmacists in a March 2013 memo that having concerns over the legitimacy of a prescription for opioids did not relieve the pharmacist from reaching volume targets for the number of prescriptions filled. Walgreens did this despite knowing that its policy of requiring pharmacists to verify suspicious prescriptions with prescribers would take time away from filling prescriptions (and reduce the number of prescriptions filled if they were rejected after investigation). The result: opioids flowed out of Walgreens pharmacies and into communities across Arizona. This policy and similar ones enforced by the other National Retail Pharmacies remained in place even as the epidemic raged.

462. This problem was compounded by the National Retail Pharmacies' failure to adequately train their pharmacists and pharmacy technicians on how to properly and adequately handle prescriptions for opioid painkillers, including what constitutes a proper inquiry into a prescription's legitimacy, whether a prescription is likely for a condition for which the FDA has approved treatments with opioids, and what measures and/or actions to take when a prescription is identified as phony, false, forged, or otherwise illegal, or when suspicious circumstances are present.

**A. Defendants manufactured, sold, shipped, and dispensed massive quantities of opioids into and in Arizona.**

463. Defendants have a duty under Arizona law to prevent the diversion of opioids for non-legitimate purposes. Given their role in selling, distributing, and/or dispensing opioids in Arizona, Defendants, and particularly the Distributor Defendants, serve as a vital safeguard against the diversion of opioids into illegal, non-medical channels.

464. Defendants have unconscionably violated their duty by selling and shipping hundreds of millions of opioid pills into Arizona.

465. Each of the Distributor Defendants sold or distributed prescription opioids to retailers from which the Distributor Defendants knew or should have known prescription opioids were likely to be diverted.

466. At all relevant times, Defendants were in possession of national, regional, state, and local prescriber- and patient-level data that allowed them to track prescribing patterns over time. They purchased this information from data companies, including but not limited to: IMS Health, QuintilesIMS, IQVIA, Pharmaceutical Data Services, Source Healthcare Analytics, NDS Health Information Services, Verispan, Quintiles, SDI Health, ArcLight, Scriptline, Wolters Kluwer, and/or PRA Health Science, and all of their predecessors or successors in interest (the "Data Vendors"). IMS Health, for example, provided Defendants with reports detailing prescriber behavior and the number of prescriptions written between competing products.[258] Similarly, Wolters Kluwer, an entity that eventually owned a data mining company created by Cardinal (ArcLight), provided Defendants with charts analyzing the weekly prescribing patterns of multiple physicians organized by territory regarding competing drugs and then analyzed the market share of those drugs.[259]

467. Defendants' information on opioid distribution patterns was not limited to their own sales or shipments. The Data Vendors' information purchased by Defendants allowed them to view, analyze, compute, and track their competitors' sales and to compare and analyze market share information.[260] It also allowed them to track prescribing trends, identify suspicious orders, identify patients who were doctor shopping, identify pill mills, etc.

---

[258] Paul Kallukaran & Jerry Kagan, *Data Mining at IMS HEALTH: How we Turned a Mountain of Data into a Few Information-rich Molehills* 3 fig.2, http://citeseerx.ist.psu.edu/viewdoc/download?doi=10.1.1.198.349&rep=rep1&type=pdf (last visited July 12, 2021).

[259] *Sorrell v. IMS Health Inc.*, No. 10-779, 2011 WL 705207, at *467–71 (Feb. 22, 2011).

[260] A Verispan representative testified that entities in the pharmaceutical supply chain use the prescribing information to "drive market share." *Sorrell v. IMS Health Inc.*, No. 10-779, 2011 WL 661712, at *9–10 (Feb. 22, 2011).

468. A dramatic example of the use of prescription information provided by IMS Health, a data company, was described in Congressional testimony between Representative James C. Greenwood and Michael Friedman, Purdue's COO and executive vice president:

> Mr. Greenwood: Well, why do you want that [IMS Health] information then?
>
> Mr. Friedman: Well, we use that information to understand what is happening in terms of the development of use of our product in any area.
>
> Mr. Greenwood. And so the use of it–and I assume that part of it–a large part of it you want is to see how successful your marketing techniques are so that you can expend money in a particular region or among a particular group of physicians–you look to see if your marketing practices are increased in sales. And, if not, you go back to the drawing board with your marketers and say, how come we spent "X" number of dollars, according to these physicians, and sales haven't responded. You do that kind of thing. Right?
>
> Mr. Friedman: Sure.[261]

469. Information from the Data Vendors allowed Defendants to track and identify instances of overprescribing. In fact, one of the Data Vendors' experts testified that the Data Vendors' information could be used to track, identify, report, and halt suspicious orders of controlled substances.[262] Defendants were, therefore, collectively aware of the suspicious orders that flowed from their facilities.

470. Of particular importance was the data provided by IQVIA in the Xponent dataset. This dataset consists of a representative sample of pharmacies, including 93% of prescriptions from over 60,000 retail pharmacies. Because IQVIA data reveals physicians' prescribing history, the data

---

[261] *Oxycontin: Its Use and Abuse: Hearing Before the House Subcommittee. on Oversight and Investigations of the Comm. on Energy and Commerce*, 107th Cong. 1 (Aug. 28, 2001) (statement of Michael Friedman, Executive Vice President, Chief Operating Officer, Purdue Pharma, L.P.), https://www.govinfo.gov/content/pkg/CHRG-107hhrg75754/html/CHRG-107hhrg75754.htm (hereinafter "*Oxycontin: Its Use and Abuse*").

[262] In *Sorrell*, expert Eugene "Mick" Kolassa testified, on behalf of the Data Vender, that "a firm that sells narcotic analgesics was able to use prescriber-identifiable information to identify physicians that seemed to be prescribing an inordinately high number of prescriptions for their product." 2011 WL 661712; *see also* Joint Appendix, *Sorrell*, 2011 WL 687134, at *204.

allows anyone who purchases it to determine how frequently a physician prescribed particular drugs, as well as what formulations and in what dosages. According to Lacey R. Keller, the data analytics expert testifying in the trial against ABDC, Cardinal, and McKesson in the Southern District of West Virginia, the IQVIA data gave them sufficient information in order to understand the overall prescribing trends in any particular county or region and gave them the ability to diligently monitor the prescribing activity of individual prescribers. Nevertheless, the Distributor Defendants did not take advantage of this data in order to identify and halt suspicious orders to pharmacies that filled these providers' prescriptions—as they were required to do.

471. Wholesalers such as ABDC, Cardinal, McKesson, Anda, and H.D. Smith have close financial relationships with both the Marketing Defendants and the customers that dispense opioids, for whom wholesalers provide a broad range of value-added services that render them uniquely positioned to obtain information and control against diversion. These services often otherwise would not be provided by manufacturers to their dispensing customers and would be difficult and costly for the dispenser to reproduce. For example, "[w]holesalers have sophisticated ordering systems that allow customers to electronically order and confirm their purchases, as well as to confirm the availability and prices of wholesalers' stock."[263] Through their generic source programs, wholesalers are also able "to combine the purchase volumes of customers and negotiate the cost of goods with manufacturers."[264] Wholesalers typically also offer marketing programs, patient services, and other software to assist their dispensing customers.

472. ABDC, Cardinal, McKesson, Anda, and H.D. Smith developed "know your customer" questionnaires and files. This information was intended to help Defendants identify suspicious orders

---

[263] *Fed. Trade Comm'n v. Cardinal Health, Inc.*, 12 F. Supp. 2d 34, 41 (D.D.C. 1998).
[264] *Id.*

or customers who were likely to divert prescription opioids.[265] The questionnaires informed Defendants of the number of pills that the pharmacies sold, how many non-controlled substances were sold compared to controlled substances, whether the pharmacy purchased opioids from other distributors, and the types of medical providers in the area. These questionnaires put ABDC, Cardinal, McKesson, Anda, and H.D. Smith on notice of suspicious orders.

473. The Marketing Defendants were aware that the Distributor Defendants were vital to ensuring the market success of their prescription opioids. For instance, an internal 1997 Purdue email evaluated each of the major distributors, including Cardinal and ABDC (as its predecessor companies Bergen Brunswig and Amerisource). This evaluation determined how valuable each distributor could be to Purdue's ability to sell OxyContin.

474. Because they distributed their drugs to wholesalers, the Marketing Defendants had the same obligation as the Distributor Defendants to identify, halt, and report suspicious orders. This obligation included using all of the information available to them in order to identify and report likely diversion by any downstream registrant, including distributors, pharmacies, and prescribers. Sources of information available to the Marketing Defendants included their own sales data, chargeback data, data purchased from data vendors such as IQVIA, and reports from their sales representatives. The Marketing Defendants failed to use this information to stop the diversion of dangerous opioids.

475. The Marketing Defendants engaged in the practice of paying rebates and/or chargebacks to the Distributor Defendants for sales of prescription opioids as a way to boost sales and better target their marketing efforts. The *Washington Post* has described the practice as industry-wide, and the Healthcare Distribution Alliance, an industry group of pharmaceutical manufacturers

---

[265] U.S. Drug Enf't Admin., *Suggested Questions a Distributor Should Ask Prior to Shipping Controlled Substances*, https://www.deadiversion.usdoj.gov/mtgs/pharm_industry/14th_pharm/levinl_ques.pdf (last visited July 20, 2021); Richard Widup, Jr. & Kathleen H. Dooley, *Pharmaceutical Product Diversion: Beyond the PDMA*, https://www.mcguirewoods.com/news-resources/publications/lifesciences/product_diversion_beyond_pdma.pdf (last visited July 20, 2021).

and distributors, includes a "Contracts and Chargebacks Working Group."[266] Further, in a recent settlement with the DEA, Mallinckrodt acknowledged that "[a]s part of their business model Mallinckrodt collects transaction information, referred to as chargeback data, from their direct customers (distributors)."[267] The transaction information contains data relating to the direct customer sales of controlled substances to "downstream registrants," meaning pharmacies or other dispensaries.

476. The National Retail Pharmacies tracked which of its stores were top sellers of particular drugs, including Schedule II substances such as opioids. But instead of using that information and data to prevent shipments of suspicious quantities or filling of suspicious prescriptions, the pharmacies joined the race to sell as many opioids as possible, failed to institute safeguards, and marketed opioids to their vast networks of retail pharmacy stores and in-store pharmacists.

477. The data that reveals and/or confirms the identity of each wrongful opioid distribution is hidden from public view in the DEA's confidential Automation of Reports and Consolidated Orders System ("ARCOS") database. The data necessary to identify with specificity the transactions that were suspicious is in Defendants' possession and has not been disclosed to the public.

478. Armed with knowledge of their own sales and shipments and industry-wide data, Defendants knew or should have known that the quantity of opioids being distributed in Arizona far exceeded the medical need of Arizona residents—even if the wider market for chronic pain had been entirely legitimate (which it was not). Defendants knew or should have known that they were shipping more opioids than could possibly have been medically appropriate and that a significant number of opioids in Arizona were being diverted from legitimate medical uses. Opioid shipments continue to be far greater than medically justified.

---

[266] *Councils and Committees*, Healthcare Distribution All., https://www.hda.org/about/councils-and-committees (last visited July 12, 2021).

[267] *Stipulation and Agreement* (July 7, 2017).

479. Sources of information placing Defendants on notice that the volume of opioids they were shipping must have been excessive include:

a. detailed transaction-level data on the sale and distribution of opioids, which can be broken down by zip code, prescriber, and pharmacy, and includes the volume of opioids, dose, and the distribution of other controlled and non-controlled substances;

b. in-person detailing to promote and provide products and services, which allows them to observe the red flags of diversion;

c. knowledge of the volume of its own sales for the Distributor Defendants, who each play such a large part in the distribution of opioids that its own volume provides a ready vehicle for measuring the overall flow of opioids into a pharmacy or geographic area; and

d. chargeback data (in return for discounts to the Distributor Defendants) that allowed the Marketing Defendants to monitor the combined flow of opioids into a pharmacy or geographic area.

## B. The Marketing Defendants who produced generic opioids produced the vast majority of opioids sold in Arizona.

480. Between 2006 and 2014, marketers who primarily produced generic opioids were the *dominant* "labels" in Arizona. According to the ARCOS data:

| **Combined Labeler Name** | **Dosage Units** |
|---|---|
| *SpecGx LLC (Mallinckrodt)*** | *841,577,975* |
| *Actavis Pharma, Inc.** | *825,952,366* |
| *Par Pharmaceutical** | *251,226,410* |
| Purdue Pharma LP** | 94,645,298 |
| *KVK-Tech, Inc.* | *85,651,900* |
| *Amneal Pharmaceuticals LLC* | *73,159,910* |
| *West-Ward Pharmaceuticals Corp.* | *34,331,600* |
| *Teva Pharmaceuticals USA, Inc.** | *19,805,396* |
| *Sun Pharmaceutical Industries, Inc.* | *18,979,100* |
| *Ethex Corporation* | *10,616,000* |

*Named Defendant; **Unnamed associate currently in bankruptcy; Generic Marketers in italics.

481. While name-brand marketers (e.g., Purdue, Abbott, and Janssen) may have had a greater role in initially expanding the market for opioids, the Marketing Defendants who

have predominantly sold generic products (e.g., Teva, Endo (through its Par subsidiary), and Actavis) exploited that expanded market to maximum advantage.

### C. Defendants ignored red flags of opioid diversion and failed to implement reasonable safeguards to prevent diversion.

482. All Defendants failed to fulfill their statutory and common-law duties to secure their links in the opioid supply chain and prevent diversion.

483. Defendants are all required to register as either manufacturers, distributors, or dispensers.[268] Similar requirements are imposed by the federal Controlled Substances Act ("CSA") and its implementing regulations.[269] These statutes and regulations impose non-delegable duties upon registrants to maintain effective controls against diversion, to maintain adequate records, and to design and operate a system to disclose to the registrant suspicious orders of controlled substances.[270]

484. Each Defendant has an affirmative duty under to act as a gatekeeper guarding against the diversion of the highly addictive, dangerous opioid drugs, Arizona law requires that "registrants" of Schedule II drugs, including opioids, must "maintain effective controls against the diversion of controlled substances or precursor chemicals to unauthorized persons or entities."[271]

485. Pharmacists are required to ensure that prescriptions for controlled substances are valid and issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his or her professional practice. Pharmacies are also required to track prescriptions for controlled substances and report suspected abuse and diversion of controlled substances.

486. Apart from the CSA and Arizona statutes and regulations, all Defendants have a duty to exercise reasonable care when selling, distributing, and dispensing opioids, which Defendants knew

[268] A.R.S. § 32-1927.03, A.R.S. § 36-2522(A), A.A.C. R4-23-604, A.A.C. R4-26-605, and A.A.C. R4-23-607.
[269] 21 U.S.C. § 811; 21 C.F.R. § 1301.11.
[270] 21 U.S.C. §§ 823, 829, 832.
[271] A.R.S. § 32-1901.01; 21 U.S.C. § 823.

or should have known were being diverted. These duties include identifying and halting suspicious orders of controlled substances before shipping them. Defendants violated these common-law duties.

487. "Suspicious orders" include orders of unusual size, orders of unusual frequency, or orders deviating substantially from a normal pattern. These criteria are disjunctive and are not all-inclusive. For example, if an order deviates substantially from a normal pattern, the size of the order does not matter, and the order must be reported as suspicious. Likewise, a registrant need not wait for a normal pattern to develop over time before determining whether a particular order is suspicious. The size of an order alone, regardless of whether it deviates from a normal pattern, is enough to trigger the responsibility to report the order as suspicious. The determination of whether an order is suspicious depends not only on the ordering patterns of the particular customer but also on the patterns of the entirety of the customer base and the patterns throughout the relevant segment of the industry.

488. Defendants have a duty to report suspicious orders in order to prevent diversion. In addition to reporting all suspicious orders, Defendants must also stop shipment on any order which is flagged as suspicious; they may only ship orders that were flagged as suspicious if, after conducting due diligence, the recipient determines that the order is not likely to be diverted into illegal channels.[272] Regardless, all suspicious orders must be reported.

489. The DEA has been clear on this point. As early as 1996, the DEA's Investigator's Manual declared, "Registrants, who routinely report suspicious orders, yet fill these orders, with reason to believe they are destined for the illicit market, are expressing an attitude of irresponsibility that is a detriment to the public health and safety." The Manual further specified that orders exceeding a pre-

[272] *See* Southwood Pharm., 72 Fed. Reg. at 36,501; *Masters Pharm.*, 861 F. 3d 206.

set threshold should be viewed as suspicious and that continued orders over that threshold "would lead a reasonable person to believe that controlled substances possibly are being diverted."[273]

490. In a letter dated September 27, 2006, the agency advised that wholesale distributors are "one of the key components of the distribution chain. If the closed system is to function properly . . . distributors must be vigilant in deciding whether a prospective customer can be trusted to deliver controlled substances only for lawful purposes. This responsibility is critical, as . . . the illegal distribution of controlled substances has a substantial and detrimental effect on the health and general welfare of the American people."[274]

491. This letter also warned the Distributor Defendants that the DEA would use its authority to revoke and suspend registrations when appropriate. The letter expressly states that a distributor, in addition to reporting suspicious orders, has a "responsibility to exercise due diligence to avoid filling suspicious orders that might be diverted into other than legitimate medical, scientific, and industrial channels."[275] The letter also instructs that "distributors must be vigilant in deciding whether a prospective customer can be trusted to deliver controlled substances only for lawful purposes."[276] The DEA warns that "even just one distributor that uses its DEA registration to facilitate diversion can cause enormous harm."

492. The DEA sent a second letter to each of the Distributor Defendants on December 27, 2007.[277] This letter reminds the Distributor Defendants of their statutory and regulatory duties to

---

[273] U.S. Drug Enf't Admin., *DEA Diversion Investigators Manual* (1996).

[274] *See* Letter from Joseph T. Rannazzisi, Deputy Assistant Adm'r, Office of Diversion Control, Drug Enf't Admin., U.S. Dep't of Justice, to Cardinal Health (Sept. 27, 2006) (hereinafter "Rannazzisi Letter") ("This letter is being sent to every commercial entity in the United States registered with the Drug Enforcement Administration (DEA) to distribute controlled substances. The purpose of this letter is to reiterate the responsibilities of controlled substance distributors in view of the prescription drug abuse problem our nation currently faces.").

[275] *Id.* at 2.

[276] *Id.* at 1.

[277] *Id.* at 2.

"maintain effective controls against diversion" and "design and operate a system to disclose to the registrant suspicious orders of controlled substances."[278] The letter further explains:

> The regulation also requires that the registrant inform the local DEA Division Office of suspicious orders when discovered by the registrant. Filing a monthly report of completed transactions (e.g., "excessive purchase report" or "high unity purchases") does not meet the regulatory requirement to report suspicious orders.
>
> The regulation specifically states that suspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of an unusual frequency. These criteria are disjunctive and are not all inclusive.
>
> Lastly, registrants that routinely report suspicious orders, yet fill these orders without first determining that order is not being diverted into other than legitimate medical, scientific, and industrial channels, may be failing to maintain effective controls against diversion. Failure to maintain effective controls against diversion is inconsistent with the public interest as that term is used in 21 [U.S.C. §§] 823 and 824, and may result in the revocation of the registrant's DEA Certificate of Registration.[279]

493. The courts have agreed. In *Masters Pharmaceuticals*, the D.C. Circuit upheld the revocation of a distributor's license and determined that, in addition to reporting suspicious orders, distributors must "decline to ship the order, or conduct some 'due diligence' and—if it is able to determine that the order is not likely to be diverted into illegal channels—ship the order."[280] These same duties apply under Arizona law.

494. While the Distributor Defendants' policies nominally allowed for compliance staff to identify any order as suspicious, as a matter of practice, only orders that exceeded a customer's monthly threshold limit for a particular category of controlled substances would actually trigger a compliance review. As a result, untold numbers of opioid orders that should have been reviewed due

[278] *Id.* at 1.
[279] *Id.* at 2.
[280] *Masters Pharm.*, 861 F.3d at 212.

to their unusual size, frequency, or departure from the customers' normal ordering patterns were never even checked to determine whether they were suspicious.

495. Even as to orders that exceeded customers' monthly thresholds, the Distributor Defendants routinely failed to accurately investigate those suspicious orders. Instead, they released those orders for delivery based on perfunctory and unverified information provided by the customer or even for no documented reason at all. Moreover, when the Distributor Defendants did identify orders as suspicious and did block them from delivery, they routinely failed to report them, sometimes going months or years without reporting any at all. When they did make suspicious-order reports, the reports were routinely incomplete, for example, by failing to identify all the relevant suspicious orders for a customer.

496. None of the Distributor Defendants had a consistent practice of conducting appropriate due diligence of either prospective new customers or their existing customers. New customers were routinely on-boarded despite the acknowledged presence of unresolved red flags, and none of the Distributor Defendants ensured that additional investigations were conducted when existing customers made suspicious orders—even when compliance staff flagged those orders as suspicious, blocked them, and reported them to the authorities.

497. Indeed, the Distributor Defendants routinely allowed their customers to make multiple suspicious orders within the same year, month, or even week without conducting any additional due diligence. In fact, salespeople would sometimes warn customers when they were approaching their monthly threshold limits for ordering certain categories of controlled substances, effectively assisting their customers in evading compliance reviews that would have otherwise occurred by manipulating the timing and volume of their orders.

498. Even where customers had to be blocked from ordering opioids in excess of their monthly threshold multiple times within a month, the Distributor Defendants would often allow those

customers to resume ordering opioids the next month, at the same volume as before, without conducting any follow-up investigation.

499. None of the Distributor Defendants conducted periodic, unexpected due diligence audits of their customers, even among the easily identifiable and relatively small groups of pharmacies that consistently ordered the highest volumes of opioids. Instead, these pharmacies could go for years without the Distributor Defendants updating their knowledge of those customers' prescriber base, customer traffic patterns, and other relevant store conditions. Even when those pharmacies were scrutinized, they were often warned in advance, giving them an opportunity to escape scrutiny and Defendants an opportunity to bury their heads in the sand.

500. None of the Distributor Defendants systematically stored, organized, and made accessible for reference in order to allow for meaningful future compliance efforts information about their customers or their owners, pharmacists, and top prescribers.

501. The Distributor Defendants did not require compliance staff to obtain customers' prescriber information, and some actually changed their policies to forbid such inquiries, willfully blinding themselves to one of the most important indicators of diversion.

502. While compliance staff and/or third-party investigators retained by the Distributor Defendants would sometimes flag prescribers as suspicious in the course of conducting due diligence of a pharmacy, that information was not stored or shared in any useable format. As a result, when the same suspicious prescriber appeared among another pharmacy's top prescribers, the compliance staff handling that subsequent due diligence investigation would have no way of knowing about the risk that had already been identified unless they had personally handled the earlier investigation and happened to remember the prescriber's name. Similarly, they made no effort to collect and compare information about pharmacies that had made high-volume orders of opioids, had been flagged for making suspicious orders, or had been suspended or terminated for suspicious or illegal practices. As

a result, compliance staff had no way to know that a pharmacy they were investigating shared ordering patterns or top prescribers with another risky, suspicious, and/or previously disciplined customer.

503. The Distributor Defendants repeatedly ignored red flags and supplied opioids to pharmacies dispensing a high percentage of controlled substances, pharmacies that dispensed dangerous cocktails (combinations of drugs such as opiates, benzodiazepine, and muscle relaxants), and pharmacies that did not have adequate controls in place to prevent diversion and abuse. The Distributor Defendants served pharmacies that filled prescriptions from distant and out-of-state doctors and pain clinics, as well as pharmacies that supplied more than one opioid to a single patient—a pattern of prescribing that is unlikely to be medically justified and thus carries a high risk of diversion. The Distributor Defendants supplied opioids to pharmacies that admitted servicing pill mills and high-prescribing doctors as well as pharmacies that reported early refills, doctor shopping, and other suspicious practices indicative of abuse or diversion. The Distributor Defendants refused to stop shipping opioids to such pharmacies.

504. The Distributor Defendants increased the supply of opioids, despite red flags, by approving incremental threshold increases, even where the requests raised the pharmacy's level of particular opioids to suspiciously high levels.

505. The Distributor Defendants failed to promptly report compliance violations. If any of the Distributor Defendants had conducted periodic audits of their own records; their customers' patterns of ordering in excess of their monthly threshold allowance for opioid products; the number of times those orders were released without justification; or the number of times those orders were blocked without being reported to government agencies and/or triggering additional investigations, suspensions, or terminations, they would have been obliged to report hundreds, if not thousands, of violations at a time.

506. Through their trade associations, the Distributor Defendants have acknowledged the duties attached to their role. Guidelines published by the Healthcare Distribution Alliance acknowledge that "distributors are uniquely situated to perform due diligence in order to help support the security of the controlled substances they deliver to their customers" and "[s]uch due diligence can reduce the possibility that controlled substances within the supply chain will reach locations they are not intended to reach." The guidelines set forth recommended steps in the "due diligence" process and note in particular: "If an order meets or exceeds a distributor's threshold, as defined in the distributor's monitoring system, or is otherwise characterized by the distributor as an order of interest, the distributor should not ship to the customer, in fulfillment of that order, any units of the specific drug code product as to which the order met or exceeded a threshold or as to which the order was otherwise characterized as an order of interest."[281]

507. The Marketing Defendants also purportedly maintained suspicious order monitoring, Know Your Customer, and anti-diversion programs.

508. Nonetheless, the Marketing Defendants' anti-diversion programs were not sufficient to meet the Marketing Defendants' duty under Arizona law to take reasonable steps to prevent vast quantities of opioids from flowing into Arizona and becoming diverted.

509. Moreover, marketing was focused on increasing, sustaining, or converting the prescriptions of the biggest prescribers. This focus on marketing to the highest prescribers demonstrates that the Marketing Defendants were keenly aware of which doctors were prescribing large quantities of opioids. Indeed, a Purdue executive acknowledged that Purdue could identify highly suspicious volumes of prescriptions. But instead of investigating or reporting those doctors, the

---

[281] Healthcare Distribution Mgmt. Ass'n, *Industry Compliance Guidelines: Reporting Suspicious Orders and Preventing Diversion of Controlled Substances*, *Cardinal Health, Inc. v. Holder*, Doc. No. 1362415 (App'x B), No. 12-5061 (D.C. Cir. Mar. 7, 2012).

Marketing Defendants were singularly focused on maintaining, capturing, or increasing their sales. They either knew or chose not to know of obvious diversion.

510. The Marketing Defendants also had a duty to ensure that the Distributor Defendants distributing their opioids had effective anti-diversion programs in place. Instead, with rare exceptions, they continued doing business with distributors knowing that a significant volume of opioids was being diverted—and in fact offering volume incentives to encourage ever-greater numbers of opioids to be sold. Additionally, as noted above, each Marketing Defendant (or corporate affiliate) was registered as a wholesaler under Arizona law. This underscores their familiarity with the duties of distributors and the importance of securing the entire opioid supply chain.

511. Furthermore, the Marketing Defendants could and should have suspended sales to specific pharmacies, to specific distributors, and of certain opioids in order to quell diversion. With rare exceptions, they chose instead to continue selling opioids that they knew or should have known would be diverted.

512. The Marketing Defendants knew their anti-diversion protocols were inadequate. Their sales representatives were fully aware that the prescription opioids they were promoting were being diverted, often with lethal consequences. As a sales representative wrote on a public forum:

> Actions have consequences - so some patient gets Rx'd the 80mg OxyContin when they probably could have done okay on the 20mg (but their doctor got "sold" on the 80mg) and their teen son/daughter/child's teen friend finds the pill bottle and takes out a few 80's... next they're at a pill party with other teens and some kid picks out a green pill from the bowl... they go to sleep and don't wake up (because they don't understand respiratory depression). Stupid decision for a teen to make...yes... but do they really deserve to die?

513. In addition to their duties as a distributor, the National Retail Pharmacies also had a duty to design and implement systems to prevent the diversion of controlled substances in their retail pharmacy operations. The National Retail Pharmacies had the ability, and the obligation, to look for these red flags on a patient, prescriber, and store level and to refuse to fill and to report prescriptions

suggestive of potential diversion. The National Retail Pharmacies also have a crucial role in creating chain-wide systems to identify and avoid filling "prescriptions" that are not issued for a legitimate purpose or by a prescriber with a valid, current license.

514. The National Retail Pharmacies breached their duties and violated Arizona law in their capacities as dispensing pharmacies. The CSA and Arizona common and statutory law impose obligations on dispensing pharmacies and require them to review each prescription prior to dispensing an opioid medication and make a determination that each prescription for an opioid is valid and issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his or her professional practice; refuse to dispense medication if there is reason to believe that the prescription was not issued for a legitimate medical purpose; and provide effective systems, controls, and procedures to prevent theft and diversion of opioids. Under the CSA and Arizona law, a pharmacist's duty to use due care when filling prescriptions goes beyond simply following the prescription's directions or determining that the prescriber has a valid controlled substances license—pharmacies that are on notice of red flags and signs of diversion or abuse may not simply robotically fill prescriptions, particularly where those prescriptions are unreasonable on their face because they are written in a quantity, frequency, or other manner that a reasonable pharmacist would do additional investigation and due diligence. The National Retail Pharmacies did not fulfill these duties.

515. Red flags are common sense warning signs that have always been an important component of controlled substance pharmacy best practices, not a novel concept to pharmacies. Relevant guidance related to the creation of systems and programs to guard against diversion and lists of "don'ts" when dispensing narcotics date back to at least the 1930s and 1940s. DEA enforcement actions also hold pharmacies responsible for failing to fulfill their corresponding responsibility under the federal Controlled Substances Act ("CSA").

516. Although pharmacists individually have duties under these statutes and regulations as well as under the common law, pharmacies such as the National Retail Pharmacies share these duties. As such, although it acts through its agents, the pharmacy is ultimately responsible to prevent diversion. Chain pharmacies also exert control over their agents, including the responsibility to ensure they comply with applicable laws and regulations in all dispensing of controlled substances. Pharmacy chains cannot absolve themselves of their own obligations by attempting to place unilateral responsibility on their agents.

517. As distributors that also operated many pharmacies, the National Retail Pharmacies were aware of red flags that should have caused their pharmacies to investigate a particular prescription before filling it. These red flags include doctors who write unusually large amounts of opioid prescriptions when compared with similar practitioners in the area, early refills for opioids prescriptions, prescriptions with unusual quantities or dosages; patients seeking to fill apresciption written for someone else, multiple consumers appearing at or near the same time with opioid prescriptions from the same physician; patients who drive long distances to have a prescription filled, consumers who seek large volumes of controlled substances in the highest strength for each prescription type, patients who appear to be creating cocktails with muscle relaxants or tranquilizers, and consumers who pay large amounts of cash for opioid prescriptions rather than using some form of insurance.

518. Red flags indicative of diversion at the retail level include suspicious behavior of patients, such as stumbling while walking, slurred speech, and the appearance of intoxication; customers coming and appearing like they may not need the medication; and customers requesting drugs by brand name or street slang, such as "blues" (a term referencing Mallinckrodt opioids). Pharmacies' training materials and controls should assist pharmacists and technicians in the identification of such behaviors.

519. The National Retail Pharmacies failed to train or instruct its employees with respect to proper policies and protocols to follow to prevent the diversion of opioids. This had the direct, readily foreseeable, and intended result of employees continuing to fill prescriptions despite clear red flags.

520. Chain pharmacies not only make observations through their local front doors, but they also have extensive data to which an individual pharmacist would not have access. They are uniquely positioned to monitor, for example, the volume of opioids being dispensed in their pharmacies relative to the size of the communities they serve. This is particularly important given that as the supply of opioids increases, so does the incidence of overdose and death. They could also use this information to monitor potentially suspicious prescribers.

521. Pharmacies must use the information available to them to guard against supplying controlled substances for non-medical use, identify red flags or potential diversion, and share with their agents, as well as provide clear guidance and training on how to use it. A former DEA diversion investigator has testified in the federal opioid MDL that pharmacies corporately have an obligation to develop policies to train pharmacists to comply with CSA regulations. She further agreed that the defendants had an obligation to develop and implement systems to provide the necessary tools for their pharmacists to comply with the CSA regulations.

522. Additionally, the National Retail Pharmacies have operating systems and methods to store and retain prescription dispensing data and records. The information such pharmacies possess must be readily retrievable, and they have an obligation to use it to identify patterns of diversion; conduct internal audits and training programs; investigate suspicious prescribers, patients, and pharmacists; and prevent diversion of controlled substances. Their hiring, training, and management of pharmacy personnel and their supporting policies, procedures, and systems should and must

promote public health and safety and assist in the identification and prevention of the diversion of controlled substances.

523. "[A] registrant's accurate and diligent adherence to [its record-keeping] obligations is absolutely essential to protect against the diversion of controlled substances."[282] An important component of an anti-diversion system is the documentation that National Retail Pharmacies possess. These pharmacies must utilize their information to identify patterns of diversion and to audit, train, and investigate suspicious activity in an effort to prevent diversion of controlled substances.

524. According to law and industry standards, if a pharmacy finds evidence of prescription diversion, the Board of Pharmacy and DEA must be contacted. As distributors and as pharmacies, the National Retail Pharmacies have a duty, and are expected, to be vigilant in ensuring that controlled substances are delivered only for lawful purposes.

525. Defendants also had obligations to report suspicious orders of other parties if they became aware of them and were thus collectively responsible for each other's compliance with their reporting obligations.

526. Defendants thus knew that their own conduct could be reported by other distributors or manufacturers and that their failure to report suspicious orders they filled could be revealed. As a result, Defendants had an incentive to communicate with each other about the reporting of suspicious orders to ensure consistency.

527. The desired consistency was achieved. As described below, no Defendant adequately reported suspicious orders, and the flow of opioids continued unimpeded.

---

[282] Brewster Drug, Inc.; Decision and Order, 85 Fed. Reg. 19020 (Apr. 3, 2020), https://www.govinfo.gov/content/pkg/FR-2020-04-03/pdf/2020-07017.pdf (citing Paul H. Volkman; Denial of Application, 73 Fed. Reg. 30630 (May 28, 2008), https://www.govinfo.gov/content/pkg/FR-2008-05-28/pdf/E8-11851.pdf).

528. Defendants' failure to identify, monitor, detect, investigate, report, and refuse to sell, fill, or dispense suspicious orders and prescriptions of opioids also violated Defendants' duty to act reasonably in light of the serious and foreseeable harms associated with opioid diversion and abuse. All Defendants' failure to take reasonable steps to prevent opioid abuse and diversion is a direct and proximate cause of, and/or substantial factor contributing to, the diversion of prescription opioids into Arizona for consumption for non-medical, non-scientific purposes.

529. Defendants knew that widespread diversion of opioids was occurring in Arizona but turned a blind eye in order to earn higher profits. The foreseeable result of Defendants' decision to continue selling, distributing, and dispensing vast quantities of opioids that were deceptively marketed and had no medical justification was widespread addiction, overdoses, death, and the societal and economic harms incurred by those, such as Plaintiffs, tasked with addressing these problems.

530. Defendants' conduct led to precisely the harm that Arizona law was designed to prevent. Arizona law is designed to, among other things, protect consumers from harmful distribution practices. Defendants' unlawful practices leading to the diversion of opioids is a direct and proximate cause of and/or a substantial factor leading to opioid abuse, addiction, morbidity, and mortality in Arizona and to the past and ongoing damages incurred by Plaintiffs.

### D. The Distributor Defendants have been investigated and fined repeatedly for failing to secure their supply chains, but refuse to change their ways.

531. The Distributor Defendants' failure to secure their opioid supply chain and prevent drug diversion has resulted in years of governmental investigations, which the Distributor Defendants have settled for hundreds of millions of dollars. Notwithstanding these settlements and the egregious wrongdoing they uncovered, the Distributor Defendants continued to violate their duties under Arizona law.

532. The details of these investigations are described below in the section for each Defendant.

533. Rather than being chastened by these investigations and penalties and taking that as impetus to step up their efforts to prevent diversion, the Distributor Defendants, individually and collectively through trade groups, pressured the DOJ to "halt" prosecutions and lobbied Congress to strip the DEA of its ability to immediately suspend distributor registrations. The result was a "sharp drop in enforcement actions" and the passage of the Ensuring Patient Access and Effective Drug Enforcement Act that, ironically, made it more difficult for the DEA to revoke a distributor's license.[283]

### E. **The Distributor Defendants misrepresented that they were complying with their duties to prevent diversion of opioids.**

534. Defendants misrepresented to the public and to regulators that they were complying with their duties, including their common law and statutory duties to identify and prevent suspicious orders of opioids. In so doing, they deceptively concealed their role in creating and perpetuating the opioids crisis that has inflicted devastating harm on Arizona.

535. These misrepresentations included statements that they were implementing suspicious order monitoring programs reasonably designed to identify and halt opioid shipments that were at high risk of diversion. Defendants made these statements as part of settlements with government entities, among other places. The statements misled the public into believing that the Distributor Defendants were taking effective steps to fight the opioid epidemic. The details are described below in the section for each Defendant.

---

[283] *See* Lenny Bernstein & Scott Higham, *Investigation: The DEA Slowed Enforcement While the Opioid Epidemic Grew Out of Control*, Wash. Post (Oct. 22, 2016), https://www.washingtonpost.com/investigations/the-dea-slowed-enforcement-while-the-opioid-epidemic-grew-out-of-control/2016/10/22/aea2bf8e-7f71-11e6-8d13-d7c704ef9fd9_story.html; Lenny Bernstein & Scott Higham, *Investigations: U.S. Senator Calls for Investigation of DEA Enforcement Slowdown Amid Opioid Crisis*, Wash. Post (Mar. 6, 2017), https://www.washingtonpost.com/investigations/us-senator-calls-for-investigation-of-dea-enforcement-slowdown/2017/03/06/5846ee60-028b-11e7-b1e9-a05d3c21f7cf_story.html; Eric Eyre, *DEA Agent: "We Had No Leadership" in WV Amid Flood of Pain Pills*, Charleston Gazette-Mail (Feb. 18, 2017), https://www.wvgazettemail.com/news/health/dea-agent-we-had-no-leadership-in-wv-amid-flood-of-pain-pills/article_928e9bcd-e28e-58b1-8e3f-f08288f539fd.html.

536. The National Retail Pharmacies committed to developing strict anti-diversion systems and acknowledged and represented to the public that they had unique duties and obligations with respect to dispensing opioids and other controlled substances.

537. The Distributor Defendants omitted any mention to the public of the deliberate actions they were taking to exacerbate the opioid epidemic, including ignoring red flags among their pharmacy customers, bouncing problematic customers from one distributor to another, turning up the overall volume of opioids flowing to Arizona pharmacies through "threshold creep," and actively marketing opioid products to patients and pharmacies.

538. Defendants made some of these statements and material omissions through their trade organizations, including the Healthcare Distribution Alliance ("HDA"), as well as the National Association of Chain Drugstores ("NACDS"), of which Walgreens, Walmart, and CVS are members.[284] In an amicus brief filed by the HDA and the NACDS, Defendants represented that they were complying with their duties to identify suspicious orders by utilizing both computer algorithms and human review to detect suspicious orders based on the generalized information available to them in the ordering process; taking action when particular orders or series of orders raised red flags because of size, frequency, or departure from patterns; and monitoring for unusual behavior by pharmacies. In this brief, they asserted:

a. "HDMA and NACDS members not only have statutory and regulatory responsibilities to guard against diversion of controlled prescription drugs, but undertake such efforts as responsible members of society."

b. "Distributors take seriously their duty to report suspicious orders, utilizing both computer algorithms and human review to detect suspicious orders based on the generalized information that *is* available to them in the ordering process."[285]

---

[284] *NACDS Member Retailers (US-based)*, Nat'l Ass'n Chain Drug Stores, https://www.nacds.org/membership/directories/chain-companies/ (last visited July 16, 2021).

[285] Brief for Healthcare Distribution Mgmt. Association and National Ass'n of Chain Drug Stores as Amici Curiae in Support of Neither Party, *Masters Pharm., Inc. v. U.S. Drug Enf't Admin.*, No. 15-1335, 2016 WL 1321983, at *3–4, *25 (D.C. Cir. Apr. 4, 2016) (hereinafter "Brief for HDMA and NACDS").

These statements were designed to give the false impression that Defendants were not deliberately turning a blind eye to egregious signs of diversion among their pharmacy customers.

539. Defendants' misrepresentations ultimately delayed an adequate response to the opioid crisis.

540. Despite representing publicly that they would secure the opioid supply chain, Defendants failed to take reasonable steps to prevent opioid diversion in Arizona.

### F. **The Distributor Defendants marketed the Marketing Defendants' opioid products.**

541. Not only did the Distributor Defendants distribute, supply, and sell prescription opioids without fulfilling their duties to maintain effective controls against diversion, they also further increased the flood of opioids into Plaintiffs' communities by actively assisting the Marketing Defendants in marketing their opioid products.

542. The Distributor Defendants marketed and promoted both branded and generic opioids to pharmacies and, in some cases, healthcare providers (including those in hospitals) and patients. These marketing activities were an integral part of the Marketing Defendants' deceptive scheme to spread misrepresentations about opioids and increase opioid prescribing. The Marketing Defendants worked with the Distributor Defendants to develop marketing activities and paid the Distributor Defendants for their efforts. As these marketing activities drove dramatic increases in opioid prescriptions, the Distributor Defendants continued to market and distribute unconscionable quantities of opioids while ignoring their obligations to monitor, report, and stop suspicious orders.

543. The Distributor Defendants benefited from this situation in two ways: (1) they were paid directly by the Marketing Defendants and other manufacturers, and (2) their revenue increased as more opioids were sold.

544. Distributors' efforts to assist manufacturers in increasing opioid prescriptions date back decades. For example, a 1991 article described efforts by the National Wholesale Druggists

Association ("NWDA"), the predecessor entity to the Healthcare Distribution Alliance, a trade group of manufacturers and distributors, to work collaboratively with wholesalers, noting how "wholesalers and manufacturers showed their optimism about the future of wholesale drugs," in light of a "spirit of intercompany teamwork open[ing] up new opportunities for everyone involved . . . ."[286] Outgoing NWDA chairman Joseph Polastri was also quoted as stating that "suppliers and wholesalers have a common economic incentive to work more closely together."[287]

545. In 1991, the NWDA organized official, high-level meetings between wholesalers and manufacturers. These visits were reported to have prompted discussions about using wholesaler sales representatives "to pass along technical product information to pharmacists, hospitals, third-party payers and perhaps even to selected doctors"; several manufacturers also expressed interest "in tapping into wholesaler telemarketing capabilities."[288]

546. Manufacturers such as Purdue were members of the NWDA starting from the early 1990s. In a statement prepared by Purdue at the NWDA's request, Purdue acknowledged the role that distributors' marketing efforts played in its OxyContin launch, noting that "wholesaler incentive programs and advertising allowances," "wholesaler dating," and a variety of promotional programming offered by distributors (such as "deal catalogs," "retail tote stuffers," "screen savers," and "telemarketing") all helped Purdue exceed expectations within just the first five months of OxyContin's availability. As Purdue explained, "[t]hrough the support of our wholesaler trading partners, availability at the retail level greatly contributed to this success." Distributor Defendants also helped facilitate the promotion of the Marketing Defendants' products at the retail level. For example, in describing services offered by McKesson and by ABDC's predecessor entity, Bergen Brunswig,

---

[286] Val Cardinale, *New Spirit of Partnering Rejuvenates Wholesalers*, 135 Drug Topics 23 (Dec. 16, 1991).

[287] *Id.*

[288] *NWDA Senior Management Teams Will Visit 30 Drug Companies by End Of Year; Wholesaler-Only Advisory Boards Have Been Established By 14 Drug Firms*, Pink Sheet (Nov. 25, 1991).

Purdue noted: "Utilizing the drug wholesaler, incentives will be offered to facilitate placement of OxyContin at the retail level."

547. The Distributor Defendants' marketing often specifically targeted pharmacists because of their unique relationship as a middle point between prescriber and patient. Pharmacists can and do interact with prescribers to make recommendations about a patient's pharmacotherapy. As such, and as the Marketing Defendants recognized, pharmacists are key to converting prescriptions into sales.

548. Opioid distributors were in a unique and trusted position in the controlled substances supply chain from which they could have spoken truthfully to their pharmacy customers about the serious risks posed by opioids (including the risk of diversion). Instead, the Distributor Defendants abused their unique position for profit by contributing to the chorus of deception surrounding opioids.

549. To engage in the promotion of controlled substances at all, under the circumstances detailed in this Complaint, was a dereliction of the Distributor Defendants' duties to prevent opioid diversion. Through these marketing activities, the Distributor Defendants contributed to and reinforced the deceptive and misleading marketing messages that healthcare providers received about opioids through other channels. Moreover, much of the Distributor Defendants' marketing content was deceptive because it either affirmatively misrepresented the benefits and risks of prescription opioids or it omitted important information about the risks of prescription opioids. The Distributor Defendants knew or should have known that these marketing messages—particularly those that misrepresented or omitted material information about the potential for diversion or risks of addiction associated with prescription opioids—were deceptive. Through their unfair and deceptive conduct, Defendants put Arizona consumers at increased risk of harm from the escalating and largely unchecked distribution and sale of prescription opioids, increased availability and diversion of opioids

to non-medical use in Arizona, and increased misuse and addiction that has created an epidemic of health problems, overdose, and death in Arizona.

550. The Distributor Defendants were not just middlemen or delivery services; on the contrary, they inserted themselves directly into doctor-patient relationships. The Distributor Defendants marketed opioids directly to patients, including for off-label and unsafe uses, and they also consulted with patients about using opioids. The Distributor Defendants, including ABDC and its Xcenda subsidiary, paid in-house scientists to publish articles downplaying the risks of opioids.

551. The Distributor Defendants also provided discount cards to induce consumers to purchase the Marketing Defendants' opioids. As a 2017 internal Purdue document explains, "[t]here is evidence associating cash payment with opioid abuse and diversion" and "[d]iscount cards can lower the out of pocket cost for a cash prescription without revealing the identity of the card user." Thus, Purdue recognized, as the Distributor Defendants should have recognized, that discount cards usable with cash payment for prescriptions facilitated abuse and diversion.

552. The Distributor Defendants invested in overcoming resistance from insurance and health plans to pay for opioids prescribed for chronic, noncancer conditions. Strategies to overcome insurers' refusal to cover opioids included call centers to help patients navigate the insurance and insurance appeals process, as well as working with doctors on the same issues.

553. The purpose and intended and achieved effect of this marketing was to sell more opioids than were medically justified. Additional details concerning each Distributor Defendant's marketing activities are described in the sections detailing conduct by each Defendant.

**G. <u>Defendants coordinated their flawed approach to preventing diversion through trade associations.</u>**

554. Defendants worked together to achieve their common purpose through trade or other organizations, such as the Pain Care Forum and the Healthcare Distribution Alliance. Participation in

these groups allowed Defendants to form interpersonal relationships and organize their activities collectively.

### 1. Pain Care Forum

555. The Pain Care Forum ("PCF") is a coalition of drugmakers, trade groups, and dozens of non-profit organizations supported by industry funding, including the Front Groups described in this Complaint. Lobbyists for members of the PCF quietly shaped federal and state policies regarding the use of prescription opioids for more than a decade.

556. The Center for Public Integrity and the Associated Press obtained "internal documents shed[ding] new light on how drugmakers and their allies shaped the national response to the ongoing wave of prescription opioid abuse."[289] Specifically, PCF members spent over $740 million lobbying in the nation's capital and in all 50 statehouses on an array of issues, including opioid-related measures.[290]

557. Defendants, who stood to profit from expanded prescription opioid use, are members of or participants in the PCF.[291] In 2012, membership and participating organizations included Marketing Defendants Endo, Purdue, Actavis, and Cephalon. But the Marketing Defendants were not alone. The Distributor Defendants actively participated and continue to participate in the PCF through, at a minimum, their trade organization, the Healthcare Distribution Alliance.[292]

558. The PCF thus allowed the Marketing and Distributor Defendants to engage in coordinated conduct to ensure an oversupply of opioids.

---

[289] Matthew Perrone, *Pro-Painkiller Echo Chamber Shaped Policy Amid Drug Epidemic*, Ctr. for Pub. Integrity (Sept. 19, 2017), https://www.publicintegrity.org/2016/09/19/20201/pro-painkiller-echo-chamber-shaped-policy-amid-drug-epidemic.

[290] *Id.*

[291] *PAIN CARE FORUM 2012 Meetings Schedule* (last updated Dec. 2011), https://assets.documentcloud.org/documents/3108982/PAIN-CARE-FORUM-Meetings-Schedule-amp.pdf.

[292] *Id.* The Executive Committee of the HDA (formerly the HDMA) currently includes the Chief Executive Officer, Pharmaceutical Segment for Cardinal Health, Inc. and the Group President, Pharmaceutical Distribution and Strategic Global Source for AmerisourceBergen Corporation. *Executive Committee*, Healthcare Distrib. All., https://www.healthcaredistribution.org/about/executive-committee (last visited July 12, 2021).

559. For example, in 2007, APF and Purdue collaborated on talking points for use at a Pain Care Forum meeting. Some of these talking points included "[o]verly restrictive regulatory policies impeded pain relief"; "doctors and people with pain" who "believe that opioid medications are addictive" constituted "barriers to effective pain care"; and opioid medications "give relief—not a 'high.'"[293]

### 2. Healthcare Distribution Alliance

560. Cardinal, ABDC, McKesson, and Anda belong to a trade association known until 2016 as the Healthcare Distribution Management Association ("HDMA"), and now known as the Healthcare Distribution Alliance ("HDA").[294] The HDA is also a member of the PCF.

561. The HDA and its members eagerly sought the active membership and participation of the Marketing Defendants by advocating the many benefits for members, including "strengthening . . . alliances."[295] Endo, J&J, Mallinckrodt, Par, Purdue, and Teva are members of the HDA.[296]

562. Beyond strengthening alliances, the benefits of HDA membership included the ability to "network one on one with manufacturer executives at HDA's members-only Business and Leadership Conference," "network[] with HDA wholesale distributor members," "host and sponsor HDA Board of Directors events," "participate on HDA committees, task forces and working groups with peers and trading partners," and "make connections."[297]

---

[293] *Treatment Options*, *supra* at 5.

[294] *Distributor*, Healthcare Distrib. All., https://www.hda.org/about/membership/distributor (last visited Aug. 5, 2021).

[295] *Manufacturer Membership Benefits*, Healthcare Distrib. All., https://www.hda.org/~/media/pdfs/membership/manufacturer-membership-benefits.ashx?la=en (last visited July 14, 2021) (hereinafter *Manufacturer Membership Benefits*).

[296] *Manufacturer*, Healthcare Distrib. All., https://www.hda.org/about/membership/manufacturer (last visited July 14, 2021).

[297] *Manufacturer Membership Benefits*, *supra*.

563. The closed meetings of the HDA's councils, committees, task forces, and working groups provided the Marketing and Distributor Defendants the opportunity to work closely together, confidentially, to develop and further their common purpose.

564. An outstanding example of this occurred in 2012. The DEA issued an interim suspension of the license of a Cardinal distribution facility. At issue was an 803% increase in opioid sales to a pharmacy that Cardinal had already been fined for selling opioids to. In response, Cardinal filed a motion for a temporary restraining order. Shortly thereafter, on April 6, 2012, Cardinal, ABDC, and McKesson met under the auspices of the HDA to "plot a course forward."[298] Their plan, which they concocted jointly, was to involve a media campaign, focus groups to explore messaging that would paint the distributors in a positive light, a crisis playbook that included a written plan for responding to various scenarios (including registration suspension and a diversion lawsuit),[299] and a plan to arrange a congressional inquiry designed to paint the DEA as "misdirected."

565. The HDA offers a multitude of conferences, including annual business and leadership conferences. The HDA and the Distributor Defendants advertise these conferences to the Marketing Defendants as an opportunity to "bring together high-level executives, thought leaders and influential managers . . . to hold strategic business discussions on the most pressing industry issues."[300] The conferences also gave the Marketing and Distributor Defendants "unmatched opportunities to network with [their] peers and trading partners at all levels of the healthcare distribution industry."[301] These conferences were significant opportunities for the Marketing and Distributor Defendants to

[298] *See also* Healthcare Mgm't & Distrib. All., *HDMA Political Strategy for DEA Suspicious Orders Matter* (n.d.).

[299] Healthcare Mgm't & Distrib. All., *Crisis Playbook: An Interactive Guide to Crisis Communications* (n.d.), https://wp-stat.s3.amazonaws.com/graphics/opioid-files/pdfs/440.pdf (last visited July 16, 2021).

[300] *Business and Leadership Conference – Information for Manufacturers*, Healthcare Distribution Alliance, https://web.archive.org/web/20150309000438/https://www.healthcaredistribution.org/events/2015-business-and-leadership-conference/blc-for-manufacturers (last accessed July 13, 2021 as of Mar. 9, 2015).

[301] *Id.*

interact at a high level of leadership. The Marketing Defendants embraced this opportunity by attending and sponsoring these events.

566. After becoming members of the HDA, Defendants were eligible to participate on councils, committees, task forces, and working groups, including:

a. Industry Relations Council: "This council, composed of distributor and manufacturer members, provides leadership on pharmaceutical distribution and supply chain issues."

b. Business Technology Committee: "This committee provides guidance to HDA and its members through the development of collaborative e-commerce business solutions. The committee's major areas of focus within pharmaceutical distribution include information systems, operational integration and the impact of e-commerce." Participation in this committee includes distributor and manufacturer members.

c. Logistics Operation Committee: "This committee initiates projects designed to help members enhance the productivity, efficiency and customer satisfaction within the healthcare supply chain. Its major areas of focus include process automation, information systems, operational integration, resource management and quality improvement." Participation in this committee includes distributor and manufacturer members.

d. Manufacturer Government Affairs Advisory Committee: "This committee provides a forum for briefing HDA's manufacturer members on federal and state legislative and regulatory activity affecting the pharmaceutical distribution channel. Topics discussed include such issues as prescription drug traceability, distributor licensing, FDA and DEA regulation of distribution, importation and Medicaid/Medicare reimbursement." Participation in this committee includes manufacturer members.

e. Contracts and Chargebacks Working Group: "This working group explores how the contract administration process can be streamlined through process improvements or technical efficiencies. It also creates and exchanges industry knowledge of interest to contract and chargeback professionals." Participation in this group includes manufacturer and distributor members.

567. Defendants also participated, through the HDA, in webinars and other meetings designed to exchange detailed information regarding their prescription opioid sales, including

purchase orders, acknowledgements, ship notices, and invoices.[302] For example, on April 27, 2011, the HDA offered a webinar to "accurately and effectively exchange business transactions between distributors and manufacturers. . . ." On information and belief, the Marketing Defendants used this information to gather high-level data regarding overall distribution and to direct the Distributor Defendants on how to most effectively sell prescription opioids.

568. The application for manufacturer membership in the HDA further indicates the level of connection among Defendants and the level of insight they had into each other's businesses.[303] For example, the manufacturer membership application must be signed by a "senior company executive," and it requests that the applicant identify a key contact and any additional contacts from within its company.[304]

569. The HDA application also requests that the manufacturer identify its current distribution information, including the facility name and contact information. Manufacturer members were also asked to identify their "sales to HDA wholesalers for your most recent fiscal year" through wholesale distributors.[305]

570. Publications and guidelines issued by the HDA confirm that Defendants utilized their HDA membership to form agreements. Specifically, in the fall of 2008, the HDA published *Industry Compliance Guidelines: Reporting Suspicious Orders and Preventing Diversion of Controlled Substances* (the "Industry Compliance Guidelines") regarding diversion.[306] As the HDA explained in an amicus brief,

---

[302] *Webinars*, Healthcare Distrib. All., https://www.healthcaredistribution.org/resources/webinar-leveraging-edi (last visited July 12, 2021).

[303] *Manufacturer Membership Application*, Healthcare Distrib. Alliance, https://www.hda.org/~/media/pdfs/membership/manufacturer-membership-application.ashx?la=en (last visited July 12, 2021).

[304] *Id.*

[305] *Id.*

[306] Healthcare Distrib. Mgm't All., *Industry Compliance Guidelines: Reporting Suspicious Orders and Preventing Diversion of Controlled Substances* (n.d.).

the Industry Compliance Guidelines were the result of "[a] committee of [HDA] members contribut[ing] to the development of this publication" beginning in late 2007.[307]

571. This statement and the Industry Compliance Guidelines themselves support the allegation that Defendants utilized the HDA to form agreements about their approach to their legal duties with respect to the distribution of controlled substances. As John M. Gray, President/CEO of the HDA, stated to the Energy and Commerce Subcommittee on Health in April 2014, it is "difficult to find the right balance between proactive anti-diversion efforts while not inadvertently limiting access to appropriately prescribed and dispensed medications."[308] Here, it is apparent that all the Defendants found the same balance: an overwhelming pattern and practice of failing to identify, report, or halt suspicious orders or to prevent diversion.

### 3. National Association of Chain Drug Stores

572. The National Association of Chain Drug Stores ("NACDS") is a national trade association that represents traditional drug stores, supermarkets, and mass merchants with pharmacies—from regional chains with four stores to national companies. Its members and/or affiliate members also include stakeholders such as manufacturers, other distributors, and other trade organizations. During the last 12 years, representatives of CVS and Walgreens have always held Board of Directors or officer seats. As controlling members of NACDS, chain pharmacies have served on and run key governing committees within the organization. Chain pharmacies have repeatedly chaired NACDS's Board of Directors, which determines the "strategic plan and positions" of the organization.

[307] *Amicus Curiae* Brief of Healthcare Distribution Management Association in Support of Cardinal Health's Motion for Injunction Pending Appeal 5, *Cardinal Health, Inc. v. Holder*, No. 12-5061 (D.C. Cir. filed Mar. 7, 2012).

[308] Statement of John M. Gray, Pres. & CEO, Healthcare Distrib. Mng't Ass'n (Apr. 7, 2014), https://docs.house.gov/meetings/IF/IF14/20140407/102093/HHRG-113-IF14-Wstate-GrayJ-20140407.pdf.

573. In 2006, the NACDS issued a "Model Compliance Manual" intended to "assist NACDS members" in developing their own compliance programs. The Model Compliance Manual notes that a retail pharmacy may "generate and review reports for its own purposes" and refers to the assessment tools identified by the Centers for Medicare and Medicaid Services in its Prescription Drug Benefit Manual chapter on fraud, waste, and abuse, including:

> Drug Utilization Reports, which identify the number of prescriptions filled for a particular customer and, in particular, numbers for suspect classes of drugs such as narcotics to identify possible therapeutic abuse or illegal activity by a customer. A customer with an abnormal number of prescriptions or prescription patterns for certain drugs should be identified in reports, and the customer and his or her prescribing providers can be contacted and explanations for use can be received.
>
> Prescribing Patterns by Physician Reports, which identify the number of prescriptions written by a particular provider and focus on a class or particular type of drug such as narcotics. These reports can be generated to identify possible prescriber or other fraud.
>
> Geographic Zip Reports, which identify possible "doctor shopping" schemes or "script mills" by comparing the geographic location (zip code) of the patient to the location of the provider who wrote the prescription and should include the location of the dispensing pharmacy.

574. Many chain pharmacies, including CVS and Walgreens, and their trade organizations, including the HDMA and the NACDS, also participated in creating a "Stakeholders" memorandum that acknowledges many of these red flags. These include, for example, traveling an unexplainable and/or unreasonably long distance to a physician office and/or pharmacy, a controlled substance refill pattern inconsistent with regular refill patterns for non-controlled substances, or a prescription that a pharmacist knows or reasonably believes another pharmacy refused to fill. The "Stakeholders" memorandum acknowledges the danger of "therapeutic duplication of two or more long-acting and/or two or more short-acting opiates (cocktails)" and of a "patient present[ing] prescriptions for highly abused 'cocktails' (combination of opiate, benzodiazepine, and muscle relaxant) of controlled substance medications (cocktails)." Medical literature has long recognized the special dangers posed

by cocktails composed of drugs of abuse that lack any documented medical efficacy. Similarly, when affirming the suspension of the controlled-substances registration of East Main Street Pharmacy, the Deputy Administrator of the DEA found that "the combination of a benzodiazepine, a narcotic and carisoprodol is well known in the pharmacy profession as being used by patients abusing prescription drugs."[309]

575. NACDS has continued to support the efforts of the National Retail Pharmacies to whitewash their role in creating and sustaining the opioid epidemic. In a recent amicus brief filed in support of Walmart in an action brought by the DOJ, NACDS asserted: "Although it is a commonly recognized that pharmacists and pharmacies were not responsible for the crisis, NACDS members are doing their part to prevent the diversion of prescription medications, reduce drug abuse, and save lives."[310]

576. Taken together, the interaction and length of the relationships between and among the Marketing and Distributor Defendants reflect a deep level of interaction and cooperation between two groups in a tightly knit industry. Defendants operated as a united entity, working together on multiple fronts, to engage in the unlawful sale of prescription opioids.

## VI. THE OPIOID EPIDEMIC CREATED BY DEFENDANTS' DRIVING OF OPIOID DEMAND AND SUPPLY HAS HARMED PLAINTIFF HOSPITALS.

### A. Impact of Opioids on Arizona Hospitals

577. Hospitals—legally and morally—are compelled to treat patients with opioid-related conditions and, as a result, have been directly and monetarily damaged by the opioid epidemic. In

[309] East Main Street Pharmacy; Affirmance of Suspension Order, 75 Fed. Reg. 66149 (Oct. 27, 2010), https://www.govinfo.gov/content/pkg/FR-2010-10-27/pdf/2010-27096.pdf. The DEA issued a suspension order concerning one of ABDC's Ohio customers, East Main Street Pharmacy, which documented deaths that occurred as a result of a failure to prevent diversion. More than half of the pharmacy's prescriptions were written by an out-of-area doctor who was writing high volumes of controlled substances.

[310] Brief of the Nat'l Ass'n of Chain Drug Stores as *Amicus Curiae* in Support of Defendants' Motion to Dismiss, *United States v. Walmart Inc.*, No. 20-1744-CFC (D. Del. filed Mar. 3, 2021), https://corporate.walmart.com/media-library/document/2021-03-03-the-national-association-of-chain-drug-stores-nacds-amicus-brief/_proxyDocument?id=00000177-fe2b-def1-a37f-fefb01180000.

addition to the cost of the opioid drugs themselves, hospitals have incurred and continue to incur millions of dollars in damages from the reduced realization of revenues from the provision of care to opioid-using patients as a result of the unlawful marketing, distribution, and sale of opioids. Arguably, more than any other institution, hospitals directly and monetarily bear the brunt of the opioid crisis.

578. These impacts do not arise merely from patients who do not pay their bills. Instead, the financing mechanisms of modern healthcare set particular rates for particular types of treatment. If treatment becomes more complicated or expensive (as it does in patients with opioid dependency or addiction as a comorbidity), then a healthcare provider's rate of realization declines. For example, it is increasingly common for individuals addicted to opioids to present at a hospital with endocarditis, treatment for which may involve surgery followed by intravenous antibiotic treatment. This treatment requires the installation of an IV port in the patient; typically, a patient with such a port will be released and will receive their intravenous antibiotics on an outpatient basis. However, because IV ports provide a ready route for intravenous drug use, the standard of care for patients with IV ports who have a concurrent opioid use disorder is to conduct the entire course of treatment on an inpatient basis. The extra costs of providing extended inpatient care to individuals with opioid use disorders lower and, in some cases, eliminate the profit that a hospital realizes from the rate of payment the hospital has negotiated with insurers and other payors.

579. Because of Defendants' conduct, the opioid epidemic is placing an increasing strain on Arizona's overburdened health care system.

580. Defendants' misrepresentations, along with those of the Front Groups and the KOLs, prompted Arizona healthcare providers to prescribe, patients to take, and payors to cover opioids for the treatment of chronic pain. Through their marketing, Defendants overcame barriers to widespread prescribing of opioids for chronic pain with deceptive messages about the risks, benefits, and sustainability of long-term opioid use. These harms were compounded by the supply of an extravagant

quantity of opioids into Arizona communities—so much that the only logical conclusion was that the product was being diverted and used illicitly.

581. During admission, hospital professionals routinely consult with patients to assess which medications the patients are taking at home. Due to Defendants' conduct, hospitals can no longer trust patients to self-report their prescriptions. Hospital pharmacies' inability to rely on their patients' self-reporting and having to take additional steps to independently verify their patients' purchases (such as by examining the PDMP) impose additional burdens on hospitals.

582. Hospitals must treat opioid users who present in need of emergency care, a fact of which Defendants were well aware. This obligation arises under the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395dd, which requires hospital emergency departments that accept payments from Medicare to provide care to anyone seeking treatment for a medical condition, regardless of citizenship, legal status, or ability to pay. Under EMTALA, participating hospitals may not transfer or discharge patients needing emergency treatment except with the informed consent or stabilization of the patient or when their condition requires transfer to a hospital better equipped to administer the treatment.

583. This is no small burden. In 2011, it was "estimated that [there were] greater than 420[,000 emergency room] visits related to the misuse of abuse of narcotic pain relievers" in the United States.[311]

584. Similarly, if a pregnant opioid-dependent person presents for treatment, under EMTALA the hospital must provide care for both the opioid-dependent parent and the opioid-dependent baby. Defendants relied on Plaintiffs to mitigate the health consequences of Defendants'

[311] Cindy Williams, Vice President and Chief Pharmacy Officer, Riverside Health Sys. *Establishment of an Opioid Stewardship Program* (n.d.).

illegal activities by providing a safety net to prevent overdose deaths and treat the health consequences arising from opioid addiction.[312]

585. The unlawful diversion of prescription opioids is a direct and proximate cause of and/or substantial factor leading to prescription opioid abuse, addiction, morbidity, and mortality in the United States. This diversion and the epidemic are direct causes of foreseeable harm to Plaintiffs.

586. Defendants' unlawful conduct resulted in direct and foreseeable, past and continuing, economic damages for which Plaintiffs seek relief.

**B. <u>Impact of Defendants' Activities on Plaintiffs</u>**

587. Plaintiffs operate hospitals located throughout Arizona. The service areas of Plaintiffs' hospitals have been hit hard by the opioid crisis.

588. Plaintiffs have treated, and continue to treat, numerous patients for opioid-related conditions, including: (1) opioid overdose; (2) opioid dependency; (3) hepatitis C, HIV, and other infections occurring as a result of intravenous drug use; (4) neonatal treatment in their NICUs for babies born opioid-dependent, for which treatment is specialized, intensive, complex, lengthy and highly expensive; and (5) psychiatric and related treatment for patients with opioid dependency who present in need of mental health treatment programs.

589. Plaintiffs have incurred and continue to incur a reduced rate of realization from the provision of health care to treat patients with opioid-related conditions. First, patients with opioid-related conditions seek treatment from Plaintiffs as a proximate result of the opioid epidemic created and engineered by Defendants. As a result, Plaintiffs' monetary losses with respect to the treatment of these patients were and are foreseeable to Defendants and were and are the proximate result of Defendants' acts and omissions specified herein. Second, patients with opioid conditions have caused Plaintiffs to incur, and continue to incur, increased costs in the form of surgical procedures and other

---

[312] *Opioid Exit Plan*, *supra*.

care that have been and are more complex and expensive than they would otherwise be if the patients were not using or abusing opioids.

590. Hospitals obtain a lower rate of realization for care provided to patients in the prescription opioid cohort (patients who have historically and/or presently used prescription opioids) than for care provided to patients who do not have a history of prescription opioid use.

591. Additionally, individuals with opioid dependency have presented and continue to present themselves to Plaintiffs claiming to have illnesses and medical problems in an effort to obtain opioids. Plaintiffs have incurred and continue to incur operational impacts related to the time and expense of diagnosing, testing, and otherwise attempting to treat these individuals.

592. The operational impacts incurred by Plaintiffs are the direct and proximate result of the marketing, distribution, and dispensing illegalities described above and the opioid epidemic created and engineered by Defendants. Because opioids are very dangerous and highly addictive drugs, it was foreseeable to Defendants that the increased use of opioids would result in a corresponding increase in patients with opioid-related conditions presenting for treatment at hospitals, including Plaintiffs. It was foreseeable to Defendants that Plaintiffs would suffer substantial monetary losses from the opioid epidemic because hospitals are on the front line of treatment for these patients and must bear the reduced realization from provision of that treatment.

593. The financial impact on hospitals includes, but are not limited to, the following:

a. increased costs of providing medical care such as emergency room visits and hospitalization to patients suffering from opioid-related addiction or disease as the reason for presentation for care and/or as a comorbidity;

b. increased costs associated with patient counseling with respect to pain management, necessitated by overprescription to the general population and dissemination of false and misleading information to prospective patients and others; as hospitals and other providers question their patients' self-reporting, it necessitates that further steps be taken in all phases of treatment and counseling;

c. the loss of revenue incurred by hospitals as a consequence of their obligation to provide care to patients suffering from opioid-related addiction or disease.

d. costs of opioids purchased by hospitals themselves, which were direct targets of Defendants' marketing campaigns;

e. costs of prescription drugs used to treat addiction;

f. costs of training personnel in the proper treatment of drug overdoses;

g. costs associated with training staff in the application of naloxone—an opioid antagonist used to block the deadly effects of opioids in the context of overdose;

h. increased costs for providing mental healthcare, treatment, rehabilitation, specialized facilities, and social services to victims of the opioid epidemic and their families;

i. costs of treating infants born with opioid-related medical conditions or born dependent on opioids due to drug use by mothers during pregnancy, including the costs of creating and maintaining special facilities and costs associated with increased staffing to observe infant behavior and adjust doses of medication used to manage withdrawal symptoms;

j. costs associated with staff burnout, particularly in neonatal intensive care units, where staff suffer from PSTD, compassion fatigue, anger, addiction, and suicide;

k. costs of providing additional personnel to respond to security concerns created by patients and others suffering from opioid abuse and dependency;

l. costs of purchasing and maintaining additional equipment necessitated by the increased demands placed on hospitals as a result of the opioid epidemic and the expanded services hospitals provided in response, as described herein;

m. costs of providing special programs over and above ordinary hospital services; and

n. costs of providing services to abate the nuisance created by Defendants' conduct for which Defendants are responsible and for which Plaintiffs have not been reimbursed.

594. Plaintiffs seek economic losses (direct, incidental, or consequential pecuniary losses) resulting from Defendants' negligence. They do not seek to recover for damages that may have been suffered by individual citizens for wrongful death, physical injury, emotional distress, or any physical damage to property.

595. Plaintiffs do seek to recover the costs of abating the nuisance Defendants created by flooding their communities with opioids. Defendants are responsible for creating this nuisance and are responsible for abating it.

596. Defendants' misconduct alleged in this case does not concern a discrete event or discrete emergency of the sort a hospital would reasonably expect to occur and is not part of the normal and expected costs of a hospital's existence. Plaintiffs allege wrongful acts that were neither discrete nor of the sort a hospital can reasonably expect.

## VII. SPECIFIC ACTIONS TAKEN BY EACH DEFENDANT TO UNLAWFULLY OVER-INFLATE THE DEMAND FOR AND SUPPLY OF PRESCRIPTION OPIOIDS

597. The following sections describe acts by each individual defendant that caused or contributed to the opioid epidemic.

598. These acts did not occur in isolation. They were often the product of formal or informal agreements (such as contractual agreements to co-promote a branded opioid) between Defendants or through joint action (such as jointly funding a presentation or publication).

599. The result of Defendants' actions was synergistic—that is, conduct that benefited one Defendant (e.g., by making a misleading representation about the safety of a particular branded opioid or by failing to report suspicious orders) benefited all other Defendants, who received the benefit of an enlarged market in which to sell prescriptions opioids.

### A. Teva and Associated Companies

600. Cephalon and Teva promulgated and spread misinformation about opioids to prescribers and consumers, nationwide and in Arizona, to convince doctors to prescribe and consumers to purchase and consume branded and generic opioid products.

601. Cephalon and Teva's false and misleading misrepresentations reached Arizona health care providers, who wrote prescriptions as a result of their deceptive actions. This foreseeably resulted in the crisis of addiction and abuse and the resulting ongoing harms to Plaintiffs described herein.

602. Cephalon and Teva sold medically unjustifiable quantities of opioids in Arizona and knew or should have known that their opioids were being diverted.

603. Many of Cephalon's misrepresentations were aimed at convincing doctors to prescribe and consumers to purchase its short-acting opioid products, Actiq and Fentora, for chronic pain and other uses well beyond the limited contexts in which these products can be safely used. Actiq has been approved by the FDA only for the "management of breakthrough cancer pain in patients 16 years and older with malignancies who are already receiving and who are tolerant to around-the-clock opioid therapy for the underlying persistent cancer pain."[313] Fentora has been approved by the FDA only for the "management of breakthrough pain in cancer patients 18 years of age and older who are already receiving and who are tolerant to around-the-clock opioid therapy for their underlying persistent cancer pain."[314]

604. Fentanyl, an ingredient in Actiq and Fentora, is linked to fatal respiratory complications in patients. Because it is 80 to 100 times more potent than morphine, and because it poses a high risk of addiction, drugs containing fentanyl are particularly likely to cause overdoses and death. Because of the dangers of Actiq and Fentora, objective studies established that these products should only be used by patients who are opioid-tolerant. For this reason, Actiq and Fentora are contraindicated in the management of acute pain. Recognizing these dangers, the FDA required Cephalon to enter into a REMS agreement.[315] For certain medications with a high risk of serious side

---

[313] *Highlights of Prescribing information, ACTIQ® (fentanyl citrate) oral transmucosal lozenge, CII (2009)*, https://www.accessdata.fda.gov/drugsatfda_docs/label/2009/020747s030lbl.pdf.

[314] *Highlights of Prescribing Information, FENTORA® (fentanyl citrate) buccal tablet, CII (2011)*, https://www.accessdata.fda.gov/drugsatfda_docs/label/2012/021947s015lbl.pdf (last visited July 12, 2021).

[315] *Transdermal Immediate-Release Fentanyl (TIRF) Medicines*, U.S. Food & Drug Admin., https://www.fda.gov/drugs/information-drug-class/transmucosal-immediate-release-fentanyl-tirf-medicines (last visited

effects, including abuse, the FDA can require pharmaceutical manufacturers, drugmakers, and/or patients to participate in a REMS.

605. Actiq and Fentora have been demonstrated to be medically safe and appropriate for use in treating breakthrough cancer pain for those patients who are already opioid tolerant. Breakthrough pain is an acute, short-term onset of pain, of moderate-to-severe intensity, affecting cancer patients whose pain is otherwise stable. However, Cephalon marketed and promoted Actiq for treatment of chronic, *noncancer* pain, including noncancer "breakthrough pain."[316] Cephalon represented that Actiq (and later Fentora) was appropriate for a variety of noncancer conditions including sports injuries, migraines, and back pain.[317]

606. To encourage prescriptions, Cephalon developed and promoted the idea that "breakthrough pain" existed outside of the cancer context, thereby making patients taking long-acting opioids for chronic noncancer conditions in need of "rescue" treatment with short-acting opioids containing fentanyl.[318]

607. Cephalon subverted its REMS commitment in three ways: (1) by wooing physicians prescribing off-label; (2) by sending its sales force to visit physicians who were prescribing off-label; and (3) by providing physicians and patients with misleading information on Actiq's risks and benefits, often through channels that circumvented FDA scrutiny.[319]

608. Cephalon was successful at encouraging off-label prescription. The 2005 marketing plan for Actiq reveals that 90% of Actiq's use was for breakthrough pain outside of the cancer context, 55% of which was for chronic back pain.[320]

July 14, 2021).

[316] *See Actiq CME Topics* (n.d.).

[317] *See id.*; P. Andrew Pyfer, Product Manager – Actiq, *ACTIQ 2002 Marketing Plan* (n.d.)

[318] *See, e.g.*, Steven P. Cohen & Perry G. Fine, *Persistent and Breakthrough Pain* (2008) (a CME funded by Cephalon).

[319] *See* Government's Memorandum for Entry of Plea and Sentencing, *United States v. Cephalon, Inc.*, No. 08-598 (E.D. Pa. Sept. 29, 2008).

[320] Andy Pyfer, Product Director, et al., *2005 Actiq Marketing Plan* (n.d.).

609. On September 10, 2007, Cephalon sent letters to doctors informing them that Fentora may lead to death and other "serious adverse events." Cephalon stated, "'[t]hese deaths occurred as a result of improper patient selection (e.g., use in opioid non-tolerant patients), improper dosing, and/or improper product substitution.'"[321] Cephalon nonetheless continued to promote Fentora for use by all cancer patients, regardless of whether the patient was opioid tolerant.

610. Also in 2007, Cephalon executive Bob Roche stated that the company sought to expand the use of Fentora to broader indications, including lower-back pain and neuropathic pain. Cephalon was aware that its deceptive marketing practices caused physicians to prescribe Fentora for uses that were not medically supported as safe and appropriate.

611. Cephalon spent lavishly on marketing to place these misrepresentations before prescribers and the public. Cephalon's quarterly marketing spending steadily climbed from below $1 million in 2000 to a peak, coinciding with the launch of Fentora, of more than $27 million in 2007:




[321] Drew Buono, *Cephalon Warns Fentora Prescribers About Possible Adverse Events*, Drug Store News (Sept. 18, 2007), https://drugstorenews.com/pharmacy/chephalon-warns-fentora-prescribers-about-possible-adverse-effects.

612. This marketing paid off. Actiq prescriptions rose from 10,000 in the first quarter of 2001 to 90,000 in the last quarter of 2003. Revenue soared too. In 2000, Actiq generated $15 million in sales, but by the end of 2006, Actiq's sales had exceeded $500 million.[322] Sales jumped 92% in just one year, which Cephalon attributed to "a dedicated sales force for ACTIQ" and "ongoing changes to [its] marketing approach including hiring additional sales representatives and targeting our marketing efforts to pain specialists."[323]

613. Prescribers were induced by Cephalon's marketing to prescribe Actiq off label. Only 1% of the 187,076 prescriptions for Actiq filled at retail pharmacies during the first six months of 2006 were prescribed by oncologists. One measure suggested that "more than 80 percent of patients who use[d] the drug don't have cancer."[324]

614. The targeting practices for Fentora were also successful. Prescriptions increased from 14,600 in 2006 to nearly 91,000 in 2007. Only a small percentage of these were properly written to cancer patients: 14% in 2006; 16–19% in 2007; and 17–21% in 2008.

615. Marketing Fentora and Actiq for chronic, noncancer pain and to cancer patients who were not already opioid-tolerant was deceptive, unfair, and unconscionable. Cephalon aimed to dramatically increase the use, and therefore distribution and availability for diversion, of opioids so potent that they can cause a fatal overdose on the very first use. As a result of these representations, fentanyl deaths have shot up as described herein, including in Arizona.

616. Teva made and/or disseminated untrue, false, and deceptive statements and concealed material facts in such a way to make its statements deceptive, including, but not limited to, the following:

---

[322] John Carreyrou, *Narcotic 'Lollipop' Becomes Big Seller Despite FDA Curbs*, Wall St. J. (Nov. 3, 2006), https://www.wsj.com/articles/SB116252463810112292.

[323] Cephalon, Inc., *Form 10-K* 28 (Mar. 31, 2003), https://www.sec.gov/Archives/edgar/data/873364/000104746903011137/a2105971z10-k.htm.

[324] Carreyrou, *supra*.

a. Creating, sponsoring, and assisting in the distribution of patient education materials that contained deceptive statements;

b. Sponsoring and assisting in the distribution of publications that promoted the deceptive concept of pseudoaddiction, even for high-risk patients;

c. Providing significant financial support to pro-opioid KOL doctors who made deceptive statements concerning the use of opioids to treat chronic noncancer pain and breakthrough chronic noncancer pain;

d. Developing and disseminating scientific studies that deceptively concluded opioids are safe and effective for the long-term treatment of chronic noncancer pain in conjunction with Teva's potent rapid-onset opioids;

e. Providing needed financial support to pro-opioid pain organizations that made deceptive statements, including in patient education materials, concerning the use of opioids to treat chronic noncancer pain;

f. Endorsing and assisting in the distribution of CMEs containing deceptive statements concerning the use of opioids to treat chronic noncancer pain and Teva's rapid-onset opioids;

g. Directing its marketing of Teva's rapid-onset opioids to a wide range of doctors serving chronic pain patients, including general practitioners, neurologists, sports medicine specialists, and workers' compensation programs; and

h. Making deceptive statements concerning the use of Teva's opioids to treat chronic noncancer pain to prescribers through in-person detailing and speakers' bureau events when such uses were unapproved and unsafe.

### 1. Promotion of Specific Opioid Products

617. Cephalon misrepresented the risk of addiction to opioids in branded advertising.

618. In materials promoting Actiq for "nonmalignant pain," Cephalon called concerns about patients becoming addicted to opioids a "widespread misunderstanding" and claimed that opioid dependence was "usually not problematic for patients who are on chronic opioid therapy."

619. Teva targeted new noncancer patients by distributing coupons good for six free Actiq lozenges through doctors treating noncancer patients. The Actiq business plan for 2000 described coupons as "a remarkably effective promotional tool that fuels prescription growth." By 2005 and 2006, 6,000 to 9,000 coupons per month for Actiq were being distributed nationwide.

620. From 2000 to approximately 2003, Actiq salespeople told patients they would not get addicted to Actiq if they followed their physician's instructions. The sort of false assurances they provided are illustrated by the following document:

**Will I get addicted to this medicine?**
You will not get addicted to *Actiq*. A common misconception is that people with cancer who are taking strong pain-relieving medicines will become addicted. This is not true. If you follow the instructions that you received from your healthcare professional about taking your pain medicines, these medicines will not become addictive.
What does happen when you take pain-relieving medicines, like *Actiq*, is that your body becomes dependent on the medicine. This means that if you suddenly stopped taking the medicine, you would experience unpleasant side effects, often referred to as "withdrawal" effects. To prevent this from happening, if you no longer need to take *Actiq* your doctor or nurse will gradually decrease your dose so that you don't have these side effects of withdrawal.

621. Teva also marketed its generic version of Actiq directly to consumers.

622. Cephalon and Teva made over 500,000 sales visits to healthcare providers from 1999 to 2017 for Actiq and Fentora. Most of these providers were not treating cancer patients, and most of the prescriptions these providers wrote were not to treat cancer pain.

623. The following chart shows that Cephalon and Teva targeted doctors with general practices rather than practices more closely aligned with the approved labeling. During the first seven months of 2004, over 50% of the targeted doctors practiced family or internal medicine and over a quarter of the calls on which Actiq was discussed were with these sorts of practitioners:

**Actiq Physician Universe Call Activity**
**2004 YTD**

| Specialty | Total Number of Physicians Targeted | | Physicians Called On During 2004 | | Total Number of Actiq Calls During 2004 * | |
|---|---|---|---|---|---|---|
| | N | % | N | % | N | % |
| Family Practice (FP) | 8943 | 29% | 2247 | 25% | 7534 | 15% |
| Internal Medicine (IM) | 7840 | 26% | 1824 | 23% | 6209 | 12% |
| Oncology-Medical (ON) | 1696 | 6% | 691 | 41% | 1970 | 4% |
| Anesthesiology (AN) | 1656 | 5% | 1279 | 77% | 9329 | 18% |
| Physical Medicine (PM) | 1593 | 5% | 1111 | 70% | 7309 | 14% |
| Neurology (N) | 1060 | 3% | 706 | 67% | 3809 | 7% |
| General Practice (GP) | 931 | 3% | 281 | 30% | 1046 | 2% |
| Hematology/Oncology (HO) | 799 | 3% | 292 | 37% | 888 | 2% |
| Anesthesiology-Pain Management (APM) | 786 | 3% | 634 | 81% | 5148 | 10% |
| All Other Oncology | 781 | 3% | 298 | 38% | 969 | 2% |
| Rheumatology (RHU) | 659 | 2% | 333 | 51% | 1504 | 3% |
| All Other Specialties | 3765 | 12% | 1085 | 29% | 5832 | 11% |
| Total | 30509 | 100% | 10781 | 30% | 51547 | 100% |

* The total number of calls may be higher than the number physicians called upon because a physician may be called on multiple times.

624. Sales strategies for Actiq focused on top prescribers to drive sales up. For example, a 2002 email from a salesperson in the southeast said that 14 physicians deemed "product champions" accounted for 30% of Actiq sales in the region, prescribing 162,527 lozenges in just 6 months.

625. A high-performing salesperson described her interactions with a high-prescribing doctor: "[i]f I knew that this physician was in town and practicing medicine, I would've been in there three times a week pushing him to write more Actiq." It was later determined that doctor should be removed from the Actiq prescriber target list after he fled the country in the face of a DEA investigation.

626. From 2002 to 2006, Actiq salespeople were trained to tell physicians asking about drug abuse that a "comprehensive evaluation of the abuse potential of ACTIQ was performed prior to FDA approval" and that Cephalon's risk-management program could reduce Actiq's risk of abuse and

diversion. This message was not supported by clinical trials—there had been no clinical study of Actiq's abuse potential.

627. On a 2007 earnings call Cephalon's marketing director described the primary target audience for Fentora sales visits as 2,000 "high prescribing opioid physicians who were responsible for 80% of Actiq prescriptions." The next tier of targets was "high prescribers of opioids but who have not historically prescribed Actiq." There was no mention of limiting promotion to prescribers treating cancer patients.

628. Q&As for Fentora's salespeople affirmatively told them not to report or flag doctors known to prescribe Fentora off-label. Senior managers signed off on the following Q&A used from December 2007 to March 2008:

> **COMPLIANCE:**
>
> **Do compliance officials want us to find/ report physicians who are writing FENTORA off- label?**
> No

(March 2008 Question and Answer for salespeople)

629. A February 2008 internal audit showed no process to "monitor call universes for appropriate prescribers."

630. Cephalon also facilitated the off-label use of its opioids by sending prescribers template "letters of medical necessity," which they could use to get insurers to agree to cover those off-label uses.

### 2. General (Unbranded) Promotion of Opioids

#### a. KOLs

631. Cephalon used KOLs to promote its messages about opioids and directed the content of that messaging. KOLs used and supported by Cephalon include Drs. Foley, Webster, Fine, and Portenoy.

632. Teva used KOLs to promote its messages about opioids and directed the content of that messaging. KOLs used and supported by Teva include Drs. Webster and Argoff.

**b. Front Groups**

633. Teva and Cephalon used Front Groups to convey misrepresentations about their opioids. Cephalon provided funding or otherwise supported the following front groups: APF, AAPM, FSMB, AfPA, ACPA, and PCF. Teva provided funding or otherwise supported the following front groups: AAPM, AfPA, USPF, ACPA, NPC, CO*RE, and HDA.

634. Along with Purdue, Cephalon co-sponsored the APF publication, *Treatment Options: A Guide for People Living with Pain*.[325]

635. Cephalon supported another APF publication called *Target Chronic Pain Notebook*.[326] This publication was cited in later KOL materials, such as "Consensus Panel Recommendations" regarding breakthrough pain (which was based on a meeting that was also supported by Cephalon), which promoted the idea of using immediate-release opioids to treat "breakthrough" pain in patients without cancer.

636. At a 2004 Orlando, Florida meeting of the AAPM, KOL Dr. Lynn Webster presented a Cephalon-sponsored study that promoted the use of fentanyl-based short-acting opioids to address breakthrough pain in patients with chronic noncancer pain.[327] Cephalon then used this study in its sales trainings.

[325] *Treatment Options*, *supra*.

[326] Am. Pain Found., *Target Chronic Pain Notebook* (rev. ed. Mar. 2008), https://nebula.wsimg.com/392ead060392f7d4fe593c5417233921?AccessKeyId=BFACF0D24D833A99FAF8&disposition=0&alloworigin=1.

[327] Lynn Webster, Oral Transmucosal Fentanyl Citrate (OTFC) for the Treatment of Chronic Noncancer Pain: A Retrospective Survey of 100 Patients, Presentation at 21st Annual Meeting of the Am. Acad. of Pain Med. (Mar. 3-7, 2004).

637. After 2011, Cephalon continued to promote the idea that clinical trials suggested that short-acting opioids were effective for "breakthrough pain" in patients without cancer, and it promoted APS's and AAPM's Guidelines for use of opioids for noncancer patients.

**c. Publications**

638. Cephalon used unbranded advertising to advance the phony concept of pseudoaddiction. Its brochure, *Making Pain Talk Painless: A Guide To Help You Talk with Your Doctor About Pain Management*, stated that medicine-seeking behavior is not addiction and encouraged patients to talk to their doctor about obtaining more pain medicine. [328]

639. Cephalon used publications to promote misrepresentations about opioids. In a number of cases, Cephalon paid for the studies on which it relied, and some of the key studies were conducted by its own consultants and employees.

640. Cephalon sponsored FSMB's *Responsible Opioid Prescribing*.[329]

641. One of the key studies on which Cephalon relied to create a market for its short-acting fentanyl products was "Prevalence and Characteristics of Breakthrough Pain in Opioid-Treated Patients with Chronic Non-Cancer Pain," written by KOL Dr. Russell Portenoy and Cephalon consultants who were on Cephalon's speakers' bureau. The study promoted the idea of using "rescue dosing" of short-acting opioids for patients with chronic pain unrelated to cancer.[330] Cephalon cited this study in branded and unbranded marketing.

642. Cephalon sponsored another study by KOLs Drs. Fine and Portenoy, aimed at providing a basis for promoting Cephalon's opioid products for noncancer "breakthrough pain."

---

[328] *Making Pain Talk Painless: A Guide to Help You Talk with Your Doctor* (July 2006). This brochure was introduced into evidence in the February 20, 2019 deposition of John Hassler in the opioid litigation brought by the State of Oklahoma available at https://nick-mail.net/marginalia/opioid-cases/oklahoma-opioids-trial/1042898736-20190403-143708-.pdf.

[329] *Responsible Opioid Prescribing, supra.*

[330] Russell K. Portenoy, et al., *Prevalence and Characteristics of Breakthrough Pain in Opioid-Treated Patients with Chronic Non-Cancer Pain*, 7 J. Pain 583 (2006), https://pubmed.ncbi.nlm.nih.gov/16885015/.

643. To expand the use of its branded fentanyl products, Cephalon sponsored the 2007 publication of an article, "Impact of Breakthrough Pain on Quality of Life in Patients with Chronic, Non-cancer Pain: Patient Perceptions and Effect of Treatment with Oral Transmucosal Fentanyl Citrate"[331] in the *Journal of Pain Medicine*. The article's authors (including Dr. Webster) stated that the "OTFC [fentanyl] has been shown to relieve BTP [breakthrough pain] more rapidly than conventional oral, normal-release, or 'short acting' opioids" and that "[t]he purpose of [the] study was to provide a qualitative evaluation of the effect of BTP on the [quality of life] of non-cancer pain patients." The number-one-diagnosed cause of chronic pain in the patients studied was back pain (44%), followed by musculoskeletal pain (12%) and head pain (7%). The article cites Dr. Portenoy and recommends fentanyl for noncancer patients:

> In summary, BTP appears to be a clinically important condition in patients with chronic non-cancer pain and is associated with an adverse impact on QoL. This qualitative study on the negative impact of BTP and the potential benefits of BTP-specific therapy suggests several domains that may be helpful in developing BTP-specific, QoL assessment tools.[332]

644. Cephalon relied on these KOL studies—sometimes co-authored by Cephalon's in-house employees, such as Dr. John Messina—to support its marketing claims that Fentora could be used safely for "breakthrough pain" outside the cancer context, including for lower-back pain and chronic neuropathic pain. It also relied on these studies in its materials aimed at getting health insurance plans to cover its opioid products.

645. In 2011, Cephalon published a "Special Report" titled "An Integrated Risk Evaluation and Risk Mitigation Strategy for Fentanyl Buccal Tablet (FENTORA®) and Oral Transmucosal Fentanyl Citrate (ACTIQ®)" in *Pain Medicine News*. Despite the repeated warnings of the dangers

[331] Donald R. Taylor, et al., *Impact of Breakthrough Pain on Quality of Life in Patients With Chronic, Non-cancer Pain: Patient Perceptions and Effect of Treatment With Oral Transmucosal Fentanyl Citrate (OTFC, ACTIQ)*, 8 Pain Med. 281–88 (2007), https://pubmed.ncbi.nlm.nih.gov/17371416/.

[332] *Id.*

associated with the use of the drugs beyond their limited indication, the first sentence of the article states: "It is well recognized that the judicious use of opioids can facilitate effective and safe management of chronic pain." The article promoted the use of Cephalon's drugs by representing that Fentora had "been shown to be effective in treatment of [breakthrough pain] associated with multiple causes of pain."[333]

646. In 2014 and thereafter, Cephalon and its paid consultants continued to promote Fentora for common, noncancer conditions such as lower-back pain, arthritis, and diabetic neuropathy. One 2015 article authored by a Teva consultant stated that the "good news" about noncancer breakthrough pain is the availability of rapid-onset fentanyl-based opioids, including Fentora.

647. A 2016 study reporting the results of a clinical trial of an ADF version of hydrocodone ER (funded by Teva with two Teva authors) concluded that it was safe and effective for chronic back pain. It did so despite being only a six-month trial (with just twelve weeks placebo-controlled) and despite the fact that 6% of subjects reported diversion or loss of pills (highly indicative of diversion).[334] If rates of diversion were that high among clinical trial subjects, who are selected only if they are believed to be able to be compliant with their medication instructions, then they would certainly be higher among the general patient population.

648. As late as 2018, Teva scientists, writing with co-authors working at ABDC's Xcenda subsidiary, published a study promoting the notion that the risk of opioid abuse is limited to a "sub-population" of those taking opioids long-term for chronic noncancer pain.[335]

---

[333] Randy J. Bradway, et al., *An Integrated Risk Evaluation and Risk Mitigation Strategy for Fentanyl Buccal Tablet (FENTORA®) and Oral Transmucosal Fentanyl Citrate (ACTIQ®)* (2011).

[334] Martin E. Hale, et al., *Six-month, Open-label Study of Hydrocodone Extended Release Formulated with Abuse-Deterrent Technology: Safety, Maintenance of Analgesia, and Abuse Potential*, 12 J. Opioid Mgm't 139 (2016), https://pubmed.ncbi.nlm.nih.gov/27194199/.

[335] Anna D. Coutinho, et al., *Long-term Opioid Users with Chronic Noncancer Pain: Assessment of Opioid Abuse Risk and Relationship with Healthcare Resource Use,* 14 J. Opioid Mgm't 131 (2018), https://pubmed.ncbi.nlm.nih.gov/29733099/ (hereinafter *Long-term Opioid Users with Chronic Noncancer Pain*).

#### d. Speakers' Bureaus

649. Teva and Cephalon used speakers' bureaus to promote misleading messages about its opioids.

650. Teva paid for many of the top opioid prescribers in the U.S. to travel to conferences at top hotels. Doctors attending conferences returned to their states where they prescribed Actiq and Fentora for off-label uses.

651. For example, a Virginia Beach rheumatologist attended the August 2003 MidAtlantic Conference at the Ritz-Carlton Reynolds Plantation, in Greensboro, Georgia. There, he listened to presentations from Dr. Steven Simon on Actiq's use for chronic back pain and from another doctor on Actiq's use for migraine headaches. He also attended a roundtable where doctors discussed Actiq's use for fibromyalgia, migraines, and chronic pain. After the conference, the doctor continued to aggressively prescribe Actiq (and other opioids) to patients suffering from fibromyalgia, chronic pain, and headaches. From December 2003 to August 2008, five of his patients died of narcotics overdoses. Others were hospitalized for drug-related conditions, including two of his Actiq patients, both of whom were sent to psychiatric treatment and drug detoxification in February 2004. During this time, Teva rated the doctor a top prescriber of Actiq (8 out of a maximum of 10), conducted scores of sales visits to him, and only ceased sales visits when the Virginia Board of Medicine summarily suspended the doctor's license in August 2008. Teva also circulated at least four internal lists flagging the doctor as a "repeat off-label Actiq prescriber." Despite these internal flags, Cephalon's sales staff continued to regularly visit the doctor to push Actiq and Fentora sales up until the date the Board of Medicine suspended his license.

652. Teva tracked which of its well-paid speakers helped them sell Actiq. For example, in 2003, Teva paid Dr. Steven Simon an honorarium of $2,000 per conference, plus travel expenses, to

present at 21 conferences. He frequently presented slides on the use of opioids, including Actiq, for chronic back pain and for arthritis.

653. Dr. Simon was praised by Cephalon for his skill at "peer-to-peer" detailing. After his presentation to 48 physicians at the Four Seasons in Carlsbad, California, Cephalon's agents circulated a glowing review to Teva's top managers for Actiq:

> Steve Simon is fantastic. He is very good with the attendees at dinner, during free time and in the meeting room. He really takes time to "peer-to-peer detail" the attendees. He is a real jewel. During his presentation, he does spend quite as bit of time on the non-pharmacological treatments for OA/RA which on the surface may seem off-strategy. My feeling, is that the time he spends on "other" treatments actually "sets" up his strong ACTIQ endorsement by building credibility. Unlike Andrea Cheville who tends to over-endorse ACTIQ, he builds credibility as a "well-rounded" pain doc who has found a place for ACTIQ in his everyday practice and I think this message resonates. He does want to change a few things - but I am trying to discourage this if you are OK with that. I would like to see him "not to change a single thing".

654. Teva's regional sales managers and senior managers, including those responsible for ensuring compliance with the Actiq REMS Agreement, attended these conferences. However, rather than monitoring doctors for off-label or contraindicated uses, these sales managers identified doctors prescribing off-label so that they could provide them with more reasons to prescribe off-label.

655. Materials prepared for conferences and meetings, which promoted Actiq for migraines, back pain, and arthritis, were withheld from the FDA under the theory that they were not promotional. That attendees were selected by sales staff and that Cephalon's agents thought the purpose was to sell Actiq shows otherwise. The meetings were, in fact, promotional and were a key part of the sales strategy for Actiq.

656. From 2006 to 2015, Cephalon paid speakers, many of whom were top prescribers, $9 million to speak about Fentora. Speaking engagements occurred not only at medical offices, but also

at bars and restaurants (frequently steakhouses). Attendees received free meals and drinks, and speakers were paid honoraria and travel expenses. Hundreds of doctors repeatedly attended the same presentations—some going to the same presentation more than 30 times—suggesting an interest more in the substance of the meal than in the substance of the presentation. Medical office "practice managers" who could help get prescribers in their offices to write Fentora prescriptions or get insurance companies to pay for Fentora were also invited to steakhouse presentations around the country.

657. Honoraria were paid to speakers even if nobody other than sales representatives attended, which occurred on 276 occasions; speakers were paid a total of $395,600 in honoraria for such "presentations."

658. From 2009 to June 2013, Teva reported its payments to physicians for speaking, consulting, educational items, meals, research, and travel as part of its five-year Corporate Integrity Agreement with the U.S. Department of Health and Human Services in connection with a 2008 guilty plea. During this time, payments made to Arizona physicians totaled $1,109,626.[336]

**e. CMEs**

659. Cephalon used CMEs to convey misrepresentations about opioids.

660. Cephalon sponsored Dr. Fine's CME entitled *Optimizing Opioid Treatment for Breakthrough Pain*, which promoted opioids for unsafe uses and misleadingly portrayed the risks and benefits of using opioids for the treatment of chronic pain. The CME misrepresented that Actiq and Fentora, taken in conjunction with long-acting opioids, would help patients regain functionality, improve their quality of life, and allow for a more active lifestyle. The CME was available online and reached Arizona prescribers.[337]

---

[336] *See Dollars for Docs, How Industry Dollars Reach Your Doctors*, ProPublica, https://projects.propublica.org/d4d-archive/companies/cephalon (last visited July 12, 2021).

[337] *Opioid Rotation*, *supra*.

661. Teva paid to have a CME it sponsored, *Opioid-Based Management of Persistent and Breakthrough Pain*, published in a supplement of *Pain Medicine News* in 2009. The CME instructed doctors that "clinically, broad classification of pain syndromes as either cancer- or non-cancer-related has limited utility" and recommended Actiq and Fentora for patients with chronic noncancer pain. This CME is still available online.[338]

### 3. Suspicious Order Monitoring

662. Teva USA and Cephalon ran a combined SOM program after Teva's acquisition of Cephalon in 2011. Both entities operated as a single unit with regard to the marketing, sale, and distribution of Cephalon's name-brand opioid products. After Teva Ltd. acquired Watson, Actavis Pharma, and Actavis LLC in 2016, those entities were folded into the Teva USA SOM program.

663. Teva did not maintain effective controls against diversion via an adequate SOM program and failed to take reasonable steps to prevent its products from being diverted.

664. Teva's only written standard operating procedure that in any way concerns suspicious order monitoring is SOP-0013489 ("Order Management"), which was approved for Cephalon on June 1, 2009, prior to its acquisition by Teva. Under those procedures, only orders by customers that are not pre-authorized by Cephalon were investigated as potentially suspicious.

665. A September 2012 consultant's report by Ronald Buzzeo and Cegedim Relationship Management found a number of deficiencies in Teva's SOM program. This report was submitted to Colleen McGinn, Teva's Director of DEA Compliance.[339]

666. The report noted Teva had a "rudimentary" SOM system with a process for opening new accounts and pended orders using a program known as "SORDS" (Suspicious ORDerS), which

---

[338] *Opioid-Based Management of Persistent and Breakthrough Pain*, Pain Med. News (Mar. 1, 2009), https://www.painmedicinenews.com/Monographs-and-Whitepapers/Article/03-09/Opioid-Based-Management-of-Persistent-and-Breakthrough-Pain/14270.

[339] Report re Teva Pharmaceutical's "Suspicious Order Monitoring" (SOM) System (Sept. 25, 2012).

the report concluded "is not sufficiently sensitive to customer ordering practices to result in any meaningful analysis of customer order practices."[340]

667. The report further noted Teva had never identified a suspicious order or reported a suspicious order to the DEA, had "no program to review 'downstream distribution' of Teva products," and had "no formal Standard Operating Procedures or official guidelines. . . ."[341]

668. The report made a number of further findings and recommendations including the following:

a. Teva's current due diligence on new and existing customers was inadequate. The report recommended expanding the amount of initial due diligence for existing and potential customers to include at a minimum further initial client screening including a questionnaire, an on-site visit, and internet research on the customer.

b. Teva's SORDS system was inadequate to properly evaluate for suspicious orders. That system "rel[ied] heavily upon the use of standard deviations for identifying orders that [were] possibly suspicious." Under this system, any order that was in excess of three standard deviations above the mean was "pended" for further investigation, which the report noted only identified three out of 1000 orders and failed to identify orders of unusual frequency or pattern. The empirical rule is that a system using three standard deviations would identify only 0.3% of orders as requiring further investigating. The report recommended immediate changes to SORDS including reducing the limit from three to two standard deviations, as well as certain long-term solutions to improve their monitoring system.

c. Teva's investigation of "pended" orders was not well-documented. The report recommended a process for Teva to investigate and document its investigation and to access information in the course of such investigation.

d. Teva did not have standard operating procedures or official guidelines for the operation of an SOM program, and the procedures followed did not have sufficient depth for opening new accounts and reviewing pended orders. The report recommended developing such written procedures and guidelines.

e. Additional recommendations included developing, incorporating, and using information "regarding what their wholesaler/distributor customers sell further 'downstream'"; putting in place SOM programs for Teva's manufacturing sites; and addressing state regulations.[342]

---

[340] *Id.*
[341] *Id.*
[342] *Id.*

669. In early 2013, Teva hired an ABDC employee to run its SOM program and design a new system. That new employee was fired within 90 days after he contacted a downstream customer about a potentially suspicious order. Prior to that time, Teva never had an individual who was specifically assigned to manage the SOM program.

670. In January 2014, Teva hired Joe Tomkiewicz ("Tomkiewicz"), who had also worked for ABDC, to design Teva's program. Tomkiewicz joined Teva after being visited at his home by DEA agents on two occasions, where they advised him to get a lawyer presumably with regard to an investigation into ABDC's SOM program and opioid diversion.

671. Tomkiewicz ultimately designed an SOM program for Teva which he coined "DefOps," which means "Defensible Operations." Tomkiewicz named it that because it was intended to be a system Teva could use to keep itself out of trouble with the DEA and because it "sounded good." The written SOPs for the system were approved in August 2014, nearly two years after Teva's consultant told Teva that it needed to have written procedures in place. The first version of the DefOps system was not put in place until March 1, 2015, to replace the SORDS system.

672. Teva's DEA Compliance Department only has a single SOM manager (Tomkiewicz), and a single employee who reports to him. This is insufficient staffing to identify, investigate, and report all suspicious orders.

673. Teva's DefOps and the prior SORDs system relied—and continues to rely—on Teva's sales department to assist in investigating potentially suspicious orders. Teva's SOM operating procedures provide that the "Suspicious Order Oversight Team" include "a representative from DEA Compliance, Customer Service, and Customer Account Management." The involvement of Teva's sales department (via Customer Account Management) in the investigation process creates a conflict of interest.

674. This conflict is illustrated by the investigation of a potentially suspicious order of Teva's generic oxycodone product. The compliance department found suspicious activity with regard to the order but did not report the order to the DEA and shipped the order without sufficient documentation of a basis to dispel that suspicion. The compliance department identified a potentially suspicious order by Publix Supermarkets for its in-store pharmacies made through Anda, Inc., one of Teva's wholesaler customers. Per Teva's procedures, Tomkiewicz requested that the Teva Sales Department obtain further information about their top 10 stores by oxycodone tablet volume, a breakdown by SKU number of their ER and IR volume, and a list of the top 5 prescribers for each of the 10 locations. Tomkiewicz identified a number of red flags with regard to the order including their Florida location, sales volume, and emphasis on the higher doses. Tomkiewicz found that 9 of the 10 pharmacies had ordered between 25.4 to 58.6% of the highest strength IR oxycodone dose (30 mg), and for 8 of those 9, the 30 mg was the largest percentage of sales. In contrast, for the remaining pharmacy (which was near a cancer center) the lowest dose (5 mg) was the largest percentage of sales (42.3%), and the highest 30 mg dose sales was only 5%. Tomkiewicz's investigation showed substantial pill-mill activity associated with a number of those prescribers. In the course of this investigation, Teva's Vice President for Commercial Operations, Christine Baeder, Teva's Director of National Accounts, Jocelyn Baker, and Teva's Senior Director for Trade Customer Service exerted substantial pressure on the compliance department and on Tomkiewicz personally to release the full order to Publix and not to report the order to the DEA. Teva's Sales Department took the view that the dispensing data was "good enough for them" and that "Publix has 0.8% overall market share and we (Teva) are trying to capture generic oxycodone market share." Teva ultimately shipped the Publix order and did not report it to the DEA. Teva should have reported the Publix order to the DEA and should not have shipped the order. There is no written record of any steps that were taken by Publix,

or any follow up by Teva after the order was shipped, to ensure Teva's oxycodone was not diverted for inappropriate uses.

675. Teva's parent company audited Teva's DEA compliance department in 2015 without interviewing anyone from the customer service or sales departments, despite their critical role in interfacing directly with customers during any investigation of suspicious orders. This report was critical of the compliance department and the SOM program. The report stated that Teva investigated 10,000 line orders per month of Schedule II products; of these 10,000 orders, 95% were automatically released. Only 5% of the orders were placed on hold to be manually checked. The report found the compliance department was in "noncompliance with DEA requirements" and was at "High Risk" of DEA regulatory action and that the SOM program was at "Moderate Risk" for such action.[343]

676. For the SOM program, the report focused primarily on the fact that suspicious orders were cleared through the decisions of a single person (Tomkiewicz), which exposed the system to the risk of mistaken releases. The audit further noted that the SOM program must clear 5,000 pending, potentially suspicious line orders per month while under pressure from the sales department to quickly clear orders and not disrupt their customers' opioid supply chain.[344]

677. Teva's 2018 SOM SOPs remain in effect and apply to all Teva Ltd. U.S. subsidiaries, including Teva USA, Cephalon, Watson, Actavis Pharma, and Actavis LLC. The 2018 written standard operating procedures are essentially the same as the initial SOM procedures that were approved by Teva in 2014.

678. Teva reported its first ever suspicious order to the DEA on February 13, 2013. It was an order from a small distributor called Capital Wholesale Drug. The suspicious order report states that the order quantity is not within the customer's normal purchasing pattern yet fails to elaborate on

---

[343] Teva, *Global Internal Audit OP 2015-04, DEA Drug Enforcement Administration – Handling Controlled Substances in US* 12, 18, 22 (Aug. 19, 2015) (hereinafter, *Teva Audit*).

[344] *Teva Audit*, *supra*, at 18, 22.

the customer's historic purchasing quantity. The report provides virtually no information about the suspicious order, nor does it offer to provide any information from Teva's investigation, such as its findings or the reasons the order was suspicious. This uninformative report is typical of all reports Teva submitted to the DEA.[345]

679. From 2013 through 2016, Teva reported only 7 suspicious orders out of 600,000 total line orders, or 0.00001% of all line orders it was processing.

680. In a deposition, Tomkiewicz claimed at least 18 suspicious orders were reported in 2017, but only five such reports are supported by documentary evidence. For 2018, Tomkiewicz testified he reported "close to 50" suspicious orders, but only 16 reports are documented.

681. Teva's SORDS system in place until 2015 was inadequate for the reasons discussed above. Teva also took nearly two years after the Buzzeo report (August 2014) to approve written procedures, and two and a half years after that report (March 2015) to institute a new SOM system. Teva also did not implement the use of chargeback data or of data on wholesalers' sales broken out by final customer to identify suspicious orders by downstream customers until 2015 and 2017, respectively. Teva also designed an in-house SOM program without overview, assistance, or review from outside consultants, but rather relied primarily on Tomkiewicz for the design and implementation of the program. Teva's SOM program also relies on and involves Teva's sales department substantially, producing clear financial conflicts.

#### 4. Enforcement Actions

682. Because of the risks associated with fentanyl, Cephalon was required to have a REMS in which it committed to monitoring Actiq prescriptions for off-label use. In 2003, an auditor

[345] Letter from Kevin Kreutzer, Manager, Suspicious Order Monitoring, Teva Pharmaceuticals USA, to Donetta Spears, Diversion Program Manager, Drug Enforcement Administration (Feb. 13, 2013).

concluded that those commitments were not being met. Rather than change its practices, Cephalon fired the auditor, and the FDA was told that the auditor misunderstood.

683. In July 2004, Cephalon produced misleading information about what it knew of off-label use of Actiq. Although the company's internal "chart audit" data revealed widespread off-label use amounting to 87 to 92% of the 700,000 Actiq prescriptions made to date, the FDA was told, "We do not track the number of representatives that learn of a physician prescribing off label." So, even though the REMS for Actiq pledged to monitor physicians for off-label use, in order to willfully remain blind, salespeople were not asked to report physicians prescribing off-label.

684. By August 2004, the FDA realized that it had been deceived and that the training for and targeting of Actiq marketing was the opposite of what had been pledged in the REMS. Instead, Cephalon "appear[ed] to encourage the off-label use rather than discourage it." The FDA also connected the off-label prescribing to public health harms, stating that the off-label prescribing "was illegal and, especially with a drug with a risk profile like Actiq, raises significant public health concerns."[346]

685. The FDA gave specific advice about sales visits: sales visits should cease once it was learned that a provider was not treating cancer patients, and the sales force should stop targeting non-compliant doctors for sales visits under the guise of educating those doctors about proper use.[347]

686. But Cephalon did not stop. Conferences continued to feature roundtables discussing how to use Actiq off-label, including for migraines, back pain, chronic noncancer pain, abdominal pain, kidney pain, arthritis, and neuropathy, along with paid speakers and slideshows on Actiq for "Treatment of Acute & Chronic Pain." Sales calls were targeted toward (a) proven prescribers of

---

[346] Industry Meeting Minutes, Cephalon & Div. of Drug Marketing, Advertising, and Commc'ns (Aug. 30, 2004).
[347] *Id.*

short- and long-acting opioids, (b) non-surgeons and non-dentists, and (c) any physician who prescribes Fentora.

687. In September 2008, four lawsuits alleging illegal off-label marketing of Actiq and two other non-opioids from 2001 to 2006 resulted in settlements and fines totaling $425 million. Cephalon pleaded guilty to off-label marketing of Actiq and entered into a corporate integrity agreement to prevent further off-label marketing. According to a DOJ press release, Cephalon had trained sales representatives to disregard restrictions in the FDA-approved label, employed sales representatives and healthcare professionals to speak to physicians about off-label uses of the three drugs, and funded CMEs to promote off-label uses.[348]

688. By September 2007, the FDA realized that Cephalon's risk mitigation plan for Fentora would not actually reduce risks associated with Fentora and issued a Public Health Advisory. Flagrantly disregarding the FDA's refusal to broaden Fentora's indication, Cephalon nonetheless marketed Fentora beyond its approved indications. On March 26, 2009, the FDA warned Cephalon against its misleading advertising of Fentora. The warning letter described a Fentora internet advertisement as misleading because it purported to broaden "the indication for Fentora by implying that any patient with cancer who requires treatment for breakthrough pain is a candidate for Fentora . . . when this is not the case." It further criticized Cephalon's other Fentora advertisements because they did not disclose the risks associated with the drug.[349]

689. Notwithstanding letters, an FDA safety alert, DOJ and state investigations, and the massive settlement, Cephalon has continued its deceptive marketing strategy.

[348] U.S. Dep't of Justice, *Biopharmaceutical Company, Cephalon, to Pay $425 Million & Enter Plea to Resolve Allegations of Off-Label Marketing* (Sept. 29, 2008), https://www.justice.gov/archive/opa/pr/2008/September/08-civ-860.html.

[349] Letter from Michael Sauers, Regulatory Review Officer, Div. of Drug Mktg., Advertising, & Commc'ns (Mar. 26, 2009).

690. In 2019, in the MDL proceeding styled *In re: National Prescription Opiate Litigation*, MDL 2804 (N.D. Ohio), Teva lost summary judgment motions.[350]

B. **Janssen and Associated Companies**

691. Janssen and J&J promulgated and spread misinformation about opioids to prescribers and consumers, nationwide and in Arizona, to convince doctors to prescribe and consumers to purchase and consume branded and generic opioid products.

692. Janssen and J&J's false and misleading misrepresentations reached Arizona healthcare providers, who wrote prescriptions as a result of their deceptive actions. This foreseeably resulted in the crisis of addiction and abuse and the resulting ongoing harms to Plaintiffs described herein.

693. Janssen and J&J sold medically unjustifiable quantities of opioids in Arizona and knew or should have known that their opioids were being diverted.

694. Janssen manufactures, promotes, sells, and distributes drugs in the United States, including the opioids Duragesic (fentanyl) and Nucynta (tapentadol). Before 2009, Duragesic accounted for at least $1 billion in annual sales. Together, Nucynta and an extended-release formulation, Nucynta ER, accounted for $172 million in sales in 2014.

695. Janssen marketed Duragesic and Nucynta in a way to broaden their use for indications beyond the label, particularly for lower back pain. Janssen did so despite acknowledging internally that as Duragesic was more widely used, abusers would find ways to access the fentanyl directly and that as use of Duragesic increased, published reports of abuse would increase as well.

696. Through this marketing, Janssen lent its powerful voice to the chorus of those advocating for the expanded use of powerful opioids (in this case, fentanyl) for chronic pain by

---

[350] Opinion and Order Re: Preemption, *In re Nat'l Prescription Opiate Litig.*, No. 17-md-2804, 2019 WL 4178591, at *10–11, (N.D. Ohio Sept. 3, 2019) (rejecting joint motion, and also rejecting Teva's "separate motion," in which "Teva argued that none of Plaintiffs' experts identified any false statements by them, and assert that neither Teva nor Cephalon should be held responsible for statements made by third parties—such as organizations that Plaintiffs label as front groups"); Opinion and Order Regarding Defendants' Summary Judgment Motions on Causation, *In re Nat'l Prescription Opiate Litig.*, No. 17-md-2804, 2019 WL 4178617 (N.D. Ohio Sept. 3, 2019).

minimizing the risks and overstating the benefits. This conduct expanded the use of prescription opioids in general and the use of long-lasting opioids in particular.

697. As reported in its most recent 10-K, J&J has agreed to pay $5 billion to resolve the claims of states, cities, and counties for the damage caused by its fraudulent and misleading marketing of opioids.[351]

698. Janssen viewed chronic pain as the real untapped market despite a lack of data for the appropriateness of its opioids for that use. Starting in the mid-1990s, Janssen's promotion of Duragesic shifted from a focus on cancer pain to chronic pain generally. As of May 1994, there was a "[s]hift away from limiting consideration to only malignant patients" to "[p]romotion of around-the-clock control highlights benefits of 72 hour efficacy in limiting breakthrough pain associated with oral medications." From April 1995 to September 1995, Janssen's "Core Campaign Journal Ad" for Duragesic used the headline "Why Interrupt These Moments With Oral Opioid Dosing?" and the tagline "Chronic Pain Control That Goes On."[352]

699. A Duragesic Business Plan for 2001 stated that Duragesic's "vision" was to be the "first choice of chronic pain patients for around-the clock-therapy." The Plan noted that "[n]on-malignant market is the growth opportunity," but it also stated just below this point that "DURAGESIC data is non-existent." Another analysis in the same document stated that "opioid acceptance for non-malignant pain" was an opportunity for Duragesic, but that "limited clinical data" was a weakness. Elsewhere in the same plan is the statement "need non-malignant pain data (lower back, OA [osteoarthritis]/RA [rheumatoid arthritis])."[353]

---

[351] Johnson & Johnson, *Form 10-K* (Feb. 22, 2021), https://johnsonandjohnson.gcs-web.com/static-files/e2a329b4-aeb6-438d-a449-f0e282cf8ee0 (hereinafter *J&J 10-K*).

[352] *Duragesic: Positioning Evolution Overview* 7, 11 (June 1, 2002) (hereinafter *Positioning Evolution*).

[353] *Duragesic 2001 Business Plan* (Aug. 2000).

700. A 2003 "Duragesic Public Relations Activities" PowerPoint identified "[e]xpand in non-malignant pain categories (back pain)" as a "Core Duragesic Brand Strategy" and "[t]arget non-malignant severe chronic pain states (primarily lower back)" as a "2003 PR Objective." The presentation advocated that Janssen "[u]se broad, unbranded messages and stories about serious chronic back pain to attract potential patients" and "[d]raw potential patients to 'opt-in' to branded Duragesic information on Internet." It further suggested creating a website called *www.chronicbackpain.com* to "utilize Internet to engage, capture chronic back pain patients." The PR plan explained that the "primary emphasis on lower back pain" was because, "[a]long with osteoarthritis," lower back pain was "identified as key growth opportunity," but "[u]nlike OA, chronic back pain is not 'owned' by any medication or pharmaceutical company."

701. In Janssen's 2011 Nucynta Business Plan, among the "Strategies & Executional Drivers" was "Strengthen differentiation through new & compelling Evidence", which included demonstrating "Superior Efficacy vs. Oxy"; "Real World outcomes vs. Oxy"; and "Reduced abuse potential."[354]

702. In Janssen's Nucynta and Nucynta ER 2012 Business Plan, an aspect of the marketing strategies associated with "differentiation" was to "Generate data to support lower abuse potential."[355] Such data was never obtained.

703. Even in the face of numerous FDA warnings, Janssen stubbornly marketed its products as having "less abuse potential" and as being appropriate for treatment of "chronic pain."

704. Janssen made and/or disseminated deceptive statements and concealed material facts in such a way to make its statements deceptive, including, but not limited to, the following:

a. Creating, sponsoring, and assisting in the distribution of patient education materials that contained deceptive statements;

---

[354] *Nucynta 2001 Business Plan* (July 27, 2010).
[355] *Nucynta & Nucynta ER 2012 Business Plan* (Dec. 12, 2012).

b. Directly disseminating deceptive statements through internet sites over which Janssen exercised final editorial control and approval that stated that opioids are safe and effective for the long-term treatment of chronic noncancer pain and improve quality of life, but that concealed contrary data;

c. Disseminating deceptive statements concealing the true risk of addiction and promoting the deceptive concept of pseudoaddiction through internet sites over which Janssen exercised final editorial control and approval;

d. Promoting opioids for the treatment of conditions for which Janssen knew, due to the scientific studies it conducted, that opioids were not efficacious and concealing this information;

e. Sponsoring, directly distributing, and assisting in the dissemination of patient education publications over which Janssen exercised final editorial control and approval, which presented an unbalanced summary of the long-term and dose-dependent risks of opioids versus non-opioid pain relievers;

f. Providing significant financial support to pro-opioid KOLs, who made deceptive statements concerning the use of opioids to treat chronic noncancer pain;

g. Providing necessary financial support to pro-opioid pain organizations that made deceptive statements, including in patient-education materials, concerning the use of opioids to treat chronic noncancer pain;

h. Targeting the elderly by assisting in the distribution of guidelines that contained deceptive statements concerning the use of opioids to treat chronic noncancer pain and the risks of opioid addiction in this population;

i. Endorsing and assisting in the distribution of CMEs containing deceptive statements concerning the use of opioids to treat chronic noncancer pain;

j. Directly distributing and assisting in the dissemination of literature written by pro-opioid KOLs that contained deceptive statements concerning the use of opioids to treat chronic noncancer pain, including the concept of pseudoaddiction;

k. Creating, endorsing, and supporting the distribution of patient and prescriber education materials that misrepresented the data regarding the safety and efficacy of opioids for the long-term treatment of chronic noncancer pain, including known rates of abuse and addiction and the lack of validation for long-term efficacy;

l. Using in-person detailing to make deceptive statements to prescribers concerning the use of opioids to treat chronic noncancer pain;

m. Mispresenting that the potential for addiction "can usually be managed" by opioid agreements between doctors and patients, which purported to set forth opioid usage plans for patients;

n. Disseminating through publications, speaker presentations, and sales personnel false representations that high doses of opioids posed little danger to patients, thereby encouraging doctors to increase patients' doses;

o. Misrepresenting to prescribers that most patients will not experience withdrawal after ending Nucynta treatment; and

p. Promoting the discredited ORT as a valid method to determine whether a patient is likely to become addicted to opioids.

705. Janssen and its representatives made, and continue to make, these and other misrepresentations about opioids.

706. Janssen's quarterly promotional spending dramatically rose from less than $5 million in 2000 to more than $30 million in 2011, coinciding with the launch of Nucynta ER. In that year, Janssen spent $142 million to promote its opioids:



**1. Promotion of Specific Opioid Products**

707. A 2001 patient booklet for Duragesic confidently but misleadingly declared: "Addiction is relatively rare when patients take opioids appropriately."[356]

708. In a 1998 letter, the FDA described Duragesic's poster as recommending use in chronic pain patients. The FDA characterized this ad as the "promotion of unapproved use," noting that the qualifying limitation that Duragesic's use is approved "in the management of chronic pain in patients who required continuous opioid analgesia for pain that cannot be managed by lesser means" "was placed near the bottom of the poster in small, inconspicuous type size, misleading and overwhelmed by the more prominent claim of chronic pain at the top of the poster."[357]

709. In the same letter, the FDA declared as "false and misleading" Janssen's claim that Duragesic "stops the pain. Not the patient." The FDA stated, "Janssen's statement implies that the use of Duragesic is not associated with any impairment of mental or physical abilities. Janssen has not submitted data to substantiate such a claim."[358]

710. Despite these warnings, Janssen continued to market Duragesic in materially the same way.

711. In or about 2002, Janssen developed another ad campaign promoting Duragesic as improving patients' functioning and work productivity that included misrepresentations that Duragesic was "[c]hronic pain relief that supports functionality" and "[i]mprove[s] . . . physical and social functioning." Photos on the four ads depicted the following:

a. a man (presumably the father of the bride) laughing with the bride with the caption: "This day will be a lifelong memory. I'm glad chronic pain won't be a part of it."

b. two hands kneading a loaf of bread with the caption: "1,360 loaves . . . and counting. Work, uninterrupted."

---

[356] *Patient Booklet: Your Questions and Answers* 22.

[357] Letter from Stephen W. Sherman, Regulatory Review Officer, Div. of Drug Mktg., Advertising, & Commc'ns, to Jacqueline Brown, Regulatory Affairs, Janssen Pharmaceutica (Mar. 5, 1998).

[358] *Id.*

c. the torso of a "blue-collar" man holding a bowling ball with the caption: "506 strikes . . . and counting. Game, uninterrupted."

d. a man holding a packing box with the caption: "Work. Plan. Stand. Sit. Bend. Stretch. Move. Carry."[359]

712. In a 2004 warning letter, the FDA found this ad campaign to be "misleading": "These outcome claims are misleading because they imply that patients will experience improved social or physical functioning or improved work productivity when using Duragesic. Janssen has not provided references to support these outcome claims." The FDA requested that Janssen "immediately cease the dissemination of promotional materials for Duragesic the same as or similar to those described above. . . . Because the violations described above are serious, we request, further, that your submission include a plan of action to disseminate truthful, nonmisleading, and complete information to the audience(s) that received the violative promotional materials."[360]

713. Janssen also promoted its opioids directly to patients using a rebate coupon for Duragesic and a copay discount card for Nucynta and Nucynta ER.

714. When detailing providers to convince them to write more prescriptions for its opioids, Janssen stated to prescribers that any reluctance to prescribe opioids was unfounded because the risks were lower than generally believed.

715. Through its sales representatives, Janssen promoted Nucynta as crush and breakage resistant to persuade prescribers that Nucynta was less likely to be abused than other opioids.

716. Janssen sent its sales force bulletins and training materials alerting them to studies of Duragesic for chronic noncancer pain and used professional file cards and similar materials in marketing that touted these studies.

---

[359] *Positioning Evolution*, *supra*.

[360] Warning Letter from Thomas W. Abrams, Director, DDMAC, to Ajit Shetty, CEO, Janssen Pharmaceutica (Sept. 2, 2004), https://millerlawpc.com/wp-content/uploads/2017/10/Opioid-Complaint-Exhibits-51-111.pdf (as Exhibit 60) (hereinafter, "Janssen 2004 Warning Letter").

### 2. General (Unbranded) Promotion of Opioids

717. A Janssen unbranded website, *PrescribeResponsibly.com*, stated that concerns about opioid addiction are "overestimated" and that "true addiction occurs only in a small percentage of patients."[361] The website excused addictive behavior as "pseudoaddiction," "a syndrome that causes patients to seek additional medications due to inadequate pharmacotherapy being prescribed. Typically, when the pain is treated appropriately the inappropriate behavior ceases."[362] The website further stated that the risk of opioid addiction "can usually be managed" through tools such as opioid agreements between patients and doctors.[363] The website recommends four to fourteen questions screeners that purportedly help physicians identify and address possible opioid misuse.[364]

718. Janssen sponsored and controlled the content of a patient education guide and video titled *Finding Relief: Pain Management for Older Adults*, which was distributed by Janssen's sales force.[365] *Finding Relief* described the addictive qualities of opioids as a myth:




---

[361] Keith Candiotti, *Use of Opioid Analgesics in Pain Management*, Prescribe Responsibly, https://web.archive.org/web/20181119235909/http://www.prescriberesponsibly.com:80/articles/opioid-pain-management (last accessed July 13, 2021 as of Nov. 19, 2018).

[362] Howard A. Heit & Douglas L. Gourlay, *What a Prescriber Should Know Before Writing the First Prescription*, Prescribe Responsibly, https://web.archive.org/web/20171003105720/http://www.prescriberesponsibly.com/articles/before-prescribing-opioids (last accessed July 13, 2021 as of Jan. 6, 2019).

[363] *Id.*

[364] Kenneth L. Kirsh & Steven D. Passik, *Assessing Patients with Pain Using Evaluation Tools*, Prescribe Responsibly, https://web.archive.org/web/20190120012152/http://www.prescriberesponsibly.com/articles/patient-pain-assessment (last accessed July 13, 2021 as of Jan. 20, 2019).

[365] *Finding Relief*, *supra.*

Until recently, this guide was still available online.

719. *Finding Relief* featured a man playing golf on the cover and listed examples of expected functional improvement from opioids, including sleeping through the night, returning to work, recreation, sex, walking, and climbing stairs. It assured patients that, "[u]sed properly, opioid medications can make it possible for people with chronic pain to 'return to normal.'" It stated that "opioids may make it easier for people to live normally" without addressing the life-altering effects of addiction, and it did not address the material risks of abuse and addiction when discussing the side effects of opioids.[366]

720. *Finding Relief* also mischaracterized dose limitations as "disadvantages" of alternative pain management medications without discussing the risks associated with increasing opioid dosages. *Finding Relief* described the advantages and disadvantages of NSAIDs on one page, and the "myths/facts" of opioids on the facing page. The disadvantages of NSAIDs are described as involving "stomach upset or bleeding," "kidney or liver damage if taken at high doses or for a long time," "adverse reactions in people with asthma," and "increase[d] risk of heart attack and stroke." The only adverse effects of opioids listed are constipation and "upset stomach or sleepiness," which the brochure claims will go away.[367]

721. The *Finding Relief* video includes deceptive statements, like fears of opioids are overemphasized and that there is no relationship between addiction and dependence.[368]

---

[366] *Id.*
[367] *Id.*
[368] *Id.*

**a. KOLs**

722. Janssen spread misrepresentations through KOLs and speakers' bureaus. The KOLs that Janssen funded and supported included Drs. Foley, Portenoy, Joransson, Fine, Fishman, Argoff, Stanos, and Arnstein. Between 1997 and 2012, Janssen spent $327,546 on KOLs.

723. J&J paid physicians involved in disseminating misleading information about opioids. Authors of the *Clinical Guidelines for the Use of Chronic Opioid Therapy in Chronic Noncancer Pain* (AAPM/APS) and *Pharmacological Management of Persistent Pain in Older Persons* (AGS) disclosed financial ties to J&J.[369]

724. Janssen worked with other defendants to use common KOLs. As but one example, in 2001 the *New York Times* published an article about the opioid industry. An internal email from Purdue reflects that a Purdue executive had a conversation with one of the KOLs used by Janssen and Purdue. "Russ [Portenoy] said that Janssen called and has called others to try to help deal with this media blitz and protect the pain movement."[370]

725. At no point after Purdue pleaded guilty in 2007 to a federal felony related to marketing OxyContin did Janssen ever inform Dr. Portenoy that it wanted to cease involvement with him so long as he remained involved with Purdue.

**b. Front Groups**

726. Janssen funded or otherwise supported Front Groups to promote the use of opioids to treat chronic pain and to reinforce the misrepresentation that opioids create positive long-term outcomes for users with chronic pain. These groups included: APF, AAPM, APS, JCAHO, USPF, AGS, ACPA, the Center for Practical Bioethics, and CO*RE.

---

[369] *APS & AAPM Guidelines*, *supra*; *2009 AGS Guidelines*, *supra*.
[370] Email from Paul Goldenheim to Howard Udell, et al. (Mar. 1, 2001).

727. J&J funded Front Groups including APS, JCAHO, AfPA, AGS, NPC, and HDA. J&J is a "participating organization" of the PCF, and J&J employees are listed in a directory of PCF contacts.[371]

728. Janssen paid about $1.4 million to AAPM and APS following their 1996 "consensus" statement that endorsed opioids to treat chronic pain and claimed that the risk that patients would become addicted to opioids was low.

729. In 2002 and 2009, AGS came out with the pro-opioid guidelines. Because AGS did not want money up front from the manufacturers, Janssen made payments to the AGS in the years following the promulgation of its guidelines.

730. Janssen funded, edited, participated in the development of, and controlled the content of misleading materials published by front groups, including the unbranded APF initiative "Let's Talk Pain." The "Let's Talk Pain" website included misinformation about opioids, such as that "the stigma of drug addiction and abuse" associated with the use of opioids stemmed from a "lack of understanding addiction." The website also perpetuated the concept of pseudoaddiction, associating patient behaviors such as "drug seeking," "clock watching," and "even illicit drug use or deception" with undertreated pain which can be resolved with "effective pain management." In 2009, the website stated that "pseudoaddiction . . . refers to patient behaviors that may occur when pain is undertreated . . . Pseudoaddiction is different from true addiction because such behaviors can be resolved with effective pain management."[372] The website also featured a video interview, edited by Janssen personnel, which claimed that opioids were what allowed a patient to "continue to function," falsely

[371] Pain Care Forum, *2010 Meetings Schedule* (n.d.)

[372] *Understanding Addiction*, Let's Talk Pain, https://web.archive.org/web/20120322234928/http://www.letstalkpain.org/real_story/addictions.html (last accessed July 13, 2021 as of Mar. 22, 2012).

implying that her experience would be representative.[373] This website was accessible online until at least 2012.

731. Janssen co-sponsored the APF publication, *Special Considerations: Pain in Specific Populations*, which sought to normalize opioid treatment for the elderly.[374]

732. Janssen paid for APF to distribute *Exit Wounds*, which contained misrepresentations such as those alleged above, to veterans and others.

**c. Publications**

733. Janssen funded studies and placed them in medical journals to support its marketing efforts. Janssen also used external studies in ways that were misleading.

734. One of the studies was "Evaluation of Long-term Efficacy and Safety of Transdermal Fentanyl in the Treatment of Chronic Noncancer Pain" by Milligan et al.[375] Janssen advised its sales force that the study's authors stated that Duragesic provided "sustained, long-term pain control" even though the study had found that one-third of its subjects did not respond to Duragesic. Janssen explained this fact by stating that it "coincide[d] with Perry Fine's comments (see editorial) that a process of trial and error is often needed to achieve adequate pain management." With regards to the study's reported global efficacy rate of 42%, Janssen advised its sales force that "[a] possible explanation for the low rate of global efficacy is that . . . the results for the global efficacy measurement did not include a 'moderate' rating," an explanation not offered by the study itself. As to the study's reported withdrawal (drop-out) rate of 43%, Janssen advised its sales force that the study's authors found "the incidence of AEs [adverse events] and the rate of withdrawal from the trial are relatively high but neither unusual nor unexpected considering the baseline clinical status of the study

---

[373] *The Let's Talk Pain Show*, Let's Talk Pain, https://web.archive.org/web/20120324220752/http://www.letstalkpain.org/talkshow/ (last accessed July 13, 2021 as of Mar. 24, 2012).

[374] Am. Pain Found., *Special Considerations: Pain in Specific Populations* (Nov. 2008).

[375] Kenneth Milligan, et al., *Evaluation of Long-Term Efficacy and Safety of Transdermal Fentanyl in the Treatment of Chronic Noncancer Pain*, 2 J. Pain 197 (2001), https://pubmed.ncbi.nlm.nih.gov/14622817/.

population." Janssen further advised its sales force that the fact that withdrawals due to adverse events or insufficient response diminished after six months "may indicate that most of the withdrawals secondary to insufficient response or AEs may be related to improper titration and lack of tolerability to the transient side effects of TDF [transdermal fentanyl, i.e., Duragesic]," again an explanation not found in the study.[376]

735. Canadian health authorities had previously commented to Janssen that the studies it submitted in support of the use of Duragesic for chronic pain, including the Milligan study, involved only patients who were already taking potent opioids before entering the studies. The Canadian authorities further noted that "the treatment of opioid naive patients with transdermal fentanyl for postoperative pain has resulted in deaths due to respiratory depression in the past." In its reply, Janssen stated, "We acknowledge that the experience in opioid naive non-cancer patients is limited." No such acknowledgment was made in Janssen's bulletin to its sales force about the Milligan study.

736. Janssen also did not advise its sales force in the bulletin that the stability of pain control achieved in the study came at the cost of nearly doubling the mean dose of Duragesic over 12 months.[377] A Janssen scientist raised concerns with the Milligan study, sending an email stating she wanted to "reiterate" concerns that had been raised regarding using the Milligan study "to make an argument for efficacy." She noted that "these studies not [sic] the appropriate design neither the end points to make a case for efficacy." Janssen did not disclose these concerns to its sales force. Nor did Janssen disclose that the Milligan study was supported by a grant from the Janssen Research Foundation and that the lead author had received financial support from Janssen.

---

[376] Memo to 275 Sales Force, et al., from Medical Services, Sales Training, Duragesic Brand Team (Sept. 21, 2001) (hereinafter, "Milligan Memo").

[377] Milligan Memo, *supra*.

737. Janssen also provided its sales force with a 1997 study by Simpson et al. entitled "Transdermal Fentanyl as Treatment for Chronic Low Back Pain."[378] Janssen advised its sales force that the study results suggested "that patients on DURAGESIC treated for chronic low back pain report greater improvement in pain relief and disability than those who received oral opioids" and that "use of Duragesic may be associated with less disability caused by chronic lower back pain." In professional file cards and other materials used by sales representatives, Janssen likewise cited the Simpson study for its claim that Duragesic "[d]emonstrated effectiveness in chronic back pain with additional patient benefits" and also claimed that "[a]ll patients who experienced overall benefit from DURAGESIC would recommend it to others with chronic low back pain."[379]

738. In its September 2004 warning letter to Janssen, the FDA found that the Simpson study was "inadequate to support th[ese] claim[s], because it was an open-label, single-arm trial with no control group" and further stated, "We are not aware of substantial evidence or substantial clinical experience to support th[ese] claim[s]." The FDA found these claims to be "unsubstantiated effectiveness claims" and that these and other misleading claims on the file card were "serious" violations and constituted misbranding. The FDA requested that Janssen "immediately cease dissemination" of these claims and come up with a plan for corrective action.[380]

**d. Speakers' Bureaus**

739. J&J and Janssen made payments to thousands of physicians nationwide, ostensibly for activities including participating on speakers' bureaus, providing consulting services, and assisting in post-marketing safety surveillance, but in fact for deceptively promoting and maximizing the use of opioids.

---

[378] Richard K. Simpson Jr., et al., *Transdermal Fentanyl as Treatment for Chronic Low Back Pain*, 14 J. Pain Symptom Mgmt. 218 (1997), https://pubmed.ncbi.nlm.nih.gov/9379069/.

[379] *See Duragesic Hospital Sales Force Cycle III Presentation* (Sept. 17, 2002).

[380] Janssen 2004 Warning Letter, *supra*.

### 3. Activities of Noramco

740. J&J and Janssen were not only involved in the marketing of their prescription opioids, but they also produced the active pharmaceutical ingredients for prescription opioids through two subsidiaries: Tasmanian Alkaloids PTY, LTD ("Tasmanian Alkaloids") and Noramco, Inc. ("Noramco"). Through this role, J&J positioned itself as the main source of a necessary ingredient to the prescription painkillers being marketed, distributed, and dispensed and thus had had profound financial incentives to expand the market for opioid products.

741. As wholly owned subsidiaries, Noramco's and Tasmanian Alkaloid's profits inured to J&J's benefit, and J&J was able to and, in fact, did exercise control over Noramco's actions in manufacturing active pharmaceutical ingredients ("APIs") for sale to Janssen and other Marketing Defendants.

742. In the early 1990s, J&J, through Noramco, began discussions with Purdue Pharmaceuticals regarding the anticipated future demand for opioid painkillers, including those opioid painkillers with oxycodone as the primary active ingredient.[381]

743. In or around 1994, Tasmanian Alkaloids began a research project with the purpose of creating a poppy plant with enhanced thebaine content; thebaine is a precursor from which oxycodone and hydrocodone can be produced. The purpose of the project was to meet the "anticipated demand" for oxycodone-based opioids, including Oxycontin. The new poppy allowed a dramatic increase in the production of oxycodone, which in turn allowed a dramatic increase in the production, marketing, and sales of oxycodone-based products.[382]

---

[381] Peter Whoriskey, *How Johnson & Johnson Companies Used a 'Super Poppy' to Make Narcotics for America's Most Abused Opioid Pills* (Mar. 26, 2020), https://www.washingtonpost.com/graphics/2020/business/opioid-crisis-johnson-and-johnson-tasmania-poppy/ (hereinafter *Super Poppy*).

[382] *Id.*

744. In or around 1996, Tasmanian Alkaloids began a program to entice Tasmanian farmers to grow the new poppy, which eventually constituted the majority of the Tasmanian crop. Tasmanian Alkaloids bought the poppies from farmers and then shipped concentrated poppy products to the United States where Noramco processed the raw materials into oxycodone, hydrocodone, and other opioid APIs.[383]

745. Tasmanian Alkaloids and Noramco, together, became world leaders in the supply of oxycodone and other thebaine-based products, and J&J, through those entities, financially benefitted from the epidemic above and beyond the profits from Janssen's sales of opioid products. As of 2015, roughly 65% of all oxycodone consumed in the United States was distributed by Noramco.[384]

746. As a condition of supplying oxycodone, Noramco requested assurances from Purdue that the latter would be able to manufacture and sell significant quantities of oxycodone-based products. Ultimately, Purdue relied largely on J&J's thebaine supply (via Tasmanian Alkaloids and Noramco) for its production of OxyContin.[385]

747. It is unknown precisely how much oxycodone was produced by Noramco or the quantities sold to various customers (including the Marketing Defendants). In 2011, the Johnson & Johnson Family of Companies in Australia submitted a submitted a document titled "Submission to the Transparency Review of the Therapeutic Goods Administration." (The Therapeutic Goods Administration is the part of the Australian Government Department of Health responsible for regulating therapeutic goods such as medicines, vaccines, medical devices and similar products.). In that submission, Johnson & Johnson represented:

> In 1995, Tasmanian Alkaloids initiated a project to develop a high-thebaine poppy. In sampling the alkaloid content of thousands of plants, one plant was found to have a high content of thebaine and no morphine, and the first commercial crop of these unique poppies was

---

[383] *Id.*
[384] *Id.*
[385] *Id.*

> harvested in 1998. The new plant revolutionised thebaine production and today it has up to 80% of the worldwide market for Oxycodone raw materials. Tasmanian Alkaloids is presently the largest manufacturer of active pharmaceutical ingredients in Australia and the largest exporter of codeine and thebaine in the world.

748. In 2015, at the time when J&J was attempting to sell off Noramco and Tasmanian Alkaloids, J&J prepared a marketing brochure representing that:

a. the purchaser had the opportunity to "[a]cquire the #1 supplier of Narcotic AOSs in the United States" and "[b]ecome a key supplier to the world's largest multi-source generics";

b. the Noramco portfolio of products, (with net trade sales in 2014), included Oxycodone ($94 million); hydrocodone ($52 million); buprenorphine ($20 million); morphine ($20 million); codeine ($18 million); and other products, for a global 2014 sales of $258 million;

c. Noramco's U.S. market share of these products in 2014 was as follows: oxycodone (65%); hydrocodone (54%); codeine (60%); and morphine (60%);

d. "Tasmanian Alkaloids produces over 40% of the world's supply of Narcotic Raw Materials";

e. "Tasmanian Alkaloids has the highest content poppies for key alkaloids"; and

f. Noramco and Tasmanian Alkaloids, located in four countries around the world (Wilmington, Delaware; Athens, Georgia; Tasmania, Australia; and Schaffhausen, Switzerland) had 483 full-time equivalent employees, including 28 employees shared with J&J.[386]

749. This brochure also represented that "Noramco has long-term agreements and/or majority controlled substance share with <u>all 7</u> of the top US generic companies." The marketing materials represented, as to "typical supply terms:"

a. Agreements cover multiple controlled substance products (4 or more);

b. Agreements are for more than 80% of customer's volume; and

c. Terms are for 3 to 5 years minimum with rolling renewals.[387]

---

[386] *Noramco World Wide Narcotics Franchise* (Oct. 2015).
[387] *Id.*

750. J&J sold Noramco and Tasmanian Alkaloids for $650 million to a private equity firm in or around 2016.[388]

751. In its findings of fact following a bench trial, an Oklahoma court found that J&J, through Tasmanian Alkaloids and Noramco, supplied opioid manufacturers, including Purdue and Teva, with APIs from the 1990s until at least 2016. According to the court, "Noramco grew to become the No. 1 narcotic API supplier of oxycodone, hydrocodone, codeine, and morphine in the United States.[389]

### 4. Cooperation with Purdue

752. When issues began to arise about abuse and diversion of Purdue's OxyContin, an internal Janssen email stated, "It was not [Janssen's] policy to advance language that would attack a competitor's product." [390] The email stressed the "need to have enough foresight to look towards the future of pain management."[391] In other words, what is bad for Purdue is bad for Janssen. This is, of course, in addition to J&J's interest in Purdue as a customer for Noramco APIs.

753. At about the same time, Purdue sent a memorandum to its "Entire Field Force" instructing them about the agreement that Purdue and Janssen reached to not disparage the other's products or to raise competitors' drug diversion problems:

> This past week, we received a complaint from Janssen's president indicating that our representatives are discussing various ways in which the Duragesic patch is abused and diverted. . . . While abuse and diversion reports for OxyContin, Duragesic, and other pharmaceutical preparations may be part of the printed and electronic press, this knowledge or information should not be discussed or used as part of the promotion of OxyContin. . . . Janssen Pharmaceuticals and Purdue have agreed that should either company have representatives who promote product out of label or out of policy, the name of the

---

[388] *Super Poppy*, *supra*.

[389] Judgment After Non-Jury Trial, Findings of Fact ¶¶ 6, 15, Case No. CJ-2017-816 (Okla. Cleveland Cty. Dist. Ct. Aug. 26, 2019), https://www.courthousenews.com/wp-content/uploads/2019/11/okla-opioids.pdf (hereinafter "Okla. Judgment").

[390] Email from Bruce Colligen to Dennis Fitzgerald (Apr. 20, 2001).

[391] *Id.*

representative will be provided to the other company for investigation and disciplinary action if necessary. . . . I trust that this memo is clear.

### 5. Suspicious Order Monitoring

754. Janssen failed to maintain effective controls against diversion.

755. Janssen's SOM program began in 2006 with its first Standard Operating Procedure for its SOM policy, in which Janssen wrote that a "potentially suspicious or excessive" controlled substance order can be defined as an order "that exceed[s] the permitted quantity by 3 times the normal mean demand" over a 52-week period.[392]

756. In 2013, Janssen modified its definition of suspicious order, stating, "A potentially suspicious or excessive controlled substance order can be defined as an order that exceeds the minimum order quantity requirements, and is above 3x's (300% of) the calculated, 12 month, per weekly order average."[393] Janssen maintained its same suspicious order algorithm from 2006 through at least March 8, 2019.

757. From 2005 through at least 2018, Janssen never reported a suspicious order to the DEA.[394]

758. Janssen only monitored for orders of unusual size and failed to ever monitor for frequency and/or pattern in real-time.[395]

759. Beginning in 2005, Janssen received chargeback data that would have provided visibility into the orders of its opioids by downstream customers.

760. Further, since at least 2011, Janssen's "SCG Trade Group" and its "marketing teams" were using 852 data (wholesalers' inventory and total sales out to their customers) and un-blinded 867

---

[392] *JOM Customer Service Suspicious or Excessive Narcotics Orders* (n.d.).

[393] *JOM Customer Service Suspicious or Excessive Orders* (July 24, 2013) (hereinafter *2013 SOM*).

[394] Deposition of Michele R. Dempsey (Jan. 22, 2019 and Mar. 8, 2019) at 487:2-488:18 (hereinafter "Dempsey Deposition); *see also* Terrence W. Woodworth, The Drug & Chemical Advisory Group, *Evaluation of the Suspicious Order Monitoring System for Johnson & Johnson* 14 (Jan. 8, 2018) ("It appears that the JOM SOM has not reported a suspicious order for controlled substances as suspicious during its entire time in operation.").

[395] Dempsey Deposition at 433:21-455:13.

data ("wholesalers total sales out to their customers broken out by outlet, i.e., Retail Pharmacies, Hospitals, Long Term Care, Clinics, etc. Last Points-of-Care in the Supply Chain where product is shipped prior to delivering to the patients"), as well as chargeback data to gain insights into the purchasing behavior of individual pharmacies and other customers to resolve demand issues and help build demand strategies. According to Janssen's documents, this information was used by sales and marketing to spot high prescribers and to ensure that wholesalers were stocking targeted pharmacies with Janssen's opioids. Janssen also was buying third-party data from Integrichain and ValueTrak.[396]

761. Janssen never incorporated any of the relevant transactional sales data that could assist in disclosing diversion into its real-time SOM system, including, IQVIA, chargeback data, sales representatives' tips, or even the Integrichain and ValueTrak data that its Trade Analytics team was using in order to sell its opioid products and track stocking at the pharmacy level. During a deposition on March 8, 2019, Janssen's Director of Controlled Substances Compliance, Michele Dempsey, was asked whether her compliance group was getting stocking data while looking at suspicious order monitoring in 2012. The answer was, "no, we were not."[397]

762. In 2012, Janssen's "Customer Service" team was required to use ValueTrak data after a distributor customer's order was flagged as potentially suspicious or excessive, "to show the [distributor] customer's inventory and compare that inventory to the demand of the increase."[398]

763. Ms. Dempsey testified that Janssen only utilized 852 and 867 data from the wholesaler in its order monitoring program, "as needed." However, Ms. Dempsey testified that, in 2017, when she was aware that another division within Janssen was getting third party 852 and 867 sales data, "I don't know if prior to 2017 [the third party data] did include Duragesic and Nucynta. But at the time

[396] *See* Email from Luis Valcarcel to Ron Kuntz & Paul Lowman (June 25, 2012 at 11:58 AM) (hereinafter "Valcarcel Email").
[397] *See* Dempsey Deposition at 106:1-8; 111:14-18, 114:11-19.
[398] *2013 SOM*, *supra*.

that I was – I learned of this [third party data], Duragesic was not included, and Nucynta was no longer a product." Consistent utilization of this third-party data to monitor sales of Janssen's Duragesic and Nucynta was necessary to identify potential diversion and should have been used for that purpose.[399]

764. Additionally, through purchases of data from ValueTrak, Janssen stated that "we can now identify the most valuable individual pharmacies in the marketplace." This data enabled Janssen to know the end customers of its distributors. Janssen was using this information, in addition to monitoring pharmacy inventory, to track the "hot spot markets [of] prescribers writing the higher strengths so [Janssen] can provide that data to the JOM Planners and Wholesaler Buyers." However, Janssen was not incorporating the third-party data into its real-time order monitoring platform.[400]

765. Janssen's SOPs did not cover pharmacies or prescribers. Janssen should have been using the data and analysis it possessed about prescribers to inform its suspicious order monitoring program and thereby prevent diversion.

766. Janssen's SOM algorithm was also materially deficient in that it was narrowly designed such that an order would only be compared to previous orders of the same product at the same strength.

767. Janssen's real-time order monitoring program only looked for orders of unusual size and not for frequency and/or pattern. Not only was the rigid formula insufficient to detect all suspicious orders, but the thresholds were also set too high to effectively identify even all orders of unusual size. Although Ms. Dempsey testified at her deposition that Janssen knew as early as 2013

---

[399] *See* Dempsey Deposition at 104:3-16, 123:11-124; *see also id.* at 122:16-123:9, 132:18-134:11 ("[W]hen an order, a controlled substance order, goes through the order monitoring program, if it is deemed to be questionable, customer service planning is involved in reaching out to the customer to understand why it is not a typical order. And this data is used to -- in some cases, as justification to show that downstream inventory is low and it required additional information -- this order was justified for release.").

[400] *See* Valcarcel Email

that data about downstream registrants "could be used, potentially, to help investigate questionable orders," Janssen did not use this information to identify and halt suspicious orders.[401]

### 6. Enforcement Actions

768. Duragesic is approved only for chronic pain in opioid-tolerant patients that cannot be treated by other drugs. In March 1998, the FDA sent Janssen a letter concerning the dissemination of "homemade" promotional pieces that promoted Duragesic in violation of federal law. In a subsequent letter, dated March 20, 2000, the FDA explained that the "homemade" promotional pieces were "false or misleading because they contain misrepresentations of safety information, broaden Duragesic's indication, contain unsubstantiated claims, and lack fair balance." This letter detailed numerous ways in which Janssen's marketing was misleading.

769. The letters did not stop Janssen. On September 2, 2004, the U.S. Department of Health and Human Services sent Janssen a warning letter concerning Duragesic due to "false or misleading claims about the abuse potential and other risks of the drug, and . . . unsubstantiated effectiveness claims for Duragesic," including "suggesting that Duragesic has a lower potential for abuse compared to other opioid products."[402]

770. Janssen intended to promote its opioids for the sort of chronic pain relief that was not permitted by the FDA, and the 2004 letter was the third letter that the FDA sent Janssen about its marketing claims.

771. One year later, Janssen was still at it. On July 15, 2005, the FDA issued a public health advisory, warning doctors of deaths resulting from the use of Duragesic and its generic competitor. The advisory noted that the FDA had been "examining the circumstances of product use to determine

---

[401] Dempsey Deposition at 132:2-134:11.
[402] Janssen 2004 Warning Letter, *supra*.

if the reported adverse events may be related to inappropriate use of the patch" and noted the possibility "that patients and physicians might be unaware of the risks" of using the drug.

772. Enforcement activities have continued. According to J&J's most recent 10-K filed with the SEC:

> In August 2019, Johnson & Johnson received a grand jury subpoena from the United States Attorney's Office for the Eastern District of New York for documents related to the Company's anti-diversion policies and procedures and distribution of its opioid medications, in what the Company understands to be part of a broader investigation into manufacturers' and distributors' monitoring programs and reporting under the Controlled Substances Act. In September 2019, Johnson & Johnson received subpoenas from the New York State Department of Financial Services (NYDFS) as part of an industry-wide inquiry into the effect of opioid prescriptions on New York health insurance premiums. In September 2020, the Company learned that NYDFS filed a statement of charges related to this investigation.[403]

773. J&J's shareholders sent demand letters and later filed derivative actions alleging breaches of fiduciary duty related to J&J's marketing of its opioids. These actions have been voluntarily dismissed without prejudice.

774. Faced with the threat of an adverse jury verdict, J&J agreed to pay $263 million to resolve the claims of the state of New York and Nassau and Suffolk Counties arising from J&J's role in creating and sustaining the opioid epidemic.[404]

775. J&J has offered to pay $5 billion to settle the same claims nationwide.[405]

### 7. Findings by Trial Courts

776. In 2019, in the MDL proceeding styled *In re: National Prescription Opiate Litigation*, MDL 2804 (N.D. Ohio), Janssen and J&J lost summary judgment motions on the issue of their liability.[406]

---

[403] *J&J 10-K*, *supra.*

[404] Jef Feeley, *J&J Reports $263M Resolution of N.Y. Opioid Lawsuits Before Trial*, Ins. J. (June 28, 2021), https://www.insurancejournal.com/news/east/2021/06/28/620396.htm.

[405] Douglas MacMillan & Kevin Schaul, *Drug Companies Seek Billion-Dollar Tax Deductions from Opioid Settlement*, Wash. Post (Feb. 12, 2021), https://www.washingtonpost.com/business/2021/02/12/opioid-settlement-tax-refund/.

[406] Opinion and Order Denying Janssen's Motion for Summary Judgment, *In re Nat'l Prescription Opiate Litig.*, No. 17-md-2804, 2019 WL 4194293, at *2–3 (N.D. Ohio Sept 4, 2019); Opinion and Order Re: Preemption, *Prescription Opiate*

777. Following a bench trial over its role in creating and sustaining the opioid epidemic, an Oklahoma court found that Janssen's opioid marketing was "false, deceptive and misleading" and entered judgment against Janssen and J&J.[407] The court ordered Janssen and J&J to pay the state $572 million.[408]

778. The judge found that the state had proven that J&J created a public nuisance by exaggerating the benefits of narcotic painkillers and minimizing their addiction risks. The court also found that "the public in general are currently experiencing an opioid crisis and epidemic."[409]

779. According to the court, J&J's marketing and promotion activities included, among other things, sales representatives providing education, literature that they funded in medical journals and publications, materials from professional societies/patient advocacy groups, continuing medical education that they funded, unbranded marketing materials, and paid speakers.[410]

780. The key messages in this marketing strategy included using the term "pseudoaddiction" to promote the concept that chronic pain was undertreated and that the solution to this problem was increasing opioid use.[411] Sales representatives did not, however, receive training regarding "pill mill" red flags, such as "pain clinics with patients lined up out the door or patients passed out in the waiting room."[412]

---

*Litig.*, 2019 WL 4178591; Opinion and Order Regarding Defendants' Summary Judgment Motions on Causation, *In re Nat'l Prescription Opiate Litig.*, No. 17-md-2804, 2019 WL 4178617 (N.D. Ohio Sept. 3, 2019).

[407] Okla. Judgment, *supra*, Findings of Fact ¶ 44.

[408] Jan Hoffman, *Johnson & Johnson Ordered to Pay $572 Million in Landmark Opioid Trial*, N.Y. TIMES (Aug. 26, 2019), https://www.nytimes.com/2019/08/26/health/oklahoma-opioids-johnson-and-johnson.html; *see also* Okla. Judgment, *supra*.

[409] Okla. Judgment, Findings of Fact ¶ 1.

[410] *Id.* ¶ 19.

[411] *Id.* ¶ 20.

[412] *Id.* ¶ 33.

### C. Endo and Associated Companies

781. Endo promulgated and spread misinformation about opioids to prescribers and consumers, nationwide and in Arizona, to convince doctors to prescribe and consumers to purchase and consume branded and generic opioid products.

782. Endo's false and misleading misrepresentations reached Arizona healthcare providers who wrote prescriptions as a result of Endo's deceptive actions. This foreseeably resulted in the crisis of addiction and abuse and the resulting ongoing harms to Plaintiffs described herein.

783. Endo sold medically unjustifiable quantities of opioids in Arizona and knew or should have known that its opioids were being diverted.

784. Endo made and/or disseminated deceptive statements and concealed material facts in such a way to make its statements deceptive, including, but not limited to, the following:

a. Creating, sponsoring, and assisting in the distribution of patient education materials that contained deceptive statements;

b. Creating and disseminating advertisements that contained deceptive statements concerning the ability of opioids to improve function long-term and concerning the evidence supporting the efficacy of opioids long-term for the treatment of chronic noncancer pain;

c. Creating and disseminating paid advertisement supplements in academic journals promoting chronic opioid therapy as safe and effective for long-term use for high-risk patients;

d. Creating and disseminating advertisements that falsely and inaccurately conveyed the impression that Endo's opioids would provide a reduction in oral, intranasal, or intravenous abuse;

e. Disseminating misleading statements concealing the true risk of addiction and promoting the misleading concept of pseudoaddiction through Endo's own unbranded publications and on internet sites Endo sponsored or operated;

f. Endorsing, directly distributing, and assisting in the distribution of publications that presented an unbalanced treatment of the long-term and dose-dependent risks of opioids versus non-opioid pain relievers;

g. Providing significant financial support to pro-opioid KOLs, who made deceptive statements concerning the use of opioids to treat chronic noncancer pain;

h. Providing needed financial support to pro-opioid pain organizations that made deceptive statements, including in patient-education materials, concerning the use of opioids to treat chronic noncancer pain;

i. Targeting the elderly by assisting in the distribution of guidelines that contained deceptive statements concerning the use of opioids to treat chronic noncancer pain and misrepresented the risks of opioid addiction in this population;

j. Endorsing and assisting in the distribution of CMEs containing deceptive statements concerning the use of opioids to treat chronic noncancer pain;

k. Developing and disseminating scientific studies that deceptively concluded opioids are safe and effective for the long-term treatment of chronic noncancer pain and improve quality of life, but that concealed contrary data;

l. Directly distributing and assisting in the dissemination of literature written by pro-opioid KOLs that contained deceptive statements concerning the use of opioids to treat chronic noncancer pain, including the concept of pseudoaddiction;

m. Creating, endorsing, and supporting the distribution of patient and prescriber education materials that misrepresented the data regarding the safety and efficacy of opioids for the long-term treatment of chronic noncancer pain, including known rates of abuse and addiction and the lack of validation for long-term efficacy; and

n. Using in-person detailing to make deceptive statements to prescribers concerning the use of opioids to treat chronic noncancer pain.

**1. Promotion of Specific Opioid Products**

785. Endo personnel stated that the promotion of brand-name opioids created a sales "pie," part of which "converts immediately to the generic flavor." The share of the pie that goes to generic opioids almost always increases over time. And, although Endo's generics were not marketed directly to physicians, there was some sales effort directed by the national account executives to retailers and wholesalers.[413]

786. Endo had an Oxymorphone Learning System for teaching sales personnel about the drug, which included the concept of "pseudoaddiction."[414]

[413] Deposition of George Stevenson, Former Vice President of Generic Business and Trade Affairs, Endo Pharmaceuticals (Feb. 15, 2019) at 213–14, 277.

[414] Endo Pharmaceuticals, *Oxymorphone Learning System: Module 3 Opana Risk Management Program* (2006).

787. Endo made the deceptive claim that there is no maximum dosage of opioids that can be safely prescribed and that, as a result, opioids are safer than NSAIDs. Endo promoted the idea that "side effects," not risk of overdose, are the only "ceiling" on opioid prescriptions. This misrepresentation is dangerous because patients develop tolerance to opioids that requires higher doses to achieve pain relief, and higher doses carry a much higher risk of overdose.

788. Endo also targeted elderly patients through misrepresentations to prescribers and consumers. Endo supported the 2009 *Guidelines for the Pharmacological Management of Persistent Pain in Older Persons*.[415] The Chairman of the task force that wrote the guidelines, KOL Dr. Bruce Ferrell, had promoted opioids in 2007 as part of an Endo-funded CME on treating pain in older patients; by 2010, Dr. Ferrell was one of Endo's paid speakers.[416]

789. Since 2013, Endo has provided more than $28 million to physicians, as well as sponsored research and development initiatives.[417] These payments and initiatives are designed to ensure that favorable statements are made about Endo's opioids.

790. Endo's commitment to disseminating the false narrative surrounding opioids is illustrated by the vast sums it spent on promotion. For instance, Endo spent more than $10 million in a single quarter in 2006 following the launch of Opana ER and more than $8 million in a single quarter in 2012 with the launch of a reformulated version.

[415] *2009 AGS Guidelines*, *supra*.

[416] Fauber & Gabler, *supra*.

[417] *December 2020 Senate Bipartisan Opioids Report*, *supra*, at 7. Purdue provided $89 million to physicians and sponsored research during the same period. *Id.*




791. Endo instructed its sales representatives to tell prescribers that opioids would improve patients' ability to function, allowing them to return to work and increase physical activity. For example, Endo distributed a flyer to doctors claiming that the use of Opana ER would allow a patient with chronic pain to work as a chef. The Endo-sponsored *Responsible Opioid Prescribing* likewise stated that patients improved their function with opioids and that functional improvement is the goal of a "long-term therapeutic treatment course."[418] Endo knew that no studies had established that opioids improve long-term functioning.

792. In consideration of a reasonable opportunity for further investigation and discovery, Plaintiffs allege that Endo improperly instructed its sales representatives to diminish and distort the risk of addiction associated with Opana ER.

793. The New York Attorney General found that Endo knew, as early as 2011, that Opana ER was being abused, but that certain sales representatives who detailed New York health care providers did not know about any policy or duty to report problematic conduct and were not trained on the company's policies or duties to report suspicious activity. Endo detailed healthcare providers

[418] *Responsible Opioid Prescribing, Second Edition*, *supra*.

(and paid bonuses to sales representatives doing that detailing) who were subsequently arrested or convicted for illegal prescribing of opioids a total of 326 times, and these prescribers collectively wrote 1,370 prescriptions for Opana ER (although the subsequent criminal charges at issue did not directly involve Opana ER).[419]

### 2. General (Unbranded) Promotion of Opioids

#### a. KOLs

794. Endo invested heavily in Front Groups and KOLs in support of its Opana ER opioid product, and in so doing, recognized the effect of such investments on its sales and marketing. Its business plan included "utiliz[ing] existing and newly trained specialist speakers" in an effort to "[p]rovide a platform for dialogue between pain specialists" and the pain physician community to discuss Opana ER.[420] These KOLs included Drs. Portenoy, Webster, Fine, Ferrell, Fishman, Argoff, Stanos, and Jackson.

795. Endo distributed *Avoiding Opioid Abuse While Managing Pain* by KOL Dr. Lynn Webster, which claims a doctor should regard aberrant patient behavior as pseudoaddiction and increase the patient's opioid dose to remedy the situation.

#### b. Front Groups

796. Endo disseminated misleading messages about opioids through various front groups that it funded and controlled, including APF, AAPM, APS, FSMB, JCAHO, AfPA, USPF, AGS, ACPA, PCF, HDA, the National Initiative on Pain Control ("NIPC"), and CO*RE.

---

[419] Assurance of Discontinuance under Executive Law Section 63, Subdivision 15, No. 15-228, *Endo Health Solutions, Inc.* (N.Y. Att'y Gen. Mar. 1, 2016), https://ag.ny.gov/pdfs/Endo_AOD_030116-Fully_Executed.pdf (hereinafter *Endo Assurance*).

[420] Endo Pharmaceuticals, *2008 – 2012 Opana ER Business Plain* PowerPoint Presentation (Nov. 29, 2007), SFC-00025042, *et seq.*, at 25073, https://www.finance.senate.gov/download/sfc-00025042.

797. Through APC and NIPC, Endo sponsored the website *PainKnowledge.org* until April 2012. This website misleadingly claimed "[p]eople who take opioids as prescribed usually do not become addicted" among other misrepresentations.[421]

798. Endo substantially funded and controlled NIPC to promote its misleading messages, including the concept of pseudoaddiction. Endo commissioned the NIPC Education Council, which it called an "educational advisory group of thought leaders in the area of pain management and opioid pharmacotherapy" to develop a program of CMEs that contained these messages.[422]

799. Endo provided at least $31 million in funding to NIPC between 2001 and 2012. Linda Kitlinski, Endo's former Director of Clinical Development and Education and NIPC's direct contact person at Endo, testified that the strategy for Opana ER was to "refocus the attention to the appropriate clinical use of opioid analgesics."[423] In an email, she indicated that "educational programs that are not done through an 'independent third-party' will be perceived as inappropriately promotional" and agreed with her colleagues that "opioids should be the focus of the new NIPC module."[424] NIPC made the following false statements regarding opioids generally, without focusing on brand names or generics: (1) "Addiction to opioids in the context of acute pain treatment is rare in those with no history of addictive disorder";[425] (2) "pseudoaddiction" is a patient's pattern of drug-seeking behavior and such behavior is merely a sign of "inadequate pain management";[426] and (3) a patient's "level of function should improve" after long-term opioid use, allowing him or her to "participate in activities of daily living, such as work and hobbies."[427]

---

[421] *Pain: Opioid Therapy*, *supra*.

[422] *Opana REMS*, *supra*.

[423] Deposition of Linda Kitlinski, Director of Clinical Development and Education, Endo Pharmaceuticals (Jan. 15, 2019)

[424] Email from Linda Kitlinski to Nancy Alverez, et al. (June 16, 2003 at 11:16 AM).

[425] Nat'l Inst. on Pain Control, *Advances in Opioid Analgesia: Maximizing Benefit While Minimizing Risk: Part 2: Initiating a Trial of Opioid Therapy* (2006)

[426] Perry Fine, Nat'l Inst. on Pain Control, *Chronic Opioid Therapy: Understanding Risk While Maximizing Analgesia* (2009) (hereinafter *Understanding Risk*).

[427] Nat'l Inst. on Pain Control, *Pain: Opioid Therapy* (2009).

800. Endo utilized APF to spread its message by supporting the publication of *Reading This Could Help Ease Your Pain: Pain Action Guide*, which included misrepresentations such as, "Pain medications rarely cause addiction. . . . Unless you have a history of substance abuse, there is little risk of addiction when these medications are properly prescribed by a doctor and taken as directed."[428]

**c. Publications**

801. Endo misrepresented the risk of addiction in various publications. In a brochure, Endo claimed, "[m]ost healthcare providers who treat patients with pain agree that patients treated with prolonged opioid medicines usually do not become addicted."[429]

802. *Opana.com* contained a pamphlet with photographs depicting patients with physically demanding jobs like those of a construction worker or chef, misleadingly implying that the drug would provide long-term pain relief and functional improvement.

803. An American Pharmacists Association publication, supported by Endo and promoting Opana ER, claimed that fears of addiction and abuse were "based largely on misunderstanding and misuse of terminology" and that addiction was distinct from "pseudoaddiction."

804. On an unbranded website, *www.painaction.com*, Endo misleadingly represented that "[m]ost chronic pain patients do not become addicted to the opioid medications that are prescribed for them," downplaying the significant risk of addiction that opioids present.

805. Endo funded and promoted the *Screener and Opioid Assessment for Patients with Pain* ("SOAPP") as another tool to determine whether a person is likely to become addicted to opioids. For example, the Endo-supported website *painEDU.org* claimed, among other misrepresentations, that

---

[428] Am. Pain Found., *Reading This Could Help Ease Your Pain: Pain Action Guide* (2000)

[429] Endo Pharmaceuticals, *Taking a Long-Acting Opioid: What Does It Mean to Me?* (2008) (hereinafter *Taking a Long-Acting Opioid*).

SOAPP could effectively manage addiction risk, but SOAPP is unable to accurately predict a patient's risk of opioid addiction.[430]

806. One Endo-sponsored brochure, *Understanding Your Pain: Taking Oral Opioid Analgesics*, stated that "[t]aking opioids as prescribed for pain relief is not addiction" and "[a]ddiction to an opioid would mean that your pain has gone away but you still take the medicine regularly when you don't need it for pain, maybe just to escape from your problems." In the same publication, Endo stated that the following test should guide patients in determining whether they are addicted to opioids: "Ask yourself: would I want to take this medicine if my pain went away? If you answer no, you are taking opioids for the right reasons – to relieve pain and improve your function. You are not addicted." The same brochure promoted the concept that "you may also need to take a short-acting opioid in between" doses of a long-acting opioid "for any increase in pain." In the Q&A Section, the pamphlet indicated that, if a patient develops "tolerance" to opioids, "it does not mean you will 'run out' of pain relief," because "[y]our dose can be adjusted or another medicine can be prescribed." The same section posed a similar question: "If I take the opioid now, will it work later when I really need it?" The response: "The dose can be increased . . . You won't 'run out' of pain relief." In recommending increasing opioid dosage as a response to tolerance, Endo did not address the risks that accompany high-dose opioid use.[431]

807. In this same pamphlet, Endo answered the hypothetical patient question, "What should I know about opioids and addiction?" by creating a false dichotomy between addiction ("a chronic brain disease") and opioid therapy ("Taking opioids for pain relief"). It goes on to explain that "[a]ddicts take opioids for other reasons, such as unbearable emotional problems. Taking opioids as

---

[430] *Opioid Risk Management*, PainEDU, https://www.painedu.org/opioid-risk-management-2/ (last visited July 14, 2021).

[431] Margo McCaffery & Chris Pasero, *Understanding Your Pain: Taking Oral Opioid Analgesics* (Russell K. Portenoy ed., 2004).

prescribed for pain relief is not addiction." This publication is still available online and was edited by KOL Dr. Russell Portenoy.[432]

808. In another pamphlet for patients, *Taking a Long-Acting Opioid: What Does It Mean to Me?*, Endo misrepresented the distinctions between physical dependence, tolerance, and addiction to downplay the risk that patients would become addicted to opioids.[433]

809. Endo supported a publication, *A Clinical Guide to Opioid Analgesia* by KOLs Dr. Russell Portenoy and Dr. Perry Fine, which was distributed through national and regional professional societies and was available online.[434]

810. In April 2007, Endo sponsored an article aimed at prescribers, published in *Pain Medicine News*, titled "Case Challenges in Pain Management: Opioid Therapy for Chronic Pain." The article asserted:

> Opioids represent a highly effective but controversial and often misunderstood class of analgesic medications for controlling both chronic and acute pain. The phenomenon of tolerance to opioids – the gradual waning of relief at a given dose – and fears of abuse, diversion, and misuse of these medications by patients have led many clinicians to be wary of prescribing these drugs, and/or to restrict dosages to levels that may be insufficient to provide meaningful relief.[435]

811. To help allay these concerns, Endo emphasized the risks of NSAIDs as an alternative to opioids. The article included a case study that focused on the danger of extended use of NSAIDs. The article did not provide the same detail concerning the serious side effects associated with opioids.[436]

---

[432] *Id.*

[433] *Taking a Long-Acting Opioid*, *supra*.

[434] Perry G. Fine & Russell K. Portenoy, *A Clinical Guide to Opioid Analgesia* (2004).

[435] Charles E. Argoff, *Case Challenges in Pain Management: Opioid Therapy for Chronic Pain*, Pain Med. News(Apr. 2007), https://www.painmedicinenews.com/download/BtoB_Opana_WM.pdf.

[436] *Id.*

**d. CMEs**

812. Endo reinforced its misleading messages through CMEs. Endo listed "[d]ifferentiation among states of physical dependence, tolerance, pseudoaddiction, and addiction" as an element to be considered when awarding grants to CME providers.[437]

813. Endo sponsored a CME through the American Association of Family Physicians ("AAFP") entitled *Managing Pain: Dispelling the Myths*. This CME was also published as a monograph and distributed to all AAFP members. Endo misleadingly represented that symptoms of addiction could be remedied by prescribing more opioids.[438]

814. CMEs directly supported by Endo included *Opioid Analgesia: Practical Treatment of the Patient with Chronic Pain*,[439] and *Advances in Opioid Analgesia: Maximizing Benefit While Minimizing Risk*.[440] The programs promoted the use of opioids for pain from osteoarthritis, neuropathy, and back pain; promoted the use of a screening tool to identify patients at higher risk for opioid addiction; and claimed that patients needing more and more opioids is merely a sign of "pseudoaddiction."

815. Endo paid for a 2007 supplement available for continuing education credit in the *Journal of Family Practice* written by a doctor who became a member of Endo's speakers' bureau in 2010. This publication, *Pain Management Dilemmas in Primary Care*, recommended screening patients using tools like the *Screener and Opioid Assessment for Patients with Pain* or the *Opioid Risk Tool* and taught that patients at high risk of addiction could safely receive chronic opioid therapy using a "maximally structured approach" involving toxicology screens and pill counts.[441]

---

[437] *Opana REMS*, *supra*.

[438] *See id.*

[439] Bill H. McCarber, *Opioid Analgesia: Practical Treatment of the Patient with Chronic Pain*, MedScape, https://www.medscape.org/viewarticle/469428 (last visited July 14, 2021).

[440] B. Eliot Cole, *Advances in Opioid Analgesia: Maximizing Benefit While Minimizing Risk*, MedScape, https://www.medscape.org/viewarticle/552190_2 (last visited July 14, 2021).

[441] Grace Ford, et al., *Pain Management Dilemmas in Primary Care,* J. Fam. Practice, Jan. 2007, at 23.

816. In 2009, Endo sponsored an NIPC CME program, *Chronic Opioid Therapy: Understanding Risk While Maximizing Analgesia*, which promoted the concept of "pseudoaddiction."[442]

817. A non-credit educational program sponsored by Endo, *Persistent Pain in the Older Adult*, misleadingly claimed that withdrawal symptoms, which make it difficult for patients to stop using opioids, could be avoided by simply tapering a patient's opioid dose over ten days and that chronic opioid therapy has been "shown to reduce pain and improve depressive symptoms and cognitive functioning." The CME was disseminated via webcast.

818. Endo and Purdue sponsored *Overview of Management Options*, a CME issued by the AMA in 2003, 2007, 2010, and 2013. The 2013 version remains available for CME credit. The CME taught that NSAIDs and other drugs, but not opioids, are unsafe at high doses.

**3. Claims About ADFs**

819. In December 2011, Endo obtained approval for a new formulation of Opana ER that added a hard coating that the company claimed made it crush-resistant.

820. Even prior to its approval, the FDA advised Endo that it could not market the new Opana ER as abuse-deterrent.

821. Nonetheless, in August 2012, Endo submitted a citizen petition asking the FDA for permission to change its label to indicate that Opana ER was abuse-resistant, both in that it was less able to be crushed and snorted and that it was resistant to injection by syringe. Endo announced it would withdraw original Opana ER from the market and sought a determination that its decision was made for safety reasons (an alleged lack of abuse deterrence), which would prevent generic copies of original Opana ER.[443]

---

[442] *Understanding Risk*, *supra*

[443] Endo, *Endo Health Solutions Sues FDA to Protect Consumers from Non-Tamper Resistant Oxymorphone* (Nov. 30, 2012), SEC.gov, https://www.sec.gov/Archives/edgar/data/1100962/000110096212000031/ex991-pressreleasexfdalaws.htm.

822. In a 2013 decision rejecting the petition, the FDA found that "study data show that the reformulated version's extended-release features can be compromised when subjected to . . . cutting, grinding, or chewing." The FDA also determined that "reformulated Opana ER" could also be "readily prepared for injections and more easily injected[.]" In fact, the FDA warned that preliminary data—including in Endo's own studies—suggested that the percentage of reformulated Opana ER abuse via injection was higher than with the original formulation.[444]

823. Endo then sued the FDA, seeking to force expedited consideration of its citizen petition. The court filings confirmed Endo's true motives: in a declaration submitted with its lawsuit, Endo's chief operating officer indicated that a generic version of Opana ER would decrease the company's revenue by up to $135 million per year. Endo also claimed that if the FDA did not block generic competition, the $125 million that Endo spent on developing the reformulated drug to "promote the public welfare" would be lost.[445] The FDA responded, "Endo's true interest in expedited FDA consideration stems from business concerns rather than protection of the public health."[446]

824. Despite Endo's purported concern for public safety, not only did Endo continue to distribute original, admittedly unsafe, Opana ER for nine months after the reformulated version became available, it declined to recall original Opana ER despite its dangers. In fact, Endo claimed in September 2012 to be "proud" that "almost all remaining inventory" of the original Opana ER had "been utilized."[447]

825. In 2009, only 3% of Opana ER abuse was by intravenous means. Since the reformulation, injection of Opana ER has increased by more than 500%. Endo's own data, presented

---

[444] Letter from Janet Woodcock, Director, CDER, to Robert Barto, Vice President, Regulatory Affairs, Endo Pharmaceuticals (May 10, 2013).

[445] Pl.'s Opp. to Defs.' and Intervenor's Mots. to Dismiss and Pl.'s Reply in Supp. of Mot. for Prelim. Inj., *Endo Pharmaceuticals Inc. v. U.S. Food and Drug Administration, et al.*, No. 1:12-cv-01936, Doc. 23 at 20 (D.D.C. Dec.14, 2012).

[446] Defs.' Resp. to the Court's November 30, 2012 Order, *Endo Pharmaceuticals Inc. v. U.S. Food and Drug Administration, et al.*, No. 1:12-cv-01936, Doc. 9 at 6 (D.D.C. Dec. 3, 2012).

[447] *Id.*; Endo News Release, Sept. 6, 2012 (Ex. L to Rurka Decl.), *Endo Pharmaceuticals Inc. v. U.S. Food and Drug Administration, et al.*, No. 1:12-cv-01936, Doc. 18-4 (D.D.C. Dec. 9, 2012).

in 2014, found that between October 2012 and March 2014, 64% of abusers of Opana ER did so by injection, compared with 36% for the old formulation.[448] The transition into injection of Opana ER made the drug even less safe than the original formulation. Injection carries risks of HIV, hepatitis C, and, in the case of reformulated Opana ER, the blood-clotting disorder thrombotic thrombocytopenic purpura (TTP), which can cause kidney failure.

826. Publicly, Endo sought to minimize the problem. On a 2013 call with investors, when asked about an outbreak of TTP in Ohio from injecting Opana ER, Endo sought to limit its import by ascribing it to "a very, very distinct area of the country."[449]

827. Despite its knowledge that Opana ER was widely abused and injected, Endo marketed the drug as tamper-resistant and abuse-deterrent. Endo sales representatives informed doctors that Opana ER was abuse-deterrent, could not be tampered with, and was safe. In addition, sales representatives did not disclose evidence that Opana ER was easier to abuse intravenously and, if pressed by prescribers, claimed that while outlier patients might find a way to abuse the drug, most would be protected.

828. A review of national surveys of prescribers regarding their "take-aways" from pharmaceutical detailing confirms that prescribers remember being told Opana ER was tamper-resistant. Endo also tracked messages that doctors took away from its in-person marketing. Among the advantages of Opana ER, according to participating doctors, was its "low abuse potential." For example, a June 14, 2012 Endo press release announced "the completion of the company's transition of its Opana ER franchise to the new formulation designed to be crush resistant."[450]

---

[448] Theresa Cassidy, et al., *The Changing Abuse Ecology: Implications for Evaluating the Abuse Pattern of Extended-Release Oxymorphone and Abuse-Deterrent Opioid Formulations*, IBH (Sept. 7, 2014), https://www.ibhsolutions.com/blog/changing-abuse-ecology-extended-release-oxymorphone/.

[449] *Endo Health Solutions Management Discusses Q4 2012 Results - Earnings Call Transcript*, Seeking Alpha (Feb. 28, 2013), https://seekingalpha.com/article/1236751-endo-health-solutions-management-discusses-q4-2012-results-earnings-call-transcript?part=single.

[450] Endo, *Endo Completes Transition of OPANA ER Franchise to New Formulation Designed to Be Crush Resistant* (June 14, 2012), https://investor.endo.com/node/9311/pdf

829. The press release further stated, "We firmly believe that the new formulation of Opana ER, coupled with our long-term commitment to awareness and education around appropriate use of opioids will benefit patients, physicians and payers."[451] The press release described the old formulation of Opana as subject to abuse and misuse but failed to disclose the absence of evidence that reformulated Opana was any better.[452] In September 2012, another Endo press release stressed that reformulated Opana ER employed "INTAC Technology" and continued to describe the drug as "designed to be crush-resistant."[453]

830. Similarly, journal advertisements that appeared in April 2013 stated that Opana ER was "designed to be crush resistant." A January 2013 article in *Pain Medicine News*, based in part on an Endo press release, described Opana ER as "crush-resistant." This article was posted on its website, which was accessible to patients and prescribers.[454]

831. In 2015, the Indiana Department of Public Health determined that an HIV outbreak in Southeastern Indiana was linked to injection of Opana.[455] Even so, Endo continued to market the drug until 2017.

832. In March 2017, because there had been "a significant shift in the route of abuse of Opana ER from nasal to injection following the product's reformulation" resulting in outbreaks of HIV, hepatitis C, and TTP, an FDA advisory committee recommended that Opana be withdrawn from the market.[456] The FDA adopted this recommendation on June 8, 2017.[457] Endo announced on

---

[451] *Id.*

[452] *Id.*

[453] Endo, *Endo Pharmaceuticals Announces Reformulated Version of OPANA ER with INTAC Technology Designed to Be Crush Resistant Accounts for More Than 90 Percent of Opana ER Total Prescription Volume* (Sept. 6, 2012), https://investor.endo.com/node/9371/pdf.

[454] *New Opana ER Strengths Released in Crush-Resistant Design*, Pain Med. News (Jan. 23, 2013), https://www.painmedicinenews.com/In-Brief/Article/01-13/New-Opana-ER-Strengths-Released-in-Crush-Resistant-Design/22393.

[455] *HIV Outbreak in Southeastern Indiana*, Ind. Dep't Pub. Health (Feb. 25, 2015), https://www.in.gov/health/hiv-std-viral-hepatitis/files/February_25__Outbreak_in_Southeastern_Indiana.pdf.

[456] *FDA Requests Removal of Opana ER*, *supra*.

[457] *Id.*

July 6, 2017, that it would agree to stop marketing and selling Opana ER.[458] However, by this point, the damage had been done. Even then, Endo continued to insist, falsely, that it "has taken significant steps over the years to combat misuse and abuse."[459]

#### 4. Suspicious Order Monitoring

833. Endo—like the Qualitest and Par entities that it acquired in 2010 and 2015, respectively—failed to maintain effective controls against diversion, implement a reasonable SOM program, or take reasonable steps to prevent its products from being diverted.

834. Endo's SOM program was carried out by employees in commercial/customer service departments, not by compliance staff that were independent from the sale of the product.

835. Until at least 2014, Endo never conducted any due diligence with respect to the customers to which it was selling its opioids beyond confirming the customer held a DEA registration. In testimony, Endo asserted that it relied on due diligence and site visits conducted by Qualitest and Par, but testimony from representatives of Qualitest's head of DEA compliance from 2011 through 2014 indicates that Qualitest had no responsibility for Endo's SOM process or associated due diligence.

836. Until at least 2013, Endo's SOM program was a "limited" system using a rudimentary algorithm that did not monitor for orders of unusual quantity, size, or frequency. The process was designed only to identify "excessive" orders from a commercial perspective, rather than suspicious orders based on unusual volume, frequency, or pattern. In 2013, Endo's then-Associate Director of Customer Service and Distribution stated: "In Endo's SAP system, we have a limited SOM Program that looks at our buying (wholesalers) customers' 3 month and 12 month history and if any order is above the 3 or 12 month it goes on hold until it is reviewed by Customer Service."[460]

---

[458] *Endo Provides Update*, *supra*.
[459] *Id.*
[460] Email from Lisa Walker to Mark Collins (Oct. 29, 2013 at 8:57 AM).

837. Beginning in 2014, Endo expanded its algorithm for identifying suspicious orders to include three order characteristics—quantity, size, and frequency—by class of customer trade. However, despite tens of thousands of order line items for controlled substances having been flagged under this and predecessor order systems, no suspicious orders were ever reported to DEA by Endo or UPS for Endo products at any point in time.

838. Endo never examined chargeback data as part of its internal order review process for its branded opioids. As of December 2018, Endo's order review system did not utilize chargeback or IMS/IQVIA data and instead relied on Qualitest and later Par to perform site visits and due diligence. However, the former head of DEA compliance for Qualitest, Tracy Norton, has testified that her group had no responsibility for Endo's branded business. Endo's Executive Director of Customer Service and Operations has also testified that Endo never conducted site visits of its customers or its customers' customers.

839. Despite tens of thousands of orders for controlled substances being flagged, Endo's SOM system never resulted in any order of an Endo opioid being reported to the DEA, and Endo never blocked the shipment of any opioid order based on its internal reviews.

840. An August 2008 audit by a DEA consultant found that Qualitest's system for reporting suspicious orders to the DEA needed improvement to comply with regulatory requirements—particularly with respect to information needed for decisions about whether to ship an order. Additionally, from 2008 to 2015, Qualitest was the subject of several DEA investigations, letters of admonition, civil penalties, and enforcement actions. Among other things, the DEA found Qualitest records could not account for, and had deviations of, at least 9 million pills for the period of December 31, 2012 through July 14, 2014.

841. At least as late as June 2009, Qualitest personnel "cut" orders down in size and just increased the number of orders so that each smaller order would clear Qualitest's SOM "thresholds," without reporting the size of the original single order to the DEA as suspicious.

842. As late as March 2013, Qualitest's SOM process had multiple deficiencies, including:

a. Qualitest applied SOM only to "retail" customers;

b. Orders were only on the basis of "historical purchases by an individual customer (thresholds)" and not by size, pattern, or frequency;

c. Qualitest did not evaluate chargeback data for SOM;

d. Qualitest did not conduct rigorous due diligence of its customers or customers' customers; and

e. Qualitest's site visits and due diligence were carried out by sales personnel, not compliance staff.

843. The due diligence process Qualitest implemented in late 2013 was not applied conscientiously or consistently. For example, large "Tier 1" customers' orders could not be reported or stopped as suspicious through the process that applied to other customers but were instead routed to the Chief Operating Officer.

844. Qualitest's implementation of its new standards was not robust and overlooked diversion risks for its biggest customers. For example, even when a customer lacked proper policies to prevent diversion, Qualitest continued to seek ways to work with the customer, rather than terminate the relationship. It was only when Qualitest began looking at chargeback data that Qualitest found problematic secondary customers and actually reported them to DEA. Likewise, Qualitest did not report or cease distribution for any of its biggest customers or their customers. Indeed, Qualitest's SOM Advisory Board, established to determine appropriate action on SOM issues, did not have the authority to terminate "Tier 1" customers, i.e., a customer with a minimum of ten million dollars in overall sales and/or 750,000 dosage units of controlled substances or List 1 chemical purchases annually; such action was left to the discretion of the Chief Operating Officer.

845. At least as early as 2010, Par was selling opioid products, but, according to an outside audit, it had no SOM program.

846. After Endo acquired Par in 2015, internal documents confirmed that Par's order review process still had major deficiencies, including: SOM decisions made by sales or customer service rather than regulatory employees; no customer due diligence other than confirming a DEA license; no reliable review for size, pattern, or frequency; and an SOP that only required reporting "criminal" activities to the DEA, which "misse[d] the point of the regulations," which is, "suspicious orders should be reported as soon as they are identified." Furthermore, there was no SOM staff, and the SOM function was limited to a manual review conducted by sales personnel, which was "viewed as a conflict of interest by the DEA." After the Par-Endo merger, the former elements of the QT DEA compliance unit took responsibility for SOMs for both businesses.

847. Endo, Qualitest, and Par did not maintain effective controls against diversion, implement a reasonable SOM program, or take reasonable steps to prevent their products from being diverted. Endo employed a rigid "excessive orders" system operated by sales and commercial personnel, never looked to available data on its customers' customers, and failed to conduct any meaningful due diligence of its customers. Until at least the spring of 2013, Qualitest applied SOM review only to "retail" customers; used a rigid formula that did not examine orders for unusual size, frequency, or pattern, or account for class of trade; ignored available data on its customers' customers; and failed to conduct any meaningful due diligence. After the spring of 2013, Qualitest's SOM program lacked real rigor, independence, and consistency. Par had no effective, independent SOM program prior to 2015 and, thereafter, operated under the deficient program Qualitest used. None of these entities employed an SOM or order review program that was an effective control against diversion.

### 5. Enforcement Actions

848. In 2016, Endo settled allegations brought by the State of New York that focused on improper marketing, abuse, and diversion of Opana ER. The investigation found that Endo had no meaningful program in place to ensure that its sales representatives were not encouraging healthcare providers who are engaged in abuse and diversion to write more prescriptions for Opana ER. As part of the settlement, Endo agreed to create an Abuse and Diversion Detection Program, but this program was inadequate, and the abuse and diversion continued.[461]

849. The New York Attorney General reported that "Endo's Vice President for Pharmacovigilance and Risk Management testified to [the NY AG] that he was not aware of any research validating the 'pseudoaddiction' concept" and acknowledged the difficulty in distinguishing "between addiction and 'pseudoaddiction.'" Endo paid a penalty and agreed to refrain from making statements in New York in any training or marketing that: (1) Opana ER or opioids generally are non-addictive, (2) most patients who take opioids do not become addicted, or (3) use the term pseudo-addiction.[462]

## D. <u>Allergan and Associated Companies</u>

850. Allergan and Actavis promulgated and spread misinformation about opioids to prescribers and consumers, nationwide and in Arizona, to convince doctors to prescribe and consumers to purchase and consume branded and generic opioid products.

851. Allergan and Actavis's false and misleading misrepresentations reached Arizona health care providers, who wrote prescriptions as a result of their deceptive actions. This foreseeably resulted in the crisis of addiction and abuse and the resulting ongoing harms to Plaintiffs described herein.

---

[461] *Endo Assurance*, *supra*.
[462] *Id.*

852. Allergan aimed to sell more opioids by convincing patients and providers that opioids are not merely appropriate, but *necessary*, for a wide range of conditions that cause chronic pain. Further, Allergan misrepresented that opioids can be taken with little risk of addiction in most patients, even though it knew that opioid use leads to tolerance and physical dependence and that anyone who takes opioids is at risk of addiction.

853. Allergan deceptively promoted opioids as helping to maintain quality of life, elevated mood, and improved social functioning.[463]

854. Allergan misrepresented that opioids were safer than other drugs, such as NSAIDs and acetaminophen, because opioids do not have dose ceilings.[464]

855. Allergan misrepresented that doctors and patients could effectively screen for addiction by using the invalid *Opioid Risk Tool.*

856. Allergan told patients whose bodies became "tolerant" at their current dose that "[t]his is not addiction," but rather indicated that a "dose adjustment" was required.[465]

857. Actavis misleadingly marketed fentanyl at high doses by saying nothing about the risk of addiction or overdose with such doses.

858. Allergan, Actavis, and their representatives made, and continue to make, these and other misrepresentations about opioids, nationwide and in Arizona.

### 1. Promotion of Specific Opioid Products

859. Allergan and Actavis promoted their branded opioids (Kadian and Norco) as formulated to be less addictive and less subject to abuse than other opioids.

---

[463] *See* Letter from Thomas Abrams, Dir., Div. of Drug Mtkg., Advertising, and Commc'ns, to Doug Boothe, CEO, Actavis US (Feb. 18, 2010) (hereinafter "Kadian Warning Letter").

[464] *See* Kadian Warning Letter, *supra*.

[465] *Learn More About Customized Pain Control with Kadian* (cited in Statement of Charges and Notice of Hearing, *In re Teva Pharm. Indus., Ltd.*, No. 2020-0032-C (N.Y. Dep't Fin. Servs. Aug. 17, 2020)).

860. A Kadian prescriber guide, published under Actavis's copyright, deceptively represented that Kadian is more difficult to abuse and less addictive than other opioids. Although full of disclaimers that Actavis has not done any studies on the topic and that the guide is "only intended to assist you in forming your own conclusion," the guide included the following misleading statements: (1) "unique pharmaceutical formulation of KADIAN may offer some protection from extraction of morphine sulfate for intravenous use by illicit users"; and (2) "KADIAN may be less likely to be abused by health care providers and illicit users" because of "Slow onset of action"; (4) "Lower peak plasma morphine levels than equivalent doses of other formulations of morphine"; (5) "Long duration of action"; (6) and "Minimal fluctuations in peak to trough plasma levels of morphine at steady state."

861. Actavis's sales force was provided with specific targets for the drugs it promoted, i.e., "1306 Kadian prescriptions per day."[466] Actavis decided to set its target and to continue marketing Kadian, despite, as Nathalie Leitch, head of Actavis's brand name marketing, admitted in an August 26, 2011 email to CEO Douglas Boothe on August 26, 2011:

> We have looked at speakers programs and every derivative thereof and have made the decision not to pursue. Legal and regulatory have been strongly opposed plus the cost-benefit very uncertain given the complete lack of clinical data for Kadian.[467]

Leitch thus admitted that Actavis's claims regarding Kadian were false.

862. As a consequence of the misleading marketing, data shows that prescribers believed (incorrectly) that Kadian was safer than other opioids.

863. Actavis had a sophisticated and well-developed generic marketing program headed by its Director of Generic Marketing, Jinping McCormick. While she was director, Actavis marketed oxycodone immediate-release tablets, oxycodone extended-release tablets (generic OxyContin), fentanyl patches, oxymorphone extended-release (generic Opana ER), and morphine sulfate extended

[466] Deposition of Douglas Boothe, former Actavis CEO at 195:19 (Jan. 17, 2019).
[467] Email from Nathalie Leitch to Doug Boothe (Aug. 26, 2011 at 4:14 PM) (emphasis added).

release (generic Kadian). Indeed, Ms. McCormick was tasked with growing generic sales from $477 million in 2010 to $535 million in 2011. Her compensation was directly tied to maximizing generic drug sales, including those of generic opioids.[468]

864. The generic marketing team led by McCormick worked closely with the brand-name marketing team and its sales force. Among other things, they engaged in extensive media promotion of oxymorphone.[469]

865. Allergan also promoted its generic opioid drugs by implementing strategic points and rebate plans whereby their customers received points and rebates as high as 15% for selling their generic drugs under what was called a "Choice program." Under this program, opioid products were associated with higher amounts of points. Allergan implemented pricing and incentive programs with customers and offered store discounts through its suppliers.

866. According to Julie Snyder, the Associate Vice President of Diversified Brand Marketing at Allergan, detailers were provided with lists of doctors to target that included the top prescribers of both branded and generic opioids.

867. Allergan's sales force reached out to physicians regarding generic opioids for the sole purpose of maximizing sales. A sales force of about 48 representatives promoted generic Kadian and oxymorphone across most of the U.S. through 2012.

868. Allergan trained sales representatives to tell providers that opioid patients have a low risk of addiction, many opioid patients are merely experiencing pseudoaddiction, and opioid withdrawal is a minor concern. One vehicle for training sales representatives to deliver this misleading information was the Kadian Learning System, which presented the concept of pseudoaddiction.[470]

---

[468] Deposition of Jinping McCormick at 28:4–12; 71:12–19; 73:4–11 (Jan. 9, 2019).
[469] Deposition of Jinping McCormick at 74:12–75:2.
[470] Actavis Elizabeth, *Kadian Learning System* (July 1, 2010).

869. Allergan instructed doctors to set dosage levels based on the needs of the patient with no maximum dose in mind.

870. Allergan misrepresented the dangers of high-dose opioid treatment. Allergan told prescribers that pain patients would not develop opioid tolerance and that opioid prescriptions had no dosage ceiling and were therefore safe.

871. Actavis used the same sales representatives that marketed its brand-name drugs, including Kadian, to market its generic opioids, including generic Kadian, directly to physicians. These were the same sales representatives that had already been trained with false messaging regarding branded Kadian and opioids generally. McCormick even suggested a "contest" and "bonus plan" for those sales representatives that sold the most oxymorphone ER. The sales representatives' compensation was directly tied to their ability to maximize sales of generic opioids.[471]

872. Allergan also worked with physician-based telemarketing companies to target high-prescribing physicians with its Kadian messaging.

873. Allergan widely distributed gift cards that covered the co-pay on branded and generic opioid prescriptions.

**2. General (Unbranded) Promotion of Opioids**

874. Allergan distributed a brochure that stated that the risk of opioid addiction was "less likely if you never had an addiction problem," misleadingly implying that the risk of addiction was low and that individuals at higher risk of addiction could be easily identified.

875. Allergan placed advertisements that omitted the full extent of the risks of generic opioids in various medical publications.

[471] Email from Michael Perfetto to Jingping McCormick, et al. (July 14, 2011, 10:44 PM); Email from Jingping McCormick to Michael Perfetto, et al. (July 14, 2011, 11:08 PM).

876. Allergan used Front Groups to convey misleading pro-opioid messages. Groups it supported included AAPM, NPC, CO*RE, and PCF.

**3. Suspicious Order Monitoring**

877. Allergan and Actavis failed to maintain effective controls to prevent diversion, failed to design and operate an adequate SOM system, and failed to take reasonable steps to prevent the Allergan entities' products from being diverted.

878. Allergan and Actavis marketed and sold medically unjustifiable quantities of opioids in Arizona and knew or should have known that its opioids were being diverted.

879. Actavis had the same rudimentary threshold-based SOM system in place from November 2000 through October 2012, during which it sold both generic opioids and branded Kadian (after 2008). Under that system, the Customer Service group printed a report "several times a day" showing any controlled substance order that was "25% over the customer's rolling average" of orders placed over the prior six months. Then, according to an internal document, "Customer Service reviews (eyeballs) the suspicious order report throughout the day (when a new report is created)," and "any order that looks unusual is investigated and any unusual items are cleared before the order is released."

880. In February 2009, Senior Manager of Actavis's Customer Service Department, Nancy Baran, explained to her boss why the existing process was inadequate to "prevent shipping excess product":

> For starters, the report is not cumulative. For example, if a customer's monthly usage is 3000 units - they can order 2999 units every day of the month and it would not be caught. At the same time, the % of times an order comes up on this report where we would actually stop the order is a fraction of 1%. Orders come in all day long over the 25% threshold.

Baran further stated:

> If we stopped to question and put on hold every one of these orders, it would be crippling. The intent of the DEA suspicious report was

> designed to prevent excessive shipments of controlled products. In my opinion, it does a lousy job at even that.[472]

881. Actavis employee Noemi Rebeco, who oversaw the day-to-day implementation of the system, wrote in August 2009 that "'DEA Analyst' Omar Plaza" would check the report "daily" and then "select customers that are exceeding the normal orders (over 25-50%) . . . [choose] the ones that should be investigated . . . get the reply from customer service advising the reason of the large Order (most of the time trade show promotions) and send to the local [DEA] office once a month a copy of the 'suspicious report.'"[473] Baran has testified that there was only one order between 2008 and 2017 that was ever deemed to be suspicious and reported to the DEA as such. All other pended orders were cleared and released.

882. The 2000–2012 Actavis system flagged only orders unusual in size; it did not flag orders unusual in frequency or unusual in pattern in real time. Actavis's rigid formula did not accurately detect all suspicious orders. The system did not utilize any downstream customer information available to Actavis, did not differentiate among NDC codes for drugs with a higher risk of diversion, and did not automatically stop orders from shipping. Although Actavis mailed reports to the DEA of orders that were identified in the system from 2009–2012, the lack of any analysis of such data made the reports meaningless. It was not an effective control, and Actavis employees recognized as much. Yet the system remained in place until 2012.

883. In September 2012, Actavis began implementing a statistics-based, more modern SOM system designed by the Buzzeo/Cegedim group to detect "orders of interest" in "Direct Customer sales." On October 1, 2012, it began working alongside Actavis's prior system.[474]

---

[472] Email from Nancy Baran to Michael Perfetto, et al. (Feb. 11, 2009 at 6:42 PM).

[473] Email from Noemi Rebeco to Nancy Baran (Aug. 24, 2009 at 9:10 AM).

[474] Actavis, *Actavis Suspicious Order Monitoring – DIRECT Customer Sales SOP*; Email from Maria Lesny to Ryan Blackburn (Oct. 4, 2012 at 11:06 AM).

884. At the same time Actavis was preparing to implement the Buzzeo/Cegedim SOM system, its employees were called to meet with the DEA. On September 12, 2012, five Actavis employees met with seven DEA personnel at its Arlington, Virginia office for about three hours to discuss opioid diversion. At this meeting, among other things, Barbara J. Boockholdt, Chief of the Regulatory Section, told the Actavis employees that some pharmacies in Florida, to which addicts were traveling and seeking 15 mg and 30 mg oxycodone tablets, "had purchased well in excess of a million dosage units per year. This is an obvious concern to DEA and must be addressed by Actavis."[475]

885. At the same meeting, Leonard Levin, Staff Coordinator of the Regulatory Section, described various activities that are required to maintain effective controls to prevent diversion and told Baran that:

a. "Actavis should send someone from their compliance team to visit pharmacies who were receiving their products in South Florida, in order for them to witness the long lines at pain clinics, out of state license plates, questionable clients, security guard(s) in the parking lots, and signs stating cash payment only."

b. Actavis employees should "get to know their customers, visit distribution sites, visit customers of those distributors, check on customers' suspicious order monitoring systems, review due diligence files, and obtain printouts of pharmacies or practitioners who are receiving Actavis products."

c. "[I]f their customers refused to provide them with sales information[,] Actavis should consider cutting them off."

d. "Actavis [should take a] serious look at their quota request, review their suspicious order monitoring system, visit their customers to review their suspicious order monitoring systems as well as their due diligence files, [and] ask to their customers' top customers for Actavis products. . . ."[476]

886. In late October 2012, Actavis had a follow-up meeting with two field representatives from the DEA's Newark, New Jersey office where the DEA requested a reduction of approximately

[475] Memo from Barbara J. Boockholdt, Chief, Regulatory Section, Off. of Diversion Control, to Joseph T. Rannazzisi, Depty Asst. Admin., Off. of Diversion Control (Nov. 5, 2012) (reporting on the September 12, 2012 meeting).
[476] *Id.*

30–40% in Actavis' manufacturing quota for oxycodone. Actavis's then-CEO, Doug Boothe, rejected the DEA's request.

887. Boothe has even denied that Actavis had a responsibility to detect and prevent diversion by downstream registrants. In deposition testimony, he explained:

> Again, I don't think we had responsibility for, accountability for preventing diversion. We had responsibility and accountability for making certain that the orders that we received were valid from licensed pharmacies and were within our suspicious order monitoring thresholds as it was described earlier then with the Buzzeo model or the more statistical model. So we -- that was our responsibility. Once it goes outside of our chain of custody, we have no capability or responsibility or accountability to -- or at least my understanding, I'm not a lawyer, as it relates to diversion. So, once we ship a valid order to a wholesaler or ship a valid order to a distributor or another smaller wholesaler, our chain of custody is finished at that point.

This belief is an inaccurate statement of Actavis's common-law and statutory duties regarding prescription opioids.

888. The core of Watson's SOM system dated to the early 2000s. A 2001 memo says Watson's inventory system automatically compiled a "12-month average" of customers' various orders and reported violations to its Customer Service personnel. A May 2004 Operational Procedure added a "SOMS multiplier table" to the system that increased the level at which the inventory system would alert a potentially suspicious order. The multiplier, set by people instead of an algorithm, placed a different value for various "classes of trade," and orders from wholesalers, distributors, and chain pharmacies were regularly allowed at triple the historical average, or more.

889. Watson's SOM system affirmatively allowed customers to get around violations by canceling the order or cutting the quantity. Mary Woods, who was in charge of the Watson SOM system, testified that Watson "never needed to file a report" because it would cut or cancel the order instead. This policy was consistent through 2012. In 2012, Watson's SOM system merely required that "[i]f the customer decides to cancel or reduce the quantity, they will need to provide a reason for the

reduction or cancellation." Before the merger with Watson, Actavis policy did not allow reducing or canceling an order. After the merger, the combined company adopted Watson's SOM system, and cutting or canceling was generally allowed. Woods has also testified that Watson's SOM system allowed orders to be shipped based on "an employee inside of the company [including salespeople] providing the justification." Watson Call Center/Customer Relations Operation did not add any new staff to handle these SOMs "validations" between 2009 and 2012, but the number increased substantially. In 2009, each "administrator" handled an average of 62 "SOMs validations" per month. In 2010, that number jumped to an average of 180, and in 2011 the number reached 280, a 350% increase over 2009. Woods, who oversaw the system, did not seek to add more personnel at any time.

890. In November 2008, Thomas Napoli, Watson's (and then post-merger Actavis's) Compliance Chief, wrote a memo stating that "[i]t is highly recommended that industry utilize a 'total SOM model.' This model favors a more statistically-based model that dynamically evaluates a variety of order characteristics to determine whether an order should be pending. Characteristics include order size, ordering frequency, ordering patterns and percentage of CS ordered." He continued that "[t]his approach is viewed to be more effective and defensible than the traditional approach of just setting a threshold."[477]

891. Starting in 2011, Napoli advocated hiring Buzzeo/Cegedim to create a new system, just as Baran had at Actavis. Napoli wrote that, among other things, the requirement of "manual effort is very labor intensive, as the current system is not configured with any analytical tools to support timely and accurate decision making. This approach also introduces the element of 'human interaction' in the order evaluation process."[478] A 2012 PowerPoint from Napoli's files notes that Cegedim had "produced a written report" and under "Findings" noted that the multiplier threshold was "not

[477] Memo from Tom Napoli re Controlled Substance Seminar Summary (Nov. 13, 2008).
[478] Thomas Napoli, *Project Continuation Justification: SOM Statistical Model Development and Hosting "in the Cloud"* (Feb. 9, 2015).

consistent with specific requirements noted within regulations and guidance"; that the Watson SOM system "evaluates at SKU level," leaving open the "possibility of distributing orders across multiple SKU's without detection"; and that the Watson SOM system did not "evaluate listed chemicals."[479] The PowerPoint made "[r]ecommendations" that included developing an SOM system to "[f]ully address specific regulatory requirements" and that the system should be "[b]udgeted for 2012 Implementation."[480] But the new system was never implemented, and when Watson bought Actavis, the combined Company reverted back to the Watson SOM system until 2015, when it announced it was selling all of its generic drugs and various corporate subsidiaries to Teva.

892. From 2000 to 2016, Watson, then Actavis (after the 2012 merger), and then Allergan (after the 2015 merger) used an SOM system with a threshold-based automated inventory component. Like the pre-merger Actavis system, it only looked for orders of unusual size and not for frequency and/or pattern in real time. The rigid formula used did not satisfy the obligation to detect and investigate suspicious orders. The automated portion of the system did not utilize any downstream customer information available, did not differentiate among NDC codes for drugs with a higher risk of diversion, and only manually stopped orders from shipping. The companies' failure to identify suspicious orders was known among their employees. It was these same employees that cut or reduced orders in order to avoid filling a suspicious order report. The SOM was not an effective control, and Watson and Actavis employees recognized as much. Yet the system remained in place until 2016.

893. Allergan continues to sell branded Kadian and Norco and continues to have a deficient SOM system to prevent the diversion of these opioids.

---

[479] *SOMS Project Evolution: IT Governance Meeting* (Apr. 5, 2012)
[480] *Id.*

#### 4. Enforcement Actions

894. Actavis received a warning letter from the FDA for circulating a brochure to patients for Kadian representing that pain "can even keep you from enjoying life" and "[i]f left untreated, pain can place stress on your body and your mental health. . . ." The FDA found that these representations constituted unsubstantiated claims of effectiveness, as it was "not aware of substantial evidence or substantial clinical experience demonstrating that the magnitude of the effect the drug has in alleviated pain, taken together with any drug-related side effects patients may experience . . . results in an overall positive impact on a patient's work, physical and mental functioning, daily activities, or the enjoyment of life."[481]

895. In this warning letter, FDA observed that Actavis's promotional materials for Kadian were misleading and "impl[ied] that Kadian is appropriate for use in a broader range of patients than it is approved to treat." The FDA found this "particularly concerning considering the serious and potentially fatal risks associated with the drug."[482]

### E. <u>AbbVie</u>

#### 1. Abbott's Collaboration with Purdue

896. As discussed *supra*, AbbVie is liable for the pre-Spinoff liabilities of Abbott related to its manufacturing, marketing, sale, and distribution of prescription opioids.

897. Between 1995 and 2006, Abbott actively promoted, marketed, and distributed Purdue's opioid products, thereby supporting Purdue's activities described below.

898. Working closely with Purdue, Abbott played a central role in establishing the market for opioids, without which there would be no epidemic in Arizona. In 1995, Abbott conducted a "commercial review" of the viability of the promotion of OxyContin for acute postoperative pain and

---

[481] Kadian Warning Letter, *supra*
[482] *Id.*

concluded that such use of OxyContin would be inappropriate. Despite these concerns, Abbott recognized that a commercial relationship with Purdue to promote the purchase of vast amounts of OxyContin could be very profitable for Abbott.

899. Internal documents from the 1995 "OxyContin Launch" orchestrated by Purdue and Abbott identified (1) "hospital pharmacists" as among their "audience," (2) "hospitals" among their "institutional targets," (3) an objective of "[f]ormulary acceptance in 75% of hospitals for first twelve months," and (4) an objective of developing a "successful distribution program" to "hospitals." In 1996, Purdue made a deal with Abbott under which Abbott's sales force would promote Purdue's lead opioid, OxyContin, in hospitals. Abbott's co-promotion of OxyContin was, in the words of Abbott's counsel, by terms of its contract, dedicated to "hospitals, surgical centers and hospital-based surgeons." Promoting the use of OxyContin for "postoperative pain" and "support[ing] the Abbott agreement" were paramount objectives identified in Purdue's internal documents. Abbott and Purdue consciously and directly targeted hospitals. "[Purdue] representatives will work with their Abbott counterparts to make calls on all Pharmacy and Therapeutic (P&T) communities." "[S]ales force will provide the appropriate clinical data necessary to continue to add OxyContin Tablets to hospital formularies." [483] Initial plans called for marketing to "[a]ll 1,200 cancer centers," "[a]ll 1,200 major teaching institutions," and "[a]ll 2,500 community hospitals with >= 100 beds." The hospital marketing plan further entailed the following actions:

a. The Purdue Frederick sales force should call on all hospital P&T committees to gain hospital formulary acceptance during the first three months of launch. This effort would entail contacting directors of pharmacies in an effort to gain formulary acceptance of OxyContin.

b. Educate MDs/RNs/RPHs regarding the advantages of OxyContin over other Step 2 opioids for cancer patients. The promotional effort should focus on the ease of use and the reduced administration time. If available, clinical outcomes

[483] 2002 Purdue Budget Plan, https://khn.org/news/purdue-and-the-oxycontin-files/ (last visited July 12, 2021) (emphasis added).

studies, showing improved quality of life and cost effectiveness, should be used to convince the house staff to use OxyContin as their opioid of choice.

c. Educational lectures should be held through the Speakers' Bureau program during grand rounds, tumor boards, etc. The Purdue Frederick Speakers' Bureau should educate the house staff about the benefits of OxyContin, while presenting clinical study data.

d. Educational symposia should be conducted through the use of satellite teleconferencing to various cancer centers and major teaching institutions across the country, offering CME credits to MDs/RNs/RPHs and focus on the implementation of the AHCPR Clinical Practice Guideline for the Management of Cancer Pain and the results of clinical trials with OxyContin.

e. Target the top 100 MS CONTIN/Duragesic hospitals and offer them a special pain management day where our OxyContin clinical investigators will train the staff on the use of OxyContin.

900. From the very beginning, Purdue and Abbott intended to position OxyContin as useful for more than just cancer pain. Internal documents from the 1995 "OxyContin Launch" indicate that they also intended it for a "secondary market . . . for non-malignant pain (musculoskeletal, injury and trauma)" and that it must be "reinforced that we do not want to niche OxyContin just for cancer pain."

901. On January 1, 1996, Abbott entered into a "Co-Promotion Agreement" with Purdue to market OxyContin using a dedicated sales force focused on hospitals and their doctors. Under the Agreement, Abbott's hospital products division would expand the market for OxyContin well beyond the existing market, which was then limited to cancer patients and patients facing end-of-life pain.

902. In 1996, Purdue envisioned OxyContin being prescribed for a long laundry list of conditions, and literally generated a "wish list" of clinical studies to support its prescription in a variety of contexts, including: (1) postoperative pain, with specific objectives of supporting the "Abbott agreement" to market to hospitals, removing "the prohibition of giving the product during the 12-24 hour immediate postop period," and removing "the qualification limiting the indication to pain for

more than a few days"; (2) "nonmalignant pain" (including low back pain and osteoarthritis); and (3) HIV/AIDS treatment.

903. Abbott, as part of the co-promotional agreement, helped turn OxyContin into the largest selling opioid in the nation. Under the co-promotional agreement with Purdue, the more Abbott generated in sales, the higher the reward. Specifically, Abbott received 25 to 30% of all net sales for prescriptions written by doctors its sales force called on. This agreement was in operation from 1996 to 2002, following which Abbott continued to receive a residual payment of 6% of net sales up through at least 2006.

904. With Abbott's help, sales of OxyContin went from a mere $49 million in its first full year on the market to $1.2 billion in 2002. Over the life of the co-promotional agreement, Purdue paid Abbott nearly half a billion dollars.[484]

905. Abbott and Purdue also conspired with Pharmacy Benefit Managers (PBMs) to drive opioid use. As described in a *Psychology Today* article:

> Abbott and Purdue actively misled prescribers about the strength and safety of the painkiller [OxyContin]. To undermine the policy of requiring prior authorization, they offered lucrative rebates to middlemen such as Merck Medco [now Express Scripts] and other pharmacy benefits managers on condition that they eased availability of the drug and lowered co-pays. The records were part of a case brought by the state of West Virginia against both drug makers alleging inappropriate and illegal marketing of the drug as a cause of widespread addiction . . . . One reason the documents are so troubling is that, in public at least, the drug maker was carefully assuring authorities that it was working with state authorities to curb abuse of OxyContin. Behind the scene, however, as one Purdue official openly acknowledged, the drug maker was "working with Medco (PBM) [now Express Scripts] to try and make parameters [for prescribing] less stringent."[485]

[484] David Armstrong, *Secret Trove Reveals 'Crusade' to Make OxyContin a Blockbuster* (Sept. 22, 2016), https://www.statnews.com/2016/09/22/abbott-oxycontin-crusade/ (hereinafter *Secret Trove*).

[485] Am. Soc'y of Addiction Med., *America's Opioid Epidemic – Court Released Documents Show Drug Makers Blocked Efforts to Curb Prescribing*, Psych. Today (Oct. 28, 2016), https://www.psychologytoday.com/blog/side-effects/201610/america-s-opioid-epidemic.

906. Abbott sales staff were instructed about the euphoria patients were experiencing on the shorter-acting painkiller Vicodin and that they should tell the physician that "OxyContin has fewer such effects." Abbott's head of pain care sales, Jerry Eichhorn, taught his staff of sales representatives that OxyContin would "minimiz[e] the risk of dependence" and "lower[] euphoria," when, in fact, he had little knowledge of pharmacology and no basis for these statements.

907. Abbott requested to review Purdue's sales aids used to promote all forms of OxyContin in order to make sure each aid met with Abbott's approval prior to being distributed.

908. Abbott regularly sent sales records and sales call records regarding OxyContin, OxyContin IR, and Oxyfast to Purdue for Purdue's use in its sale and distribution of OxyContin, OxyContin IR, and Oxyfast.

909. Instead of being forthcoming with information regarding the addictive nature of OxyContin after newspaper and electronic media reports regarding OxyContin and addiction began to be released, Abbott instructed its sales force representatives to avoid any discussion of abuse or diversion unless the called-upon physician specifically brought the subject up first.[486]

910. Abbott sales representatives would also plan and host events for targeted physicians and staff, such as outings to professional sporting events.

911. Abbott used fifteen-minute and thirty-minute phone cards as incentives in order "to gain access" to physicians so that Abbott's sales representatives could promote the use of OxyContin products.

912. Abbott and Purdue required intense efforts from Abbott sales representatives in order to promote the use of OxyContin, including devoting 50% of sales representatives' daily time to marketing the use of OxyContin products and keeping up an average of six sales physician and/or clinic meetings a day.

---

[486] *Secret Trove*, *supra.*

913. In order to allay physician concerns regarding OxyContin and addiction, Abbott requested, received, and used training materials in the form of presentations from Purdue entitled, "Handling Abuse, Addiction and Diversion Issues – Manager Meeting Workshop."

914. Abbott agreed to market OxyContin to hospitals and to specifically target anesthesiologists, surgeons, and orthopedists. To accomplish this, Abbott agreed to dedicate a group of three hundred detailers and twenty "hospital integrated systems executives" to call on hospitals and doctors across the country, including in Arizona. In detailing hospitals and their doctors, Abbott supplied its representatives with IMS Health data reflecting the prescribing data for the targeted doctors, including opioids.

915. Abbott performed its part of the Agreement well and succeeded in expanding the market for OxyContin and other opioids. Abbott's detailers called on hospitals and doctors in Arizona, targeting anesthesiologists, surgeons, and emergency room doctors to convince these doctors to begin to prescribe OxyContin for long-term, chronic pain.

916. Abbott was not a passive partner. Abbott described its efforts as a promotional "blitz." Abbott's sales representatives worked closely with Purdue sales representatives to aggressively promote OxyContin. The marketing campaigns included utilizing promotional items such as gifts, free phone cards, and other incentives. Abbott funded dinners for surgeons, selling them on OxyContin while they waited for the food. Representatives would also purchase and send lunch and/or snacks to potential prescribers' offices.[487]

917. These efforts were so effective that when bad press ultimately started to be received by Abbott about OxyContin abuses, Abbott sales representatives worked with Purdue representatives to counter negative press and ensure that these criticisms would not impact the prescription-writing habits of OxyContin prescribers.

[487] *Secret Trove, supra.*

918. Abbott sales directors and managers and Purdue management met quarterly throughout the contract term to discuss future sales materials in development, how to benefit from market research, and how to develop unmet needs to increase the purchase of OxyContin.

919. Over the life of the contract with Purdue, Abbott did not rely solely upon the training materials from Purdue. Abbott and Purdue examined market research and data in order to fine tune the promotional materials. Abbott worked with a third party to create and use an adult learning module-type program to make its sales calls more effective. Abbott received sales and profit information from Purdue which reflected that its sales calls were very effective in expanding the market for OxyContin. Sales continued to remain strong in both hospital and retail markets during and after the Co-Promotion Agreement.

920. One of Abbott's duties under the contract was to build "good will" regarding OxyContin so that, even after the contract between Abbott and Purdue expired, Purdue could maintain a relationship with physicians and entities that continued purchasing OxyContin—just as they intended. This was accomplished, in part, by Abbott providing Purdue with Abbott's sales call records and notes in both electronic and paper formats.

921. Abbott's efforts to expand the market for and influence the standard of care for prescribing OxyContin and to solidify Purdue's future sales of OxyContin were successful. Abbott's efforts substantially contributed to the maintenance of the expanded market for OxyContin for treatment of chronic pain until 2018, when Purdue stopped marketing OxyContin to prescribers.

922. Many people, including residents of Arizona, remain dependent on opioids, thereby continuing the damage caused by Abbott and Purdue's actions herein described.

923. Abbott assisted Purdue in expanding the market for OxyContin by recruiting doctors to participate in studies on new uses of OxyContin. These studies were used to convince other doctors to prescribe OxyContin. For instance, in November 1997, Abbott distributed an "OxyContin post

PCA" study to promote OxyContin use following surgery. Abbott also recruited doctors to promote OxyContin through CME seminars.

924. Abbott instructed its sales representatives to detail doctors with charts and the message that OxyContin provided a slower peak in oxycodone blood concentration, "a lower peak concentration," and slower concentration decrease than a comparable dose of immediate-release (IR) oxycodone.

925. Abbott used "sage" advice to address doctors who were concerned with euphoria of OxyContin's competing products by instructing its representatives to "Tell your doctor that with its longer half-life Oxycontin has fewer such [euphoric] effects" than competitors such as Vicodin.

926. Abbott's training manuals highlighted the "delayed absorption" language from the OxyContin label and noted, "slower absorption may lessen abuse risk." Abbott's training materials described the statement regarding "iatrogenic addiction" (addiction arising out of a legitimate prescription) not as a warning about risk, but simply a "reminder to the physician that addiction as a result of legitimate medical use is very uncommon, and not to mistake tolerance, physical dependence, or attempt by the patient to obtain adequate analgesia as signs of addiction."

927. Abbott trained its sales representatives to deliver the message that OxyContin's formulation diminished side effects and lowered oxycodone's abuse or addiction potential. For instance, in a 1999 handout, Abbott noted that short-acting Schedule III opioids had a higher abuse potential.

928. Abbott trained its sales representatives to tell doctors that the lack of a high peak also lowered the incidence of side effects associated with OxyContin and its abuse potential.

929. Abbott provided its sales representatives with an OxyContin visual aid entitled "24 hours of pain relief THE HARD WAY," which included a log graph depicting blood plasma

concentrations of OxyContin over time as flatter than they actually were. The piece also asserted that "100% of all clinical patients were dosed Q 12 H in clinical trials," which was not true.

930. Abbott trained its sales representatives to describe a slower elimination half-life for OxyContin compared to other immediate-release opioids and to claim that such would decrease its abuse potential. At the time of those representations, however, no studies or scientific data supported this claim.

931. Abbott further instructed sales representatives to tell doctors that the "sustained analgesia that OxyContin provides helps minimize the risk of patient dependence because patients don't have to keep dodging themselves to achieve and maintain pain relief more than twice daily."

932. Abbott trained its sales representatives to state that OxyContin was "less habit-forming" than other opioids and that "less than 1% [of patients] become addicted."

933. Abbott, along with Purdue, pursued postoperative studies to support a "supplemental new drug application" that would remove the restriction on postoperative use of OxyContin for pain immediately following surgery. Abbott and Purdue pursued this change in spite of growing reports of OxyContin addiction.

934. Abbott provided its sales representatives with reprints to give to doctors, one of which was a piece written by Purdue KOL Dawn Marcus. The Marcus article advocated using long-action opioids for the treatment of chronic pain and stated, without citation, "While studies report drug abuse/dependence/addiction is 3 to 19 percent of chronic pain patients, true addiction (psychologic dependency) is uncommon with the use of long-acting opioids for chronic pain."[488]

935. Abbott's website touted that OxyContin was "co-promoted by Purdue Pharma LP and Abbott Laboratories" and that Abbott's "pain management therapies are safe, effective and easy to

---

[488] Dawn A. Marcus, *Treatment of Nonmalignant Chronic Pain*, 61 Am. Fam. Physician 1331 (2000), https://www.aafp.org/afp/2000/0301/p1331.html.

use." Abbott recommended that OxyContin Tablets were "for patients with moderate to severe pain requiring opioid therapy for more than a few days."

936. Abbott heavily incentivized its staff to push OxyContin, offering $20,000 cash prizes and luxury vacations to top performers. Abbott's almost religious zeal to sell the drug is evident in the wide use of terminology from the Middle Ages Crusades: sales representatives were called "royal crusaders" and "knights" in internal documents, supervised by the "Royal Court of OxyContin"—executives referred to in memos as the "Wizard of OxyContin," "Supreme Sovereign of Pain Management," and the "Empress of Analgesia." The head of pain care sales, Jerry Eichhorn, was the "King of Pain," and signed memos simply as "King."[489]




937. Abbott, in a 1997 document, indicated that prescriptions written by "Abbott MD's" comprised 25% of all OxyContin prescriptions. In addition, Purdue's budget records reveal details of the payments to Abbott for its OxyContin work, which were termed "commissions." From 1996

[489] *Secret Trove, supra.*

through 2002, Abbott was paid $374 million in commissions, according to those documents. Total sales of the drug during that time were nearly $5 billion.[490]

938. From 2003 to 2006, OxyContin sales were nearly $6 billion. From 1996 to 2005, inclusive, Abbott's "commissions" exceeded $500 million. The importance of targeting hospital emergency rooms was illustrated by a study that demonstrated that patients who receive an opiate prescription within 7 days of surgery are 44% more likely to still be using the medication one year after surgery than patients who do not receive an opioid prescription.[491]

939. These efforts were so effective that when bad press ultimately started to be received by Abbott about OxyContin abuses, Abbott sales representatives worked with Purdue representatives religiously to take on the abuse problem head-on and found that negative press was not changing the prescribing habits of OxyContin prescribers.

940. Abbott knew as early as 1999 that OxyContin was being improperly shared between patients but when confronted with this knowledge, Abbott chose to adjust its selling points to insist that doctors should really weigh the high value of patient's pain relief with OxyContin against the chance of pills being shared.

941. On or about July 29, 2020, Abbott filed a claim in the Purdue Bankruptcy, seeking contribution and/or indemnification for any liabilities to be accrued by Abbott relating in any way to opioids. Abbott expressly invoked indemnification provisions in the 1996 Co-Promotion Agreement, which Abbott alleged were still in force, and required Purdue to indemnify Abbott for at least some liabilities accrued by Abbott relating to opioids.

---

[490] *Id.*

[491] *Opioid Exit Plan, supra*, at 593.

942. On November 24, 2020, Abbott's marketing partner, Purdue, pleaded guilty to federal criminal charges relating to the marketing of OxyContin and other opioid products. This is the second time that Purdue has pleaded guilty to federal criminal charges related to its marketing of opioids.[492]

### 2. Abbott's Other Promotion of Opioids

943. Abbott was, at least at all times pre-Spinoff, an active member of the National Pharmaceutical Council (NPC).

944. Between approximately 1999 and 2003, Abbott was a leader in Front Groups and a leading supporter of the JCAHO/Joint Commission Guideline creation, discussed *supra*, used against hospitals in the late 1990s and early 2000s. Abbott was one of six organizations that provided support for the Joint Commission's pain management program, which culminated in the promulgation, implementation, and enforcement of its 2001 Pain Guidelines against hospitals that it accredited.

945. In 2000, Abbott continued to aggressively market OxyContin, but in addition to the above measures, it also utilized the recently adopted pain care standards issued by the Joint Commission. Abbott instructed its sales force to leverage the new pain guidelines, which had been made part of the accreditation requirements for hospitals, by reminding doctors and hospitals that if they did not treat pain they could risk the hospital's accreditation.

946. According to records of the Joint Commission, Abbott contributed to the Joint Commission in March 2003 for "honoraria and related expenses" concerning "Topic: JCAHO Standards Related to Sedation, Pain Management and Restraint issues" and additional funds in October 2010 for "honoraria and related expenses" concerning "Topic: How Quality Measures are Developed and Used by Providers/Payer."

---

[492] *Opioid Manufacturer Purdue Pleads Guilty to Fraud and Kickback Conspiracies*, U.S. Dep't Just. (Nov. 24, 2020), https://www.justice.gov/opa/pr/opioid-manufacturer-purdue-pharma-pleads-guilty-fraud-and-kickback-conspiracies.

947. Abbott was an original member of the Pain Care Forum ("PCF"), formed in 2006, and Abbott expanded the number of its representatives participating in PCF by 2010. Abbott was listed as a participating organization on a membership directory in February 2010, listing four Abbott employees as participants.

948. In 2007, Abbott funded prominent KOL Scott Fishman, who published his notorious book, *Responsible Opioid Prescribing, a Physician's Guide*.

949. Abbott funded leading KOL Russell Portenoy. A 2007 fundraising prospectus from Dr. Portenoy's program shows that his program received millions of dollars over the preceding decade in funding from opioid makers including Endo, Abbott, Cephalon, Purdue, and J&J.

950. Abbott funded a medical writer to assist authors with a manuscript preparation for a CME designed to promote the broader use of opioids: *Opioids May be Useful for Chronic Noncancer Pain Management in Primary Care* by L. Barclay & P. Murata.

951. Abbott also utilized APS's *Journal of Pain* to disseminate marketing materials directed at physicians. For example, Abbott conducted a survey entitled "Unmet needs: among patients experiencing acute and chronic pain: Results from a survey of 606 pain patients and 491 physicians," published in APS's *Journal of Pain* in April 2008. The authors claimed the survey showed that "end-of-dose pain" occurred in over 90% of the paint patients and further "highlights some unmet needs experienced by pain patients taking IR medications."[493]

### 3. Abbott's Sales of Vicodin and Other Opioids

952. On June 30, 2002, Abbott completed its acquisition of the pharmaceutical assets of BASF SE (a German conglomerate). These assets included the business entity then known as Knoll Pharmaceuticals (Knoll Pharmaceuticals and its successor entities are referred to as "Knoll").

---

[493] P. Vo, et al., *Unmet Needs: Among Patients Experiencing Acute and Chronic Pain: Results from a Survey of 606 Pain Patients and 491 Physicians*, 9 Suppl. 2 J. Pain. 69 (2008), https://www.jpain.org/article/S1526-5900(08)00298-8/fulltext.

953. Knoll is the creator of at least two opioid products, and has held, at all pertinent times, the patents for these products. The first is Dilaudid, the brand name for hydromorphone, a legacy opioid invented in the 1920s. The second is Vicodin, the brand name for a composite product containing hydrocodone and acetaminophen, first approved in the early 1980s.

954. Knoll was an Abbott subsidiary at all times from June 30, 2002 to January 1, 2013. Abbott directed and controlled all of Knoll's conduct and operations relating to Knoll's pharmaceutical business, including all operations relating to opioids.

955. At all times between June 30, 2002, and January 1, 2013, Abbott manufactured and sold Dilaudid and Vicodin.

956. At all times (at the very least) between 2003 and late-2008, Abbott was planning to sell a controlled-release version of Vicodin, which it referred to internally as "Vicodin CR," and had a large staff of sales representative prepared to market the product—but the FDA denied approval for the product in late 2008.

957. The hydrocodone/acetaminophen composite originally developed by Knoll (which includes Vicodin, and now its generic versions) is the <u>dominant</u> form of opioid. At most (if not all) pertinent times in the past 30 years, it has been the most prescribed painkiller of any kind. In 2012, hydrocodone/acetaminophen was prescribed approximately 135 million times. In 2017, hydrocodone/acetaminophen represented approximately half of the U.S. painkiller market. In at least some years, hydrocodone/acetaminophen has been the most prescribed medication <u>of any kind</u> in the United States.

958. One reason for the brisk sales was that, until 2014, hydrocodone/acetaminophen was a Schedule III drug (rather than Schedule II, as it is today). As such, prescriptions could be refilled by patients without additional prescriptions. In fact, Knoll made this part of the basis for its promotion of Vicodin in the 1980s and 1990s. Knoll marketed Vicodin as "The Highest Potency Pain Relief You

Can Still Phone In." Knoll used such advertising on trinkets and toys, such as fanny packs and water bottles bearing the name "Vicodin," to promote increased sales.

959. Abbott's sales of Vicodin generated $166 million in revenues in 2010 and $168 million in 2011. Upon information and belief, revenues were of a similar dimension in other time periods.

### 4. AbbVie's Continued Sale of Opioids and Support of Front Groups

960. In addition to being liable for Abbott's pre-Spinoff conduct as a matter of contract and successorship law, AbbVie itself engaged in actionable conduct and immediately joined the conspiracy described herein. AbbVie continued Abbott's pharmaceutical operations in all material respects, picking up right where Abbott left off.

961. Jerry Eichhorn, the notorious "King of Pain" and head of sales at Abbott in the 1990s, never left the business. Eichhorn became the senior marketing executive at AbbVie.[494]

962. At all times between January 1, 2013, and at least November 17, 2018, AbbVie manufactured and sold Dilaudid and Vicodin.

963. AbbVie participated in many collaborative efforts to promote opioid use.

964. AbbVie contributed a total of $705,000 to AfPA spread out between 2014 ($175,000); 2015 ($125,000); and 2016 ($405,000). "Since 2012, the AfPA has received at least $2.1 million in payments for opioid manufacturers including AbbVie, Endo, Grunenthal, Mallinckrodt, Pfizer, Purdue and Teva. Open Payments data further shows that . . . doctors who sat on the organization's board of directors have received more than $5 million in payments from pharmaceutical manufacturers and device manufacturers, of which $1.9 million came from opioid makers." AbbVie paid Robin Dore, one of the directors, $145,000.

965. AbbVie contributed a total of $919,500 to USPF starting in 2014; most of the contributions occurred in 2016 ($310,000); 2017 ($300,000); and 2018 ($300,000).

---

[494] *Secret Trove*, *supra*.

966. Between 2013 and 2015, AbbVie also contributed to AAPM and ACPA.

967. A 2020 U.S. Senate report specifically identifies AbbVie as a major funder of the ten Front Groups that it looked at during the period from 2012 to 2019. "Based upon payment data collected for this investigation, between 2012 and 2019, drug manufacturers that marketed opioids or opioid-related therapies paid almost $30 million to these organizations . . . major funders included . . . AbbVie, which made payments of more than $1.6 million."[495]

968. On May 8, 2020, AbbVie completed its acquisition of Defendant Allergan for $63 billion. Through that acquisition it acquired, at the very least, Allergan's branded opioid product lines, including Kadian. AbbVie has disclosed on its most recent Form 10-K filed with the SEC that Allergan faces over 3,000 lawsuits relating to opioids.[496]

969. AbbVie never took any affirmative act to leave, or even distance itself from, the conspiracy alleged herein.

**F. <u>Mallinckrodt (unnamed associate)</u>**

970. Mallinckrodt promulgated and spread misinformation about opioids to prescribers and consumers, nationwide and in Arizona, to convince doctors to prescribe and consumers to purchase and consume branded and generic opioid products.

971. Mallinckrodt's false and misleading misrepresentations reached Arizona healthcare providers, who wrote prescriptions as a result of its deceptive actions. This foreseeably resulted in the crisis of addiction and abuse and the resulting ongoing harms to Plaintiffs described herein.

972. Mallinckrodt sold medically unjustifiable quantities of opioids in Arizona and knew or should have known that its opioids were being diverted.

---

[495] *December 2020 Senate Bipartisan Opioids Report*, *supra*, at 9.

[496] AbbVie, Inc., *Form 10-K* (Feb. 19, 2021), https://investors.abbvie.com/static-files/b1ca3ffe-226e-499d-992e-344f42d470d1.

973. Mallinckrodt promoted its branded opioids Exalgo and Xartemis XR, and opioids generally, in a campaign that consistently mischaracterized the risk of addiction. Mallinckrodt did so through its website and sales force, as well as through unbranded communications distributed through the C.A.R.E.S. Alliance. Its sales team also marketed its generic opioids.

974. As some manufacturers and distributors began to raise their standards for selling and distributing oxycodone, Mallinckrodt advertised its opioids as more accessible alternatives that were ready to fill the void and as a replacement for OxyContin.

975. Mallinckrodt made and/or disseminated deceptive statements and concealed material facts in such a way to make its statements deceptive, including, but not limited to, the following:

a. Creating and promoting publications that misrepresented and trivialized the risks of addiction;

b. Creating and promoting publications that overstated the benefits of opioids for chronic pain; and

c. Making deceptive statements about pseudoaddiction.

976. Mallinckrodt and its representatives made, and continue to make, these and other misrepresentations in order to increase opioid prescriptions.

**1. Promotion of Specific Opioid Products**

977. Mallinckrodt advertised Exalgo and Xartemis XR as abuse resistant. For example, one Mallinckrodt press release stated that "the physical properties of EXALGO may make it difficult to extract the active ingredient using common forms of physical and chemical tampering, including chewing, crushing and dissolving."[497] However, one member of the FDA's Controlled Substance Staff noted in 2010 that hydromorphone has "a high abuse potential comparable to oxycodone" and further

[497] *FDA Approves Mallinckrodt's EXALGO® (hydromorphone HCl) Extended-Release Tablets 32 mg (CII) for Opioid-Tolerant Patients with Moderate-to-Severe Chronic Pain*, Fierce Biotech (Aug. 27, 2012), https://www.fiercebiotech.com/biotech/fda-approves-mallinckrodt-s-exalgo-r-hydromorphone-hcl-extended-release-tablets-32-mg-cii.

stated that "we predict that Exalgo will have high levels of abuse and diversion." Moreover, Mallinckrodt knew, and has known for years, that its opioids were at high risk of being abused, and that abuse-resistant formulas did not make opioids less addictive. It also knew that its opioids were sought after by drug abusers and that even its abuse-resistant opioid formulations could deliver a fatal dose if crushed and consumed.

978. With respect to Xartemis XR, Mallinckrodt's promotional materials stated that "XARTEMIS XR has technology that requires abusers to exert additional effort to extract the active ingredient from the large quantity of inactive and deterrent ingredients."[498]

979. Demonstrating the importance of detailing to its business, in anticipation of Xartemis XR's approval, Mallinckrodt added 150 to 200 sales representatives to promote it.[499]

980. In a 2013 *Mallinckrodt Pharmaceuticals Policy Statement Regarding the Treatment of Pain and Control of Opioid Abuse*, which is still available online, Mallinckrodt stated, "Sadly, even today, pain frequently remains undiagnosed and either untreated or undertreated," and cited to a report that concludes, "the majority of people with pain use their prescription drugs properly, are not a source of misuse, and should not be stigmatized or denied access because of the misdeeds or carelessness of others."[500]

981. As late as 2020, Mallinckrodt's website, in a section on responsible use of opioids, claimed that "[t]he effective pain management offered by our medicines helps enable patients to stay

[498] *Balancing Effective Treatment with Responsible Use*, Mallinckrodt Pharmaceuticals, https://web.archive.org/web/20200601233634/http://mallinckrodt.com/corporate-responsibility/responsible-use/ (last accessed July 18, 2021 as of June 1, 2020) (hereinafter *Balancing Effective Treatment*).

[499] Samantha Liss, *Mallinckrodt Banks on New Painkillers for Sales*, St. Louis Bus. J. (Dec. 20, 2013), https://argentcapital.com/2013/12/30/mallinckrodt-banks-on-new-painkillers-for-sales/.

[500] Mallinckrodt Pharmaceuticals, *Mallinckrodt Pharmaceuticals Policy Statement Regarding the Treatment of Pain and Control of Opioid Abuse*, https://web.archive.org/web/20131117191421/http://www.mallinckrodt.com/Responsibility/Product_Safety_Stewardship/ (last accessed July 21, 2021 as of Nov. 17, 2013).

in the workplace, enjoy interactions with family and friends, and remain an active member of society."[501]

### 2. General (Unbranded) Promotion of Opioids

982. Mallinckrodt instructed physicians that opioid doses can be safely increased with no ceiling dose and encouraged doctors to dramatically increase patients' dosages. In so doing, it misrepresented the risks associated with taking increasingly high doses of opioids—risks that include addiction and fatal overdose.

983. Mallinckrodt used and supported Front Groups to convey misleading messages about the safety and efficacy of prescription opioids. These groups included FSMB, AfPA, ACPA, NPC, HDA, USPF, and CO*RE.

984. Mallinckrodt had close relationships with numerous KOLs, including Drs. Webster, Fishman, and Arnstein.

985. Dr. Lynn Webster served on the company's Advisory Board and performed a study about the anti-deterrent effects of Mallinckrodt's drugs that the company relied on in its marketing materials.

986. Dr. Scott Fishman's book, *Responsible Opioid Prescribing*, was given away for free by Mallinckrodt's C.A.R.E.S. Alliance.[502]

987. Mallinckrodt promoted the publication *Defeat Chronic Pain Now!* through the C.A.R.E.S. Alliance.[503] This publication includes numerous misleading or false statements that promoted the widespread use of opioids. "[I]n our opinion," the book's authors explained,"many of these folks on TV [shows about opioid addiction] appeared not to be addicted, but rather had developed a physical dependence, which is a normal bodily reaction that happens with lots of different types of medication,

[501] *Balancing Effective Treatment*, *supra*.
[502] *C.A.R.E.S. Alliance Tools*, *supra*, at 8.
[503] *C.A.R.E.S. Alliance Tools*, *supra*, at 13.

including medications not used for pain, and is easily remedied." *Defeat Chronic Pain Now!* also represented that "[o]pioids, even if taken chronically, can be safely and comfortably stopped by gradually reducing the dosage, usually by 10 percent every five to seven days." In a mock Q&A, a patient with chronic pain expresses concern that opioid treatment might result in addiction, but the authors respond, "We definitely would try [opioid] treatment for our patients in your situation" because "[i]t is very uncommon for a person with chronic pain to become 'addicted' to narcotics IF (1) he doesn't have a prior history of any addiction and (2) he only takes the medication to treat pain." The authors also argue that, like addiction, "the issue of tolerance is overblown." *Defeat Chronic Pain Now!* remains available for purchase online today.[504]

988. Other false claims and misrepresentations in this book include:

a. "Only rarely does opioid medication cause a true addiction when prescribed appropriately to a chronic pain patient who does not have a prior history of addiction."

b. "It is currently recommended that every chronic pain patient suffering from moderate to severe pain be viewed as a potential candidate for opioid therapy." "When chronic pain patients take opioids to treat their pain, they rarely develop a true addiction and drug craving."

c. "Only a minority of chronic pain patients who are taking long-term opioids develop tolerance."

d. "<u>The bottom line:</u> Only rarely does opioid medication cause a true addiction when prescribed appropriately to a chronic pain patient who does not have a prior history of addiction."

e. "Studies have shown that many chronic pain patients can experience significant pain relief with tolerable side effects from opioid narcotic medication when taken daily and no addiction."

989. Dr. Fishman published a glowing review of *Defeat Chronic Pain Now!*.[505]

---

[504] Charles Argoff & Bradley Galer, *Defeat Chronic Pain Now!: Groundbreaking Strategies for Eliminating the Pain of Arthritis, Back and Neck Conditions, Migraines, Diabetic Neuropathy, and Chronic Illness* (2010).

[505] *Defeat Chronic Pain Now Website*, *supra*.

990. The FAQs section of *pain-topics.org*, a now-defunct website for which Mallinckrodt provided funding, also contained misleading information about pseudoaddiction. Specifically, the website advised providers to "keep in mind" that signs of potential drug diversion, rather than signaling "actual" addiction, "may represent pseudoaddiction," which the website described as behavior that occurs in patients when pain is "undertreated" and includes patients becoming "very focused on obtaining opioid medications and may be erroneously perceived as 'drug seeking.'"[506]

991. Mallinckrodt made thousands of payments to physicians nationwide, ostensibly for activities including participating on speakers' bureaus, providing consulting services, and assisting in post-marketing safety surveillance, but in fact for deceptively promoting and maximizing the use of opioids.

### 3. Suspicious Order Monitoring

992. Mallinckrodt knew its anti-diversion program was inadequate. The *Washington Post* has reported that in 2009, a law-enforcement task force informed Mallinckrodt of a bust in which Mallinckrodt's pills were recovered. Mallinckrodt identified the distributor responsible for the diverted drugs (which had a long history of egregious opioid purchases). Yet in the six weeks after the bust, Mallinckrodt reportedly shipped an additional 2.1 million oxycodone tablets to the same distributor.[507]

### 4. Enforcement Actions

993. On July 11, 2017, Mallinckrodt agreed to pay $35 million to resolve a federal investigation that had been underway since at least 2011. The government alleged that "Mallinckrodt failed to design and implement an effective system to detect and report 'suspicious orders' for

---

[506] *FAQs Evidence-Based Answers*, Pain Treatment Topics, https://web.archive.org/web/20131012185504/http://pain-topics.org/faqs/index1.php (last visited July 21, 2021 as of Oct. 12, 2013).

[507] Lenny Bernstein & Scott Higham, *The Government's Struggle to Hold Opioid Manufacturers Accountable* (Apr. 2, 2017), https://www.washingtonpost.com/graphics/investigations/dea-mallinckrodt/

controlled substances – orders that are unusual in their frequency, size, or other patterns . . . [and] Mallinckrodt supplied distributors, and the distributors then supplied various U.S. pharmacies and pain clinics, an increasingly excessive quantity of oxycodone pills without notifying DEA of these suspicious orders."[508]

994. As part of this settlement, Mallinckrodt agreed that at certain times from 2008 through 2011, aspects of Mallinckrodt's system to monitor and detect suspicious orders were inadequate to prevent diversion. Mallinckrodt publicly stated that it would improve its internal controls.[509]

995. In the press release accompanying the settlement, the Department of Justice stated:

> [Mallinckrodt] did not meet its obligations to detect and notify DEA of suspicious orders of controlled substances such as oxycodone, the abuse of which is part of the current opioid epidemic. These suspicious order monitoring ("SOM") requirements exist to prevent excessive sales of controlled substances, like oxycodone. . . . Mallinckrodt's actions and omissions formed a link in the chain of supply that resulted in millions of oxycodone pills being sold on the street. . . . Manufacturers and distributors have a crucial responsibility to ensure that controlled substances do not get into the wrong hands. . . .[510]

996. The Memorandum of Agreement entered into by Mallinckrodt avers, "As a registrant under the CSA, Mallinckrodt had a responsibility to maintain effective controls against diversion, including a requirement that it review and monitor these sales and report suspicious orders to DEA."[511] Mallinckrodt further acknowledged that it "recognizes the importance of the prevention of diversion of the controlled substances they manufacture" and agreed that it would "design and operate a system that meets the requirements of 21 C.F.R. § 1301.74(b) . . . [such that it would] utilize all available transaction information to identify suspicious orders of any Mallinckrodt product."

---

[508] *Mallinckrodt Agrees to Pay Record $35 Million Settlement for Failure to Report Suspicious Orders of Pharmaceutical Drugs and for Recordkeeping Violations*, U.S. Dep't Just. (July 11, 2017), https://www.justice.gov/opa/pr/mallinckrodt-agrees-pay-record-35-million-settlement-failure-report-suspicious-orders (hereinafter *Mallinckrodt Agrees to Pay*).

[509] 2017 Mallinckrodt MOA, *supra*.

[510] *See Mallinckrodt Agrees to Pay*, *supra*.

[511] 2017 Mallinckrodt MOA, *supra*.

Mallinckrodt specifically agreed "to notify DEA of any diversion and/or suspicious circumstances involving any Mallinckrodt controlled substances that Mallinckrodt discovers."[512]

997. The Memorandum of Agreement further details the DEA's allegations regarding Mallinckrodt's failures to fulfill its legal duties as an opioid manufacturer:

a. Mallinckrodt's alleged failure to distribute oxycodone and hydrocodone products in a manner authorized by its registration and Mallinckrodt's alleged failure to operate an effective SOM system and to report suspicious orders to the DEA when discovered as required by and in violation of 21 C.F.R. § 1301.74(b). The above includes, but is not limited to Mallinckrodt's alleged failure to conduct adequate due diligence of its customers;

b. Detect and report to the DEA orders of unusual size and frequency;

c. Detect and report to the DEA orders deviating substantially from normal patterns including, but not limited to, those identified in letters from the DEA Deputy Assistant Administrator, Office of Diversion Control, to registrants dated September 27, 2006 and December 27, 2007:

   i. orders that resulted in a disproportionate amount of a substance which is most often abused going to a particular geographic region where there was known diversion,

   ii. orders that purchased a disproportionate amount of substance which is most often abused compared to other products, and

   iii. orders from downstream customers to distributors who were purchasing from multiple different distributors, of which Mallinckrodt was aware;

d. Use "chargeback" information from its distributors to evaluate suspicious orders; and

e. Take sufficient action to prevent recurrence of diversion by downstream customers after receiving concrete information of diversion of Mallinckrodt product by those downstream customers.[513]

998. Mallinckrodt acknowledged that "[a]s part of [its] business model Mallinckrodt collects transaction information, referred to as chargeback data, from [its] direct customers (distributors). The transaction information contains data relating to the direct customer sales of controlled substances to

---

[512] *Id.*
[513] *Id.* at 2–3.

'downstream' registrants." Mallinckrodt agreed that, from this data, it would "report to the DEA when Mallinckrodt concludes that the chargeback data or other information indicates that a downstream registrant poses a risk of diversion."[514]

999. Despite representing publicly that it would secure its supply chain, Mallinckrodt failed to take reasonable steps to prevent opioid diversion in Arizona. Mallinckrodt claimed that it was taking action, pointing to its participation in the "Anti-Diversion Industry Working Group, a collective of leading manufacturers and distributors of pharmaceutical controlled substances coming together to collaborate and share best practices . . . for opioid anti-diversion programs."[515] Similarly, Mallinckrodt has claimed to be "committed . . . to fighting opioid misuse and abuse," and has asserted, "We address diversion and abuse through a multidimensional approach that includes educational efforts [and] monitoring for suspicious orders of controlled substances . . . ."[516]

1000. On August 8, 2018, the U.S. House of Representatives Energy & Commerce Committee sent Mallinckrodt a letter requesting information about the company's SOM program. The request for information is part of the Committee's investigation into "potential breakdowns in the controlled substances supply chain which may have contributed to the nation's opioid epidemic." Members of this committee followed up with additional requests for information about the SOM program.[517]

---

[514] *Id.* at 5.

[515] *Mallinckrodt Will Respond to Sen. McCaskill's Request for Information on Opioid Anti-Diversion and Suspicious Order Monitoring Activities*, Mallinckrodt Pharmaceuticals (July 27, 2017), https://mallinckrodt.com/about/news-and-media/news-detail/?id=8601.

[516] *Mallinckrodt plc Receives FDA Approval for XARTEMIS XR (Oxycodone Hydrochloride and Acetaminophen) Extended-Released Tablets (CII)*, Mallinckrodt Pharmaceuticals (Mar. 12, 2014), https://www.mallinckrodt.com/about/news-and-media/news-detail/?id=7176.

[517] Letter from Reps. Greg Walden, Brett Guthrie, and H. Morgan Griffith, House Comm. Energy & Commerce, to Mark Trudeau, President and CEO, Mallinckrodt Pharmaceuticals (Jan. 13, 2020), https://republicans-energycommerce.house.gov/wp-content/uploads/2020/01/011320-Letter-to-Mallinckrodt-Pharmaceuticals.pdf.

### G. <u>Purdue (unnamed associate)</u>

1001. Purdue promulgated and spread misinformation about opioids to prescribers and consumers, nationwide and in Arizona, to convince doctors to prescribe and consumers to purchase and consume branded and generic opioid products.

1002. Purdue sold medically unjustifiable quantities of opioids in Arizona and knew or should have known that its opioids were being diverted. In fact, prior to 2010, a quarter of Purdue's revenue from 80 mg OxyContin tablets was attributable to black-market users snorting or injecting the drug.[518]

1003. Purdue's false and misleading misrepresentations reached Arizona healthcare providers, who wrote prescriptions as a result of its deceptive actions. This foreseeably resulted in the crisis of addiction and abuse and the resulting ongoing harms to Plaintiffs described herein.

1004. These misrepresentations began at the time of the initial approval of OxyContin by the FDA. In collaboration with Purdue, FDA regulator Curtis Wright drafted a sentence for the package insert that repeated one of Purdue's mantras: "Delayed absorption, as provided by OxyContin tablets, is believed to reduce the abuse liability of the drug."[519] This statement was unsupported by rigorous clinical evidence. In exchange for his assistance with obtaining FDA approval for OxyContin and for this misleading statement, Curtis Wright was rewarded with a $400,000 a year job at Purdue barely a year after leaving the FDA.[520] One of the federal prosecutors involved in the 2007 criminal case against Purdue has expressed the belief that even before he left the agency, "there was a secret deal cut" to give Wright this job.[521]

---

[518] *Empire of Pain*, *supra*, at 312–13.
[519] *Id.* at 195.
[520] *Id.* at 195–96.
[521] *Id.* at 268.

1005. To further insulate itself from oversight, Purdue in the early 2000s hired as a consultant a U.S. Attorney who was among the first to raise alarms about OxyContin abuse. Joe Famularo, who had characterized OxyContin as a "locust plague" devastating his state, began working as an unpaid consultant (who nevertheless received speaker's fees) and began to praise OxyContin as a "fine product."[522]

1006. Purdue widely promoted the false notion that patients who take opioids for chronic pain face little to no risk of addiction. For example, Purdue claimed in a company press release that fear of addiction to opioids was "exaggerated"[523] and that "there is very little risk of addiction from the proper uses of" opioids. Purdue trivialized the risk of addiction in many documents over many years.

1007. Purdue misrepresented that doctors and patients could effectively screen for addiction risk using the *Opioid Risk Tool*, even though it cannot accurately predict a patient's risk of opioid addiction.

1008. Purdue knew by the mid-1990s that OxyContin was being abused, that it was being mentioned "on websites and in chat rooms frequented by drug abusers," and that "[m]onitoring that traffic" was "enough to keep a person busy all day."[524] By 1999, Purdue had received a tremendous amount of information indicating that OxyContin was being diverted and abused to a great extent in many states, including Arizona. Yet Purdue never adequately addressed the diversion and abuse of its opioid products.

1009. Purdue's label for OxyContin did not sufficiently disclose the true risks to, and experience of, its patients. However, the FDA made clear to Purdue as early as 2001 that the

---

[522] *Id.* at 248.

[523] Purdue Pharma, *New Hope for Millions of Americans Suffering from Persistent Pain: Long-Acting OxyContin Tablets Now Available to Relieve Pain* (May 31, 1996), https://documents.latimes.com/oxycontin-press-release-1996/ (hereinafter *OxyContin Press Release*).

[524] *Pain Killer*, *supra*.

disclosures in its OxyContin label were insufficient. In the end, Purdue narrowed the recommended use of OxyContin to situations when "a continuous, around-the-clock analgesic is needed for an extended period of time" and added a warning that "[t]aking broken, chewed, or crushed OxyContin tablets" could lead to a "potentially fatal dose." Purdue did not, until 2014, change the label to indicate that OxyContin should not be the first therapy (or even the first opioid) used and did not disclose the incidence or risk of overdose and death even when OxyContin was not abused. Purdue announced the label changes in a letter to health care providers.[525] Until 2014, the OxyContin label stated in a black-box warning that opioids have "abuse potential" and that the "risk for opioid abuse is increased in patients with a personal or family history of substance abuse."[526]

1010. Purdue made and/or disseminated deceptive statements and concealed material facts in such a way to make its statements deceptive, including, but not limited to, the following:

a. Creating, sponsoring, and assisting in the distribution of patient-education materials distributed to consumers that contained deceptive statements;

b. Creating and disseminating advertisements that contained deceptive statements concerning the ability of opioids to improve long-term function and misrepresented the evidence supporting the efficacy of long-term opioids treatment for chronic noncancer pain;

c. Disseminating misleading statements concealing the true risk of addiction and promoting the deceptive concept of pseudoaddiction through unbranded publications and internet sites that were marketed to and accessible by consumers;

d. Distributing brochures to doctors, patients, and law-enforcement officials that included deceptive statements concerning the indicators of possible opioid abuse;

e. Sponsoring, directly distributing, and assisting in the distribution of publications that promoted the deceptive concept of pseudoaddiction, even in high-risk patients;

[525] *Purdue Pharma Statement to 60 Minutes Regarding the Segment on Opioid Medicines Expected to Air Sunday, February 24, 2019*, Purdue Pharma (Feb. 22, 2019), https://www.purduepharma.com/news/2019/02/22/purdue-pharma-statement-to-60-minutes-regarding-the-segment-on-opioid-medicines-expected-to-air-sunday-february-24-2019/.

[526] *Full Prescribing Information: OxyContin* (Apr. 16, 2013), https://www.accessdata.fda.gov/drugsatfda_docs/label/2013/022272Orig1s014lbl.pdf.

f. Endorsing, directly distributing, and assisting in the distribution of publications that presented an unbalanced assessment of the long-term and dose-dependent risks of opioids versus non-opioid pain relievers;

g. Providing significant financial support to pro-opioid KOLs who made deceptive statements concerning the use of opioids to treat chronic noncancer pain;

h. Providing essential financial support to pro-opioid pain organizations that made deceptive statements, including in patient education materials, concerning the use of opioids to treat chronic noncancer pain;

i. Assisting in the distribution of guidelines that contained deceptive statements concerning the use of opioids to treat chronic noncancer pain and misrepresented the risks of opioid addiction;

j. Endorsing and assisting in the distribution of CMEs containing deceptive statements concerning the use of opioids to treat chronic noncancer pain;

k. Developing and disseminating scientific studies that misleadingly concluded opioids are safe and effective for the long-term treatment of chronic noncancer pain and improve quality of life and that concealed contrary data;

l. Assisting in the dissemination of literature written by pro-opioid KOLs that contained deceptive statements concerning the use of opioids to treat chronic noncancer pain;

m. Creating, endorsing, and supporting the distribution of patient and prescriber education materials that misrepresented the data regarding the safety and efficacy of opioids for the long-term treatment of chronic noncancer pain, including known rates of abuse and addiction and the lack of validation for long-term efficacy;

n. Targeting veterans by sponsoring and disseminating patient education marketing materials that contained deceptive statements concerning the use of opioids to treat chronic noncancer pain, despite knowing that opioids can have fatal interactions with benzodiazepines, a drug commonly used to treat PTSD;

o. Targeting the elderly by assisting in the distribution of guidelines that contained deceptive statements concerning the use of opioids to treat chronic noncancer pain and misrepresented the risks of opioid addiction in this population;

p. Disseminating misleading statements in educational materials to hospital doctors and staff while purportedly educating them on new pain standards;

q. Making deceptive statements concerning the use of opioids to treat chronic noncancer pain to prescribers through in-person detailing; and

r. Withholding from law enforcement the names of prescribers Purdue believed to be facilitating the diversion of its opioids, while simultaneously marketing opioids

to these doctors by disseminating patient- and prescriber-education materials and advertisements and CMEs that Purdue knew would reach these same prescribers.

1011. Purdue and its representatives made, and continue to make, these and other misrepresentations about opioids.

1012. More specifically, Purdue made and/or disseminated deceptive statements and promoted a culture that misled doctors and patients into believing opioids were a safe treatment for chronic pain, including, but not limited to, the following:

a. In 1998, Purdue distributed 15,000 copies of an OxyContin video to physicians without submitting it to the FDA for review, an oversight later acknowledged by Purdue. After Purdue submitted a second version of the video, the FDA concluded that the video minimized the risks from OxyContin and made unsubstantiated claims regarding its benefits to patients.[527]

b. According to training materials, Purdue instructed sales representatives to assure doctors—repeatedly and without evidence—that "fewer than one per cent" of patients who took OxyContin became addicted.[528]

c. Andrew Kolodny, the co-director of the Opioid Policy Research Collaborative at Brandeis University, has worked with hundreds of patients addicted to opioids. He has stated that, though many fatal overdoses have resulted from opioids other than OxyContin, the crisis was initially precipitated by a shift in the culture of prescribing—a shift carefully engineered by Purdue. "If you look at the prescribing trends for all the different opioids, it's in 1996 that prescribing really takes off," Kolodny said. "It's not a coincidence. That was the year Purdue launched a multifaceted campaign that misinformed the medical community about the risks."[529]

d. Purdue had a speakers' bureau, and it paid several thousand clinicians to attend medical conferences and deliver presentations about the merits of its drug. Doctors were offered all-expenses-paid trips to pain-management seminars in places like Boca Raton. Such spending was worth the investment: doctors who attended these seminars in 1996 wrote OxyContin prescriptions more than twice as often as those who didn't.[530]

---

[527] U.S. Gov't Accountability Office, GA-04-110, *Prescription Drugs: OxyContin Abuse and Diversion and Efforts to Address the Problem* (2004), https://www.gao.gov/assets/gao-04-110.pdf.

[528] Patrick Radden Keefe, *The Family That Built an Empire of Pain*, New Yorker (Oct. 23, 2017), https://www.newyorker.com/magazine/2017/10/30/the-family-that-built-an-empire-of-pain (hereinafter Keefe, *Family*).

[529] *Id.*

[530] *Id.*

e. The company advertised in medical journals, sponsored websites about chronic pain, and distributed a dizzying variety of OxyContin swag: fishing hats, plush toys, and luggage tags.[531]

f. Purdue also produced promotional videos featuring satisfied patients—like a construction worker who talked about how OxyContin had eased his chronic back pain, allowing him to return to work. The videos, which also included testimonials from pain specialists, were sent to tens of thousands of doctors. The marketing of OxyContin relied on an empirical circularity: the company convinced doctors of the drug's safety with literature that had been produced by doctors who were paid, or funded, by the company.[532]

g. Purdue encouraged sales representatives to increase sales of OxyContin through a lucrative bonus system, which resulted in a large number of visits to physicians with high rates of opioid prescriptions. "In 2001, Purdue paid $40 million in bonuses to its sales representatives."[533]

h. By 2003, the DEA found that Purdue's "aggressive methods" had "very much exacerbated OxyContin's widespread abuse." Rogelio Guevara, a DEA senior official, concluded that Purdue had "deliberately minimized" the risks associated with the drug.[534]

**1. Promotion of Specific Opioid Products**

1013. In its 1996 press release announcing the release of OxyContin, for example, Purdue declared, "The fear of addiction is exaggerated."[535]

1014. Purdue used the Porter & Jick Letter in a 1998 promotional video, "I got my life back," in which Dr. Alan Spanos states, "In fact, the rate of addiction amongst pain patients who are treated by doctors <u>is much less than 1%.</u>"[536]

1015. In a patient brochure, *A Guide to Your New Pain Medicine and How to Become a Partner Against Pain*, Purdue misleadingly claimed that "legitimate" pain patients would not face a risk of addiction. In response to the question "Aren't opioid pain medications like OxyContin Tablets

---

531 *Id.*
532 *Id.*
533 *Id.*
534 *Id.*
535 *OxyContin Press Release*, *supra*.
536 *Purdue Pharma OxyContin Commercial*, YouTube, https://www.youtube.com/watch?v=Er78Dj5hyeI (emphasis added) (last visited July 21, 2021).

'addicting'?" Purdue claimed that there was no need to worry about addiction if taking opioids for legitimate, "medical" purposes: "Drug addiction means using a drug to get 'high' rather than to relieve pain. You are taking opioid pain medication for medical purposes. The medical purposes are clear and the effects are beneficial, not harmful."

1016. Despite its acknowledgment that "[w]e do not have such data to support OxyContin promotion," Purdue ran a full-page ad for OxyContin in the *Journal of the American Medical Association*, proclaiming, "There Can Be Life With Relief," and showing a man happily fly-fishing alongside his grandson. By implying that OxyContin would help users' function, this ad earned a warning letter from the FDA, which admonished, "It is particularly disturbing that your November ad would tout 'Life With Relief' yet fail to warn that patients can die from taking OxyContin."[537]

1017. A series of medical journal advertisements for OxyContin in 2012 presented "Pain Vignettes"—case studies featuring patients with pain conditions persisting over several months—that implied functional improvement. For example, one advertisement described a "writer with osteoarthritis of the hands" and implied that OxyContin would help him work more effectively.

1018. In its marketing, Purdue focused on "naïve" patients and on keeping patients on opioids longer. A particularly insidious aspect of this was Purdue's savings card program. The cards provided a discount on a patient's first five prescriptions. In 2012, Purdue's internal ten-year plan highlighted its discovery that opioid savings cards kept patients on opioids longer: "more patients remain on OxyContin after 90 days." The savings card program was incredibly lucrative. The return on investment for Purdue was 4.28, so that every $1,000,000 given away in savings came back to Purdue as $4,280,000 in revenue—because patients stayed on dangerous opioids longer. Discounts

[537] Chris Adams, *FDA Orders Purdue Pharma To Pull Its OxyContin Ads*, Wall St. J. (Jan. 23, 2003), https://www.wsj.com/articles/SB1043259665976915824.

could have cut Purdue's revenue if patients took opioids only for a short time. But because the card program kept patients on opioids longer, Purdue profited.

1019. Purdue employed sales representatives in Arizona to promote Purdue's opioids in Arizona and sold millions of dollars of opioids in Arizona. Aggressive and frequent visits to prescribers were always Purdue's most important marketing technique. Purdue's representatives made numerous sales calls to health care providers in Arizona.

1020. Each of these in-person sales visits cost Purdue money—on average more than $200 per visit. But Purdue made that money back many times over because it convinced doctors to prescribe its addictive drugs. When Purdue identified doctors as profitable targets, Purdue visited them frequently—often weekly, sometimes nearly daily. Purdue detailers asked doctors to list specific patients they were scheduled to see and pressed the doctors to commit to prescribing these patients Purdue opioids. By the time a patient walked into a clinic, the doctor, in Purdue's words, had already "guaranteed" that he or she would prescribe Purdue's drugs.

1021. Purdue continued to incentivize its representatives to sell opioids even after some competitors had ended that practice. Representatives who failed to get enough patients on opioids were placed on probation, put on performance improvement plans, and threatened with termination if they did not generate more opioid sales. This was not an empty threat. In 2015 alone, Purdue replaced 14% of its sales representatives and 20% of its district managers for failing to generate enough opioid sales.

1022. To make sure doctors prescribed more opioids, Purdue tracked their prescriptions, visited their offices, bought them meals, and asked them to put specific patients on Purdue drugs. Purdue selected doctors to target based on its estimates of which doctors could be influenced to increase opioid prescriptions the most. Purdue managers told representatives to visit most often the doctors who were most likely to change their prescribing to benefit Purdue. Purdue sales

representatives visited Purdue's targets up to 200 times per year; those visits could cost Purdue up to $40,000 annually per doctor. Purdue did not spend that amount of money so sales representatives could watch doctors write prescriptions that they were already going to write anyway. Instead, Purdue paid to lobby these doctors because Purdue knew its representatives could and would convince them to put more patients on opioids, at higher doses, for longer periods. Those extra prescriptions paid back Purdue's investment many times over.

1023. In the fourth quarter of 2013, Purdue employed 632 sales representatives; during that quarter, they visited prescribers 176,227 times—an annualized rate of over 700,000 visits. Purdue executives told Mark Radcliffe and other sales managers that sales representatives should be committed to increasing opioid prescriptions. Purdue's budget for Sales and Promotion for 2013 was $312,563,000. In 2013, Purdue spent over $9 million on meals alone for its prescribers.

1024. Purdue intensified its marketing efforts in subsequent years, in an effort to counteract decreasing sales. For 2018, Purdue approved a target for sales representatives to visit prescribers 1,050,000 times—which on information and belief would include numerous visits to Arizona prescribers—almost double the number of sales visits they had ordered during the peak of OxyContin sales in 2010.

1025. Purdue trained its sales representatives to deliver a wide range of misinformation about opioids to prescribers in Arizona. For example, an article in the *American Journal of Public Health* noted that "Purdue trained its sales representatives to carry the message that the risk of addiction was 'less than one percent.'"[538] Purdue knew that there was no legitimate scientific basis for this claim, which came from an anecdote in a one-paragraph letter to the editor. Rather, as early as the 1990s, studies

[538] *Commercial Triumph*, *supra*.

demonstrated rates of prescription-drug abuse among chronic-pain patients as high as 34%. A Purdue-funded study of patients who used OxyContin for headaches found that the addiction rate was 13%.[539]

1026. According to documents provided by a former Purdue detailer, sales representatives were trained and tested on the meaning of pseudoaddiction, suggesting that they were directed to, and did, describe pseudoaddiction to prescribers.

1027. Sales representatives marketed OxyContin as a product "to start with and to stay with."[540] Sales representatives also received training in overcoming doctors' concerns about addiction with talking points about the drug's abuse potential that they knew to be untrue. One of Purdue's early training memos compared doctor visits to "firing at a target," declaring that "[a]s you prepare to fire your 'message,' you need to know where to aim and what you want to hit!"[541] According to the memo, the target is physician resistance: "The physician wants pain relief for these patients without addicting them to an opioid."[542]

1028. Former sales representative Steven May, who worked for Purdue from 1999 to 2005, explained to a journalist how he and his coworkers were trained to overcome doctors' objections to prescribing opioids. The most common objection he heard about prescribing OxyContin was that "it's just too addictive."[543] May and his coworkers were trained to "refocus" doctors on "legitimate" pain patients and to represent that "legitimate" patients would not become addicted. In addition, they were trained to say that 12-hour dosing made the extended-release opioids less "habit-forming" than painkillers that need to be taken every four hours.

---

[539] Keefe, *Family*, *supra*.
[540] *Id.*
[541] *Pain Killer*, *supra*, at 102.
[542] *Id.*
[543] David Remnick, *How OxyContin Was Sold to the Masses* (Steven May interview with Patrick Radden Keefe), New Yorker (Oct. 27, 2017), https://www.newyorker.com/podcast/the-new-yorker-radio-hour/how-oxycontin-was-sold-to-the-masses.

1029. Purdue managers praised sales representatives for pitching doctors on the idea that prescribing to "trustworthy" patients was safe. A sales rep reported that one doctor "let me know that she will Rx OxyContin when the pts [patients] has chronic pain and are trustworthy." The rep added that he would "[f]ollow up with Dr and ask what pts does she consider 'trust worthy?'" A Purdue district manager responded: "Great follow up question on what patients does he consider trustworthy."

1030. Purdue sales representatives regularly overstated and misstated the evidence for and impact of the abuse-deterrent features of these opioids. Specifically, Purdue sales representatives:

a. claimed that Purdue's ADF opioids prevent tampering and could not be crushed or snorted;

b. claimed that Purdue's ADF opioids reduce opioid abuse and diversion;

c. asserted or suggested that Purdue's ADF opioids are non-addictive or less addictive;

d. asserted or suggested that Purdue's ADF opioids are safer than other opioids, could not be abused or tampered with, and were not sought out for diversion; and

e. failed to disclose that Purdue's ADF opioids do not impact oral abuse or misuse.

1031. Purdue used sales representatives to cause prescribers to prescribe higher doses. This was manifested in Purdue's *Individualize the Dose* campaign and was communicated to prescribers in detailers' visits. Sales representatives were relentlessly pressured to increase the average doses prescribed in their territories. An aspect of this strategy was to encourage faster upward titration—moving quickly from smaller to larger doses. The lowest dosage of Purdue's Butrans product, for example, was described to prescribers as an "introductory" dose that would presumptively be increased for most if not all patients.

1032. Purdue conducted a single study on osteoarthritis for its Butrans opioid, and it failed. Purdue admitted in internal documents that its opioids "are not indicated for a specific disease" and that "it is very important that you never suggest to your HCP [health care professional] that OxyContin

is indicated for the treatment of a specific disease state such as Rheumatoid Arthritis or Osteoarthritis." Nevertheless, to meet its business goals, Purdue trained its representatives to mislead doctors by promoting opioids for osteoarthritis without disclosing Purdue's failed trial. One Purdue manager even asked: "What can be said in response to a prescriber who asks directly or indirectly, 'can this product be prescribed for my patient with OA [osteoarthritis]?' In responding are we required to specifically mention the failed trials in OA?"

1033. Purdue also streamed videos to doctors on its OxyContin Physicians Television Network, which presented misrepresentations about opioids.

### 2. General (Unbranded) Promotion of Opioids

1034. Purdue utilized Front Groups to help disseminate and defend its false messages. These groups included APF, AAPM, APS, FSMB, UW-PPSG, JCAHO, AfPA, USPF, AGS, ACPA, NPC, CO*RE, PCF, HDA, the Academy of Integrative Pain Management, the ACS Cancer Action Network, the American Chronic Pain Association, the American Society of Pain Educators, the American Society of Pain Management Nursing, the Center for Practical Bioethics, and the Washington Legal Foundation.

1035. Purdue supported AGS's *Guidelines for the Pharmacological Management of Persistent Pain in Older Persons* (2009).[544]

1036. Purdue sponsored APF's *A Policymaker's Guide to Understanding Pain & Its Management*, which taught that "[s]ymptoms of physical dependence can often be ameliorated by gradually decreasing the dose of medication during discontinuation," but did not disclose the significant hardships that often accompany cessation of use. This publication also claimed that "multiple clinical studies" have shown that opioids are effective in improving daily function, psychological health, and health-related quality of life for chronic pain patients. But the article cited as support stated the

[544] *2006 AGS Guidelines*, *supra*.

contrary, noting the absence of long-term studies and concluding, "For functional outcomes, the other analgesics were significantly more effective than were opioids."

1037. Purdue and Cephalon sponsored the APF publication, *Treatment Options: A Guide for People Living with Pain.*[545]

1038. Purdue engaged KOLs, including Drs. Foley, Portenoy, Webster, Fine, Fishman, Haddox, Spanos, and Jackson as well as Jennifer Bolen, J.D., to make misrepresentations about opioids to physicians and the public. The KOLs used presentation slides created by Purdue while serving as faculty or speakers at meetings attended, on information and belief, by Arizona prescribers to make these misrepresentations.

1039. A Purdue email from 2004 noted that National Pain Education Council ("NPEC"), an organization also supported by Janssen, used "the same speakers [who] spoke for us at regional and national meetings."[546] Dr. Portenoy was cochair of the NPEC,[547] which, according to an internal Janssen document, was used to assist in marketing Duragesic.[548]

1040. Purdue funded a 2012 CME program called *Chronic Pain Management and Opioid Use: Easing Fears, Managing Risks, and Improving Outcomes*. The presentation deceptively instructed doctors that, through the use of screening tools, more frequent refills, and other techniques, even high-risk patients showing signs of addiction could be treated with opioids.

1041. A Purdue presentation for doctors titled *Medication Therapy Management* recited what had been the consensus view for decades: "Many medical students are taught that if opioids are prescribed in high doses or for a prolonged time, the patient will become an addict." Purdue then assured doctors that this traditional concern about addiction was wrong and that such patients instead

---

[545] *Treatment Options*, *supra*.

[546] Email from Harry Lazarus to Joseph DaBronzo, et al. (Mar. 24, 2004, 9:12 AM).

[547] *About NPEC*, Nat'l Pain Educ. Council, https://web.archive.org/web/20080517231127/http://www.npecweb.org/aboutnpec.asp?id=15&selMenu=2,0 (last visited July 21, 2021 as of May 17, 2008).

[548] *Duragesic (Fentanyl Transdermal System) CII: 2003 Business Plan Summary* 10, 13 (n.d.).

suffer from "pseudoaddiction" because "opioids are frequently prescribed in doses that are inadequate." Doctors on Purdue's payroll admitted in writing that pseudoaddiction was used to describe "behaviors that are clearly characterized as drug abuse" and put Purdue at risk of "ignoring" addiction and "sanctioning abuse." But Purdue nevertheless urged doctors to respond to signs of addiction by prescribing higher doses of Purdue's drugs.

1042. Purdue, acting with Endo, sponsored *Overview of Management Options*, a CME issued by the AMA in 2003, 2007, 2010, and 2013. The 2013 version remains available for CME credit. The CME taught that NSAIDs and other drugs, but not opioids, are unsafe at high doses.

1043. Purdue sponsored the misleading webinar, *Managing Patients' Opioid Use: Balancing the Need and Risk*.

1044. Purdue's educational brochure, *Providing Relief, Preventing Abuse*, claimed that addiction is only triggered in susceptible individuals. The brochure also represented that "pseudoaddiction has emerged in the literature to describe the inaccurate interpretation of behaviors in patients who have pain that has not been effectively treated." Addictive behavior, according to Purdue, did not preclude "successful opioid therapy." These statements are false.

1045. Purdue sponsored and distributed *Responsible Opioid Prescribing.*[549]

1046. Purdue's unbranded website, *PartnersAgainstPain.com*,[550] lied about the risks of addiction from the treatment of chronic pain with opioids: "Current Myth: Opioid addiction (psychological dependence) is an important clinical problem in patients with moderate to severe pain treated with opioids. Fact: Fears about psychological dependence are exaggerated when treating appropriate pain

[549] *Responsible Opioid Prescribing*, *supra*.

[550] *Partners Against Pain* consists of both a website, styled as an "advocacy community" for better pain care, and a set of medical education resources distributed to prescribers by sales representatives. It existed until at least 2015 and was a vehicle for Purdue to downplay the risks of addiction from long-term opioid use.

patients with opioids." These claims were repeated in a brochure published and distributed by Purdue.[551]

1047. In 2005, Purdue posted an unbranded pamphlet entitled *Clinical Issues in Opioid Prescribing* on *PartnersAgainstPain.com*. It circulated the physical pamphlet through at least 2007 and posted it on its website through at least 2013. The pamphlet listed conduct, including "illicit drug use and deception," that it claimed was not evidence of true addiction but rather "pseudoaddiction":

> A term which has been used to describe patient behaviors that may occur when pain is undertreated. Patients with unrelieved pain may become focused on obtaining medications, may 'clock watch," and may otherwise seem inappropriately "drug-seeking.' Even such behaviors as illicit drug use and deception can occur in the patient's efforts to obtain relief. Pseudoaddiction can be distinguished from true addiction in that the behaviors resolve when the pain is effectively treated.[552]

1048. Purdue sponsored the publication of *Exit Wounds*, which misrepresented the dangers of prescription opioids for veterans, discussed *supra*.[553]

1049. Purdue hired the most prolific opioid prescribers as spokespersons to promote its drugs to other doctors.

1050. "From 1996 to 2001, Purdue conducted more than 40 national pain-management and speaker training conferences at resorts in Florida, Arizona, and California. More than 5000 physicians, pharmacists, and nurses attended these all-expenses-paid symposia, where they were recruited and trained for Purdue's national speakers' bureau. It is well documented that this type of pharmaceutical company symposium influences physicians' prescribing even though the physicians who attend such symposia believe that such enticements do not alter their prescribing patterns."[554]

---

[551] Partners Against Pain, *Dispelling the Myths About Opioids* (1999).

[552] Partners Against Pain, *Clinical Issues in Opioid Prescribing: Considerations for the Practitioner in the Use of Opioids in Managing Moderate to Severe Pain*

[553] *Empire of Pain*, *supra*, at 297.

[554] *Commercial Triumph*, *supra*.

1051. In presentations to prescribers, Purdue cited research by KOL Dr. Haddox on "pseudoaddiction" to support the false and perverse proposition that the proper response to signs of addiction is *more* opioids.

### 3. Claims about ADFs

1052. Purdue introduced reformulated ADF OxyContin shortly before generic versions of OxyContin were to become available. Purdue thus anticipated and countered a threat to its market share and the price it could charge for OxyContin. Purdue nonetheless touted its introduction of ADF opioids as evidence of its good corporate citizenship and commitment to addressing the opioid crisis.[555]

1053. Reformulated ADF OxyContin was approved by the FDA in April 2010.[556] It was not until 2013 that the FDA, in response to a citizen petition filed by Purdue, permitted reference in the label to supposed abuse-deterrent properties.[557] When Hysingla ER (extended-release hydrocodone) launched in 2014, the product included similar abuse-deterrent properties and limitations.[558] But in the beginning, the FDA made clear that limited claims could be made about ADF because no evidence supported claims that ADFs prevented tampering or reduced overall rates of oral abuse or of abuse generally.[559]

1054. Despite its self-proclaimed good intentions, Purdue merely continued its generally deceptive tactics with respect to ADF. If pressed, Purdue acknowledged that perhaps some "extreme" patients might still abuse the drug but claimed that the ADF features protect the majority of patients.

---

[555] *Empire of Pain*, *supra* at 305–09.

[556] Determination That the OXYCONTIN (Oxycodone Hydrochloride) Drug Products Covered by New Drug Application 20-553 Were Withdrawn From Sale for Reasons of Safety or Effectiveness, 78 Fed. Reg. 23273 (Apr. 18, 2013), https://www.govinfo.gov/content/pkg/FR-2013-04-18/pdf/2013-09092.pdf.

[557] *Id.*

[558] *Full Prescribing Information: Hyslinga ER* (Nov. 20, 2014), https://www.accessdata.fda.gov/drugsatfda_docs/label/2014/206627s000lbl.pdf.

[559] Ctr. for Drug Evaluation & Research, U.S. Food & Drug Admin., *Summary Review*, NDA No. 22-272 (Apr. 5, 2010), https://www.accessdata.fda.gov/drugsatfda_docs/nda/2010/022272s000SumR.pdf (hereinafter *OxyContin OP Summary Review*).

These misrepresentations and omissions are misleading and contrary to Purdue's ADF labels, its own information, and publicly available data.

1055. In 2010, the FDA required that Purdue include certain "key points" in communications about ADF OxyContin, including that "the product is not completely tamper-resistant and those intent on abusing this new formulation will likely find a means to do so" and that "the product can still be misused or abused and result in overdose by simply administering or ingesting larger than recommended oral doses."[560]

1056. In the 2012 medical office review of Purdue's application to include an abuse-deterrence claim in its label for OxyContin, the FDA noted that the overwhelming majority of deaths linked to OxyContin were associated with oral consumption and that only 2% of deaths were associated with recent injection and only 0.2% with snorting the drug.

1057. The FDA's Director of the Division of Epidemiology stated in September 2015 that no data that she had seen suggested the reformulation of OxyContin "actually made a reduction in abuse," given continued oral abuse, shifts to injection of other drugs (including heroin), and defeat of the ADF mechanism. Even Purdue's funded research showed that half of OxyContin abusers continued to orally abuse the drug after the reformulation rather than shift to other drugs. Purdue has been aware that extended-release opioids can be abused and that ADF formulations have been defeated for more than a decade.

1058. A 2013 article presented by Purdue employees based on a review of data from poison control centers concluded that ADF OxyContin can reduce abuse but ignored important negative findings. The article revealed that abuse merely shifted to other drugs and that, when the actual incidence of harmful exposures was calculated, there were more harmful exposures to opioids after

[560] *OxyContin OP Summary Review*, *supra*.

the reformulation of OxyContin. In short, the article deceptively emphasized the advantages and ignored the disadvantages of ADF OxyContin.[561]

1059. One-third of the patients in a 2015 study defeated the ADF mechanism and were able to continue inhaling or injecting the drug.[562] To the extent that the abuse of Purdue's ADF opioids was reduced, there was no meaningful reduction in opioid abuse overall, as many users simply shifted to other opioids such as heroin.[563] As a result, the FDA concluded in September 2020 that reformulated OxyContin had not "reduced opioid overdoses" overall.[564]

1060. In 2015, claiming a need to further assess its data, Purdue abruptly withdrew a supplemental new drug application related to reformulated OxyContin one day before FDA staff was to release its assessment of the application. The staff review preceded an FDA advisory committee meeting related to new studies by Purdue "evaluating the misuse and/or abuse of reformulated OxyContin" and whether those studies "have demonstrated that the reformulated product has a meaningful impact on abuse."[565] In consideration of a reasonable opportunity for further investigation and discovery, Plaintiffs allege that Purdue never presented the data to the FDA because the data would not have supported its claims that OxyContin's ADF properties reduced abuse or misuse.

1061. Despite its own evidence of abuse and the lack of evidence regarding the benefit of ADF opioids in reducing abuse, Dr. J. David Haddox, the Vice President of Health Policy for Purdue, falsely claimed in 2016 that evidence did not show Purdue's ADF opioids were being abused in large numbers.

---

[561] Stevan Geoffrey Severtson, et al., *Reduced Abuse, Therapeutic Errors, and Diversion Following the Reformulation of Extended-Release Oxycodone in 2010*, 14 J. Pain 1122 (2013).

[562] Theodore J. Cicero & Matthew S. Ellis, *Abuse-Deterrent Formulations and the Prescription Opioid Abuse Epidemic in the United States: Lessons Learned from OxyContin*, 72 JAMA Psychiatry (2015), https://pubmed.ncbi.nlm.nih.gov/25760692/.

[563] *Empire of Pain, supra,* at 316.

[564] *Id.* at 427.

[565] Joint Meeting of the Drug Safety and Risk Management Advisory Committee and the Anesthetic and Analgesic Drug Products Advisory Committee; Notice of Meeting, 80 Fed. Reg. 30686 (May 25, 2015), https://www.govinfo.gov/content/pkg/FR-2015-05-29/pdf/2015-13004.pdf.

1062. Purdue's recent advertisements in national newspapers also mislead prescribers, patients, payors, and the public by continuing to present its ADF opioids as evidence of its efforts to reduce opioid abuse.

**4. Claims about OxyContin's Duration of Effect**

1063. Purdue also dangerously misled doctors and patients about OxyContin's duration and onset of action, making the knowingly false claim that OxyContin would provide 12 hours of pain relief for most patients. As laid out below, Purdue made this claim for two reasons. First, it provided the basis for both Purdue's patent and its market niche. Second, it allowed Purdue to imply or state outright that OxyContin's release mechanism avoided peaks and valleys and therefore the rush that fosters addiction and attracts abusers.[566]

1064. Purdue promotes OxyContin as an extended-release opioid, but OxyContin does not produce a steady concentration of oxycodone (the active ingredient) in the body. Instead, as illustrated in the following chart, which was apparently adapted from Purdue's own sales materials, the concentration of the drug increases sharply at first and then tapers off over the course of twelve hours:[567]

[566] *See Empire of Pain*, *supra*, at 231–32.

[567] Jim Edwards, *How Purdue Used Misleading Charts to Hidge OxyContin's Addictive Power*, CBS News: Moneywatch (Sept. 28, 2011), https://web.archive.org/web/20180702200937/https://www.cbsnews.com/news/how-purdue-used-misleading-charts-to-hide-oxycontins-addictive-power/ (last accessed Aug. 10, 2021 as of July 2, 2018).




Figure 1

1065. The reduced concentration of oxycodone over time means that OxyContin no longer provides the same level of pain relief. As a result, in many patients, OxyContin's effect does not last the twelve hours for which Purdue promotes it—a fact that Purdue has known at all relevant times.[568]

1066. OxyContin tablets initially release approximately 40% of the active medicine. The initial rush of nearly half of the powerful opioid triggers a powerful psychological response. OxyContin thus behaves more like an immediate-release opioid, which Purdue in its original 1995 FDA-approved drug label claimed was more addicting.[569] The initial burst of oxycodone also means that there is less of the drug available at the end of the dosing period. This decline in oxycodone concentration precipitates withdrawal symptoms in patients, a phenomenon known as "end of dose" failure. In fact, the FDA found in 2008 that a "substantial number" of chronic pain patients will experience end-of-dose failure with OxyContin.[570]

---

[568] *Empire of Pain*, *supra*, at 231.

[569] *Id.* at 195 ("Delayed absorption, as provided by OxyContin tablets, is believed to reduce the abuse liability of the drug.").

[570] Letter from Janet Woodcock, Director, Ctr. for Drug Evaluation & Research, U.S. Food & Drug Admin., to

1067. End-of-dose failure renders OxyContin even more dangerous because the withdrawal symptoms are followed by a euphoric rush with the next dose—a cycle that fuels a craving for OxyContin. For this reason, Dr. Theodore Cicero, a neuropharmacologist at the Washington University School of Medicine in St. Louis, has called OxyContin's 12-hour dosing "the perfect recipe for addiction."[571] Many patients will exacerbate this cycle by taking their next dose ahead of schedule or resorting to a rescue dose of another opioid, increasing the overall quantity of opioids they are taking.

1068. Purdue nevertheless has falsely promoted OxyContin as if it were effective for a full twelve hours. Purdue instructed its sales representatives to parrot the language developed by Purdue and Curtis Wright in the package insert for OxyContin: "The delivery system is believed to reduce the abuse liability of the drug."[572]

1069. Purdue's advertising in 2000 included claims that OxyContin provides "Consistent Plasma Levels Over 12 Hours." That claim was accompanied by a chart, mirroring the chart on the previous page. However, this version deceptively minimized the rate of end-of-dose failure by using a logarithmic scale to make it appear that the decline in oxycodone concentration over time is less than it actually is:

Richard Blumenthal, Attorney General, State of Connecticut (Sept. 9, 2008), https://www.purduepharma.com/wp-content/pdfs/fda_response_blumenthal_oxycontin.pdf.

[571] Harriet Ryan, et al., '*You Want a Description of Hell?' OxyContin's 12-Hour Problem*, L.A. Times (May 5, 2016), http://www.latimes.com/projects/oxycontin-part1/ (hereinafter, "*You Want a Description of Hell?*").

[572] *Empire of Pain*, *supra*, at 208.




1070. Purdue's 12-hour messaging was key to its competitive advantage over short-acting opioids that required patients to wake in the middle of the night to take their pills. Purdue advertisements also emphasized "Q12h" dosing. These include an advertisement in the February 2005 *Journal of Pain* and the 2006 *Clinical Journal of Pain* featuring an OxyContin logo with two pill cups, reinforcing the twice-a-day message. A Purdue memo to the OxyContin launch team stated that "OxyContin's positioning statement is 'all of the analgesic efficacy of immediate-release oxycodone, with convenient q12h dosing'" and that "[t]he convenience of q12h dosing was emphasized as the most important benefit."[573]

1071. Purdue executives, therefore, maintained the messaging of twelve-hour dosing even when many reports surfaced that OxyContin did not last twelve hours. Instead of acknowledging a need for more frequent dosing, Purdue instructed its representatives to push higher-strength pills,

573 Launch Team Meeting 3/31/95 Minutes (Apr. 4, 1995), L.A. Times (May 5, 2016), http://documents.latimes.com/oxycontin-launch-1995/.

even though higher dosing carries its own risks, as noted above. Higher dosing also means that patients will experience higher highs and lower lows, increasing their craving for their next pill. Nationwide, based on an analysis commissioned by the Los Angeles Times, more than 52% of patients taking OxyContin longer than three months are on doses greater than 60 milligrams per day[574]—which converts to the 90 MED (morphine equivalent dose) that the CDC Guideline urges prescribers to "avoid" or "carefully justify."[575]

1072. That OxyContin did not provide pain relief for a full twelve hours was known to Purdue but was not disclosed to prescribers. When some prescribers became aware that OxyContin did not provide twelve hours of pain relief, some began to prescribe it to be taken three times per day, a fact of which Purdue was well aware. A 1996 sales strategy memo from a Purdue regional manager emphasized that representatives should "convinc[e] the physician that there is no need" to prescribe OxyContin in shorter intervals and that the solution to inadequate pain control is higher doses.[576] By 2001, Purdue knew that 20% of OxyContin prescriptions were being written for a more frequent dosing schedule.[577] Purdue knew that more frequent dosing undermined its central claim that OxyContin prevented abuse because it did not have a hit followed by a crash. For that reason, one sales manager instructed her team that anything shorter than 12-hour dosing "needs to be nipped in the bud. NOW!!"[578]

1073. Even Purdue's competitor, Endo, was aware of the problem. Endo attempted to position its Opana ER drug as offering "durable" pain relief, by which Endo intended to suggest a contrast to OxyContin.[579] Opana ER advisory board meetings featured pain specialists citing the lack

---

[574] *You Want a Description of Hell?*, *supra*.

[575] *2016 CDC Guideline*, *supra*, at 16.

[576] Memo from Windell Fisher to B. Gergely (Nov. 7, 1995), http://documents.latimes.com/sales-manager-on12-hour-dosing-1996/.

[577] *Empire of Pain, supra,* at 232.

[578] *You Want a Description of Hell?*, *supra*.

[579] *Endo Receives FDA Approval for Opana® ER (oxymorphone HCl) Extended-Release and Opana® (oxymorphone HCl) Immediate Release Tablets CII*, Endo (June 23, 2006), https://investor.endo.com/news-releases/news-release-details/endo-

of 12-hour effect as a disadvantage of OxyContin. Endo even ran advertisements for Opana ER referring to its "real" 12-hour dosing.

**5. Plans for Addiction Treatment**

1074. Purdue's awareness of the addictive properties of its opioid products is best exemplified by its cynical attempts to profit from addiction treatment. To do so, Purdue developed *Project Tango*—a secret plan for Purdue to expand into the business of selling drugs to treat opioid addiction. In internal documents, Purdue wrote down what it had publicly denied for decades: addictive opioids and opioid addiction are "naturally linked." The project, which involved Kathe Sackler, a member of Purdue's board, among others, determined that Purdue should expand across "the pain and addiction spectrum," to become "an end-to-end pain provider." Purdue illustrated the end-to-end business model with a picture of a dark hole labeled "Pain treatment" that a patient could fall into with "Opioid addiction treatment" waiting at the bottom.[580]

1075. Noting that "[o]pioid addiction (other than heroin) has grown by ~20% [compound annual growth rate] from 2000 to 2010," the *Project Tango* team found that the "market" for opioid addiction treatment had more than doubled between 2009 to 2014, from $0.8 billion to $1.9 billion:

receives-fda-approval-opanar-er-oxymorphone-hcl-extended.

[580] *BDC Meeting – Project Tango* (Sept. 12, 2014).




*Purdue's measure of the opioid addiction "market"*

1076. Internal *Project Tango* documents also reveal that Purdue's tactic of blaming addiction on untrustworthy patients was a lie. The truth, which Purdue knew, is that the real risk of addiction is not so limited:

> ▪ *"This can happen to any-one – from a 50 year old woman with chronic lower back pain to a 18 year old boy with a sports injury, from the very wealthy to the very poor"*

*Purdue's "Project Tango" patient and clinical rationale*

1077. *Project Tango* concluded that millions of people who became addicted to opioids were Purdue's next business opportunity. Staff wrote: "It is an attractive market. Large unmet need for vulnerable, underserved and stigmatized patient population suffering from substance abuse,

dependence and addiction." The team identified eight ways that Purdue's experience getting patients hooked **on** opioids could now be used to sell treatment to get patients **off** them.

1078. In June 2017, Purdue considered a scheme to sell the overdose antidote Narcan. The need for Narcan to reverse overdoses was rising so fast that Purdue calculated it could provide a growing source of revenue, tripling from 2016 to 2018.

### 6. Failure to Report Suspicious Activity

1079. Since at least 2002, Purdue has maintained a database of healthcare providers suspected of inappropriately prescribing OxyContin or other opioids. Physicians could be added to this database based on observed indicators of illicit prescribing such as excessive numbers of patients, cash transactions, patient overdoses, and unusual prescribing of the highest-strength pills, which were a prime target for diversion.[581]

1080. In one example, a pain clinic in South Carolina was diverting massive quantities of OxyContin. People traveled to the clinic from towns as far as 100 miles away to get prescriptions, the DEA's diversion unit raided the clinic, and prosecutors eventually filed criminal charges against the doctors. But Purdue's sales representative for that territory, Eric Wilson, continued to promote OxyContin sales at the clinic. He reportedly told another local physician that this clinic accounted for 40% of the OxyContin sales in his territory. At that time, Wilson was Purdue's top-ranked sales representative.[582] In response to news stories about this clinic, Purdue issued a statement, declaring that "if a doctor is intent on prescribing our medication inappropriately, such activity would continue regardless of whether we contacted the doctor or not."[583]

1081. In another example, a Purdue sales manager informed her supervisors in 2009 about a suspected pill mill in Los Angeles, reporting over email that when she visited the clinic with her sales

---

[581] Purdue, *Identifying Possible Diversion* (Oct. 15, 2002).
[582] *Pain Killer*, *supra*, at 298–300.
[583] *Id.*

representative, "it was packed with a line out the door, with people who looked like gang members" and that she felt "very certain that this an organized drug ring."[584] She wrote, "This is clearly diversion. Shouldn't the DEA be contacted about this?" But her supervisor at Purdue responded that while they were "considering all angles," it was "really up to [the wholesaler] to make the report."[585] This pill mill was not just distributing opioids locally; over a million pills were transported to the City of Everett, Washington, a city of around 100,000 people. Couriers drove up I-5 through California and Oregon or flew from Los Angeles to Seattle. The Everett-based dealer who received the pills from southern California wore a diamond necklace in the shape of the West Coast states with a trail of green gemstones—the color of 80-milligram OxyContin—connecting Los Angeles and Washington state. Purdue waited until after the clinic was shut down in 2010 to inform the authorities.[586]

1082. At Purdue, the board and senior management were aware that Purdue regularly received "Reports of Concern" about abuse and diversion of opioids, reports of other adverse events, and calls to Purdue's compliance "hotline." In July 2007, staff told board members and senior management that more than 5,000 adverse events had been reported to Purdue in just the first three months of the year. Staff also stated that Purdue received 572 Reports of Concern about abuse and diversion of Purdue opioids during the second quarter of 2007, but that they completed only 21 field inquiries in response. Staff also indicated that they received more than 100 calls to Purdue's compliance hotline during the quarter, which was a "significant increase," but Purdue did not report any of the hotline calls or Reports of Concern to the FDA, DEA, Department of Justice, or state authorities.

1083. Purdue also tracked prescribers from whom there was a substantial possibility of opioids being diverted or, at a minimum, grossly over-prescribed. It described these prescribers

---

[584] Harriet Ryan, et al., *More than 1 million OxyContin pills ended up in the hands of criminals and addicts. What the drug maker knew*, L.A. Times (July 10, 2016), http://www.latimes.com/projects/la-me-oxycontin-part2/.

[585] *Id.*

[586] Harriet Ryan, et al., *How Black-Market OxyContin Spurred a Town's Descent Into Crime, Addiction and Heartbreak*, L.A. Times (July 10, 2016), https://www.latimes.com/projects/la-me-oxycontin-everett/.

collectively as "Region Zero" and even generated a map, presented to the entire Purdue Board, correlating these prescribers with poison control calls and pharmacy thefts. A portion of this national map is shown below.




*Map presented to the Purdue Board in 2011*

1084. Despite its awareness of the spatial association between these high prescribers, overdose, and criminality, Purdue made a conscious decision not to report these prescribers to authorities.

1085. Purdue deceptively and unfairly failed to report to authorities illicit or suspicious prescribing of its opioids, even as it has publicly and repeatedly touted its "constructive role in the fight against opioid abuse" and its "strong record of coordination with law enforcement.[587]

---

[587] *Setting The Record Straight On OxyContin's FDA-Approved Label*, Purdue (May 5, 2016), https://web.archive.org/web/20180329081806/http://www.purduepharma.com/news-media/get-the-facts/setting-the-record-straight-on-oxycontins-fda-approved-label/; *Setting The Record Straight On Our Anti-Diversion Programs*, Purdue

1086. At the heart of Purdue's public outreach is the claim that it works hand-in-glove with law enforcement and government agencies to combat opioid abuse and diversion. Purdue has consistently trumpeted this partnership since at least 2008, and the message of close cooperation is in virtually all of Purdue's recent pronouncements in response to the opioid epidemic.

1087. Purdue's website asserted: "We are acutely aware of the public health risks these powerful medications create. . . . That's why we work with health experts, law enforcement, and government agencies on efforts to reduce the risks of opioid abuse and misuse . . . ."[588] Purdue's statement on "Opioids Corporate Responsibility" likewise stated that "[f]or many years, Purdue has committed substantial resources to combat opioid abuse by partnering with . . . communities, law enforcement, and government."[589] And, responding to criticism of Purdue's failure to report suspicious prescribing to regulatory and enforcement authorities, the website similarly proclaimed that Purdue "ha[s] a long record of close coordination with the DEA and other law enforcement stakeholders to detect and reduce drug diversion."[590]

1088. These public pronouncements created the false impression that Purdue is proactively working with law enforcement and government authorities nationwide to root out drug diversion, including the illicit prescribing that can lead to diversion. It aimed to distance Purdue from its past conduct in deceptively marketing opioids and make its current marketing seem more trustworthy and truthful.

(July 11, 2016), http://www.purduepharma.com/news-media/get-the-facts/setting-the-record-straight-on-our-anti-diversion-programs/ (hereinafter *Setting The Record Straight*).

[588] *Opioids With Abuse-Deterrent Properties*, Purdue, https://web.archive.org/web/20180401055008/http://www.purduepharma.com/healthcare-professionals/responsible-use-of-opioids/opioids-with-abuse-deterrent-properties/ (last accessed July 21, 2021 as of Apr. 1, 2018).

[589] *Id.*

[590] *Setting The Record Straight*, *supra*. Contrary to its public statements, Purdue seems to have worked behind the scenes to push back against law enforcement.

### 7. Enforcement Actions

1089. Purdue would repeat misleading or false claims throughout many of the investigations and enforcement actions it faced. At a hearing before the House of Representatives' Subcommittee on Oversight and Investigations of the Committee on Energy and Commerce in August 2001, Purdue emphasized "legitimate" treatment, dismissing cases of overdose and death as something that would not befall "legitimate" patients: "Virtually all of these reports involve people who are abusing the medication, not patients with legitimate medical needs under the treatment of a healthcare professional."[591]

1090. In May 2007, Purdue and three of its executives pled guilty to federal criminal charges for misbranding OxyContin in what the company acknowledged was an attempt to mislead doctors about the risk of addiction. Purdue was ordered to pay nearly $635 million in fines and fees. In its plea, Purdue admitted that its promotion of OxyContin was misleading and inaccurate, misrepresented the risk of addiction, and was unsupported by science. At the time, this was one of the largest settlements with a drug company for marketing misconduct.[592] Additionally, Michael Friedman, the company's president, pled guilty to a misbranding charge and agreed to pay $19 million in fines; Howard R. Udell, Purdue's top lawyer, also pled guilty and agreed to pay $8 million in fines; and Paul D. Goldenheim, Purdue's former medical director, pled guilty and agreed to pay $7.5 million in fines.[593]

1091. The charges were downgraded from felonies to misdemeanors, thereby sparing the men jail time. According to one former Justice Department official, this was a "political outcome that

---

[591] *Oxycontin: Its Use and Abuse: Hearing Before the House Subcomm. on Oversight and Investigations of the Comm. on Energy and Commerce*, 107th Cong. 1 (Aug. 28, 2001) (statement of Michael Friedman, Executive Vice President, Chief Operating Officer, Purdue Pharma, L.P.), https://www.govinfo.gov/content/pkg/CHRG-107hhrg75754/html/CHRG-107hhrg75754.htm (hereinafter *Oxycontin: Its Use and Abuse*).

[592] Barry Meier, *In Guilty Plea, OxyContin Maker to Pay $600 Million*, N.Y. Times (May 10, 2007), https://www.nytimes.com/2007/05/10/business/11drug-web.html.

[593] *Purdue Execs Plead Guilty to OxyContin Fraud*, Fierce Biotech (May 9, 2007), https://www.fiercebiotech.com/biotech/purdue-execs-plead-guilty-to-oxycontin-fraud.

Purdue bought" by going over the head of the prosecutors to the leadership of the Department of Justice.[594]

1092. In the same year, Purdue settled with 26 states and the District of Columbia for its Consumer Protection Act violations regarding its extensive off-label marketing of OxyContin and its failure to adequately disclose abuse and diversion risks associated with the drug.[595]

1093. None of this stopped Purdue. In fact, Purdue continued to create the false perception that opioids were safe and effective for long-term use, even after being caught using unbranded marketing methods to circumvent the system.

1094. Currently, Purdue has declared bankruptcy and is seeking to use a settlement in the bankruptcy court to shield the Sacklers, the family that owns Purdue, from liability and allow them to keep over half of the fortune they made from Purdue's sales of OxyContin. To facilitate this settlement, Purdue enlisted Luther Strange, the former Alabama Attorney General and former chairman of the Republican Attorneys General Association, to convince his former colleagues to accept the terms of Purdue's lowball settlement offer.[596]

1095. On November 24, 2020, Purdue pleaded guilty to federal criminal charges relating to the marketing of OxyContin and other opioid products:

> As part of today's guilty plea, Purdue admitted that from May 2007 through at least March 2017, it conspired to defraud the United States by impeding the lawful function of the Drug Enforcement Administration (DEA). Purdue represented to the DEA that it maintained an effective anti-diversion program when, in fact, Purdue continued to market its opioid products to more than 100 health care providers whom the company had good reason to believe were diverting opioids. Purdue also reported misleading information to the DEA to boost Purdue's manufacturing quotas. The misleading information comprised prescription data that included prescriptions written by doctors that Purdue had good reason to believe were

---

594 *Empire of Pain, supra,* at 276–77.

595 Shannon Henson, *Purdue Pharma Settles with States over OxyContin* (May 8, 2007), https://www.law360.com/articles/24311/purdue-pharma-settles-with-states-over-oxycontin.

596 *Id.* at 402.

> engaged in diversion. The conspiracy also involved aiding and abetting violations of the Food, Drug, and Cosmetic Act by facilitating the dispensing of its opioid products, including OxyContin, without a legitimate medical purpose, and thus without lawful prescriptions.
>
> Purdue also admitted it conspired to violate the federal Anti-Kickback Statute. Between June 2009 and March 2017, Purdue made payments to two doctors through Purdue's doctor speaker program to induce those doctors to write more prescriptions of Purdue's opioid products. Also, from April 2016 through December 2016, Purdue made payments to Practice Fusion Inc., an electronic health records company, in exchange for referring, recommending, and arranging for the ordering of Purdue's extended release opioid products – OxyContin, Butrans, and Hysingla.[597]

1096. Purdue agreed to a criminal fine of $3.544 billion and $2 billion in criminal forfeiture. To settle False Claims Act liability, Purdue agreed to pay $2.8 billion and the Sacklers agreed to pay $225 million.[598]

### H. AmerisourceBergen

1097. ABDC, despite being a giant distributor with purportedly comprehensive systems for tracking the movement of drugs, failed to take adequate steps to prevent the diversion of opioids in Arizona.

1098. ABDC sold and shipped unreasonable quantities of opioids into Arizona, including many red-flag pharmacies in Arizona, and continued to do so despite extensive and blatant evidence of diversion at many facilities in Arizona. ABDC has been investigated and fined for some of its many failures to secure its supply chain but continues to allow inappropriate and harmful distribution of opioids.

1099. The volume of opioids ABDC shipped into Arizona was so high as to put it on notice that not all of the drugs being ordered would be used to fill prescriptions for legitimate medical uses.

[597] *Opioid Manufacturer Purdue Pharma Pleads Guilty to Fraud and Kickback Conspiracies*, U.S. Dep't Just. (Nov. 24, 2020), https://www.justice.gov/opa/pr/opioid-manufacturer-purdue-pharma-pleads-guilty-fraud-and-kickback-conspiracies.

[598] *Id.*

1100. The opioid crisis described herein is a direct and foreseeable result of ABDC's actions.

1101. ABDC has agreed to pay $6.5 billion as part of a global settlement in the opioid litigation; as reported in ABDC's most recent 10-K filing with the SEC, it recorded $6.6 billion as a charge in the fourth quarter of the fiscal year ending September 30, 2020. As part of this settlement, ABDC has also agreed to make specific improvements to its anti-diversion programs.[599]

1102. ABDC directly distributes opioids to hospitals, including Plaintiffs. Testifying to their close relationship, one ABDC division, ASD Healthcare, services 100% of U.S. hospitals.[600] According to ABDC's 10-K:

> [W]e distribute a comprehensive offering of brand-name, specialty brand-name, and generic pharmaceuticals, over-the-counter healthcare products, home healthcare supplies and equipment, and related services to a wide variety of healthcare providers located in the United States and select global markets, including acute care hospitals and health systems. . . .[601]

1103. The company advertises the goal for hospitals:

> Improve efficiency and elevate the patient experience by leveraging the full power of AmerisourceBergen's integrated offerings-including unmatched product access, actionable data insights and market-leading specialty expertise.[602]

This data includes data on opioid distribution and prescription rates in the areas served by Plaintiffs and other hospitals—yet ABDC did not share that data to enable hospitals to more effectively combat the opioid epidemic.

1104. In 2013, Walgreens entered a ten-year agreement with ABDC.[603] ABDC was described as being able to gain "purchasing synergies" from Walgreens through the companies' relationship.

---

[599] AmerisourceBergen Corporation, *Form 10-K* (Nov. 19, 2020), https://d18rn0p25nwr6d.cloudfront.net/CIK-0001140859/44edc41e-d63c-4a49-81ce-619723b2ee77.pdf (hereinafter *ABDC 10-K*).

[600] *Our Network*, Amerisource Bergen, https://www.asdhealthcare.com/our-network (last visited July 16, 2021).

[601] *ABDC 10-K*, *supra*.

[602] *Hospitals and Health Systems*, AmerisourceBergen, https://www.amerisourcebergen.com/provider-solutions/hospitals-and-health-systems (last visited July 18, 2021).

[603] As a part of its distribution agreement, Walgreens gained purchase rights to AmerisourceBergen equity, allowing it to further participate in the prescription opioid shipment boom in America. Walgreens subsequently exercised

According to ABDC's most recent 10-K, Walgreens now accounts for 33% of AmerisourceBergen's revenue.[604]

1105. ABDC also participated in front groups such as HDA and PCF (via HDA's membership).

**1. Enforcement Actions**

1106. In 2007, the DEA issued an immediate suspension order against an ABDC distribution center in Orlando, Florida for failing to maintain effective controls against hydrocodone diversion. According to the order, ABDC distributed hydrocodone to pharmacies in amounts that far exceeded what an average pharmacy orders to meet the legitimate needs of its customers, distributed hydrocodone to pharmacies even though they ordered small amounts of other drug products relative to those purchases, distributed hydrocodone to pharmacies much more frequently than ABDC's other customers, and shipped to pharmacies that ABDC knew or should have known filled many prescriptions issued by physicians who did not conduct a medical examination, instead writing prescriptions for controlled substances ordered by customers over the internet.[605]

1107. As part of the agreement to restore the Orlando facility's license to ship controlled substances, ABDC publicly stated that it would "implement an enhanced and more sophisticated order monitoring program" nationwide.[606]

1108. In 2012, the State of West Virginia sued ABDC and Cardinal, as well as several smaller wholesalers, on numerous causes of action, including violations of consumer credit and protection

---

these purchase rights, ultimately owning approximately 28% of AmerisourceBergen. As part of the transaction, Walgreens has the ability to nominate up to two members of the Board of Directors of AmerisourceBergen. Currently, Walgreen's Co-Chief Operating Officer sits on the AmerisourceBergen Board of Directors.

[604] *ABDC 10-K*, *supra*.

[605] *See DEA Suspends Orlando Branch of Drug Company from Distributing Controlled Substances*, U.S. Drug Enf't Admin. (Apr. 24, 2007), https://www.dea.gov/sites/default/files/divisions/mia/2007/mia042407p.html.

[606] AmerisourceBergen, *AmerisourceBergen Signs Agreement with DEA Leading to Reinstatement of Its Orlando Distribution License to Distribute Controlled Substances* (June 22, 2007), https://www.sec.gov/Archives/edgar/data/1140859/000119312507141013/dex991.htm.

laws, antitrust laws, and the creation of a public nuisance. Unsealed court records from that case demonstrate that between 2007 and 2012, ABDC shipped 80.3 million hydrocodone pills and 38.4 million oxycodone pills into West Virginia.[607] These quantities demonstrate that ABDC failed to control the supply chain or to report and take steps to halt suspicious orders. In 2016, ABDC agreed to settle the West Virginia lawsuit for $16 million.[608]

1109. In 2012, ABDC was subpoenaed by the DEA in an investigation into the company's failure to protect against diversion of particular controlled substances into non-medically necessary channels.[609]

1110. These enforcement activities are ongoing. In its most recent 10-K filed with the SEC, ABDC reported:

> Since July 2017, the Company has received subpoenas from several U.S. Attorney's Offices, including grand jury subpoenas from the U.S. Attorney's Office for the District of New Jersey ("USAO-NJ") and the U.S. Attorney's Office for the Eastern District of New York ("USAO-EDNY"). Those subpoenas request the production of a broad range of documents pertaining to the Company's distribution of controlled substances through its various subsidiaries, including ABDC, and its diversion control programs. The Company has been engaged in discussions with the various U.S. Attorney's Offices, including the Health Care and Government Fraud Unit of the Criminal Division of the USAO-NJ, and has been producing documents in response to the subpoenas.[610]

**2. Marketing Activities**

1111. ABDC participated in inflating the demand for opioids. It broadly advertised its promotional services to the Marketing Defendants. If hired by a Marketing Defendant, ABDC

---

[607] Eric Eyre, *Drug Firms Shipped 40M Pain Pills a Year to WV*, Charleston Gazette-Mail (May 15, 2015), https://www.wvgazettemail.com/news/drug-firms-shipped-40m-pain-pills-a-year-to-wv/article_1166a11b-6129-550f-ab72-c71f483a0e53.html.

[608] Thomas Sullivan, *Drug Wholesalers to Pay $36 Million Over West Virginia Pill Mill Claims*, Pol'y & Med. (updated May 5, 2018), https://www.policymed.com/2017/02/drug-wholesalers-to-pay-36-million-over-west-virginia-pill-mill-claims.html.

[609] Jeff Overley, *AmerisourceBergen Subpoenaed by DEA Over Drug Diversion,* Law360 (Aug. 9, 2012), https://www.law360.com/articles/368498/amerisourcebergen-subpoenaed-by-dea-over-drug-diversion.

[610] *ABDC 10-K*, *supra*.

provided targeted communications to customers through a variety of marketing media to distinguish the Marketing Defendant's product. ABDC promoted at least three Marketing Defendants' opioid products, including those of Endo and Janssen. ABDC marketed Endo's Opana ER through at least direct mail and email blasts.

1112. Marketing was not merely incidental to ABDC. It was important enough that ABDC paid the consulting firm McKinsey to review ABDC's suite of marketing services that it offered to drug manufacturers, including the Marketing Defendants.

1113. ABDC made presentations at trade shows to purportedly educate target customers about new drugs, but in reality to promote excessive purchases of prescription opioids. ABDC also engaged with KOLs who promoted prescription opioids.

1114. In the late 1990s, ABDC (through its predecessor Bergen Brunswig) assisted Purdue in promoting OxyContin by installing a "glimmer button" in ordering software used by pharmacists. If the pharmacist selected one of twenty-five competitor opioids to order, the glimmer button would pop up suggesting that the pharmacist order OxyContin.

1115. Much of this marketing involved ABDC's Xcenda subsidiary, which provides a variety of services for over 470 clients in the medical field representing over 600 brands.[611] These services include health policy research, global market intelligence, gathering real-world evidence, developing messaging to convince payors to reimburse for clients' products, and health economics outcomes and research.[612] According to an Xcenda press release found on ABDC's website:

> Manufacturers can turn to Xcenda for strategic guidance on, and the generation of, health economics and outcomes evidence that healthcare decision makers will find credible. Xcenda HEOR experts – both for in-house and field-based teams – are available on a contract basis to provide support to health outcomes teams by developing

[611] *Why Xcenda?*, AmerisourceBergen, https://www.xcenda.com/expertise-why-xcenda (last visited July 18, 2021).

[612] *Areas of Expertise*, AmerisourceBergen, https://www.xcenda.com/expertise-areas-of-expertise (last visited July 18, 2021).

> strategies, executing projects, creating and communicating effective product value stories, and supporting product approval. With their extensive knowledge, along with deep understanding of payer perspectives and their decision-making process, these consultants are well positioned to make an immediate impact for manufacturers when brought onto a team.[613]

1116. ABDC was able to use Xcenda to further ABDC's purpose of distributing and selling more prescription opioids in Arizona than could possibly have been legitimate.

1117. As ABDC's agent and subsidiary, Xcenda engaged in marketing activities on ABDC's behalf and promoted the sale of opioids that ABDC distributed. Xcenda had the authority to act for ABDC in its marketing efforts for the opioids that ABDC distributed. As ABDC's subsidiary, Xcenda was subject to ABDC's control. This was an arrangement to which Xcenda consented.

1118. Upon information and belief, as ABDC's subsidiary that was responsible for marketing drugs distributed by ABDC, Xcenda necessarily was authorized to act on ABDC's behalf. Moreover, if ABDC disapproved of any particular marketing tactic by Xcenda, ABDC could prohibit further use of that particular marketing.

1119. Xcenda used a variety of marketing tools to assist manufacturers including situational analysis, market research, segmentation strategy, and value proposition design.

1120. Xcenda and ABDC both used the common marketing rule of 80/20. This rule states that 20 percent of customers will account for 80% of the volume. Xcenda used this to determine which pharmacies purchased the most Fentora and to target them to encourage the purchase of more Fentora.

1121. In 2013, four Xcenda researchers published a study that concluded that it might be possible to identify patients at the highest risk for opioid-related adverse drug events following post-

---

[613] *Xcenda Unveils New Service Offerings to Enhance Manufacturers' Market Access Strategies for Specialty Products*, AmerisourceBergen (July 12, 2016), https://www.amerisourcebergen.com/newsroom/press-releases/xcenda-unveils-new-service-offerings.

surgical opioid therapy and so indicate when opioids should be avoided.[614] This misleadingly suggested that patients in whom opioids were safe to use could be easily identified.

1122. Xcenda continued pursuing research in this direction and developed a tool that could purportedly be used by hospitals when determining whether and in what quantity to prescribe opioids to patients for post-surgical pain, with the aim of avoiding adverse events including "euphoria" and "respiratory depression." The study concluded that 45.3% of those undergoing GI surgery (including 75.0% of men) were at high risk for an opioid-related adverse drug event but misleadingly implied that the remaining patients could safely be prescribed opioids without risking adverse events.[615]

1123. Teva paid for Xcenda to conduct and write a study, which concluded that, despite a significantly higher risk of prescription opioid use leading to overdose, accident, or injury in patients with a history of alcohol abuse or dependence, patients with such histories were still appropriate candidates for opioid therapy for chronic, noncancer pain.[616]

1124. A second Teva-funded study performed and written by Xcenda compared health outcomes for patients on various types of opioid regimens (short-acting, long-acting, or a combination).[617] The study promoted the use of long-acting opioids ("LAOs") in chronic noncancer pain ("CNCP") patients, concluding that the result of this study can show "a specific role for use of LAOs in the management of CNCP patients."[618] Teva manufactures and sells generic long-acting opioids including generic OxyContin, generic Kadian, generic Avinza, and generic MS Contin.

---

[614] E. Richard Kessler, et al., *Cost and Quality Implications of Opioid-Based Postsurgical Pain Control Using Administrative Claims Data from a Large Health System: Opioid-Related Adverse Events and Their Impact on Clinical and Economic Outcomes*, 33 Pharmacotherapy 383 (2013), https://pubmed.ncbi.nlm.nih.gov/23553809/.

[615] Harold S. Mikowitz, et al., *Development and Validation of a Risk Score to Identify Patients at High Risk for Opioid-Related Adverse Drug Events*, 20 J. Managed Care & Specialty Pharmacy 948 (2014), https://www.jmcp.org/doi/pdf/10.18553/jmcp.2014.20.9.948.

[616] Pamela E. Landsman-Blumberg, et al., *Burden of Alcohol Abuse or Dependence Among Long-Term Opioid Users with Chronic Noncancer Pain*, 23 J. Managed Care & Specialty Pharmacy 718 (2017), https://www.jmcp.org/doi/pdf/10.18553/jmcp.2017.23.7.718.

[617] Pamela E. Landsman-Blumberg, et al., *Health Care Resource Use and Cost Differences by Opioid Therapy Type Among Chronic Noncancer Pain Patients*, 10 J. Pain Res. 1713 (2017), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5533567/pdf/jpr-10-1713.pdf.

[618] *Id.* at 1720.

1125. Yet another study funded by Teva (and over which Teva had a right to review the full manuscript) concluded that there was an identifiable group of chronic pain patients predisposed to a higher risk of opioid misuse, but failed to identify specific factors that placed patients at greater risk. According to the authors, their findings "reinforce the importance of physician knowledge and discretion in individual patient-level treatment physicians," thereby implying (misleadingly) that physicians could rely on their instincts to identify patients at risk of opioid misuse. The study also suggested that it was reasonable to merely implement increased monitoring of at-risk patients rather than seek out non-opioid therapy for their chronic pain.[619] Three of the five authors were Xcenda employees; the remaining two were Teva employees.

1126. Until at least 2018, Xcenda scientists continued to publish articles and materials promoting the use of opioids to treat chronic noncancer pain and downplaying the risks of abuse.

**3. Distribution Actions**

1127. When distributing prescription opioids, ABDC had a duty to prevent diversion by implementing an effective system to detect and halt suspicious orders and by conducting regular investigations of current and prospective customers.

1128. As early as 1990, ABDC utilized a threshold-based system to determine if an order is "excessive" (i.e., suspicious). ABDC's Senior Vice President of Corporate Security and Regulatory Affairs has testified that from 1990 to 1998, the threshold was calculated through the following procedure: "You take all the pharmacies within that category and divide by the number of pharmacies to come up with an average volume for the month per drug category. And then there was a multiplier of three. Any order that was over the threshold amount would be produced an excessive order report." He then clarified that the "3" multiplier was used for Schedule II and Schedule III narcotic drugs and a "6" multiplier, or maybe higher, was used for other drugs. He stated that the controlled substances

[619] *Long-term Opioid Users with Chronic Noncancer Pain*, *supra*.

identified during that time period were shipped prior to being reported to the DEA. Such a policy constitutes a clear failure to maintain effective controls against diversion, as it entailed shipping controlled substance orders identified as suspicious (or in this case, "excessive") and was not designed to identify orders of unusual frequency or those that deviated from normal ordering patterns. Further, this system improperly utilized a factor of "3" and "6" to establish thresholds well above the calculated average for ABDC's customers.

1129. From 1998 to 2007, the threshold calculation used a customer's four-month rolling average and then applied a multiplier of three to "identify a trigger that would identify a suspicious order." Again, such a policy constitutes a clear failure to maintain effective controls against diversion because ABDC continued to ship controlled substance orders identified as suspicious. In addition, the system failed to identify orders of unusual frequency or deviating from a normal pattern, used a much shorter time period for calculating the threshold (which would allow the average to increase faster), failed to compare like pharmacies' purchasing activity, utilized a factor of "3" to establish threshold well above the calculated average for ABDC's customers, and neglected to take into consideration other relevant factors such as order frequency patterns, order averages for similar pharmacies, or comparisons of sales of Schedule II or III controlled substances with the sales of other controlled substances.

1130. ABDC's use of a threshold-based system using a 3x multiplier was derived from the DEA's Chemical Handler's Manual. The Manual's guidelines relate to "Listed Chemicals," rather than controlled substances, and primarily focused on the sale of chemicals used to make illicit methamphetamine.[620] As a result, the use of this manual to set thresholds for a distributor's SOM program as it relates to prescription opioid pills is inappropriate.

[620] Drug Enf't Admin., U.S. Dep't of Justice, *Chemical Handler's Manual: A Guide to Chemical Control Regulations* (2001) (hereinafter *Chemical Handler's Manual*).

1131. Even if the Chemical Handler's Manual is appropriate in this context (and it is not), ABDC did not implement its full advice. "Suspicious orders" of Listed Chemicals are defined by 21 U.S.C. § 830(b)(1)(A) as orders of "extraordinary" size based on a formula that multiples a monthly base weight average per base code by a multiplier (3x). Relying upon a threshold of "extraordinary" does not accurately identify every suspicious order in the context of controlled substance distribution. The Chemical Handler's Manual specifies that "when a regulated person suspects that an order may be intended for illicit purposes, good practice requires that every reasonable effort be made to resolve those suspicions. In addition to making the required reports, the transaction should not be completed until the customer is able to eliminate the suspicions. The distributor may have to forego some transactions."[621] Nevertheless, ABDC did not consider foregoing such transactions at the time.

1132. During this time, ABDC shipped all orders of controlled substances before ruling out the possibility of the orders being suspicious. Only after shipping the orders did ABDC report any orders that it deemed to be suspicious to the DEA through an "excessive order report." ABDC sent these reports on a monthly basis to the DEA. ABDC took no other actions with regards to excessive orders prior to 2005, meaning that ABDC shipped all orders—including orders that may have been suspicious—without any further investigation or due diligence.[622]

1133. At least as early as December 1, 2005, ABDC operated an "Excessive/Suspicious Order Investigation Program" to "review the ordering activity of its customers to identify possible excessive or suspicious orders of controlled substances and listed chemicals." Although the system now allegedly provided for the identification and investigation of excessive orders, ABDC's system still identified these orders using a threshold. Therefore, the 2005 system was not new, it merely

---

[621] *Chemical Handler's Manual*, *supra*, at 21.

[622] *See* Steve Mays, *ABDC Diversion Control Program Effective June 25, 2007* at 9 (2007) ("Historically Controlled Substance/ Listed Chemical order monitoring has been based on a ship and report process.") (hereinafter *ABDC Diversion Control Program*)

continued the threshold-based system that was in place prior to the newly written policy. And, although ABDC conflated concepts of "excessive" orders and "suspicious" orders by treating them identically, ABDC continued its policy of shipping such orders to its customers, despite internally identifying them as either excessive or suspicious. While the 2005 policy and procedures included a new "investigation" component that was not previously present in ABDC's suspicious order monitoring system, this component was effectively ignored because ABDC's official national policy from 1990 until 2007 was to ship all orders of controlled substances, regardless of size, frequency, deviations from prior orders, deviations from averages, deviations from defined thresholds, or whether that order was determined to be suspicious.[623]

1134. In addition to the excessive order reports which included orders that exceeded the relevant threshold, employees in ABDC's distribution centers ("DCs") were provided with guidelines instructing them to report orders that were of an unusual size or frequency, or which deviated from the normal ordering pattern. ABDC placed signs in the DC "cages" with the base quantity levels that could be ordered, and it was left to a DC employee's discretion to determine whether an order was suspicious. ABDC's order monitoring system at the time also required that ABDC confirm whether customers had the appropriate licenses.

1135. At this time, ABDC employed the same monitoring policy across all of its customers, regardless of the type of customer or whether they may have operated as "internet pharmacies," a type of entity known to be at higher risk for diversion. Further, ABDC did not have any policies or procedures in place to compare its customers' purchase of controlled substances with the average purchases of similarly situated customers. Rather, ABDC only "monitored the average of each customer against its own orders at that time." Nor did ABDC have any system in place to monitor its

---

[623] Steve Mays, *New Retail Pharmacy Account Due Diligence* (May 8, 2007).

purchasing of Schedule II or III controlled substances as it compared to other types of substances, or any system to evaluate the frequency of orders of controlled substances placed by its customers.

1136. Prior to 2005, ABDC's due diligence policy consisted solely of, according to ABDC's then-Director of Regulatory Affairs, "a good faith effort to make sure that that customer's properly licensed with the state and registered with the DEA." Following a meeting with the DEA, ABDC began using a brief questionnaire to obtain information about its customers as part of a new due diligence effort, but this questionnaire had only 10-12 questions, all of which were related to internet pharmacies.

1137. Prior to 2007, ABDC did not have a clear hierarchy establishing responsibility for preventing diversion. It did not form the Diversion Control Group or Team until after 2007.[624] This group was later referred to as the Corporate Security & Regulatory Affairs Department ("CSRA").

1138. Aside from the baseline numeric thresholds ABDC used to identify "excessive" orders, ABDC lacked clear objective standards for determining when orders from its customers were "suspicious." As a result, DC employees had effectively unfettered discretion to decide what constituted a normal ordering pattern and when a customer's order deviated from that pattern.

1139. Beginning in 2007, ABDC's written policies for compliance were contained within its Order Monitoring Program ("OMP").[625] The programs are administered by CSRA. From 2007 to 2015, the program's specifics were scattered through a series of policy and procedure documents. These documents were not uniform for ABDC and its subsidiary, Bellco Health, which it acquired in 2007.

1140. The most significant change was ABDC no longer shipped orders to customers that ABDC identified as being suspicious. The OMP primarily relied on static thresholds to determine

---

624 Email re BOD CS TPs (Aug. 10, 2017) (hereinafter, "BOD Email").
625 *See generally ABDC Diversion Control Program*, *supra*.

whether an order was potentially suspicious and should be investigated. If an order exceeded a threshold, it was flagged as an excessive or potentially suspicious order. ABDC would not automatically designate an order that exceeded the threshold as "suspicious."[626]

1141. To determine each customer's threshold under the 2007 system, ABDC grouped customers within a "Customer Type." The "Customer Types" were based on how customers were registered with the DEA, e.g., hospital/clinic, retail pharmacy, distributor, etc. ABDC would then classify each customer by its "Customer Size," which was based upon its total average monthly total revenue of prescription sales of both control and non-controlled drugs (as opposed to its purchasing pattern of a specific drug family) relative to its peers in the same "Customer Type." Then, ABDC looked at the Customer Type and Customer Size and created an average purchase among each drug family within each Customer Size (small, medium, large, or extra large) and applied the same 3x multiplier.[627]

1142. If a customer's order exceeded a threshold, ABDC placed it in "OMP review." After an order exceeded a threshold, all subsequent orders in the same drug family from that customer were rejected while the earlier order was in OMP review. Each DC was responsible for an initial review of all orders in OMP review. If the DC associates could determine that the order was not suspicious, they would release it, but if the DC was unsure, the order was flagged for investigation by CSRA personnel. Those people would then determine whether to report the order to DEA as suspicious. ABDC had no set, concrete rules or criteria for DC associates to determine whether or not an order in OMP review required further investigation before it could be cleared and shipped.[628]

1143. This system failed to identify suspicious orders because it continued to employ a "threshold-based system" based on an arbitrary "3x multiplier" among drug families which ignored

[626] *See* BOD Email. *Supra.*
[627] *ABDC Diversion Control Program*, *supra.*
[628] *See ABDC Diversion Control Program*, *supra.*

other relevant information and because it left critical discretion to identify suspicious orders with its DC employees, without putting in place any set, concrete rules or criteria on how suspicious orders should be identified.

1144. A customer who was repeatedly going over a threshold could request a "threshold review" to have its threshold adjusted. The procedure for submitting a threshold review began when ABDC's sales teams, who were responsible for acquiring new customers and managing existing customers, submitted threshold review forms to CSRA requesting the threshold reviews for their customers. Because sales representatives benefitted when their customers purchased more drugs, they were incentivized to assist their customers in obtaining threshold increases.

1145. Even after implementing this policy, ABDC still continued to ship some orders that were identified and even reported to the DEA as suspicious.

1146. In 2007, ABDC also implemented a Know Your Customer (KYC) program. ABDC generally required a customer questionnaire, a site visit, a license verification, and an online investigation as part of its new customer due-diligence process. A central component of ABDC's new customer procedure was its Retail Pharmacy Questionnaire ("Form 590"). The form asks for information about other distributors, disciplinary history, customer payment methods, percentages of controlled substances, and usage numbers for specific high-risk drugs, among other questions.[629] Though the form requests information about top prescribers of opioids, it is not ABDC's policy to perform news searches on those prescribers as part of the new customer procedure, and controlled substances could account for a significant portion of prescriptions dispensed before triggering an additional investigation.

---

[629] *See ABDC Diversion Control Program*, *supra*; AmerisourceBergen Corp., *Retail Pharmacy Questionnaire: Form 590* (June 30, 2007).

1147. The Form 590 process, however, suffered from numerous deficiencies. First, for many years, Form 590 was only for new customers. None of the requisite due-diligence information was collected for existing customers. Additionally, ABDC exempted "retail chain pharmacies" (broadly defined to include pharmacies with 10 or more locations, or any number of locations in more than one state) from the Form 590 requirement. Rather than require all pharmacies within a chain to complete a Form 590, ABDC allowed the chain to complete one Form 590. This exempted large swaths of ABDC's customers from the requirement of completing Form 590. Furthermore, ABDC does not require new customers to provide complete usage reports or dispensing data as part of the onboarding process. By relying on customers to self-report without any documented verification, ABDC does not fulfill its obligation of truly knowing its customers' business practices.

1148. Even when Form 590s were required, many were either illegibly filled out or contained substantial omissions. In 2016, ABDC began a process to identify deficiencies in the information provided on the forms,[630] but by May 29, 2018, only 60% of the due diligence deficiencies had been remedied. The lack of both current and historical documentation of due-diligence efforts is indicative of ABDC's failure to maintain effective controls to prevent diversion.

1149. Rather than focusing on putting effective controls in place to prevent diversion and designing and operating a system to detect suspicious orders and stop them, ABDC circumvented the requirements and coached customers on how to avoid being detected by the system. For example, a July 2013 ABDC document entitled "Sales Talking Points" explained ways that pharmacies could adjust their ordering habits to avoid "exposure to regulatory and enforcement agencies actions."

1150. ABDC's policies are not sufficient to comply with the requirements to track and report suspicious orders. Under ABDC's deficient policies, it does not hold for review orders that only meet

[630] Email from Eric Cherveny to Stephen Hendrickson, et al. (Aug. 5, 2016, 1:29 PM).

one of the criteria for an order to be deemed suspicious. By limiting the orders even held for review, ABDC does not fulfill its obligation to identify orders of interest, much less suspicious orders.

1151. Examples of egregious cases identified in an investigation by New York's Attorney General included:

a. A pharmacy at or above the 99th percentile in terms of both the number of opioid orders and total opioid weight, at which, between 2014 and 2016, more than 10% of its prescriptions were written by prescribers who were later indicted or convicted of opioid-related prescribing and distribution charges; ABDC reported nearly 200 suspicious order reports from this pharmacy in 2013-2014, and as of 2018, it was still serving as this pharmacy's primary opioid distributor;

b. A pharmacy where, between 2013 and 2017, 77% of its prescriptions, on average, were written by prescribers who were later indicted or convicted, including 90% in 2014, and to which ABDC appears to have only stopped shipping in 2017; and

c. A Bronx pharmacy that exceeded the 95th percentile for the percentage of oxycodone volume shipped for five years straight (2012 to 2016), where on average 58% of its opioid prescriptions were paid for in cash (99th percentile), where for three consecutive years (2013 to 2015) approximately half of all opioid scripts were written by prescribers who were later convicted, and which, as of 2018, was still a customer of ABDC.[631]

1152. At all relevant times, ABDC failed to employ enough qualified compliance staff to implement its diversion prevention policies, failed to ensure those compliance staff were meeting its anti-diversion duties, and failed to enforce even the defective policies it had in place.

1153. Since the integration of Bellco into ABDC and the revamp of its Diversion Control Program in 2015, the company has increased anti-diversion staffing, but has not significantly increased the number of fully trained ground-level employees. Since that time, ABDC has maintained only five to seven front-line employees on its Diversion Control Team, responsible for reviewing new customers and monitoring its existing customers.

[631] Memorandum Opinion, *Lebanon Cty. Emps.' Retirement Fund v. AmerisourceBergen Corp.*, No. 2019-0527-JTL (Del. Ch. Ct. Jan. 13, 2020), https://courts.delaware.gov/Opinions/Download.aspx?id=300360.

1154. Disjunction between ABDC and Bellco has led to many compliance failures. Bellco Generics customers, for example, regularly completed the 590 Form independently, submitted it to Bellco, and were onboarded without receiving a site visit. Until system integration in or around November 2015, staff had no systematic way of identifying dual customers. The lack of an integrated system also meant that thresholds were not coordinated between ABDC and Bellco. As a result, a dual customer could have high thresholds with both entities and could even be exceeding both thresholds or having both thresholds periodically increased, without detection. In or around April 2013, ABDC implemented a policy for dual customers that prevented both ABDC and Bellco from supplying controlled substances to the same customer, but implementation was spotty, and in practice, only a small percentage of orders flagged for review were canceled—and even fewer were deemed suspicious.

1155. The one area in which ABDC has consistently stood out as compared to its major competitors is its unwillingness to identify suspicious orders, even among customers that regularly exceeded their thresholds and presented multiple red flags of diversion. Numerous ABDC opioid customers exhibited several common indicators of suspicious activity for multiple years. These flags included:

a. Scoring above the 90th percentile in the county for opioid order volume;

b. Scoring above the 90th percentile in the county for total opioid orders;

c. Scoring above the 90th percentile in the county for oxycodone order volume;

d. Scoring above the 90th percentile in the county for total oxycodone orders;

e. Scoring above the 90th percentile in the state for the percentage of oxycodone volume shipped out of all controlled substances shipped;

f. Filling prescriptions by prescribers who were later indicted or convicted on opioid-related prescribing and distribution charges;

g. Scoring above the 90th percentile in terms of percentage of patient doctor-shoppers;

h. Scoring above the 90th percentile in terms of percentage of cash payments; and

i. Scoring above the 90th percentile in terms of the median MME prescribed per day.

1156. ABDC's sales representatives had an incentive to enable the pharmacies in their territories to order unnecessarily large quantities of opioids. According to the testimony of a retired ABDC sales representative in West Virginia, their bonuses were based on total sales to their pharmacies.

1157. In addition, sales representatives were inadequately trained to identify and halt ABDC's sales of controlled substances to pharmacies where diversion was occurring. For example, a DEA suspension order concerning one of ABDC's Ohio customers, East Main Street Pharmacy, documented deaths that occurred as a result of a failure to prevent diversion. Julie Fuller, the ABDC sales representative responsible for East Main Street Pharmacy, testified in the suspension proceedings. Notwithstanding obvious signs of illegal activity, including the fact that more than half of the pharmacy's prescriptions were written by an out-of-area doctor who was writing high volumes of controlled substances, Fuller "acknowledged that the purpose of her visits was not 'to observe [the pharmacist]' in the practice of pharmacy but to get his business."[632] Subsequent to the suspension proceedings, Fuller signed a Declaration, where she stated that ABDC only provided her with general sales training and did not provide any training or information on (a) how to identify questionable pharmacy behavior like suspicious dispensing, sales, or prescription filling practices; (b) how to report concerns regarding those behaviors; or (c) how to ensure that account managers only signed up and maintained accounts with legitimate pharmacies. These failures led to diversion at the pharmacy.

1158. ABDC allowed Walgreens to "police their own orders and block any order that would exceed [ABDC]'s threshold thus triggering a suspicious order being sent to DEA from [ABDC]."

[632] East Main Street Pharmacy; Affirmance of Suspension Order, 75 Fed. Reg. 66149 (Oct. 27, 2010), https://www.govinfo.gov/content/pkg/FR-2010-10-27/pdf/2010-27096.pdf.

Additionally, when ABDC received orders from Walgreens "outside the expected usage," Walgreens and ABDC met to discuss adjusting thresholds or using "soft blocking." Contrary to DEA guidance and its own stated policy, ABDC also shared the threshold limits set by its "order monitoring program" with Walgreens and provided Walgreens with weekly SOM statistics. ABDC generally would not take action on Walgreens orders that exceeded its thresholds without first talking to Walgreens.

**4. Public Statements of Compliance**

1159. ABDC misleadingly claims on its website and in other public statements that it has an effective diversion control team and protocol and that its sophisticated "diversion control program" provides daily reports to regulators about the quantity, type, and receiving pharmacy of every order of controlled substances it distributes.[633]

1160. ABDC has taken the public position that it is "work[ing] diligently to combat diversion and [is] working closely with regulatory agencies and other partners in pharmaceutical and healthcare delivery to help find solutions that will support appropriate access while limiting misuse of controlled substances." A company spokesperson also provided assurance that "[a]t [ABDC], we are committed to the safe and efficient delivery of controlled substances to meet the medical needs of patients."[634]

1161. The implication that ABDC has effectively addressed diversion is false, as ABDC's repeated payments to settle diversion-related violations indicate.

1162. ABDC's public statements misled the public, including Plaintiffs, into believing that ABDC was taking effective steps to fight the opioid epidemic.

---

[633] *Safe and Secure Distribution of Controlled Substances*, AmerisourceBergen (Sept. 2019), https://www.amerisourcebergen.com/-/media/assets/amerisourcebergen/fighting-the-opioid-epidemic/abc_opioidreport_sept2019.pdf; Letter from Amanda B. Robinson, Morgan Lewis & Bockius, to Sen. Claire McCaskill (July 3, 2018), https://www.hsgac.senate.gov/imo/media/doc/AmerisourceBergen%20Response%20Ltr%20to%20McCaskill%20re%20Opioids%20Report.pdf.

[634] *Records Show Rural West Virginia Flooded with Painkillers*, Ins. J. (June 6, 2016), https://www.insurancejournal.com/magazines/mag-features/2016/06/06/410426.htm#.

## I. Cardinal

1163. Cardinal, despite being a giant distributor with purportedly comprehensive systems for tracking the movement of drugs, failed to take adequate steps to prevent the diversion of opioids in Arizona.

1164. Cardinal sold and shipped unreasonable quantities of opioids into Arizona, including many red-flag pharmacies in Arizona, and continued to do so despite extensive and blatant evidence of diversion at many facilities in Arizona. Cardinal has been investigated and fined for some of its many failures to secure its supply chain but continues to allow inappropriate and harmful distribution of opioids.

1165. The volume of opioids Cardinal shipped into Arizona was so high as to put it on notice that not all of the drugs being ordered would be used to fill prescriptions for legitimate medical uses.

1166. The opioid crisis described herein is a direct and foreseeable result of Cardinal's actions.

1167. According to its most recent 10-K filed with the SEC: "Cardinal Health, Inc. . . . is a globally integrated healthcare services and products company providing customized solutions for hospitals . . . ."[635] In fact, "nearly 90 percent of American hospitals . . . depend upon Cardinal Health for critical supplies."[636]

1168. Cardinal has directly targeted hospitals, including Plaintiffs, to drive sales of the prescription opioids it distributes. Its website boasts to hospitals that it "works to align our resources with your capabilities and needs, helping your hospital or health network stay resilient and responsive."[637]

---

[635] Cardinal Health, Inc., *Form 10-K* (Aug. 13, 2020), https://d18rn0p25nwr6d.cloudfront.net/CIK-0000721371/5a7655cd-b024-43a1-925b-c012229afa01.pdf (hereinafter, *Cardinal 10-K*).

[636] *Cardinal Health Partners with FourKites to Build Cognitive Supply Chain*, Intrado Global Newswire (Mar. 29, 2021), https://www.globenewswire.com/en/news-release/2021/03/29/2200673/0/en/Cardinal-Health-Partners-with-FourKites-to-Build-Cognitive-Supply-Chain.html.

[637] *Hospitals and Health Systems*, Cardinal Health, https://www.cardinalhealth.com/en/services/hospital-and-

1169. Its most recent 10-K also shows that Cardinal has agreed to pay $5.56 billion to resolve claims brought by states, cities, and counties related to its opioid distribution practices. According to Cardinal:

> The Settlement Framework includes (1) a cash component, pursuant to which we would pay up to $5.56 billion over eighteen years, (2) development and participation in a program for free or rebated distribution of opioid abuse treatment medications for a period of ten years, and (3) to-be specified industry-wide changes to distributor-controlled substance anti-diversion programs.[638]

Separately, Cardinal also paid $66 million to two counties in Ohio to resolve their claims ahead of the first bellwether trial in the national opioid litigation.[639]

1170. Cardinal was on notice that its protocols were inadequate to prevent the diversion and abuse of the opioids within its care.

1171. Cardinal also participated in Front Groups including HDA and PCF (through HDA's membership).

**1. Enforcement Actions**

1172. On December 26, 2006, Cardinal entered into an Assurance of Discontinuance Pursuant to Executive Law § 63(15) with the New York Attorney General related to its failures to prevent and monitor price diversion and closed-door pharmacies.[640]

1173. On September 18, 2007, the DEA issued a Warrant for Inspection against the Cardinal Stafford, Texas Distribution Center ("Stafford Facility") for failure to maintain effective controls against diversion of hydrocodone.

---

health-systems.html (last visited July 19, 2021).

[638] *Cardinal 10-K*, *supra*.

[639] *Cardinal Health Reports First Quarter Results for Fiscal Year 2020*, Cardinal Health (Nov. 7, 2019), https://ir.cardinalhealth.com/news/press-release-details/2019/Cardinal-Health-Reports-First-Quarter-Results-for-Fiscal-Year-2020/default.aspx.

[640] Assurance of Discontinuance under Executive Law § 63(15), *Cardinal Health, Inc.* (N.Y. Att'y Gen. Dec. 26, 2006), https://ag.ny.gov/sites/default/files/press-releases/archived/Assurance%20of%20Discontinuance.pdf.

1174. On November 28, 2007, the DEA issued an Order to Show Cause and Immediate Suspension Order against the Cardinal Auburn, Washington Distribution Center for failure to maintain effective controls against diversion of hydrocodone.[641]

1175. On December 5, 2007, the DEA issued an Order to Show Cause and Immediate Suspension Order against the Cardinal Lakeland, Florida Distribution Center ("Lakeland Facility") for failure to maintain effective controls against diversion of hydrocodone.[642]

1176. On December 7, 2007, the DEA issued an Order to Show Cause and Immediate Suspension Order against the Cardinal Swedesboro, New Jersey Distribution Center for failure to maintain effective controls against diversion of hydrocodone.[643]

1177. On January 30, 2008, the DEA issued an Order to Show Cause against the Stafford Facility for failure to maintain effective controls against diversion of hydrocodone.[644]

1178. In 2008, Cardinal paid a $34 million penalty to settle allegations about opioid diversion taking place at seven warehouses around the United States (the "2008 Cardinal Settlement Agreement").[645] These allegations included failing to report to the DEA thousands of suspicious orders of hydrocodone that Cardinal then distributed to pharmacies that filled illegitimate prescriptions originating from rogue internet pharmacy websites.[646] The settlement also referenced allegations by the DEA that Cardinal failed to maintain effective controls against the diversion of controlled substances at all 27 of its distribution centers nationwide.[647]

---

[641] *Settlement and Release Agreement and Administrative Memorandum of Agreement* 1 & app'x B (Oct. 2, 2008) (hereinafter *Cardinal 2008 Settlement*).

[642] *Id.* at 1 & app'x C.

*DEA Suspends Lakeland Branch of Drug Company from Distributing Controlled Substances*, U.S. Dep't Just. (Dec. 11, 2007), http://s3.amazonaws.com/fcmd/documents/documents/000/003/350/original/Cardinal_Health_-_DEA_Suspension_of_Lakeland_FL_07DEAPR.pdf?1429557281.

[643] *Id.* at 1 & app'x D.

[644] *Id.* at 1 & app'x E.

[645] *Cardinal Health Inc., Agrees to Pay $34 Million to Settle Claims that it Failed to Report Suspicious Sales of Widely-Abused Controlled Substances*, U.S. Dep't Just. (Oct. 2, 2008), https://www.justice.gov/archive/usao/co/news/2008/October08/10_2_08.html.

[646] *Id.*

[647] *Cardinal 2008 Settlement*, *supra*.

1179. As part of the 2008 Cardinal Settlement Agreement, Cardinal agreed to "maintain a compliance program designed to detect and prevent diversion of controlled substances as required by the CSA and applicable DEA regulations."[648]

1180. However, in 2012, the DEA issued an "immediate suspension order," suspending Cardinal's registration for the Lakeland Facility as a result of Cardinal's failure to maintain effective controls against diversion of oxycodone.[649]

1181. To settle this action, Cardinal agreed that it had (i) failed to maintain effective controls against the diversion of controlled substances, including failing to conduct meaningful due diligence to ensure that controlled substances were not diverted; (ii) failed to detect and report suspicious orders of controlled substances as required by the CSA; and (iii) failed to adhere to the provisions of the 2008 Cardinal Settlement Agreement.[650]

1182. As part of the 2012 settlement, Cardinal agreed to cease distributing controlled substances from its Lakeland Facility for two years.[651]

1183. On December 23, 2016, Cardinal agreed to pay the United States $34 million to resolve allegations that it violated federal regulations and statutes in Washington, Maryland, and Florida by failing to report suspicious orders of controlled substances, including oxycodone, to the DEA.[652] In the settlement agreement, Cardinal admitted, accepted, and acknowledged that it had violated the CSA between January 1, 2009 and May 14, 2012 by failing to:

---

[648] *Id.*

[649] Order to Show Cause and Immediate Suspension of Registration, *Cardinal Health* (U.S. Drug Enf't Admin. Feb. 2, 2012); *DEA Suspends Pharmaceutical Wholesale Distributor and Retailers' Ability to Sell Controlled Substances*, U.S. Dep't Just. (Feb. 6, 2012), http://s3.amazonaws.com/fcmd/documents/documents/000/003/349/original/Cardinal_Health_-_DEA_Suspension_of_Lakeland_FL_12DEAPR.pdf?1429557281.

[650] Administrative Memorandum of Agreement (May 14, 2012), https://www.thehealthlawfirm.com/uploads/Cardinal%20Health%20-%20Memo%20of%20Agreement.pdf.

[651] *Cardinal Health Brings Resolution to Litigation with DEA Settlement*, Cardinal Health (May 15, 2012), https://s1.q4cdn.com/238390398/files/doc_news/2012/CAH_News_2012_5_15_General_Releases.pdf.

[652] Settlement Agreement (Dec. 20, 2106), https://media.bizj.us/view/img/10285208/cardinal-health-settlement.pdf; *United States Reaches $34 Million Settlement with Cardinal Health for Civil Penalties Under the Controlled Substances Act*, U.S. Drug Enf't Admin. (Dec. 27, 2016), https://www.dea.gov/press-releases/2016/12/27/united-states-reaches-34-million-settlement-cardinal-health-civil (hereinafter *$34 Million Settlement*).

a. "timely identify suspicious orders of controlled substances and inform the DEA of those orders, as required by 21 C.F.R. § 1301.74(b)";

b. "maintain effective controls against diversion of particular controlled substances into other than legitimate medical, scientific, and industrial channels, as required by 21 C.F.R. § 1301.74, including the failure to make records and reports required by the CSA or DEA's regulations for which a penalty may be imposed under 21 U.S.C. §842(a)(5)"; and

c. "execute, fill, cancel, correct, file with the DEA, and otherwise handle DEA 'Form 222' order forms and their electronic equivalent for Schedule II controlled substances, as required by 21 U.S.C. §828 and 21 C.F.R. Part 1305."

1184. A related $10 million settlement covered a Cardinal subsidiary, which failed to report a single suspicious order despite shipping oxycodone and hydrocodone to more than 20 New York-area pharmacy locations that placed unusually high orders for controlled substances at an unusually frequent rate.[653]

1185. Cardinal agreed to pay $20 million in January 2017 to settle claims by the West Virginia Attorney General that Cardinal had failed to use proper controls when shipping opioids.[654]

1186. Cardinal is also the subject of ongoing investigations. It has reported in its most recent 10-K:

> We have received federal grand jury subpoenas issued in connection with investigations being conducted by the U.S. Attorney's Office for the Eastern District of New York and the Fraud Section of the U.S. Department of Justice ("DOJ"). The subpoenas seek documents relating to our anti-diversion policies, procedures and program, and our distribution of certain controlled substances. We are cooperating with these requests.[655]

---

[653] *$34 Million Settlement*, *supra*.

[654] Charles Ornstein, *Drug Distributors Penalized for Turning a Blind Eye in Opioid Epidemic* (Jan. 27, 2017), https://www.npr.org/sections/health-shots/2017/01/27/511858862/drug-distributors-penalized-for-turning-blind-eye-in-opioid-epidemic.

[655] *Cardinal 10-K*, *supra*.

### 2. Marketing Activities

1187. Cardinal has actively sought to increase the demand for and sale of opioids in Arizona by marketing these dangerous and addictive drugs to pharmacists and prescribers, and even directly to consumers, contrary to its public claim that it merely serves as a secure delivery service for transporting medications from warehouse to pharmacy. Cardinal not only offers marketing services to its drug manufacturer clients, but it also incentivizes and encourages manufacturers to use these marketing channels as a way of building their business and increasing sales of prescription opioids.

1188. In its own words, Cardinal advertises that its "commercial team helps to position [a manufacturer's] product for success by identifying physicians who treat unique patient populations, understanding prescriber behavior and driving engagement."[656]

1189. Cardinal marketed opioids by direct-to-consumer marketing, direct mail marketing, email marketing, marketing in customer newsletters, telemarketing, advertisements on its ordering platform, and pharmacy rebates.

1190. Cardinal's promotional services offered to the Marketing Defendants also included programs to train KOLs. Cardinal also offered to provide KOLs to deliver web-based conference programs promoting a drug manufacturer's products. Further, Cardinal offered a proprietary database of providers to whom the Marketing Defendants could send email blasts and presentation material to promote its products. Cardinal provided these services to promote opioids sold by the Marketing Defendants.[657]

---

[656] *Solutions for Biopharma Success*, Cardinal Health, https://www.cardinalhealth.com/en/services/manufacturer/biopharmaceutical.html (last visited July 19, 2021).

[657] *See Non-Personal Promotion*, Cardinal Health, https://www.cardinalhealth.com/en/services/manufacturer/biopharmaceutical/commercialization/non-personal-promotion.html (last visited Aug. 6, 2021); *Provider Consulting*, Cardinal Health, https://www.cardinalhealth.com/en/services/manufacturer/biopharmaceutical/commercialization/provider-consulting.html (last visited Aug. 6, 2021); *Provider Engagement*, Cardinal Health, https://www.cardinalhealth.com/en/services/manufacturer/biopharmaceutical/commercialization/provider-engagement.html (last visited Aug. 6, 2021).

1191. Cardinal provided marketing assistance to Allergan, Endo, and Janssen. Cardinal marketed Endo's Opana ER through at least direct mail and email blasts.

1192. Cardinal made presentations at trade shows to purportedly educate target customers about new drugs, but in reality to promote excessive purchases of prescription opioids.

1193. Cardinal disseminated certain opioid advertisements that contained deceptive statements regarding the risk of addiction, abuse, and diversion posed by these drugs. Many of Cardinal's opioid advertisements failed to disclose the serious risks associated with opioids or provide "fair balance" in their representation of the risks and benefits of the drugs. Cardinal disseminated advertisements promoting opioids without mentioning any of the drugs' risks. These advertisements failed to provide "fair balance" and had material omissions, which rendered them misleading to their intended recipients.

1194. Cardinal disseminated advertisements that were not clearly labeled as paid advertising content and would reasonably have been mistaken by Cardinal's pharmacy customers as neutral informational content provided by Cardinal.

1195. Through these and other advertisements, Cardinal took advantage of its unique position of trust as a distributor of controlled substances to promote opioids in deceptive and misleading ways. Cardinal knew or should have known that these advertisements—particularly those that misrepresented the risk of diversion for, or addictive potential of, prescription opioids—were deceptive, because of its own heightened duties, as a distributor, when handling controlled substances. Moreover, when engaging in pharmaceutical marketing, Cardinal knew or should have known about the attendant legal obligations, including the obligation to provide "fair balance" and adequately disclose the risks associated with the drugs it was promoting.

**3. Distribution Activities**

1196. The SOM system that Cardinal used from April of 2000 until late 2007 or early 2008 had two operational aspects. First, Cardinal utilized "Ingredient Limit Reports," which were generated as a retrospective review of the prior month's distribution data based on a formula that was applied on a monthly basis. A hard copy was then mailed to the local DEA office. Cardinal's methodology in the Ingredient Limit Reports was based on the DEA's 1998 Reno Report, which provides guidance on monitoring monthly orders of chemicals used to make illicit methamphetamine. The Reno Report, referencing the Chemical Handlers Manual, advises a distributor to set an "ingredient limit" as a tool to detect monthly orders of extraordinary size. This limit is determined by calculating a monthly average for similarly situated customers and multiplying by a factor of three. Monthly orders in excess of this limit are deemed "extraordinary" and must be reported.

1197. Cardinal used this methodology to monitor controlled substances, but instead used a factor of four to identify unusual monthly orders. This design is insufficient because: (a) it fails to identify suspicious orders before shipment; (b) it uses after-the-fact reporting of suspicious orders; (c) it ships suspicious orders; (d) it uses a 4x factor which exceeds the 3x factor recommended by the Reno Report to detect orders of extraordinary size; and (e) the Reno Report is designed to detect diversion of List 1 chemicals, not Schedule II or III controlled substances. Cardinal knew or should have known that such a system, by itself, was woefully insufficient to meet its obligations to prevent diversion.

1198. The second part of the SOM system in place until 2008 was to have cage/vault employees look for suspicious orders based on the "Excessive Purchases Schedule II" and "Excessive Purchases Schedule III, IV, V" charts. Excessive daily orders were defined for hydrocodone and oxycodone:

a. Hydrocodone – 800 Tabs/Caps

b. Oxycodone/Acet – 1200 Tabs/Caps

c. Oxycodone/Asa – 500 Tabs

d. Oxycodone – 600 Tabs

1199. If Cardinal's pickers and checkers (i.e., the employees pulling bottles from the controlled substances cage in the distribution center for shipment to pharmacies) spotted an excessive order, they were to notify the local DEA office prior to shipment of the order if possible and place a copy of these orders in the distribution center's suspicious order file along with a Regulatory Agency Contract Form (Form #1), noting any specific instructions from the DEA.

1200. Although Cardinal's official policy was for any order exceeding these thresholds to be reported as suspicious prior to shipment, this policy was often disregarded. Cardinal employees instructed Cardinal personnel to ignore the daily limits. One employee, Dave Strizzi, claimed that these limits were for guidance and that orders should be cut but that staff should "record the orders that exceed these limits for possible reporting to the DEA" (emphasis added). In addition, on November 5, 2006, Rafael Varela, one of Cardinal's QA and Compliance managers, wrote, "the Vault Keyers were, until today, overriding the limiters for the vault items in the system," indicating that Cardinal's policies were not being followed.

1201. Prior to 2006, Cardinal's due diligence was limited to determining whether an order had been placed by a person with a valid registration to possess controlled substances. While this is a necessary first step in the process, it does not satisfy a distributor's obligation to conduct due diligence on its customers before shipping controlled substances to them.

1202. In 2006, Cardinal adopted a narrow due-diligence policy applicable to closed-door pharmacies engaged in contract pricing. This due diligence was limited to these pharmacies and was

not designed to ensure that appropriate investigations were undertaken to prevent the diversion of controlled substances.

1203. In 2008, Cardinal implemented several Standard Operating Procedures ("SOPs") related to anti-diversion. This system had two primary components. The first component was threshold utilization. This included setting a specific threshold (based on dosage unit) for each customer for each controlled drug base code or drug family and holding and not shipping an order that exceeded the allotted threshold.

1204. Cardinal's approach to setting these thresholds was fatally flawed. Cardinal's threshold system required it to determine the twelve-month average for its customers, for each base code based on type and size of customer and multiply that average by a multiple of 3 for schedule II's and a multiple of 5 for schedule III's. This approach was insufficient because: (a) it set the thresholds based on ordering patterns that had already been primed by the years of unreasonably large orders that had led to the opioid epidemic already raging by 2008; and (b) Cardinal relied on the inapplicable methodology of the Reno Report for the 3x and 5x multipliers.

1205. Cardinal regularly ignored the thresholds it had set for its customers. For instance, the DEA found that following the 2008 settlement with the DEA, Cardinal failed to report any suspicious orders of oxycodone products for pharmacies in Maryland between 2008 and October 1, 2011. During this time, the DEA found that Cardinal Health increased thresholds for these Maryland pharmacies despite evidence indicating potential diversion. A DEA investigation also found that certain Florida customers were inappropriately permitted to exceed their predetermined threshold:

a. CVS 219 allowed to exceed its threshold 14 out of 16 months.

b. Gulf Coast allowed to exceed its threshold 12 out of 29 months.

c. CVS 5195 allowed to exceed its threshold 5 consecutive months.

d. Caremed allowed to exceed its threshold 13 out of 17 months.

These examples illustrate the nationwide scope of Cardinal's deficient anti-diversion programs.

1206. Because Cardinal's system at this time automatically stopped orders that exceeded the threshold, each order that was ultimately shipped above the threshold was reviewed by a Cardinal employee, and a conscious decision was made to release the order. Cardinal's compliance staff routinely released orders in excess of a customer's threshold without conducting the follow-up investigation and providing the detailed written justification called for by the SOPs. Because Cardinal failed to adequately investigate every stopped order, Cardinal released orders that contributed to diversion.

1207. The second component of this system was "Know Your Customer" (KYC). The KYC aspect of Cardinal's system collected information from various sources: (a) new account approval process, (b) on-sight investigations, (c) additional internal research conducted on the customer, and (d) justifications for changes made and due diligence conducted related to any specific order or threshold change.

1208. Although Cardinal began to train its sales representatives in the KYC program, up until 2012, there was little to no actual implementation of this program. Cardinal did perform some on-site investigations but, according to the Special Demand Committee Report of Cardinal's Board of Directors, those investigations were not reviewed properly.[658]

1209. Cardinal's failures came not necessarily in the design of its KYC system, but in the operation of that system. Due diligence files must be complete, accurate, and maintained on each customer so that a registrant has a sufficient understanding of each customer. These customer files also must be accessible to allow a registrant to use this information when it receives an order that is

[658] Special Demand Comm., Bd. of Dirs. of Cardinal Health, Inc., *Investigation Report* 36 (Apr. 12, 2013), https://www.cardinalhealth.com/content/dam/corp/web/documents/Report/CH-Report-of-Special-Demand-Committee-April-12-2013-Redacted.pdf.

potentially suspicious. Cardinal did not maintain sufficient KYC/due diligence files on each of its customers in order to have the requisite knowledge of them.

1210. During this period, Cardinal also treated retail chain customers differently from retail independent customers. Cardinal relied on chain customers to conduct their own due diligence and investigations related to potentially suspicious orders and other diversion concerns. Cardinal cannot fulfill its duty to prevent diversion if it does not apply at least the same level of scrutiny to all of its customers.

1211. Moreover, these policies were fundamentally flawed in that they were not coordinated within the context of a consistent, unified umbrella policy to prevent the diversion of controlled substances, resulting in employees governed by one of the SOPs being unaware of the obligations imposed by other SOPs on other employees, even when effective anti-diversion measures required that understanding and coordination. Furthermore, the SOPs were not readily available even to the employees charged with implementing them.

1212. In addition, Cardinal's SOPs and policies contained numerous gaps that would have prevented them from effectively preventing diversion, even if enforced. For example, these policies:

a. Allowed compliance staff to approve onboarding new accounts with no formal mechanism to ensure review and approval by a supervisor;

b. Allowed onboarding of new accounts even where customers failed to provide requested information about other suppliers, dispensing data, and top prescriber information; and

c. Allowed compliance staff to release a customer's first order in excess of its monthly threshold, regardless of whether the customer made other orders in excess of the same drug threshold at the same time.

1213. During this period, Cardinal's practice was not to report suspicious orders but rather to report an order as suspicious when the customer appeared suspicious, and Cardinal intended to terminate that customer. Waiting until the point of termination to report suspicious orders does not satisfy Cardinal's obligation to report suspicious orders so as to prevent diversion.

1214. At all relevant times, Cardinal failed to employ qualified compliance staff to implement these policies, failed to adequately train compliance staff and sales representatives concerning Cardinal's anti-diversion duties, and failed to enforce even the defective policies it had in place.

1215. Cardinal failed to install qualified personnel in key compliance positions. For example, Cardinal's front-line "New Account Specialists" and "Analysts," responsible for onboarding new customers and monitoring existing customers, respectively, were routinely recruited from the ranks of the company's existing pool of administrative assistants. These employees, who had no experience in regulatory compliance, were generally supervised by individuals with no prior experience in supervising investigative functions.

1216. Moreover, Cardinal failed to provide meaningful training to these unqualified compliance employees. Instead, Cardinal expected the compliance staff to "learn on the job" through informal in-person "team meetings." Due to the lack of proper training and clear guidelines, compliance staff did not fully understand critical components of their jobs and often developed their own procedures and benchmarks for reviewing customers.

1217. Cardinal was aware of these deficiencies. A 2008 PowerPoint presentation created by Michael Moné, Cardinal's Vice President of Anti-Diversion from 2007 to 2012, indicated that Cardinal needed to re-educate its 40,000 employees about their responsibilities to prevent diversion.

1218. Unsurprisingly, these unqualified and untrained staff routinely failed to follow even the most basic procedures required under the company's various SOPs. In addition, Cardinal allowed customers to reinstate their accounts through the new account onboarding process despite having compliance red flags.

1219. Even to staff charged with investigations and anti-diversion, the message was clear: without sales, there is no Cardinal. Indeed, many of Cardinal's policies and practices prioritized sales over regulatory obligations.

1220. For example, in 2008, Cardinal prepared talking points for an NACDS Conference about its planned retail chain SOM program, making it clear that the program would "minimize the disruption" to retail chains and that they would "work together" with the pharmacies "to ensure that our Suspicious Order Monitoring program for retail chains does not interrupt" business. Cardinal also provided warnings to chain pharmacies, including Walgreens, that they were approaching thresholds so that the chains could avoid triggering SOM reporting and adjust ordering patterns by, for example, delaying orders or, more often, obtaining a threshold increase. Such "early warnings" were so helpful to Walgreens that as of 2012 Walgreens adopted the concept for its own SOM system for self-distribution, noting internally that by "flagging the stores at 75%," it could "avoid cutting/reducing orders and subsequently not have to report a SOM to the DEA."

1221. Nevertheless, preferential treatment of Walgreens ultimately was not enough for Cardinal to keep Walgreens's business. After Walgreens shifted its business to ABDC as its exclusive supplier, Cardinal complained: "we bailed you guys out when you had your [DEA] issues."

1222. As a result of these deficient policies and practices, Cardinal did not maintain effective controls. For instance, on October 26, 2011, the DEA executed an administrative search warrant at Cardinal's Lakeland, Florida distribution center. The investigation uncovered that the facility had shipped 50 times as much oxycodone to its top four pharmacy customers in Florida as it had to all other Florida pharmacies combined. Additionally, the DEA found that the Lakeland facility's shipments exceeded Cardinal's own internal volume thresholds and that a Cardinal investigator had warned that Lakeland's oxycodone shipments posed a high risk of diversion—but he had been ignored.

1223. Although this investigation led to a settlement, in 2012 and 2013, Cardinal took significant steps to renew focus on increased sales at the cost of a robust and responsible compliance

structure, thereby keeping as customers pharmacies that it knew or should have known were high risk for diversion of opioids. For example, Cardinal:

a. Continuously reduced the due diligence information collected from prospective and existing customers, diluting the customer questionnaire, removing the requirements to collect photos of the pharmacies, and ceasing to ask about top prescribers;

b. Expanded the geographic territories of investigators with essential regional knowledge of, for example, top prescribers and their locations relative to the pharmacies where their prescriptions were being filled, thus reducing the investigators' efficacy;

c. Restricted the information reviewed from site visits by first removing the investigator comment section and for a time eliminating written reports entirely; and

d. Demoted, moved to non-compliance functions, or let go several staff members who articulated an interest in expanding the company's compliance functions, aggressively scrutinizing pharmacy customers, and/or terminating problematic customers.

1224. At the same time, Cardinal revised its SOM program ostensibly to be less subjective, but in reality, it did the opposite. The system Cardinal implemented in 2013 continued to utilize both thresholds and KYC, but now the thresholds were based solely on the individual customer's information without consideration of the population it served or comparison to similar customers. The precise details of the operation of this system are within Cardinal's knowledge and have not been made publicly available.

1225. During this time, Cardinal continued to fail to report suspicious orders. A Cardinal Employee, Todd Cameron, has testified that Cardinal failed to report approximately 14,000 separate suspicious orders from across the country between 2012 and 2015.

1226. These failures were systemic. For instance, in June 2008, Cardinal received 421 orders nationwide that its system flagged as warranting investigation, but only 12 were ever reported as suspicious. On information and belief, at least some of the remaining 409 orders should also have been reported as suspicious.

1227. Even where Cardinal did block customers' orders and report them, it routinely took no steps to suspend or terminate those customers pending further investigation and instead allowed them to continue receiving their threshold amount of opioids month after month, regardless of whether they continued to make additional suspicious orders.

1228. For example, between 2012 and 2017, Cardinal reported twelve or more opioid-related suspicious orders for at least one year—the equivalent of one per month—for hundreds of pharmacies. Those pharmacies had known red flags in their shipment orders and prescription data. More than half of these pharmacies exceeded the 90th percentile in their state in terms of (a) opioid volume shipped; (b) oxycodone volume shipped; and (c) median strength of opioids prescribed per day. Nonetheless, even after reporting twelve or more opioid-related suspicious orders for one of these pharmacies, Cardinal continued to ship opioids, on average, for more than three years. Among this group of suspect pharmacies that Cardinal did nothing to control were particularly egregious cases in which Cardinal found more than 50 opioid-related suspicious orders per year—the equivalent of one suspicious order per week for three or more consecutive years.

1229. Even if Cardinal had conducted due diligence to investigate its high-volume opioid customers, Cardinal's failure to implement any system to store and share information about their suspicious customers and/or suspicious prescribers would have compromised the effectiveness of any such investigation.

1230. Due to these flaws in its SOM program, Cardinal routinely continued to supply pharmacies that filled prescriptions for prescribers that had been flagged in its own (infrequent) investigations as likely sources of diversion.

### 4. Public Statements of Compliance

1231. Cardinal's public representations created the appearance that Cardinal would secure its supply chain. These representations were false because Cardinal failed to take reasonable steps to prevent opioid diversion in Arizona.

1232. Cardinal touted its anti-diversion practices and purported anti-diversion monitoring programs and publicly stated in settlements that it would take reasonable measures to prevent diversion. Cardinal had stated that its "sophisticated, state-of-the-art anti-diversion program includes advanced analytics, technology and on-the-ground deployment of investigatorsto evaluate pharmacies, scrutinize customers and orders, as well as identify, block and report orders of prescription-controlled substances that do not meet our strict anti-diversion criteria."[659]

1233. Cardinal claims, "We challenge ourselves to best utilize our assets, expertise and influence to make our communities stronger and our world more sustainable, while governing our activities as a good corporate citizen in compliance with all regulatory requirements and with a belief that doing 'the right thing' serves everyone."[660] Cardinal likewise claims to "lead [its] industry in anti-diversion strategies to help prevent opioids from being diverted for misuse or abuse."

1234. Along the same lines, it claims to "maintain a sophisticated, state-of-the-art program to identify, block and report to regulators those orders of prescription-controlled medications that do not meet [its] strict criteria."[661] A Cardinal executive recently claimed that Cardinal uses "advanced analytics" to monitor its supply chain; Cardinal assured the public it was being "as effective and efficient as possible in constantly monitoring, identifying, and eliminating any outside criminal

---

[659] *Cardinal Health Statement on Multi-State Inquiry by Attorneys General*, Cardinal Health (Sept. 18, 2017), https://newsroom.cardinalhealth.com/2017-09-18-Cardinal-Health-Statement-On-Multi-State-Inquiry-By-Attorneys-General.

[660] *Corporate Citizenship*, Cardinal Health, https://www.cardinalhealth.com/en/about-us/corporate-citizenship.html (last visited July 19, 2021).

[661] *Issues that Matter: How State Attorneys General Are Tackling the Opioid Crisis*, CBS News (Oct. 18, 2017), https://www.cbsnews.com/news/pennsylvania-attorney-general-josh-shapiro-issues-that-matter/.

activity."[662] Given the sales volumes and the company's history of violations, either this executive was wrong, or, if Cardinal had such a system, it ignored the results.

1235. Cardinal continues to make misleading statements regarding its history of compliance with its obligations to detect and prevent diversion:

> Our anti-diversion program includes a state-of-the-art, constantly adaptive, rigorous system supported by program specialists who monitor and investigate suspicious orders using advanced analytics and other tools. We operate a strict and uncompromising system to spot, stop, and report to regulators suspicious orders of prescription controlled substances, including opioids. As threats evolve, we are constantly adapting our system to prevent the diversion and misuse of medications. We operate in good faith and our goal is to get it right. Through our program to date, Cardinal Health representatives have conducted hundreds of thousands of site inspections of our pharmacy customers nationwide and thousands of pharmacies have been identified that do not meet our anti-diversion standards, and we refuse to do business with them.[663]

1236. Cardinal's public statements misled the public, including Plaintiffs, into believing that Cardinal was taking effective steps to fight the opioid epidemic.

### J. <u>McKesson</u>

1237. Despite being a giant distributor with purportedly comprehensive systems for tracking the movement of drugs, McKesson failed to take adequate steps to prevent diversion of opioids in Arizona.

1238. McKesson sold and shipped unreasonable quantities of opioids into Arizona, including many red-flag pharmacies in Arizona, and continued to do so despite extensive and blatant evidence of diversion at many facilities in Arizona. McKesson has been investigated and fined for

---

[662] Lenny Bernstein, et al., *How Drugs Intended for Patients Ended Up in the Hands of Illegal Users: 'No One Was Doing Their Job'* (Oct. 22, 2016), https://www.washingtonpost.com/investigations/how-drugs-intended-for-patients-ended-up-in-the-hands-of-illegal-users-no-one-was-doing-their-job/2016/10/22/10e79396-30a7-11e6-8ff7-7b6c1998b7a0_story.html.

[663] *Addressing the Opioid Crisis: Board Engagement and Governance*, Cardinal Health, https://www.cardinalhealth.com/en/about-us/corporate-citizenship/ethics-and-governance/board-engagement-and-governance.html (last visited July 19, 2021).

some of its many failures to secure its supply chain but continues to allow inappropriate and harmful distribution of opioids.

1239. This distribution has generated enormous profits. For the fiscal year ending on March 31, 2021, McKesson generated revenues of $232 billion.[664]

1240. The volume of opioids McKesson shipped into Arizona was so high as to put it on notice that not all of the drugs being ordered would be used to fill prescriptions for legitimate medical uses.

1241. McKesson has acknowledged these failures. Speaking about certain pharmacies in West Virginia that McKesson belatedly terminated after supplying them with excessive quantities of opioids for years, McKesson's CEO admitted, "[i]n hindsight, I would have liked to have seen us move much more quickly to identify the issues with these pharmacies."[665]

1242. The opioid crisis described herein is a direct and foreseeable result of McKesson's actions.

### 1. Enforcement Actions

1243. In late 2005, DEA began investigating McKesson for filling large quantities of hydrocodone and oxycodone orders for rogue internet pharmacies. In January 2006, DEA notified McKesson that it had identified more than 2 million doses of hydrocodone delivered by McKesson to several rogue internet pharmacies during a three-week period. Importantly, during discussions with DEA, McKesson conceded that these extremely large orders were not flagged, in part, because

[664] McKesson Corp., *Form-10K*, May 12, 2021, https://s24.q4cdn.com/128197368/files/doc_financials/2021/ar/MCK-Q4FY21-10-K.pdf.

[665] *Combatting the Opioid Epidemic: Examining Concerns about Distribution and Diversion*, Hearing before the Subcomm. on Oversight & Investigations of the Comm. On Energy & Commerce, No. 115-124 (May 8, 2018), https://www.govinfo.gov/content/pkg/CHRG-115hhrg31601/html/CHRG-115hhrg31601.htm (hereinafter *Combatting the Opioid Epidemic*)

McKesson did not track the sale of generic drugs for suspicious order monitoring purposes under that system.[666]

1244. The violations at issue were as egregious as they were widespread. For example, from January 2005 to October 2006 McKesson delivered over 3 million doses of hydrocodone to a single small pharmacy in Baltimore, Maryland while also failing to report any of the orders from that pharmacy as suspicious. In a single month, McKesson delivered more than 2 million doses of hydrocodone to seven pharmacies in the Tampa area and failed to report any orders from those pharmacies as suspicious. Over a several-month period in 2007, McKesson delivered 2.6 million doses of hydrocodone to two Texas pharmacies while failing to report any orders from those pharmacies as suspicious.[667]

1245. These excessive and suspicious purchases ultimately led to DEA seeking a show cause order against the distribution center supplying these pills. McKesson ultimately resolved these violations as part of a 2008 settlement.[668]

1246. On May 2, 2008, McKesson agreed to pay more than $13 million in civil penalties for filling hundreds of suspicious opioid orders. McKesson also entered into an Administrative Memorandum of Agreement with the DEA which provided that McKesson would "maintain a compliance program designed to detect and prevent the diversion of controlled substances, inform DEA of suspicious orders required by 21 C.F.R. § 1301.74(b), and follow the procedures established by its Controlled Substance Monitoring Program."[669]

---

[666] Memorandum from Michael Mapes to Joseph Rannazzisi (Jan 23, 2006).
[667] Settlement and Administrative Memorandum of Agreement (May 2, 2008) (hereinafter, "McKesson 2008 Settlement").
[668] *Id.*
[669] *Id.*

1247. As part of McKesson's 2008 Settlement with the DEA, McKesson claimed to have "taken steps to prevent such conduct from occurring in the future," including specific measures delineated in a "Compliance Addendum" to the Settlement.[670]

1248. Despite this promise, McKesson paid $150 million in 2017 to resolve another investigation into its violations of the CSA in California, Colorado, Florida, Illinois, Massachusetts, Michigan, Missouri, Kentucky, Nebraska, New Jersey, Ohio, Washington, West Virginia, and Wisconsin. In this investigation, the DEA and DOJ concluded that McKesson's desire for increased sales and retaining its customers overrode its obligations to report suspicious orders and jeopardized the health and safety of people around the country. Among other things, the investigation revealed that McKesson's system for detecting "suspicious orders" from pharmacies was so ineffective and dysfunctional that, in a five-year period, it filled more than 1.6 million orders, but reported just 16 orders as suspicious - all from a single consumer.[671] Even more troublingly, the investigators found that McKesson's distribution centers "were supplying pharmacies that sold to criminal drug rings."[672]

1249. In this settlement, McKesson admitted that, between January 1, 2009 and January 17, 2017, it "did not identify or report to DEA certain orders placed by certain pharmacies which should have been detected by McKesson as suspicious based on the guidance contained in the DEA Letters." Despite its obligations under the 2008 settlement agreement, McKesson "failed to properly monitor its sales of controlled substances and/or report suspicious orders to DEA, in accordance with McKesson's obligations under the 2008 Agreements, the CSA, and 21 C.F.R. § 1301.74(b)."[673]

---

[670] *Id.*

[671] *McKesson Agrees to Pay Record $150 Million Settlement for Failure to Report Suspicious Orders of Pharmaceutical Drugs*, U.S. Dep't Just. (Jan. 17, 2017), https://www.justice.gov/opa/pr/mckesson-agrees-pay-record-150-million-settlement-failure-report-suspicious-orders (hereinafter *McKesson Agrees to Pay*).

[672] Lenny Bernstein & Scott Higham, *'We Feel Like Our System Was Hijacked': DEA Agents Say Huge Opioid Case Ended with a Whimper*, Wash. Post (Dec. 17, 2017), https://www.washingtonpost.com/investigations/mckesson-dea-opioids-fine/2017/12/14/ab50ad0e-db5b-11e7-b1a8-62589434a581_story.html (hereinafter *Hijacked*).

[673] Settlement Agreement and Release (Jan. 5, 2017), https://www.justice.gov/opa/press-release/file/928471/download.

1250. McKesson further admitted that it had "distributed controlled substances to pharmacies even though those [McKesson] Distribution Centers should have known that the pharmacists practicing within those pharmacies had failed to fulfill their corresponding responsibility to ensure that controlled substances were dispensed pursuant to prescriptions issued for legitimate medical purposes by practitioners acting in the usual course of their professional practice, as required by 21 C.F.R. § 1306.04(a)." McKesson admitted that it had "failed to maintain effective controls against diversion of particular controlled substances into other than legitimate medical scientific and industrial channels by sales to certain of its customers in violation of the CSA and the CSA's implementing regulations."[674]

1251. As part of the 2017 McKesson Settlement Agreement, McKesson agreed that its authority to distribute controlled substances from 12 distribution centers would be partially suspended for several years.[675] The overall sanctions to which McKesson submitted were the most severe ever imposed on a DEA-registered distributor.

1252. As the *Washington Post* reported in 2017, DEA staff recommended a much larger penalty than the $150 million ultimately agreed to for McKesson's continued and renewed breach of its duties, as much as a billion dollars, and delicensing of certain facilities.[676] A DEA memo outlining the investigative findings in connection with the administrative case against 12 McKesson distribution centers included in the 2017 settlement stated that McKesson "[s]upplied controlled substances in support of criminal diversion activities"; "[i]gnored blatant diversion"; had a "[p]attern of raising thresholds arbitrarily"; "[f]ailed to review orders or suspicious activity"; and "[i]gnored [the company's] own procedures designed to prevent diversion."

---

[674] *Id.* at 3, 4.
[675] *Id.* at 3.
[676] *Hijacked*, *supra*.

1253. On December 17, 2017, CBS aired an episode of *60 Minutes* featuring Assistant Special Agent David Schiller, who described McKesson as a company that killed people for its own financial gain and blatantly ignored the CSA requirement to report suspicious orders:

> DAVID SCHILLER: If they would have stayed in compliance with their authority and held those that they're supplying the pills to, the epidemic would be nowhere near where it is right now. Nowhere near.
>
> * * *
>
> They had hundreds of thousands of suspicious orders they should have reported, and they didn't report any. There's not a day that goes by in the pharmaceutical world, in the McKesson world, in the distribution world, where there's not something suspicious. It happens every day.
>
> [INTERVIEWER:] And they had none.
>
> DAVID SCHILLER: They weren't reporting any. I mean, you have to understand that, nothing was suspicious?[677]

### 2. Marketing Activities

1254. McKesson and Cardinal promoted opioids for Allergan.

1255. McKesson, Cardinal, and AmerisourceBergen all helped market Janssen's opioids.

1256. Purdue's savings program for OxyContin was administered by McKesson:

[677] Bill Whitaker, Interview with David Schiller, *60 Minutes* (aired Dec. 17, 2017).




### 3. Distribution Activities

1257. While McKesson's first written policy aimed at preventing diversion dates back to at least 1997, the company has shown an unwillingness to comply with that policy and those that followed it.

1258. Before 2008, McKesson utilized a SOMS that only retrospectively reported sales of controlled substances that exceeded certain thresholds. The SOMS did not flag truly suspicious orders, and McKesson performed no due diligence and did not block the shipment of suspicious orders. McKesson's only system utilized for identifying and reporting suspicious orders was found in Section 55 of the McKesson Drug Operations Manual. Under this system, McKesson produced daily and monthly reports—known as DU-45 reports—that documented retrospective sales of controlled substances when those sales exceeded three times that customer's twelve-month purchase average for that drug base code.[678] Orders listed on this report were not held or halted, but were shipped without review.

1259. McKesson's own regulatory employees have conceded that these reports did not satisfy McKesson's obligation to report suspicious orders. According to McKesson's Regulatory

[678] McKesson, *Drug Operations Manual: Section 55 DEA Compliance* 39–40 (1997).

Affairs Director, David Gustin, "the previous reports [DU-45] were not the exclusive and proper response to this regulation. We have an obligation to report 'suspicious orders.' . . . Simply reporting larger than usual orders does not when there are so many plausible and routine reasons for orders to be 'larger than normal.'"[679] Similarly, another Director of Regulatory Affairs for McKesson, Gary Hilliard, has testified that McKesson's suspicious-order monitoring system prior to 2007 was not designed to detect true suspicious orders.[680] Instead, this system was focused solely on reporting excessive orders, which is not consistent with the requirements of the CSA. Of equal importance, Section 55 included no requirement to block orders that were deemed excessive and ultimately reported to DEA. In fact, McKesson made no effort to block suspicious opioid orders until it began utilizing a new SOM system in May 2008.[681] Similarly, outside of confirming erroneous "fat fingered" orders, McKesson undertook no investigation of the legitimacy of excessive orders under the Section 55 program.[682]

1260. The massive shortcomings of Section 55 led to the DEA's investigation into large shipments of opioids provided by McKesson to rogue internet pharmacies in 2005 and 2006. In response to this investigation, in May 2007, McKesson launched the Lifestyle Drug Monitoring Program (hereinafter "LDMP").[683]

1261. The LDMP was limited to four drugs (oxycodone, hydrocodone, alprazolam, and phentermine).[684] For these four drugs, an 8,000 monthly dosage unit threshold was set for every McKesson customer nationwide.[685] Once the 8,000 dosage unit threshold was met in a given month, a three-level review process was to be triggered.[686] McKesson represented to the DOJ that under the

---

[679] Email from Dave Gustin to Tyra Williams, et al. (Feb. 4, 2011, 3:08 PM).
[680] MDL 1091-1 at 80 Ex. 238 (1/10/19 Gary Hilliard Depo. at 176:8-176:22).
[681] MDL 1091-1 at 80 Ex. 238 (1/10/19, Gary Hilliard Depo. at 52:21-53:3).
[682] MDL 1091-1 at 80 Ex. 241 (11/8/18, Blaine Snider Depo. at 77:3-78:4).
[683] Keith McIntrye, *Lifestyle Drug Monitoring Program* (May 16, 2007).
[684] *Id.*
[685] *Id.*
[686] *Id.*

LDMP "customers will not be allowed to exceed the 8,000 monthly dosage limit until a due diligence review has been completed."[687] But this is not how the program actually operated. Testimony from McKesson's regulatory employees has confirmed the LDMP had no mechanism to block orders once the 8,000 unit threshold was met and while an investigation was ongoing. In fact, pharmacy customers were routinely permitted to exceed the 8,000 monthly dosage thresholds prior to a due-diligence review being completed by McKesson.

1262. McKesson's LDMP did not fare any better when it came to identifying suspicious orders. To the extent any orders were reported to DEA under the LDMP, it was only excessive orders meeting the parameters of the Section 55 protocols discussed above.

1263. Additional problems with the LDMP were uncovered during routine auditing of the program. First, it was noted that "it is possible not all of the products containing one of the generic ingredients are included" in the reports generated as part of the LDMP. Additionally, the Daily Dosage Summary Report generated under the LDMP was organized by distribution center, and therefore a customer could exceed the monthly 8,000 dosage unit threshold and avoid detection by simply spreading its purchases across multiple distribution centers.

1264. In May 2008, McKesson launched the Controlled Substances Monitoring Program ("CSMP"). The CSMP continued to apply monthly thresholds, but, unlike the LDMP thresholds, the CSMP's monthly thresholds applied to all opioid products. Thresholds were initially set under the CSMP by reviewing the customer's twelve-month purchase history for each drug base code, reviewing the highest month of purchases in that twelve-month period, and adding a 10% buffer to that purchase amount. Thresholds could then be adjusted through a process referred to as a threshold change request. The CSMP also retained the LDMP's tiered three-level review process, which was triggered

[687] Letter from Hyman, Phelps, & McNamara, P.C., Counsel for McKesson, to Linden Barber, Associate Chief Counsel, Diversion & Regulatory Litigation Section, Drug Enf't Admin. (Apr. 25, 2007).

once a customer met their monthly threshold. However, in many cases, including in Ohio's Summit and Cuyahoga Counties, McKesson's files reveal that Level 2 or 3 reviews were never conducted.

1265. Under the CSMP, McKesson also included a "Know Your Customer" process. Again, however, McKesson's due diligence files produced in the federal opioid MDL show that for years this process was very rudimentary in nature and that there were very few substantive investigations being performed. Thus, McKesson's due diligence files make clear that McKesson was completely failing to comply with its duty to investigate its customers and their orders.

1266. At the outset of the program, McKesson notified all of its customers they should not expect any change in their ability to order controlled substances. When introducing the CSMP to its customers, McKesson stated, "[t]his program addresses the DEA's requirements to ensure controlled substances are used in the way they were intended, but it also ensures that you as a McKesson customer can continue with business as usual." But it was precisely this "business as usual" that had already led McKesson into a $13.25 million dollar settlement with the DOJ for failing to have effective controls against diversion as it pertained to opioid distribution.

1267. The CSMP did belatedly allow McKesson to block opioid orders that were identified as suspicious. However, the CSMP contained multiple loopholes to ensure that as few orders as possible were blocked.

1268. First, although McKesson established thresholds under the CSMP, those thresholds were frequently set far too high to ever be triggered. In fact, in August 2014, the DOJ pointed out this flaw and noted that McKesson's review process under the CSMP was not even triggered until a customer had purchased 10% more than its monthly average. In addition, the monthly average was calculated based on purchases from the 2007-2008 time period, which the DOJ noted was a "year in which McKesson had settled claims because diversion was flourishing in McKesson-supplied pharmacies." The extremely high thresholds set by McKesson for controlled substances did not go

unnoticed within the company. On August 31, 2011, Director of Regulatory Affairs, David Gustin, stated, "I have thought of an area that needs to be tightened up in CSMP and it is the number of accounts we have that have large gaps between the amount of Oxy or Hydro they are allowed to buy (their threshold) and the amount they really need. (Their current purchases) This increases the 'opportunity' for diversion by exposing more product for introduction into the pipeline than may be being used for legitimate purchases."[688] Despite Gustin's concerns, no serious efforts were undertaken to systematically reduce thresholds until 2015, a full four years later.[689]

1269. Second, McKesson routinely increased thresholds without obtaining adequate justification for the increase. A customer was supposed to provide documentation supporting a legitimate change in business that warranted the threshold increase. Despite this requirement, McKesson would increase thresholds for the flimsiest of reasons or for no reason at all. For example, in November 2008, McKesson employees permanently increased opioid thresholds for 200 customers by 30% for no reason other than it was around the Thanksgiving holiday. In April 2011, David Gustin explained that McKesson needed to tighten up the process regarding threshold increases because threshold increases were "almost automatic" and being granted for insufficient reasons, like "business increase." Regulatory Affairs Director Tom McDonald reiterated these concerns in July 2012, noting that the company was too liberally granting threshold increases without proper documentation and often based only on a claim of business growth by the customer. Mr. Gustin became so concerned about the lack of due diligence being conducted by McKesson that he even noted to other colleagues in regulatory affairs that "[w]e as DRAs need to get out visiting more customers and away from our laptops or the company is going to end up paying the price . . . big time." Another Regulatory Affairs

---

[688] Email from Dave Gustin to Dave Fagerskog, et al. (Aug. 31, 2011, 3:15 PM).

[689] *See* Email from Nate Hartle to Krista Peck (May 1, 2015, 5:05 PM) (hereinafter "Hartle Email"); Nate Hartle, *McKesson's Controlled Substance Monitoring Program: Oxycodone Threshold Reduction Report* (Feb. 9, 2015) (hereinafter *Threshold Reduction Report*).

Director, Michael Oriente, responded, "I am overwhelmed. I feel that I am going down a river without a paddle and fighting the rapids. Sooner or later, hopefully later I feel we will be burned by a customer that did not get enough due diligence. I feel it is more of when than if we have a problem rise up."

1270. McKesson ultimately acknowledged the problem of deficient due diligence, especially as to threshold increase requests. A November 2013 training deck noted a desire to make threshold change increases "the exception, not the rule" going forward in order to address the lack of due diligence that had become commonplace at McKesson.[690] The lack of due diligence for threshold increases was also readily apparent to DOJ. In August 2014, DOJ noted that McKesson appeared to be willing to approve threshold increases for opioids for the flimsiest of reasons.

1271. Third, McKesson has a long history of absolute deference to retail national account customers when it comes to threshold increases. McKesson's Senior Director of Distribution Operations, Donald Walker, testified that McKesson did not ask for dispensing data in order to verify the legitimacy of threshold increases for retail national account customers and generally deferred to those customers to decide when it was appropriate for them to get threshold increases for controlled substances. These lax practices resulted in McKesson routinely granting threshold increases to retail national account customers without any apparent due diligence. Retail national accounts received even more leeway on their thresholds, generally being given a 20-25% buffer, rather than 10%. McKesson also deferred completely to retail national account customers to dictate when their thresholds would be increased. McKesson's Senior Director of Distribution Operations, Donald Walker, readily acknowledged that McKesson did not ask for dispensing data in order to verify the legitimacy of threshold increases for retail national account customers and generally deferred to those customers to decide when it was appropriate for them to get threshold increases for controlled substances. For example, as seen in a January 2009 presentation, McKesson outlined its plan for automatic threshold

[690] McKesson, *Controlled Substance Compliance Program* (Nov. 1, 2013).

increases for CVS stores when they approached their threshold and to seek a justification for thresholds increases from CVS only if the increases were "extraordinary" and without "further CVS explanation." McKesson's erroneous reasoning for such automatic threshold increases was to "minimize disruption of business" and to ignore reviewing "routine" threshold increases. McKesson adopted this "hands-off" approach to its largest customers for one reason only—fear of losing the large chains' business.

1272. Fourth, McKesson took affirmative steps to reduce the number of blocked orders by warning customers that they were approaching a threshold. This process ensured that customers could seek an increase before McKesson would be forced to block their orders. In discussing the creation of these warning reports in October 2006, Sharon Mackarness of McKesson noted, "[w]e are in the business to sell product. If we could produce a report … that warned a customers approach to the threshold, say at 85% of their 10,000 dosages, work could begin on justifying an increase in threshold prior to any lost sales." These threshold warning reports were utilized for years thereafter to great effect as a preemptive tool to increase thresholds before orders had to be blocked.

1273. Acknowledging the impropriety of providing these warning reports to customers, in November 2013 McKesson announced to its employees a new policy pertaining to threshold warning reports. The presentation states "[w]e are not communicating specific thresholds or providing threshold warning reports. We believe this is a better practice. Thresholds are not intended to allow customers to manage against a number. We strongly believe that customers should exercise their corresponding responsibility one prescription at a time."[691] However, in the following months, McKesson was already making exceptions to this newly established policy.[692] The shift to not

[691] McKesson, *Suggested Talking Points and FAQs Regarding Decision to Significantly Reduce Thresholds* (n.d.).
[692] *See* Email from David Graziano to Melenie Petropoulos (Dec. 23, 2013, 2:03 PM); Email from Stephen Schmidt to Melenie Petropoulos (Jan. 27, 2014).

providing these warning reports was appropriate, and McKesson should have abided by this policy without exception.

1274. The above measures individually and collectively rendered McKesson's CSMP ineffective as an anti-diversion tool. Thus, while the CSMP could have been used as a tool to identify suspicious orders and properly investigate them, significant efforts were undertaken by McKesson to thwart the effectiveness of the system as a whole.

1275. McKesson's CSMP also could have been used as a tool to report suspicious orders, but it was not used to meet that regulatory requirement until five years after the program was initially launched. For instance, of the 1.6 million orders for controlled substances processed between 2008 and 2013 by its Aurora, Colorado Distribution Center, McKesson reported only sixteen as suspicious.[693] The DEA and DOJ began investigating McKesson again in 2013 and quickly discovered that McKesson had developed a policy of not reporting suspicious orders. As a result, there was a "nationwide" and "systemic" failure of McKesson to report suspicious orders and otherwise maintain effective controls against diversion.

1276. The egregiousness of McKesson's failure to report suspicious orders is shown supported by the quantity of orders McKesson did report as suspicious once it finally decided to start fulfilling its reporting obligation. McKesson reported almost no suspicious orders of opioids from 2008 to 2013, but in 2015, McKesson reported a total of 230,000 suspicious controlled substance orders nationally.[694] Hundreds of thousands of orders did not suddenly become suspicious overnight. They had always been suspicious and simply were not reported.

1277. In fact, the term "suspicious" when it came to controlled substances was taboo within the company. When McKesson's CSMP was created in 2008, it advised employees to "[r]efrain from

---

[693] *McKesson Agrees to Pay*, *supra*.
[694] *McKesson Board of Directors' Response to International Brotherhood of Teamsters* 24 (n.d.).

using the word 'suspicious' in communications'" because "[o]nce McKesson deems an order and/or customer suspicious, McKesson is required to act. This means that all controlled substances sales to that customer must cease and the DEA must be notified." This passage demonstrates that McKesson was both fully aware of its regulatory responsibilities and was determined to avoid them at all costs.

1278. McKesson's CSMP was riddled with flaws and loopholes that rendered them substantially ineffective. Specifically, the CSMP at various points:

a. Directed that customers' monthly threshold limits be set by reference to customers' prior ordering volumes, without requiring investigation of those volumes' appropriateness, effectively building all prior diversion activity into the company's future shipments of opioids to those customers;

b. Allowed customers to resolve investigations into orders in excess of their monthly threshold and into requests to increase monthly thresholds by self-reporting the answers to three yes or no questions, without requiring validation of those answers;

c. Failed to require key indicators of diversion as part of the company's due diligence of pharmacies, including but not limited to obtaining prescriber-level information;

d. Exempted some customers from scrutiny who consistently placed orders in excess of their threshold;

e. Alerted customers when they were nearing their monthly threshold limit for opioid products;

f. Failed to adequately design and operate a system to disclose suspicious orders to the DEA; and

g. Required little to no diligence on chain-pharmacy orders, so as to maintain these large customer accounts regardless of the consequences.

1279. McKesson never required pharmacies to provide prescriber-level dispensing data when granting threshold increases or investigating suspicious orders. Moreover, when compliance staff did receive prescriber-level data and identified suspicions about particular pharmacies based on doctors for whom they filled prescriptions, the company lacked any system by which it could identify other pharmacies that filled prescriptions for the same physicians. McKesson deliberately blinded itself to that key data—resulting in continued shipments of opioids to many pharmacies that the company

should have scrutinized due to the prevalence of suspicious prescribers whose prescriptions were being filled in those locations.

1280. McKesson's lack of attention to its compliance and anti-diversion obligations is evidenced by the *de minimis* resources the company invested in regulatory staff. From 2008 to 2012, implementation of the CSMP for all McKesson pharmacy customers across the country was left to four regional Directors of Regulatory Affairs ("DRAs"). Each of these four DRAs—a number that grew to six in 2012—was responsible for onboarding new pharmacy customers, reviewing and increasing thresholds, and conducting all due diligence for all of the pharmacies across their region, with no other dedicated regulatory staff.

1281. Upon learning in 2008 that a competing distributor had increased its regulatory department to at least 30 employees, a DRA suggested that McKesson do that same, but no such position was created until five years later. The DRAs did not receive any designated regulatory staff to assist them until 2014, and the training eventually provided to that staff was inadequate to allow them to perform their jobs effectively.

1282. In the absence of dedicated regulatory staff, McKesson assigned virtually all of its front-line compliance functions to operations and sales staff and administrative assistants with no experience with controlled-substance regulations, or indeed any corporate compliance experience at all. Though the operations and administrative staff reported to the DRA, these employees also often lacked prior experience in regulatory compliance. And sales staff reported to sales management and rarely interacted with compliance personnel at all.

1283. McKesson provided minimal training to these operations, administrative, and sales personnel with respect to their roles in ensuring the company's compliance with state and federal controlled substances laws and regulations. Senior regulatory staff also did not do audits or even ask for feedback on the CSMP from these front-line sales personnel.

1284. McKesson failed to provide any mechanism to ensure that these employees' responsibility and incentive to promote sales did not compromise their ability and/or willingness to perform their compliance-related functions when doing so could result in the loss of those sales. Even McKesson management recognized this inherent problem.

1285. McKesson's under-resourced, under-qualified, and untrained staff routinely bypassed critical procedures set forth in the CSMP and frequently failed to obtain and maintain the records called for by its CSMPs in the due-diligence files of its customers. For example, McKesson employees regularly failed to ensure completion of even the minimal, three-question form used to resolve inquiries into orders in excess of the customer's threshold.

1286. When customers requested increases in their threshold allowance for opioid orders, McKesson routinely approved those increases within days, hours, or even minutes, before any independent, diligent investigation could possibly have been conducted, and without being provided any reasonable justification. On many occasions, McKesson uncritically and immediately accepted the most perfunctory explanations from its customers.

1287. Even though McKesson's CSMP required it to keep records of each request for a threshold change, McKesson routinely failed to complete and maintain those records.

1288. In the cases where McKesson's compliance staff did identify issues with a particular pharmacy, the company lacked any mechanism to ensure the retention and sharing of information to identify other customers with related red flags. For example, when McKesson identified suspicions about particular pharmacies based on doctors for whom they filled prescriptions, the company lacked any system by which it could identify other pharmacies that filled prescriptions for the same physician. McKesson's head of compliance had explicitly recognized this problem—but the company did nothing to remedy this key failure in its compliance system.

1289. Even when McKesson actually did identify customers' obvious red flags, it frequently failed to implement suspensions or terminations.

1290. In those few cases in which McKesson did block customers' orders and report them as suspicious to the DEA, McKesson routinely took no steps to suspend or terminate those customers pending further investigation and instead simply allowed them to continue receiving their threshold amount of opioids month after month thereafter, regardless of whether the customer continued to make additional suspicious orders.

1291. For example, in New York between 2011 and 2017, McKesson submitted twelve or more opioid-related suspicious order reports ("SORs") for at least one year for 245 distinct pharmacies, representing one opioid-related SOR every month for more than ten percent of its pharmacies in the state. For 133 of these pharmacies, McKesson submitted opioid-related SORs roughly twice a month for a full year. During the first year in which McKesson sent at least two opioid-related SORs per month, those pharmacies exhibited several telltale red flags.

1292. Specifically, more than half of those pharmacies: (a) exceeded the 90th percentile in the (entire) state in terms of volume of oxycodone shipped; (b) exceeded the 90th percentile in the (entire) state in terms of number of oxycodone orders; and (c) filled over one hundred opioid prescriptions in a year by one or more prescribers later indicted or convicted by law enforcement of medically unnecessary prescribing, opioid diversion, or related crimes.

1293. Following the first year in which McKesson submitted 24 or more opioid-related SORs for a year, McKesson continued to ship to these pharmacies, on average, for nearly three years. In fact, as of 2018, it appeared that McKesson was still shipping to 116 of these pharmacies, or 77% of the group.

1294. Moreover, as of 2018, 67% of these pharmacies had filled prescriptions by one or more prescribers later indicted or convicted of opioid-related crimes. Indeed, some of these pharmacies had a majority of their opioid prescriptions written by prescribers who were later indicted or convicted.

1295. Even worse than its record in dealing with pharmacies that McKesson did identify as placing suspicious orders is its pattern of failing to even identify and block as suspicious any orders at all for pharmacies that persistently displayed red flags of diversion.

1296. These failures extended to the highest levels of the company. As revealed in an action on behalf of McKesson's shareholders, the company's records show that the Company's Audit Committee failed to monitor McKesson's information reporting system to assess the state of the Company's compliance with the CSA and McKesson's 2008 Settlements. The records show that in October 2008, the Audit Committee had an initial discussion of the 2008 Settlements and results of internal auditing, which revealed glaring omissions, specifically:

a. some customers had "not yet been assigned thresholds in the system to flag large shipments of controlled substances for review";

b. "[d]ocumentation evidencing new customer due diligence was incomplete";

c. "documentation supporting the company's decision to change thresholds for existing customers was also incomplete"; and

d. Internal Audit "identified opportunities to enhance the Standard Operating Procedures."

1297. Yet, instead of correcting these deficiencies, for a period of more than four years, the Audit Committee failed to address the CSMP or perform any more audits of McKesson's compliance with the CSA or the 2008 Settlements, the shareholder action's description of McKesson's internal documents reveals. During that period of time, McKesson's Audit Committee failed to inquire whether the Company was in compliance with obligations set forth in those agreements and with the controlled substances regulations more generally. It was only in January 2013 that the Audit Committee received an Internal Audit report touching on these issues.

1298. In short, McKesson, was "neither rehabilitated nor deterred by the 2008 [agreement]," as a DEA official working on the case noted. Quite the opposite, "their bad acts continued and escalated to a level of egregiousness not seen before."[695]

1299. After renewed investigations by the DEA and DOJ beginning in late 2013, McKesson began to try and tighten up its SOM policies. Included within those efforts was the threshold-reduction initiative wherein McKesson reduced the oxycodone thresholds for most customers, which ultimately resulted in a total threshold reduction for oxycodone of 42 million doses per month.[696]

1300. Then in 2013, McKesson began to report <u>every order</u> placed in excess of a customer's threshold as a suspicious order. In 2015, for example, McKesson provided the DEA with over 230,000 suspicious order reports, or over 630 per day. McKesson's automatic submission of every order in excess of a threshold without any review thereby shifted the burden to the DEA to determine whether the order was in fact suspicious. Indeed, McKesson was well aware that this was not an adequate system to disclose suspicious orders to the DEA, as McKesson had been previously told that "inundating local DEA office[s]" was not useful.

1301. McKesson also began working with a consulting company named Analysis Group (AGI) in 2014 to create a new SOM policy. AGI and McKesson tinkered around with some advanced analytics over the next couple of years until finally settling into a new analytics-based program in 2017. Under this new system, McKesson established two separate thresholds: the benchmark threshold and the same-customer threshold. The lower of these two thresholds was binding on the customer as their operative threshold. The same-customer threshold is simply a threshold created based on the customer order history for the product in question. That threshold changes monthly as a new average is established for the customer. The benchmark threshold is established by weighting factors such as the

[695] *Hijacked*, *supra*.
[696] Hartle Email, *supra*; *Threshold Reduction Report*, *supra*.

size of the pharmacy and typical usage for the geographic region whether the pharmacy is located. Orders exceeding these thresholds are blocked and reported to DEA.

#### 4. Public Statements of Compliance

1302. McKesson's public representations created the appearance that McKesson would secure its supply chain. These representations were false because McKesson failed to take reasonable steps to prevent opioid diversion in Arizona.

1303. McKesson publicly claims that its "customized analytics solutions track pharmaceutical product storage, handling and dispensing in real time at every step of the supply chain process," creating the impression that McKesson uses this tracking to help prevent diversion.

1304. McKesson has also publicly stated that it has a "best-in-class controlled substance monitoring program to help identify suspicious orders," and claimed it is "deeply passionate about curbing the opioid epidemic in our country."[697]

1305. As part of its 2008 settlement with the DEA, McKesson claimed to have "taken steps to prevent such conduct from occurring in the future"[698]

1306. McKesson's public statements misled the public, including Plaintiffs, into believing that McKesson was taking effective steps to fight the opioid epidemic.

### K. Anda

1307. Anda was a major distributor nationally, shipping over 1.2 billion MMEs between 2006 and 2014, including 2,6145,300 doses of oxycodone and hydrocodone.

1308. Despite being a major distributor with purportedly comprehensive systems for tracking the movement of drugs, Anda failed to take adequate steps to prevent diversion of opioids in Arizona.

---

[697] Scott Higham, et al., *Drug Industry Hired Dozens of Officials from the DEA as the Agency Tried to Curb Opioid Abuse*, Wash. Post (Dec. 22, 2016), https://www.washingtonpost.com/investigations/key-officials-switch-sides-from-dea-to-pharmaceutical-industry/2016/12/22/55d2e938-c07b-11e6-b527-949c5893595e_story.html

[698] McKesson 2008 Settlement, *supra*.

1309. Anda sold and shipped unreasonable quantities of opioids into Arizona, including many red-flag pharmacies in Arizona, and continued to do so despite extensive and blatant evidence of diversion at many facilities in Arizona. Anda has been investigated and fined for some of its many failures to secure its supply chain but continues to allow inappropriate and harmful distribution of opioids.

1310. The opioid crisis described herein is a direct and foreseeable result of Anda's actions.

**1. Enforcement Actions**

1311. An Anda subsidiary voluntarily surrendered its DEA registration, which authorized it to distribute controlled substances, to avoid further enforcement actions.[699]

1312. Anda was sued by and settled with the Attorneys General of West Virginia and New York regarding its opioid distribution practices.[700]

1313. In 2019, in the MDL proceeding styled *In re: National Prescription Opiate Litigation*, Anda and certain other smaller distributors filed a motion for summary judgment styled "Non-RICO Small Distributors' Motion for Summary Judgment Based on their *De Minimis* Status (DKT # 1879)." In opposing the motion, the factual record presented by the plaintiffs (two Ohio municipalities) relating to Anda consisted of a subset of the information enumerated in this Complaint. The MDL court denied the motion for summary judgment as to all of the moving defendants, including Anda.[701]

[699] Ranking Member's Off., U.S. Senate Homeland Sec. & Gov'tal Affairs Comm., *Fueling an Epidemic: Report Three* (2018), https://www.hsgac.senate.gov/imo/media/doc/REPORT-Fueling%20an%20Epidemic-A%20Flood%20of%201.6%20Billion%20Doses%20of%20Opioids%20into%20Missouri%20and%20the%20Need%20for%20Stronger%20DEA%20Enforcement.pdf

[700] *State Reaches $4.2M Settlement with Five Drug Companies*, W. Va. Record (June 23, 2016), https://wvrecord.com/stories/510936977-state-reaches-4-2m-settlement-with-five-drug-companies. *New York Attorney General Announces Settlement with Three Distributors Amid Long Island Trial* (July 20, 2021), https://www.law.com/newyorklawjournal/2021/07/20/new-york-attorney-general-announces-settlement-with-three-opioid-distributors-amid-long-island-trial/?slreturn=20210706151323.

[701] *In re Nat'l Prescription Opiate Litig.*, No. 1:17-md-2804, 2019 WL 4178588 (N.D. Ohio Sept. 3, 2019).

### 2. Distribution Activities

1314. When distributing prescription opioids, Anda had a duty to prevent diversion by implementing an effective system to detect and halt suspicious orders and by conducting regular investigations of current and prospective customers.

1315. In violation of that duty, Anda recklessly distributed opioids, as its SOM program was designed and implemented deficiently in numerous ways. Those deficiencies include: 1) routinely shipping orders in excess of the monthly threshold it assigned customers, for which it was cited by the DEA; 2) routinely increasing when a customer placed an order that exceeded the threshold; 3) making the increased threshold permanent, even if the reason for the increase was temporary; 4) shipping suspicious orders without reporting them to the DEA; 5) clearing suspicious orders for a number of vague reasons which did not actually involve investigation; and 6) understaffing its compliance department.

1316. Though Anda often internally identified orders or stores of concern when pitching clients or deciding whether to continue or expand business with these clients, there is no evidence that Anda ever reported a suspicious order related to any chain customer, including Walgreens. Until at least 2017, Anda used a "screen-out" threshold system of monitoring that rejected orders above a threshold and did not track when a customer attempted to order above that threshold. Instead, it would work with customers to increase their thresholds.[702]

1317. Anda routinely increased its customers' thresholds when they placed an order that exceeded the threshold. Examples include: (a) obtaining a 3900% increase to 200,000 pills per opioid family per month; (b) approving an increase of 99,999%, which allowed a Nevada customer to "purchase up to unlimited dosage units per month"; and (c) approving a request from a Virginia

---

[702] *See* Letter from Ronald W. Buzzeo to Robert L. Brown, Director of Regulatory Compliance, Anda (Nov. 12, 2015); Operations Committee Meeting Minutes (Sept. 29, 2010); Email from Emily Schultz to Donna Cupp (Jan. 17, 2021, 1:55 PM); Email from Shaeen Suraj-Persad to Vicki Mangus (Mar. 26, 2013, 12:52 PM).

customer to "make this location unlimited" and removing all thresholds and allowing unlimited purchases. Once adjusted upwards, the new limits would become permanent, even if the reason for the increase was temporary.

1318. Anda also repeatedly ignored red flags. When Walgreens's Jupiter, Florida distribution center shut down, Anda became Walgreens's exclusive secondary distributor of Schedule II controlled substances in 2013. Anda agreed to do so despite the fact that Anda had conducted an audit of Walgreens showing that many Walgreens stores had red flags of diversion. When an Ohio customer was admonished by the DEA for lacking SOM systems, Anda continued to approve huge shipments to the customer. In fact, it repeatedly increased the customer's thresholds from 75,000 units per month per chemical to 200,000 units per month.

1319. Similarly, in 2013, Walgreens received an administrative warrant and subpoenas and believed its Perrysburg Ohio distribution center was about to be shut down by the DEA. Within days of receiving the warrants and subpoenas, Mallinckrodt began to work with Walgreens to "put all hands on deck" to immediately reroute Walgreens's opioid supply through other distributors, including Cardinal Health and Anda, so that the pills would keep flowing.[703]

1320. Anda shipped suspicious orders without reporting them to the DEA. In fact, between 2007 and 2012, Anda did not report a single suspicious order to the DEA.

1321. Anda's policy was to clear suspicious orders for a number of standard reasons without actually investigating. The list of acceptable reasons for which suspicious orders could be cleared was vague, thereby allowing clearance for just about any reason. When the DEA told Anda in 2011 that it

[703] Administrative Inspection Warrant, *In re Walgreens Corp. (Perrysburg)*, No. 3:13-MJ-7003 (N.D. Ohio issued Feb. 5, 2013); U.S. Dep't of Just./Drug Enf't Admin. Subpoena, *In re* Case No. 17-13-2042 (Feb. 4, 2013); U.S. Dep't of Just./Drug Enf't Admin. Subpoena, *In re* Case No. 17-13-2042 (Feb. 5, 2013); U.S. Dep't of Just./Drug Enf't Admin. Subpoena, *In re* Case No. 17-13-2042 (Feb. 5, 2013) (for video); U.S. Dep't of Just./Drug Enf't Admin. Subpoena, *In re* Case No. 17-13-2042 (Feb. 5, 2013) (for sales reports); U.S. Dep't of Just./Drug Enf't Admin. Subpoena, *In re* Case No. 17-13-2042 (Feb. 5, 2013) (inventory counts); U.S. Dep't of Just./Drug Enf't Admin. Subpoena, *In re* Case No. 17-13-2042 (Feb. 5, 2013) (recipient listing); U.S. Dep't of Just./Drug Enf't Admin. Subpoena, *In re* Case No. 17-13-2042 (Feb. 5, 2013) (store-specific records)

should start an onsite inspection program, Anda never did. At that time, the DEA told Anda that its Florida distributions, in particular, were a "mess," citing a problem sales representative and many problem pharmacies.

1322. Anda's compliance department was severely understaffed. Anda's compliance program had just six employees as compared to the 216 employees in the sales department. This means that each compliance officer would have to review 722 suspicious orders per month to keep up with the workload. Anda's own documents evidence its failed SOM program: in 2011 Anda had 9,624 customers without appropriate due-diligence materials to whom Anda was still shipping opioids.

1323. Anda's failures with respect to its SOM program are even more egregious because it knew of the propensity for opioids to be abused and because it had an obligation to take "reasonable measures" to identify suspicious orders and implement procedures to ensure that its opioids were not diverted for illicit use. Instead of focusing on preventing diversion, Anda focused on sales. Anda promoted various opioids to increase its sales numbers while failing to implement an effective SOM program.

1324. Anda communicated with other distributors about SOM processes and compared systems. For example, in 2008, Anda's CEO answered Cardinal's questions about Anda's Schedule II increase limit process, telling Cardinal exactly how Anda flags suspicious orders. In 2012, Anda obtained a description of McKesson's SOM Program from Rite Aid, a chain pharmacy. An analysis of the program concluded that, under McKesson's program, a new customer could hypothetically start the year with a monthly Schedule II limit of 1000 and by the end of the year have a limit as high as 86,500. In 2012, Anda and Rite Aid discussed the metrics McKesson used for "automatically" increasing Oxy limits, noting that McKesson's formula is "flawed" and will result in having "an issue

with a store before you actually realize there is an issue." Anda never reported the flaws in McKesson's SOM program to the DEA.[704]

1325. Finally, Anda has admitted that it is to blame for the opioid-related harm: "Is the one who makes the drugs, sells the drugs, prescribes the drugs, or fills a prescription for the drug [to blame]? We all play a very important role and that is why we are all responsible."

### 3. Public Statements of Compliance

1326. Anda's public representations created the appearance that Anda would secure its supply chain. These representations were false because Anda failed to take reasonable steps to prevent opioid diversion in Arizona.

1327. Anda's public statements misled the public, including Plaintiffs, into believing that Anda was taking effective steps to fight the opioid epidemic.

## L. H.D. Smith

1328. Despite being a giant distributor with purportedly comprehensive systems for tracking the movement of drugs, H.D. Smith failed to take adequate steps to prevent the diversion of opioids in Arizona.

1329. H.D. Smith sold and shipped unreasonable quantities of opioids into Arizona, including many red-flag pharmacies in Arizona, and continued to do so despite extensive and blatant evidence of diversion at many facilities in Arizona. H.D. Smith has been investigated and fined for some of its many failures to secure its supply chain but continues to allow inappropriate and harmful distribution of opioids.

[704] Email from Al Paonessa III to Peter Kerrane (Aug. 9, 2008, 12:06 AM); Email from Michael Cochrane to Albert Paonessa (Sept. 11, 2008, 2:31 PM)_

1330. The volume of opioids H.D. Smith shipped into Arizona was so high as to put it on notice that not all of the drugs being ordered would be used to fill prescriptions for legitimate medical uses.

1331. The opioid crisis described herein is a direct and foreseeable result of H.D. Smith's actions.

1332. H.D. Smith also participated in front groups such as HDA, HDMA, and PCF (via HDA's membership).

**1. Enforcement Actions**

1333. In 2016, H.D. Smith entered into a settlement with West Virginia, agreeing to pay $3.5 million to resolve an action alleging that the company contributed to the state's opioid-addiction epidemic by negligently distributing opioids.[705]

1334. H.D. Smith's shipments to West Virginia were so extensive that the House Energy and Commerce Committee wrote to H.D. Smith in 2018, citing DEA data showing 2008 sales of 1.1 million hydrocodone doses to Family Discount Pharmacy in Mount Gay-Shamrock, a West Virginia town home to only 1,800 people. That same year, H.D. Smith sold more than 1.3 million hydrocodone and oxycodone to a Sav-Rite Pharmacy in Kermit, West Virginia, a town with a population of 406. Between 2007 and 2008, H.D. Smith also sold 5 million hydrocodone pills to pharmacies in Williamson, West Virginia, where approximately 3,000 people lived. Representatives from both parties were concerned about the volume of opioids H.D. Smith was distributing to West Virginia: "Data provided to the committee by the Drug Enforcement Administration raises . . . questions regarding H.D. Smith's efforts to monitor for, and mitigate, controlled substance diversion in West Virginia."[706]

---

[705] $3.5 Million Settlement Reached with Drug Wholesaler, WSAZ.com (Jan. 3, 2017), https://www.wsaz.com/content/news/35-million-settlement-reached-with-drug-wholesaler-409570545.html.

[706] Letter from House Comm. On Energy & Comm. To J. Christopher Smith, President & CEO, H.D. Smith (Jan. 26, 2018), https://republicans-energycommerce.house.gov/wp-content/uploads/2018/01/20180126HDSmith.pdf.

1335. In 2019, in the MDL proceeding styled *In re: National Prescription Opiate Litigation*, H.D. Smith and certain other smaller distributors filed a motion for summary judgment styled "Non-RICO Small Distributors' Motion for Summary Judgment Based on their *De Minimis* Status (DKT # 1879)." In opposing the motion, the factual record presented by the plaintiffs (two Ohio municipalities) relating to H.D. Smith consisted of a subset of the information enumerated in this Complaint. The MDL court denied the motion for summary judgment as to all of the moving defendants, including H.D. Smith.[707]

### 2. Marketing Activities

1336. H.D. Smith executives were active in industry groups such as HDA, HDMA, and PCF (via HDA's membership).

1337. J. Christopher Smith, while President and COO, was an active member of HDMA, serving as Co-Chair of its Industry Relations Counsel. Ron Lanton, Government Affairs Counsel, was a member of HDMA's Government and Public Policy Counsel. Thomas Doyle, Executive Vice President, Commercial Solutions, was part of HDMA's Specialty & Biotech Distributors Council. Dale Smith, President of H.D. Smith, appears to be an active member of HDA. On HDA's website, he is identified as HDA Vice Chairman and was Chairman and CEO of HDA's Board of Directors and Executive Committee (as of Nov. 2015), having also served on HDA's Government and Public Policy Council and Industry Relations Council.[708] Dale Smith, President of H.D. Smith, was Vice Chairman, Chairman, and CEO of HDA's Board of Directors and Executive Committee, and also served on HDA's Government and Public Policy Council and Industry Relations Council.

---

[707] *In re Nat'l Prescription Opiate Litig.*, No. 1:17-md-2804, 2019 WL 4178588 (N.D. Ohio Sept. 3, 2019).

[708] *See* About, Dale Smith, https://www.hda.org/persons/dale-smith; Speaker, IPDC 12-13 Nov. 2015, Brussels, Belgium, Dale Smith, https://www.hda.org/persons/dale-smith-jr-ipdc.

### 3. Distribution Activities

1338. When distributing prescription opioids, H.D. Smith had a duty to prevent diversion by implementing an effective system to detect and halt suspicious orders and by conducting regular investigations of current and prospective customers. But H.D. Smith's policies and procedures for monitoring pharmaceutical orders have long been insufficient, which has allowed opioid diversion in Arizona for an extensive period of time.

1339. From 2006 to 2008, H.D. Smith's SOM program was manual, rather than automated. H.D. Smith had two undated and little-used written policies covering suspicious order monitoring. Few employees of H.D. Smith knew these policies existed.

1340. Starting in 2006, H.D. Smith began working on an automated compliance system, but this "system" was never really a viable automated system, just iterations and attempts.

1341. In or around 2008, H.D. Smith began developing a computer-based suspicious-order-monitoring program, which H.D. Smith called "CSOMP." CSOMP had multiple flaws that undermined its purpose of detecting and reporting suspicious orders.

1342. First, H.D. Smith's suspicious-order-monitoring reports, which might have identified suspicious orders, were not reviewed until after the flagged orders had been shipped.

1343. Second, CSOMP did not consider opioid order pattern or frequency. H.D. Smith's SOM program permitted automated release of any and all orders by new pharmacies during a 90- to 120-day period, allowing them to "ramp up," even when they exceeded order volume limits. For instance, in a May 21, 2008 internal email, George Euson ("Euson"), Director of Corporate Security, wrote to H.D. Smith employees regarding CSOMP enhancements: "You are allowed to release all orders that show up in the system for new accounts for up to 120 days after the start date listed. This will allow ramp up of new accounts." When opioid orders neared threshold limits, the orders were still released without further investigation or reporting, allowing the customer to build a high-volume-

sales "history." In fact, in order to avoid reporting a suspicious order to the DEA, H.D. Smith would notify customers when they approached their threshold limits, allowing customers to request threshold increases and avoid triggering thresholds. Additionally, those thresholds for reporting were based on the client's prior sales. So, if a client spent more, their limit could be reset to that higher point.

1344. Issues with CSOMP requiring modifications and fixes to address broken functionality continued until at least February 2015. These issues included stopping only one large controlled drug order at a time for review, while allowing a smaller order for the same customer to be filled while larger order was being reviewed; allowing 448 people within H.D. Smith to release holds in CSOMP; having a lack of tools to detect orders of unusual frequency or pattern; and having multiple accounts assigned to one customer or DEA number, each of which was assigned thresholds (i.e., 3 accounts; 3x the threshold limit for that customer).

1345. H.D. Smith was aware of deficiencies with its SOM, and management deliberately tried to hide this knowledge.

1346. An H.D. Smith employee with responsibilities for CSOMP monitoring who resigned in February 2015 explained her concerns with H.D. Smith's SOM system in her exit interview. At the time of the interview, Lori Kirbach stated as a main reason for leaving, "<u>the company is and has been breaking the law for some time</u>." She did not understand why this was being tolerated. Specifically, Ms. Kirbach stated that "CSOMP has not been working correctly since OPUS Go Live and that no one will listen to them when they bring it up. Compliance is releasing orders that they should not be releasing." She added that the "DEA is about two years behind in looking at CSOMP data and it[']s only a matter of time before they catch up to us and questions are asked." Ms. Kirbach also added that her manager "often said not to put certain issues (such as the CSOMP issue) in email so in the event the company is ever sued and the email is produced" other employees could "deny any

knowledge." She recalled getting her "ass chewed" by her manager, Tom, for putting something in an email that he thought she shouldn't have.

1347. Other H.D. Smith employees have also admitted its SOM program was insufficient. For example, Euson wrote an email on September 28, 2007 regarding a list of suspicious pharmacies he had circulated internally in February 2006 and an updated list of suspicious pharmacies in May 2007. The listed pharmacies had been identified as suspicious by other wholesalers and the DEA due to "excess purchases of controlled substances." Two of the DEA's suspicious pharmacies had also been identified by H.D. Smith as one of nine pharmacy customers comprising 80% of H.D. Smith's Florida distribution of oxycodone. One, Pharmcore, was a customer at the time of the February 2006 email. The other, Pharmacy Express, was set up as a customer in December 2006. According to Euson: "Both have huge and excessive amounts of controlled substance purchases." He continued, "We will have a hard time explaining to DEA why after we were warned nearly 1 ½ years ago, we continued to sell excessive quantities of CS to these businesses."

1348. Another H.D. Smith employee, P.J. VanderMeersch, Compliance Specialist, wrote in September 2013 about her serious concerns with H.D. Smith's CSOMP: "we are absolutely not compliant with Federal Regulations and we know we aren't."

1349. As recently as 2014, in a PowerPoint presentation regarding Compliance and Security, the Compliance Department noted the need to develop CSOMP enhancements to meet DEA standards.

1350. An H.D. Smith employee wrote an email in July 2014 noting that CSOMP program issues had "resulted in customers receiving products which they were not supposed to." As a result of these shortfalls, H.D. Smith shipped 17 bottles of oxycodone to one customer who was not supposed to be able to order any.

1351. In or around 2014, H.D. Smith hired a new compliance officer and began to create an improved CSOMP program that would comply with applicable laws. However, before any enhancements went into effect, that new compliance officer was terminated in 2016.

1352. On May 31, 2016, H.D. Smith rehired their former Vice President of Compliance.

**4. Public Statements of Compliance**

1353. At a May 8, 2018 hearing before the House Energy and Commerce subcommittee, H.D. Smith refused to take any responsibility for the massive amounts of opioids it shipped to West Virginia, the state which at the time had the highest overdose rate in the United States. At the time, J. Christopher Smith, former President and CEO, stated, "H.D. Smith conducted itself responsibly and discharged its obligations."[709] H.D. Smith distributed 1.1 billion oxycodone and hydrocodone pills to West Virginia between 2006 and 2012.[710]

1354. The implication that H.D. Smith has effectively addressed diversion is false, as H.D. Smith's repeated payments to settle diversion-related violations indicate.

1355. H.D. Smith's public statements misled the public, including Plaintiffs, into believing that H.D. Smith was taking effective steps to fight the opioid epidemic.

**M. <u>Walgreens</u>**

1356. Walgreens, despite being a giant company with purportedly comprehensive systems for tracking the movement of drugs, failed to take adequate steps to prevent diversion of opioids in Arizona.

1357. Walgreens sold and shipped unreasonable quantities of opioids into Arizona, including to many red-flag pharmacies, and continued to do so despite extensive and blatant evidence of

---

[709] *Combatting the Opioid Epidemic*, *supra*.

[710] Robert O'Harrow Jr. & Scott Higham, *Drug Company Executives Said They Did Not Contribute to the Opioid Epidemic. Nearly 2,000 Communities Say Otherwise*, Wash. Post (July 20, 2019), https://www.washingtonpost.com/nation/2019/07/20/drug-companies-executives-said-they-didnt-contribute-opioid-epidemic-nearly-communities-say-otherwise/.

diversion at many of its own retail pharmacies in Arizona. Walgreens also dispensed unreasonable quantities of opioids from those pharmacies despite being on notice of signs of diversion, in violation of its duties as a pharmacist under Arizona law.

1358. Walgreens has been investigated and fined for some of its many failures to secure its supply chain and fill prescriptions appropriately, but it continues to allow the inappropriate and harmful distribution of opioids.

1359. The opioid crisis described herein is a direct and foreseeable result of Walgreens's actions.

1360. The volume of opioids Walgreens shipped into and dispensed in Arizona was so high as to put it on notice that not all of the drugs were being used to fill prescriptions for legitimate medical uses.

1361. In addition, Walgreens also distributed and dispensed substantial quantities of prescription opioids in other states, and these drugs were diverted from these other states to Arizona. Walgreens failed to take meaningful action to stop this diversion despite its knowledge, and it contributed substantially to the opioid epidemic in Arizona.

1362. Walgreens developed and maintained highly advanced data collection and analytical systems to monitor the inventory and ordering needs of customers in real time and depicted the exact amounts of pills, pill type, and anticipated order threshold for its own stores.

1363. Through this proprietary data, Walgreens had direct knowledge of patterns and instances of improper distribution, prescribing, and use of prescriptions. It used this data to evaluate its own sales activities and workforce.

1364. Walgreens also was in possession of extensive data indicative of diversion such as individual doctors' prescribing to its customers, the percentage of a prescriber's prescriptions that were controlled substances or were made outside of the scope of the prescriber's usual practice or

geographic area, individual prescription activity across all Walgreens stores, the percentages of prescriptions purchased in cash, the number of individuals traveling long distances to fill prescriptions, the number of prescriptions for drug "cocktails" known for their abuse potential, such as oxycodone and Xanax, and the number of individuals who arrived together with identical or nearly identical prescriptions. Such data are a valuable resource that Walgreens could have used to help stop diversion. Walgreens chose not to do so.

### 1. Enforcement Actions

1365. In May 2006, the DEA sent Walgreens a Letter of Admonition citing Walgreens for record-keeping inadequacies and security deficiencies at its Perrysburg DC. Specifically, the DEA found that the "formulation utilized by the firm for reporting suspicious ordering of controlled substances was insufficient."[711]

1366. In April 2012, the DEA served a subpoena to one of Walgreens's Schedule 2 controlled substance distribution centers, the Jupiter DC, requesting, among other things, all controlled substance SOPs, communications about controlled substances, and customer due-diligence files for 14 Walgreens stores.[712] The DEA also served a Warrant of Inspection authorizing seizure of, among other things, all records related to the distribution of controlled substances.[713]

1367. On September 13, 2012, the DEA issued an immediate suspension order ("ISO") for the Jupiter DC, finding Walgreens's distribution practices constituted an "imminent danger to the public health and safety" and were "inconsistent with the public interest." The DEA further found that the distribution center failed to comply with DEA regulations that required it to report suspicious drug orders Walgreens received from its retail pharmacies, resulting in at least tens of thousands of

[711] Letter from Robert L. Corso, Special Agent in Charge, Detroit Field Division, U.S. Drug Enf't Admin., to Todd Polarolo, Distrib. Ctr. Manager, Walgreen Company (May 17, 2006).

[712] U.S. Dep't of Justice, Drug Enf't Admin., Subpoena No. GS-12-176915, Case No. GS-12-2012 (Mar. 19, 2012).

[713] Warrant for Inspection, *In re Walgreens Corp.*, No. 12-8125-AEV (S.D. Fla. Apr. 3, 2012).

violations, particularly concerning massive volumes of prescription opiates. According to the DEA, "Notwithstanding the ample guidance available, Walgreens has failed to maintain an adequate suspicious order reporting system and as a result, has ignored readily identifiable orders and ordering patterns that, based on the information available throughout the Walgreens Corporation, should have been obvious signs of diversion occurring at [its] customer pharmacies."[714]

1368. The allegations in the Order to Show Cause and the Interim Suspension Order were exacerbated by the fact that over a year earlier, on April 7, 2011, Walgreens had entered into a prior Settlement Agreement with the DEA regarding allegations of non-compliance with the Controlled Substance Act wherein Walgreens had agreed to "maintain a compliance program to detect and prevent diversion of controlled substances."[715]

1369. According to the Order to Show Cause, Walgreens's corporate headquarters pushed to increase the number of oxycodone sales to Walgreens's Florida pharmacies and provided bonuses for pharmacy employees based on the number of prescriptions filled at the pharmacy in an effort to increase oxycodone sales. In July 2010, Walgreens ranked all of its Florida stores by number of oxycodone prescriptions dispensed in June of that year and found that the highest-ranking store filled almost 18 oxycodone prescriptions per day; these pills were all distributed from the Jupiter DC.[716]

1370. In February 2013, the DEA issued similar Subpoenas and Warrant of Inspection on the Perrysburg DC. Walgreens employees made plans in preparation for the Perrysburg DC being "shut down" by the DEA, like the Jupiter DC. Within weeks of receiving the six subpoenas and warrant, Walgreens decided to "discontinue distribution of controlled substances from the Perrysburg

[714] Order to Show Cause & Immediate Suspension of Registration, *In re Walgreens Co.* (Drug Enf't Admin. Sept. 13, 2012) (hereinafter "2012 Walgreens ISO").
[715] Admin. Memo. of Agreement (Apr. 7, 2011).
[716] 2012 Walgreens ISO, *supra*.

facility" in order to "eliminate any immediate need for further DEA administrative action" regarding the Perrysburg DC.[717]

1371. On June 10, 2013, Walgreens entered into a Settlement and Memorandum of Agreement ("MOA") with the DEA to resolve outstanding allegations involving the Walgreens distribution centers and pending actions concerning six Walgreens retail pharmacies. Walgreens agreed to pay $80 million in civil penalties, the largest settlement in DEA history at that time, to resolve the DEA's claims that Walgreens negligently allowed controlled substances, including oxycodone and other prescription painkillers, to be diverted into the black market. In addition to the $80 million civil penalty, Walgreens agreed to surrender its Jupiter DC's registration to distribute or dispense controlled substances listed in Schedules II–V for two years from the issuance of the Jupiter ISO. As part of the MOA, Walgreens admitted that Walgreens's "suspicious order reporting for distribution to certain pharmacies did not meet the standards identified by DEA in three letters from DEA's Deputy Assistant Administrator, Office of Diversion Control, sent to every registered manufacturer and distributor, including Walgreens, on September 27, 2006, February 7, 2007 and December 27, 2007." This settlement also resolved allegations of record-keeping and dispensing violations in New York, Michigan, and Colorado.[718]

1372. Walgreens has also settled with a number of state attorneys general, including West Virginia ($575,000).[719]

1373. In January 2017, an investigation by the Massachusetts Attorney General found that some Walgreens pharmacies failed to monitor patients' drug-use patterns and did not use sound

[717] Letter from Alice S. Fisher, Philip J. Perry, Latham & Watkins LLP, and David S. Weinstein, Clarke Silverglate, P.A., to C. Lee Reeves, II, Scott Lawson, Wayne Groves, Drug Enf't Admin. (Feb. 20, 2013).

[718] Settlement & Memo. of Agreement (June 10, 2013); *Walgreens Agrees to Pay a Record Settlement of $80 Million for Civil Penalties Under the Controlled Substances Act*, U.S. Dep't Just. (June 11, 2013), https://www.justice.gov/usao-sdfl/pr/walgreens-agrees-pay-record-settlement-80-million-civil-penalties-under-controlled (hereinafter *Walgreens Agrees to Pay*).

[719] Settlement Agreement (June 7, 2016), http://ago.wv.gov/Documents/2016-6-6,%20fully%20signed%20Walgreens%20Settlement%20Agreement%20(M0130988xCECC6).pdf.

professional judgment when dispensing opioids and other controlled substances—despite the context of soaring overdose deaths in Massachusetts. Walgreens agreed to pay $200,000 and follow certain procedures for dispensing opioids.[720]

1374. On the eve of trial, Walgreens agreed to pay $5 million to Nassau and Suffolk Counties in New York to resolve claims arising from its role in creating and sustaining the opioid epidemic.[721]

### 2. Marketing Activities

1375. Working with Purdue as early as 2001, Walgreens played a pivotal role in expanding the market and ensuring the demand for and supply of prescription opioids would grow to tragic proportions. Purdue was particularly interested in using what Walgreens described to Purdue as its Regional Level Market Programs to educate pharmacists and patients on the benefits of Purdue's OxyContin.

1376. Purdue leveraged its relationship with Walgreens and their mutually beneficial goal of growing the opioid business to ensure that Purdue had input into the "corporate guidelines" that Walgreens's pharmacists were "expected to follow" when it came to dispensing prescription opioids.

1377. Starting in at least 1999, Purdue sponsored Walgreens's continuing education programs designed to encourage stores to "get on the Pro Pain Management Band Wagon." Purdue was thrilled with the response and assistance it received from Walgreens when Purdue presented *Pain Management for the Pharmacist*. At the beginning of each Purdue-sponsored meeting, a particular Walgreens pharmacist made a presentation on his store and the program implemented. His store actively advertised to area doctors and patients that they were a "full-service" pain management pharmacy. This service included providing a list to physicians' offices of all the Class II analgesics they

[720] Felice J. Freyer, *Walgreens to Pay $200,000 Settlement for Lapses with Opioids*, Bos. Globe (Jan. 18, 2017), https://www.bostonglobe.com/metro/2017/01/18/walgreens-agrees-better-monitor-opioid-dispensing/q0B3FbMo2k3wPt4hvmTQrM/story.html.

[721] Scott Eidler & Candace Ferrette*, Suffolk Accepts $21.5M Opioid Settlement; Nassau Gives Preliminary OK*, Newsday, https://www.newsday.com/long-island/nassau-suffolk-opioid-settlements-1.50303922 (last updated July 12, 2021).

had in stock (and they had everything), accepting "verbal orders" for Class II analgesics prior to presentation of the original prescription at the store to decrease "waiting time," allowing partial fills on CII prescriptions in terminal patients, and accepting after hours "emergency CII prescriptions" without a hassle. Purdue praised the pharmacist's actions as "fantastic."

1378. Walgreens's use of pro-opioid continuing education continued even as the opioid crisis grew. For example, Walgreens's Market Director of Pharmacy Operations recommended that Walgreens's District Managers and Pharmacy Supervisors attend a continuing education program titled *The Pharmacists' Role in Pain Management: A Legal Perspective*, which was available online at RxSchool.com.[722] The program was eventually made mandatory.

1379. This program was one in a long line of pharmacist "education" programs, or CEs, that Purdue developed as part of its strategy to disseminate "a new school of thought" about opioids. Released in 2009, the program was presented by Jennifer Bolen, JD. Ms. Bolen was a frequent speaker for Purdue and other opioid manufacturers, served as Special Counsel for AAPM, acted as a KOL for Purdue, and was described by Purdue as "a pain patient who takes opioids." Through these programs, Purdue and Walgreens disseminated fraudulent information that redefined the red flags of abuse or diversion in an effort to correct pharmacists' supposed "misunderstanding" about pain patients and the practice of pain management. Purdue took what it called an "aggressive role" in educating Walgreens's pharmacists on pain-management issues.

1380. Walgreens's Market Director of Pharmacy Operations also recommended an Endo-sponsored continuing education program, *Navigating the Management of Chronic Pain: A Pharmacist's Guide*. This CE disseminated manufacturer messaging designed to broaden the market for opioids. For example, it stated, "according to most reports, approximately 30% of the population lives with chronic

[722] *See Walgreen Co. Controlled Substance Anti-Diversion and Compliance Program* (July 17, 2012) (hereinafter *Walgreens Compliance Program*).

pain" and citing, *inter alia*, another CE presentation sponsored by APS. It also claimed that "most opioid adverse effects can be managed with careful planning and patient education." It went on to discuss "fears and prejudices" related to addictive behaviors that "unnecessarily limit" opioid use, described as "opiophobia," which the piece claimed was the result of "misunderstandings regarding the concepts of addiction, physical dependence, and tolerance."

1381. One of the presenters for this Endo-sponsored CE was Kenneth C. Jackson. Mr. Jackson was also a frequent speaker and KOL for Purdue. In addition, he co-authored a Purdue-sponsored CE program, *Use of Opioids in Chronic Noncancer Pain*. Released in April 2000, it was designed to eliminate "misconceptions about addiction, tolerance and dependence."

1382. As Purdue astutely recognized, chain pharmacies, including Walgreens, were critical to the campaign to promote prescription opioid use, noting in internal documents:

> The pharmacist plays a vital role in pain management, as they are the last piece of the puzzle in getting patients prescriptions filled. If the pharmacist is not educated in the use of OxyContin or has any misconceptions about the use of opioids, it can result in a prescription not getting filled and a patient suffering from needless pain.
>
> The pharmacist is the ultimate gate keeper. At times, they can make or break the effective use of Oxycontin. We are running into several cases of legal and regulatory issues, which has resulted in counter detailing of Oxycontin. Much of this is borne out of ignorance.
>
> The absolute last thing we want is for the OxyContin prescription to be bounced out at the pharmacy level because of unfounded fears from the "uneducated" pharmacist.

1383. Walgreens, rather than playing the critical gatekeeper role that it was supposed to play, instead helped open the floodgates to allow dangerous opioid narcotics to deluge communities in Arizona. It participated in the multi-faceted campaign to spread misinformation about opioids and improperly increase the utilization and supply of opioids including by:

a. Spreading false messages to pharmacists and patients through provider and patient "education" campaigns designed to improperly normalize widespread use of opioids;

b. Direct marketing of opioids to patients, pharmacists, and healthcare providers;

c. In-store advertisements and advertising campaigns designed to drive sales of prescription opioids;

d. Use of financial incentives such as coupon programs, rebate programs, and loyalty programs designed to drive opioid sales; and

e. Driving the sale of opioid products through patient adherence programs designed to generate long-term opioid use.

### 3. Dispensing Activities

1384. Walgreens dispensed millions of opioid doses from its retail pharmacies in Arizona.

1385. Walgreens violated its duty as a pharmacy to prevent abuse and diversion of controlled substances. According to the DEA, Walgreens's pharmacies "filled customer prescriptions that they knew or should have known were not for legitimate medical use."[723]

1386. Although Walgreens purported to have in place "Good Faith Dispensing" ("GFD") policies for many years, it failed to meaningfully apply these policies or to train employees in its retail pharmacies to identify and report potential diversion.

1387. Despite knowing that prescribers could contribute to diversion and having a separate and corresponding duty with respect to filling prescriptions, from at least 2006 through 2012, Walgreens's GFD explicitly instructed pharmacists who were "unable to dispense a prescription in good faith" to "contact the prescriber" and, if "confirm[ed]" as "valid" by the prescriber, "process the prescription as normal." Further, though Walgreens's policies listed a handful of "questionable circumstances," such as "increased frequency of prescriptions for the same or similar controlled drugs by one prescriber[,] for large numbers of patients[, and] for quantities beyond those normally prescribed," it is unclear what, if any, resources Walgreens made available to its pharmacists for

[723] *Walgreens Agrees to Pay*, *supra*.

checking these vague criteria, which, in any event, became meaningless if a prescriber "confirm[ed]" the prescription as "valid."[724]

1388. Upon information and belief, Walgreens failed to adequately train its pharmacists and pharmacy technicians on how to prevent diversion, including what measures and/or actions to take when a prescription is identified as phony, false, forged, or otherwise illegal, or when other suspicious circumstances are present. Walgreens further failed to provide its pharmacists the means of doing so. For example, Walgreens's policies and internal documents acknowledged that distance between the patient, pharmacists, and/or prescriber constituted a red flag, however, Walgreens did not even begin piloting an automated process for flagging such distances through common and long-available technological solutions until the spring of 2021.

1389. Ultimately, in 2011, Walgreens and the DEA entered a Memorandum of Agreement regarding all "Walgreens . . . pharmacy locations registered with the DEA to dispense controlled substances," requiring Walgreens to implement significant nationwide controls lacking in its operations. Walgreens was required to create a nationwide "compliance program to detect and prevent diversion of controlled substances as required by the . . . (CSA) and applicable DEA regulations." Pursuant to the MOA, the "program shall include procedures to identify the common signs associated with the diversion of controlled substances including but not limited to, doctor-shopping and requests for early refills" as well as "routine and periodic training of all Walgreens walk-in, retail pharmacy employees responsible for dispensing controlled substances on the elements of the compliance program and their responsibilities under the CSA." Further, Walgreens was required to "implement and maintain policies and procedures to ensure that prescriptions for controlled substances are only dispensed to authorized individuals pursuant to federal and state law and regulations."[725]

---

[724] *Good Faith Practices and Fraudulent Prescriptions* (rev. Feb. 7, 2007)
[725] Admin. Memo. of Agreement (Apr. 7, 2011).

1390. As with distribution, Walgreens failed to allocate anywhere near the resources necessary to dispensing compliance and supervision. Walgreens has approximately 26,000 pharmacists, each of whom may receive as many as 500 prescriptions a day. In 2013, however, Walgreens internally reported that its District Managers and Pharmacy Supervisors were "challenged to get into the stores," and in a 90-day period, more than a thousand stores did not receive a visit from the managers or supervisors. These supervisory employees were assigned a "high number of stores," and their time was consumed with "people processes, business planning, [and] market and district meetings," such that supervision in store was being handled informally by "community leaders" who have "limited formal authority."

1391. Walgreens knew its much-touted good-faith dispensing, or "GFD," policies were ineffective, and, in 2013, it launched a "Target Drug GFD" ("TDGFD") program to purportedly "put teeth around GFD for high risk products." The policies required pharmacists to perform extra checks on red flags and to complete TDGFD checklists when presented with certain opioid prescriptions. However, the TDGFD procedures were largely window dressing. Walgreens deliberately omitted hydrocodone from its TDGFD process, despite knowing in 2013 that it was the most abused of all prescription opioids, and in 2019 was still considering whether to add hydrocodone, even though it had been a Schedule II opioid since 2014. Walgreens further failed to make the TDGFD checklist an electronic form until 2020, despite knowing that doing so would make compliance and supervision more effective. A review of Walgreens's TDGFD forms in certain jurisdictions reveals Walgreens failed to even complete a TDGFD form for as many as half of the prescriptions for which Walgreens's own policies stated such a form was required.

1392. In one internal audit, the audit team noted no formal monitoring program existed to confirm that pharmacies across the chain were complying with controlled-substance documentation and retention requirements, no monitoring outside of the deficient "store walk program" existed to

monitor TDGFD requirements, no corporate reporting was being generated, and employees were failing to timely complete GFD training, such that, at the time of the audit, over 35,000 employees had not completed their required training for that year. Management's response largely was to seek to incorporate additional compliance measures into the store walk procedure. However, documents from 2016 regarding monthly store compliance walks indicate that during the monthly "Compliance Walks" to "verify compliance . . . [with] regulatory requirements in . . . pharmacy areas," substantially no dispensing compliance supervision occurred beyond ensuring the pharmacy was verifying the patient's address on five sample prescription fills.

1393. Unsurprisingly, compliance with GFD has been poor. In 2015, Walgreens performed a "business continuity" audit of a random sample of approximately 2,400 pharmacies to determine whether Walgreens was "compliant with the policies/procedures put in place" regarding dispensing pursuant to Walgreens's agreement with the DEA. As the audit progressed, Walgreens internally noted "put your seatbelts on" because the audits were "not going great" and that the company would need to implement a "mitigation plan . . . to satisfy the MOA" for the non-compliance revealed by the audit. In Walgreens's own words, "Results were unfavorable." Fewer than 60% of stores were complying with GFD policies with respect to filled prescriptions; 1,160 stores did not have a single refused prescription; and an additional 1,182 stores had refused fewer than 25 prescriptions total in a 9-month period. Only 63 out of 2,400 pharmacies had refused 26 or more prescriptions during that same nine months.

1394. Walgreens's determination to bury evidence of noncompliance in the service of profit goals has continued. When a Walgreens consultant interviewed Walgreens pharmacy employees, they drafted a report finding that employees "sometimes skirted or completely ignored" proper procedures to meet corporate metrics and committed "errors resulting from stress." The consultants reported that they "heard multiple reports of improper behavior" that were "largely attributed to the desire" to

meet a corporate metric known as "promise time," which ensures that patients get prescriptions filled within a set amount of time. Upon reviewing a draft of the report, senior leaders at Walgreens directed the consultants to remove some of the damaging findings, which the consultant company ultimately did, even though the consultant's employees stated requests to remove information from slides conflicted with their business ethics. At around this same time, Walgreens awarded the consultant company a $1.5 billion contract.[726]

1395. The DEA found evidence that Walgreens had a corporate policy encouraging increased sales of oxycodone. As the DEA's September 2012 Order to Show Cause and Immediate Suspension of Registration explains:

> In July 2010, Walgreens's corporate headquarters conducted an analysis of oxycodone dispensing for the prior month at its Florida retail pharmacies and produced an 11-page spreadsheet, ranking all Florida stores by the number of oxycodone prescriptions dispensed in June. The spreadsheet was sent to Walgreens's market pharmacy supervisors in Florida on July 29, 2010, with the admonition that they "*look at stores on the bottom end . . . . We need to make sure we aren't turning legitimate scripts away. Please reinforce.*" A corporate market director of pharmacy operations did reinforce this message to Florida market pharmacy supervisors, highlighting that their "*busiest store in Florida*" was filling almost 18 oxycodone prescriptions per day, yet "*We also have stores doing about 1 a day. Are we turning away good customers?*"[727]

1396. In 2011, a Walgreens project to "Increase Rx Sales and prescription Counts" instructed pharmacies to "improve C2 business," i.e., dispense more Schedule II controlled substances. This focus on increasing controlled-substance dispensing, including opioids, continued even after the DEA investigation and $80 million fine. For example, in 2014, the Rx Integrity department created a "Pharmacist Controlled Substance Dispensing Opportunities" tool to "identify pharmacists that are dispensing a low rate of controlled substances" and help pharmacists "feel more comfortable in filling

[726] Ellen Gabler, *At Walgreens, Complaints of Medication Errors Go Missing*, N.Y. Times (Feb. 21, 2020), https://www.nytimes.com/2020/02/21/health/pharmacies-prescription-errors.html.

[727] 2012 Walgreens ISO, *supra*.

controlled substances," specifically focusing on pharmacists dispensing low rates of opioids like "hydromorphone, oxycodone, methadone . . . hydrocodone," and the cocktail drugs comprising the rest of the "holy trinity" of abuse, such as "carisoprodol . . . [and] alprazolam."

1397. Walgreens emphasized in its policies for pharmacists and pharmacy managers: "The best evidence of a well-run pharmacy is the increase in prescriptions and pharmacy sales." A March 2013 memo confirms that volume targets included controlled substances as late as 2013 and even after the adoption of the GFD policy. Specifically, the memo states as a response to an "[a]nticipated question" that "GFD concerns doesn't [sic] relieve you from trying to attain the numbers that have been set for you." When considering high Schedule II dispensing at a particular pharmacy in New Jersey in 2012, as the opiate crisis raged, the pharmacy supervisor pushed back against any attempt to reduce the supply of oxycodone, focusing on the impact the reduction would make on filled prescriptions and "the bonus tied to" one pharmacy employee.

1398. Walgreens also lobbied against the imposition of caps or limits on the volume of prescriptions a pharmacist may fill.

1399. As discussed above, both Cardinal and ABDC gave Walgreens special treatment as a customer, enabling Walgreens's pharmacies to place and have filled orders that should have been stopped as suspicious.

1400. Walgreens, by virtue of its data analytics, was actually aware at a corporate level of indicia of diversion, such as (1) individuals traveling long distances to fill prescriptions; (2) prescriptions for drug "cocktails," known for their abuse potential, such as oxycodone and Xanax; (3) individuals who arrived together with identical or nearly identical prescriptions; (4) high percentages of cash purchases; and (5) doctors prescribing outside the scope of their usual practice or geographic area. However, Walgreens failed to effectively make the data demonstrating these obvious flags available to its pharmacists and failed to properly address the red-flag dispensing patterns.

1401. Walgreens also failed to adequately use data available to it to identify doctors who were writing suspicious numbers of prescriptions and/or prescriptions of suspicious amounts or doses of opioids, and it failed to adequately use data available to it to prevent the filling of prescriptions that were illegally diverted or otherwise contributed to the opioid crisis. While Walgreens periodically implemented programs that would identify the most suspicious prescribers, it failed to make this data readily available to its pharmacists, and either terminated or failed to act on them at the corporate level.

1402. At the store level, Walgreens did not make any controlled-substance metrics available to pharmacists for specific prescribers. Further, despite the fact that at the corporate level Walgreens utilized many tools, including IMS, for descriptive statistics around prescriber patterns, Walgreens was not aware of any consistent reports written using that data. Instead, when a pharmacist or Walgreens team member had a concern about a particular prescriber, ad hoc prescriber profiles were pulled. However, these reports were difficult to interpret, so corporate would have to assist with the analysis and interpretation of the reports.

1403. Walgreens ran reports known as "GFD Opportunities reports," generated from data on its individual pharmacies and pharmacists. A "GFD Opportunities" tool included information such as "Cash rank," Oxycodone IR rank, "target" drug quantity rank, and target drug rate rank. With the information available to it, Walgreens thus knew which pharmacists filled more controlled substances prescriptions than others; however, Walgreens failed to meaningfully act to curtail red flag dispensing.

1404. Upon information and belief, based on other enforcement actions against the company, Walgreens also failed to adequately analyze its opioid sales to identify patterns regarding prescriptions that should not have been filled and to create policies accordingly, or if it conducted such reviews, it failed to take any meaningful action as a result.

#### 4. Distribution Activities

1405. Walgreens is one of the largest distributors of opioids in Arizona, having shipped millions of doses of opioids to its stores across the state.

1406. Walgreens has violated its obligations as a distributor under Arizona law to prevent abuse and diversion of prescription opioids.

1407. According to ARCOS data, Walgreen's distributed 9,268,200 oxycodone and hydrocodone pills to its retail pharmacies in Arizona between 2006 and 2014. The same data shows one Walgreens store in Bullhead City dispensing nearly 9 million pills during this period in a town of just over 40,000 inhabitants.

1408. In some cases, Walgreens allowed stores to increase their orders by as much as 600% in the space of just two years, including, for example, supplying a Florida town of 3,000 with 285,800 orders of oxycodone in one month. Such problems were not confined to Florida but are emblematic of Walgreens's company-wide failure to live up to its obligations to prevent diversion.

1409. Walgreens's corporate officers not only turned a blind eye; they also provided pharmacists with incentives through a bonus program that compensated them based on the number of prescriptions filled at the pharmacy. In fact, corporate attorneys at Walgreens suggested, in reviewing the legitimacy of prescriptions coming from pain clinics, that "if these are legitimate indicators of inappropriate prescriptions perhaps we should consider not documenting our own potential noncompliance," underscoring Walgreens's attitude that profit outweighed compliance with drug laws or the health of communities.[728]

1410. There is no evidence that Walgreens ever took any action related to the Suspicious Control Drug Order report besides generating it and mailing it to the DEA. Walgreens failed to

[728] 2012 Walgreens ISO, *supra*; Jenn Abelson, et al., *At Height of Crisis, Walgreens Handled Nearly One in Five of the Most Addictive Opioids*, Wash. Post (Nov. 7, 2019), https://www.washingtonpost.com/investigations/2019/11/07/height-crisis-walgreens-handled-nearly-one-five-most-addictive-opioids/.

perform any reasonable investigation on thousands of orders identified as "suspicious" and instead shipped the orders without meaningful review.

1411. One of the managers for Walgreens's Pharmaceutical Integrity ("RX Integrity") Department stated that, when he was with the Loss Prevention Department, he "basically burned the data on a CD and sent it off. I didn't dive into each individual report or CD" and instead "would look at it briefly, but just to see if the data transferred to the CD, but that's about the extent." In an erratum submitted in connection with a deposition in the MDL, Walgreens acknowledged that it "is currently unaware of due diligence that was performed based on orders being flagged . . ."

1412. Walgreens conducted very limited and irregular due diligence prior to the formation of the Pharmaceutical Integrity Department in late 2012/beginning of 2013. For example, limited pre-2012 emails produced by Walgreens reveal that the "warehouse" (Walgreens distribution center) would call stores to inquire about large orders, but those orders would be cleared if the store confirmed that they were not accidental errors. Even after the creation of the Pharmaceutical Integrity Department, Walgreens did little due diligence and did not keep complete records of any due diligence performed. Walgreens's failure to retain historical records and failure to incorporate historical due-diligence information into its SOM program is problematic because an important aspect of every due-diligence review should always be an examination of the history of the customer who placed the flagged order. Without such information, one cannot fully evaluate trends over time or make fully informed decisions about whether or not orders of controlled substances are likely to be diverted into illicit channels.

1413. Walgreens's practice of attempting to catch and correct ordering errors at the DC level is just an inventory-management program and does not satisfy Walgreens's obligation to prevent diversion. Walgreens performed no pre-shipment or post-shipment due diligence on any orders that were flagged. Additionally, even when Walgreens began to cut orders that exceeded their "tolerance,"

"frequency," or "ceilings," their policies did not call for appropriate due diligence to be performed on such orders and did not specify what constituted appropriate due diligence.

1414. Walgreens employed a number of limited and disjointed SOM programs during overlapping time periods, but none of them fulfilled Walgreens's duties as a distributor. Walgreens's failures to design and operate an effective SOM program are especially problematic because Walgreens, as a self-distributor, had limitless information about its customers available to it at all times. Walgreens's distribution "customers" are individual Walgreens pharmacies and Walgreens had the ability to conduct "data mining . . . across retail pharmacies to determine the maximum amount that a pharmacy should be allowed to receive."[729]

1415. Because Walgreens self-distributed, only distributing controlled substances to its own pharmacies, Walgreens's distribution and pharmacy ordering operations were highly integrated. Walgreens provided stores with suggested orders for controlled substances, with amounts based on the stores' previous orders for that drug. As part of its new SOM program, which was not fully implemented until late 2012/early 2013, Walgreens began to more strictly control the recommended orders and implemented ceilings that more strictly limited stores' ability to exceed the recommended order amounts. As summarized by one of Walgreens's Pharmaceutical Integrity Managers in August 2013:

> The Controlled Substances Order Monitoring system now in place sets limits for each item based on the chain average for that item for stores of similar size. If a particular store fills more of this item than normal and needs additional product we would need to document the reason and increase via a CSO Override. . . . The purpose for this is to ensure we have performed adequate review before sending in additional inventory.
>
> The previous system would continue to send additional product to the store without limit or review which made possible the runaway growth

[729] Walgreens, *Suspicious Order Monitoring Program: Policy and Procedures for the Pharmaceutical Integrity Team* (n.d.)

> of dispensing of products like Oxycodone, that played a roll [sic] in the DEAs investigation of Walgreens.[730]

This shows that Walgreens's SOM program permitted excess distribution of prescription opioids to Walgreens's pharmacies through at least 2013 without any comprehensive limit or review.

1416. In addition to self-distributing, Walgreens knew its pharmacies also received shipments of opioids from outside distributors, including Cardinal. Walgreens not only had access to data regarding the number of opioids its pharmacies were receiving from the outside distributors, but Walgreens also knew that the outside distributors relied on Walgreens for some portion of the outside distributors' due diligence. Additionally, Walgreens knew that its outside distributors were flagging its own pharmacies for making suspicious orders for prescription opioids and yet continued to self-distribute to those pharmacies without reporting any of those pharmacies' orders as suspicious.

1417. In 2006, Walgreens instituted the Questionable Order Quantity policy, which purported to establish procedures for verifying questionable store order quantities for prescription items. This policy instructed distribution center personnel to review orders and contact the pharmacy with questions regarding quantities. Once all orders were reviewed for accuracy, they were to be processed by the distribution center. From 2006 to 2010, this policy made no mention of reporting suspicious orders. In 2010, the policy was updated to include language that suspicious store orders and inquiries would be handled through the Corporate Office Internal Audit Department and noted that suspicious orders would be reported to the DEA within 3 days. However, the policy gave no specifics as to how or by whom such orders would be reported. Even worse, this policy does not appear to have been implemented; the Chief Audit Executive at Walgreens has testified that she could not recall any audit department responsibility concerning specific suspicious orders. The Questionable Order Quantity policy was updated again in October 2013 to state that Walgreens Strategic Inventory

---

[730] Email from Edward Bratton to Amish Patel (Aug. 19, 2013, 11:57 AM).

Management System will stop what would be considered suspicious controlled drug orders from being released for picking.[731]

1418. The Questionable Order Quantity policy applied to all products (including non-pharmacy products) an individual store ordered from a Walgreens distribution center. The policy was not intended to detect suspicious orders but rather orders that were entered in error (e.g., an order for 1000 units when an order of 100 units was intended).

1419. Walgreens's documents effectively acknowledge that this policy was not a true anti-diversion measure, and it recognized internally that it did not even begin creating an SOM system until March 2008.[732]

1420. Walgreens DC personnel did not receive any training related to orders deviating from a normal pattern. Further, there were no guidelines for determining what constituted an abnormal or suspicious quantity, but rather anything in the triple digits would generally be flagged. This meant that a store had to order 100 or more 100 count bottles of oxycodone or hydrocodone (10,000 dosages units) before an order would be flagged.

1421. In 2006, Walgreens received a Letter of Admonition from the DEA that set out the deficiencies in Walgreens's formula for identifying suspicious orders. The system set its standard to identify deviations from a normal ordering pattern in groupings of 25 customers, based on the number of non-controlled and controlled substance prescriptions filled by each customer. Within each group, Walgreens calculated the average order per item of each controlled substance. Walgreens then took the average and multiplied that figure by three. Orders above that value were used as the base to

---

[731] Shelley Crisel, Walgreens, *RX Questionable Order Qty* (Dec. 11, 2006); Heather Smith, Walgreens, *Authentication of Prescription Order Policy* (rev. Oct. 7, 2013).

[732] L. Dettmer et al., *Internal Audit Report* (Dec. 22, 2008) (hereinafter, *Interal Audit*).

determine if an order was suspicious. No attempt was made to examine whether orders were suspicious other than by quantity.[733]

1422. In May 2006, the DEA informed Walgreens that the "formulation utilized by the firm for reporting suspicious ordering of controlled substances was insufficient" and "inadequate" and that Walgreens's suspicious ordering report "formula should be based on (Size, pattern, frequency)." Rather than design and operate a system to identify suspicious orders, Walgreens modified its reporting of suspicious orders to the DEA to use a version of the formula described in Appendix E-3 to the Chemical Handlers Manual ("Appendix E-3"). Notably, Appendix E-3 adopted by Walgreens was virtually identical to the Customer Grouping Formula that the DEA had just told Walgreens was "insufficient" and "inadequate" in that it also utilized a store average multiplied by a factor of 3 to calculate a purchase limit. Nevertheless, Walgreens began reporting to the DEA using this Appendix E-3 formula in March 2007. Walgreens did not perform any due diligence on the suspicious orders identified by these reports prior to shipping the orders. This system simply reported orders that were greater than three times the store's average order for the last 13 months and only when there were orders in excess of this formula for two or more consecutive months.[734]

1423. Though Walgreens claims that it implemented the three times formula based on DEA guidance, DEA never approved Walgreens's SOM system or any use of the Appendix E-3 formula during the course of DEA's cyclic or scheduled investigations of Walgreens's distribution centers. As DEA 30b6 witness Clare Brennan testified, while DEA investigators are trained to ensure an SOM system is in place, they are also trained not to approve any SOM system. This non-approval, the impropriety of any attempt by Walgreens to rely on prior purported approval, and the compliance

[733] Letter from Robert L. Corso, Special Agent in Charge, Drug Enf't Admin., to Todd Polarolo, Distrib. Ctr. Manager, Walgreen Company (May 17, 2006) (hereinafter "Corso Letter"); Walgreens, *DEA Communication* (n.d.).

[734] Corso Letter, *supra*. Email from Melanie Soliva to James VanOverbake (Apr. 3, 2007, 3:38 PM).

failures of Walgreens's then utilized system, were re-emphasized by the letter Walgreens—and all controlled-substance distributors—received from the DEA in 2007.

1424. This type of "excessive report" without any due diligence performed on order did not satisfy Walgreens's obligations to detect and prevent diversion, a fact of which Walgreens was aware. In September 2007, three senior Walgreens employees (Dwayne Pinon, Senior Attorney; James Van Overbake, Auditor; and Irene Lerin, Audit Manager) attended the DEA Office of Diversion Control's 13th Pharmaceutical Industry Conference in Houston, Texas. Michael Mapes, Chief, DEA, Regulatory Section, gave a presentation at this conference relating to suspicious orders, which included the reminder that the CSA "requirement is to report suspicious orders, not suspicious sales after the fact." Mr. Mapes advised the audience not to "confuse suspicious order report with an excessive purchase report. They are two different things."[735]

1425. Additionally, in November 2012, the Walgreens's Divisional Vice President of Pharmacy Services reported to Kermit Crawford, Walgreens's President of Pharmacy, Health, and Wellness, his notes from meeting with the DEA about reporting suspicious orders, which included the note, "[i]f suspicious - you don't ship."

1426. In a December 2008 Internal Audit of its Perrysburg, Ohio DC, Walgreens acknowledged systemic and longstanding failures in the systems surrounding DEA compliance:

> In our opinion internal controls that ensure compliance with DEA regulations at the Perrysburg DC require improvement. In addition, some of these issues pertain to all company DCs and should be addressed to avoid potential DEA sanctions. Specifically, our review found four issues previously cited in the DEA's May 2006 inspection report that are still open. In addition, four issues noted in our previous audit (report dated July 2005) remain un-remediated. Areas requiring the greatest level of improvement are as follows:

[735] Michael Mapes, *Suspicious Orders* (Sept. 2007), Walgreens, DEA/Industry Seminar Report (Sept. 26, 2007).

DC-wide:

- pseudoephedrine reporting requirements and inventory maintenance
- suspicious controlled drug order processing and reporting
- controlled drug reporting, specifically receiving record information
- lack of formalized CII controlled substance policies and procedures.[736]

1427. The Internal Audit continues, "Walgreens is required to have a process to disclose to the DEA any suspicious orders of controlled substances that deviate from the normal size, pattern, and frequency. Any orders that are deemed to be suspicious are required to be reported to the DEA upon discovery." It also notes that while "Walgreens produces monthly Suspicious Controlled Drug Orders report," the audit team recommended discussions continue across multiple departments within Walgreens regarding "reporting suspicious control drug orders" and an "Updated Suspicious Control Drug Order Identification Methodology," with an "Estimated Completion Date for the New Reporting" of "June 30 2009." The audit also underlined Walgreens's lack of urgency in addressing the problems, indicating that the next "Cross-Functional Meeting" to address the "Updated Suspicious Controlled Drug Order Identification Methodology" would not occur for more than five months.[737]

1428. The Walgreens controlled-substances DC personnel who spoke to the DEA during its inspections did not recall ever telling the DEA that Walgreens internally determined that Walgreens's SOM system contained no monitoring process, that the SOM system did not stop suspicious orders from being shipped, that Walgreens could be filling illicit orders, or that the orders Walgreens reported to the DEA as suspicious had already been shipped.

1429. In March 2008, Walgreens formed a five-department "team" to finally "begin creating" an SOM program, and, in June 2008, developed a new SOM algorithm to begin to address the

---

[736] *Internal Audit*, *supra*.
[737] *Id.*

inadequacies of Walgreens's SOM policies. Despite years of knowledge that its SOM was insufficient, and despite developing a sophisticated algorithm in 2008, Walgreens did not practically implement its SOM program until 2009, when it began to pilot the algorithm with respect to orders from seven Walgreens stores. The algorithm evaluated the regular periodic orders for controlled substances orders that these seven Walgreens stores placed to Walgreens distribution centers for "tolerance" (size of the order) and "frequency" (how often the period orders were placed).[738]

1430. While the new SOM program flagged some orders from these seven stores as suspicious, during this time, Walgreens did not halt orders that violated the algorithm or take any other comprehensive steps to prevent flagged orders from being shipped or filled. The algorithm also ignored controlled substance orders that Walgreens pharmacies were placing with outside distributors and did not prevent stores from placing an order to an outside distributor even if the order had already been rejected by the new SOM system.[739]

1431. Rather than report the orders flagged by its SOMS algorithm, Walgreens continued to use the formula found in Appendix E-3 to report orders as suspicious to the DEA. Walgreens knew the SOM algorithm and the E-3 formula did not flag the same orders, but it still did not report orders flagged by the new algorithm.[740]

1432. Further, although the new algorithm identified more than 389 pages of suspicious orders per week as of August 2010, it failed to identify all the orders that Walgreens had marked as suspicious under its "three times" formulas and all the orders previously listed on its Suspicious Control Drug Order reports and submitted to the DEA "on a monthly basis." This "discrepancy" prompted an internal email from an employee in Walgreens's Loss Prevention Department to

---

[738] *Walgreens Compliance Program*, *supra*; Email from Mike Bleser to Jeffrey Berkowitz, et al. (Apr. 6, 2012) (hereinafter "Bleser Email"); Memo from Wayne Bancroft & Tracy Morris to Steve Bamberg, et al. (June 23, 2008); Email from Barb Martin (Aug. 28, 2009); Walgreens, *Controlled Substance Ordering: Evolution of Controlled Substance Ordering Process* (n.d.) (hereinafter *Walgreens Controlled Substance Ordering*).

[739] Email from Rakesh Khanna to Ferdinand Dungca (Apr. 23, 2012, 9:23 AM) (hereinafter "Khanna Email").

[740] Kahnna Email, *supra*.

Walgreens's Vice President, Distribution Centers and Logistics, suggesting that "the new system should be tested further and enhanced to provide broader coverage of controlled substance activity. The same e-mail stated that "we are not equipped to handle the 389+ pages of ADR4 [suspicious order monitoring] data which are compiled nationwide each week" and asked if his department had "a resource available" to assist.[741] An email in response "recall[ed] the old paper report as being inches thick" and an instruction "in 1985 not to review or contact anyone on the data." The response inquired, among other things, "Who from your group has been reviewing the data collected for the past twenty-five years?" and "At present is anyone doing any review on what would be considered suspicious quantities that are physically ordered and are releasing to stores?"[742]

1433. Not until September 2010 would the program, implemented in bits and pieces, be rolled out chain wide. At this time, Walgreens first began to take steps to prevent certain suspicious orders from being filled. Walgreens flagged orders according to its SOM algorithm on a nationwide basis and also began to automatically reduce quantities of certain flagged orders before those orders were filled and shipped by Walgreens distribution centers.[743]

1434. These cut orders were not reported to the DEA as suspicious, nor were they halted for review. The DEA found that Walgreens's policy of reducing and then filling and shipping suspicious orders without reporting them violated the law:

> This policy ignores the fact that the reporting requirement of 21 CFR § 1301.74(b) applies to orders, not shipments. A suspicious order placed by a customer pharmacy is made no less suspicious by application of a system designed to reduce or eliminate such orders prior to shipping. Construing the regulation this way defeats the essential purpose of the suspicious order requirement, which, as I stated in *Southwood,* is "to provide investigators in the field with information regarding potential illegal activity in an expeditious manner." 72 FR at 36501.[744]

[741] Email from Marcie Ranick to Dan Coughlin (Aug. 3, 2010, 12:38 PM).
[742] Email from Dan Coughlin to Marcie Ranick (Aug. 3, 2010, 1:05 PM).
[743] *Walgreens Controlled Substance Ordering*, *supra*.
[744] 2012 Walgreens ISO, *supra*.

1435. This phase of Walgreens's SOM program still had significant gaps or loopholes which caused Walgreens to continue to provide its stores with suspicious quantities of controlled substances, including the following:

a. Walgreens continued to neglect to incorporate a store's orders of controlled substances from outside distributors into the determination of whether a given order was suspicious. This allowed stores to circumvent the effect of orders being cut by Walgreens distribution centers because stores could simply place the cut portion of the order with an outside distributor.

b. Walgreens allowed interstoring (obtaining drugs from other Walgreens stores) of controlled substances until April 2013 but did not account for interstoring when identifying suspicious orders.

c. Walgreens's SOM algorithm only considered 13 weeks of sales data and would recalibrate the thresholds if there was a gradual increase in sales. Only a sudden spike in sales would result in orders getting cut.

d. In addition to their regular periodic orders for controlled substances from the Walgreens distribution centers, Walgreens stores were permitted to place ad hoc "PDQ" ("pretty darn quick") orders for controlled substances outside of their normal order days. The limits and automatic reductions Walgreens placed on stores' orders to distribution centers did not apply to PDQ orders, such that a store could, for instance, hit its weekly limit for a particular controlled substance and then place daily PDQ orders for the same drug, resulting in total order amounts far exceeding the monthly cumulative order limits put in place by Walgreens's SOM program. Walgreens did not remove oxycodone from PDQ ability until October 2012; other Schedule II controlled substances were not removed from PDQ until even later.

e. Walgreens only examined its stores individually rather than comparing them to one another. The result was that a store that historically had a pattern of excessively large orders could continue making excessively large orders.

f. Walgreens had the ability to remove entire stores and products from SOM review.

g. Even when Walgreens began cutting orders over a certain limit, stores could simply "call the DC" to obtain a "manual work around" the purported limit. The distribution centers did not have the ability to evaluate the information necessary to determine the propriety of any such overrides.

1436. Walgreens's post-2009 SOM system flagged thousands of items per month as being suspicious. Internal Walgreens documents indicate that, in July 2011 alone, as many as 20,699 orders for controlled substances were "marked suspicious" by the new algorithm. However, very few of these

orders received any review, and any review performed was nominal at best. Meanwhile, Walgreens failed to adequately staff the program and train its employees regarding its requirements.

1437. One example of the sorts of information that was available and considered, but not acted upon, is found in emails from January 10–11, 2011 between a Walgreens DC employee and Barbara Martin, identified by Walgreens as being one of two employees primarily responsible for performing due diligence on suspicious orders in the 2009–2012 time period under the new SOM system. The DC employee noted "several stores that are ordering huge quantities of 682971 [30 mg oxycodone] on a regular basis," and with respect to a single store, "we have shipped them 3271 bottles [of 30 mg oxycodone] between 12/1/10 and 1/10/11. I don't know how they can even house this many bottles to be honest. How do we go about checking the validity of these orders?" Ms. Martin noted that the store had average weekly sales of 36,200 dosage units, which was equal to 362 bottles per week, stating, "I have no idea where these stores are getting this type of volume. The last pharmacy I was manager at did about 525 rxs/day and we sold about 500 tabs a month (5 bottles)." Ms. Martin then told the DC employee that she could call the district pharmacy supervisor to see if he "may be able to shed some light on the subject." Despite the fact that questions had been raised about this store ordering volume in January 2011, the very next month, Walgreens filled and shipped orders totaling another 285,800 dosage units of 30-milligram oxycodone to the same pharmacy.[745]

1438. Of the orders that were the subject of these email exchanges, the DEA specifically found that "[b]ased on the evidence available to DEA, none of these orders were reported to DEA as suspicious and all appear to have been shipped, without any further due diligence to verify their legitimacy."[746]

---

[745] *See* 2012 Walgreens ISO, *supra*.
[746] *Id.*

1439. When suspending Walgreens's license to distribute controlled substances from a distribution center in 2012, the DEA specifically considered the Suspicious Control Drug Order reports and made the following further findings of fact and conclusions of law about Walgreens's suspicious order monitoring system—applicable across Walgreens's operations:

> [Walgreens's] practice with regard to suspicious order reporting was to send to the local DEA field office a monthly report labeled 'Suspicious Control Drug Orders.'
>
> [The Suspicious Control Drug] reports, consisting of nothing more than an aggregate of completed transactions, did not comply with the requirement to report suspicious orders as discovered, despite the title [Walgreens] attached to these reports.
>
> Upon review of an example of the Suspicious Control Drug Order report for December 2011, [Walgreens's] suspicious order report for December 2011 appears to include suspicious orders placed by its customers for the past 6 months. The report for just suspicious orders of Schedule II drugs is 1712 pages and includes reports on approximately 836 pharmacies in more than a dozen states and Puerto Rico.
>
> This report from the Jupiter [Florida] Distribution Center covers pharmacies in multiple states and Puerto Rico, yet the average order and trigger amount is the same for a particular drug regardless of the pharmacy's location, the population it serves, or the number of other pharmacies in the area.
>
> As made clear in 21 C.F.R. § 1301.74(b), *Southwood,* and the December 27, 2007 letter to distributors from the Deputy Assistant Administrator for the Office of Diversion Control, suspicious orders are to be reported *as discovered,* not in a collection of monthly completed transactions. Moreover, commensurate with the obligation to identify and report suspicious orders as they are discovered is the obligation to conduct meaningful due diligence in an investigation of the customer and the particular order to resolve the suspicion and verify that the order is actually being used to fulfill legitimate medical needs. This analysis must take place *before* the order is shipped. No order identified as suspicious should be fulfilled until an assessment of the order's legitimacy is concluded.
>
> DEA's investigation of [Walgreens] . . . revealed that Walgreens failed to detect and report suspicious orders by its pharmacy customers, in violation of 21 C.F.R. § 1301.74(b). 21 C.F.R. § 1301.74(b).

> DEA investigation of [Walgreens's] distribution practices and policies . . . demonstrates that [Walgreens] has failed to maintain effective controls against the diversion of controlled substances into other than legitimate medical, scientific, and industrial channels, in violation of 21 U.S.C. *55* 823(b)(l and (e)(l). [Walgreens] failed to conduct adequate due diligence of its retail stores, including but not limited to, the six stores identified above, and continued to distribute large amounts of controlled substances to pharmacies that it knew or should have known were dispensing those controlled substances pursuant to prescriptions written for other than a legitimate medical purpose by practitioners acting outside the usual course of their professional practice. . . . [Walgreens has not] recognized and adequately reformed the systemic shortcomings discussed herein.
>
> [DEA's] concerns with [Walgreens's] distribution practices are not limited to the six Walgreens pharmacies [for which DEA suspended Walgreens's dispensing registration].[747]

1440. The DEA further found that Walgreens "failed to conduct any meaningful investigation or analysis to ensure that the massive amounts of commonly abused, highly addictive controlled substances being ordered by these pharmacies were not being diverted into other than legitimate channels." The DEA noted that "[Walgreens] has been unable to provide any files related to any effort to adequately verify the legitimacy of any particular order it shipped to its customer stores."[748]

1441. Knowing that this DC's license could be suspended, Walgreens collaborated with ABDC and Cardinal to design a plan to have some of the stores currently serviced by the at-risk DC to be serviced by the outside distributors. Showing the extent and willingness of their cooperation, ABDC and Cardinal "feel that once the plan is set, they can start servicing very quickly (1-2 days) In the event of a Jupiter C2 shutdown."[749] Thus, rather than use the suspension of the Jupiter DC's license as an opportunity to revisit how many opioids its pharmacies were pumping out into

---

[747] *Id.*
[748] *Id.*
[749] Bleser Email, *supra*.

communities, Walgreens opted to maintain distribution and dispensing of opioids at high levels with the aid of outside distributors.

1442. After the DEA began its investigation, Walgreens held meetings with the DEA and informed the DEA that it was implementing "new changes" to "enhance" its SOM program.[750]

1443. Nevertheless, Walgreens addressed only a few of the gaps in its SOM program. For instance, the SOM program began to incorporate outside vendor orders into the overall SOM analysis, but only when analyzing order frequency—not in analyzing the tolerance (i.e., overall limits). Orders from outside distributors were now tracked, but a store could still order the remainder of an order that had been cut by the Walgreens distribution center from an outside distributor. Orders that were flagged and then cut were still not reported as suspicious.[751]

1444. Also, in response to the DEA investigation, Walgreens formed Pharmaceutical Integrity ("Rx Integrity"), an internal compliance unit, which took the position that the orders flagged by Walgreens's algorithm were not "suspicious" under the controlled-substances regulations (despite being described as such in Walgreens's own documents) but, rather, were "orders of interest." Furthermore, as of January 2013, the Rx Integrity team only had the ability to immediately investigate orders placed via a Controlled Substance Override ("CSO") Form. Regular orders flagged via the algorithm were a week old and, in most cases, had already shipped by the time that Rx Integrity was able to review them.

1445. Beginning in November 2012, Walgreens changed the frequency algorithm to "ceiling limits" that looked at the overall total a Walgreens store was ordering before allowing the DC to fill the order, finally incorporating orders from outside distributors into a more comprehensive analysis.

---

[750] *Walgreens Compliance Program*, *supra*.
[751] Khanna Email, *supra*.

Walgreens also began cutting a store's order to zero when the store manually manipulated a suggested order or created an order that exceeded the tolerance or ceiling.

1446. However, Walgreens undermined the effectiveness of the "ceiling limits" by allowing stores to view their limits to determine the likelihood of a given order being flagged. Indeed, a Walgreens internal document states, "the ceiling tool was designed to provide stores direction to place orders for controls without an order being flagged."

1447. In December 2012, the further enhanced SOM system flagged "14,000 items that the stores ordered across the chain that would have to be investigated" before they could be shipped. Walgreens did not have sufficient resources to timely review these orders. Walgreens noted that "[t]he DEA would view this as further failures of our internal processes, which could potentially result in additional pharmacies and distribution centers being subjected to regulatory actions and ultimately prohibited from handling controlled substances." At the time these 14,000 orders were flagged, Walgreens's Rx Integrity team was composed of fewer than five people. Even at its height, Rx Integrity had only eleven employees.

1448. One of the mechanisms that Walgreens put in place to deal with the number of flagged orders was the CSO system, an "alternative ordering procedure" to be used in response to demand increases. Orders that exceeded the Walgreens algorithm were cut to predetermined limits unless an override was approved. When Walgreens stores were close to hitting their ceiling limits, they were directed to complete a CSO Form. The Rx Integrity team of eleven was then tasked with reviewing the CSO Forms and making decisions with regard to override approvals. At times, the Rx Integrity team received between 1,000 and 3,000 CSO forms per month. When CSO overrides were submitted they were routinely approved. For example, Walgreens's documents show that over 95% of CSO overrides were approved by Rx Integrity in both 2014 and 2015.

1449. Walgreens has admitted to failures in its suspicious order monitoring prior to 2012. Comparing the 2012 SOM system to the previous system, one of Walgreens's Pharmaceutical Integrity Managers in August 2013 explained:

> The Controlled Substances Order Monitoring system now in place sets limits for each item based on the chain average for that item for stores of similar size. If a particular store fills more of this item than normal and needs additional product we would need to document the reason and increase via a CSO Override. . . . The purpose for this is to ensure we have performed adequate review before sending in additional inventory.
>
> The previous system would continue to send additional product to the store without limit or review which made possible the runaway growth of dispensing of products like Oxycodone, that played a roll [sic] in the DEAs investigation of Walgreens.[752]

1450. Walgreens did not prioritize compliance when instituting its SOM system. MDL testimony from the Senior Director of Walgreens's Pharmaceutical Integrity Department, which is charged with supervising Walgreens's SOM system, revealed that even as late as 2012, 2013, and 2014, Walgreens viewed the SOM system as an inventory control mechanism rather than as a compliance control mechanism:

> Q: Now, Walgreens's system, similar to my alarm, is there to detect a potential red flag. Would you agree with that?
>
> A: It was put in place to ensure that the stores had the proper quantities. Not necessarily to . . . detect a red flag. The whole idea was to make sure that the stores were getting the quantities that they needed based on their peer group.

1451. Walgreens never equipped its distribution centers to properly monitor for, report, and halt suspicious orders, or otherwise effectively prevent diversion. When it became clear Walgreens would need to devote significant resources to achieve compliance, Walgreens chose instead to cease controlled-substance distribution altogether. Walgreens stated that "while the financial impact of no

---

[752] Email from Edward Bratton to Amish Patel (August 19, 2013).

longer . . . [self-distributing] from the Walgreens DCs was taken into consideration, there is a greater risk to the company in fines and loss of licenses if we continue to sell these items in our warehouses."[753]

1452. Upon information and belief, Walgreens failed to adequately analyze and address its opioid sales relative to: (a) the number of opioid prescriptions filled by its pharmacies compared to the population of the pharmacy's community; (b) the increase in opioid sales compared to past years; and (c) the number of opioid prescriptions filled compared to other drugs.

#### 5. Public Statements of Compliance

1453. In connection with a DEA settlement, Walgreens publicly stated that it would maintain a compliance program to detect and monitor diversion, including training its pharmacists on red flags for diversion, but it has failed to implement a program to adequately do so.[754]

1454. The National Association of Chain Drugstores, of which Walgreens is a member, joined the amicus brief in *Masters Pharmaceuticals* filed by the HDA that represented that the distributors and chain drugstores were fulfilling their duties to detect and prevent diversion.[755]

1455. Walgreens's public statements misled the public, including Plaintiffs, into believing that Walgreens was taking effective steps to fight the opioid epidemic.

### N. CVS

1456. CVS, despite being a giant company with purportedly comprehensive systems for tracking the movement of drugs, failed to take adequate steps to prevent diversion of opioids in Arizona.

1457. CVS sold and shipped unreasonable quantities of opioids into Arizona, including to many red-flag pharmacies, and continued to do so despite extensive and blatant evidence of diversion

[753] Email from Barb Martin to Dan Hein (Apr. 16, 2013, 9:34 AM).
[754] Settlement & Memo. of Agreement (June 10, 2013).
[755] Brief for HDMA and NACDS, *supra*; *NACDS Member Retailers (US-based)*, NACDS, https://www.nacds.org/membership/directories/chain-companies/ (last visited July 19, 2021).

at many of its own retail pharmacies in Arizona. CVS also dispensed unreasonable quantities of opioids from those pharmacies despite being on notice of signs of diversion, in violation of its duties as a pharmacist under Arizona law.

1458. CVS has been investigated and fined for some of its many failures to secure its supply chain and fill prescriptions appropriately, but it continues to allow the inappropriate and harmful distribution of opioids.

1459. The opioid crisis described herein is a direct and foreseeable result of CVS's actions.

1460. The volume of opioids CVS shipped into and dispensed in Arizona was so high as to put it on notice that not all of the drugs were being used to fill prescriptions for legitimate medical uses.

1461. In addition, CVS also distributed and dispensed unreasonably high quantities of prescription opioids in other states, and these opioids were diverted from these other states to Arizona. CVS failed to take meaningful action to stop the diversion despite its knowledge. CVS contributed substantially to the opioid epidemic in Arizona.

1462. CVS developed and maintained highly advanced data-collection and analytical systems to monitor the inventory and ordering needs of customers in real time and depicted the exact amounts of pills, pill types, and anticipated order threshold for its retail pharmacy stores.

1463. CVS tracked which of its stores were top sellers of particular drugs. But instead of using that information and data to prevent shipments of suspicious quantities or filling of suspicious prescriptions, CVS joined the race to sell as many opioids as possible, including by failing to institute safeguards and by marketing opioids to their vast networks of retail pharmacy stores and in-store pharmacists.

**1. Enforcement Actions**

1464. CVS is a repeat offender; the company has paid fines totaling over $40 million as the result of a series of investigations by the DEA and the DOJ. It nonetheless treated these fines as the cost of doing business. CVS allowed its pharmacies to continue dispensing opioids in quantities significantly higher than any plausible medical need would require and violating their record-keeping and dispensing obligations. The following examples are illustrative rather than exhaustive.

1465. Dating back to 2006, CVS retail pharmacies in Oklahoma and elsewhere intentionally violated the CSA by filling prescriptions signed by prescribers with invalid DEA registration numbers.[756]

1466. In August 2013, CVS was fined $350,000 by the Oklahoma Pharmacy Board for improperly selling prescription narcotics in at least five locations in the Oklahoma City metropolitan area.[757]

1467. In September 2014, CVS agreed to pay $1.9 million in civil penalties to resolve allegations it filled prescriptions written by a Texas doctor whose controlled-substance registration had expired.[758]

1468. In May 2015, CVS agreed to pay a $22 million penalty following a DEA investigation that found that employees at two pharmacies in Sanford, Florida, had dispensed prescription opioids "based on prescriptions that had not been issued for legitimate medical purposes by a health care provider acting in the usual course of professional practice. CVS also acknowledged that its retail

[756] *CVS to Pay $11 Million To Settle Civil Penalty Claims Involving Violations of Controlled Substances Act*, U.S. Dep't Just. (Apr. 3, 2013), https://www.justice.gov/usao-wdok/pr/cvs-pay-11-million-settle-civil-penalty-claims-involving-violations-controlled.

[757] Andrew Knittle, *Oklahoma pharmacy board stays busy, hands out massive fines at times*, Oklahoman (May 3, 2015), http://newsok.com/article/5415840.

[758] Patrick Danner, *H-E-B, CVS Fined Over Prescriptions*, San Antonio Express-News (Sept. 5, 2014), http://www.expressnews.com/business/local/article/H-E-BCVSfined-over-prescriptions-5736554.php.

pharmacies had a responsibility to dispense only those prescriptions that were issued based on legitimate medical need."[759]

1469. In August 2015, CVS entered into a $450,000 settlement with the U.S. Attorney's Office for the District of Rhode Island to resolve allegations that several of its Rhode Island stores violated the CSA by filling invalid prescriptions and maintaining deficient records. The United States alleged that CVS retail pharmacies in Rhode Island filled a number of forged prescriptions with invalid DEA numbers and filled multiple prescriptions written by psychiatric nurse practitioners for hydrocodone, despite the fact that these practitioners were not legally permitted to prescribe that drug. Additionally, the government alleged that CVS had record-keeping deficiencies.[760]

1470. In February 2016, CVS paid $8 million to settle allegations made by the DEA and the DOJ that from 2008 to 2012, CVS stores and pharmacists in Maryland violated their duties under the CSA by filling prescriptions with no legitimate medical purpose.[761]

1471. In June 2016, CVS agreed to pay $3.5 million to resolve allegations that 50 of its stores in Massachusetts and New Hampshire violated the Controlled Substances Act by filling forged prescriptions for controlled substances – mostly addictive painkillers – more than 500 times between 2011 and 2014.[762]

1472. In September 2016, CVS entered into a $795,000 settlement with the Massachusetts Attorney General wherein CVS agreed to require pharmacy staff to access the state's prescription

[759] *United States Reaches $22 Million Settlement Agreement with CVS For Unlawful Distribution of Controlled Substances*, U.S. Dep't Just. (May 13, 2015), https://www.justice.gov/usao-mdfl/pr/united-states-reaches-22-million-settlement-agreement-cvs-unlawful-distribution.

[760] *Drug Diversion Claims Against CVS Health Corp. Resolved With $450,000 Civil Settlement*, U.S. Dep't Just. (Aug. 10, 2015), https://www.justice.gov/usao-ri/pr/drug-diversion-claims-against-cvs-health-corp-resolved-450000-civil-settlement.

[761] *United States Reaches $8 Million Settlement Agreement with CVS for Unlawful Distribution of Controlled Substances*, U.S. Dep't Just. (Feb. 12, 2016), https://www.justice.gov/usao-md/pr/united-states-reaches-8-million-settlement-agreement-cvs-unlawful-distribution-controlled.

[762] *CVS to Pay $3.5 Million to Resolve Allegations that Pharmacists Filled Fake Prescriptions*, U.S. Dep't Just. (June 30, 2016), https://www.justice.gov/usao-ma/pr/cvs-pay-35-million-resolve-allegations-pharmacists-filled-fake-prescriptions.

monitoring program website and review a patient's prescription history before dispensing certain opioid drugs.[763]

1473. In July 2017, CVS paid a fine of $5 million in a settlement with DEA and United States to resolve allegations that its pharmacies in the Eastern District of California failed to keep and maintain accurate records of Schedule II, III, IV, and V controlled substances. CVS admitted that the numerous retail stores covered by this settlement violated their record-keeping obligations.[764]

1474. In August 2018, CVS paid a civil penalty of $1 million to resolve record-keeping violations at CVS Pharmacy locations throughout the Northern District of Alabama. It was the largest civil fine paid in Alabama for a DEA registrant.[765]

### 2. Marketing Activities

1475. CVS was a critical participant in Defendants' campaign to create a sea change in the way opioids were used in the United States, including Arizona. CVS worked in concert with opioid manufacturers and other distributors to ensure that the false messaging surrounding the treatment of pain and the true addictive nature of opioids was consistent and geared to normalize their widespread use.

1476. As a critical participant in the fraudulent scheme with all other defendants, CVS's role was not limited to supplying the expanded market for prescription opioids. CVS also worked hard to ensure that demand for prescription opioids was not only sustained but multiplied.

---

[763] Dialynn Dwyer, *CVS Will Pay $795,000, Strengthen Policies Around Dispensing Opioids in Agreement with State*, Boston.com (Sept. 1, 2016), https://www.boston.com/news/local-news/2016/09/01/cvs-will-pay-795000-strengthen-policies-around-dispensing-opioids-in-agreement-with-state/.

[764] *CVS Pharmacy Inc. Pays $5M to Settle Alleged Violations of the Controlled Substance Act*, U.S. Dep't Just. (July 11, 2017), https://www.justice.gov/usao-edca/pr/cvs-pharmacy-inc-pays-5m-settle-alleged-violations-controlled-substance-act.

[765] *CVS Pharmacy Pays $1 Million Penalty in Settlement with DOJ for violations of the Controlled Substances Act*, U.S. Dep't Just. (Aug. 21, 2018), https://www.justice.gov/usao-ndal/pr/cvs-pharmacy-pays-1-million-penalty-settlement-doj-violations-controlled-substances-act.

1477. To grow the demand for prescription opioids, CVS participated in the marketing, advertising, and promotion of opioid products with and on behalf of opioid manufacturers and other distributors.

1478. CVS did not limit its marketing and promotion of opioids to its involvement with any specific manufacturers or distributors. CVS did not draw lines when it came to promoting opioids, and there were no brand boundaries.

1479. Marketing, advertising, and promoting opioids was not a new practice for CVS. In fact, CVS had been advertising these services for years.

1480. For example, CVS made at least one pitch to Insys, a company whose senior executives were criminally convicted for their unlawful marketing, to help sell its incredibly potent opioid, Subsys, a liquid form of fentanyl.




1481. Here, CVS touted the reach of its communications and explained the science behind its sophisticated marketing, advertising, and promotional services.

## Pharmaceutical Services



**Get the** medicine **Right.....**



**...with the** right educational **communications.**

NewScript Rx
Clinical FoCVS
Rx Literature Display
Rx Edge®
CareCheck Plus
ExtraCare

**Communicate your product's unique clinical benefits to thousands of targeted individuals.**

2 ©2011 Caremark. All rights reserved. CVS Caremark proprietary and confidential information. Not for distribution without written permission from CVS Caremark.

## Pharmaceutical Services: Overview

| | | |
|---|---|---|
| *RPh* | NewScript<br>Clinical FoCVS | **MEDICAL PUBLICATIONS TO RETAIL PHARMACISTS**<br>Clinical reviews of targeted products or recently launched products published in hard copy and electronically. |
| *Retail Stores Patient Messaging* | Rx Literature Display<br>Rx Edge<br>CareCheck Plus<br>ExtraCare | **STRATEGEICALLY PLACED INFORMATION FOR PATIENTS**<br>Executed across all CVS retail locations, literature directed towards patients within store aisles and at point of sale. |

3 ©2011 Caremark. All rights reserved. CVS Caremark proprietary and confidential information. Not for distribution without written permission from CVS Caremark.

1482. Hardly novices, CVS recognized its expertise in ensuring that opioid manufacturers like Insys were able to reach their intended market by using CVS's promotional programs which are designed to "deliver results."

1483. Through CVS's NEWScript program, CVS claimed to be perfectly poised to assist with new-product launches and a truly impressive reach.




1484. CVS even offered Insys the chance at having a literature display in its patient waiting rooms and to help Insys "target patients" using its signature ExtraCare consumer loyalty card database.




a. CVS's Work with Purdue

1485. As early as 2001, CVS worked with Purdue and its unbranded marketing arm, Partners Against Pain ("PAP"), to "fight back" against allegations (later proved to be true) that Purdue's OxyContin was being abused at alarming rates. Purdue and its partners, including CVS, used Purdue's PAP website to claim that the risk of addiction associated with OxyContin was very small.

1486. CVS also worked with Purdue to ensure that CVS pharmacists were trained by Purdue on many of the misleading marketing messages that would later form the basis of Purdue's 2007 criminal guilty plea and $600 million fine for misleading regulators, doctors, and patients about OxyContin's risk of addiction and potential for abuse.

1487. Purdue's and CVS's tactics included (1) distributing what an internal Purdue memo describes as "our . . . Brochure" purporting to teach pharmacists how to identify fraudulent prescriptions; (2) requiring new CVS hires to view what Purdue describes as "our written CE

[continuing education] programs"; and (3) planning to co-host additional CE programs to indoctrinate pharmacists and other health professionals with Purdue's misrepresentations concerning opioids.

1488. The Purdue memo, reproduced below, also reveals that these tactics were supported by CVS's leadership, including its directors of quality improvement and regulatory compliance and its Manager of Professional Practices:

PURDUE

Stephen L. Seid
Sr. Director, National Accounts and Trade Relations
(203) 588-7315

TO: Jim Lang FROM: Steve Seid

RE: **CVS Pharmacy** DATE: May 11, 2001

Jim, on May 2, 2001 Don Tasser and I met with three of the key pharmacy people at CVS. They were:

— Barry Jasilli, R.Ph., J.D., Director, Quality Improvement
— Susan DelMonico, R.Ph., J.D., Director, Regulatory Compliance
— Sharon Galzarano, R.Ph., Manager of Professional Practices

The goal of the meeting was to talk about mutually beneficial initiatives with CVS to improve education with their pharmacists. We also wanted to reiterate our position on ensuring availability of OxyContin® for appropriate patients. I think overall the entire meeting was very productive and the CVS people were extremely supportive.

Key issues discussed were as follow:

1 They were resolute in their commitment to good pharmacy practice. Part of that good pharmacy practice is ensuring availability of OxyContin for appropriate patients. Their goal is good patient care.

2 As a group they were vocal, particularly Barry Jasilli, indicating that they felt that Purdue was in many ways being victimized by the situation. That the product is not the issue, but that the abuser is the issue. He indicated that, from his perspective, we should be fighting back even harder. We should be pointing out the benefits of our brand.

3 CVS will be sending out a copy of our Abuse and Diversion Brochure to 4,100 pharmacies. Our letter will be personalized for the CVS pharmacist and cosigned by Barry Jasilli and Susan DelMonico. They will also be sending out a version of the Abuse and Diversion Brochure with their logo.

4 CVS will also put a copy of the Abuse and Diversion Brochure on their intranet site called RxNet.

5 They will be looking to utilize both of our written CE Programs, in particular, for new grads coming to work for CVS.

6 They talked about being more preemptive with our joint educational efforts. We will be setting up at least five programs at this time through CVS.

7 They talked about the possibility of co hosting programs in areas of healthcare professionals. I don't know if there was a unanimous agreement among the CVS people, but we will follow up to see if that is possible. Susan DelMonico will be the point person for CE Programs.

I believe we are garnering some significant support with CVS. Don Tasser will ensure follow up on these key programs.

1489. CVS's ties to PAP and Purdue were so deep that CVS even used PAP's and Purdue's logos on a cover letter when providing the aforementioned guide to CVS pharmacists:

PARTNERS AGAINST PAIN® CVS/pharmacy®

June 2001

Dear CVS Pharmacists:

CVS is proud to participate in Partners Against Pain®, a therapeutic alliance of pharmacists, physicians, nurses, and pain experts, sponsored by Purdue Pharma. We acknowledge the legitimate concern of pharmacists over the diversion of opioid medications.

That's why we recently developed, and have enclosed, "How to Stop Drug Diversion & Protect Your Pharmacy." Included in this guide are such helpful tips from the U.S. Drug Enforcement Administration, such as:

- How to detect prescriptions that have been "rinsed" blank and rewritten
- Confirming prescriptions using a published phone number – not the number on the prescription – if you have doubts about any aspect of it

Treating people in pain is a top priority. Purdue is a leader in educating the healthcare community on effective pain management and the appropriate use of pain medicines. Why? Because we believe that education and open communication are keys to effective pain control.

Along with hundreds of educational programs and brochures, Partners Against Pain sponsors the award-winning website – www.partnersagainstpain.com – which provides pain information, assessment tools, and support – 24 hours a day. We hope you and your customers will visit this site, and that the enclosed brochure will help you in your efforts to serve your customers and protect your pharmacy from drug diversion.

Provide the right patients, with the right pain medicine, at the right dosage, under the right supervision. Together, let's treat the pain. Please share a copy of this letter with your technician.

Sincerely,

Dr. Robert F. Reder, V.P.
Medical Affairs & Worldwide Drug Safety
Purdue Pharma L.P.

Barry Jasilli, R.Ph., JD
Director, Quality Improvement
CVS Corporation

cc: Philip Keough, R.Ph.
Director, Pharmacy Operations

Sharon Galzarano, R.Ph.
Manager, Professional Practices

Susan DelMonico, R.Ph., JD
Director, Regulatory Compliance
CVS Corporation

PURDUE

One Stamford Forum, Stamford, Connecticut 06901-3431 Telephone (203) 588-5000 Fax (203) 588-8850
www.partnersagainstpain.com

### b. CVS's Work with Endo

1490. CVS worked with Endo to increase patient adherence to continued use of opioids. CVS had a crucial role in carrying out one of the key sales tactics in Endo's 2012 business plan.

1491. Through a company called Catalina Health ("Catalina"), Endo was able to target OxyContin patients in areas where Opana ER had preferred formulary status. Catalina in turn worked

to create a brand-loyalty program that kept new patients on their opioids. CVS, through its pharmacy-retention programs, sent letters to the patients' homes to encourage them to stay on Opana—even though prolonged use of opioids increases the risk of addiction and even though patients in pain presumably need no reminder to continue to take their pain medications.

1492. The agreement between CVS and Endo was formalized in an agreement to promote, market, and advertise Endo's opioid products via its "CVS Carecheck Plus Patient Education Service." CVS not only contractually agreed to promote Opana ER to its customers (i.e., patients) at the point of sale, it even insisted upon reviewing and **approving** the specific messaging used.

#### c. CVS's Work with Cardinal and Actavis

1493. CVS helped Actavis promote its opioids by working with Cardinal's Marketing and Business Development team on programs designed to offer rebates and off-invoice discounts on products, with the aim being to "move [] product."

### 3. Dispensing Activities.

1494. CVS dispensed millions of opioid doses from its retail pharmacies in Arizona. For instance, the CVS store in Bullhead City dispensed over 16 million doses of hydrocodone and oxycodone between 2006 and 2014, the largest number of any direct retail pharmacy in the state.

1495. CVS violated its duty as a pharmacy to prevent abuse and diversion of controlled substances by filling opioid prescriptions in Arizona under circumstances showing red flags of opioid diversion, in violation of its common-law and statutory duties under Arizona law.

1496. CVS acknowledged in an article it published in the New England Journal of Medicine that "[p]harmacies have a role to play in the oversight of prescriptions for controlled substances, and

opioid analgesics in particular."[766] The DEA agreed, identifying "both pharmaceutical distributors and chain pharmacies as part of the problem" contributing to opioid abuse and related deaths.[767]

1497. The same article noted the advantage the National Retail Pharmacies have in meeting their CSA obligations. Pharmacies can use "aggregated information on all prescriptions filled at the chain" in order to examine "patterns" of opioids and other "high-risk drugs" and target "inappropriate prescribing."[768]

1498. CVS's continued practice of filling suspicious orders facilitated the diversion of opioids nationwide. For example, in Florida, starting with an already high baseline, a single CVS ordered approximately four times the amount of oxycodone a typical pharmacy ordered in one year in 2006. By 2010, the same pharmacy's 10-month history showed quantities more than thirty times the amount of oxycodone a typical pharmacy ordered in one year, and the pharmacy's supervisor could not explain why the volume was so high. During that time, Cardinal was the pharmacy's main distributor, and two of CVS's Florida pharmacies were among Cardinal's top four retail pharmacy customers, dispensing a staggering amount of oxycodone compared to Cardinal's other Florida customers. Interviews with employees of these pharmacies revealed that they routinely observed red flags and obvious signs that they were filling illegitimate prescriptions. One set a daily limit of oxycodone 30mg prescriptions the pharmacy would fill each day, basing the limit on the amount in stock that day, so as to ensure that the "real pain patients" could get their prescriptions filled. The pharmacy usually reached its limit by lunchtime each day, and at times within 30 minutes of opening. Customers, aware that prescriptions were first come, first served, would line up outside the store as early as 7:45 AM. An employee acting as "bouncer" included escorting off the premises customers who were "hooked" on opioids and

[766] Mitch Betses & Troyen Brennan, *Abusive Prescribing of Controlled Substances - A Pharmacy View*, 369 N. Engl. J. Med. 989, 989 (203), https://www.nejm.org/doi/pdf/10.1056/NEJMp1308222?articleTools=true.

[767] *Id.* at 991.

[768] *Id.* at 990.

became belligerent if their prescriptions were refused among his job duties. Although CVS had in place dispensing guidelines for controlled-substance prescriptions, these guidelines were not followed at these stores. Rather, they dispensed controlled-substance prescriptions despite the existence of "warning signs" in the guidelines.[769]

1499. CVS lacked meaningful policies and procedures to guide its pharmacy staff in maintaining effective controls against diversion, even as they evolved over time. Not until 2012 did CVS create guidelines explaining in more detail the "red flags" or cautionary signals that CVS pharmacists should be on the lookout for to prevent diversion and to uphold their corresponding responsibilities to ensure that all dispensed controlled substances are issued for a legitimate medical purpose. Even so, CVS's conduct and the volume it dispensed in Arizona thereafter indicates that its policies were not applied.

1500. In addition, CVS had performance metrics in place that pressured pharmacists to put profits ahead of safety.

1501. CVS used performance metrics related to its own profits, which would rely, in part, upon the number of prescriptions dispensed. By 2010, CVS had implemented performance metrics that remain publicly available online. CVS's metrics system lacked any measurement for pharmacy accuracy or customer safety. They did, however, prioritize speed and volume, including by requiring pharmacists to meet wait- or fill-time expectations. Moreover, the bonuses for pharmacists are calculated, in part, on how many prescriptions that pharmacist fills within a year. Opioid prescriptions were even included in the volume goals until 2013, and after that time, the pressure from the metrics' focus on profitability remained. These policies remained in place even as the epidemic raged. Even in 2020, pharmacists described CVS as the "most aggressive chain in imposing performance metrics."[770]

---

[769] Declaration of Joseph Rannazzisi, *Holiday CVS, LLC d/b/a CVS/Pharmacy Nos. 5195/219 v. Eric Holder, Jr. et al.*, No. 1:12-cv-191, Doc. 19-6 ¶¶ 38–41, 48, 56 (D.D.C. Feb. 24, 2012) (hereinafter "Rannazzisi Declaration").

[770] See Ellen Gabler, *How Chaos at Pharmacies Is Putting Patients at Risk*, N.Y. Times, (Jan. 31, 2020),

1502. Concerning the metrics at CVS, one pharmacist commented that "You get stressed, and it takes your mind away from the actual prescriptions." Another former CVS pharmacist recalled that "[e]very prescription [wa]s timed," and a backlog would pop up in color on pharmacists' computer screens if they fell behind.[771] Additionally, CVS has faced discrimination complaints alleging that the company's "Metrics" system set unobtainable goals—or at least, goals that could not be obtained without violating the laws and practice rules governing pharmacists' professional responsibilities, edging out older pharmacists.

More recently, a former CVS pharmacist in North Carolina described being driven to leave his position and open his own pharmacy, where he could work safely. He described working a 13-hour shift with no breaks for lunch or dinner at CVS the day before he left in December 2018; a day on which he filled "552 prescriptions—about one every minute and 25 seconds—while counseling patients, giving shots, making calls and staffing the drive-through." In departing, he let his manager know that he would not "work in a situation that is unsafe." One pharmacist was so alarmed that he wrote anonymously to the Texas State Board of Pharmacy to caution: "I am a danger to the public working for CVS."[772]

### 4. Distribution Activities

1503. CVS is one of the largest distributors of opioids in Arizona, having shipped millions of doses of opioids to its retail pharmacy stores across the state.

1504. CVS has violated its obligations as a distributor under Arizona law to prevent abuse and diversion of prescription opioids.

---

https://www.nytimes.com/2020/01/31/health/pharmacists-medication-errors.html (hereinafter *Chaos at Pharmacies*).

[771] Sam Roe, et al., *Pharmacies Miss Half of Dangerous Drug Combinations* (Dec. 15, 2016), https://www.chicagotribune.com/investigations/ct-drug-interactions-pharmacy-met-20161214-story.html.

[772] *Chaos at Pharmacies*, *supra*.

1505. As a vertically integrated distributor and dispenser of prescription opioids, CVS knew or should have known that an excessive volume of opioids was being sold in Arizona and in the counties in which Plaintiffs operate. CVS funneled far more opioids here than could have been expected to serve legitimate medical uses and ignored suspicious orders and other red flags of diversion.

1506. CVS was, or should have been, fully aware that the opioids it was distributing and dispensing were likely to be diverted, yet it did not take meaningful action to investigate or to ensure that it was complying with its duties and obligations with regard to controlled substances, including reporting suspicious orders and refusing to ship them unless and until due diligence allayed the suspicion.

1507. CVS's public statements indicate that it was aware of its responsibilities to monitor and report suspicious orders of controlled substances. The systems CVS uses for business purposes could have easily been used to identify suspicious orders and practices. However, the extensive list of settlements detailed elsewhere in this Complaint suggest substantial shortcomings in meeting these responsibilities.

1508. CVS, not any individual CVS store, is the DEA registrant for each CVS pharmacy across the country. CVS renews the DEA licenses for its pharmacies through a "Registration Chain Renewal." CVS headquarters paid more than $5 million to renew the licenses of 7,597 CVS locations from October 2013 to December 2016.

1509. CVS's Director of Managed Care Operations, Scott Tierney, testified that CVS's data vendors were used "for analysis and aggregation of data" and some "consulting services." CVS would provide the vendors with "prescriber level data, drug level data, plan level data, [and] de-identified patient data."[773]

---

[773] *See* Joint Appendix in *Sorrell v. IMS Health Inc.*, No. 10-779, 2011 WL 687134 *245–46 (U.S. filed Feb. 22,

1510. The DEA explained red flags that CVS should be familiar with to carry outs its controlled substance responsibilities in a December 2010 meeting with CVS representatives and counsel. In order to ensure that controlled substances were dispensed for legitimate medical purposes, CVS would want to look out for red flags such as: many customers receiving the same combination of prescriptions; many customers receiving the same strength of controlled substances; many customers paying cash for their prescriptions; many customers with the same diagnosis codes written on their prescriptions; and individuals driving long distances to visit physicians and/or to fill prescriptions.[774]

1511. For years after this meeting, the DEA repeatedly advised CVS of the need for a monitoring system and operating procedures to track, investigate, and report suspicious orders. The systems CVS put into place remained deficient. CVS did not report its first suspicious opioid order until February 29, 2012. Nearly two years later, on November 21, 2013, CVS had reported only 7 orders to the DEA across all of its distribution centers and pharmacies in the United States.

1512. CVS distribution centers and outside wholesalers, including its partner Cardinal, supplied opioids to CVS retail pharmacy stores until October 6, 2014. CVS pharmacies placed orders with CVS distribution centers through a CVS central mainframe computer ordering system.

1513. Until at least 2009, CVS relied on the gut instincts of human pickers and packers of the drugs in distribution centers—workers responsible for pulling items off distribution shelves for delivery to pharmacy stores—to identify "really big" orders. CVS did not train pickers and packers how to identify unusual orders by size, frequency, or patterns. Until August 2013, CVS did not have even have written policies, procedures, or protocols regarding the obligations of pickers and packers. This was not an effective SOM system.

---

2011).

[774] *See* Rannazzisi Declaration, *supra*.

1514. In 2007, CVS began working on a Standard Operating Procedure Manual ("SOP") to address controlled-substances compliance, including SOM. For years thereafter no such manual or SOM had been completed. Until August 2010, CVS's internal documents indicated CVS was "still in the process of writing the suspicious order monitoring section of this standard operating procedure."

1515. During this time, CVS employed a DEA compliance coordinator. The employee holding that title from 2008 to 2014 has stated that her title was only for reference in SOPs and not her real job. She had nothing to do with SOM monitoring other than updating the SOP.

1516. In 2009, CVS began using a computer algorithm that flagged potentially suspicious orders needing additional investigation. Flagged orders produced an Item Review Report ("IRR"). For several years, CVS manipulated the IRR algorithm to be less sensitive and to flag fewer orders for investigation. CVS believed that the SOM was producing too many IRRs for orders CVS believed were "not suspicious on their face." IRRs were the primary SOM process. If an order was not flagged as suspicious under the IRR system, there was no due diligence of that order.

1517. CVS learned in 2010 that its SOM algorithm was also deficient because it only monitored by drug, not active ingredient. This meant that if a drug's name or description changed, historical data would be lost, and the system could not determine whether orders exceeded or diverged from prior volumes or patterns.

1518. CVS's SOM algorithm also failed to consider store pharmacy orders from outside vendors. The SOM did not track how many opioids a CVS pharmacy ordered from Cardinal, for example, alongside any orders placed directly with a CVS distribution center. CVS knew this was a problem and that stores engaged in this practice stay below reporting thresholds. Pharmacies could also circumvent reporting thresholds by placing telephone orders with outside vendors. This deficiency is particularly glaring because, at a corporate level, CVS had full access to the orders its pharmacies placed to outside vendors.

1519. While CVS could now report that it had developed an automated SOM system, it neglected to provide written instructions to its employees for how to perform critical reviews of the IRRs until February 29, 2012.

1520. In 2012, CVS also created guidelines explaining "red flags" or cautionary signals its pharmacists should look for to prevent diversion and ensure controlled-substance prescriptions were issued for legitimate medical purposes. However, CVS failed to use data available at the corporate level to assist pharmacists with evaluating these diversion red flags.

1521. In July 2013, internal e-mails reflected that CVS's primary tool for investigating suspicious orders relied on data that was months or even years old and made any analysis, "for the most part, irrelevant and pointless."

1522. In March 2014, CVS implemented a new SOM system in the Indianapolis distribution system. System data feed issues created inaccuracies in the SOM historical data. A risk analysis of the new system determined, in June 2014, that the risk level was high due to: inconsistent due diligence in SOM analysts reaching out to stores to investigate suspicious orders; inconsistency in documenting due-diligence investigations of suspicious orders; lack of engagement by the Management Team; lack of communication between the SOM Management Team and SOM Analysts; and lack of clarity in how the new SOM system was identifying suspicious orders.

1523. Although CVS failed repeatedly to implement an effective SOM system years after being alerted to the need to do so, CVS did implement a system related to its own profits by 2010.

1524. By 2010, CVS could not track the accuracy of pharmacies or customer safety metrics, but it had found a way to track pharmacists' speed and volume. Pharmacists' bonuses were tied to the number of prescriptions they filled; opioid prescriptions were included in this tally until 2013. CVS

still puts profits and profitability over customer safety and prescription accuracy with pharmacists in 2020 describing CVS as the "most aggressive chain in imposing performance metrics."[775]

1525. CVS worked with other defendants to avoid monitoring and reporting suspicious orders. CVS understood that in order for Cardinal and McKesson to meet their due-diligence obligations under the CSA, they would need access to CVS's dispensing information. CVS refused to provide dispensing information about doctors or patients unless it was requested by the DEA.

1526. Prior to 2013, Cardinal and McKesson performed due diligence differently for CVS than for other pharmacies. Instead of distributors contacting or visiting CVS stores, as with other pharmacies, they contacted CVS's loss-prevention offices at corporate headquarters. This meant that CVS controlled all "due diligence investigations" of its opioid orders. CVS prevented distributors from independently determining appropriate order thresholds for opioids at CVS stores, reserving the right to adjust threshold quantities and percentages to values CVS deemed appropriate.

**5. Public Statements of Compliance**

1527. CVS's public statements misled the public, including Plaintiffs, into believing that CVS was taking effective steps to fight the opioid epidemic.

1528. CVS CEO Larry Merlo described his company as "America's front door to health care with a presence in nearly 10,000 communities across the country," which allowed it to "see firsthand the impact of the alarming and rapidly growing epidemic of opioid addiction and misuse."[776] Despite this statement, CVS did not take steps to address its own role in the epidemic; CVS chose to feed it instead.

---

[775] *Chaos at Pharmacies*, *supra*.

[776] *See, e.g.*, David Salazar, *CVS Health Unveils New PBM, Pharmacy Efforts to Curb Opioid Abuse*, (Sept. 21, 2017), https://drugstorenews.com/pharmacy/cvs-health-unveils-new-pbm-pharmacy-efforts-curb-opioid-abuse.

1529. The National Association of Chain Drugstores, of which CVS is a member, joined the amicus brief in *Masters Pharmaceuticals* filed by the HDA that represented that the distributors and chain drugstores were fulfilling their duties to detect and prevent diversion.[777]

**O. <u>Walmart</u>**

1530. Walmart, despite being the largest employer in the United States, with purportedly comprehensive systems for tracking the movement of drugs, failed to take adequate steps to prevent the diversion of opioids in Arizona.

1531. Walmart operates more than 5,000 pharmacies nationwide that dispense prescription opioids and other controlled substances. Until 2018, it also acted as a wholesale distributor of controlled substances for its own pharmacies.

1532. Walmart sold and shipped unreasonable quantities of opioids into Arizona and continued to do so despite extensive and blatant evidence of diversion at many of its own retail pharmacies in Arizona. Walmart also dispensed unreasonable quantities of opioids from those pharmacies despite being on notice of signs of diversion, in violation of its duties as a pharmacist under Arizona law.

1533. Walmart has been investigated and fined for some of its many failures to secure its supply chain and fill prescriptions appropriately, but it continues to allow the inappropriate and harmful distribution of opioids.

1534. The opioid crisis described herein is a direct and foreseeable result of Walmart's actions.

[777] Brief for HDMA and NACDS, *supra*; *NACDS Member Retailers (US-based)*, NACDS, https://www.nacds.org/membership/directories/chain-companies/ (last visited July 19, 2021).

1535. The volume of opioids Walmart shipped into and dispensed in Arizona was so high as to put it on notice that not all of the drugs were being used to fill prescriptions for legitimate medical uses.

1536. According to data from the ARCOS database, between 2006 and 2014, Walmart dispensed more than ***14 million*** dosage units of oxycodone and hydrocodone from the three Walmart pharmacies in Mohave County. The volume of opioids Walmart shipped into Mohave County was so high that Walmart must have known that the orders were suspicious. The volume of prescriptions being filled, let alone any of their characteristics, should have informed Walmart that prescriptions being filled were not for legitimate medical uses, were issued outside the usual course of professional practice, or both.

1537. In addition, Walmart also distributed and dispensed substantial quantities of prescription opioids in other states, and these drugs were diverted from these other states to Arizona. Walmart failed to take meaningful action to stop this diversion despite its knowledge, and it contributed substantially to the opioid epidemic in Arizona.

1538. Walmart developed and maintained highly advanced data collection and analytical systems to monitor the inventory and ordering needs of customers in real-time and depicted the exact amounts of pills, pill type, and anticipated order threshold for its own stores.

1539. The federal MDL Court has denied a motion for summary judgment regarding the adequacy of Walmart's suspicious order monitoring efforts.[778] In doing so, it "note[d] the record evidence suggests obvious deficiencies that a layperson could plainly recognize."[779]

**1. Enforcement Actions**

1540. Walmart has been the subject of numerous enforcement actions, past and present.

---

[778] *See* Opinion and Order Denying Walmart's Motion for Summary Judgment, *In re Nat'l Prescription Opiate Litig.*, No. 17-md-2804 (N.D. Ohio Jan. 27, 2020), Doc. 3102.

[779] *Id.* at 4 n.12.

1541. Walmart received more than 50 "Letters of Admonition" from the DEA for its dispensing practices from 2000 to 2018.

1542. In 2007 and 2008, Walmart paid two settlements to resolve actions arising from CSA violations—one for filing unlawful prescriptions and the other for record-keeping violations.

1543. Federal prosecutors took action against five Walmart and Sam's Club Pharmacies in Texas, alleging that they failed to maintain records required by the CSA. Specifically, "accountability audits did not match the drugs on hand, revealing major overages and shortages in the accountability of controlled substances, and there were missing invoices for controlled substances all in violation of the CSA."[780] A U.S. Attorney further explained that "[b]ecause of the pharmacies' lack of proper record keeping, a variety of Schedule II, III, IV and V controlled substances were lost or stolen and possibly diverted."[781]

1544. Following its settlement of this action in 2009, Walmart claimed that the agreement only pertained to a handful of stores in that state and claimed that Walmart was "eager to comply with the law." A Walmart spokesperson further claimed, "We take record keeping seriously[,]" and "[w]e continuously review our processes at our pharmacies to ensure they are accurate and in full compliance with the law." [782]

1545. In 2009, the DEA issued a Show Cause order seeking to revoke the registration of a Walmart pharmacy in California. The order alleged that the pharmacy:

> (1) improperly dispensed controlled substances to individuals based on purported prescriptions issued by physicians who were not licensed to practice medicine in California; (2) dispensed controlled substances . . . based on Internet prescriptions issued by physicians for other than a legitimate medical purpose and/or outside the usual course of professional practice . . . ; and (3) dispensed controlled substances to

---

[780] Associated Press, *Wal-Mart Settles Drug Records Accusation* (Jan. 7, 2009), https://chainstoreage.com/news/wal-mart-settles-drug-records-accusations (hereinafter *Walmart Settles*)

[781] Richard Connelly, *Now We Know Why Wal-Mart Has That Smiley Face*, Hous. Press (Jan. 7, 2009), https://www.houstonpress.com/houston/Print?oid=6724828.

[782] Associated Press, *Wal-Mart Settles Drug Records Accusation* (Jan. 7, 2009), http://prev.dailyherald.com/story/?id=262762

> individuals that [the pharmacy] knew or should have known were diverting the controlled substances.

1546. To resolve the 2009 proceeding, Walmart entered into an MOA with the DEA in 2011. It stayed in effect through March 2015. Upon information and belief, the failures described in the 2011 MOA were not limited to California but reflected systemic failures at the corporate level. Indeed, the 2011 MOA required Walmart to adopt a national compliance program that applied to "all current and future Walmart Pharmacy locations." It also required Walmart to collect reports from its pharmacists when those pharmacists determined that controlled-substance prescriptions were invalid and refused to fill them.

1547. The 2011 MOA specifically required that Walmart implement procedures to make certain that pharmacists identified red flags:

> The program shall include procedures to identify the common signs associated with the diversion of controlled substances including but not limited to, doctor-shopping, requests for early refills, altered or forged prescriptions, prescriptions written by doctors not licensed to practice medicine in the jurisdiction where the patient is located, and prescriptions written for other than a legitimate medical purpose by an individual acting outside the usual course of his professional practice.

1548. During the four-year term of the 2011 MOA, Walmart required pharmacists to document a refusal to fill on a refusal-to-fill form. Walmart received these forms and so learned about problematic prescribing practices. Yet, Walmart did not use the information on them to alert its pharmacists about possible or known pill-mill prescribers. Walmart did not even do so for nearby stores to which a customer was likely to take a refused prescription. It was particularly important for Walmart to do this because its pharmacists did not always work overlapping shifts and some of its pharmacists "floated" between several stores, thereby reducing the pharmacists' ability to communicate their concerns directly to one another.

1549. In fact, rather than use the information on the refusal-to-fill forms to fulfill its obligation to prevent diversion, Walmart instead used them solely to respond to complaints from patients or prescribers when a prescription was not filled.

1550. In the 2011 MOA, Walmart also promised to notify the DEA within seven days of a refusal to fill. When Walmart did so, it removed comments documenting the reasons for the refusal to fill, thereby denying the DEA access to information that Walmart's reporting was supposed to produce.

**a. 2018 DOJ Investigation into Walmart Pharmacies in Texas**

1551. In October 2018, the DOJ had evidence that Walmart pharmacies in Texas dispensed opioids that killed customers who overdosed on the drugs. "The pharmacists who dispensed those opioids had told the company they didn't want to fill the prescriptions because they were coming from doctors who were running pill mills," but their pleas "for help and guidance from Walmart's corporate office" fell on deaf ears.[783]

1552. A Texas federal prosecutor, in connection with an investigation that began in 2016, described a systemic problem. The investigation showed Walmart's issue was not a few rogue employees. Rather, "Walmart had a national problem."[784]

1553. The investigation reportedly revealed that between 2011 and 2017, "Walmart pharmacists repeatedly filled prescriptions that they worried were not for legitimate medical purposes, including large doses of opioids and mixtures of drugs the DEA considered red flags for abuse." They did so even though Walmart pharmacists in Texas, Maine, North Carolina, Massachusetts, Kansas,

[783] Jesse Eisinger & James Bandler, *Walmart Was Almost Charged Criminally Over Opioids. Trump Appointees Killed the Indictment.*, ProPublica, (Mar. 25, 2020), https://www.propublica.org/article/walmart-was-almost-charged-criminally-over-opioids-trump-appointees-killed-the-indictment (hereinafter, "Eisinger & Bandler").

[784] *Id.*

and Washington all "raised alarms to the company's national compliance department about doctors."[785]

1554. Regarding a Texas doctor who was later convicted of illegal distribution of opioids, a Walmart pharmacist wrote: "We are all concerned about our jobs and about filling for a pill mill doctor. . . Please help us." Another described the same doctor as a "problem," a "liability for us," and a "risk that keeps [him] up at night," cautioning "[t]his is a serious situation."[786]

1555. Similarly, in September 2016, a Walmart pharmacist in Pennsylvania advised that a doctor was "under investigation by the DEA for what we believe is a pill mill operation" and that Rite Aid, another chain pharmacy, had begun to refuse to fill his prescriptions, prompting prescriptions from this prescriber, which were "almost solely narcotic and controlled prescriptions" to double. Still, Walmart adhered to its policy of requiring a case-by-case analysis of each prescription from the suspected pill mill presented to any Walmart pharmacy; it would not block the prescriber in its system or allow a "blanket" refusal to fill. Walmart was more concerned with potential sales than it was with preventing diversion.[787]

1556. The group of Texas federal prosecutors and agents involved in this investigation were unsuccessful in their attempt to bring criminal charges against Walmart. Instead, Walmart began to negotiate a civil settlement with the DOJ.[788]

1557. More recently, Walmart reportedly claimed to be cooperating with a federal investigation and "taking action to fix its opioid dispensing practices." In fact, however, Walmart subsequently "acknowledged that it halted its cooperation in mid-2018."[789] As explained below, the DOJ recently filed suit against Walmart for its opioid distribution and dispensing practices.

---

785 *Id.*
786 *Id.*
787 *Id.*
788 *Id.*
789 Eisinger & Bandler, *supra.*

**b. December 2020 DOJ Civil Action against Walmart in Delaware**

1558. The enforcement actions against Walmart culminated in December 2020 when the DOJ filed an action against Walmart for civil penalties, alleging:

> As a nationwide dispenser *and* distributor of opioids, and given the sheer number of pharmacies it operates, Walmart was uniquely well positioned to prevent the illegal diversion of opioids. Yet, for years, as the prescription drug abuse epidemic ravaged the country, Walmart abdicated these responsibilities.

The DOJ identified numerous violations of Walmart's obligations including failing to investigate orders that may be suspicious, shipping orders without conducting adequate investigations, failing to report hundreds of thousands of suspicious orders received at its distribution centers, designing SOM programs that did not capture all suspicious orders, continuing to fill prescriptions for known pill-mill prescribers, and refusing to use its data and resources to identify problematic prescribers, notify pharmacists of the identity of these prescribers, and institute programs to prevent filling their prescriptions. The complaint alleged that such conduct resulted in hundreds of thousands of violations of the Controlled Substances Act.[790]

1559. In the DOJ's press release discussing the December 2020 civil action against Walmart, Acting Assistant Attorney General of the Civil Division, Jeffrey Bossert Clark, remarked that "Walmart had the responsibility and means to help prevent the diversion of prescription opioids. Instead, for years, it did the opposite – filling thousands of invalid prescriptions at its pharmacies and failing to report suspicious orders of opioids and other drugs placed by those pharmacies. This unlawful conduct contributed to the epidemic of opioid abuse throughout the United States." DEA Acting Administrator Timothy Shea stated that Walmart's practices of violating or ignoring processes

[790] Complaint, *United States v. Walmart Inc.*, No. 20-1744-CFC (D. Del. filed Dec. 22, 2020), https://www.justice.gov/opa/press-release/file/1347906/download (hereinafter "Walmart DOJ Complaint").

to safeguard drug diversion and routinely filling illegitimate prescriptions resulted in "[t]oo many lives . . . lost because of oversight failures and those entrusted with responsibility turning a blind eye."[791]

### 2. Marketing Activities

1560. Walmart teamed up with Purdue to spread misinformation about prescription opioids. As early as 1995, Purdue and Walmart launched presentations utilizing pro-opioid KOLs to pharmacists across the country. As Purdue described: "The Program [on pain management] will originate from Walmart's Studios in Bentonville, AR and sent by satellite to more than 2,000 stores across the country. It is expected that as many as 4,000 pharmacists and district manages will either attend the session or view the video tape."

### 3. Dispensing Activities

1561. Walmart violated its duty as a pharmacy to prevent the abuse of controlled substances.

1562. Walmart managers stressed the importance of speedy prescription filling to their pharmacists. For example, a December 17, 2014 email to certain pharmacists stated that "shorter wait times keep patients in store." Other emails urged that if prescriptions were not filled quickly, customers would shop elsewhere. Managers told pharmacists to "hustle from station to station" because filling prescriptions was "a battle of seconds."[792]

1563. Some of Walmart's Health and Wellness Directors set goals for pharmacists to fill prescriptions in 20 minutes. One Walmart pharmacist reported that criticisms from the "Health and Wellness Director about not getting prescriptions out in 20 minutes cause[d] the pharmacy to take short cuts and affects patient safety."[793]

---

[791] *Department of Justice Files Nationwide Lawsuit Against Walmart Inc. for Controlled Substances Act Violations*, U.S. Dep't Just. (Dec. 22, 2020), https://www.justice.gov/opa/pr/department-justice-files-nationwide-lawsuit-against-walmart-inc-controlled-substances-act.

[792] Walmart DOJ Complaint, *supra*.

[793] *Id.*

1564. To foster speedy dispensing, Walmart imposed requirements and restrictions on pharmacists to encourage rapid filling of prescriptions of all types without adequate time for investigation. One result was that Walmart pharmacists filled numerous prescriptions with red flags that pharmacists knew or should have known were almost certainly invalid. These red flags included:

a. combinations of opioids that should not be used together (such as multiple immediate-release opioids, multiple dosages of the same immediate-release opioid, or an immediate-release opioid alongside methadone;

b. commonly abused combinations of opioids with non-opioids (including the "trinity" of an opioid, a benzodiazepine, and carisoprodol);

c. repeated prescriptions for very high dosages and quantities of opioids (including, on 16 separate occasions, giving one customer enough medication to take 93 opioid pills per day); and

d. requests to fill Schedule II prescriptions earlier than would be necessary if the drugs were being consumed on schedule.[794]

1565. Walmart's pressure on pharmacists to fill more prescriptions quickly was at odds with a culture and practice of compliance. Incentive awards were tied to the number of prescriptions filled and the amount of profit that the pharmacy generated. Managers ranked stores for the volumes of prescriptions filled and congratulated pharmacists when the pharmacy dispensed high volumes.[795]

1566. Upon information and belief, controlled substances were included in Walmart's pharmacy incentive program for most of the relevant time period. In 2013, the DEA expressed concerns that bonus incentives for dispensing controlled substances could "lead to bad pharmacist decisions because they know they will get something out of filling scripts." Even though Walmart agreed it should not provide "special" incentives particular to filling controlled-substance prescriptions, it resisted excluding controlled substances from incentives also applied to other drugs

---

[794] *See id.*
[795] *Id.*

and does not appear to have excluded controlled-substance prescriptions from bonus calculation formulas.

1567. When Walmart pharmacists suspected diversion based on an individual prescriber's practices, pharmacists could not refuse to fill all controlled-substance prescriptions from that provider. Instead, they had to refuse each prescription individually by "fill[ing] out a form that could take 20 minutes, a bureaucratic hurdle that pharmacists sought to avoid because they were under pressure to fill prescriptions quickly."[796] These forms were called "refusal to fill forms."

1568. In fact, a 2011 document from Walmart Regulatory Affairs regarding the "Proper Prescriber-Patient Relationship" stated: "Blanket refusals of prescriptions are not allowed. A pharmacist must make an individual assessment of each prescription and determine that it was not issued based on a valid prescriber-patient relationship or a valid medical reason before refusing to fill."[797] Walmart only began to allow blanket refusals to fill in 2017.

1569. Because Walmart refused until 2017 to allow blanket refusals, Walmart created a situation in which inappropriate dispensing of opioids was inevitable. Walmart pharmacists could not simultaneously comply with Walmart's demand to fill prescriptions quickly and its demand that each prescription from a pill-mill doctor be separately rejected and documented on a refusal-to-fill form. As noted by one Walmart pharmacy manager explained in a February 6, 2015 email, if the pharmacists individually rejected each prescription from a pill-mill doctor, "that is all we would do all day long."[798]

1570. Before mid-2015, Walmart did not have a system that enabled its pharmacists to search for refusal-to-fill information completed by other pharmacists. The only ways a Walmart pharmacist

---

[796] Eisinger & Bandler, *supra*.
[797] *Id.*
[798] Walmart DOJ Complaint, *supra*.

could learn about previous refusals to fill were through word of mouth or by requesting red-flag information from Walmart's compliance unit before filling a prescription.[799]

1571. Beginning in 2015, Walmart pharmacists documented their refusals to fill in a system known as Archer. Pharmacists could search Archer for refusals to fill for particular patients or prescribers, but the reasons for refusing to fill were still not provided. This limited pharmacists' ability to determine if a suspicious prescription was part of a pattern. Moreover, until February 2017, Walmart failed to inform its pharmacists that they could use Archer for this purpose.[800]

1572. Although Walmart was supposed to revamp its dispensing compliance program, systemic failures continued. Walmart's corporate office not only failed to insist that Walmart implement adequate controls against diversion, but it ignored concerns raised by Walmart pharmacists. One internal document from 2015, for example, notes concerns from a Walmart pharmacist that "his leadership would not support his refusing to fill any 'legitimate' (written by a Dr) prescriptions and he stated that his current volume/staffing structure doesn't allow time for individual evaluation of prescriptions[.]" When this pharmacist refused to fill a customer's controlled-substance prescription because the customer was attempting to fill it too soon, the Market Health & Wellness Director for that store complained to management that the pharmacist "sent a customer to a competitor," "expressed significant concern about how 'sending customers away' would impact the sales figures for the store," and insisted that "the store needs to fill every available prescription."

1573. In addition, Walmart always had the ability to "centrally block" problematic prescribers across all Walmart and Sam's Club pharmacies, but it did not establish a procedure to do so until 2017. In the "Practice Compliance" document describing this policy, Walmart admitted that it has information about prescribing practices not available to individual pharmacists:

---

799 *Id.*
800 *Id.*

> While pharmacists are in the best position to determine whether individual prescriptions are appropriate, additional information may be obtained that is not available to our pharmacists. Therefore, in certain situations, a prescriber may be identified whose prescribing practices raise concerns about prescribing controlled substances for legitimate medical purposes. After a thorough review, these additional insights may lead Walmart to place a block in Connexus on controlled substance prescriptions from these prescribers.

1574. One internal email showed that in response to a question from a regional manager in 2015 about documenting pharmacists' concerns about doctors believed to be operating pill mills, Walmart's director of Health and Wellness Practice Compliance, Brad Nelson, wrote, "We have not invested a great amount of effort in doing analysis on the data since the agreement [requiring such reporting] is virtually over. Driving sales and patient awareness is a far better use of our Market Directors and Market manager's time."[801]

1575. As a consequence of Walmart's deficient internal policies and emphasis on speed, on numerous occasions, Walmart pharmacists filled a controlled-substance prescription that showed red flags, where the prescription was the same as or similar to a prescription that another Walmart pharmacist had previously recognized as invalid and had refused to fill. For example, on August 22, 2014, pharmacists at Walmart stores in Inverness and Lecanto, Florida, refused to fill an MS Contin 60mg prescription for a patient, with the pharmacists reporting in refusal-to-fill forms that the patient was "pharmacy shopping" and "has been to numerous pharmacies throughout Florida and has been to doctors from Brandon and Tampa." Just three days later, a Walmart pharmacist in Sebring, Florida, filled the same prescription.[802]

1576. Walmart also filled prescriptions written by numerous known pill-mill prescribers despite blatant red flags that warranted investigations and refusals to fill. For example, between June 2013 and June 2014, Walmart filled over 700 prescriptions issued by W.W., a doctor in Fort Myers,

---

[801] *Id.*
[802] *Id.*

Florida, whose medical license was revoked by the Tennessee Board of Medical Examiners for a failure to supervise nursing staff with "egregious prescribing habits" regarding controlled substances. Walmart did so despite red flags and direct warnings from Walmart pharmacists. These warnings included reports of multiple patients with prescriptions from W.W. arriving in the same vehicle and waiting in the parking lot for shipments of controlled substances to arrive at the pharmacy. Indeed, multiple pharmacists at multiple Walmart stores described W.W. on refusal-to-fill forms as running a "pill mill." One of these even included specific details of W.W.'s practice indicative of pill-mill operations such as accepting only cash, prescribing large quantities of oxycodone (and later hydrocodone), and dividing prescriptions in half to "give the appearance of smaller quantities being dispensed." In December 2014 and January 2015, a pharmacy reported to Walmart's compliance department that W.W.'s license had been suspended in two states. In spite of all of these red flags, Walmart continued to fill W.W.'s prescriptions.[803]

1577. Another physician from North Carolina who was prosecuted and is serving a twenty-year prison sentence for illegal opioid distribution expressly directed his patients to Walmart to have their opioid prescriptions filled. Walmart's pharmacists reported concerns about the doctor up the corporate chain, but for years, Walmart did nothing and instead continued to dispense thousands of opioid pills.[804]

1578. Walmart pharmacies in states across the country—including in Arizona—filled opioid prescriptions from one Miami, Florida physician, R.M. Walmart filled more than 300 controlled-substance prescriptions written by R.M. from June 2015 through May 2016. R.M. was indicted by a federal grand jury in November 2015 for violations of federal controlled-substance laws. Walmart

---

[803] *Id.*
[804] *Id.*

therefore continued to fill prescriptions for controlled substances written by R.M. six months after he was indicted. In June 2020, R.M. pleaded guilty to conspiracy to dispense and distribute oxycodone.[805]

### 4. Distribution Activities

1579. Walmart is one of the largest distributors of opioids in Arizona, having shipped millions of doses of opioids to its Walmart stores across the state.

1580. From 2000 to approximately May 2018, Walmart self-distributed hundreds of millions of doses of controlled substances to Walmart-branded and Sam's Club-branded pharmacies in Arizona.

1581. Walmart and Sam's Club pharmacies used McKesson and AmerisourceBergen as backup distributors for controlled substances. Walmart-branded pharmacies received millions of controlled-substance orders from McKesson and Sam's Club-branded pharmacies received over a million controlled-substance orders from AmerisourceBergen.[806] In 2016, McKesson and Walmart formed ClarusOne Sourcing Services LLP to source generic pharmaceuticals for their respective U.S. operations. As part of this "partnership," McKesson and Walmart "established an organization in London to provide strategic sourcing services for both companies," according to a job posting on McKesson's website. Although Walmart pharmacies could order additional opioids from these distributors, Walmart failed to account for these orders in its SOM program. This failure is even more egregious because Walmart, as the corporate owner of each of its pharmacies, had or should have had the data necessary to determine what orders for opioids were placed with these outside distributors.

1582. Because Walmart self-distributed opioids to its own pharmacies, Walmart had access to data unavailable to independent distributors, but it failed to use that data to fulfill its obligations to identify, investigate, halt, and report suspicious orders. Such data included information about

[805] *Id.*
[806] *Id.*

prescriptions that pharmacists had refused to fill, its pharmacists' knowledge of pill-mill prescribers, and its ability to track prescriptions paid for in cash or filled for individuals who lived considerable distances from their prescriber or from the Walmart pharmacy filling the prescription. Such data was in addition to the data about individual pharmacies available to any distributor.

1583. Walmart could have, but did not, use its "big data" capabilities to detect suspicious orders. Instead, Walmart used sophisticated data analysis only to improve efficiency and increase profit. Even when Walmart did investigate an order to determine if it was suspicious, Walmart failed to document the investigation, thereby violating its obligations under federal and state law and deliberately depriving itself of information it could have used to detect diversion from associated with particular pharmacies.

1584. Despite being one of the largest distributors of opioids in Arizona, Walmart knowingly maintained a deficient SOM. Walmart's SOM was so deficient that it failed to report at least hundreds of thousands of suspicious orders. From June 26, 2013 to November 29, 2017, Walmart sent its pharmacies 15.2 million orders of Schedule II controlled substances and Schedule III narcotics. In that time, it reported only 204 suspicious orders. By comparison, McKesson, when receiving orders from Walmart pharmacies, reported more than 13,000 suspicious orders in the same period.[807]

1585. Walmart knew that its deficient SOM program and its regular habit of shipping orders of interest before determining whether or not they were suspicious posed a great risk of diversion. Indeed, Walmart's Senior Manager of Logistics wrote in an August 2014 email:

> The alternative to pulling the order back is to simply continue to follow the process we have today. We can add further evaluation of orders after shipment but, if we see an issue that suggests that product shouldn't have been shipped, we just leave it at the store and let it enter the market. Given the choices, [having the store] ship . . . the product back feels like the more socially responsible approach, but the [Distribution Center] will do whatever leadership wants them to do.

---

[807] Walmart DOJ Complaint, *supra*.

1586. Prior to 2011, Walmart did not have any written policy or procedure in place to monitor orders of controlled substances shipped by its pharmacy distribution centers. On information and belief, no Walmart employee ever flagged an order as suspicious prior to 2011.

1587. Walmart has claimed that its hourly employees and associates monitored the orders they were filling at Walmart Distribution Centers for unusual size, pattern, and frequency. Typically, this "review" involved between 700 and 800 orders a day. Walmart has also claimed that these hourly associates were instructed to alert a supervisor if an order appeared unusual based on their experience and memory. Upon information and belief, Walmart can produce no written evidence that any such instructions were given to Walmart associates, no evidence that the training necessary to implement such a procedure had been conducted, and no evidence that anyone was actually alerted about an unusual order or performed any follow up inquiry.

1588. Walmart failed to provide any guidance to the associates as to what constitutes a "suspicious" order. Instead, Walmart has suggested that its associates' subjective judgment based on their "knowledge and experience" as distribution center employees was sufficient. There is no evidence that any Walmart employee ever flagged an order as suspicious prior to November 2010. Moreover, Walmart continued to use such employees to conduct the required monitoring for suspicious orders despite their lack of training.

1589. Beginning in November 2010, Walmart began to require certain employees to review a monthly "control drug stock exception report." This report, produced after the controlled substances had already been shipped, identified pharmacies whose controlled-substances orders exceeded 3.99% of their total orders.[808]

[808] *Id.*

1590. This policy failed to comply with Walmart's obligations because it could not identify orders of unusual frequency or pattern, nor could it identify individual, unusually large orders. This policy also failed to halt the shipment of any suspicious orders.

1591. At some point after November 2010, Walmart implemented a program establishing uniform numeric thresholds for the number of bottles of controlled substances individual pharmacies could order without taking into account characteristics that might warrant lower numbers, such as the size of the community or the presence of nearby competitor pharmacies. The system purported to flag orders for more than 20 bottles of a Schedule II substance; for more than 50 bottles of a Schedule III, IV, or V substance; or for 30% more than the rolling four-week average (only if a store ordered 11 bottles or more). Walmart had no reason for selecting 50 bottles as the same threshold for drugs of widely varying abuse potential. The policy also failed to identify orders of unusual frequency or pattern because it was only designed to evaluate the size of orders.[809]

1592. At this time, the system used to monitor for suspicious orders was called Reddwerks. This system was not designed as an SOM system but was instead an order fulfillment system that tracked orders placed by pharmacies and shipments from distribution centers to pharmacies.[810] Under this system, an alert did not mean Walmart would report the order or halt it pending necessary due diligence. On the contrary, upon information and belief, Walmart *never* reported an order flagged by its monitoring program to the DEA as suspicious. In addition, rather than halting the order, Walmart would simply cut the order to the 50-bottle threshold and ship it.

1593. This practice continued until mid-2012 when Walmart implemented "hard limits" on opioid orders. Under this approach, weekly orders of Oxycodone 30mg ("Oxy 30") were automatically reduced to 20 bottles. Still, Walmart failed to report orders over that threshold to the DEA.[811]

---

809 *Id.*
810 *Id.*
811 *Id.*

1594. Walmart knew that it violated its obligations to prevent diversion by failing to report orders that Walmart reduced to its internal threshold before shipping. In a February 2015 meeting, DEA diversion investigators actually told Walmart this. Nevertheless, Walmart continued to ship cut orders without reporting the original suspicious orders until at least November 29, 2017.[812]

1595. Walmart did not even apply its lax policy consistently. On at least 216 separate occasions between June 2013 and July 2015, Walmart shipped more than 20 bottles of Oxy 30 to an individual pharmacy within a single week. Because roughly half of these orders were placed to six individual pharmacies, Walmart had information suggestive of diversion in these locations; it thus had an obligation to report these orders to the DEA. Walmart, of course, failed to do so.[813]

1596. And even if Walmart had consistently applied this policy, it would still have been insufficient because it was based on the number of bottles, not the number of pills. Walmart pharmacies exploited this loophole by ordering larger bottles. Walmart was well aware of this deficiency. In an October 11, 2013 memorandum, the General Manager of Distribution Center 6046 in Williamsport, Maryland highlighted a store that had switched from 100-count bottles to 1000-count bottles and concluded that Walmart needed to switch from flagging bottles to flagging pills. Walmart did not begin to do so until at least August 2015.[814]

1597. Another deficiency of Walmart's threshold program was that it worked only by National Drug Codes ("NDCs") rather than by controlled substance. If two different manufacturers produce a pill with the same dose of the same drug, these two pills will have separate NDCs. Thus, Walmart pharmacies could exceed the thresholds by ordering the same product made by two different

[812] *Id.*
[813] *Id.*
[814] *Id.*

manufacturers. They did this on 146 occasions for Oxy 30 and at least 1,500 times for other Schedule II controlled substances.[815]

1598. Walmart also monitored weekly orders of more than 20 bottles of Schedule II controlled substances other than Oxy 30. This "Over 20 Report" was provided to the corporate office in the morning, and, if nothing was done by mid-afternoon, the orders were filled and shipped. In many cases, orders on the report were only investigated in a cursory fashion or never even investigated at all before being shipped despite Walmart classifying them as orders of interest.[816]

1599. In an attempt to repair deficiencies in its SOM, Walmart modified its policy in July 2014 to require evaluation of individual orders by identifying orders of interest and then investigating them to determine when they were suspicious. This policy was still deficient because it relied on Reddwerks, which could only identify orders of unusual size. Walmart was aware of this deficiency as early as October 2014.

1600. Walmart also ignored other signs of diversion beyond the size, frequency, and pattern of orders. In a number of cases, Walmart pharmacists alerted compliance personnel that they were receiving prescriptions issued by pill mills and that they were witnessing first-hand evidence of diversion. For instance, despite several notifications from pharmacists at Store 5654 in Tampa, Florida that a particular prescriber was "questionable" and had a pattern of prescribing large quantities of opioids, Walmart failed to report any suspicious orders or limit shipments to that store.[817]

1601. Walmart knew that its monitoring program was insufficient to fulfill its obligation to prevent diversion. For example, in 2013, Walmart acknowledged in an internal presentation that it had not yet designed a compliant system for suspicious-order identification, monitoring, and reporting. Walmart further acknowledged in 2014 that it had "no process in place" to comply with government

---

815 *Id.*
816 *Id.*
817 *Id.*

regulations and that this created the "severe" risk of "financial or reputational impact to the company." It was not until late 2014 that Walmart's written policies and procedures required orders of interest to be held and investigated.

1602. In 2015, Walmart made some modifications to Reddwerks in an attempt to improve its SOM. These modifications implemented store-specific thresholds. However, in doing so, Walmart used a statistical methodology that an outside contractor, Mu Sigma, had identified as flawed. In fact, Mu Sigma had proposed a replacement SOM for Reddwerks that Walmart rejected due to cost, despite the fact that Mu Sigma's bid amounted to 0.0007% of Walmart's operating revenue.[818]

1603. Walmart's methodology was flawed, in part, because the thresholds Walmart used to determine whether a pharmacy's orders required investigation were based on the pharmacy's prior orders over the previous fifty-two weeks. These orders, of course, were those allowed under the Reddwerks system which, as discussed above, were often already excessive. Therefore, Walmart's new system would fail to detect certain suspicious orders.

1604. Moreover, Walmart set an arbitrary threshold of 2,000 dosage units for controlled substances.[819] Any order below that threshold was deemed non-suspicious. As a result, a pharmacy that typically ordered very small quantities of a controlled substance could radically increase the size of its order (thereby becoming very large for that pharmacy) without triggering a review.

1605. At times, Walmart would place certain pharmacies on remediation plans designed to limit their orders of controlled substances.[820] Despite these plans, Walmart would still ship orders that exceeded the thresholds established in the plans. For instance, during a two-month remediation period in which Store 2530 was limited to 50 bottles of buprenorphine HCL 8mg per week, Walmart twice shipped orders exceeding that amount without making any report to the DEA.

---

[818] *Id.*
[819] *Id.*
[820] *Id.*

1606. Walmart's corporate designee, testifying on its behalf in the MDL, conceded that the thresholds were set for business purposes, not for the purpose of maintaining effective controls against diversion.

1607. Walmart has violated its obligations as a distributor under Arizona law to prevent abuse.

**5. Public Statements of Compliance**

1608. The National Association of Chain Drugstores, of which Walmart is a member, joined the amicus brief in *Masters Pharmaceuticals* filed by the HDA that represented that the distributors and chain drugstores were fulfilling their duties to detect and prevent diversion.[821] It also filed an amicus brief supporting Walmart's motion to dismiss in the December 2020 DOJ action described above.[822]

1609. Through nationwide advertising, Walmart presented a public image of the safety and excellence of all the pharmacists the company hired.

1610. For example, in a recruitment video for pharmacists on Walmart's YouTube channel, the company shows Walmart pharmacists speaking about working at the company: "the safety and the excellence we carry to our patients is phenomenal," adding that "the culture that our company has [is] respect for the individual, service, and excellence, and, of course, we always have integrity." The commercial also states that Walmart's pharmacists "strive for excellence" and are "passionate about providing quality healthcare."[823]

1611. Walmart's public statements misled the public, including Plaintiffs, into believing that Walmart was taking effective steps to fight the opioid epidemic.

---

[821] Brief for HDMA and NACDS, *supra*; *NACDS Member Retailers (US-based)*, NACDS, https://www.nacds.org/membership/directories/chain-companies/ (last visited July 19, 2021).

[822] NACDS Walmart Brief, *supra*.

[823] Walmart, *Your Career as a Walmart Pharmacist*, YouTube (Sept. 25, 2014), https://www.youtube.com/watch?v=9VD12JXOzfs.

## VIII. DEFENDANTS ENGAGED IN CONCERTED ACTION TO DRIVE UP DEMAND FOR AND SUPPLY OF PRESCRIPTION OPIOIDS.

1612. Defendants did not accomplish their goal of driving up demand for and inappropriately increasing the supply of prescription opioids by acting alone. Instead, they collaborated with one another and with other entities, such as Purdue and Mallinckrodt. It was this concerted action that caused the harm to Plaintiffs alleged herein.

1613. Defendants had a common object to promote the manufacture, sale, distribution, dispensing, and use of prescription opioids throughout the United States, including in Arizona and Plaintiffs' communities, in violation of the CSA and Arizona's pharmaceutical laws and regulations, and the common law of fraud and nuisance. Defendants had a meeting of the minds on this common object.

1614. In pursuit of this common object, Defendants committed numerous unlawful acts, as described throughout this Complaint.

1615. Much of this conduct took the form of contributions to KOLs and Front Groups. In effect, funding KOLs and Front Groups allowed Defendants to pool their resources to promote mutually beneficial propaganda about the benefits and risks of prescription opioids to treat chronic, noncancer pain.

1616. KOLs supported by multiple Defendants included:

a. Kathy Foley (Cephalon, Janssen, Purdue)

b. Lynn Webster (Teva, Cephalon, Endo, Purdue, Mallinckrodt)

c. Perry Fine (Cephalon, Janssen, Endo, Purdue)

d. Russell Portenoy (Cephalon, Janssen, Endo, Abbott, Purdue)

e. Charles Argoff (Teva, Janssen, Endo)

f. Scott Fishman (Janssen, Endo, Abbott, Mallinckrodt, Purdue)

g. Steven Stanos (Janssen, Endo)

h. Paul Arnstein (Janssen, Mallinckrodt)

i. Kenneth Jackson (Endo, Purdue)

1617. Front Groups financially supported by multiple Defendants included:

a. APF (Cephalon, Teva, Janssen, Endo, Purdue)

b. AAPM (Cephalon, Teva, Janssen, Endo, Allergan, AbbVie, Purdue)

c. APS (Janssen, J&J, Endo, Purdue)

d. AGS (Janssen, J&J, Endo)

e. JCAHO (Janssen, J&J, Endo, Abbott, Purdue)

f. FSMB (Cephalon, Teva, Endo, Mallinckrodt, Purdue)

g. AfPA (Cephalon, Teva, J&J, Endo, AbbVie, Mallinckrodt, Purdue)

h. ACPA (Cephalon, Teva, Janssen, Endo, AbbVie, Mallinckrodt)

i. PCF (Cephalon, Teva, J&J, Endo, Actavis, Abbott, Purdue, ABDC (through HDA), Cardinal (through HDA), McKesson (through HDA), Anda (through HDA)

j. USPF (Teva, Janssen, Endo, AbbVie, Mallinckrodt, Purdue)

k. CO*RE (Janssen, Endo, Allergan, Mallinckrodt, Purdue)

l. NPC (Teva, J&J, Allergan, Mallinckrodt, Purdue)

m. HDA (Teva, J&J, Endo, Mallinckrodt, Purdue, Cardinal, ABDC, McKesson, Anda)

n. NACDS (Walgreens, CVS, Walmart)

1618. Publications, websites, and CMEs developed and supported by multiple Front Groups and Defendants included:

a. *Responsible Opioid Prescribing* (Cephalon, Endo, Purdue, and FSMB)

b. *Treatment Options: A Guide for People Living with Pain* (Cephalon, Purdue, APF)

c. *Exit Wounds* (Endo, Purdue, APF)

d. *Guidelines for the Pharmacological Management of Persistent Pain in Older Persons* (Endo, Janssen, Purdue, AGS, APF)

e. *Pain Action Guide* (Endo, APF)

f. *Chronic Opioid Therapy: Understanding Risk While Maximizing Analgesia* (Endo, NIPC)

g. *Special Considerations: Pain in Specific Populations* (Janssen, APF)

h. *Persistent Pain in the Older Adult* (Endo, APF, NIPC)

i. *Painknowledge.org* (Endo, APF, NIPC)

j. *Finding Relief: Pain Management for Older Adults* (Janssen, AAPM, AGS)

k. *Let's Talk Pain* (Janssen, APF)

l. *Partners Against Pain* (Purdue, APF)

m. *A Policymaker's Guide to Understanding Pain & Its Management* (Purdue, APF)

n. *Overview of Management Options* (Purdue, Endo)

1619. In addition, Defendants engaged in a variety of activities described herein to support the inappropriate and excessive prescription and use of opioids, including:

a. Abbott and Purdue engaged in the co-promotion of OxyContin to physicians working in hospitals.

b. Janssen and Purdue agreed not to disparage one another's products or ineffective anti-diversion practices even though they knew that these strategies were driving excessive use and abuse of prescription opioids.

c. ABDC provided marketing assistance to Endo, Janssen, and Purdue to encourage pharmacies to order and dispense larger quantities of prescription opioids.

d. Teva and ABDC worked together through ABDC's Xcenda subsidiary to publish scientific articles promoting the use of opioids and minimizing their risks.

e. Cardinal provided marketing assistance to Allergan, Endo, Janssen, and Purdue to promote their prescription opioids.

f. McKesson provided marketing assistance to Allergan, Janssen, and Purdue to promote their prescription opioids.

g. Cardinal and ABDC used the HDA to develop a coordinated response to defeat increasing regulatory interest in their controlled substance distribution.

h. ABDC and Cardinal agreed to give Walgreens favorable treatment in their SOM programs, thereby enabling Walgreens pharmacies to place and have filled suspicious orders that should have been halted, investigated, and not shipped.

i. Cardinal and McKesson agreed to give CVS favorable treatment in their SOM programs, thereby enabling CVS to place and have filled suspicious orders that should have been halted, investigated, and not shipped.

j. Anda coordinated its SOM process with Cardinal and communicated with Rite Aid to evaluate McKesson's SOM process, but failed to report the conclusion that McKesson's SOM process was inadequate.

k. Walgreens assisted Purdue in marketing OxyContin by allowing Purdue to have input its Walgreens's dispensing policies and by requiring its pharmacists to view "educational" material provided by Endo.

l. Mallinckrodt assisted Walgreens in shifting its controlled-substance distribution immediately to Cardinal and Anda following warnings and subpoenas issued to Walgreens's Perrysburg, Ohio distribution center.

m. Walgreens worked with Cardinal and ABDC to develop contingency plans to maintain the high supply of opioids to its pharmacies in the event that Walgreens lost its license to distribute Schedule II substances from its Jupiter, Florida DC.

n. CVS worked with Purdue to disseminate the false message that the risk of addiction and potential for abuse associated with opioid use were very small. CVS allowed Purdue to train CVS's pharmacists with Purdue's promotional materials on OxyContin, which contained misrepresentations about the risks of using opioids.

o. CVS entered an agreement with Endo to promote, market, and advertise Endo's opioid products to consumers. CVS took on key responsibilities in marketing Endo's opioids to patients, including sending letters to targeted patients' homes, in order to increase patient adherence to continued use of opioids.

p. CVS worked with Cardinal to create programs that offered rebates and off-invoice discounts on Actavis's opioids in order to promote and increase sales of these opioids.

q. Walmart and Purdue worked together as early as 1995 to launch pro-opioid presentations featuring KOLs to pharmacists across the country.

r. Walmart and McKesson formed ClarusOne Sourcing Services LLP in 2016 to source generic pharmaceuticals and provide strategic sourcing services.

## IX. <u>ADDITIONAL ALLEGATIONS PERTAINING TO PUNITIVE DAMAGES</u>

1620. Each Defendant knew that large and suspicious quantities of opioids were being poured into communities throughout the United States. Despite this knowledge, Defendants took either no steps or utterly inadequate steps to report suspicious orders, control the supply of opioids,

or otherwise prevent diversion. Indeed, Defendants acted in concert to maintain high quotas for their products and to ensure that suspicious orders would not be reported to regulators.

1621. Defendants' conduct was so willful and deliberate that it continued in the face of numerous enforcement actions, fines, and other warnings from federal and state governments and regulatory agencies. Defendants paid their fines, made promises to do better, and continued on with their marketing and supply schemes. This ongoing course of conduct knowingly, deliberately, and repeatedly threatened and accomplished harm to public health and safety and large-scale economic harm to hospitals, families, communities, and governments across Arizona.

1622. As all of the governmental actions against Defendants show, Defendants knew that their actions were unlawful, and yet deliberately refused to change their practices because compliance with their legal obligations would have decreased their sales and profits.

1623. In these circumstances, Defendants' actions were so outrageous that malice against those injured may be implied.

## X. TOLLING AND FRAUDULENT CONCEALMENT

1624. Defendants, individually and acting through their employees and agents, knowingly and intentionally concealed material facts and knowledge from Plaintiffs and others to induce them into purchasing and administering opioids as set forth in detail above. At all times relevant to this Complaint, Defendants took steps to avoid detection of and to fraudulently conceal their deceptive conduct. Defendants' fraudulent concealment was successful, and they hid from the public and Plaintiffs facts sufficient to arouse suspicion of the claims that Plaintiffs now assert.

1625. In fact, an integral component of Defendants' marketing scheme was to keep their role in the deceptive marketing of opioids a secret. Thus, Defendants' fraud was two-fold: they concealed the true risks associated with opioid use, and they concealed their own role in that

misinformation campaign. Accordingly, Defendants engaged in a variety of positive acts of fraud that were furtively planned and secretly executed so as to keep the fraud itself concealed.

1626. Defendants concealed the true risks associated with opioids in the following ways, among others:

a. Defendants invented the term "pseudoaddiction" and promoted it to the medical community, including Plaintiffs. This term was designed to skew and lessen the real risk of addiction that comes with opioid use.

b. Defendants provided the medical community, including Plaintiffs, with false and misleading information about ineffectual medical strategies to avoid or control addiction. For example, Defendants promoted "abuse-deterrent formulations" of their drugs as a way to avoid addiction risks, when in reality, no formulation of opioids could control or mitigate the risk of addiction.

c. Defendants recommended to the medical community, including Plaintiffs, that dosages be increased, without disclosing the risks of addiction and death.

d. Defendants spent millions of dollars over a period of years on a misinformation campaign aimed at highlighting opioids' alleged benefits, disguising the risks, and promoting sales. For example, Defendants deployed a vast network of KOLs and Front Groups to falsely promote the benefits of opioids while concealing their harms, risks, and highly addictive nature. These Front Groups and KOLs were often funded in whole or in part by Defendants for the very purpose of concealing the risks of opioids and promoting their false benefits.

e. Defendants funded and manipulated various scientific research projects and publications that promoted the "benefits" of opioids. Defendants worked to make these research projects and publications appear accurate, complete, truthful, and supported by objective evidence when they were not. Defendants would purposefully distort some studies and their conclusions and offer them as evidence for propositions the studies did not support. The lack of support for Defendants' research and publications was not apparent to medical professionals who relied upon them in making treatment decisions, like those employed by Plaintiffs.

1627. Defendants concealed their involvement in the above-described misinformation campaign in a number of sophisticated ways:

a. Defendants disguised their role in funding Front Groups and KOLs. For example, after studying payments to opioid-advocacy Front Groups in the 2012 to 2017 period, the U.S. Senate Homeland Security & Government Affairs Committee concluded that neither pharmaceutical companies nor Front Groups "fully or routinely disclose the extent of their financial relationships" and both the companies and the groups "fail to adequately disclose manufacturer

contributions," resulting in a "lack of transparency." Through the assumed credibility of KOLs and Front Groups, Defendants were able to disseminate false messages about opioids in order to increase sales, while simultaneously disguising their own role in the epidemic.

b. Defendants hid behind the assumed credibility of these individuals and organizations without disclosing their role in shaping, funding, selecting, editing, and approving the content of information and materials these third parties disseminated. For example, *painknowledge.org*, which was run but the NIPC, did not disclose Endo's involvement. Defendants exerted their influence in emails, meetings, and correspondence that were not and have not yet become public.

c. Defendants purposefully portrayed themselves to the public as in compliance with their obligations to monitor, report, and prevent suspicious orders of opioids. They promoted their false efforts to rein in the supply and diversion of opioids. These misrepresentations led the medical community, including Plaintiffs, to believe that Defendants were working to fight the opioid epidemic—not exacerbate it.

1628. Defendants continually and secretly engaged in their scheme to avoid compliance with their legal obligations. Only Defendants and their agents knew or could have known about Defendants' unlawful actions because Defendants made deliberate efforts to conceal their conduct. As a result, Plaintiffs were unable to obtain vital information bearing on their claims absent any fault or lack of diligence on their part.

1629. By doing all of this while hiding their own involvement and knowing full well that their statements were misrepresentations of material facts, Defendants engaged in intentional, fraudulent misrepresentations and concealment of material fact, as detailed herein.

1630. Defendants intended and knew that Plaintiffs would rely on their misrepresentations, omissions, and concealment and that such reliance would cause harm to Plaintiffs. The medical community, including Plaintiffs, were duped by Defendants' campaign to misrepresent and conceal the truth about the opioid drugs that they were aggressively pushing.

1631. Plaintiffs reasonably relied on Defendants' misrepresentations and omissions in writing and filling prescriptions for Defendants' opioids. The use of Defendants' opioids became widespread and continuous as a result.

1632. Plaintiffs' claims are equitably tolled because Defendants knowingly and fraudulently concealed their wrongful acts and the material information pertinent to their discovery. As a result of Defendants' conduct, Plaintiffs did not know, and could not have known through the exercise of reasonable diligence, of their claims.

1633. Thus, Defendants successfully concealed from the medical community, including Plaintiffs, facts sufficient to arouse suspicion of the claims that Plaintiffs now assert. Plaintiffs' claims against Defendants are therefore tolled because Plaintiffs did not know of the existence or scope of Defendants' industry-wide deception and could not have acquired such knowledge earlier through the exercise of reasonable diligence. The suspension of the statute of limitations for Plaintiffs' claims remained in effect until Plaintiffs discovered the fraudulent concealment, which was within three years of the initial filing of this Complaint.

1634. Moreover, Defendants' continued and persistent concealment of the harms and risks associated with opioids, coupled with their promotion of the false "benefits" that opioids provide, allowed the nuisance of the opioid epidemic to fester, and to continue to fester to this day, unabated.

1635. Defendants continued tortious and unlawful conduct has caused a repeated and continuous injury. The damages have not occurred all at once but have continued to occur and have increased as time progresses. The harm is not completed, nor have all the damages been incurred until the wrongdoing ceases. Defendants' wrongdoing and unlawful activity have not ceased. The nuisance they created therefore remains unabated. Plaintiffs' nuisance claim is tolled and cannot be barred from recovery by the statute of limitations because the nuisance created by Defendants is a temporary, ongoing nuisance.

# XI. CAUSES OF ACTION

## A. First Claim for Relief: Nuisance

1636. Plaintiffs repeat, reallege, and incorporate by reference Paragraphs 1 through 1635 of this Complaint, as if fully set forth herein.

1637. This claim is brought under the common law of nuisance.

1638. All Defendants substantially participated in nuisance-causing activities.

1639. This claim is brought against all Defendants.

### 1. Defendants interfered with a public right.

1640. The nuisance created by Defendants is the over-saturation of opioids distributed and dispensed for illegitimate purposes among Plaintiffs' patient population and in the geographic areas Plaintiffs serve, as well as the adverse social, economic, and human health outcomes associated with widespread opioid use and misuse.

1641. The flood of opioids caused by Defendants' conduct is harmful and disruptive to and substantially and unreasonably annoys, injuriously affects, endangers, and interferes with the safety, health, morals, comfort, and general welfare of the public.

1642. This nuisance undermines public health, quality of life, and safety. It has resulted in high rates of addiction, overdoses, fatalities, dysfunction, and despair within families and entire communities. It has created a public health crisis.

#### a. Defendants' interference with the public right was unreasonable.

1643. Defendants unreasonably interfered with, endangered, or injured the public health, welfare, and safety in Plaintiffs' communities by selling, facilitating, or promoting the sale of prescription opioids to the patients of Plaintiffs as well as to unintended users, including criminals, children, and people at risk of overdose or suicide.

1644. Defendants unreasonably interfered with a public right through, as described in Sections IV and VII, their marketing of opioids.

1645. Defendants unreasonably interfered with a public right by distributing, selling, and/or dispensing opioids in a manner that did not comply with their statutory and common law obligations to identify and prevent diversion of opioids into illegitimate channels, as described in Sections V and VII.

1646. Defendants' nuisance-causing activities also include failing to implement effective controls and procedures in their supply chains to guard against theft, diversion, and misuse of controlled substances and failing to adequately design and operate systems to detect, halt, and report suspicious orders of controlled substances.

1647. Plaintiffs' resources are being unreasonably consumed in efforts to address the opioid epidemic, thereby eliminating or reducing available resources that could be used to benefit the community within the geographic areas served by Plaintiffs.

1648. Defendants' interference with Plaintiffs' rights is unreasonable because that interference:

a. Has harmed and will continue to harm public health services and the public peace;

b. Has harmed and will continue to harm the communities and neighborhoods that Plaintiffs serve;

c. Is proscribed by statutes and regulations, including those applicable to controlled substances;

d. Is of a continuing nature and has produced long-lasting effects;

e. Is known or reasonably should be known by Defendants to have a significant effect upon Plaintiffs; and

f. Has inflicted substantial costs on Plaintiffs.

1649. Defendants' nuisance-causing activities are not outweighed by the utility of Defendants' behavior. In fact, their behavior is illegal and has no social utility whatsoever. There is no

legitimately recognized societal interest in facilitating widespread opioid addiction, dependency, or misuse; failing to identify, halt, and report suspicious opioid transactions; or filling prescriptions not written for legitimate medical purposes.

1650. Defendants knew of the public health hazard their conduct would create. It was foreseeable to Defendants that their conduct would unreasonably interfere with the ordinary comfort, use, and enjoyment of residents in the communities in which Plaintiffs operate and throughout the State of Arizona.

1651. Defendants' conduct is unreasonable, intentional, unlawful, reckless, and/or negligent.

1652. At all times, all Defendants possessed the right and ability to control the nuisance-causing outflow of opioids from distribution centers, pharmacy locations, or other points of sale. Defendants had the power to shut off the supply of illicit opioids in the geographic areas Plaintiffs serve.

**b. The nuisance created by Defendants has caused Plaintiffs special injury.**

1653. As a direct and proximate result of the nuisance, Plaintiffs have sustained economic harm by spending a substantial amount of money trying to remedy the harms caused by Defendants' nuisance-causing activity. In short, the Defendants created a mess, leaving to the Plaintiffs and other hospitals the burden and costs of cleaning it up. This is a classic nuisance.

1654. As a result of Defendants' actions, Plaintiffs have suffered a special injury, different from that suffered by the public at large, by individual users, and by governmental entities. Plaintiffs have suffered a broad range of adverse operational impacts, including, but not necessarily limited to (1) the lower rate of realization from the provision of health care to patients with opioid-related conditions, (2) elevated operational expenses incurred to respond to the conditions created by the opioid epidemic, and (3) the cost of purchasing opioids Plaintiffs would not have otherwise purchased but for Defendants' conduct.

1655. The public nuisance, i.e., the opioid epidemic, created, perpetuated, and maintained by Defendants can be abated, and further recurrence of such harm and inconvenience can be abated.

1656. Defendants should be required to pay the expenses Plaintiffs have incurred or will incur in the future to fully abate the nuisance.

1657. Defendants are jointly liable for the conduct of their co-conspirators as per the collective conduct allegations in Section VIII.

1658. Therefore, Plaintiffs demand judgment in their favor against Defendants for injunctive relief, abatement of the public nuisance, and damages in an amount to be determined, together with all costs of this action, including prejudgment interest, post-judgment interest, costs and expenses, attorney fees, and such other relief as this Court deems just and equitable.

**B. Second Claim for Relief: Unjust Enrichment**

1659. Plaintiffs repeat, reallege, and incorporate by reference Paragraphs 1 through 1658 of this Complaint, as if fully set forth herein.

1660. This claim is brought under the Arizona common law of unjust enrichment.

1661. This claim is brought against all Defendants.

1662. Plaintiffs provided unreimbursed treatment and treatment at increased cost to patients with opioid-related conditions that Defendants are responsible for creating. Defendants marketed, distributed, and dispensed an unreasonably high number of opioids into the communities served by Plaintiffs and caused an excessive number of patients to develop opioid-related conditions and a public health crisis. Defendants are responsible for the cost of battling with the public health crisis because their business conduct directly caused the public health crisis. Yet, Defendants shifted that cost to Plaintiffs' hospitals.

1663. Plaintiffs thereby conferred a benefit on Defendants. Defendants have not had to bear the additional expenses Plaintiffs incurred, including treating patients with opioid-related conditions,

extra costs of providing extended inpatient care to individuals with opioid use disorders, and increased operational costs in responding to the conditions created by the opioid epidemic. Moreover, Defendants derived profits from creating more patients with opioid-related conditions.

1664. Because Defendants' conduct caused Plaintiffs to incur additional expenses, Plaintiffs could reasonably expect to receive the value of their contribution to treating patients with conditions caused by Defendants' marketing, distribution, and dispensing of prescription opioids.

1665. Defendants appreciated and knew of this benefit because they knew their opioid promotional and marketing policies would cause (and in fact have caused) a public health crisis as a consequence of doing their business. Defendants knew and expected that hospitals throughout the United States would be devoting their limited resources in battling the public health crisis, including providing unreimbursed treatment and treatment at increased cost to patients with opioid-related conditions that Defendants were responsible for creating.

1666. As an expected and intended result of their conscious wrongdoing as set forth in this Complaint, Defendants have profited and benefited from the opioid epidemic. In the alternative, Defendants have profited and benefited from the opioid epidemic as a result of the conduct described in this Complaint, even if that conduct was not wrongful.

1667. Plaintiffs purchased and continue to purchase opioid products marketed, distributed, and sold by Defendants. Defendants falsely, deceptively, and unfairly marketed opioid products to Plaintiffs, their pharmacy representatives, and their doctors. Plaintiffs purchased opioids as a result of this conduct.

1668. Defendants have received and continue to receive the benefit of the false, deceptive, and unfair marketing and sales of their opioid products directly to Plaintiffs, their pharmacy representatives, and their doctors.

1669. The circumstances under which Defendants accepted or retained the benefit, described above, were such as to make it inequitable for Defendants to retain the benefit without payment of its value.

1670. Defendants have therefore been unjustly enriched at the expense of Plaintiffs.

1671. By reason of the foregoing, Defendants must disgorge their unjustly acquired profits and other monetary benefits resulting from their unlawful conduct and provide restitution to the Plaintiffs.

## C. Third Claim for Relief: Fraud and Deceit

1672. Plaintiffs repeat, reallege, and incorporate by reference Paragraphs 1 through 1671 of this Complaint, as if fully set forth herein.

1673. Defendants' misconduct alleged in this case is ongoing and persistent.

1674. Defendants' conduct was accompanied by wanton and willful disregard of persons who foreseeably might be harmed by their fraudulent acts and omissions.

1675. Defendants acted with actual malice because Defendants acted with a conscious disregard for the rights and safety of other persons and said actions had a great probability of causing substantial harm.

1676. This claim is brought against all Defendants.

### 1. Defendants made false representations of material fact.

1677. In the course of their business or other transactions in which they had a pecuniary interest, Defendants made false representations and otherwise failed to disclose material facts to the medical community, including to Plaintiffs' physicians.

1678. Defendants' false representations and deceptions as to material facts during the relevant period include but are not limited to:

a. Misrepresentations overstating the benefits of and evidence supporting the use of opioids in chronic pain;

b. Misrepresentations that the risks of long-term opioid use, especially the risk of addiction, were overblown;

c. Misrepresentations that opioid doses can be safely and effectively increased until pain relief is achieved;

d. Misrepresentations that signs of addiction were "pseudoaddiction" and thus reflected undertreated pain, which should be responded to with more opioids;

e. Misrepresentations that screening tools effectively prevent addiction;

f. Misrepresentations concerning the comparative risks of NSAIDs and opioids;

g. Misrepresentations that opioids differ from NSAIDs in that opioids have no ceiling dose;

h. Misrepresentations that evidence supports the long-term use of opioids for chronic pain;

i. Misrepresentations that chronic opioid therapy would improve patients' function and quality of life;

j. False portrayals of their efforts and/or commitment to rein in the diversion and abuse of opioids;

k. Misrepresentations that withdrawal is easily managed;

l. Purdue's and Endo's misrepresentations that alleged abuse-deterrent opioids reduce tampering and abuse;

m. Teva's misrepresentations that Actiq and Fentora were appropriate for treatment of noncancer pain and its failure to disclose that Actiq and Fentora were not approved for such use;

n. Cephalon's unsubstantiated claims that Actiq and Fentora were appropriate for treatment of noncancer pain;

o. Defendants' use of Front Groups to misrepresent that the deceptive statements from the sources described in this Complaint came from objective, independent sources;

p. Defendants' creation of a body of deceptive, misleading, and unsupported medical and popular literature, advertisements, training materials, and speaker presentations about opioids that (i) understated the risks and overstated the benefits of long-term use; (ii) appeared to be the result of independent, objective research; and (iii) were thus more likely to be relied upon by physicians, patients, and payors; and,

q. Such other misrepresentations and deceptions outlined above.

1679. By engaging in the acts and practices alleged herein, Defendants, in the relevant time period, omitted material facts that they had a duty to disclose by virtue of their other representations, including but not limited to the fact that:

a. Opioids are highly addictive and may result in overdose or death;

b. No credible scientific evidence supports the use of screening tools as a strategy for reducing abuse or diversion;

c. High dose opioids subject the user to greater risks of addiction, other injury, and/or death;

d. Opioids present the risks of hyperalgesia, hormonal dysfunction, decline in immune function, mental clouding, confusion, dizziness, increased falls and fractures in the elderly, NAS, and potentially fatal interactions with alcohol or benzodiazepines; these omissions were made while Defendants exaggerated the risks of competing products such as NSAIDs;

e. Claims regarding the benefits of chronic opioid therapy lack scientific support or are contrary to the scientific evidence;

f. Purdue's 12-hour OxyContin fails to provide a full twelve hours of pain relief in many patients;

g. Purdue and Endo's abuse-deterrent formulations are not designed to address and have no effect on the most common route of abuse (oral), can be defeated with relative ease, and may increase overall abuse;

h. The Marketing Defendants failed to consistently and accurately report suspicious prescribers and/or orders;

i. Cephalon's Actiq and Fentora were not approved for noncancer pain;

j. Defendants had substantial financial ties and other associations with Front Groups and KOLs that resulted in the production of deceptive literature and materials; and

k. Such other omissions and concealments as described above in this Complaint.

1680. In each of the circumstances described in the foregoing paragraph, Defendants knew or should have known that their failure to disclose rendered their representations untrue or misleading.

1681. The Distributor Defendants were also knowingly deceptive during the relevant period, and their deception was intended to induce reliance. These deceptions include but are not limited to:

a. Acknowledgment of the Distributor Defendants by and through their front group, the HDMA, that distributors are at the center of a sophisticated supply chain and, therefore, are uniquely situated to perform due diligence in order to help support the security of the controlled substances they deliver to their customers;

b. Acknowledgment of the Distributor Defendants that because of their unique position within the "closed" system, they were to act as the first line of defense in the movement of legal pharmaceutical controlled substances from legitimate channels into the illicit market;

c. Cardinal claiming to "lead [its] industry in anti-diversion strategies to help prevent opioids from being diverted for misuse or abuse";

d. ABDC taking the same position as its counterparts within the industry and stating that it was "work[ing] diligently to combat diversion and [is] working closely with regulatory agencies and other partners in pharmaceutical and healthcare to help find solutions that will support appropriate access while limiting misuse of controlled substances";

e. Misrepresentations by the Distributor Defendants that they were in compliance with their statutory and regulatory responsibilities to guard against diversion of controlled prescription drugs and their obligation to undertake such efforts as responsible members of society;

f. Misrepresentations in publications and other materials produced or distributed by the Distributor Defendants that repeated the misrepresentations about the safety and efficacy of prescription opioids made by the Marketing Defendants;

g. ABDC assisting in marketing other Defendants' opioids (including Purdue's OxyContin) and disseminating false information about those opioids in order to created higher demand for the opioids;

h. ABDC's Xcenda subsidiary publishing scientific articles promoting the use of opioids and minimizing their risks;

i. Cardinal disseminating advertisements that contained deceptive statements regarding the risk of addiction, abuse, and diversion posed by opioids; and

j. Such other omissions or concealments as described above in this Complaint.

1682. The Distributor Defendants, in the relevant time period and with the intent that others rely on their omissions or suppression of information, omitted material facts that the Distributor

Defendants had a duty to disclose by virtue of their other representations, including but not limited to the fact that:

a. There was no legitimate medical purpose for the copious amounts of opioids shipped into and around Plaintiffs' communities;

b. They filled prescriptions for which there was no legitimate medical purpose;

c. They failed to report suspicious orders;

d. They failed to maintain effective controls against diversion of particular controlled substances into other than legitimate medical, scientific, and industrial channels by sales to certain customers;

e. They failed to prevent diversion from legitimate to non-legitimate channels;

f. They failed to conduct meaningful due diligence to ensure that controlled substances were not diverted into other than legitimate channels;

g. They failed to keep and maintain accurate records of Schedule II–V controlled substances; and

h. Such other omissions or concealments as alleged above in this Complaint.

1683. Defendants had a duty not to deceive Plaintiffs, their agents, communities, and physicians, and the public because Defendants had in their possession unique material knowledge as to the risks and benefits of prescription opioids. This information was unknown and unknowable to Plaintiffs.

1684. Defendants' false representations and omissions were material because they induced Plaintiffs to purchase and prescribe prescription opioids. The false representations and omissions were made intentionally and recklessly.

**2. Defendants knew that these representations were false.**

1685. Defendants knew that the representations described above were false or, alternately, failed to exercise reasonable care or competence in obtaining or communicating the representations.

1686. Defendants had knowledge of the falsity and materiality of the representations or made the representations in reckless disregard of whether the representations were true or false.

1687. Defendants had knowledge of the materiality of the facts that they were intentionally or recklessly concealing.

**3. Defendants intended that their statements would be relied upon.**

1688. Defendants made their false representations with the intent that the medical community, including physicians in hospitals like Plaintiffs, and others would rely on them.

1689. Defendants made such false representations for the purposes of inducing the physicians to prescribe and administer, and consumers to purchase and consume, opioids.

1690. Defendants intended that Plaintiffs, their agents, communities, and physicians, and persons on whom Plaintiffs and their agents relied would rely on Defendants' misrepresentations and omissions. These Defendants intended and knew or should have known that this reasonable and rightful reliance would induce Plaintiffs to purchase and prescribe opioids. Defendants intended and knew or should have known that such reliance would cause Plaintiffs to suffer loss.

**4. Plaintiffs and others justifiably relied on Defendants' misrepresentations and omissions.**

1691. Plaintiffs and others rightfully, reasonably, and justifiably relied on Defendants' representations and/or concealments, both directly and indirectly regarding the safety and efficacy of opioids, and Defendants' compliance with the system that was designed to prevent diversion of dangerous drugs. Plaintiffs rely on Defendants to convey truthful, accurate, and complete information about their products. Information about Defendants' compliance with suspicious order monitoring and similar anti-diversion efforts is peculiarly within Defendants' knowledge, necessitating Plaintiffs' reliance.

1692. Defendants knew or should have known Plaintiffs were directly and proximately injured as a result of this reliance. Plaintiffs' injuries were directly and proximately caused by this reliance.

1693. As a result of these representations and/or omissions, Plaintiffs proceeded under the misapprehension that the opioid crisis was simply a result of conduct by persons other than Defendants. As a consequence, these Defendants prevented Plaintiffs from making a more timely and effective response to the opioid epidemic.

**5. Plaintiffs suffered injury as a result.**

1694. Because Defendants' fraudulent misrepresentations and omissions to Plaintiffs and others prevented an effective response to the opioid epidemic, Plaintiffs suffered a broad range of adverse operational impacts, including, but not necessarily limited to (1) the lower rate of realization from the provision of health care to patients with opioid-related conditions, (2) elevated operational expenses incurred to respond to the conditions created by the opioid epidemic, and (3) the cost of purchasing opioids Plaintiffs would not have otherwise purchased but for Defendants' misrepresentations and omissions.

1695. Plaintiffs have suffered monetary damages as aforesaid. As such Plaintiffs seek all legal and equitable relief as allowed by law, including *inter alia* injunctive relief, restitution, disgorgement of profits, compensatory and punitive damages, and all damages allowed by law to be paid by the Defendants as well as attorney fees and costs, and pre- and post-judgment interest.

**D. Fourth Claim for Relief: Fraudulent Concealment**

1696. Plaintiffs repeat, reallege, and incorporate by reference Paragraphs 1 through 1695 of this Complaint, as if fully set forth herein.

1697. The Count is brought against all Defendants.

1698. Defendants failed to disclose material facts, where a legal or equitable duty existed, with the intent that others act or refrain from acting in reliance on the non-disclosure, and which non-disclosure was in fact relied upon.

1699. The material facts that Defendants failed to disclose are set forth in the Third Claim for Relief (Fraud and Deceit) as well as throughout this Complaint and are incorporated by reference.

1700. Defendants had a duty to disclose these facts, arising from obligations under federal and state controlled-substance laws, as well as duties under common law, to avoid endangering the community by flooding it with opioids and creating an epidemic.

1701. Moreover, Defendants in many instances had unique, material knowledge as to the effects of opioids, the falsity of their claims concerning the efficacy of their use, and the magnitude of their distribution. This sort of information was generally unknown or unknowable, and if disclosed in any meaningful way would have prompted increased regulatory or government scrutiny of the opioid industry, threatening Defendants' profits.

1702. Plaintiffs suffered actual pecuniary damages proximately caused by Defendants' concealment of material fact.

1703. Plaintiffs have suffered monetary damages as aforesaid. As such Plaintiffs seek all legal and equitable relief as allowed by law, including *inter alia* injunctive relief, restitution, disgorgement of profits, compensatory and punitive damages, and all damages allowed by law to be paid by the Defendants as well as attorney fees and costs, and pre- and post-judgment interest.

E. **<u>Fifth Claim for Relief: Civil Conspiracy</u>**

1704. Plaintiffs repeat, reallege, and incorporate by reference Paragraphs 1 through 1703 of this Complaint, as if fully set forth herein, including, but not limited to, the concerted action allegations of Section VIII.

1705. Plaintiffs bring this claim under the common law providing for the civil liability of persons who conspire to commit one or more unlawful or tortious acts.

1706. "For a civil conspiracy to occur two or more people must agree to accomplish an unlawful purpose or to accomplish a lawful object by unlawful means, causing damages." *Baker v.*

*Stewart Title & Trust of Phoenix*, 197 Ariz. 535, 542 ¶ 30, 5 P.3d 249, 256 (Ct. App. 2000). "In short, liability for civil conspiracy requires that two or more individuals agree and thereupon accomplish 'an underlying tort which the alleged conspirators agreed to commit.'" *Wells Fargo Bank v. Arizona Laborers, Teamsters and Cement Masons Local No. 395 Pension Trust Fund*, 201 Ariz. 474, 498 ¶ 99, 38 P.3d 12, 36 (2002) (quoting *Baker*, 197 Ariz. at 545 ¶ 42, 5 P.3d at 259).

1707. Conspirators are liable for any tortious act, even unknown, committed in furtherance of the conspiracy, including acts not personally committed. *Baker*, 197 Ariz. at 542 ¶ 31, 5 P.3d at 256.

1708. All named Defendants conspired with each other and with various entities and persons who are not named in this Complaint to commit the acts upon which each of the claims alleged in this action are based. At the core of the conspiracy was a meeting of the minds on an object to be accomplished. The goals of the conspiracy, that is, the gist of the conspiratorial meeting of the minds, was to expand the market for and supply of opioids, and to accomplish this, Defendants falsely marketed opioids and failed to control against diversion in the face of overwhelming evidence that diversion was taking place.

1709. Even if some of the Distributor Defendants were competitors with each other in some spheres of business, or some of the Marketing Defendants were competitors with each other, or some of the National Retail Pharmacies were competitors with each other, it served all of their interests to promote opioid use, to sell as many opioids as possible, to create a marketplace where massive distribution and use of and addiction to opioids was the norm, and to look the other way and fail to report or control massive drug diversions against overwhelming evidence of the epidemic they were creating. They acted in concert and in tacit and explicit agreement to pursue these goals.

1710. Each Defendant is liable for its co-conspirators' acts in furtherance of the conspiracy.

1711. Each of the Claims for Relief asserted in this Complaint arises from acts in furtherance of the conspiracy described in this Complaint and in this Count, and each Defendant is liable for the conduct of its co-conspirators in the commission of those torts and/or statutory violations.

1712. Defendants' conduct in furtherance of the conspiracy described herein was not mere parallel conduct because each Defendant acted directly against its commercial interests in not reporting the unlawful distribution practices of their competitors to the authorities when under a legal duty to do. Each Defendant acted against its commercial interests in this regard due to an actual or tacit agreement between Defendants that they would not report each other to the authorities so they could all continue to engage in their unlawful conduct.

1713. Defendants had a meeting of the minds on the object of or course of action for this conspiracy. Defendants knew and agreed upon the unlawful object or course of action for this conspiracy. Defendants also knew that their wrongful actions would inflict injury upon the targets of the conspiracy, including Plaintiffs.

1714. Defendants' conspiracy and their actions and omissions in furtherance thereof caused the direct and foreseeable losses alleged herein.

1715. Defendants' misconduct alleged in this case is ongoing and persistent.

1716. Because of Defendants' dissemination of false information and misleading information of opioid risks, benefits, and sustainability for chronic pain, and false and misleading statements regarding compliance with laws concerning the distribution of opioids, Defendants are responsible for the costs of addressing the public health crisis that they created.

1717. Defendants conspired to create a public nuisance and to commit tortious conduct and are therefore jointly and severally liable for the damages flowing from the conspiracy.

1718. Plaintiffs have suffered monetary damages as aforesaid. As such Plaintiffs seek all legal and equitable relief as allowed by law, including *inter alia* injunctive relief, restitution, disgorgement of

profits, compensatory and punitive damages, and all damages allowed by law to be paid by the Defendants as well as attorney fees and costs, and pre- and post-judgment interest.

### F. Sixth Claim for Relief: Arizona Consumer Fraud Act (A.R.S. § 44-1522)

1719. Plaintiffs repeat, reallege, and incorporate by Paragraphs 1 to 1718 of this Complaint, as if fully set forth herein.

1720. This cause of action is brought pursuant to Section 44-1522, Arizona Statutes, which is known as the Arizona Consumer Fraud Act.

1721. The act, use or employment of any person of any deception, deceptive or unfair act or practice, fraud, false pretense, misrepresentation, or concealment, suppression or omission of any material fact with the intent that other rely on such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice.[824]

1722. The Arizona Consumer Fraud Act is a broad act intended to eliminate unlawful practices.[825] The act further provides that it be construed consistent with the Federal Trade Commission Act, 15 U.S.C.A. § 55(a)(1), which states:

> The term "false advertisement" means an advertisement, other than labeling, which is misleading in a material respect; and in determining whether any advertisement is misleading, there shall be taken into account (among other things) not only the representations made or suggested by statement, word, design, device, sound, or any combination thereof, but also the extent to which the advertisement fails to reveal facts material in light of such representations or material with respect to consequences which may result from the use of the commodity to consequences which may result from the use of the commodity to which the advertisement related under the conditions prescribed in said advertisement, or such conditions as are customary or usual. No advertisement of a drug shall be deemed false if it is disseminated only to members of the medical profession, contains no false representation of material fact,

---

[824] A.R.S. § 44-1522(A).

[825] *Holeman v. Neils*, 803 F. Supp. 237, 242 (D. Ariz. 1992).

and includes, or is accompanied in each instance by truthful disclosure of, the formula showing quantitatively each ingredient of such drug.

1723. "The term 'deceptive' has been interpreted to include representations that have a 'tendency and capacity' to convey misleading impressions to consumers even though interpretations that would not be misleading also are possible. The meaning and impression are to be taken from all that is reasonably implied, not just from what is said, and in evaluating the representations, the test is whether the least sophisticated reader would be misled."[826]

1724. Plaintiffs each qualify as a "person" within the meaning of A.R.S. § 44-1521(6).

1725. All Defendants qualify as "person[s]" under A.R.S. § 44-1521(6), and all Defendants committed acts of deception and unfair practices in their sale and advertisements.

1726. Defendants engaged in deception, deceptive or unfair acts or practices, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of material facts with the intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of prescription drugs in violation of the Arizona Consumer Fraud Act, A.R.S. § 44-1522(A).

### 1. Marketing Violations

1727. During the relevant period and as detailed further herein, Defendants have each engaged in unfair and deceptive acts or practices in commerce in violation of the Arizona Consumer Fraud statute by:

a. actively promoting and marketing the use of opioids for indications not federally approved;

b. circulating false and misleading information concerning opioids' safety and efficacy;

c. overstating the benefits of chronic opioid therapy;

---

[826] *Madsen v. Western American Mortg. Co.*, 143 Ariz. 614, 618, 694 P.2d 1228, 1232 (Ct. App. 1985) (internal quotations omitted).

d. overstating opioids' superiority compared with other treatments, such as other non-opioid analgesics, physical therapy, and other alternatives;

e. promising improvement in patients' function and quality of life;

f. failing to disclose the lack of evidence supporting long-term use;

g. downplaying, trivializing, or omitting the risks of addiction, overdose, and death arising from their use;

h. mischaracterizing the difficulty of withdrawal from opioids and the prevalence of withdrawal symptoms; and

i. such other misrepresentations and deceptions outlined above.

1728. Defendants violated the Arizona Consumer Fraud statute because they engaged in false or misleading statements about the efficacy and safety of opioid pharmaceuticals, as described herein.

**2. Regulatory and Statutory Violations**

1729. Each of the Defendants have engaged in unfair and/or deceptive trade practices by (1) omitting the material fact of their failure to design and operate a system to disclose suspicious orders of controlled substances, as well as by failing to actually disclose such suspicious orders, as required Arizona's Uniform Controlled Substances Act, A.R.S. § 36-2501, *et seq.*, Arizona rules A.A.C. R4-23-604 and A.A.C. R4-26-605, and laws incorporated therein; and (2) knowingly or intentionally furnishing false or fraudulent information in, and/or omitting material information from documents filed with the DEA in violation of Arizona's Controlled Substances Act, A.R.S. § 36-2501, *et seq.*

1730. By entering into a conspiracy and joint enterprise as described in Section VIII, all Defendants are liable for the conduct of their co-conspirators, including marketing conduct.

1731. Defendants' unfair or deceptive acts or practices in violation of the Arizona Consumer Fraud Act offend Arizona's public policy, are immoral, unethical,[827] oppressive and unscrupulous, as

[827] A.R.S. § 32-1901.01(A)(26)

well as malicious, wanton and manifesting of ill will, and they caused substantial injury to Plaintiffs. Plaintiffs risk irreparable injury as a result of the Marketing and Supply Chain Defendants', and their agents', acts, misrepresentations and omissions in violation of the Arizona Consumer Fraud Act, and these violations present a continuing risk to Plaintiff, as well as to the general public.

1732. As a direct and proximate result of Defendants' violations of the Arizona Consumer Fraud Act, Plaintiffs have suffered and continue to suffer injury-in-fact and actual damages.

1733. Defendants, individually and acting through their employees and agents, and in concert with each other, knowingly made misrepresentations, omissions, or suppressed material facts to Plaintiffs with the intent induce them to purchase, administer, and consume opioids as set forth in detail above.

1734. Defendants knew at the time that they made their misrepresentations and omissions that they were false and/or misleading.

1735. Defendants intended that Plaintiffs, physicians, patients, and/or others would rely on their misrepresentations and omissions.

1736. Plaintiffs, physicians, patients, and/or others reasonably relied upon Defendants' misrepresentations and omissions.

1737. Plaintiffs would not have purchased the quantity of opioids it had from Defendants had it known the truth about Defendants' misrepresentations and omissions.

1738. In the alternate, the Defendants recklessly disregarded the falsity of their representations regarding opioids.

1739. By reason of their reliance on Defendants' misrepresentations and omissions of material fact, Plaintiffs, physicians, patients, and/or others suffered actual pecuniary damage.

1740. Defendants' conduct was willful, wanton, and malicious and was directed at the public generally.

1741. Plaintiffs are entitled to recover damages caused by Defendants' fraud in an amount to be determined at trial.

### G. Seventh Claim for Relief: Arizona Racketeering and Illegal Control of an Enterprise (A.R.S. § 13-2314.04)

1742. Plaintiffs repeat, reallege, and incorporate by Paragraphs 1 to 1741 of this Complaint, as if fully set forth herein.

1743. This Claim for relief alleges violations of A.R.S. § 13-2314.04(A).

1744. At all relevant times, Plaintiffs were entities capable of holding legal or beneficial interest in property.

#### 1. Structure of the False Narrative Enterprise

1745. At all relevant times, Defendants, in violation of the law of the Arizona Racketeering statutes (A.R.S. §§ 13-2312 to -2314.04) (hereinafter, "Arizona RICO"), conducted (managed) or participated, directly or indirectly, in the conduct (management) of the False Narrative Enterprise, through a pattern of unlawful or otherwise prohibited activity.

a. **Name:** At all relevant times, there existed an "enterprise," within the meaning of A.R.S. § 13-2312 – to wit, an association-in-fact comprised of each of the Defendants – referred to herein as "The False Narrative Enterprise."

b. **Continuity**: The continuity of the False Narrative Enterprise was coterminous with the period of time necessary to defraud Plaintiffs, other hospitals, physicians, other healthcare providers, patients and their families, and the American public in general.

c. **Effect on Commerce**: The False Narrative Enterprise was engaged in, and its activities affected, interstate and foreign commerce.

d. **Membership and Roles of Each Class of Participant**: The False Narrative Enterprise reflected several types of participants, not all of which were complicit, and not all of which are named herein as Defendants:

   i. **The Marketing Defendants and Associates**. The Marketing Defendants are Teva, Janssen, Endo, Allergan, and AbbVie. The Marketing Defendants along with unnamed co-conspirators Purdue and Mallinckrodt: (1) conceptualized and set in motion the falsehoods about opioids that created billions of dollars of artificial demand for these highly addictive and dangerous products,

described in Section IV; (2) engaged in fraudulent and reckless conduct in the distribution of opioids, as described in Section V; and (3) conspired with other Defendants who were engaging in the same conduct.

ii. **The Front Groups**. The Marketing Defendants used the Front Groups, not named as defendants herein and not all of which were fully complicit, to stoke demand for opioids by falsely creating the impression of independent third-party authoritative validation of the false claims of the Marketing Defendants and Purdue and Mallinckrodt.

iii. **The KOLs.** The Marketing Defendants used KOLs, not named as defendants herein and who may not have been fully complicit, to provide ostensibly valid, third party, authoritative validation of the Marketing Defendants' false claims.

iv. **Distributor Defendants.** The Distributor Defendants are ABDC, Anda, Cardinal, H.D. Smith, McKesson, Walgreens, CVS, and Walmart; they joined the False Narrative Enterprise with full awareness and complicity and acted in concert with the Marketing Defendants to pool information about vulnerable targets and share the king size profits reaped from the sale of opioids to addicts, deliberately ignoring their obligations under the Controlled Substances Act. Distributor Defendants (1) engaged in their own predicate acts, described in Section V; (2) conspired with other Defendants who were engaging in both fraudulent marketing conduct (Section IV) and wrongful distribution conduct (Section V).

v. **Corrupt Physicians and Pharmacies, a/k/a Pill Mills.** prescribed opioids illegally and with no basis in legitimate medicine; and dispensed opioids illegally and in direct violation of their legal obligations.

### 2. The Common Purpose and Scheme of the False Narrative Enterprise

1746. The lawful purpose of the False Narrative Enterprise was the manufacture, marketing, distribution, and sale of pharmaceutical products in interstate and foreign commerce. The unlawful purpose of the False Narrative Enterprise was to engage in and carry out an intentional scheme to defraud purchasers and others, including doctors and hospitals, by propagating falsehoods about the safety and benefits of opioids.

1747. In order to unlawfully increase the demand for opioids, Defendants formed an association-in-fact enterprise (the "False Narrative Enterprise") with the Front Groups and KOLs described above. Knowing that their products were highly addictive, ineffective and unsafe for the treatment of long-term chronic pain, non-acute and non-cancer pain, Defendants formed an

association-in-fact enterprise and engaged in a scheme to unlawfully increase their profits and sales and grow their share of the prescription painkiller market through (1) repeated and systematic misrepresentations about the safety and efficacy of opioids for treating long-term chronic pain, and (2) ongoing disregard of their duties to identify, investigate, halt and report suspicious orders of opioids and diversion of their drugs into the illicit market.

### 3. Predicate Acts

1748. At all relevant times, Defendants conducted (managed) or participated, directly or indirectly, in the conduct (management) of the False Narrative Enterprise, through a pattern of unlawful activity. In addition to participating in a RICO-violative enterprise, Defendants, with full knowledge and purpose, conspired to violate those provisions in the Arizona RICO statutes prohibiting participation in unlawful or otherwise prohibited enterprises. Defendants did so by engaging in multiple, repeated, and continuous violations of:

a. **A.R.S. § 13-2310(A). Fraudulent Schemes and Artifices:** Any person who, pursuant to a scheme or artifice to defraud, knowingly obtains any benefit by means of false or fraudulent pretenses, representations, promises or material omissions is guilty of a class 2 felony. For purposes of this section, "scheme or artifice to defraud" includes a scheme or artifice to deprive a person of the intangible right of honest services. A.R.S. § 23-2310(E). The presumptive sentence in Arizona for a class 2 felony is <u>5 years</u>. A.R.S. § 13-702(D).

b. **A.R.S. § 13-2311(A). Fraudulent Schemes and Artifices; Willful Concealment.** Any person who, pursuant to a scheme or artifice to defraud or deceive, knowingly falsifies, conceals or covers up a material fact by any trick, scheme or device or uses any false writing or document knowing such writing or document contains any false, fictitious or fraudulent statement or entry is guilty of a class 5 felony. The presumptive sentence in Arizona for a class 5 felony is <u>1.5 years</u>. A.R.S. § 13-702(D).

c. **A.R.S. § 13-3417. Use of Wire Communication or Electronic Communication in Drug Related Transactions.** It is unlawful for a person to use any wire communication to facilitate the violation of any felony provision or to conspire to commit any felony provision of chapter 23 of this title. The presumptive sentence for violation of this statute in Arizona is in accordance with a class 5 felony, as such, the presumptive sentence is <u>1.5 years</u>. A.R.S. § 13-702(D). The Defendants, in violation of § 13-3417, transmitted communications electronically to designated persons for ostensibly legitimate purposes, but with

the actual, unlawful purpose of asserting false claims through fraud and to engage in an intentional scheme to defraud Plaintiff, other health care providers, patients and their families and, in general, the American public.

d. **A.R.S. § 36-2531. "Prohibited Acts" under the Arizona Controlled Substances Act.** It is unlawful for a person "[t]o furnish false or fraudulent material information in, or omit any material information from, any application, report or other document required to be kept or filed under [… Title 36, C]hapter [27] or any record required to be kept by [… Title 36, C]hapter [27]." Records required to be kept under Chapter 36 include those enumerated in Title 32, Chapter 18, A.R.S. The presumptive sentence for violation of this statute in Arizona is in accordance with a class 4 felony, as such, the presumptive sentence is 2.5 years. A.R.S. § 13-702(D).

Defendants' violations of A.R.S. §§ 13-2310(A), 13-2311(A), 13-3417, and 36-2531 constitute acts of "racketeering" as that term is defined in A.R.S. §§ 13-2301(D)(4). Specifically, Defendants asserted false claims, including false claims asserted through fraud, A.R.S. § 13-2301(D)(4)(xv); and engaged in a scheme or artifice to defraud, A.R.S. § 13-2301(D)(4)(xx).

1749. The Marketing Defendants' substantial financial contribution to the False Narrative Enterprise, and the advancement of opioids- friendly messaging, fueled the U.S. opioids epidemic. The Marketing Defendants' marketing conduct is set forth in more detail in Section IV.

1750. The Marketing Defendants, through their participation in the False Narrative Enterprise, concealed the true risks and dangers of opioids from the medical community and the public, including Plaintiffs, and made misleading statements and misrepresentations about opioids that downplayed the risk of addiction and exaggerated the benefits of opioid use. These misrepresentations are identified in detail in Section IV above.

1751. The Marketing Defendants, the Front Groups, and the KOLs acted together for a common purpose and perpetuated the False Narrative Enterprise's scheme, including through the unbranded promotion and marketing network described in Section IV.

1752. There was regular communication between the Marketing Defendants, the Front Groups, and KOLs, in which information was shared, misrepresentations coordinated, and payments

exchanged. Typically, the coordination, communication, and payment occurred, and continues to occur, through the repeated and continuing use of the wires and mail in which the Marketing Defendants, Front Groups, and KOLs shared information regarding overcoming objections and resistance to the use of opioids for chronic pain. The Marketing Defendants, Front Groups, and KOLs functioned as a continuing unit for the purpose of implementing the False Narrative Enterprise's scheme and common purpose, and each agreed and took actions to hide the scheme and continue its existence.

1753. At all relevant times, the Front Groups were aware of the Marketing Defendants' conduct and were knowing and willing participants in and beneficiaries of that conduct. Each Front Group also knew, but did not disclose, that the other Front Groups were engaged in the same scheme, to the detriment of consumers, prescribers, and Plaintiffs. But for the False Narrative Enterprise's unlawful fraud, the Front Groups would have had incentive to disclose the deceit by the Marketing Defendants and the False Narrative Enterprise to their members and constituents. By failing to disclose this information, Front Groups perpetuated the False Narrative Enterprise's scheme and common purpose and reaped substantial benefits.

1754. At all relevant times, the KOLs were aware of the Marketing Defendants' conduct, were knowing and willing participants in that conduct, and reaped benefits from that conduct. The Marketing Defendants selected the KOLs solely because they favored the aggressive treatment of chronic pain with opioids. The Marketing Defendants' support helped the KOLs become respected industry experts. And, as they rose to prominence, the KOLs falsely touted the benefits of using opioids to treat chronic pain, repaying the Marketing Defendants by advancing the latter's marketing goals. The KOLs also knew, but did not disclose, that the other KOLs and Front Groups were engaged in the same scheme, to the detriment of consumers, prescribers, and Plaintiffs. But for the False Narrative Enterprise's unlawful conduct, the KOLs would have had incentive to disclose the

deceit by the Marketing Defendants and the False Narrative Enterprise and to protect their patients and those of other physicians. By failing to disclose this information, the KOLs furthered the False Narrative Enterprise's scheme and common purpose and reaped substantial benefits.

1755. As public scrutiny and media coverage revealed how opioids ravaged communities throughout the United States, the Front Groups and KOLs did not challenge the Marketing Defendants' misrepresentations, seek to correct their own previous misrepresentations, terminate their role in the False Narrative Enterprise, or disclose publicly that the risks of using opioids for chronic pain outweighed their benefits and were not supported by medically acceptable evidence.

1756. The Marketing Defendants, Front Groups, and KOLs engaged in certain discrete categories of activities in furtherance of the common purpose of the False Narrative Enterprise. As described herein, the False Narrative Enterprise's conduct in furtherance of the common purpose of the False Narrative Enterprise involved: (1) misrepresentations regarding the risk of addiction and safe use of prescription opioids for long-term chronic pain (described in detail above); (2) lobbying to defeat measures to restrict over-prescription; (3) efforts to criticize or undermine CDC guidelines; and (4) efforts to limit prescriber accountability.

1757. In addition to disseminating misrepresentations about the risks and benefits of opioids, the False Narrative Enterprise also furthered its common purpose by criticizing or undermining CDC guidelines. Members of the False Narrative Enterprise criticized or undermined the CDC Guidelines which represented "an important step - and perhaps the first major step from the federal government - toward limiting opioid prescriptions for chronic pain."[828]

1758. Several Front Groups, including the U.S. Pain Foundation and the AAPM, criticized the draft guidelines in 2015, arguing that the "CDC slides presented on Wednesday were not

[828] *Fueling an Epidemic Part Two*, *supra*.

transparent relative to process and failed to disclose the names, affiliation, and conflicts of interest of the individuals who participated in the construction of these guidelines."[829]

1759. The AAPM criticized the prescribing guidelines in 2016, through its immediate past president, stating "that the CDC guideline makes disproportionately strong recommendations based upon a narrowly selected portion of the available clinical evidence."[830]

1760. The Marketing Defendants alone could not have accomplished the purpose of the False Narrative Enterprise without the assistance of the Front Groups and the KOLs, who were perceived as "neutral" and more "scientific" than the Marketing Defendants themselves. Without the work of the Front Groups and the KOLs in spreading misrepresentations about opioids, the False Narrative Enterprise could not have achieved its common purpose.

1761. The impact of the False Narrative Enterprise's scheme is still in place - i.e., the opioids continue to be prescribed and used for chronic pain, and the epidemic continues to injure Plaintiffs and consume Plaintiffs' resources.

1762. As a result, it is clear that the Marketing Defendants, Front Groups, and KOLs were all willing participants in the False Narrative Enterprise, had a common purpose and interest in the object of the scheme, and functioned within a structure designed to effectuate the Enterprise's purpose.

1763. Each of the Marketing Defendants exerted control over the False Narrative Enterprise and participated in the operation or management of the affairs of the False Narrative Enterprise, directly or indirectly, in the following ways:

a. Creating and providing a body of deceptive, misleading and unsupported medical and popular literature about opioids that (i) understated the risks and overstated the benefits of long-term use; (ii) appeared to be the result of independent,

---

[829] Pat Anson, *Chronic Pain Groups Blast CDC for Opioid Guidelines* (Sept. 22, 2015), https://www.painnewsnetwork.org/stories/2015/9/22/chronic-pain-groups-blast-cdc-for-opioid-guidelines.

[830] Am. Acad. of Pain Med., *CDC Guideline for Prescribing Opioids for Chronic Pain*, Alpine Pain & Rehabilitation (Mar. 16, 2016), https://www.alpinepainandrehab.com/cdc-opioids.html.

objective research; and (iii) was thus more likely to be relied upon by physicians, patients, and payors;

b. Creating and providing a body of deceptive, misleading and unsupported electronic and print advertisements about opioids that (i) understated the risks and overstated the benefits of long-term use; (ii) appeared to be the result of independent, objective research; and (iii) was thus more likely to be relied upon by physicians, patients, and payors;

c. Creating and providing a body of deceptive, misleading and unsupported sales and promotional training materials about opioids that (i) understated the risks and overstated the benefits of long-term use; (ii) appeared to be the result of independent, objective research; and (iii) was thus more likely to be relied upon by physicians, patients, and payors;

d. Creating and providing a body of deceptive, misleading and unsupported CMEs and speaker presentations about opioids that (i) understated the risks and overstated the benefits of long-term use; (ii) appeared to be the result of independent, objective research; and (iii) was thus more likely to be relied upon by physicians, patients, and payors;

e. Selecting, cultivating, promoting and paying KOLs based solely on their willingness to communicate and distribute the Marketing Defendants' messages about the use of opioids for chronic pain;

f. Providing substantial opportunities for KOLs to participate in research studies on topics the Marketing Defendants suggested or chose, with the predictable effect of ensuring that many favorable studies appeared in the academic literature;

g. Paying KOLs to serve as consultants or on the Marketing Defendants' advisory boards, to serve on the advisory boards and in leadership positions of Front Groups, and to give talks or present CMEs, typically over meals or at conferences;

h. Selecting, cultivating, promoting, creating, and paying Front Groups based solely on their willingness to communicate and distribute the Marketing Defendants' messages about the use of opioids for chronic pain;

i. Providing substantial opportunities for Front Groups to participate in and/or publish research studies on topics the Marketing Defendants suggested or chose (and paid for), with the predictable effect of ensuring that many favorable studies appeared in the academic literature;

j. Paying significant amounts of money to the leaders and individuals associated with Front Groups;

k. Donating to Front Groups to support talks or CMEs, that were typically presented over meals or at conferences;

l. Disseminating many of their false, misleading, imbalanced, and unsupported statements through unbranded materials that appeared to be independent publications from Front Groups;

m. Sponsoring CME programs put on by Front Groups that focused exclusively on the use of opioids for chronic pain;

n. Developing and disseminating pro-opioid treatment guidelines with the help of the KOLs as authors and promoters, and the help of the Front Groups as publishers, and supporters;

o. Encouraging Front Groups to disseminate their pro-opioid messages to groups targeted by the Marketing Defendants, such as the elderly, and then funding that distribution;

p. Concealing their relationship to and control of Front Groups and KOLs from Plaintiffs and the public at large; and

q. Intending that Front Groups and KOLs would distribute through the U.S. mail and interstate wire facilities promotional and other materials that claimed opioids could be safely used for chronic pain.

1764. The False Narrative Enterprise had a hierarchical decision-making structure that was headed by Defendants and supported by the KOLs and Front Groups. The Marketing Defendants controlled representations made about their opioids and their drugs, doled out funds to PBMs and payments to KOLs, and ensured that representations made by KOLs, Front Groups, and the Marketing Defendants' sales detailers were consistent with the Marketing Defendants' messaging throughout the United States including in Arizona. The Front Groups and KOLs in the False Narrative Enterprise were dependent on the Marketing Defendants for their financial structure and for career development and promotion opportunities.

1765. The Front Groups also conducted and participated in the conduct of the False Narrative Enterprise, directly or indirectly, in the following ways:

a. The Front Groups promised to, and did, make representations regarding opioids and the Marketing Defendants' drugs that were consistent with the Marketing Defendants' messages;

b. The Front Groups distributed, through the U.S. Mail and interstate wire facilities, promotional and other materials which claimed that opioids could be safely used

for chronic pain without addiction, and misrepresented the benefits of using opioids for chronic pain outweighed the risks;

c. The Front Groups echoed and amplified messages favorable to increased opioid use—and ultimately, the Marketing Defendants' financial interests;

d. The Front Groups issued guidelines and policies minimizing the risk of opioid addiction and promoting opioids for chronic pain;

e. The Front Groups strongly criticized the 2016 CDC that recommended limits on opioid prescriptions for chronic pain; and

f. The Front Groups concealed their connections to the KOLs and the Marketing Defendants.

1766. The Marketing Defendants' Front Groups, "with their large numbers and credibility with policymakers and the public—have 'extensive influence in specific disease areas.'" The larger Front Groups "likely have a substantial effect on policies relevant to their industry sponsors." "By aligning medical culture with industry goals in this way, many of the groups described in this report may have played a significant role in creating the necessary conditions for the U.S. opioid epidemic."[831]

1767. The KOLs also participated in the conduct of the affairs of the False Narrative Enterprise, directly or indirectly, in the following ways:

a. The KOLs promised to, and did, make representations regarding opioids and the Marketing Defendants' drugs that were consistent with the Marketing Defendants' messages themselves;

b. The KOLs distributed, through the U.S. Mail and interstate wire facilities, promotional and other materials which claimed that opioids could be safely used for chronic pain without addiction and misrepresented that the benefits of using opioids for chronic pain outweighed the risks;

c. The KOLs echoed and amplified messages favorable to increased opioid use—and ultimately, the Marketing Defendants' financial interests;

d. The KOLs issued guidelines and policies minimizing the risk of opioid addiction and promoting opioids for chronic pain;

e. The KOLs strongly criticized the 2016 CDC guidelines that recommended limits on opioid prescriptions for chronic pain; and

---

[831] *Fueling an Epidemic Part Two*, *supra*.

f. The KOLs concealed their connections to the Front Groups and the Marketing Defendants and their sponsorship by the Marketing Defendants.

1768. The scheme devised and implemented by the Marketing Defendants and members of the False Narrative Enterprise amounted to a common course of conduct intended to increase the Marketing Defendants' sales from prescription opioids by encouraging the prescribing and use of opioids for long-term chronic pain. The scheme was a continuing course of conduct, and many aspects of it continue through to the present. As discussed in detail above, the Marketing Defendants funded and controlled the various Front Groups, which appeared to be independent, but were not, and which transmitted the Marketing Defendants' misrepresentations. The Marketing Defendants and the Front Groups thus worked together to promote the goals of the False Narrative Enterprise.

1769. The Marketing Defendants worked together with each other through the Front Groups that they jointly funded and through which they collaborated on the joint promotional materials described above.

1770. Similarly, as discussed in detail above, The Marketing Defendants paid KOLs to spread their misrepresentations and promote their products. The Marketing Defendants and the KOLs thus worked together to promote the goals of the False Narrative Enterprise.

1771. To achieve the common goal and purpose of the False Narrative Enterprise, the Marketing Defendants and members of the False Narrative Enterprise hid from consumers, prescribers, regulators, and Plaintiffs: (a) the fraudulent nature of the Marketing Defendants' marketing scheme; (b) the fraudulent nature of statements made by the Marketing Defendants and by their KOLs, Front Groups and other third parties regarding the safety and efficacy of prescription opioids; and (c) the true nature of the relationship between the members of the False Narrative Enterprise.

1772. The Marketing Defendants, and each member of the False Narrative Enterprise agreed, with knowledge and intent, to the overall objective of the Marketing Defendants' fraudulent

scheme and participated in the common course of conduct to commit acts of fraud and indecency in marketing prescription opioids.

1773. Indeed, for the Marketing Defendants' fraudulent scheme to work, each of them had to agree to implement similar tactics regarding fraudulent marketing of prescription opioids. This conclusion is supported by the fact that the Marketing Defendants each financed, supported, and worked through the same KOLs and Front Groups and often collaborated on and mutually supported the same publications, CMEs, presentations, and prescription guidelines.

1774. The Marketing Defendants' predicate acts all had the purpose of creating the opioid epidemic that substantially injured Plaintiffs' business and property, while simultaneously generating billion-dollar revenue and profits for the Marketing Defendants. The predicate acts were committed or caused to be committed by the Marketing Defendants through their participation in the False Narrative Enterprise and in furtherance of its fraudulent scheme.

1775. Defendants' conduct in the distribution of opioids is set forth in more detail in Section V and summarized herein.

1776. Faced with the reality that they will now be held accountable for the consequences of the opioid epidemic they created, members of the industry resort have categorically denied any criminal behavior or intent. But Defendants' actions went far beyond what could be considered ordinary business conduct. For more than a decade, Defendants worked together in an illicit enterprise, engaging in conduct that was not only illegal, but in certain respects anti-competitive, with the common purpose and achievement of vastly increasing their respective profits and revenues by exponentially expanding a market that the law intended to restrict.

1777. As "registrants" under the law of Arizona, Defendants are duty bound to identify and report suspicious orders of controlled substances. Critically, Defendants' responsibilities do not end with the products they manufacture or distribute -- there is no such limitation in the law because their

duties cut across company lines. Thus, when Defendants obtain information about the sales and distribution of other companies' opioid products, as they did through data mining companies like IMS Health, they were legally obligated to report that activity.

1778. If morality and the law did not suffice, competition dictates that Defendants would turn in their rivals when they had reason to suspect suspicious activity. Indeed, if a manufacturer or distributor could gain market share by reporting a competitor's illegal behavior (causing it to lose a license to operate, or otherwise inhibit its activity), ordinary business conduct dictates that it would do so. Under federal and Arizona RICO, this whistleblower or watchdog function is not only a protected choice, but a statutory mandate. Unfortunately, however, that is not what happened. Instead, knowing that investigations into potential diversion would only lead to shrinking markets, Defendants elected to operate in a conspiracy of silence, in violation of both federal and Arizona law concerning controlled substances and federal and Arizona RICO.

1779. Defendants' scheme required the participation of all. If any individual member broke rank, its compliance activities would highlight deficiencies of the others, and their scheme would crumble. But, if all the members of the enterprise conducted themselves in the same manner, it would be difficult for the government authorities to go after any one of them. Accordingly, through the connections they made as a result of their participation in the HAD, Defendants chose to flout the closed system designed to protect the citizens. Publicly, in 2008, they announced their formulation of "Industry Compliance Guidelines: Reporting Suspicious Orders and Prevention Diversion of Controlled Substances." But, privately, Defendants refused to act and through their lobbying efforts, they collectively sought to undermine the impact of government regulation and enforcement. Indeed, despite the issuance of these Industry Compliance Guidelines, which recognize Defendants' duties under the law, as illustrated by the subsequent industry-wide enforcement actions and consent orders issued after that time, none of them complied. John Gray, President and CEO of the HDA said to

Congress in 2014, it is "difficult to find the right balance between proactive anti-diversion efforts while not inadvertently limiting access to appropriately prescribed and dispensed medications." Yet, Defendants apparently all found the same profit-maximizing balance - intentionally remaining silent to ensure the largest possible financial return.

1780. As described above, at all relevant times, Defendants operated as an association-in-fact enterprise formed for the purpose of unlawfully increasing sales, revenues, and profits. In support of this common purpose and fraudulent scheme, Defendants jointly agreed to disregard their duties to identify, investigate, halt and report suspicious orders of opioids and diversion of their drugs into the illicit market.

1781. At all relevant times, as described above and so as to generate unlawful profits, Defendants exerted control over, conducted and/or participated in the False Narrative Enterprise by fraudulently claiming that they were complying with their duties to maintain effective controls against diversion, including duties to identify, investigate, and report suspicious orders of opioids in order to prevent diversion of those highly addictive substances into the illicit market and to halt such unlawful sales

1782. Defendants disseminated false and misleading statements to state and federal regulators claiming that:

a. they were complying with their obligation to maintain effective controls against diversion of their prescription opioids;

b. they were complying with their obligation to design and operate a system to disclose to the registrant suspicious orders of their prescription opioids;

c. they were complying with their obligation to report suspicious orders or diversion of their prescription opioids; and

d. they did not have the capability to identify suspicious orders of controlled substances.

1783. Defendants applied political and other pressure to halt prosecutions for failure to report suspicious orders of prescription opioids and lobbied for less stringent regulation of their marketing and distribution of pharmaceutical products.

1784. Defendants are required to make reports of any suspicious orders identified through the design and operation of their system to disclose suspicious orders.

1785. Defendants knowingly and intentionally furnished false or fraudulent information in their reports about suspicious orders, and/or omitted material information from reports, records and other documents required to be filed. Specifically, Defendants were aware of suspicious orders of prescription opioids and the diversion of their prescription opioids into the illicit market, and failed to take responsive action. This failure included the failure to report this information to the government.

1786. Defendants used, directed the use of, and/or caused to be used, thousands of interstate mail and wire communications in service of their scheme through virtually uniform misrepresentations, concealments, and material omissions regarding their compliance with their mandatory reporting requirements and the actions necessary to carry out their unlawful goal of selling prescription opioids without reporting suspicious orders or the diversion of opioids into the illicit market.

1787. In devising and executing the illegal scheme, Defendants devised and knowingly carried out a scheme and/or artifice to defraud by means of materially false or fraudulent pretenses, representations, promises, or omissions of material facts.

1788. For the purpose of executing the illegal scheme, Defendants committed unlawful acts, which number in the thousands, intentionally and knowingly, with the specific intent to advance the illegal scheme. These unlawful acts, which included repeated acts of mail fraud and wire fraud, constituted a pattern of unlawful activity.

1789. Defendants (and/or their agents), for the purpose of executing the illegal scheme, sent and/or received (or caused to be sent and/or received) by mail or by private or interstate carrier, shipments of prescription opioids and related documents by mail or by private carrier affecting interstate commerce.

1790. Each Defendant manufactured, shipped, paid for, and/or received payment for prescription opioids, throughout the United States.

1791. Defendants used the internet and other electronic facilities to carry out their scheme and conceal the ongoing fraudulent activities. Specifically, Defendants made misrepresentations about their compliance with the statutes, regulations, and other laws requiring them to identify, investigate, and report suspicious orders of prescription opioids and/or diversion of the same into the illicit market.

1792. At the same time, Defendants misrepresented the superior safety features of their order monitoring programs, their ability to detect suspicious orders, their commitment to preventing diversion of prescription opioids, and their compliance with federal and state laws regarding the identification and reporting of suspicious orders of prescription opioids. Defendants utilized the internet and other electronic resources to exchange communications, to exchange information regarding prescription opioid sales, and to transmit payments and rebates/chargebacks.

1793. Defendants also communicated by U.S. Mail, by interstate facsimile, and by interstate electronic mail with each other and with various other affiliates, regional offices, regulators, distributors, and other third-party entities in furtherance of the scheme.

1794. The mail and wire transmissions described herein were made in furtherance of Defendants' scheme and common course of conduct to deceive regulators, the public, and Plaintiffs that Defendants were complying with their legal obligations to identify and report suspicious orders

of prescription opioids all while Defendants were knowingly allowing millions of doses of prescription opioids to divert into the illicit drug market.

1795. Many of the precise dates of the fraudulent uses of the U.S. mail and interstate wire facilities have been deliberately hidden by Defendants and cannot be alleged without access to Defendants' books and records. However, Plaintiffs have described the types of, and in some instances, occasions on which the predicate acts of mail and/or wire fraud occurred. They include thousands of communications to perpetuate and maintain the scheme, including the things and documents described in the preceding paragraphs.

1796. Defendants did not undertake the practices described herein in isolation, but as part of a common scheme. Various other persons, firms, and corporations, including third-party entities and individuals not named as defendants in this Complaint, may have contributed to and/or participated in the scheme with Defendants in these offenses and have performed acts in furtherance of the scheme to increase revenues, increase market share, and /or minimize the losses for Defendants.

1797. The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of obtaining significant monies and revenues from the sale of their highly addictive and dangerous drugs. The predicate acts also had the same or similar results, participants, victims, and methods of commission. The predicate acts were related and not isolated events.

1798. The predicate acts all had the purpose of creating the opioid epidemic that substantially injured Plaintiffs' business and property, while simultaneously generating billion-dollar revenue and profits for Defendants. The predicate acts were committed or caused to be committed by Defendants through their participation in the False Narrative Enterprise and in furtherance of its fraudulent scheme.

1799. As described above, Defendants were repeatedly warned, fined, and found to be in violation of applicable law and regulations, and yet they persisted. The sheer volume of enforcement actions against Defendants supports the conclusion that Defendants operated through a pattern and practice of willfully and intentionally omitting information from their mandatory reports.

1800. Each instance of unlawful activity alleged herein was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims. Defendants calculated and intentionally crafted their scheme to increase and maintain profits from unlawful sales of opioids, without regard to the effect such behavior would have on Arizona, its citizens, or Plaintiffs. Defendants were aware that Plaintiffs and others rely on Defendants to maintain a closed system of manufacturing and distribution to protect against the non-medical diversion and use of their dangerously addictive opioid drugs.

1801. By intentionally refusing to report and halt suspicious orders of their prescription opioids, Defendants engaged in a fraudulent scheme and unlawful course of conduct constituting a pattern of unlawful activity.

4. **Pattern of Unlawful Activity**

1802. Defendants' scheme described herein was perpetrated, in part, through multiple acts of mail fraud and wire fraud, and violations of statutes regulating the distribution of controlled substances, constituting a pattern of unlawful activity as described herein.

1803. The pattern of unlawful activity used by the False Narrative Enterprise likely involved thousands of separate instances of the use of the U.S. Mail or interstate wire facilities in furtherance of the unlawful False Narrative Enterprise.

1804. These communications included essentially uniform misrepresentations, concealments and material omissions regarding the beneficial uses and non-addictive qualities for the long-term treatment of chronic, non-acute and non-cancer pain, with the goal of profiting from increased sales

of the Marketing Defendants' drugs induced by consumers', prescribers', regulators', and Plaintiffs' reliance on the Marketing Defendants' misrepresentations. Each of these fraudulent mailings and interstate wire transmissions constitutes an unlawful act, and, collectively, these violations constitute a pattern of unlawful activity, through which the Marketing Defendants, the Front Groups, and the KOLs defrauded and intended to defraud Plaintiffs. The Marketing Defendants devised and knowingly carried out an illegal scheme and artifice to defraud by means of materially false or fraudulent pretenses, representations, promises, or omissions of material facts regarding the safe, non-addictive, and effective use of opioids for long-term chronic, non-acute, and non-cancer pain. The Marketing Defendants and members of the False Narrative Enterprise knew that these representations contradicted the FDA-approved use these drugs and were not supported by actual evidence. The Marketing Defendants intended that that their common purpose and scheme to defraud would, and did, use the U.S. Mail and interstate wire facilities, intentionally and knowingly with the specific intent to advance and for the purpose of executing their illegal scheme. By intentionally concealing the material risks and affirmatively misrepresenting the benefits of using opioids for chronic pain to prescribers, regulators, and the public, including Plaintiffs, the Marketing Defendants, the Front Groups, and the KOLs engaged in a fraudulent and unlawful course of conduct constituting a pattern of unlawful activity. The Marketing Defendants' use of the U.S. Mail and interstate wire facilities to perpetrate the opioids' marketing scheme involved thousands of communications, publications, representations, statements, electronic transmissions, payments, including, *inter alia*:

a. Marketing materials about opioids, and their risks and benefits, which the Marketing Defendants sent to health care providers, such as hospitals transmitted through the internet and television, published, and transmitted to Front Groups and KOLs located across the country and the State;

b. Written representations and telephone calls between the Marketing Defendants and Front Groups regarding the misrepresentations, marketing statements, and claims about opioids, including the non-addictive, safe use of chronic long-term pain generally;

c. Written representations and telephone calls between the Marketing Defendants and KOLs regarding the misrepresentations, marketing statements and claims about opioids, including the non-addictive, safe use of chronic long-term pain generally;

d. E-mails, telephone, and written communications between the Marketing Defendants and the Front Groups agreeing to or implementing the opioids marketing scheme;

e. E-mails, telephone, and written communications between the Marketing Defendants and the KOLs agreeing to or implementing the opioids marketing scheme;

f. Communications between the Marketing Defendants, Front Groups, and the media regarding publication, drafting of treatment guidelines, and the dissemination of the same as part of the False Narrative Enterprise;

g. Communications between the Marketing Defendants, KOLs and the media regarding publication, drafting of treatment guidelines, and the dissemination of the same as part of the False Narrative Enterprise;

h. Written and oral communications directed to State agencies, federal and state courts, and private insurers throughout Arizona that fraudulently misrepresented the risks and benefits of using opioids for chronic pain; and

i. Receipts of increased profits sent through the U.S. Mail and interstate wire facilities - the wrongful proceeds of the scheme.

1805. In addition to the above-referenced predicate acts, it was intended by and foreseeable to the Marketing Defendants that the Front Groups and the KOLs would distribute publications through the U.S. Mail and by interstate wire facilities and, in those publications, claim that the benefits of using opioids for chronic pain outweighed the risks of doing so.

1806. Defendants' use of U.S. Mail and interstate wires in conduct related to the distribution of opioids includes, but is not limited to, the transmission, delivery, or shipment of the following by Defendants, and/or third parties that were foreseeably caused to be sent as a result of Defendants' illegal scheme, of the following:

a. The prescription opioids themselves;

b. Documents and communications that facilitated the manufacture, purchase, and sale of prescription opioids;

c. Defendants' government registrations;

d. Documents and communications that supported and/or facilitated Defendants' government registrations;

e. Defendants' records and reports that were required to be submitted to regulatory authorities;

f. Documents intended to facilitate the manufacture and distribution of Defendants' prescription opioids, including bills of lading, invoices, shipping records, reports, and correspondence;

g. Documents for processing and receiving payment for prescription opioids;

h. Payments from the Distributor Defendants to the Marketing Defendants;

i. Rebates and chargebacks from the Marketing Defendants to the Distributor Defendants;

j. Payments from the National Retail Pharmacies to the other Distributor Defendants;

k. Payments to Defendants' lobbyists through the PCF;

l. Payments to Defendants' trade organizations, like the HDA, for memberships and/or sponsorships;

m. Deposits of proceeds from Defendants' manufacture and distribution of prescription opioids; and

n. Other documents and things, including electronic communications.

1807. Defendants also participated in a pattern of violations of the federal Controlled Substances Act and analogous state common and statutory law by refusing to comply with their obligations under the law to report suspicious orders and prescribers.

1808. At least two unlawful acts as defined in A.R.S. § 13-2301(D)(4))(b)(iv)–(x), (xiii), (xv)–(xvi), (xviii)–(xx), (xxvi) meet the following requirements: (i) the last act of unlawful activity that is alleged as the basis of the claim occurred with five years of a prior act of unlawful activity; and (ii) the unlawful acts that are alleged as the basis of the claim were related to each other or to a common organizing principle, including the affairs of an enterprise. Unlawful acts are related if they have the same purposes, results, participants, victims or methods of commission or otherwise interrelated by

distinguishing characteristics; and (iii) the unlawful acts that are alleged as the basis of the claim were continuous or exhibited the threat of being continuous. A.R.S. §§ 13-2314.04 (T)(3)(a)(i)–(iii). The False Narrative Enterprise committed the following predicate offenses: (xv) Asserting false claims, including false claims asserted through fraud; (xx) A scheme or artifice to defraud.

1809. At all relevant times, Defendants, in violation of the above statutes, conducted (managed) or participated, directly or indirectly, in the conduct (management) of the False Narrative Enterprise, through a pattern of unlawful activity, by engaging in multiple, repeated, and continuous violations of Arizona law proscribing fraudulent schemes and the concealment thereof, A.R.S. §§ 13-2310 to -2311, Arizona law proscribing electronic communications in connection with drug transactions, A.R.S. § 13-3417, and Arizona's Uniform Controlled Substances Act, § 36-2501, *et seq.* Defendants transmitted electronic communications to designated persons for ostensibly legitimate purposes, but with the actual, unlawful purpose of engaging in an intentional scheme to defraud Plaintiffs, other hospitals, health care providers, patients and their families, and, in general, the American public.

5. **Consequences**

1810. By reason of the above-referenced violations of A.R.S. § 13-2314.04(A), Plaintiffs were injured in their business or property within the meaning of A.R.S. § 132314.04(A) and are entitled to assert this claim and to recover threefold the damages they sustained, as demonstrated at trial, and the cost of the suit, including reasonable attorneys' fees, as well as such other appropriate relief, as the Court may provide.

## H. Eighth Claim for Relief: Racketeering Influenced and Corrupt Organizations Act (18 U.S.C. §§ 1961–1968)

1811. Plaintiffs repeat, reallege, and incorporate by Paragraphs 1 to 1810 of this Complaint, as if fully set forth herein.

1812. This Claim for relief alleges violations of 18 U.S.C. §§ 1962(c)–(d).

1813. At all relevant times, Plaintiffs were entities capable of holding legal or beneficial interest in property, which means that they were "person[s]" within the meaning of 18 U.S.C. §§ 1961(3), 1962(c).

**1. Structure of the False Narrative Enterprise**

1814. At all relevant times, Defendants, in violation of RICO, conducted (managed) or participated, directly or indirectly, in the conduct (management) of the False Narrative Enterprise, through a pattern of unlawful or otherwise prohibited activity.

a. **Name:** At all relevant times, there existed an "enterprise," within the meaning of 18 U.S.C. §§ 1961(4), 1962(c) – to wit, an association-in-fact comprised of each of the Defendants – referred to herein as "The False Narrative Enterprise."

b. **Continuity**: The continuity of the False Narrative Enterprise was coterminous with the period of time necessary to defraud Plaintiffs, other hospitals, physicians, other healthcare providers, patients and their families, and the American public in general.

c. **Effect on Commerce**: The False Narrative Enterprise was engaged in, and its activities affected, interstate and foreign commerce.

d. **Membership and Roles of Each Class of Participant**: The False Narrative Enterprise reflected several types of participants, not all of which were complicit, and not all of which are named herein as Defendants:

   i. **The Marketing Defendants and Associates**. The Marketing Defendants are Teva, Janssen, Endo, Allergan, and AbbVie. The Marketing Defendants along with unnamed co-conspirators Purdue and Mallinckrodt: (1) conceptualized and set in motion the falsehoods about opioids that created billions of dollars of artificial demand for these highly addictive and dangerous products, described in Section IV; (2) engaged in fraudulent and reckless conduct in the distribution of opioids, as described in Section V; and (3) conspired with other Defendants who were engaging in the same conduct.

   ii. **The Front Groups**. The Marketing Defendants used the Front Groups, not named as defendants herein and not all of which were fully complicit, to stoke demand for opioids by falsely creating the impression of independent third-party authoritative validation of the false claims of the Marketing Defendants and Purdue and Mallinckrodt.

   iii. **The KOLs.** The Marketing Defendants used KOLs, not named as defendants herein and who may not have been fully complicit, to provide ostensibly valid, third party, authoritative validation of the Marketing Defendants' false claims.

iv. **Distributor Defendants.** The Distributor Defendants are ABDC, Anda, Cardinal, H.D. Smith, McKesson, Walgreens, CVS, and Walmart; they joined the False Narrative Enterprise with full awareness and complicity and acted in concert with the Marketing Defendants to pool information about vulnerable targets and share the king size profits reaped from the sale of opioids to addicts, deliberately ignoring their obligations under the Controlled Substances Act. Distributor Defendants (1) engaged in their own predicate acts, described in section V; (2) conspired with other Defendants who were engaging in both fraudulent marketing conduct (Section IV) and wrongful distribution conduct (Section V).

v. **Corrupt Physicians and Pharmacies, a/k/a Pill Mills.** prescribed opioids illegally and with no basis in legitimate medicine; and dispensed opioids illegally and in direct violation of their legal obligations.

**2. The Common Purpose and Scheme of the False Narrative Enterprise**

1815. The lawful purpose of the False Narrative Enterprise was the manufacture, marketing, distribution, and sale of pharmaceutical products in interstate and foreign commerce. The unlawful purpose of the False Narrative Enterprise was to engage in and carry out an intentional scheme to defraud purchasers and others, including doctors and hospitals, by propagating falsehoods about the safety and benefits of opioids.

1816. In order to unlawfully increase the demand for opioids, Defendants formed an association-in-fact enterprise (the "False Narrative Enterprise") with the Front Groups and KOLs described above. Knowing that their products were highly addictive, ineffective and unsafe for the treatment of long-term chronic pain, non-acute and non-cancer pain, Defendants formed an association-in-fact enterprise and engaged in a scheme to unlawfully increase their profits and sales and grow their share of the prescription painkiller market through (1) repeated and systematic misrepresentations about the safety and efficacy of opioids for treating long-term chronic pain, and (2) ongoing disregard of their duties to identify, investigate, halt and report suspicious orders of opioids and diversion of their drugs into the illicit market.

### 3. Predicate Acts

1817. At all relevant times, Defendants conducted (managed) or participated, directly or indirectly, in the conduct (management) of the False Narrative Enterprise, through a pattern of unlawful activity. In addition to participating in a RICO-violative enterprise, Defendants, with full knowledge and purpose, conspired, in violation of 18 U.S.C. § 1962(d), to violate § 1962(c). Defendants did so by engaging in multiple, repeated, and continuous violations of:

a. **Wire Fraud, 18 U.S.C. § 1343**. Defendants, in violation of § 1343, transmitted communications electronically to designated persons for ostensibly legitimate purposes, but with the actual, unlawful purpose of asserting false claims through fraud and to engage in an intentional scheme to defraud Plaintiff, other health care providers, patients and their families and, in general, the American public.

b. **Mail Fraud, 18 U.S.C. § 1341.** Defendants, in violation of § 1341, transmitted communications through the U.S. Mail to designated persons for ostensibly legitimate purposes, but with the actual, unlawful purpose of asserting false claims through fraud and to engage in an intentional scheme to defraud Plaintiff, other health care providers, patients and their families and, in general, the American public.

c. **The Controlled Substances Act, 21 U.S.C. § 801, *et seq.***

1818. The Marketing Defendants' substantial financial contribution to the False Narrative Enterprise, and the advancement of opioid-friendly messaging, fueled the U.S. opioids epidemic. The Marketing Defendants' marketing conduct is set forth in more detail in Section IV.

1819. The Marketing Defendants, through their participation in the False Narrative Enterprise, concealed the true risks and dangers of opioids from the medical community and the public, including Plaintiffs, and made misleading statements and misrepresentations about opioids that downplayed the risk of addiction and exaggerated the benefits of opioid use. These misrepresentations are identified in detail in Section IV above.

1820. The Marketing Defendants, the Front Groups, and the KOLs acted together for a common purpose and perpetuated the False Narrative Enterprise's scheme, including through the unbranded promotion and marketing network described in Section IV.

1821. There was regular communication between the Marketing Defendants, the Front Groups, and KOLs, in which information was shared, misrepresentations coordinated, and payments exchanged. Typically, the coordination, communication, and payment occurred, and continues to occur, through the repeated and continuing use of the wires and mail in which the Marketing Defendants, Front Groups, and KOLs shared information regarding overcoming objections and resistance to the use of opioids for chronic pain. The Marketing Defendants, Front Groups, and KOLs functioned as a continuing unit for the purpose of implementing the False Narrative Enterprise's scheme and common purpose, and each agreed and took actions to hide the scheme and continue its existence.

1822. At all relevant times, the Front Groups were aware of the Marketing Defendants' conduct and were knowing and willing participants in and beneficiaries of that conduct. Each Front Group also knew, but did not disclose, that the other Front Groups were engaged in the same scheme, to the detriment of consumers, prescribers, and Plaintiffs. But for the False Narrative Enterprise's unlawful fraud, the Front Groups would have had incentive to disclose the deceit by the Marketing Defendants and the False Narrative Enterprise to their members and constituents. By failing to disclose this information, Front Groups perpetuated the False Narrative Enterprise's scheme and common purpose and reaped substantial benefits.

1823. At all relevant times, the KOLs were aware of the Marketing Defendants' conduct, were knowing and willing participants in that conduct, and reaped benefits from that conduct. The Marketing Defendants selected the KOLs solely because they favored the aggressive treatment of chronic pain with opioids. The Marketing Defendants' support helped the KOLs become respected industry experts. And, as they rose to prominence, the KOLs falsely touted the benefits of using opioids to treat chronic pain, repaying the Marketing Defendants by advancing the latter's marketing goals. The KOLs also knew, but did not disclose, that the other KOLs and Front Groups were

engaged in the same scheme, to the detriment of consumers, prescribers, and Plaintiffs. But for the False Narrative Enterprise's unlawful conduct, the KOLs would have had incentive to disclose the deceit by the Marketing Defendants and the False Narrative Enterprise and to protect their patients and those of other physicians. By failing to disclose this information, the KOLs furthered the False Narrative Enterprise's scheme and common purpose and reaped substantial benefits.

1824. As public scrutiny and media coverage revealed how opioids ravaged communities throughout the United States, the Front Groups and KOLs did not challenge the Marketing Defendants' misrepresentations, seek to correct their own previous misrepresentations, terminate their role in the False Narrative Enterprise, or disclose publicly that the risks of using opioids for chronic pain outweighed their benefits and were not supported by medically acceptable evidence.

1825. The Marketing Defendants, Front Groups, and KOLs engaged in certain discrete categories of activities in furtherance of the common purpose of the False Narrative Enterprise. As described herein, the False Narrative Enterprise's conduct in furtherance of the common purpose of the False Narrative Enterprise involved: (1) misrepresentations regarding the risk of addiction and safe use of prescription opioids for long-term chronic pain (described in detail above); (2) lobbying to defeat measures to restrict over-prescription; (3) efforts to criticize or undermine CDC guidelines; and (4) efforts to limit prescriber accountability.

1826. In addition to disseminating misrepresentations about the risks and benefits of opioids, the False Narrative Enterprise also furthered its common purpose by criticizing or undermining CDC guidelines. Members of the False Narrative Enterprise criticized or undermined the CDC Guidelines which represented "an important step - and perhaps the first major step from the federal government - toward limiting opioid prescriptions for chronic pain."[832]

---

[832] *Fueling an Epidemic Part Two*, *supra*.

1827. Several Front Groups, including the U.S. Pain Foundation and the AAPM, criticized the draft guidelines in 2015, arguing that the "CDC slides presented on Wednesday were not transparent relative to process and failed to disclose the names, affiliation, and conflicts of interest of the individuals who participated in the construction of these guidelines."[833]

1828. The AAPM criticized the prescribing guidelines in 2016, through its immediate past president, stating "that the CDC guideline makes disproportionately strong recommendations based upon a narrowly selected portion of the available clinical evidence."[834]

1829. The Marketing Defendants alone could not have accomplished the purpose of the False Narrative Enterprise without the assistance of the Front Groups and the KOLs, who were perceived as "neutral" and more "scientific" than the Marketing Defendants themselves. Without the work of the Front Groups and the KOLs in spreading misrepresentations about opioids, the False Narrative Enterprise could not have achieved its common purpose.

1830. The impact of the False Narrative Enterprise's scheme is still in place - i.e., the opioids continue to be prescribed and used for chronic pain, and the epidemic continues to injure Plaintiffs and consume Plaintiffs' resources.

1831. As a result, it is clear that the Marketing Defendants, Front Groups, and KOLs were all willing participants in the False Narrative Enterprise, had a common purpose and interest in the object of the scheme, and functioned within a structure designed to effectuate the Enterprise's purpose.

---

[833] Pat Anson, *Chronic Pain Groups Blast CDC for Opioid Guidelines* (Sept. 22, 2015), https://www.painnewsnetwork.org/stories/2015/9/22/chronic-pain-groups-blast-cdc-for-opioid-guidelines.

[834] Am. Acad. of Pain Med., *CDC Guideline for Prescribing Opioids for Chronic Pain*, Alpine Pain & Rehabilitation (Mar. 16, 2016), https://www.alpinepainandrehab.com/cdc-opioids.html.

1832. Each of the Marketing Defendants exerted control over the False Narrative Enterprise and participated in the operation or management of the affairs of the False Narrative Enterprise, directly or indirectly, in the following ways:

a. Creating and providing a body of deceptive, misleading and unsupported medical and popular literature about opioids that (i) understated the risks and overstated the benefits of long-term use; (ii) appeared to be the result of independent, objective research; and (iii) was thus more likely to be relied upon by physicians, patients, and payors;

b. Creating and providing a body of deceptive, misleading and unsupported electronic and print advertisements about opioids that (i) understated the risks and overstated the benefits of long-term use; (ii) appeared to be the result of independent, objective research; and (iii) was thus more likely to be relied upon by physicians, patients, and payors;

c. Creating and providing a body of deceptive, misleading and unsupported sales and promotional training materials about opioids that (i) understated the risks and overstated the benefits of long-term use; (ii) appeared to be the result of independent, objective research; and (iii) was thus more likely to be relied upon by physicians, patients, and payors;

d. Creating and providing a body of deceptive, misleading and unsupported CMEs and speaker presentations about opioids that (i) understated the risks and overstated the benefits of long-term use; (ii) appeared to be the result of independent, objective research; and (iii) was thus more likely to be relied upon by physicians, patients, and payors;

e. Selecting, cultivating, promoting and paying KOLs based solely on their willingness to communicate and distribute the Marketing Defendants' messages about the use of opioids for chronic pain;

f. Providing substantial opportunities for KOLs to participate in research studies on topics the Marketing Defendants suggested or chose, with the predictable effect of ensuring that many favorable studies appeared in the academic literature;

g. Paying KOLs to serve as consultants or on the Marketing Defendants' advisory boards, to serve on the advisory boards and in leadership positions of Front Groups, and to give talks or present CMEs, typically over meals or at conferences;

h. Selecting, cultivating, promoting, creating, and paying Front Groups based solely on their willingness to communicate and distribute the Marketing Defendants' messages about the use of opioids for chronic pain;

i. Providing substantial opportunities for Front Groups to participate in and/or publish research studies on topics the Marketing Defendants suggested or chose

(and paid for), with the predictable effect of ensuring that many favorable studies appeared in the academic literature;

j. Paying significant amounts of money to the leaders and individuals associated with Front Groups;

k. Donating to Front Groups to support talks or CMEs, that were typically presented over meals or at conferences;

l. Disseminating many of their false, misleading, imbalanced, and unsupported statements through unbranded materials that appeared to be independent publications from Front Groups;

m. Sponsoring CME programs put on by Front Groups that focused exclusively on the use of opioids for chronic pain;

n. Developing and disseminating pro-opioid treatment guidelines with the help of the KOLs as authors and promoters, and the help of the Front Groups as publishers, and supporters;

o. Encouraging Front Groups to disseminate their pro-opioid messages to groups targeted by the Marketing Defendants, such as the elderly, and then funding that distribution;

p. Concealing their relationship to and control of Front Groups and KOLs from Plaintiffs and the public at large; and

q. Intending that Front Groups and KOLs would distribute through the U.S. mail and interstate wire facilities promotional and other materials that claimed opioids could be safely used for chronic pain.

1833. The False Narrative Enterprise had a hierarchical decision-making structure that was headed by Defendants and supported by the KOLs and Front Groups. The Marketing Defendants controlled representations made about their opioids and their drugs, doled out funds to PBMs and payments to KOLs, and ensured that representations made by KOLs, Front Groups, and the Marketing Defendants' sales detailers were consistent with the Marketing Defendants' messaging throughout the United States including in Arizona. The Front Groups and KOLs in the False Narrative Enterprise were dependent on the Marketing Defendants for their financial structure and for career development and promotion opportunities.

1834. The Front Groups also conducted and participated in the conduct of the False Narrative Enterprise, directly or indirectly, in the following ways:

a. The Front Groups promised to, and did, make representations regarding opioids and the Marketing Defendants' drugs that were consistent with the Marketing Defendants' messages;

b. The Front Groups distributed, through the U.S. Mail and interstate wire facilities, promotional and other materials which claimed that opioids could be safely used for chronic pain without addiction, and misrepresented the benefits of using opioids for chronic pain outweighed the risks;

c. The Front Groups echoed and amplified messages favorable to increased opioid use—and ultimately, the Marketing Defendants' financial interests;

d. The Front Groups issued guidelines and policies minimizing the risk of opioid addiction and promoting opioids for chronic pain;

e. The Front Groups strongly criticized the 2016 CDC that recommended limits on opioid prescriptions for chronic pain; and

f. The Front Groups concealed their connections to the KOLs and the Marketing Defendants.

1835. The Marketing Defendants' Front Groups, "with their large numbers and credibility with policymakers and the public—have 'extensive influence in specific disease areas.'" The larger Front Groups "likely have a substantial effect on policies relevant to their industry sponsors." "By aligning medical culture with industry goals in this way, many of the groups described in this report may have played a significant role in creating the necessary conditions for the U.S. opioid epidemic."[835]

1836. The KOLs also participated in the conduct of the affairs of the False Narrative Enterprise, directly or indirectly, in the following ways:

a. The KOLs promised to, and did, make representations regarding opioids and the Marketing Defendants' drugs that were consistent with the Marketing Defendants' messages themselves;

b. The KOLs distributed, through the U.S. Mail and interstate wire facilities, promotional and other materials which claimed that opioids could be safely used

---

[835] *Fueling an Epidemic Part Two*, *supra*.

for chronic pain without addiction and misrepresented that the benefits of using opioids for chronic pain outweighed the risks;

c. The KOLs echoed and amplified messages favorable to increased opioid use—and ultimately, the Marketing Defendants' financial interests;

d. The KOLs issued guidelines and policies minimizing the risk of opioid addiction and promoting opioids for chronic pain;

e. The KOLs strongly criticized the 2016 CDC guidelines that recommended limits on opioid prescriptions for chronic pain; and

f. The KOLs concealed their connections to the Front Groups and the Marketing Defendants and their sponsorship by the Marketing Defendants.

1837. The scheme devised and implemented by the Marketing Defendants and members of the False Narrative Enterprise amounted to a common course of conduct intended to increase the Marketing Defendants' sales from prescription opioids by encouraging the prescribing and use of opioids for long-term chronic pain. The scheme was a continuing course of conduct, and many aspects of it continue through to the present. As discussed in detail above, the Marketing Defendants funded and controlled the various Front Groups, which appeared to be independent, but were not, and which transmitted the Marketing Defendants' misrepresentations. The Marketing Defendants and the Front Groups thus worked together to promote the goals of the False Narrative Enterprise.

1838. The Marketing Defendants worked together with each other through the Front Groups that they jointly funded and through which they collaborated on the joint promotional materials described above.

1839. Similarly, as discussed in detail above, The Marketing Defendants paid KOLs to spread their misrepresentations and promote their products. The Marketing Defendants and the KOLs thus worked together to promote the goals of the False Narrative Enterprise.

1840. To achieve the common goal and purpose of the False Narrative Enterprise, the Marketing Defendants and members of the False Narrative Enterprise hid from consumers, prescribers, regulators, and Plaintiffs: (a) the fraudulent nature of the Marketing Defendants'

marketing scheme; (b) the fraudulent nature of statements made by the Marketing Defendants and by their KOLs, Front Groups and other third parties regarding the safety and efficacy of prescription opioids; and (c) the true nature of the relationship between the members of the False Narrative Enterprise.

1841. The Marketing Defendants, and each member of the False Narrative Enterprise agreed, with knowledge and intent, to the overall objective of the Marketing Defendants' fraudulent scheme and participated in the common course of conduct to commit acts of fraud and indecency in marketing prescription opioids.

1842. Indeed, for the Marketing Defendants' fraudulent scheme to work, each of them had to agree to implement similar tactics regarding fraudulent marketing of prescription opioids. This conclusion is supported by the fact that the Marketing Defendants each financed, supported, and worked through the same KOLs and Front Groups and often collaborated on and mutually supported the same publications, CMEs, presentations, and prescription guidelines.

1843. The Marketing Defendants' predicate acts all had the purpose of creating the opioid epidemic that substantially injured Plaintiffs' business and property, while simultaneously generating billion-dollar revenue and profits for the Marketing Defendants. The predicate acts were committed or caused to be committed by the Marketing Defendants through their participation in the False Narrative Enterprise and in furtherance of its fraudulent scheme.

1844. Defendants' conduct in the distribution of opioids is set forth in more detail in Section V and summarized herein.

1845. Faced with the reality that they will now be held accountable for the consequences of the opioid epidemic they created, members of the industry resort have categorically denied any criminal behavior or intent. But Defendants' actions went far beyond what could be considered ordinary business conduct. For more than a decade, Defendants worked together in an illicit

enterprise, engaging in conduct that was not only illegal, but in certain respects anti-competitive, with the common purpose and achievement of vastly increasing their respective profits and revenues by exponentially expanding a market that the law intended to restrict.

1846. As "registrants" under the law of Arizona, Defendants are duty bound to identify and report suspicious orders of controlled substances. Critically, Defendants' responsibilities do not end with the products they manufacture or distribute -- there is no such limitation in the law because their duties cut across company lines. Thus, when Defendants obtain information about the sales and distribution of other companies' opioid products, as they did through data mining companies like IMS Health, they were legally obligated to report that activity.

1847. If morality and the law did not suffice, competition dictates that Defendants would turn in their rivals when they had reason to suspect suspicious activity. Indeed, if a manufacturer or distributor could gain market share by reporting a competitor's illegal behavior (causing it to lose a license to operate, or otherwise inhibit its activity), ordinary business conduct dictates that it would do so. Under federal and Arizona RICO, this whistleblower or watchdog function is not only a protected choice, but a statutory mandate. Unfortunately, however, that is not what happened. Instead, knowing that investigations into potential diversion would only lead to shrinking markets, Defendants elected to operate in a conspiracy of silence, in violation of both federal and Arizona law concerning controlled substances and federal and Arizona RICO.

1848. Defendants' scheme required the participation of all. If any individual member broke rank, its compliance activities would highlight deficiencies of the others, and their scheme would crumble. But, if all the members of the enterprise conducted themselves in the same manner, it would be difficult for the government authorities to go after any one of them. Accordingly, through the connections they made as a result of their participation in the HAD, Defendants chose to flout the closed system designed to protect the citizens. Publicly, in 2008, they announced their formulation of

"Industry Compliance Guidelines: Reporting Suspicious Orders and Prevention Diversion of Controlled Substances." But, privately, Defendants refused to act and through their lobbying efforts, they collectively sought to undermine the impact of government regulation and enforcement. Indeed, despite the issuance of these Industry Compliance Guidelines, which recognize Defendants' duties under the law, as illustrated by the subsequent industry-wide enforcement actions and consent orders issued after that time, none of them complied. John Gray, President and CEO of the HDA said to Congress in 2014, it is "difficult to find the right balance between proactive anti-diversion efforts while not inadvertently limiting access to appropriately prescribed and dispensed medications." Yet, Defendants apparently all found the same profit-maximizing balance - intentionally remaining silent to ensure the largest possible financial return.

1849. As described above, at all relevant times, Defendants operated as an association-in-fact enterprise formed for the purpose of unlawfully increasing sales, revenues, and profits. In support of this common purpose and fraudulent scheme, Defendants jointly agreed to disregard their duties to identify, investigate, halt and report suspicious orders of opioids and diversion of their drugs into the illicit market.

1850. At all relevant times, as described above and so as to generate unlawful profits, Defendants exerted control over, conducted and/or participated in the False Narrative Enterprise by fraudulently claiming that they were complying with their duties to maintain effective controls against diversion, including duties to identify, investigate, and report suspicious orders of opioids in order to prevent diversion of those highly addictive substances into the illicit market and to halt such unlawful sales

1851. Defendants disseminated false and misleading statements to state and federal regulators claiming that:

a. they were complying with their obligation to maintain effective controls against diversion of their prescription opioids;

b. they were complying with their obligation to design and operate a system to disclose to the registrant suspicious orders of their prescription opioids;

c. they were complying with their obligation to report suspicious orders or diversion of their prescription opioids; and

d. they did not have the capability to identify suspicious orders of controlled substances.

1852. Defendants applied political and other pressure to halt prosecutions for failure to report suspicious orders of prescription opioids and lobbied for less stringent regulation of their marketing and distribution of pharmaceutical products.

1853. Defendants are required to make reports of any suspicious orders identified through the design and operation of their system to disclose suspicious orders.

1854. Defendants knowingly and intentionally furnished false or fraudulent information in their reports about suspicious orders, and/or omitted material information from reports, records and other documents required to be filed. Specifically, Defendants were aware of suspicious orders of prescription opioids and the diversion of their prescription opioids into the illicit market, and failed to take responsive action. This failure included the failure to report this information to the government.

1855. Defendants used, directed the use of, and/or caused to be used, thousands of interstate mail and wire communications in service of their scheme through virtually uniform misrepresentations, concealments, and material omissions regarding their compliance with their mandatory reporting requirements and the actions necessary to carry out their unlawful goal of selling prescription opioids without reporting suspicious orders or the diversion of opioids into the illicit market.

1856. In devising and executing the illegal scheme, Defendants devised and knowingly carried out a scheme and/or artifice to defraud by means of materially false or fraudulent pretenses, representations, promises, or omissions of material facts.

1857. For the purpose of executing the illegal scheme, Defendants committed unlawful acts, which number in the thousands, intentionally and knowingly, with the specific intent to advance the illegal scheme. These unlawful acts, which included repeated acts of mail fraud and wire fraud, constituted a pattern of unlawful activity.

1858. Defendants (and/or their agents), for the purpose of executing the illegal scheme, sent and/or received (or caused to be sent and/or received) by mail or by private or interstate carrier, shipments of prescription opioids and related documents by mail or by private carrier affecting interstate commerce.

1859. Each Defendant manufactured, shipped, paid for, and/or received payment for prescription opioids, throughout the United States.

1860. Defendants used the internet and other electronic facilities to carry out their scheme and conceal the ongoing fraudulent activities. Specifically, Defendants made misrepresentations about their compliance with the statutes, regulations, and other laws requiring them to identify, investigate, and report suspicious orders of prescription opioids and/or diversion of the same into the illicit market.

1861. At the same time, Defendants misrepresented the superior safety features of their order monitoring programs, their ability to detect suspicious orders, their commitment to preventing diversion of prescription opioids, and their compliance with federal and state laws regarding the identification and reporting of suspicious orders of prescription opioids. Defendants utilized the internet and other electronic resources to exchange communications, to exchange information regarding prescription opioid sales, and to transmit payments and rebates/chargebacks.

1862. Defendants also communicated by U.S. Mail, by interstate facsimile, and by interstate electronic mail with each other and with various other affiliates, regional offices, regulators, distributors, and other third-party entities in furtherance of the scheme.

1863. The mail and wire transmissions described herein were made in furtherance of Defendants' scheme and common course of conduct to deceive regulators, the public, and Plaintiffs that Defendants were complying with their legal obligations to identify and report suspicious orders of prescription opioids all while Defendants were knowingly allowing millions of doses of prescription opioids to divert into the illicit drug market.

1864. Many of the precise dates of the fraudulent uses of the U.S. mail and interstate wire facilities have been deliberately hidden by Defendants and cannot be alleged without access to Defendants' books and records. However, Plaintiffs have described the types of, and in some instances, occasions on which the predicate acts of mail and/or wire fraud occurred. They include thousands of communications to perpetuate and maintain the scheme, including the things and documents described in the preceding paragraphs.

1865. Defendants did not undertake the practices described herein in isolation, but as part of a common scheme. Various other persons, firms, and corporations, including third-party entities and individuals not named as defendants in this Complaint, may have contributed to and/or participated in the scheme with Defendants in these offenses and have performed acts in furtherance of the scheme to increase revenues, increase market share, and /or minimize the losses for Defendants.

1866. The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of obtaining significant monies and revenues from the sale of their highly addictive and dangerous drugs. The predicate acts also had the same or similar results, participants, victims, and methods of commission. The predicate acts were related and not isolated events.

1867. The predicate acts all had the purpose of creating the opioid epidemic that substantially injured Plaintiffs' business and property, while simultaneously generating billion-dollar revenue and profits for Defendants. The predicate acts were committed or caused to be committed by Defendants

through their participation in the False Narrative Enterprise and in furtherance of its fraudulent scheme.

1868. As described above, Defendants were repeatedly warned, fined, and found to be in violation of applicable law and regulations, and yet they persisted. The sheer volume of enforcement actions against Defendants supports the conclusion that Defendants operated through a pattern and practice of willfully and intentionally omitting information from their mandatory reports.

1869. Each instance of unlawful activity alleged herein was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims. Defendants calculated and intentionally crafted their scheme to increase and maintain profits from unlawful sales of opioids, without regard to the effect such behavior would have on Arizona, its citizens, or Plaintiffs. Defendants were aware that Plaintiffs and others rely on Defendants to maintain a closed system of manufacturing and distribution to protect against the non-medical diversion and use of their dangerously addictive opioid drugs.

1870. By intentionally refusing to report and halt suspicious orders of their prescription opioids, Defendants engaged in a fraudulent scheme and unlawful course of conduct constituting a pattern of unlawful activity.

4. **Pattern of Unlawful Activity**

1871. Defendants' scheme described herein was perpetrated, in part, through multiple acts of mail fraud and wire fraud, and violations of statutes regulating the distribution of controlled substances, constituting a pattern of unlawful activity as described herein.

1872. The pattern of unlawful activity used by the False Narrative Enterprise likely involved thousands of separate instances of the use of the U.S. Mail or interstate wire facilities in furtherance of the unlawful False Narrative Enterprise.

1873. These communications included essentially uniform misrepresentations, concealments and material omissions regarding the beneficial uses and non-addictive qualities for the long-term treatment of chronic, non-acute and non-cancer pain, with the goal of profiting from increased sales of the Marketing Defendants' drugs induced by consumers', prescribers', regulators', and Plaintiffs' reliance on the Marketing Defendants' misrepresentations. Each of these fraudulent mailings and interstate wire transmissions constitutes an unlawful act, and, collectively, these violations constitute a pattern of unlawful activity, through which the Marketing Defendants, the Front Groups, and the KOLs defrauded and intended to defraud Plaintiffs. The Marketing Defendants devised and knowingly carried out an illegal scheme and artifice to defraud by means of materially false or fraudulent pretenses, representations, promises, or omissions of material facts regarding the safe, non-addictive, and effective use of opioids for long-term chronic, non-acute, and non-cancer pain. The Marketing Defendants and members of the False Narrative Enterprise knew that these representations contradicted the FDA-approved use these drugs and were not supported by actual evidence. The Marketing Defendants intended that that their common purpose and scheme to defraud would, and did, use the U.S. Mail and interstate wire facilities, intentionally and knowingly with the specific intent to advance and for the purpose of executing their illegal scheme. By intentionally concealing the material risks and affirmatively misrepresenting the benefits of using opioids for chronic pain to prescribers, regulators, and the public, including Plaintiffs, the Marketing Defendants, the Front Groups, and the KOLs engaged in a fraudulent and unlawful course of conduct constituting a pattern of unlawful activity. The Marketing Defendants' use of the U.S. Mail and interstate wire facilities to perpetrate the opioids' marketing scheme involved thousands of communications, publications, representations, statements, electronic transmissions, payments, including, *inter alia*:

a. Marketing materials about opioids, and their risks and benefits, which the Marketing Defendants sent to health care providers, such as hospitals transmitted through the internet and television, published, and transmitted to Front Groups and KOLs located across the country and the State;

b. Written representations and telephone calls between the Marketing Defendants and Front Groups regarding the misrepresentations, marketing statements, and claims about opioids, including the non-addictive, safe use of chronic long-term pain generally;

c. Written representations and telephone calls between the Marketing Defendants and KOLs regarding the misrepresentations, marketing statements and claims about opioids, including the non-addictive, safe use of chronic long-term pain generally;

d. E-mails, telephone, and written communications between the Marketing Defendants and the Front Groups agreeing to or implementing the opioids marketing scheme;

e. E-mails, telephone, and written communications between the Marketing Defendants and the KOLs agreeing to or implementing the opioids marketing scheme;

f. Communications between the Marketing Defendants, Front Groups, and the media regarding publication, drafting of treatment guidelines, and the dissemination of the same as part of the False Narrative Enterprise;

g. Communications between the Marketing Defendants, KOLs and the media regarding publication, drafting of treatment guidelines, and the dissemination of the same as part of the False Narrative Enterprise;

h. Written and oral communications directed to State agencies, federal and state courts, and private insurers throughout Arizona that fraudulently misrepresented the risks and benefits of using opioids for chronic pain; and

i. Receipts of increased profits sent through the U.S. Mail and interstate wire facilities - the wrongful proceeds of the scheme.

1874. In addition to the above-referenced predicate acts, it was intended by and foreseeable to the Marketing Defendants that the Front Groups and the KOLs would distribute publications through the U.S. Mail and by interstate wire facilities and, in those publications, claim that the benefits of using opioids for chronic pain outweighed the risks of doing so.

1875. Defendants' use of U.S. Mail and interstate wires in conduct related to the distribution of opioids includes, but is not limited to, the transmission, delivery, or shipment of the following by Defendants, and/or third parties that were foreseeably caused to be sent as a result of Defendants' illegal scheme, of the following:

a. The prescription opioids themselves;

b. Documents and communications that facilitated the manufacture, purchase, and sale of prescription opioids;

c. Defendants' government registrations;

d. Documents and communications that supported and/or facilitated Defendants' government registrations;

e. Defendants' records and reports that were required to be submitted to regulatory authorities;

f. Documents intended to facilitate the manufacture and distribution of Defendants' prescription opioids, including bills of lading, invoices, shipping records, reports, and correspondence;

g. Documents for processing and receiving payment for prescription opioids;

h. Payments from the Distributor Defendants to the Marketing Defendants;

i. Rebates and chargebacks from the Marketing Defendants to the Distributor Defendants;

j. Payments from the National Retail Pharmacies to the other Distributor Defendants;

k. Payments to Defendants' lobbyists through the PCF;

l. Payments to Defendants' trade organizations, like the HDA, for memberships and/or sponsorships;

m. Deposits of proceeds from Defendants' manufacture and distribution of prescription opioids; and

n. Other documents and things, including electronic communications.

1876. Defendants also participated in a pattern of violations of the federal Controlled Substances Act and analogous state common and statutory law by refusing to comply with their obligations under the law to report suspicious orders and prescribers.

1877. At all relevant times, Defendants, in violation of the above statutes, conducted (managed) or participated, directly or indirectly, in the conduct (management) of the False Narrative Enterprise, through a pattern of unlawful activity, by engaging in multiple, repeated, and continuous

acts of mail fraud, wire fraud, and violations of the CSA. Defendants transmitted electronic communications to designated persons for ostensibly legitimate purposes, but with the actual, unlawful purpose of engaging in an intentional scheme to defraud Plaintiffs, other hospitals, health care providers, patients and their families, and, in general, the American public.

5. **Consequences**

1878. By reason of the above-referenced violations of 18 U.S.C. § 1962(c)–(d), Plaintiffs were injured in their business or property within the meaning of 18 U.S.C. § 1964(c) and are entitled to assert this claim and to recover threefold the damages they sustained, as demonstrated at trial, and the cost of the suit, including reasonable attorneys' fees, as well as such other appropriate relief, as the Court may provide.

## XII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs ask that the Court:

A. Enter judgment against Defendants, jointly and severally, and in favor of Plaintiffs;

B. Award compensatory damages in an amount sufficient to fairly and completely compensate Plaintiffs for all damages; treble damages; punitive damages; pre-judgment and post-judgment interest as provided by law and at the highest legal rate;

C. Award such equitable relief against Defendants as the Court should find appropriate, including the costs of abatement and disgorgement of illicit proceeds;

D. Award Plaintiffs their cost of suit, including reasonable attorneys' fees as provided by law; and

E. Award such further and additional relief as the Court may deem just and proper under the circumstances.

## XIII. JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

Dated: September 14, 2021

Respectfully Submitted,

*/s/ Don Barrett*
John W. (Don) Barrett
**BARRETT LAW GROUP, P.A.**
P.O. Box 927
404 Court Square North
Lexington, Mississippi 39095
Tel: (662) 834-2488
Fax: (662) 834-2628
dbarrett@barrettlawgroup.com

Additional Counsel for Plaintiffs Who Will Seek Admission *Pro Hac Vice*:

David McMullan, Jr.
Richard Barrett
Sterling Aldridge
**BARRETT LAW GROUP, P.A.**
P.O. Box 927
404 Court Square North
Lexington, Mississippi 39095
Tel: (662) 834-2488
Fax: (662) 834-2628
dbarrett@barrettlawgroup.com
dmcmullan@barrettlawgroup.com
rrb@rrblawfirm.net
saldridge@barrettlawgroup.com

Bryan Whitney
Eric Atkinson
**WHITNEY WHITNEY BALDRIGE ATKINSON**
111 N. 4th St.
Kingman, AZ 86401
Telephone: 928-753-5295
brw@wwbalaw.com
eatkinson@wwbalaw.com

Warren Burns
Darren Nicholson
**BURNS CHAREST, LLP**
900 Jackson St., Suite 500
Dallas, Texas 75202
Telephone: (469) 904-4550
Facsimile: (469) 444-5002
wburns@burnscharest.com
dnicholson@burnscharest.com

Korey A. Nelson
Rick Yelton
Patrick Murphree
Leila Abu-Orf
**BURNS CHAREST, LLP**
365 Canal Street, Suite 1170
New Orleans, LA 70130
Telephone: (504) 799-2845
Facsimile: (504) 881-1765
knelson@burnscharest.com
ryelton@burnscharest.com
pmurphree@burnscharest.com
labuorf@burnscharest.com

Jonathan W. Cuneo
Monica Miller
Evelyn Li
Mark H. Dubester
David L. Black
Jennifer E. Kelly
**CUNEO GILBERT & LADUCA, LLP**
4725 Wisconsin Avenue, NW, Suite 200
Washington, DC 20016
Telephone: (202)789-3960
jonc@cuneolaw.com
monicam@cuneolaw.com
evelyn@cuneolaw.com
mark@cuneolaw.com
dblack@cuneolaw.com
jkelly@cuneolaw.com

Steve Martino
**TAYLOR MARTINO, P.C.**
51 St. Joseph St.
Mobile, AL 36602
Telephone: (251) 433-3131
SteveMartino@taylormartino.com

Gerald M. Abdalla, Jr.
**ABDALLA LAW, PLLC**
602 Steed Road, Suite 200
Ridgeland, Mississippi 39157
Telephone: (601) 487-4590
jerry@abdalla-law.com

*Attorneys for Plaintiffs*

# APPENDIX

## GLOSSARY OF ABBREVIATIONS

| Abbreviation | Definition |
|---|---|
| AAFP | American Association of Family Physicians |
| AAPM | American Pain Society |
| ABDC | Defendant AmerisourceBergen Drug Corporation |
| ACPA | American Chronic Pain Association |
| ADF | Abuse-deterrent formulations |
| AfPA | Alliance for Patient Access |
| AGS | American Geriatrics Society |
| ANDA | Abbreviated New Drug Application |
| APF | American Pain Foundation |
| API | Active pharmaceutical ingredient |
| ARCOS | Automation of Reports and Consolidated Orders System |
| CDC | U.S. Centers for Disease Control and Prevention |
| CME | Continuing Medical Education |
| CNCP | Chronic non-cancer pain |
| CO*RE | Collaborative for Opioids REMS Education |
| CSA | Controlled Substances Act |
| CSO | Controlled Substance Override |
| CSRA | Corporate Security & Regulatory Affairs Department |
| DC | Distribution center |
| DEA | Drug Enforcement Administration |
| EMTALA | Emergency Medical Treatment and Active Labor Act |
| FSMB | Federation of State Medical Boards |
| GFD | Good Faith Dispensing |
| HDA | Healthcare Distribution Alliance |
| HDMA | Healthcare Distribution Management Association |
| ISO | Immediate suspension order |
| JCAHO | Joint Commission of the Accreditation of Healthcare Organizations |
| KOL | Key opinion leader |
| LAO | Long-acting opioid |
| MME | Morphine milligram equivalent |
| MOA | Memorandum of Agreement |
| NACDS | National Association of Chain Drugstores |
| NAS | Neonatal abstinence syndrome |
| NDA | New Drug Application |
| NEJM | New England Journal of Medicine |
| NIPC | National Initiative on Pain Control |
| NPC | National Pharmaceutical Council |
| NPEC | National Pain Education Council |
| NSAID | Nonsteroidal anti-inflammatory drugs |
| NWDA | National Wholesale Druggists Association |

| | |
|---|---|
| OMP | Order Monitoring Program |
| OUD | Opioid use disorder |
| PCF | Pain Care Forum |
| PDMP | Prescription Drug Monitoring Program |
| PDQ | Pretty darn quick |
| PPSG | University of Wisconsin Pain & Policy Study Group |
| REMS | Risk Evaluation and Mitigation Strategy |
| RWJF | Robert Wood Johnson Foundation |
| SOAPP | Screener and Opioid Assessment for Patients with Pain |
| SOM or SOMS | Suspicious order monitoring programs or systems |
| SOP | Standard Operating Procedure |
| TDGFD | Target Drug GFD (Good Faith Dispensing) |
| USAO-EDNY | U.S. Attorney's Office for the Eastern District of New York |
| USAO-NJ | U.S. Attorney's Office for the District of New Jersey |
| USPF | U.S. Pain Foundation |
| UW-PPSG | Pain and Policy Study Group of the University of Wisconsin |
| VA | Veterans Administration |
| WEC | Defendant Walgreen Eastern Co., Inc. |
| WHO | World Health Organization |